1  Leslie Schwaebe Akins (Bar No. 138678)
   Dennis R. Villavicencio (Bar No. 166300)
2  AKINS & VILLAVICENCIO, LLP
   P.O. Box 131253
3  Carlsbad, California 92013
   (760) 931-2920 telephone
4  (760) 603-0547 facsimile

5  Attorney for Plaintiff and Creditor
   Alfonso Fiero

6

| FILED |
| JAN − 8 2007 |
| CLERK, U.S. BANKRUPTCY COURT CENTRAL DISTRICT OF CALIFORNIA BY _____ |

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10 ALFONSO FIERO, an individual, as        CASE NO.    ADV06-01971-BB
   Assignee of the Judgment issued April               LA 01-26497-BB
11 6, 1999 in favor of Judgment Creditor
   FIERO BROTHERS, INC., Assignor,        **FIRST AMENDED** COMPLAINT TO
12 pursuant to the Assignment dated        REOPEN BANKRUPTCY OF DEBTOR
   March 1, 2006,                          CERY PERLE TO DETERMINE
13                                         DISCHARGEABILITY OF COMPLAINT
                         Plaintiff,        BASED ON FRAUD, DEFALCATION BY
14                                         FIDUCIARY, WILFUL MISCONDUCT,
        v.                                 SECURITIES FRAUD JUDGMENT
15
   CERY B. PERLE, an individual,           (11 U.S.C. §§ 523(a)(2)(A),(a)(4), (a)(6)
16                                         and (a)(19))
                         Defendant,
17                                         Hon. Judge Sheri Bluebond
                                           Date Reopened: 9/13/06
18

19        Plaintiff and creditor ALFONSO FIERO ("Plaintiff"), as assignee of the Judgment

20 entered in the Los Angeles Superior Court on April 1, 1999 in case no. BS 055659 in favor

21 of FIERO BROTHERS, INC. ("FIERO BROTHERS"), against Defendant CERY PERLE

22 ("Defendant"), et al, pursuant to the Assignment between Plaintiff and FIERO BROTHERS

23 dated March 1, 2006, by Leslie Schwaebe Akins, Esq., of AKINS & VILLAVICENCIO, LLP,

24 his undersigned counsel, brings forth his First Amended Complaint against Defendant and

25 hereby alleges as follows:

26 / / /

27 / / /

28 / / /

1    1.    The Debtor CERY B. PERLE (herein, "PERLE") filed a Chapter 7 Petition

2    for Relief, Case Number LA 01-26497-BB.

3    2.    This is a core proceeding over which this court has jurisdiction under title

4    28 U.S.C. § 157(b).

5    3.    On September 17, 1998 the NASD issued its arbitration award in Case

6    No. 98-00587 in favor of FIERO BROTHERS and jointly and severally against PERLE,

7    Waldron & Co. ("Waldron") in the amount of $350,000. On March 17, 1999, FIERO

8    BROTHERS' Petition to Confirm Arbitration Award was granted by the Los Angeles

9    Superior Court in Case No. BS 055659. On April 6, 1999, Judgment was issued in the

10    Los Angeles Superior Court in Case No. BS 055659 in the amount of $350,000.00

11    jointly and severally against Waldron & Co., Inc. and PERLE. On January 6, 2000 the

12    Los Angeles Superior Court issued an Abstract of Judgment in the amount of $350,215

13    in favor of FIERO BROTHERS against Waldron and PERLE. The NASD Arbitration

14    Award and resulting Judgment were based on securities fraud in violation of Section

15    10b of the Securities Exchange Act and SEC Rule 10b-5, common law fraud in the

16    purchase and sale of securities, namely that PERLE and his broker-dealer firm Waldron

17    & Co., Inc. engaged in artificial market making activity, parking arrangements,

18    guarantees against loss, and fraudulent purchasing in connection with Shopping.com

19    (IBUY") stock (hereafter, "the Debt").

20    4.    PERLE is the Debtor herein and is also the judgment Defendant in the

21    cited Los Angeles Superior Court action.  Plaintiff is a creditor of PERLE.

22    5.    This is an adversary proceeding to determine the dischargeability of the

23    Debt resulting from PERLE's and Waldron's (I) the violation of Section 10b of the

24    Securities Exchange Act of 1934 and SEC Rule 10b-5the Federal securities laws (as

25    that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934 [15

26    USCS § 78c(a)(47)]), any of the State securities laws, or any regulation or order issued

27    under such Federal or State securities laws; and/ or (ii) common law fraud, deceit, or

28    / / /

1   manipulation in connection with the purchase or sale of a security, and/ or (iii)

2   defalcation by a fiduciary, and/ or wilful misconduct.

3       6.      In February, 1998,FIERO BROTHERS filed its Statement of Claim and

4   Demand for Arbitration against Respondents with the NASD. FIERO BROTHERS filed

5   their Second Amended Statement of Claim on March 18, 1998. The FIERO

6   BROTHERS' Amended Statement of Claim charged that Respondents, while acting as

7   fiduciaries, fraudulently obtained FIERO BROTHERS' property by purchasing shares of

8   Shopping.Com common stock for FIERO BROTHERS at prices that were greater then

9   the prevailing market rates for said stock, and by charging FIERO BROTHERS

10  excessive mark ups in the purchase of said stock, which resulted in FIERO

11  BROTHERS being defrauded out of hundreds of thousands of dollars, with said monies

12  being wrongfully converted by Respondents. Additionally, FIERO BROTHERS asserted

13  that Respondents through their control of virtually all of the Shopping.Com stock, and

14  through their use of fraudulent misrepresentations, omissions of facts, and deceptive

15  practices, fraudulently manipulated the market price and trading volume for

16  Shopping.Com stock, engaged in secret transactions, and took other illegal actions

17  aimed to mitigate their own personal losses, to the detriment of Shopping.Com

18  shareholders, including FIERO BROTHERS.

19      7.      FIERO BROTHERS were not informed that PERLE filed for bankruptcy

20  relief, and was not included in PERLE's list of creditors. FIERO BROTHERS only

21  learned of PERLE's bankruptcy in late 2005.

22  THE PARTIES TO THE UNDERLYING LAWSUIT

23      8.      FIERO BROTHERS was a registered securities broker dealer and a

24  member of the National Association of Securities Dealers, Inc. ("NASD"), with offices

25  located in New York, New York.

26      9.      Respondent Waldron & Co., Inc. ("Waldron") was a registered securities

27  broker dealer and a member of NASD, with offices located in Irvine, California.

28  / / /

10. PERLE was the president and principal of Waldron.

11. Respondent Ed Harris was an undisclosed principal of Waldron.

12. Respondent Wedbush acted as the clearing agent for Waldron.

13. Respondent Ed Wedbush was a principal of Wedbush.

### FACTS APPLICABLE TO ALL CLAIMS

14. Among other activities in which it engaged in, FIERO BROTHERS was a market maker for numerous securities trading of the NASDAQ system. As such, FIERO BROTHERS was responsible for maintaining an orderly market in each security issue for which it made a market, and as such was obligated to purchase or sell securities in each such issue for its own account as market conditions warranted. As a result, a market maker such as Fiero Brothers must occasionally sell shares that it does not own. This is known as taking a short position.

15. In 1998, FIERO BROTHERS had a short position in Shopping.Com stock (ticker "IBUY"). Waldron was an underwriter of IBUY shares and the principal market maker of IBUY shares. IBUY was a bulletin board security.

16. Beginning at or about the time of IBUY's initial public offering, Waldron supported the price of IBUY shares in the marketplace through secret practices, undisclosed to FIERO BROTHERS, that included artificial market making activity, parking IBUY shares in its customers' accounts, guarantees against loss and fraudulent purchasing. Neither PERLE nor Waldron disclosed to FIERO BROTHERS the fact that they were supporting the price of IBUY stock or were engaging in any manipulative activities.

17. In or about January 1998, the supply of IBUY shares exceeded the demand for IBUY stock, and the price began to decline. Rather than allow the price of IBUY to fall, Waldron purchased hundreds of thousands of shares of IBUY for its own account. When Waldron's net capital was insufficient to purchase any more shares of IBUY stock, Waldron began "parking" (i.e., selling IBUY shares to Waldron's customers) the IBUY shares in customer accounts so that it could prop up the price for IBUY stock.

By February 1998, Waldron, its customers, and its customers' accounts that it controls at other broker dealers, controlled and /or had a beneficial interest in nearly the entire public float of IBUY stock.

18.    Respondent Harris, an undisclosed principal of Waldron, purchased 500,000 shares of IBUY for his own account and for accounts that he controlled. On February 12, 1998, Waldron also maintained in inventory approximately 400,000 shares of IBUY. Waldron's customers owned and controlled hundreds of thousands of shares of IBUY, acquired when Waldron took IBUY public.

19.    Because of Waldron's concentrated interest in IBUY stock, both directly through its principal's ownership and its own inventory account, and indirectly through the accounts of Waldron's customers, it was in Waldron's and PERLE's financial interest to continue supporting the price of IBUY stock until their personal and corporate positions were liquidated, and their exposure to a decline for IBUY stock was reduced. Therefore, at the direction of PERLE, Waldron continued to support the market price for IBUY stock, increasing the purchases of IBUY stock in the accounts that Waldron directly and indirectly controlled. However, this practice jeopardized Waldron's ability to meet its net capital requirements.

20.    As it became more expensive for Waldron to continue supporting the market price for IBUY shares in its inventory and customer accounts, PERLE, as president and control person of Waldron 1)) improperly directed Waldron's trading room to not accept sell orders for IBUY shares; and 2) pressured registered representatives to purchase IBUY shares for their customers without regard to suitability, in violation of the NASD Code of Conduct, Section 10b of the Securities Exchange Act, and state blue sky laws. Some registered representatives complied with PERLE's directives; others did not and left Waldron, selling their clients out of IBUY stock once they obtained alternative employment.

21.    As the brokers sold the IBUY stock parked in their clients' accounts, the price for IBUY shares continued to fall, Waldron ran into problems meeting its margin

1  and net capital requirements, and experienced a troubling number of Reg-T extension

2  and sell outs.  Upon discovering these facts Wedbush, which also faced financial

3  exposure if Waldron failed, began engaging in illegal acts to protect itself.

4      22.    Wedbush conspired with PERLE to manipulate the price of IBUY shares

5  and conduct "buy-ins" of IBUY stock at an artificially inflated price, thereby creating

6  profit for Waldron.  Wedbush and Waldron acted together to effectuate the scheme.

7      23.    Waldron convinced other market makers of IBUY to raise their bids in

8  exchange for Waldron improperly agreeing to buy said stock from the market makers at

9  a higher price, thereby creating an appearance of upward momentum.  By virtue of this

10  orchestrated activity, Waldron and PERLE artificially created the appearance of upward

11  momentum in the price of IBUY shares.

12      24.    On four separate occasions, Waldron, at PERLE's direction, executed

13  buy-ins against FIERO BROTHERS for shares of IBUY at prices that were in excess of

14  the artificially inflated market price for IBUY stock. These fraudulent buy-ins are:

| DATE | # SHARES | MARKET PRICE | BUY-IN PRICE | EXCESS |
|------|----------|--------------|--------------|--------|
| 2/12/98 | 35,000 | 21 5/8- 21 3/4 | 25 1/8 | $ 119,306 |
| 3/6/98 | 25,455 | 25 15/16- 25 31/32 | 29 | $ 77,637 |
| 3/11/98 | 36,428 | 29 1/4- 29 5/16 | 36 | $ 244,067 |
| 3/16/98 | 38,050 | 21 13/16 - 21 7/8 | 26 ½ | $ 176,932 |

20  The 2/12/98 and the 3/6/98 buy-ins were not reported by Waldron or Wedbush.

21      25.    Before each buy-in, Waldon would act to move the artificial price of IBUY

22  even higher than its then outrageous price.  Once the price was sufficiently high to

23  make up Waldron's net capital, Wedbush and Waldron cashed in on the scheme by

24  buying in above the artificial price they created.  Importantly- since Waldron already

25  controlled the majority of the IBUY shares - Waldron did nothing more than sell shares

26  to itself at prices significantly higher than what it originally paid.  Thus, the buy-ins were

27  not completed in arms-length transactions; they were fictitious trades in which Waldron

28  / / /

1    purported to sell to itself intended solely to drive up the price of IBUY stock. Within

2    minutes of the buy-ins, the price for IBUY shares fell dramatically.

3        26.    PERLE and the other Respondents withheld from FIERO BROTHERS the

4    fact that they were artificially manipulating the price of IBUY stock, and that FIERO

5    BROTHERS was being charged excessive prices for the IBUY stock bought in by

6    Waldron and PERLE for FIERO BROTHERS. Further, PERLE and the other

7    Respondents participated in the fraud by such actions that included polling market

8    makers for "guaranteed delivery" of IBUY shares knowing full well that PERLE's broker-

9    dealer, Waldron, had possession of the majority of IBUY stock.

10       27.    When the price of IBUY shares fell, Wedbush directed Waldron to

11   liquidate half of its proprietary position before the opening of the market which it did at

12   $20.00 per share), and prevented Waldron from making a market in IBUY shares,

13   causing the price for IBUY shares to fall by approximately thirty percent (30%). Without

14   Waldron supporting IBUY stock, the price declined to $16.00 per share on February 13,

15   1998.

16       28.    Waldron recommenced making a market in IBUY stock on February 17.

17   1998. By 9:30 am on February 18, 1998, Waldron and PERLE had artificially raised the

18   share price for IBUY stock to $22.0625. Later Waldron and PERLE were able to

19   artificially raise the share price for IBUY stock to $32.5.

20       29.    On or about March 11, 1998, another securities broker dealer Chatfield

21   Dean & Co. published a research report that issued a "sell" recommendation for IBUY

22   stock, claiming that the stock  had an "exuberant valuation" at $29.+ per share, and was

23   estimated that $5.00 per share "would be more appropriate." Another research report

24   initiated a sell recommendation stating that Waldron completely dominated and

25   controlled almost every share of IBUY and could basically place the price fro IBUY

26   stock "anywhere it wants." Almost immediately, the price for IBUY stock began to

27   rapidly decline.

28   / / /

30.    To prop up the price, on March 18, 1998, PERLE and Waldron purchased 600,000 shares of IBUY at prices ranging between $27 and $30 per share. However, this resulted in Waldron violating its net capital requirements, causing Wedbush to terminate its clearing agent agreement with Waldron. Without a clearing agent, Waldron could not support the price for IBUY stock, causing a further price decline.

31.    On March 16, 1998, in an effort to limit its own exposure for the capital losses caused by Waldron's fraudulent manipulation of IBUY, Wedbush, without FIERO BROTHER's authorization or consent, covered (i.e., bought-in against) FIERO BROTHER's short IBUY position at a price five points above the then falling market price for IBUY shares. This fraudulent transaction was kept private and was not reported to the tape.

32.    Since February 12, 1998, there were eight fraudulent buy-ins of IBUY shares by PERLE and Waldron and Wedbush, completed at prices above the then prevailing market price for IBUY shares. At PERLE's direction and control, Waldron used the above-market buy-in scheme, and the unlawful profits it received from buying in IBUY stock for FIERO BROTHERS at above-market prices, to finance its upward manipulation of the price of IBUY shares; PERLE, Waldron and Wedbush continued said fraudulent scheme to mitigate its losses and stay in business.

33.    PERLE's and the other Respondents' manipulative and deceptive acts violated Rule 11810(c)1C) of the NASD Uniform Practice Code which states: "[Where a buy-in is executed] members must be prepared to defend the price at which the "buy-in" is executed relative to the current market at the time of the "buy-in." PERLE's and Respondents' conduct also violated NASD Code of Conduct Rule 2320, which requires that in any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market

/ / /

1 | conditions. FIERO BROTHERS claim that as a result of the fraudulent buy-ins at over-
2 | market prices, FIERO BROTHERS was deprived of approximately $600,000.

3 |     34.    Respondents' foregoing acts violated 17 CFR 240.10b-5 "when in
4 | connection with the Buy-In of IBUY they acted together in a common scheme to
5 | manipulate the price of IBUY shares and to defraud FIERO BROTHERS."
6 | Respondents' acts were intended to defraud FIERO BROTHERS, were completed as
7 | planned, and resulted in FIERO BROTHERS being deprived of approximately $600,000
8 | in monies and profits due FIERO BROTHERS.

9 |     35.    Under California law, stock brokers and their employing broker-dealers
10 | are fiduciaries of their clients. Further, under New York law, stock-brokers and their
11 | employing broker-dealers can be fiduciaries where they exercise discretion regarding a
12 | customer's account. By fraudulently buying in IBUY stock for FIERO BROTHERS at
13 | fraudulent and above-market prices, Waldron and Wedbush were fiduciaries of FIERO
14 | BROTHERS; and PERLE and Respondent Harris, as the presidents and control
15 | persons of Waldron and Wedbush, were also fiduciaries of FIERO BROTHERS.
16 | Respondents had a fiduciary duty to FIERO BROTHERS to execute buy-ins and
17 | purchase IBUY shares at the best available price. Since Waldron and Wedbush
18 | dominated and controlled IBUY shares, they had a fiduciary duty to FIERO BROTHERS
19 | to not charge more than a 5% mark-up on IBUY shares they sold out of their proprietary
20 | accounts.

21 |     36.    The prices that PERLE and the other Respondents charged FIERO
22 | BROTHERS in buying in the IBUY stock were marked-up significantly from Waldron's
23 | contemporaneous cost for IBUY shares, and the difference is money properly belonging
24 | to FIERO BROTHERS that was wilfully and unlawfully converted by PERLE and
25 | Respondents, in violation of law.

26 |     37.    As a result of these unlawful, fraudulent and excessive mark-ups, PERLE
27 | and the other Respondents breached their fiduciary duties to FIERO BROTHERS,
28 | / / /

1  causing damages that exceeded $600,000 through the wilful conversion by PERLE and

2  Respondents.

3       38.     FIERO BROTHERS filed and served its Second Amended Statement of

4  Claim on March 18, 1998, a true and correct copy of which is attached hereto as

5  **Exhibit "A**."

6       39.     Between September 1-4, 1998, a full evidentiary hearing took place in the

7  subject NASD arbitration hearing regarding FIERO BROTHERS' dispute with the

8  named Respondents.

9       40.     On September 17, 1998, the NASD issued an arbitration award in favor of

10  FIERO BROTHERS as follows:

11                          <u>CASE SUMMARY</u>

12       Claimant alleged that Respondent Waldron & Co., Inc. engaged in artificial market

13  making activity, parking arrangements, guarantees against loss, and fraudulent purchasing

14  in connection with Shopping.com (IBUY") stock.

15       Claimant alleged that Respondent Wedbush Morgan Securities, Inc. and Edward

16  Wedbush conspired to manipulate the price of IBUY and conduct a buy-in at an artificially

17  inflated price.

18       Respondent Waldron & Co., Inc. counter-claimed against Fiero Bros., Inc. alleging

19  corrupt market practices and perversion of the arbitration process.  Respondent Waldron

20  & Co., Inc.  Cross-claimed against Third Party Respondent Key West Securities, Inc.

21  alleging that Key West Securities acted in collusion with FIERO BROTHERS, Inc.

22  Respondents denied each and every allegation of wrongdoing set forth in the Claimant's

23  Statement of Claim.

24                          <u>RELIEF REQUESTED</u>

25                              (Omitted)

26              <u>OTHER ISSUES CONSIDERED AND DECIDED</u>

27                              (Omitted)

28                              <u>AWARD</u>

---

1. **Respondents Waldron & Co., Inc., CERY Perle and Ed Harris are jointly and severally liable to and shall pay Claimant the sum of $350,000.00 in** compensatory damages.

2. Respondent Wedbush Morgan Securities is liable to and shall pay Claimant the sum of $50,000.00 in compensatory damages.

3. All Respondents' Counter-claims are dismissed in their entirety;

4. Each party shall bear its own costs, including attorneys fee.

5. All claims for punitive damages are denied.

A true and accurate copy of the Arbitration Award is attached hereto as **Exhibit "B."**

41.    On February 11, 1999 FIERO BROTHERS filed its Petition to Confirm Arbitration Award As To Respondents Waldron & Co., Inc., Cery Perle, Wedbush Morgan Securities, Inc., Ed Wedbush, and Key West Securities, Inc. And To Vacate Award As To Respondent Ed Harris ("Petition to Confirm Arbitration Award").

42.    On March 17, 1999, FIERO BROTHERS' Petition to Confirm Arbitration Award was granted.

43.    On April 6, 1999, Judgment was issued in the Los Angeles Superior Court in Case No. BS 055659 in the amount of **$350,215.00** against Waldron & Co., Inc. and Cery Perle. A true and correct copy of the April 6, 1999 Judgment is attached hereto as **Exhibit "C"**.

44.    On January 6, 2000 the Los Angeles Superior Court issued an Abstract of Judgment in the amount of **$350,215** in favor of FIERO BROTHERS against Waldron and PERLE. A true and correct copy of the January 6, 2000 Abstract of Judgment is attached hereto as **Exhibit "D"**.

45.    In November 2000, PERLE's broker-dealer, Waldron & Co., Inc. (CRD # 868, Irvine, California) was expelled from NASD membership. The sanction was based on findings that the firm executed buy-ins of IBUY stock when the firm controlled the float of the stock. The findings also stated that the buy-ins were executed by having the firm supply the stock for the buy-ins at prices that far exceeded the inside ask price at

1  the time of the transactions, resulting in unfair profits for the firm. (NASD Case #

2  CAF990023)

3      46.    In or about May 2001, PERLE was barred from association with any

4  NASD member in any capacity.

5      47.    On March 1, 2006, FIERO BROTHERS assigned the Judgment to

6  Plaintiff. A true and correct copy of the Assignment of Asset is attached hereto as

7  **Exhibit "E"**.

8                                    I.

9                    **FIRST CAUSE OF ACTION**

10          **(DETERMINATION OF DISCHARGEABILITY BASED ON FRAUD,**

11      **FRAUDULENT PRETENSE AND FRAUDULENT MISREPRESENTATION**

12                    **11 U.S.C. § 523(a)(2)(A))**

13      48.    Plaintiff incorporates paragraphs 1 through 47, above, inclusive, as though

14  fully set forth at this point.

15      49.    By using FIERO BROTHER's IBUY stock and assets in its' Waldron account

16  to artificially manipulate the market of IBUY stock, parking IBUY stock into FIERO

17  BROTHER's account, by failing comply with the best execution policies of the NASD,

18  PERLE, directly and as the control person and president of his former broker-dealer firm

19  Waldron & Co., committed manipulative or deceptive acts involving the purchase and sale

20  of securities. The dates of each of these fraudulent buy-ins are as follows:

21  The counter-party to the buy-in was Waldron; the beneficiaries of these fraudulent

22  transactions were PERLE and Waldron.

23      50.    PERLE, individually and in concert with others, committed the manipulative

24  and deceptive acts in furtherance of their scheme to defraud FIERO BROTHERS and their

25  other customers, and to obtain their monies through false pretenses by falsely creating an

26  active market and an artificially priced market for IBUY stock for their own financial gain and

27  benefit, knowing full well that without their fraudulent actions the price for IBUY stock would

28  significantly drop and substantially harm PERLE and the other Respondents who held large

1  positions in IBUY stock.  Through fraud and false pretenses PERLE and the other

2  Respondents wrongfully convert monies and property properly belonging to FIERO

3  BROTHERS for PERLE's and his co-conspirator's own personal gain.

4      51.    PERLE, individually and in concert with the other Respondents, engaged in

5  the manipulative and deceptive acts with the intent to defraud and deceive FIERO

6  BROTHERS.

7      52.    At all times relevant to this complaint, FIERO BROTHERS was ignorant of the

8  true facts, was ignorant of PERLE's and the other Respondents' manipulative and deceptive

9  acts, and relied upon their being licensed securities broker-dealers and brokers, acting in

10  compliance with all federal and state laws and regulations, as well as the rules and

11  regulations of the NASD, as set forth in the NASD Manual, including the Code of Conduct.

12      53.    Had FIERO BROTHERS known or been informed that PERLE and the other

13  Respondents were artificially manipulating the market for IBUY stock, were parking IBUY

14  stock into FIERO BROTHERS' account, were purchasing and selling IBUY stock for FIERO

15  BROTHERS at above-market or below-market prices, then FIERO BROTHERS would not

16  have entrusted its money and IBUY shares to PERLE and his firm Waldron & Co.

17      54.    As a direct and proximate result of PERLE's manipulative and deceptive acts,

18  FIERO BROTHERS suffered damages, for which it was awarded $350,000 in its NASD

19  arbitration proceeding.

20      55.    FIERO BROTHERS has since confirmed the NASD Arbitration Award in the

21  Los Angeles Superior Court, and had judgment entered, with an abstract of judgment filed

22  on January 6, 2000.

23      56.    As a consequence of PERLE's conduct, Plaintiff is entitled to a determination

24  that the Debt owed to it in the sum of $350,215 plus interest at the rate of 10% per annum

25  is nondischargeable under section 523(a)(2) of the United States Bankruptcy Code.

26  / / /

27  / / /

28                                    II.

FIRST AMENDED COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY

13

## SECOND CAUSE OF ACTION

## (DETERMINATION OF DISCHARGEABILITY BASED ON

## DEFALCATION OF FIDUCIARY)

57.     Plaintiff reincorporates by reference herein paragraphs 1 through 56, inclusive, above, as though fully set forth at this point.

58.     PERLE is indebted to Plaintiff in the sum of $ 350,215 on a debt for fraud or defalcation or both while acting in a fiduciary capacity as a result of the following events:

A.     PERLE was the president, principal and a control person of Waldron & Co., Inc., a registered broker-dealer and a member of the National Association of Securities Dealers, Inc. ("NASD"). FIERO BROTHERS is a registered broker-dealer and a member of the NASD.

B.     In 1998, both Waldron and FIERO BROTHERS made a market in Shopping.Com (IBUY) stock.

C.     In February 1998, FIERO BROTHERS held a short position in IBUY stock; whereas Waldron, in its inventory account and in accounts that it controlled, and in the accounts of its customers, controlled virtually all of the public float for IBUY.

D.     In February and March, 1998, Waldron, as the underwriter of the IBUY public offering, the primary market maker of IBUY stock, and holder and controller of virtually all of the public float of IBUY stock, acting as broker, "bought-in" thousand of shares of IBUY stock for FIERO BROTHERS (to reduce or close open short positions held by FIERO BROTHERS) at prices that were far in excess of the then prevailing market price for IBUY, and engaged in fictitious trades of IBUY stock whereby it diverted the profit from FIERO BROTHERS to itself.

/ / /

E.     Additionally, in order to control and maintain the support price or artificially

1    increase the demand and the price for IBUY stock, Waldron and its

2    principal PERLE, engaged in a scheme, aided by Wedbush, to

3    fraudulently manipulate the market for IBUY shares, create an artificial

4    increasing price momentum for said stock, and create the appearance of

5    an active market for IBUY.

6    59.    PERLE was authorized by FIERO BROTHERS to cover its short position in

7    IBUY stock in compliance with all rules and regulations of the NASD and all federal and

8    state statutes and regulations regulating the securities markets.  However, by using

9    Fiero Brother's monies and IBUY stock in a manner not authorized by FIERO

10    BROTHERS for PERLE's and the other Respondents' personal and own financial needs

11    and investments, PERLE and Respondents breached their fiduciary duties to FIERO

12    BROTHERS.

13    60.    PERLE, while Fiero Brother's fiduciary, committed either embezzlement or

14    larceny in using and retaining some or all of these monies; thus creating a debt to

15    FIERO BROTHERS equal to the monies wrongfully and unlawfully retained by PERLE

16    and the other Respondents from the buy ins of IBUY stock for FIERO BROTHERS at

17    excessive and above-market prices, which debt is nondischargeable under 11 USCS §

18    523(a)(4). *In re Reilly* (1986, BC DC Hawaii) 68 BR 545.

19    61.    Waldron and PERLE engaged in these fraudulent and illegal acts and

20    schemes without FIERO BROTHERS' knowledge.

21    62.    As a direct and proximate result of Waldron and PERLE's wrongful acts,

22    FIERO BROTHERS was deprived of its property in the form of money and stock in

23    excess of $600,000.

24    63.    Waldron and PERLE's fraudulent and wrongful acts violated NASD Rule

25    11810(c)(1)© of the NASD Uniform Practice Code.  Further, such wrongful conduct

26    constitutes securities fraud under 17 CFR 240.10b-5 which states:

27    / / /

28    It shall be unlawful for any person, directly or indirectly, by the use of any

1   means or instrumentality of interstate commerce, or of the mails or of any

2   facility of any national securities exchange,

3   (a) To employ any device, scheme, or artifice to defraud,

4   (b) To make any untrue statement of a material fact or to omit to state a

5   material fact necessary in order to make the statements made, in the light

6   of the circumstances under which they were made, not misleading, or

7   ©) To engage in any act, practice, or course of business which operates or

8   would operate as a fraud or deceit upon any person, in connection with the

9   purchase or sale of any security.

10   64.    The debt of $350,215 owed from PERLE to Plaintiff is nondischargeable

11   under section 523(a)(4) of the United States Bankruptcy Code.

12   **III.**

13   **(DETERMINATION OF DISCHARGEABILITY OF CLAIM**

14   **BASED ON DEBTOR'S WILFUL MISCONDUCT)**

15   65.    Plaintiff reincorporates by reference herein paragraphs 1 through 64,

16   inclusive, above, as though fully set forth at this point.

17   66.    PERLE and his firm Waldron converted the excess proceeds from its buy-

18   ins of IBUY stock for FIERO BROTHERS at excessive and above-market prices for their

19   own improper uses and to mitigate their own trading losses in IBUY stock. By unlawfully

20   converting Fiero Brother's property, a debt was created in Fiero Brother's favor which is

21   nondischargeable in bankruptcy pursuant to 11 USCS § 523(a)(6).

22   67.    PERLE's and Waldron's unlawful conversion of Fiero Brother's property

23   was done without its knowledge or consent, and was done intentionally and without

24   justification and excuse, to Fiero Brother's injury, and constitutes willful and malicious

25   injury within meaning of 11 USCS § 523(a)(6).

26   / / /

27   / / /

28   68.    As a direct and proximate result of Waldron and PERLE's wrongful acts,

1  FIERO BROTHERS was deprived of its property in the form of money and stock in excess

2  of $600,000.

3      69.    The debt of $350,215 owed from PERLE to Plaintiff is nondischargeable

4  under section 523(a)(6) of the United States Bankruptcy Code.

5                                          III.

6        **(DETERMINATION OF DISCHARGEABILITY OF CLAIM BASED ON**

7      **JUDGMENT ARISING FROM FRAUD IN PURCHASE AND SALE OF SECURITIES)**

8      70.    Plaintiff reincorporates by reference herein paragraphs 1 through 69,

9  inclusive, above, as though fully set forth at this point.

10     71.    11 USCS § 523(a)(19) provides:

11     (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title [11

12     USCS § 727, 1141, 1228(a), 1228(b), or 1328(b)] does not discharge an individual debtor

13     from any debt–

14         (19) that--

15             (A) is for--

16                 (I) the violation of any of the Federal securities laws (as that term is defined

17             in section 3(a)(47) of the Securities Exchange Act of 1934 [15 USCS §

18             78c(a)(47)]), any of the State securities laws, or any regulation or order issued

19             under such Federal or State securities laws; or

20                 (ii) common law fraud, deceit, or manipulation in connection with the

21             purchase or sale of any security; and

22             (B) results, before, on, or after the date on which the petition was filed, from--

23                 (I) any judgment, order, consent order, or decree entered in any Federal or

24             State judicial or administrative proceeding;

25                 (ii) any settlement agreement entered into by the debtor; or

26  / / /

27  / / /

28                 (iii) any court or administrative order for any damages, fine, penalty, citation,

1    restitutionary payment, disgorgement payment, attorney fee, cost, or other

2    payment owed by the debtor.

3    72.    In February 1998, FIERO BROTHERS filed its Demand for Arbitration

4  against PERLE with the National Association of Securities Dealers, Inc. for damages

5  sustained in connection with PERLE's unlawful and fraudulent buy-in of IBUY stock for

6  Fiero Brother at excessive and at above-market prices, with PERLE and Waldron

7  converting the excess above-market price generated from these buy-ins for their own

8  financial gain and benefit.  Plaintiff's Second Amended Statement of Claim filed March

9  1998 pleaded three claims against PERLE and its firm Waldron & Co., Inc. for Violation

10  of NASD Code of Conduct Rule 11810, Breach of Fiduciary Duty, and Violation of

11  Section 10b and SEC Rule 10b-5.

12    73.    Between September 1-4, 1998, a full evidentiary hearing took place in the

13  subject NASD arbitration hearing regarding FIERO BROTHERS' dispute with the named

14  Respondents.

15    74.    On September 17, 1998, the NASD issued an arbitration award in favor of

16  FIERO BROTHERS as follows:

17                                CASE SUMMARY

18    Claimant alleged that Respondent Waldron & Co., Inc. engaged in artificial market

19    making activity, parking arrangements, guarantees against loss, and fraudulent purchasing

20    in connection with Shopping.com (IBUY") stock.

21    Claimant alleged that Respondent Wedbush Morgan Securities, Inc. and Edward

22    Wedbush conspired to manipulate the price of IBUY and conduct a buy-in at an artificially

23    inflated price.

24    Respondent Waldron & Co., Inc. counter-claimed against Fiero Bros., Inc. alleging

25    corrupt market practices and perversion of the arbitration process.  Respondent Waldron &

26    Co., Inc. Cross-claimed against Third Party Respondent Key West Securities, Inc. alleging

27    that Key West Securities acted in collusion with FIERO BROTHERS, Inc.

28    Respondents denied each and every allegation of wrongdoing set forth in the Claimant's

1    Statement of Claim.

2                              <u>RELIEF REQUESTED</u>

3                                    (Omitted)

4                  <u>OTHER ISSUES CONSIDERED AND DECIDED</u>

5                                    (Omitted)

6                                     <u>AWARD</u>

7    1.    Respondents Waldron & Co., Inc., CERY Perle and Ed Harris are **jointly and**

8          **severally liable** to and shall pay Claimant the sum of $350,000.00 in

9          compensatory damages.(Emphasis added.)

10   2.    Respondent Wedbush Morgan Securities is liable to and shall pay Claimant the

11         sum of $50,000.00 in compensatory damages.

12   3.    All Respondents' Counter-claims are dismissed in their entirety;

13   4.    Each party shall bear its own costs, including attorneys fee.

14   5.    All claims for punitive damages are denied.

15   (See, Exhibit "B.")

16         75.    On February 11, 1999 FIERO BROTHERS filed its Petition to Confirm

17   Arbitration Award.

18         76.    On March 17, 1999, FIERO BROTHERS' Petition to Confirm Arbitration

19   Award was granted.

20         77.    On April 6, 1999, Judgment was issued in the Los Angeles Superior Court

21   in Case No. BS 055659 in the amount of $350,215.00 against Waldron & Co., Inc. and

22   Cery Perle. (See, Exhibit C.)

23         78.    On January 6, 2000 the Los Angeles Superior Court issued an Abstract of

24   Judgment in the amount of $350,215 in favor of FIERO BROTHERS against Waldron

25   and PERLE. (See, Exhibit D.)

26         72.    As a result of the foregoing, a debt was created by PERLE's and

27   Waldron's (A) violation of the Federal securities laws or any regulation or order issued

28   under such Federal or State securities laws, or common law fraud, deceit, or

─────────────────────────────────────────────────

FIRST AMENDED COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY

19

1  under such Federal or State securities laws, or common law fraud, deceit, or

2  manipulation in connection with the purchase or sale of any security; and (B) resulted

3  from a judgment entered in a Federal or State judicial or administrative proceeding.

4      73.    The debt of $350,215 owed by PERLE to Plaintiff is nondischargeable

5  under section 523(a)(19) of the United States Bankruptcy Code.

6      WHEREFORE, Plaintiff prays that the court grant relief as follows:

7      1.    That the Court determines that the Debt owing to Plaintiff from PERLE in the

8  amount of $350,215 plus interest at the rate of 10% per annum is nondischargeable under

9  11 U.S.C. § 523(a)(2)(A).

10     2.    That the Court determines that the Debt owing to Plaintiff from PERLE in the

11  amount of $350,215 plus interest at the rate of 10% per annum is nondischargeable under

12  11 U.S.C. § 523(a)(4).

13     3.    That the Court determines that the Debt owing to Plaintiff from PERLE in the

14  amount of $350,215 plus interest at the rate of 10% per annum is nondischargeable under

15  11 U.S.C. § 523(a)(6).

16     4.    That the Court determines that the Debt owing to Plaintiff from PERLE in the

17  amount of $350,215 plus interest at the rate of 10% per annum is nondischargeable under

18  11 U.S.C. § 523(a)(19).

19     5.    For reasonable attorney's fees.

20     6.    For costs of suit.

21     7.    For such other and further relief as this Court deems just and proper.

22  Dated:        January 5, 2007             Respectfully submitted,

23                                           AKINS & VILLAVICENCIO, LLP

24

25                                           By:

26                                              Leslie Schwaebe Akins, Esq.
                                                Attorney for Plaintiff
                                                ALFONSO FIERO
27

28

---

**COPY**

NASD REGULATION, INC.

———————————————————————X

In the Matter of the Arbitration Among          :

FIERO BROTHERS, INC.,                           :          Arb. No. 98-00587

                              Claimant,         :

                                                :          **SECOND AMENDED**
                                                :          **STATEMENT OF CLAIM**
                    vs.                         :

WALDRON & CO., CERY PERLE, ED HARRIS,          :
WEDBUSH, MORGAN SECURITIES, INC., and          :
ED WEDBUSH,                                      :

                              Respondents.      :

                                                :

———————————————————————X

The following constitutes the Second Amended Statement of Claim and Request for

Immediate Injunction of Fiero Brothers, Inc. against Waldron & Co., Cery Perle, Ed Harris,

Wedbush, Morgan Securities, Inc. and Ed Wedbush.


### PARTIES

1.      Fiero Brothers, Inc. ("Fiero Brothers") is a registered broker dealer and a member

        of the National Association of Securities Dealers, Inc. ("NASD") with an office at

        120 Broadway, New York, New York.

2.      Waldron & Co. ("Waldron") was a registered broker dealer and a member of the

        NASD with an office at 19000 MacArthur Boulevard, Irvine, California.

3.      Cery Perle was the president and a principal of Waldron.

4.      Ed Harris was an undisclosed principal of Waldron.

5

5.   Wedbush, Morgan Securities, Inc. ("Wedbush") is a registered broker dealer and a
     member of the NASD with an office at 1000 Wilshire Blvd., Suite 900, Los
     Angeles, California. Wedbush acted as clearing agent for Waldron.

6.   Ed Wedbush is a principal of Wedbush.


## FACTS

7.   Among other activities in which it engages, Fiero Brothers acts, at all relevant
     times did act, as a market maker for numerous securities trading on the NASDAQ
     system. Thus, Fiero Brothers is responsible for maintaining an orderly market in
     each issue for which it makes a market, and as such is obligated to purchase or sell
     securities in each such issue for its own account as market conditions warrant. As
     a result, a market maker such as Fiero Brothers must at least occasionally sell
     shares that it does not own. This is known as taking a short position.

8.   As of February 12, 1998, Fiero Brothers had a short position in Shopping.Com
     shares ("IBUY"), an issue in which Fiero Brothers makes a market.

9.   Waldron acted as an underwriter of IBUY shares, and was the primary market
     maker in the security. IBUY is a bulletin board security.

10.  Commencing at or about the time of the initial public offering (and continuing
     through the present) Waldron supported the price of the IBUY shares through
     artificial market making activity, parking arrangements, guarantees against loss and
     fraudulent purchasing.

2

6

11.   Waldron failed to disclose any of its manipulative activities to Fiero Brothers.

12.   In or about January 1998, the supply of IBUY shares exceeded the demand for the
same.  Rather than allow the price of IBUY to fall, Waldron purchased an
inordinate amount of shares for its own account.  Eventually, Waldron's net capital
was insufficient to permit it to purchase the additional shares.  Waldron then began
parking the IBUY shares in customer accounts so that it might continue to prop up
the price.

13.   The public float of IBUY shares is approximately 1,300,000 shares.  Waldron and
dominates and controls the market for IBUY.  Moreover, by virtue of its parking
activities, Waldron has cornered the market for IBUY.  Upon information and
belief, Waldron , its customers and accounts controlled by Waldron at other broker
dealers have beneficial ownership of nearly the entire public float.

14.   Upon information and belief, Ed Harris — an undisclosed principal of Waldron —
has purchased as much as 500,000 shares of IBUY for accounts under his control.
In addition, on February 12, 1998 Waldron maintained and inventory of more than
400,000 shares of IBUY in its proprietary accounts.  Moreover, in light of the fact
that Waldron did the initial public offering of IBUY, Waldron's customers own
hundreds of thousands of IBUY shares.

15.   As time passed, Waldron found it increasingly expensive and difficult to park stock
in customer accounts and accounts Waldron controls at other firms on the street.
To avoid being closed due to insufficient net capital, Cery Perle, president of

3

Waldron, directed its trading room not to accept sell orders from Waldron customers. Cery Perle also pressured registered representatives to purchase IBUY for their customers without regard to the suitability of the investment. Some registered representatives complied with Cery Perle's direction, but others resigned from Waldron to protect their customers.

16.    After leaving Waldron, the registered representatives sold their customers out of IBUY. This selling caused additional pressure on the price of IBUY shares. Nevertheless — determined not to allow the price of the stock to fall — Waldron continued to absorb the oversupply by purchasing the stock even though it did not have the funds to pay for it.

17.    Waldron soon began to have an unusual amount of regulation-T extensions and sell-outs. At that point, Wedbush became aware of Waldron's scheme. Since Wedbush clears for Waldron, its records reflected that Waldron had cornered the market in IBUY— that is, Waldron and its customers owned nearly the entire public float of IBUY.

18.    Wedbush realized that Waldron's position in IBUY threatened both Waldron's and Wedbush's viability. Were Waldron to close its doors, Wedbush would be responsible for Waldron's losses and market obligations. The potential loss to Wedbush exceeded $10,000,000 — a net capital hit which Wedbush could not survive. Faced with this dire circumstance, Wedbush determined to join Waldron's scheme rather than allow (or require) Waldron to close its doors. Thus, Wedbush

began engaging in illegal acts to protect itself. Primary among its goals were to ensure that the NASD did not force Waldron to cease operation on the basis of insufficient net capital.

19.    To this end, Edward Wedbush conspired and agreed with Carey Perle to further manipulate the price of IBUY and conduct a buy-in at an artificially inflated price. Wedbush and Waldron acted together to execute this scheme.

20.    Waldron contacted "friendly" market makers in IBUY and asked them to raise their bids. Waldron agreed to purchase any stock sold to the market makers at the higher prices, and to indemnify the market makers against loss. By virtue of this orchestrated activity, Waldron artificially created the appearance of upward momentum in the price of IBUY shares.

21.    On four separate occasions, Waldron, through Wedbush, executed buy-ins against Fiero Brothers for shares of IBUY at prices in excess of the artificially inflated market price. The following is a list of the dates of each buy-in, the number of shares bought-in against Fiero Brothers, the purported market price at the time of the buy-in and the price at which the buy-in was executed:

| DATE | No. of SHARES | "MARKET" PRICE | BUY-IN PRICE |
|---|---|---|---|
| February 12, 1998 | 35,350 | 21 5/8 - 21 3/4 | 25 1/8 |
| March 6, 1998 | 25,455 | 25 15/16 - 25 31/32 | 29 |
| March 11, 1998 | 36,428 | 29 1/4 - 29 5/16 | 36 |
| March 16, 1998 | 38,050 | 21 13/16 - 21 7/8 | 26 1/2 |

5

9

22.    The buy-ins against Fiero Brothers on February 12, 1998 and March 16, 1998 were not reported by Waldron or Wedbush.

23    Just prior to the buy-ins, Wedbush – knowing that Waldron had possession of all of the IBUY shares – pretended to poll market makers for "guaranteed delivery" of IBUY shares. In light of Waldron's position in IBUY, there was no need for "guaranteed delivery". Wedbush's demand for "guaranteed delivery" was a pretense which Waldron and Wedbush used to complete the fraud.

24.    Before each buy-in, Waldron would act to move the artificial price of IBUY even higher than its then outrageous price. Once the artificial price was sufficiently high to shore up Waldron's net capital, Wedbush and Waldron cashed in on the scheme by buying-in above the artificial price they created. Importantly – because it already controlled all of the IBUY shares – Waldron did nothing more than sell shares to itself at prices significantly higher than what it originally paid. Thus, the buy-ins were not completed in arms length transactions; they were fictitious trades in which Waldron purported to sell to itself.

25.    Wedbush failed to disclose its manipulative activities to Fiero Brothers.

26.    Within minutes of the February 12, 1998 buy-in, the price of IBUY fell many points and finally closed at $21.875. Realizing that the price of IBUY was falling fast – and that Waldron needed to sell more stock at high prices to stay in business – Wedbush directed Waldron to liquidate half of its proprietary position

6

before the market opened on February 13, 1998. Wedbush also prohibited
Waldron from making a market.

27. As instructed, Waldron sold approximately 170,000 shares of IBUY at $20 per
share – $1.875 per share less than the closing price and a full $5.25 below the Buy-
In price – before the market opened on February 13, 1998, and did not make a
market in IBUY that day.

28. Without Waldron to support the market on February 13, 1998, the price of IBUY
shares fell as low as $16 per share.

29. On February 17, 1998 Waldron recommenced making a market in IBUY. By 9:30
a.m. on February 18, 1998, Waldron had artificially raise the price of IBUY to
$22.0625. In the interim – i.e., after the close on February 17, 1998 and before the
opening on February 18, 1998 – Waldron completed a large number of trades at a
full $1.00 below its published market. Upon information and belief, these trades
were additional sellouts of stock parked in customer accounts.

30. Waldron subsequently artificially increase the price of IBUY to a high of $32 ½
per share.

31. On or about March 11, 1998, Chatfield Dean & Co. published a research report
with a "sell" recommendation on IBUY shares. The report stated that the IBUY
shares were "overvalued", that $29+ per share was an "exuberant valuation" and
estimated that a market price of $5 would be more appropriate. On or about that
same day Key West Securities, Inc. initiated an immediate "sell" recommendation

7

for IBUY shares stating that "Waldron completely dominates and controls almost every share and can basically place the price anywhere it wants."

32.   These two reports caused a tremendous amount of selling pressure on IBUY shares. On March 13, 1998, Waldron purchased approximately 600,000 shares of IBUY at prices ranging from 27-30 (approximately $17,000,000 of IBUY stock). Because of Waldron's limited net capital, Wedbush ceased to clear for Waldron on March 16, 1998. Consequently, Waldron could not support the market in IBUY on March 16, 1998, and the price of IBUY fell nearly 8 points.

33.   Wedbush, hoping to mitigate the capital losses caused by Waldron's fraudulent acts and continue to operate, thereafter bought-in Fiero Brothers (March 16, 1998) at a price five points above the then-falling market price. Of course, this transaction was not reported to the tape.

34.   Since February 12, 1998, there have been at eight fraudulent buy-ins of IBUY shares by Waldron and Wedbush. Each fraudulent buy-in was completed above the prevailing market price for IBUY and, upon information and belief, involved fictitious trades by which Waldron sold securities to itself. Waldron used the above-market buy-in scheme as a method of financing its continuing upward manipulation of the price of IBUY shares. Wedbush now continues that scheme to mitigate its capital losses and stay in business.

12

## FIRST CLAIM FOR RELIEF

35      Fiero Brothers repeats and realleges the allegations set forth in paragraphs 1

through 34 above as if fully set forth herein.

36.     The buy-ins against Fiero Brothers improperly were conducted above the

purported market price for IBUY.

37.     Respondents' actions violated Rule 11810(c)(1)(C) of the NASD Uniform Practice

Code (the "Code"). The Code sets forth, in pertinent part, the following:

> [Where a buy-in is executed] members must be prepared to defend
> the price at which the "buy-in" is executed relative to the current
> market at the time of the "Buy-in".

38.     Respondents can not justify the mark-ups they made on the IBUY shares.

39.     As a result of the buy-ins, Fiero Brothers has been damaged in excess of $510,000

plus interests.

40.     As a result of the buy-ins, Respondents have been unjustly enriched in excess of

$510,000.

41.     Respondents' conduct was inconsistent with the high standards of commercial

honor and the just and equitable principles of trade which NASD members must

observe.

9

13

## SECOND CLAIM FOR RELIEF

42.     Fiero Brothers repeats and realleges the allegations set forth in paragraphs 1 through 34 above as if fully set forth herein.

43.     The market price of IBUY properly should be approximately $5.00.

44.     Respondents violated 17 CFR 240.10b-5 when in connection with the Buy-In of IBUY they acted together in a common scheme to manipulate the price of IBUY shares and defraud Fiero Brothers.

45.     Respondents intended to defraud Fiero Brothers.

46.     Respondents completed the fraud as planned.

47.     As a result of the scheme to defraud, Fiero Brothers was damaged in excess of $3,250,000 plus interest.

48.     As a result of the scheme to defraud, Respondents have been unjustly enriched in excess of $3,250,000.

49.     Respondents' conduct was inconsistent with the high standards of commercial honor and the just and equitable principles of trade which NASD members must observe.

10

14

## THIRD CLAIM FOR RELIEF

50.   Fiero Brothers repeats and realleges the allegations set forth in paragraphs 1
      through 34 above as if fully set forth herein.

51.   In executing the buy-ins Waldron and Wedbush were entrusted with purchasing
      stock on behalf of Fiero Brothers. Waldron and Wedbush had a fiduciary duty to
      Fiero Brothers -- like any other customer on whose behalf it was acting -- to
      purchase IBUY shares at the best available price.

52.   Since Waldron and Wedbush dominated and controlled IBUY stock, it had a duty
      to Fiero Brothers -- like any other customer -- not to charge a greater than 5%
      mark-up on shares it sold out of its proprietary account.

53.   The prices which Waldron and Wedbush charged Fiero Brothers were mark-up
      significantly from Waldron's contemporaneous cost for IBUY. Indeed, these
      mark-ups were excessive.

54.   Waldron and Wedbush breached their fiduciary duties to Fiero Brothers.

55.   As a result of the excessive mark-ups, Fiero Brothers has been damaged in excess
      of $510,000 plus interests.

56.   As a result of the excessive mark-ups, Respondents have been unjustly enriched in
      excess of $510,000.

57.   Respondents' conduct was inconsistent with the high standards of commercial
      honor and the just and equitable principles of trade which NASD members must
      observe.

11

15

W H E R E F O R E, Fiero Brothers requests the following:

(1)    entry of an award of $510,000 in damages against Respondents on the First Claim for Relief, plus interest, costs and attorneys' fees;

(2)    entry of an award of $3,250,000 in damages against Respondents on the Second Claim for Relief, plus interest, costs and attorneys' fees;

(3)    entry of an award of $510,000 in damages against Respondents on the Third Claim for Relief, plus interest, costs and attorneys' fees;

(4)    that this matter be referred to market regulation for disciplinary proceedings against Respondents; and

(5)    such other, further, and different relief as the arbitration panel may award in connection with this arbitration proceeding.

Dated: Westchester, New York
      March 18, 1998

Respectfully submitted,

MPR Law Practice, P.C.
43 Powder Horn Road
Cortlandt Manor, NY 10566
(914) 739-6000

Attorneys for Fiero Brothers, Inc.

12

16

**AWARD**

# NASD REGULATION, INC., OFFICE OF DISPUTE RESOLUTION

In the matter of the Arbitration Between

### Name of Claimant

Fiero Brothers, Inc.

v.

Arbitration No.
98-00587

### Name of Respondents

Waldron & Co., Inc., Cery Perle, Ed Harris
Wedbush Morgan Securities, Inc.,
Ed Wedbush, and Key West Securities, Inc.

---

## REPRESENTATION

For Claimant:

Martin P. Russo, Esq.
MPR Law Practice, P.C.
New York, New York

For Respondents Waldron & Co., Inc.,
and Cery Perle:

H. Thomas Fehn, Esq.
Fields, Fehn & Sherwin
Los Angeles, California

For Respondents Wedbush Morgan
Securities, Inc., and Ed Wedbush:

Marie E. Eaton
Wedbush Morgan Securities, Inc.
Los Angeles, California

For Respondent Ed Harris:

Ed Harris (Did Not Appear)
In Pro Per
Los Angeles, California

F 002208

## CASE INFORMATION

| | |
|---|---|
| Statement Of Claim filed: | February 17, 1998 |
| Claimant's Submission Agreement Signed: | February 17, 1998 |
| Claimant's Answer to Counterclaim of Waldron & Co., Inc. and Cery Perle filed: | May 7, 1998 |
| Claimant's Answer to Counterclaim of Wedbush Morgan Securities, Inc. and Ed Wedbush filed: | May 7, 1998 |
| Statement of Answer filed by Respondents Wedbush, Morgan Securities, Inc. and Ed Wedbush: | March 31, 1998 |
| Respondents Wedbush, Morgan Securities, Inc.'s, and Ed Wedbush's Submission Agreement signed: | March 31, 1998 |
| Statement of Answer filed by Waldron & Co., Inc., Ed Harris, and Cery Perle; Counter Claim against Claimant Fiero Bros., and Cross Claim against Third Party Respondent Key West Securities, Inc. filed by Respondents Waldron & Co., Inc. and Cery Perle | April 16, 1998 |
| Statement of Answer filed by Respondent Key West Securities, Inc. | July 28, 1998 |

## HEARING INFORMATION

Pre Hearing Conference Dates / Sessions:

March 6, 1998 (1 session)
April 16, 1998 (1 session)
May 11, 1998 (1 session)
May 26, 1998 (1 session)
July 16, 1998 (1 session)
July 20, 1998 (1 session)
July 21, 1998 (1 session)
July 30, 1998 (1 session)
August 6, 1998 (1 session)
August 12, 1998 (1 session)
August 20, 1998 (1 session)

*98-00587*

F 002209

18

Hearing Dates / Sessions:

September 1, 1998 (2 sessions)
September 2 1998 (2 sessions)
September 3 1998 (2 sessions)
September 4 1998 (2 sessions)

Hearing Location:

Los Angeles, California

## CASE SUMMARY

Claimant alleged that Respondent Waldron & Co., Inc. engaged in artificial market making activity, parking arrangements, guarantees against loss, and fraudulent purchasing in connection with Shopping.Com ("IBUY") stock.

Claimant alleged that Respondent Wedbush Morgan Securities, Inc., and Edward W. Wedbush conspired to manipulate the price of IBUY and conduct a buy-in at an artificially inflated price.

Respondent Waldron & Co., Inc. Counter-claimed against Fiero Bros., Inc. alleging corrupt market practices and perversion of the arbitration process. Respondent Waldron & Co., Inc. Cross-claimed against Third Party Respondent Key West Securities, Inc., alleging that Key West Securities, Inc. acted in collusion with Fiero Brothers, Inc.

Respondents denied each and every allegation of wrongdoing set forth in the Claimant's Statement of Claim.

## RELIEF REQUESTED

Claimant, in its Second Amended Statement of claim, sought $510,000.00 in compensatory damages plus interest as a result of the buy-ins: $3,250,000.00 plus interest, as a result of Respondents defrauding Claimant; and $510,000.00 plus interest as a result of excessive markups, as well as costs, and attorney's fees for bringing the suit.

Counter-Claimant Wedbush Morgan Securities, in its Joint Response to Statement of Claim sought $750,000.00 compensatory and punitive damages.

Counter-Claimant Waldron & Co., in its Complaint for Defamation and Tortious Interference with Business Relations, sought unspecified general and special damages, plus interest, against all Respondents, jointly and severally.

Respondents requested that the Arbitration Panel dismiss the Claimant's claim in its entirety.

*Page 3 of 7*

98-00587

F 002210

19

## OTHER ISSUES CONSIDERED AND DECIDED

On July 16, 1998, Case No. 98-01150, Fiero Bros. v. Wedbush Morgan Securities, Inc. consolidated into Case No. 98-00587.

On August 28, 1998, the Arbitration Panel granted Key West Securities' Motion to Dismiss.

On September 3, 1998, during the hearing, the Arbitration Panel granted Respondent Edward W. Wedbush's Motion to Dismiss.

The parties have agreed that the Award in this matter may be executed either in counterpart copies or that a handwritten, signed Award may be entered. In either case, the parties have agreed to receive conformed copies of the Award while the original remains on file with the NASD Regulation, Inc., Office of Dispute Resolution.

### AWARD

After considering the pleadings, the testimony, and the evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows:

1) Respondents Waldron & Co., Inc., Cery Perle and Ed Harris are jointly and severally liable to and shall pay Claimant the sum of $350,000.00 in compensatory damages.

2) Respondent Wedbush Morgan Securities is liable to and shall pay Claimant the sum of $50,000.00 in compensatory damages.

3) All Respondents' Counter-claims are dismissed in their entirety.

4) Each party shall bear its own costs, including attorneys fees.

5) All claims for punitive damages are denied.

98-00587

F 002211

## FORUM FEES

Pursuant to Rule 10332(c) of the Code of Arbitration Procedure, the following forum fees are assessed jointly and severally against Waldron & Co., Inc., Cery Perle, and Ed Harris:

| | |
|---|---|
| Five Full-Panel Pre-Hearing Conference Sessions @ $1,000.00 / Session | = $5,000.00 |
| Six Discovery Pre-Hearing Conference Sessions @ $300.00 / Session | = $1,800.00 |
| Eight Hearing Sessions @ $1,000.00 / Session | = $8,000.00 |
| Total Fees Jointly and Severally Assessed against | |
| Respondents Waldron & Co., Inc., Cery Perle, and Ed Harris | |
| Fees are payable to NASD Regulation, Inc. | = $14,800.00 |

## OTHER FEES

Pursuant to Rule 10333 of the Code, Claimant Fiero Brothers, Inc. has paid to NASD Regulation, Inc. the $1,500.00 member surcharge previously invoiced.

Pursuant to Rule 10333 of the Code, Respondent Wedbush Morgan Securities, Inc. has paid to NASD Regulation, Inc. the $1,500.00 member surcharge previously invoiced.

Pursuant to Rule 10333 of the Code, Respondent Waldron & Co., Inc. to NASD Regulation, Inc. the $1,500.00 member surcharge previously invoiced.

Pursuant to Rule 10333 of the Code, Third Party Respondent Key West Securities, Inc. shall pay to NASD Regulation, Inc. the $1,500.00 member surcharge previously invoiced.

Pursuant to Rule 10333 of the Code, Claimant Fiero Brothers, Inc. has paid to NASD Regulation, Inc. the $600.00 pre-hearing member process fee previously invoiced.

Pursuant to Rule 10333 of the Code, Respondent Wedbush Morgan Securities, Inc. has paid to NASD Regulation, Inc. the $600.00 pre-hearing member process fee previously invoiced.

Pursuant to Rule 10333 of the Code, Respondent Waldron & Co., Inc. has paid to NASD Regulation, Inc. the $600.00 pre-hearing member process fee previously invoiced.

Pursuant to Rule 10333 of the Code, Third Party Respondent Key West Securities, Inc. shall pay to NASD Regulation, Inc. the $600.00 pre-hearing member process fee previously invoiced.

Pursuant to Rule 10333 of the Code, Claimant Fiero Brothers, Inc. shall pay to NASD Regulation, Inc. the $50.00 balance remaining on the hearing member process fee previously invoiced.

Pursuant to Rule 10333 of the Code, Respondent Wedbush Morgan Securities, Inc. shall pay to NASD Regulation, Inc. the $2,500.00 hearing member process fee previously invoiced.

*98-00587*

F 002212

21

Pursuant to Rule 10333 of the Code, Respondent Waldron & Co., Inc. shall pay to NASD Regulation, Inc. the $2,500.00 hearing member process fee previously invoiced.

Pursuant to Rule 10333 of the Code, Third Party Respondent Key West Securities, Inc. shall pay to NASD Regulation, Inc. the $2,500.00 hearing member process fee previously invoiced.

*98-00587*

F 002213

## ARBITRATORS

Name ............................................................................................................. Public / Industry
Robert L. Schouweiler, Esq.
Walter W. Klosterman                                                                    Public Arbitrator
Robert J. Ruben, Esq.                                                                   Industry Arbitrator
                                                                                        Public Arbitrator

Concurring Arbitrators' Signatures

_____

Robert L. Schouweiler, Esq.

_____

Walter W. Klosterman

_____

Robert J. Ruben, Esq.

Date of Service:_____

*Page 7 of 7*

*98-00587*

F 002214

23

## ARBITRATORS

Name ..................................................
Robert L. Schouweiler, Esq. .................................................................................Public / Industry
Walter W. Klosterman                                                    Public Arbitrator
Robert J. Ruben, Esq.                                                   Industry Arbitrator
                                                                         Public Arbitrator

Concurring Arbitrators' Signatures

_Robert L. Schouweiler_ (signature)

Robert L. Schouweiler, Esq.

Walter W. Klosterman

Robert J. Ruben, Esq.

Date of Service: _____

98-00557

F 002215

24

## ARBITRATORS

Name .................................................................................................

Robert L. Schouweiler, Esq. .......................................... Public / Industry
Walter W. Klosterman                                            Public Arbitrator
Robert J. Ruben, Esq.                                           Industry Arbitrator
                                                               Public Arbitrator

Concurring Arbitrators' Signatures

_____
Robert L. Schouweiler, Esq.

_____
Walter W. Klosterman

_____
Robert J. Ruben, Esq.

Date of Service: _____

*Page 7 of 7*

98-00587

F 002216

25

# ARBITRATORS

| Name | Public / Industry |
|------|-------------------|
| Robert L. Schouweiler, Esq | Public Arbitrator |
| Walter W. Klosterman | Industry Arbitrator |
| Robert J. Ruben, Esq. | Public Arbitrator |

Concurring Arbitrators' Signatures

_____

Robert L. Schouweiler, Esq.

_____

Walter W. Klosterman

_____

Robert J. Ruben, Esq.

Date of Service: _____

98-00587

F 002217

26

1 | THE LAW OFFICES OF
  | MARK STEVEN KESSLER
2 | Mark Steven Kessler, Bar No. 57489
  | 11770 Bernardo Plaza Court, Suite 315
3 | San Diego, California 92128
  | (619) 675-9001
4 |
  | Attorneys for Petitioner FIERO
5 | BROTHERS, INC.

*FILED*
LOS ANGELES SUPERIOR COURT
APR 06 1999
JOHN A. CLARKE, CLERK
BY C. MASON, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| FIERO BROTHERS, INC., | ) CASE NO. BS 055659 |
| Petitioner | ) |
| v. | ) JUDGMENT |
| WALDRON & CO., INC; CERY PERLE, ED HARRIS; WEDBUSH MORGAN SECURITIES, INC.; ED WEDBUSH; AND KEY WEST SECURITIES, INC. | ) ) ) ) ) |
| Respondents. | ) ) |

The award of Robert L. Schouweiler, Esq., Walter W. Klosterman, and Robert J. Ruben, Esq., arbitrators, having been confirmed by order of this Court on March 17, 1999, and no statement of decision having been requested by any party,

IT IS ADJUDGED that Petitioner FIERO BROTHERS, INC. recover from Respondents, Waldron & Co., Inc. and Cery Perle the sum of Three Hundred Fifty Thousand Dollars ($350,000.00), together with interest thereon at the rate of ten percent (10%) per year from September 17, 1998, and costs of this proceedings in the sum of Two Hundred Fifteen Dollars ($215.00).

4-6
Dated: March _____, 1999

L W Crispo
JUDGE OF THE SUPERIOR COURT
LAWRENCE W. CRISPO

ORIGINAL

JAN 6 2000 abstract 2
JAN 21 2000 W rt Z A

JUDGMENT
1
_____ 1 2 2000 W rt. Riverside    Lo.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address): | TELEPHONE NO. | FOR RECORDER'S USE ONLY |
|---|---|---|

☒ Recording requested by and return to:

PETER D. LEPISCOPO, ESQ. CA139583
Law Offices Of Peter D. Lepiscopo
2635 Camino del Rio South, Suite 108
San Diego, California 92108

(619) 299-5343

☒ ATTORNEY FOR   ☒ JUDGMENT CREDITOR   ☐ ASSIGNEE OF RECORD

NAME OF COURT: SUPERIOR COURT OF CALIFORNIA
STREET ADDRESS: LOS ANGELES COUNTY
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: CENTRAL DISTRICT

PETITIONER: FIERO BROTHERS, INC.

RESPONDENT: WALDRON & CO., INC., et al.

CASE NUMBER:

BS 055659

| ABSTRACT OF JUDGMENT | FOR COURT USE ONLY |
|---|---|

1. The ☒ judgment creditor ☐ assignee of record
applies for an abstract of judgment and represents the following:

   a. Judgment debtor's
      Name and last known address
      WALDRON & CO., INC.
      1900 MacArthure Boulevard
      8th Floor
      Irvine, California 92612

   b. Driver's license No. and state:                    ☒ Unknown
   c. Social Security No.:                                ☒ Unknown
   d. Summons or notice of entry of sister-state judgment was personally served or
      mailed to (name and address): WALDRON & CO., INC., c/o H. Thomas Fehn, Esq.,
                11755 Wilshire Boulevard, 15th Floor, Los Angeles,
                California 90025

   e. ☒ Additional judgment debtors are shown on reverse.

Date: January 4, 2000
Peter D. Lepiscopo, Esq. CA139583
......................................
(TYPE OR PRINT NAME)

▶ _____ (SIGNATURE OF APPLICANT OR ATTORNEY)

2. a. ☒ I certify that the following is a true and correct abstract
      of the judgment entered in this action.
   b. ☐ A certified copy of the judgment is attached.
3. Judgment creditor (name):
   FIERO BROTHERS, INC.
   whose address appears on this form above the court's name.
4. Judgment debtor (full name as it appears in judgment):
   WALDRON CO., INC. and CERY PERLE

5. a. Judgment entered on
      (date): 4/6/99
   b. Renewal entered on
      (date):
   c. Renewal entered on
      (date):

This abstract issued on
(date): January 6, 2000

6. Total amount of judgment as entered or last renewed:
   $350,215.00 XXXXXXXXXXXXXXXXXXXXXXXXX
7. ☐ An ☐ execution ☐ attachment lien XXXXXXXXXX
   is endorsed on the judgment as follows:
   a. Amount: $
   b. In favor of (name and address):

8. A stay of enforcement has
   a. ☒ not been ordered by the court.
   b. ☐ been ordered by the court effective until
      (date):
9. ☐ This judgment is an installment judgment.

JOHN A. CLARKE, CLERK
Clerk, by _____, Deputy
A. J. MORGAN

Form Adopted by Rule 982
Judicial Council of California
982(a)(1) [Rev. January 1, 1991]

ABSTRACT OF JUDGMENT
(Civil)

Code of Civil Procedure, §§ 488.480,
674, 700, 190

| | |
|---|---|
| PETITIONER: FIERO BROTHERS, INC. | CASE NUMBER: |
| RESPONDENT: WALDRON & CO., INC., et al. | BS 255659 |

INFORMATION ON ADDITIONAL JUDGMENT DEBTORS

**10.** Name and last known address

CERY PERLE
353.5 East Coast 219 Highway
Corona Del Mar, California
92625

Driver's license No. & state: [X] Unknown.
Social Security No.: 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 [ ] Unknown.
Summons was personally served at or mailed to (address):
CERY PERLE, c/o H. Thomas Fehn, Esq.,
11755 Wilshire Blvd., 15t Floor
Los Angeles, California 90025

**11.** Name and last known address

Driver's license No. & state: [ ] Unknown.
Social Security No.: [ ] Unknown.
Summons was personally served at or mailed to (address):

**12.** Name and last known address

Driver's license No. & state: [ ] Unknown.
Social Security No.: [ ] Unknown.
Summons was personally served at or mailed to (address):

**13.** Name and last known address

Driver's license No. & state: [ ] Unknown.
Social Security No.: [ ] Unknown.
Summons was personally served at or mailed to (address):

**14.** Name and last known address

Driver's license No. & state: [ ] Unknown
Social Security No.: [ ] Unknown
Summons was personally served at or mailed to (address):

**15.** Name and last known address

Driver's license No. & state: [ ] Unknown
Social Security No.: [ ] Unknown
Summons was personally served at or mailed to (address):

**16.** Name and last known address

Driver's license No. & state: [ ] Unknown
Social Security No.: [ ] Unknown
Summons was personally served at or mailed to (address):

**17.** Name and last known address

Driver's license No. & state: [ ] Unknown
Social Security No.: [ ] Unknown
Summons was personally served at or mailed to (address):

**18.** [ ] Continued on attachment 18.

982(a)(1) [Rev. January 1, 1991]

ABSTRACT OF JUDGMENT
(CIVIL)

Page two

# Assignment of Asset

This agreement is made and entered into this 1st day of March, 2006, by and between Alfonso Fiero and Fiero Brothers Inc., a New York Corporation.

Whereas, on the 1st day of March, 2006, Fiero Brothers Inc. hereby assigns, transfers and sets over to Alfonso Fiero all rights, title and interest in the judgment awarded to Fiero Brothers in the case of "Fiero Brothers Inc. V. Cery Perle". This judgment was entered in the Superior Court of California, Los Angeles County on 4/6/99. This assignment is in consideration of alleged prior obligations.

The assignment enables Alfonso Fiero to seek enforcement of this judgment. Alfonso Fiero shall be entitled to all monies of the judgment, which rights are also assigned.

Fiero Brothers Inc. further warrants that it has full right and authority to transfer said judgment.

Signed this 1st day of March, 20006.

By:

_____
Fiero Brothers Inc.
John Fiero, President

By:

_____
Alfonso Fiero

E

