Leslie Schwaebe Akins (Bar No. 138678)
LESLIE SCHWAEBE AKINS, A LAW CORPORATION
7157 Argonauta Way
Carlsbad, California 92009
(760) 931-2920 telephone
(760) 603-0547 facsimile

Attorney for Plaintiff
Alfonso Fiero

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | CASE NO. LA 01-26497-BB |
| CERY BRADLEY PERLE, | [Chapter 7] |
| Debtor, | Adv. No. 06-01971-BB |
| | The Honorable S. Bluebond- 626 |

**OPENING MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF ALFONSO FIERO'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT**

ALFONSO FIERO,

                              Plaintiff,
    v.

CERY B. PERLE, an individual,

                              Defendant,

**DATE:  November 10, 2009
TIME:   2:00 p.m.
CTRM: 1475**

DATE FILED: September 13, 2006
DISCOVERY CUT OFF: July 31, 2009
TRIAL DATE: None set

---

MEMO.POINTS AND AUTHORITIES RE: MSJ                    CASE NO. LA 01-26497-BB

# TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   B.    General Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   A.    The Initial Public Offering of Shopping.com  . . . . . . . . . . . . . . . . . . . . . 5

   B.    The Buy-ins of Shopping.com Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C.    Fiero Bros.' Short Position in Shopping.com Stock . . . . . . . . . . . . . . . 7

   D.    Perle and Waldron's Market Manipulation of Shopping.com Stock  . . . . 8

   E.    Waldron and Perle's Conduct Against Fiero Bros.  . . . . . . . . . . . . . . . . 9

   F.    The SEC Action Against Perle and Waldron  . . . . . . . . . . . . . . . . . . . . 10

      1.    Perle exercised absolute control over Waldron  . . . . . . . . . . . . . 12

      2.    Perle manipulated the stock of Shopping.com . . . . . . . . . . . . . . 12

      3.    Short Sellers were damaged and Defendant and
         Waldron profited from the manipulation scheme  . . . . . . . . . . . . 15

      4.    Perle' Conduct Constituted Securities Fraud and Made
         Him Liable For Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   G.    Corsair Capital Partners and Alternative Investments LLC's
      District Court Action Against Perle and Waldron . . . . . . . . . . . . . . . . . 16

   H.    Perle's Chapter 7 Petition and Corsair and AI' Adversary Proceeding . 17

   I.    Fiero Bros. Assignment of the Judgment to Plaintiff  . . . . . . . . . . . . . . 19

III.    ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   A.    Summary Judgment Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   B.    Fiero Bros.' Arbitration Award and Resulting Fiero Judgment
      Against Perle is Entitled to Collateral Estoppel and is
      Non-Dischargeable Under Bankruptcy Code Section 523(a)(6)
      and (a)(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Summary Judgment Should be Granted in Favor of Plaintiff .......... 23

    (i)    Plaintiff's objection to discharge under Section 523(a)(6) ...... 23

    a.    The Issues Were Necessarily Determined Against Perle ...... 24

    b.    The Issues Were Finally Decided on the Merits .............. 25

    c.    Collateral Estoppel Bars the Discharge of Perle's

       Debt to Plaintiff ....................................... 25

D.    Plaintiff's Judgment Is Based on Securities Fraud

and Manipulation and is Thus Non-Dischargeable

Under Bankruptcy Section 523(a)(19) ........................... 25

E.    Plaintiff's Judgment is Based on Defendant's Wilful

Malicious Injury and is Therefore Nondischargeable

Under Bankruptcy Code Section 523(a)(6) ........................ 33

IV. CONCLUSION ............................................. 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

Albarran v. New Form, Inc., (In re Barboza,)
545 F.3d 702 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Allen v. McCurry,
449 U.S. 90 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Almstead, Dempsey & Co.,
47 S.E.C. 1034 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . 20

Brandstetter v. Derebery (In re Derebery),
324 B.R. 349 (C.D.Ca. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Carrillo v. Su (In re Su),
290 F. 3d 1140 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Celotex Corp. v. Catrett,
477 U.S. 317, 106 S. Ct. 2548,
91 L. Ed. 2d 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cohen v. de la Cruz,
523 U.S. 213 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Costello, Russotto & Co.,
42 S.E.C. 798, Exchange Act Release No. 7729,
1965 WL 6611 at *3 (Oct. 22, 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D.E. Wine Investments, Inc.,
66 SEC Docket 0763 (Jan. 6, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Edward J. Mawod & Co. v. SEC
591 F. 2d 588 (10th Cir 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Ernst and Ernst v. Hochfelder
425 US 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

First Independent Group, Inc. v. SEC,
37 F. 3d 30 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

FTC v. Stefanchik,
559 F.3d 924 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Grandon v. Merrill Lynch & Co.,
147 F.3d 184 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Grogan v. Garner,
498 US. 279, 11 S. Ct. at 657 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Hughes v. Arnold,
393 B.R. 712 (E.D. Ca. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

1

2
In re Bigelow,
271 B.R. 178 (9th Cir. BAP 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3
In re Chan,
355 B.R. 494 (E.D. PA 2006)
(citing 148 Cong. Rec. S1787 daily ed March 12, 2002) . . . . . . . . . . . . . . . . . . . . 26

4

5
In re Civiello
348 B.R. 459 (Bankr. N.D. Ohio 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

6

7
In re Derebery
324 B.R. 349 (C.D.Ca. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8
In re Elder
262 B.R. 799 (C.D. Ca. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

9

10
In re Jung Sup Lee
335 B.R. 130 (9th Cir. BAP 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11
In re Su
290 F3d at 1146 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

12

13
In re WorldCom, Inc.,
329 B.R. 10 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

14
In re Younie,
211 B.R. 367 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15

16
In the Matter of the Application of Gary E. Bryant,
51 S.E.C. 463 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

17
In the Matter of Duker & Duker,
6 S.E.C. 386 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18

19
In the Matter of Edward J. Mawod & Co.,
46 S.E.C. 865 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

20
In the Matter of Pagel, Inc,
48 S.E.C. 223 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

21

22
In the Matter of Sheldon, Reid and Pattison
Exch. Act. Rel. No. 31, 475 (Nov. 18, 1992) 52 SEC Dkt. 3826 . . . . . . . . . . . . . . . 28

23

24
In the Matter of Sky Scientific, Inc.,
SEC Initial Decisions Release No. 137
1999 SEC LEXIS 475 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25
In the Matter of Swartwood, Hesse, Inc.,
50 S.E.C. 1301 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

26

27
In the Matter of Tennessee Securities, Inc. and Charles Roy Gaw,
1974 SEC LEXIS 1214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28
In re Nat'l Western Life Ins. Deferred Annuities Litigation,
2009 U.S. Dist. LEXIS 62949 (S.D. Ca. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Jett v. Sicroff (In re Sicroff),
 401 F.3d 1101 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Khaligh v. Hadaegh (In re Khaligh),
338 B.R. 817 (B.A.P. 9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 106 S. Ct. at 1348,
89 L. Ed. 2d 538 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Montana v. United States,
440 U.S. 153(1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Murray. Bammer (In re Bammer)
131 F.3d 781 (9th Cir. 1987)(en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Nat'l Gold Exchange, Inc. v. Stern (In re Stern),
403 B.R. 58 (C.D. Ca. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Parklane Hosiery Co. v. Shore,
439 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Petralia v. Jercich (In re Jercich),
238 F.3d 1202 (9th Cir.), cert. denied, 533 U.S. 930 (2001) . . . . . . . . . . . . . . . 25, 34

Pringle v. Water Quality Ins. Syndicate,
2009 U.S. Dist. LEXIS 69478 (C.D. Ca. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Richard R. Perkins,
51 S.E.C. 380, 1993 SEC LEXIS 882 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

R. J. Koeppe & Co. v S.E.C.,
95 F2d 550 (1938, CA7 Ill) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Robert B. Orkin,
53 S.E.C. Docket 1963, 1993 WL 89023
Exchange Act Release No. 32, 035 (Mar. 23, 1993) . . . . . . . . . . . . . . . . . . . . . . 29

Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin),
525 F.3d 805 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sec. Alarm Fin. Enters., LP v. Terrell (In re Terrell),
2007 Bankr. LEXIS 4330 (C.D. CA 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

SEC v. Feminella,
947 F. Supp 722, 731, (S.D.N.Y 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SEC v. First Jersey Sec., Inc.,
101 F.3d 1450, 1469 (2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Sherman v. SEC (In re Sherman),
491 F.3d 948, 9555 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Soremekun v. Thrifty Payless, Inc.,
509 F.3d 978, 984 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Structured Inv. Co. v. Vincent (In re Vincent),
2006 Bankr. Lexis 4106 (D.C. Nev 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Hernandez,
572 F.2d 218 (9ᵗʰ Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Boyce,
2000-1 U.S. Tax Cas. (CCH) P50,341 (S.D. Ca. 2000) . . . . . . . . . . . . . . . . . . . . . 22

United States v. Mendoza,
464 U.S. 154 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Ortiz-Diaz,
849 F.Supp. 734 (E.D.Ca. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v Stein,
456 F2d 844 (1972, CA2 NY) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

US SEC v. Zwick,
2007 U.S. Dis. Lexis (19045) (SDNY 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Waltz v. United States Dep't of Agriculture,
251 F.R.D. 491 (E.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**FEDERAL STATUTES**

11 U.S.C. §523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

11 U.S.C. §523(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18, 21-25, 33-35

11 U.S.C. §523(a)(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21-23, 25-27, 33

15 U.S.C. § 3(a)(47) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16-19, 21, 28-29; 31

15 U.S.C. §15(c)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

15 U.S.C. §17(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 29-31

15 U.S.C. §20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. §77a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §77q(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. § 77aaa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §78a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

15 U.S.C. §78c(a)(47) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §78i(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. §78j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

15 U.S.C. §78o(c)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

15 U.S.C. §78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. §78aaa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §79a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §80a-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

15 U.S.C. §80b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**FEDERAL REGULATIONS**

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 11, 16-19, 21, 27-31

17 C.F.R. § 240.15c1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

**FEDERAL RULES**

Federal Bankruptcy Rule 7056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Federal Rule of Civil Procedure 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

**REGULATORY RULES**

NASD Rule 11810(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 8, 21, 27

**MISCELLANEOUS AUTHORITIES**

Collier on Bankruptcy ¶523.12[2] (15th Ed. Rev. 2007) . . . . . . . . . . . . . . . . . . . . . 34

18 Moore's Federal Practice, §132.03[4][h] (Matthew Bender 3d Ed. 2002). . . . . . . . 25

18 Moore's Federal Practice, §132.03[5][b] (3d ed. 2002). . . . . . . . . . . . . . . . . . . . 25

18 Moore's Federal Practice §132.03[5][b][I] (3d ed. 2002) . . . . . . . . . . . . . . . . . . . 25

1  I.    **INTRODUCTION**

2      A.  **Summary of Argument**

3          This nondischargeability lawsuit and this Motion for Summary Judgment ("Motion")

4  requests a determination that the judgment debt owed by defendant Cery Bradley Perle

5  ("Perle" or "Defendant") to plaintiff Alfonso Fiero ("Plaintiff"), as assignee of the judgment

6  entered in favor of assignor Fiero Brothers, Inc. ("Fiero Bros.") by the Los Angeles Superior

7  Court against Perle ("Fiero Judgment"), was not discharged by Perle's bankruptcy. The

8  Fiero Judgment is based upon a confirmed arbitration award issued by the NASD

9  Regulation, Inc., office of Dispute Resolution ("NASD") in favor of Fiero Bros. against Perle,

10  on Fiero Bros. claims that Perle and his company Waldron & Co., Inc. ("Waldron")

11  manipulated the price of Shopping.com stock and executed buy-ins of Shopping.com stock

12  against Fiero Bros. at excessive and above market prices, in violation of NASD Rule

13  11810(c) (1) (C) of the NASD Uniform Practice Code (the "Code"), Securities and

14  Exchange Commission ("SEC") Rule 17 CFR 240.10b-5 ("Rule 10b-5) of the Securities

15  Exchange Act, and in breach of their fiduciary duties.

16          This Motion is based on the claim of collateral estoppel and res judicata as a result

17  of *three* separate prior judicial proceedings–*one of which was a proceeding before Judge*

18  *Sheri Bluebond in this very Court.* Any one of the following proceedings would, on its own,

19  be sufficient for the Court to grant this Motion:

20      1.   The Fiero Judgment arising out of an NASD Arbitration for securities law
21           violations and stock manipulation;

22      2.   This Bankruptcy Court's findings of fact and conclusions of law in the
             nondischargeabilty adversary proceeding entitled *Corsair Capital Partners,*
23           *L.P. and Alternative Investments, L.P. v. Cery Bradley Perle*, LA 01-26497-
             BB, Adversary Proceeding Case No. AD01-02219 (the "Corsair Adversary
24           Proceeding"), a separate action filed by different creditors of Perle alleging
             the same exact misconduct and based on the same facts alleged by Plaintiff;
25           and

26      3.   U.S. District Judge Dickran Tevrizian's findings of fact and conclusions of law
             in the matter of *SEC v. Waldron & Co. and Cery B. Perle*, Central Dist. of
27           California Case No. CV 99-3299 DT ("SEC Action"), a separate action
             alleging the same exact misconduct violated federal securities laws.

28  / / /

1   This Bankruptcy Court, specifically Judge Sherry Bluebond, is very familiar with this
2   Defendant and with both the Corsair Adversary Proceeding and the SEC Action, as Judge
3   Bluebond made findings of fact and conclusions of law in the Corsair Adversary
4   Proceeding based, in part, on Judge Tevrizian's findings and conclusions in the SEC
5   Action. Applying, (1) the resulting Fiero Judgment that Plaintiff's assignor Fiero Bros.
6   obtained against Defendant for stock fraud; (2) Judge Bluebond's findings and conclusions
7   concerning Perle's stock fraud in the Corsair Adversary Proceeding; and/or (3) Judge
8   Tevrizian's findings and conclusions in the SEC Action, it is Plaintiff's position that there
9   is no longer a triable issue of fact with respect to the instant adversary proceeding.

10   Therefore, the Court should grant Plaintiff's summary judgment and order the debt
11   due Fiero Bros. evidenced by the Fiero Judgement is excepted from discharge, in the
12   same manner and on the same facts as it granted the Corsair plaintiffs summary
13   judgement and held the debt owed them by Perle as excepted from discharge in the
14   Corsair Adversary Proceeding.

15   **B. General Background**

16   Beginning in 1997, Perle, as the owner, control person and president of Waldron,
17   engaged in securities fraud by manipulating the market price for the publicly traded stock
18   of Shopping.com ("Shopping.com" or "IBUY"), an Internet retailer taken public by Waldron.
19   Perle, through Waldron, directly and indirectly controlled the majority of Shopping.com's
20   1.3 million shares common stock, artificially increased the price for IBUY stock by buying
21   up available stock for Waldron's inventory and client accounts, by restricting the sale of
22   IBUY stock, by creating false demand, by issuing misleading press releases and, while
23   controlling the available inventory of IBUY stock, fraudulently and indefensibly "buying-in"
24   IBUY stock for market makers holding short positions in IBUY stock at prices that grossly
25   exceeded the then prevailing market price.

26   In 1998, Fiero Bros. was a registered market-maker and short seller of IBUY stock.
27   Other short sellers of IBUY stock include Corsair Capital Partners, L.P. ("Corsair") and
28   Alternative Investments, L.P. ("AI"). Between February 12 and March 19, 1998, while

1  Fiero Bros. held a short position in IBUY stock, Perle through Waldron fraudulently effected
2  buy- ins of Fiero Bros.' short positions in IBUY stock at prices that far exceeded its then
3  trading market price.  As a result of these unauthorized short sale buy-ins, Fiero Bros.
4  suffered damages in excess of $350,000.

5        To stop the market manipulation of IBUY stock, on February 17, 1998 Fiero Bros.
6  filed a Statement of Claim with the NASD against Perle, his broker-dealer Waldron, its
7  clearing firm Wedbush Morgan Securities, Inc. ("Wedbush"), and others ("Respondents"),
8  NASD Arb. No. 98-00587 ("NASD Arbitration").  The NASD Arbitration alleged that
9  Respondents manipulated the price of IBUY stock on February 12, 1998, and, to Fiero
10 Bros.' injury, engaged in an improper buy-in of IBUY stock at excessive prices in violation
11 of NASD Rule 11810(c)(1)(C), and SEC Rule Rule 10b-5. Fiero Bros. later amended its
12 claim to include additional misconduct, expanded the number of identified improper buy-ins
13 of IBUY stock for Fiero Bros. to include the March 6, March 11, and March 16, 1998, and
14 increased the amount which Fiero Bros. claimed it was damaged.

15       On September 17, 1998, after a four-day evidentiary hearing, the NASD arbitration
16 panel agreed with Fiero Bros. and awarded Fiero Bros. $350,000 in compensatory
17 damages, plus interest, jointly and severally against Perle, Waldron, Wedbush and Ed
18 Harris (NASD Arbitration Award"). Fiero Bros. petitioned the Superior Court for the State
19 of California County of Los Angeles to confirm the NASD Arbitration Award, which was
20 granted. On April 6, 1999, the Fiero Judgment was entered for $350,000 against Perle and
21 Waldron.

22       Fiero Bros. was Perle's first victim, but not his last to file suit; as did the regulators.
23 SEC commenced its own investigation into the alleged fraudulent trading activity in IBUY
24 stock. On September 23, 1998, the SEC  filed the SEC Action against Perle and Waldron
25 violations of the anti-fraud provisions of the federal securities laws, the Honorable Dickran
26 Tevrizian presiding.  Judge Tevrizian granted summary judgment in favor of the SEC,
27 making specific findings of fact and conclusions of law that Perle had engaged in securities
28 fraud.

1        Thereafter, in March 1999, Corsair and AI jointly filed suit in the Central District of

2  California against Perle, Waldron, and Wedbush for violations of federal securities laws

3  for market manipulation regarding IBUY stock and the resulting damage to market makers

4  like the Fiero Bros and Corsair ("Corsair District Court Action"), based upon some of the

5  same transactions involving Fiero Bros. (i.e., they were part of the same illegal buy-in).

6  Judge Rafeedie eventually entered judgment against Perle and in favor of Corsair and AI

7  in the Corsair District Court Action for $685,825.00.

8        On May 25, 2001, Perle filed for Chapter 7 bankruptcy. Perle did not name Fiero

9  Bros. as a creditor in his bankruptcy proceeding. On August 28, 2001, Corsair and AI filed

10  the Corsair Adversary Proceeding with this Court. In May 2002, Cosair and AI filed their

11  motion for summary judgment or, alternatively partial summary judgement, which motion

12  was granted on August 13, 2002. In its ruling, Judge Sheri Bluebond ruled that Corsair's

13  judgment entered in the Corsair District Court Action was nondischargeable under

14  Bankruptcy Code Section 523(a)(6). Judge Bluebond's decision was based on the same

15  facts as the SEC Action. Many of the transactions were asserted in Fiero Bros.' NASD

16  Arbitration.

17        The Fiero Bros. Judgment survives discharge under Bankruptcy Code section

18  523(a)(6) and 523(a)(19). Under principles of collateral estoppel, Perle cannot

19  demonstrate any genuine issue of material fact to withstand the instant motion, and Plaintiff

20  is entitled to judgment as a matter of law. Perle has previously litigated the issue of

21  whether he committed securities fraud and engaged in improper wilful and malicious

22  activities in the fraudulent buy-ins of IBUY stock for Fiero Bros and others, and lost. Perle

23  has also been found liable to two other short sellers of IBUY stock (i.e. Corsair and AI) for

24  these same illegal activities involving the same transactions. Given the magnitude of

25  evidence, the findings of fact, conclusion of law and judgments entered in these three

26  previous proceedings, Perle should not now be permitted to waste the Court's and

27  Plaintiff's time and resources, to try issues which have previously and repeatedly been

28  established against him.

## II.    STATEMENT OF FACTS

### A.    The Initial Public Offering of Shopping.com

In the Corsair Adversary Proceeding, based upon a complaint alleging the same exact misconduct as the instant proceeding, and based upon the SEC action and the findings of fact and conclusions of law found therein, this court has already found the following facts and rendered the following conclusions of law:

Waldron & Co., Inc. was a registered securities broker-dealer and member of the NASD, which had its principal office in Irvine, California. (Exhibit 1 to Appendix of Evidence ("App. Ex."), Finding No. ("F.N.") 1; App. Ex. 2, F.N. 1.) Defendant Perle was the President and one-third owner of Waldron. (Ex. 1, F.N. 1; Ex. 2, F.N. 4.) Prior to his termination on August 28, 1998, Perle controlled the operations of Waldron. (Ex. 1, F.N. 26; Ex. 2, F. Ns. 5.8, 9.)

Shopping.com was a start-up internet retailer based in Corona del Mar, California. (App. Ex. 1, F.N. 2; App. Ex. 2, F.N. 6.) In or about August 1997, Waldron planned Shopping.com's initial public offering ("IPO"). (App. Ex. 1, F.N. 2; App. Ex. 2, F.N. 10.). Perle performed due diligence for the IPO and participated in the road shows for the IPO to introduce Shopping.com to potential investors. (App. Ex. 1, F.N. 2; App. Ex. 2 F. Ns. 11-12.) Waldron as lead underwriter took Shopping.com public on November 25, 1997 (Ex. 1, F.N. 2; App. Ex. 2, F. Ns. 10-14.) Shopping.com's initial public offering raised $11.7 million from the sale of 1.3 million shares of common stock at a price of $9.00 per share. (App. Ex. 1, F.N. 3; App. Ex. 2, F.N. 14.) After the initial public offering, 1.3 million shares of IBUY stock traded publicly in the NASD over-the-counter("OTC") market. (App. Ex. 2, F.N. 15.)

Waldron was also the primary market maker for IBUY stock, meaning that Waldron posted bid and ask prices to the public and stood ready to buy or sell the stock at the posted prices. (App. Ex. 1, F.N. 4; App. Ex. 2, F.N. 16; App. Ex. 3, ¶9.) From November 1997 through at least April 1998, Waldron controlled nearly all of the IBUY shares available for public trading. (App. Ex. 1, F.N. 5.) Between November 25, 1997 and March 23, 1998,

1  IBUY's stock price increased 255% from $9.00 to $32.13 per share, despite the company's

2  dismal financial performance. (App. Ex. 1, F.N. 5; App. Ex. 2, F.Ns. 17-18.) As of

3  December 19, 1997, Waldron held 253,295 shares of IBUY stock in its inventory accounts,

4  and its customers held 972,320 shares of the stock in their accounts. Thus, as of

5  December 19, 1997, Waldron controlled 94.3% of the 1.3 million publicly tradable shares,

6  and continued to hold over 90% of those shares from December 19, 1997 through April 3,

7  1998. (App. Ex. 1, F.N. 6, App. Ex. 2., F.Ns. 19-22)  Waldron cleared its securities

8  transactions through Wedbush, Morgan Securities, Inc. ("Wedbush."). (App. Ex 1, F.N. 7.)

9       On March 24, 1998, the SEC suspended trading in the IBUY stock for ten days

10  citing "recent market activity that may have been the result of manipulative conduct." (App.

11  Ex. 1F.N. 8; App. Ex. 2, F.N. 26.).

12  **B.    The Buy-Ins of Shopping.com Stock**

13       Beginning in January 1998, short sellers were very active in IBUY stock. (App. Ex.

14  1, F.N. 38, App. Ex. 2, F.N. 166.).  A short sale is where a person sells stock that he does

15  not own.  App. Ex. 1, F.N. 39.).  A person who may consider the price of a stock

16  overvalued in the market, i.e., its market price is higher than its actual worth, and based

17  on the expectation that the market will be corrected and the price will drop to reflect the

18  true value of the stock, may offer to sell shares which he does not then own, with the

19  expectation that by the time he must deliver them, he will be able to buy them in the market

20  at a price lower than that at which he has offered to sell. The short seller's gain is the

21  difference between the higher price at which he sold, and the lower price at which he

22  purchased the stock. (App. Ex. 1, F.N. 39.) A "buy-in" is a securities industry procedure by

23  which a buyer, in situations where a seller fails to deliver securities that have been sold to

24  that buyer (called a "fail" in the securities industry), is permitted to go into the market to buy

25  the security, and charge the failing party with the purchase cost. (App. Ex. 1F.N. 40; App.

26  Ex. 2, F.N. 168 fn.7; Affidavit of John Fiero dated December 18, 2008 ("J. Fiero Aff.") ¶ 9.)

27       Because Waldron controlled over 90% of the publicly tradable shares of IBUY,

28  Waldron was able to execute a short squeeze by which Waldron created a shortage of

1   stock in the market and made it difficult for short sellers to find stock to deliver on their

2   short sales. (App. Ex. 1, F.N. 1; App. Ex. 2, F.N. 167.) Due to Waldron's control and the

3   fact that it was on the buy side of most short sales, Waldron used its own inventory to "buy-

4   in" short sellers who could not deliver shares they sold, and charged them prices in excess

5   (by up to 50%) of the closing price of the stock on the day of the "buy-ins." (App. Ex. 1, F.N.

6   41; App. Ex. 2, F.Ns. 166-170; App. Ex. 3, ¶ 21; App. Ex. 19 ( Declaration of Thomas

7   Martinsen dated December 15, 1998, ¶ ¶ 9,10, and Exs. 7, 9 and 10).

8       In order to keep the price of IBUY stock artificially high and to control the public float,

9   from February 1998 through mid-March 1998, Perle, Waldron, and their clearing firm

10  Wedbush, jointly conducted numerous illegal buy-ins of IBUY stock at prices above the

11  already manipulated market price. (App. Ex. 1, F.N. 48, App. Ex.18, ¶¶ 43-54.)

12      As a result of Waldron's and Perle's short squeeze, from December 22, 1997

13  through March 23, 1998, Waldron realized profits of approximately $1,759,729. (App. Ex.

14  2, F.N. 170.)  Additionally, between late November 1997 and March 1998, Waldron

15  realized profits of almost $1.5 million in ordinary trading of IBUY stock. (App. Ex. 2, F.N.

16  171.)

17          **C.    Fiero Bros.' Short Position in Shopping.com Stock**

18      Fiero Bros. was a registered securities broker-dealer and member of the National

19  Association of Securities Dealers, Inc. ("NASD") and market-maker and short seller of

20  numerous securities trading on the NASDAQ system, including IBUY stock. (J. Fiero Aff.

21  ¶3.)   As a market-maker, Fiero Bros. was responsible for maintaining an orderly,

22  non-volatile market in each issue for which it makes a market and as such is obliged to

23  purchase or sell specific amounts of securities in each such issue, for its own account, as

24  market conditions may warrant. (J. Fiero Aff., ¶ 3.) As a result, Fiero Bros., at times had

25  to sell shares that it did not own, which in the securities industry is commonly referred to

26  as taking a "short" position. (J. Fiero Aff., ¶ 4; App. Ex. 3.). (App. Ex. 1, F.N. 39.)

27      Fiero Bros. cleared its securities trades through King Financial Services, Inc. ("King")

28  which in turn, cleared its trades (including the Fiero Bros. trades) through the National

1   Securities Clearing Corp ("NSCC"). (J. Fiero Aff., ¶ 5.) At all times relevant to this matter,

2   Fiero Bros. made a market in the shares of IBUY stock. (J. Fiero Aff., ¶6.) Trades made

3   by Fiero Bros. in the shares of IBUY were cleared through NSCC. (J. Fiero Aff., ¶ 6.)  In

4   1998, Fiero Bros. had a short position in IBUY stock. (J. Fiero Aff., ¶ 13.)

5       Fiero Bros., like Corsair and AI, were short sellers of IBUY stock who were caught

6   in Perle's short squeeze. (App. Ex. 1, Findings No. 47.; App. Ex. 2, Findings Nos. 166-170.;

7   App. Ex. 3; J. Fiero Aff., ¶¶ 8, 13.) From February 12, 1998 through March 16, 1998, Fiero

8   Bros. had short positions which were fraudulently "bought in"[1] at excessive prices as

9   follows:

| DATE | QUANTITY | BUY-IN PRICE | MARKET PRICE |
|------|----------|--------------|--------------|
| February 12, 1998 | 35,350 | 25 1/4 | 21 5/8- 24 3/4 |
| March 6, 1998 | 25,455 | 29 | 25 15/16- 25 31/32 |
| March 11, 1998 | 36,428 | 36 | 29 1/4- 29 5/16 |
| March 16, 1998 | 38,050 | 26.5 | 21 13/16- 21 7/8 |

15  (App. Ex. 23; J. Fiero Aff.,¶ 8; ¶ 24; App. Ex. 3, ¶ 21; App. Ex. 2, F.Ns. 166-170; App. Ex.

16  19, ¶¶ 9, 10, Ex. 7; App. Ex. 20, p. 59:2-25.)

17      Waldron and Perle knew that Fiero Bros. was a market maker, knew Fiero Bros.

18  was shorting IBUY stock, and was being caught in the short squeeze as it could not make

19  delivery of IBUY Stock since it was controlled by Waldron. (App. Exs. 20, 22 and 23.)

20      **D.    Perle and Waldron's Market Manipulation of Shopping.com Stock**

21      Since the time of Shopping.com's initial public offering in November 1997, Waldron

22  has supported the price of the IBUY stock through artificial market making activity, illegal

23  "parking" arrangements, improper guarantees against loss and fraudulent purchases and

24  sales. (App. Ex. 1, F.Ns. 27-37; App. Ex. 2, F.Ns. 50-57, 55, 61, 63-76.) Waldron's net

25

26  [1]  "Buy-ins" of stock are regulated by the Rules of the NASD (now Financial Industries Regulatory
    Authority ("FINRA"), including Rule 11810(c)(1)(C) of the NASD Uniform Practice Code. (J. Fiero Aff.,

27  ¶10.) NASD rules require shares bought in for the account of a seller be purchased at the best available
    price, that the seller who is subject to a buy in transaction relies upon compliance upon the rules, and that

28  the executing members must be able to defend the price at which the buy-in is executed relative to the
    market at the time of the buy-in. (J. Fiero Aff., ¶¶10, 11;  Rule 11810(c)(1)(C).)

1  capital eventually became insufficient to permit it to purchase additional IBUY shares for

2  its own account. Waldron then began "parking" IBUY shares in real and fictitious customer

3  accounts, i.e., purchasing shares of IBUY for customers' accounts without authority to do

4  so, so that it might continue to prop up the price. (App. Ex. 1, F.N. 34; App. Ex. 2, F.Ns. 41-

5  82.) (App. Ex. 3 ¶ 12.)

6      Additionally, Perle, president of Waldron, wrongfully directed Waldron's trading

7  personnel not to accept sell orders from Waldron customers and, also, improperly

8  pressured Waldron's registered representatives to purchase IBUY shares for their

9  customers' accounts without regard to the suitability of the investment. (App. Ex. 1, F.N.

10  35; App. Ex. 2, F.Ns. 83-144.). These fraudulent activities were not disclosed to Fiero

11  Bros. (App. Ex. 3, ¶ 9,10; App. Ex. 3.)

12      **E.    Waldron and Perle's Conduct Against Fiero Bros.**

13      As a result the fraudulent conduct concerning IBUY stock, on February 17, 1998,

14  Fiero Bros. filed a Claim with the NASD Dispute Resolution, Inc. alleging that Perle and

15  Waldron engaged in fraudulent, artificial market-making activity, parking arrangements,

16  guarantees against loss, and fraudulent buy-in on February 12, 1998 of IBUY stock against

17  Fiero Bros. (J. Fiero Aff., ¶ 14.) This Statement of Claim was amended on March 18, 1998

18  to include additional wrongful activity and three additional fraudulent buy-ins (App. Ex. 3;

19  J. Fiero Aff. ¶¶15-17.) Perle and Waldron denied Fiero Bros.' claims, and filed counter-

20  claims against Fiero Bros.

21      Between September 1-4, 1998 the claims between Fiero Bros. and Perle, et. al.

22  were arbitrated. Fiero Bros. put on evidence of Perle and Waldron's control of IBUY stock,

23  their market manipulation of IBUY, their forced buy-ins of IBUY stock apportioned against

24  Fiero Bros., and the damages suffered by Fiero Bros. from Perle and Waldron' conduct.

25  (App. Ex. 23; Supplemental Affidavit of John Fiero dated September 28, 2009 ("J. Fiero

26  Supp. Aff."), ¶¶ 3, 4-50, 52-60, 65-71, Exs. 6-26.). Many of these same exhibits were used

27  by Corsair in their later District Court action and in their Adversary Proceeding. Akins Aff.,

28  ¶22; App. Ex. 21.)

1   After a four-day evidentiary hearing on the claims and counter-claims, the NASD

2   arbitration panel agreed with Fiero Bros. that Perle and Waldron had improperly engaged

3   in market manipulation and fraudulent buy-ins of IBUY stock against Fiero Bros. and

4   awarded Fiero Bros. $350,000 in compensatory damages, plus interest, jointly and

5   severally against Perle, Waldron, Wedbush and Ed Harris. (App. Ex. 4, J. Fiero Aff. ¶ 17,

6   Ex. 2.)

7   Specifically, the NASD Arbitration Award case summary reflected that Fiero Bros.'

8   claim was that Perle "engaged in artificial market making activity, parking arrangements,

9   guarantees against loss, and fraudulent purchasing in connection with Shopping.Com

10  ("IBUY") stock." (App. Ex. 4.) The NASD Arbitration Award also assessed all NASD forum

11  fees and arbitration costs against the respondents. (App. Ex. 4.)

12  On February 22, 1999, Fiero Bros. filed its Petition to Confirm Arbitration Award as

13  to respondents Waldron and Perle ("Petition") in the Los Angeles Superior Court, Case No.

14  BS055659 against Perle and Waldron.  (App. Ex. 5; J. Fiero Aff., ¶¶18-20, Ex. 3.) On

15  March 17, 1999, Fiero Bros.' Petition came on for hearing in the Los Angeles Superior

16  Court. The Minutes and Ruling on Fiero Bros.' Petition reflect that the Petition was

17  supported by the documents and that the Court GRANTED Fiero Bros.' Petition and

18  confirmed the Arbitration Award in the sum of $350,000 against Waldron and Perle. (App.

19  Ex. 6, p.1:22-2:26-p.3:2; J. Fiero Aff., ¶ 21, Ex. 4.)  On April 6, 1999 the Los Angeles

20  Superior Court issued its Order Confirming Arbitration Award and entered the Fiero

21  Judgment. (App. Exs. 7, 8; J. Fiero Aff., ¶¶ 22, 23, Exs. 5,6.)  Notice of Entry of Judgment

22  was filed on April 20, 1999. (App. Ex. 9; J. Fiero Aff., 24, Ex. 7.) On January 4, 2000, Fiero

23  Bros. filed its Abstract of Judgment for $350,000, which the Clerk of the Los Angeles

24  Superior Court issued on January 6, 2000 . (App. Ex. 10; J. Fiero Aff., ¶25; Ex. 8.)

25  **F.   The SEC Action Against Perle and Waldron[2]**

26

27      [2] The foregoing information were included in the findings of fact and conclusions of law issued by
the SEC enforcement action entitled Securities and Exchange Commission v. Cery B. Perle, C.D. Court
28  Case No.98-824 LHM (Anx), subsequently Case No.99-3299 DT (Ex),(the "SEC Action").

1     On September 23, 1998, the SEC filed civil action in the District Court against Perle

2   for violations of the anti-fraud provisions of the federal securities laws with respect to their

3   activities relating to IBUY stock. (App. Ex. 1, F.N. 14; App. Ex. 17.) The SEC alleged that

4   between November 25, 1997 and March 23, 1998--*the relevant dates during which the*

5   *Fiero Bros. were damaged as a result of Defendant's stock manipulation*--Waldron and

6   Perle artificially raised the price of IBUY stock 255%, from its initial public offering price of

7   $9.00 per share, to a high of $32.13 per share, resulting in over $4.1 million in ill-gotten

8   gains to Waldron. (App. Ex. 1, F.N. 15; App. Ex. 17 ¶¶9, 26.) It further alleged that

9   Waldron and Perle manipulated the price of the stock by (1) controlling the supply,

10   purchasing large blocks of stock to reduce the amount of shares available for public

11   trading, executing unauthorized trades and parking stock in customer and fictitious

12   accounts, and restricting customers from selling IBUY stock in their accounts; and (2)

13   creating artificial demand for the stock, by issuing a false and misleading press release,

14   and while Waldron was acting as a market maker, raising the bid for the stock without

15   economic justification. (App. Ex. 1, F.N. 16; App. Ex. 17, ¶¶2-4,9-30.)

16     On December 17, 1998, the SEC moved for summary judgment on its claims and

17   the District Court in the SEC Action entered a final judgment ordering Perle to pay a civil

18   penalty of $110,000 and enjoining him from future violations of the securities laws was

19   entered on February 11, 1999. (App. Ex. 1, F.N.S. 20-24.; App. Ex. 13.)

20     On May 3, 1999, Judge Tevrizian issued detailed findings of fact and conclusions

21   of law regarding Perle's and Waldron's activities with respect to IBUY stock, and concluded

22   that Perle violated the antifraud provisions of the securities laws, including Section 17(a)

23   of the Securities Act of 1933, 15 U.S.C. §77q(a), Section 10(b) of the Securities Exchange

24   Act of 1934 (the "1934 Act"), 15 U.S.C. §78j(b), and Rule l0b-5, 17 C.F.R. §240.10b-5,

25   Section 20(a) of the1934 Act, 15 U.S.C. §78t(a), Section 15(c)(l) of the 1934 Act, 15 U.S.C.

26   §78o(c)(l), and Rule 15cl-2, 17 C.F.R. §240.15c1-2. (App. Ex. 1, F.N. 25; App. Ex. 2, pp.

27   25:8-28:14.)

28   / / /

1    Further, Judge Tevrizian in the SEC Action made the following specific findings of

2   fact, which were later adopted and accepted as uncontroverted findings of fact by the

3   Honorable Sheri Bluebond in the Adversary Proceeding filed by <u>Corsair Capital Partners,</u>

4   <u>L.P. and Alternative Investments, L.P. v. Cery Bradley Perle</u>, United States Bankruptcy

5   Court for the Central District of California- Los Angeles Division, Adversary Proceeding No.

6   AD01-02219-BB in the bankruptcy action entitled <u>In Re Cery Bradley Perle</u>, United States

7   Bankruptcy Court For the Central District of California- Los Angeles Division, Case No. LA

8   01-26497-BB ("Corsair Adversary Proceeding"):

9       **1.    Perle exercised absolute control over Waldron.**

10    Perle directly controlled all of Waldron's operations, and micro-managed its

11  personnel and operations. No decisions were made without his approval, including who

12  was hired and who was fired. No trades were executed without Perle's knowledge and

13  approval. (App. Ex. 2, F.Ns. 8-9; App. Ex. 26.)

14      **2.    Perle manipulated the stock of Shopping.com in a manner and at times
         which resulted in damage to Fiero Bros.**

15    By August 1997, before the IPO, Waldron was planning to manipulate the supply

16  of IBUY stock. (App. Ex. 2, F.Ns. 27-28; App. Ex. 1, F.N. 27.) Perle and Waldron acted to

17  control the supply of IBUY stock by reducing the "float." Waldron was the lead underwriter

18  in the firm commitment underwriting of Shopping.com's 1.3 million share IPO, and when

19  the IPO closed on December 5, 1997, all but approximately 260,000 of the 1.3 million

20  shares sold were held in Waldron's inventory and retail accounts. (App. Ex. 2, F.Ns. 30-31;

21  App. Ex. 1, F.N. 28.) Between November 25, 1997 and January 14, 1998, Waldron was

22  a net purchaser of 251,232 shares of IBUY stock from other broker-dealers. (App. Ex., F.N.

23  32; App. Ex. 1, F.N. 29.) Such large purchases just after an IPO suggest an effort to

24  reduce the floating supply of a security and so render its price sensitive to demand. (App.

25  Ex. 2, F.N. 33; App. Ex. 1, F.N. 30.)

26    From late November 1997 to at least late March 1998, Perle requested and received

27  from Shopping.com's president Robert McNulty a confidential report generated by

28  Depository Trust Company ("DTC"), at the request of the issuer of a security (not a broker-

1    dealer or market maker such as Perle and Waldron) to allow the issuer to track activity in
2    its stock. (App. Ex. 2, F.Ns. 34-37, 40; App. Ex. 1, F.N. 31.) This report tracked which
3    brokerage firms held or were short IBUY stock in the market. (App. Ex. 1, F.N. 37.) Perle
4    personally monitored the information in the DTC reports and used it to discover which
5    brokerage firms held or were short IBUY stock in the market. (App. Ex. 2, F.Ns. 38,39; App.
6    Ex. 1, F.N. 32.)

7         Perle and Waldron also acted to control the supply of IBUY stock by conducting
8    unauthorized trades and parking IBUY stock in customer accounts. IBUY stock was sold
9    into Waldron customers' accounts without authorization or consent, in some cases
10   resulting in cash deficits generated in those accounts. (App. Ex. 2, F.Ns. 50-54,56-57, 59;
11   App. Ex. 1, F.N. 33.) IBUY stock and other securities were also sold from customer
12   accounts without authorization. (App. Ex. 2, F.Ns. 61,63-65,73; App. Ex. 1, F.N. 33.) In
13   many instances Perle delayed responding to or ignored customers' requests to reverse the
14   unauthorized transactions, and they were reversed only after repeated requests. (App. Ex.
15   2, F.Ns. 55-56,66-72,74-76; App. Ex. 1, F.N. 33.)

16        Perle and Waldron controlled the supply of IBUY stock by parking IBUY stock in
17   fictitious accounts. (App. Ex. 1, F.N. 34.) On February 10 and 11, 1998, Waldron
18   purchased 132,520 shares of IBUY stock into its inventory, increasing its position from
19   87,157 to 219,677 shares, and resulting in its clearing broker, Wedbush Morgan, issuing
20   a margin call for over $2.3 million, which required Waldron to raise funds immediately or
21   risk liquidating part of its IBUY stock inventory position. (App. Ex. 2, F.Ns. 77, 78; App. Ex.
22   1, F.N. 34.) By Waldron selling 75,000 shares of IBUY stock for $1,882,910 between
23   February 9 and 12, from its inventory account to twelve fictitious customer accounts (which
24   had no funds or assets to pay for the purchases) enabled Waldron to resolve its margin
25   call with Wedbush Morgan. (App. Ex. 2, F.Ns. 79,80,81.) On February 17,1998, Waldron
26   repurchased the 75,000 shares back into its inventory account. (App. Ex. 2, F.N. 82; App.
27   Ex. 1, F.N. 34.)

28   ///

1    Perle and Waldron also acted to control the supply of IBUY stock by restricting

2    Waldron's customers' sales of IBUY stock. Perle told Waldron's registered representatives

3    who tried to process their clients' sell instructions that they should "find a home" for the

4    IBUY stock, i.e., sell it to another Waldron client, or risk losing their jobs; all Waldron

5    registered representatives were required to sign a "Penalty Bid" for IBUY stock or else lose

6    their commissions.(App. Ex. 2, F.Ns. 83-86.) When customers tried to sell the IBUY stock

7    within 90 days of the purchase, Waldron employees would not return their calls, would not

8    take the sell orders or follow customer instructions, tried to talk the customers out of selling

9    the stock, ridiculed their decision to sell, and/or tried to convince them to buy more IBUY

10    stock. (App. Ex. 2, F.Ns. 87-100, 101-106, 110-129, 133,135-143.) 124, 126-135; App. Ex.

11    1, F.N. 35.)

12    In early March 1998, Perle and Waldron also created an artificial demand for IBUY

13    stock by directing Waldron's public relations firm to issue a false and misleading press

14    release on Shopping.com, which was a buy recommendation for IBUY stock, to try to

15    counter another firm's negative report about Shopping.com. (App. Ex. 2, F.Ns. 144-147.)

16    Perle provided the public relations firm with the research report, reviewed and approved

17    the press release, and caused it to be published. (App. Ex. 2, F.Ns. 147-157; App. Ex. 1,

18    F.N. 36.)

19    Perle and Waldron also created an artificial demand for IBUY stock by raising the

20    bid without economic justification. Between November 25, 1997 and January 14,1998, the

21    price of IBUY stock rose 46.5%, from $8.88 to $13.00 per share, with Waldron as the

22    driving force behind the increase. (App. Ex. 2, F.Ns. 158-159; App. Ex. 1, F.N. 37.) While

23    ten other broker-dealers quoted IBUY stock in the market during that time, Waldron

24    maintained the high bid price 95.5% of the time during trading hours, advanced the high

25    bid 51 of the 59 times (86.4%) it was raised, and increased its bid 55 times, with 51 of the

26    increases (92.7%) being advances to a new high bid price. (App. Ex. 2, F.Ns. 160-163;

27    App. Ex. 1, F.N. 37.) During that period, Waldron held no less than 100,000 shares of IBUY

28    stock in its inventory, and frequently held over 200,000 shares. (App. Ex. 2, F.N. 164; App.

1  Ex. 1, F.N. 37.) It defies logic for a market maker to raise the bid for a security when it

2  holds a substantial amount of the stock in its inventory. Internal retail demand for a stock

3  is generally filled from a broker-dealer's inventory before an effort is made to purchase (bid

4  for) the stock on the market. (App. Ex. 2, F.N. 165; App. Ex. 1, F.N. 37.)

5  **3.    Short Sellers were damaged and Defendant and Waldron profited from
the manipulation scheme.**

6  Beginning in late January 1998, short sellers, traders who sell stock they do not own

7  to take advantage of an anticipated price drop, were very active in trading of IBUY stock.

8  (App. Ex. 2, F.N. 166; App. Ex. 1, F.N. 38.) Because Waldron controlled over 90% of the

9  publicly tradable shares, it was able to execute a "short squeeze," by which Waldron

10  created a shortage of stock in the market and made it difficult for short sellers to find stock

11  to deliver on their short sales. (App. Ex. 2, F.N. 167; App. Ex. 1, F.N. 41.)[3] Due to

12  Waldron's control of supply and the fact that it was on the buy side of most of the short

13  sales, Waldron was able to use its own inventory to "buy-in" short sellers who could not

14  deliver the shares they sold in doing so, Waldron often charged the bought-in market

15  makers prices far in excess (by up to 50%) of the closing price of the stock on the day of

16  the buy-ins. (App. Ex. 2, F.Ns. 168-169; App. Ex. 1, F.N.41.) Between November 25, 1997

17  and March 23, 1998, Waldron made over $4.1 million in profits as a result of the

18  manipulative activity in IBUY stock. (App. Ex. 2, F.Ns. 170-173; App. Ex. 1, F.N. 41.)

19  **4.    Perle's Conduct Constituted Securities Fraud and Made Him Liable for
Damages.**

20

21  Based on all of the foregoing, Judge Tevrizian concluded in the SEC Action that,

22  inter alia, Perle, by engaging in the conduct described above, directly or indirectly, in

23  connection with the purchase or sale of securities, by the use of the means or

24  instrumentalities of interstate commerce, or of the mails, or of any facility of a national

25  securities exchange, with scienter: (a) employed devices, schemes or artifices to defraud;

26

27  [3] Further, between February 12, 1998 and March 19, 1998, Waldron, Perle and Wedbush illegally
bought-in Fiero Bros."IBUY stock at prices up to $14.00 per share more than the weighted average

28  market price of IBUY stock on the dates of sale. (App. Ex. 23; J. Fiero Supp. Aff., ¶ 19-23, 26-27, 30-31,
32-35 and 36; Exs.1-5, and 9-11.).

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons, in violation of Section l0(b) of the 1934 U.S.C. §78j(b), and Rule l0b-5 thereunder, 17 C.F.R. §240.10b-5. (App. Ex. 2, Conclusion Nos. 2 and 3.) Perle's fraudulent activities also made him liable as a controlling person of Waldron, in violation of Section 15(c)(l) of the 1934 Act. 15 U.S.C. §78o(c)(1), and Rule 15cl-2 thereunder, 17 C.F.R. §240.15c1-2. (App. Ex. 2, Conclusion No. 4; App. Ex. 1, F.N. 42.)

The Court in the SEC Action also ordered injunctive relief noting that (a)Perle's past violations permitted an inference that he would commit future violations; (b) his violations were not isolated but continued over a period of months; (c) Perle acted with a high degree of scienter in conducting the manipulation scheme; (d) Perle's violations of the federal securities laws were egregious; and (e) Perle failed to provide any assurances against future violations of the federal securities laws or recognized the wrongful nature of his conduct. (App. Ex. 2, Conclusion No. 5; App. Ex. 1, F.N. 43.) Additionally, the Court in the SEC Action imposed a $110,000 penalty against Perle as his conduct involved (1) fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and (2) directly or indirectly resulted in substantial losses or created the risk of substantial losses to other persons. (App. Ex. 2, Conclusion No. 6.; App. Ex. 1, F.N. 43.)

**G.    Corsair's and Al's District Court Action Against Perle and Waldron**

In addition the fraudulent buy-ins for Fiero Bros., Perle and Waldron also executed fraudulent buy-ins of IBUY stock against Corsair and Al, who were also short sellers caught in Perle's short squeeze of IBUY stock. (App. Ex. 1, F.N. 47.) As part of their scheme to manipulate the price of IBUY stock as described previously, from March 16, 1998 through May 27, 1998, Waldron, Perle and the Wedbush Defendants illegally bought-in Corsair's and Al's IBUY stock at prices up to $13.25 more than the weighted average market price of IBUY stock on the date(s) of sale. (App. Ex. 1, F.Ns. 48, 49.)

1    Before Perle filed his bankruptcy, and before the filing of the Corsair Adversary

2    Proceeding, Corsair and AI filed an action in the District Court for the Central District of

3    California, Case No. SA CV 99-469 AHS against Perle and others for Federal and state

4    securities law violations and other claims, all resulting from Perle's scheme to profit from

5    manipulation of the market price for IBUY stock ("Corsair District Court Action"). (App. Ex.

6    1, F.N. 50; App. Ex. 18, Ex. 1.) Corsair and AI obtained a default judgment from Judge

7    Rafeedie in the Corsair District Court Action for $685,825.00 against Perle on May 26,

8    2000. ("Corsair Judgment") (App. Ex. 1, F.N. 59; App. Ex. 18, Ex.3.) The Corsair

9    Judgment against Perle was based on Judge Rafeedie's findings that Perle had violated

10   the anti-fraud provision of the federal securities laws particularly Section 10(b) of the 1934

11   act and Rule 10b-5. (App. Ex. 1, F.N. 61.)

12   **H.    Perle's Chapter 7 Petition and Corsair and AI's Adversary Proceeding**

13   On May 25, 2001, Perle filed his Petition for Bankruptcy before this Court, Case No.

14   LA 01-26497-BB. (App. Ex. 1, F.N. 63.) On August 28, 2001, Corsair and AI filed the

15   Corsair Adversary Proceeding seeking to determine the dischargeability of the debt

16   evidenced by the Corsair Judgment on the grounds that Perle's conduct giving rise to the

17   debt was fraudulent, willful and malicious, larcenous and a breach of fiduciary duty, such

18   that it was exempt from discharge under 11 U.S.C. § 523. (App. Ex. 1, F.N. 63, 64.; App.

19   Ex. 18.) On May 14, 2002, Corsair and AI filed their motion for summary judgment or,

20   alternatively partial summary judgement, which was supplemented by Court request on

21   June 18, 2002, and opposed by Perle. (App. Ex. 12, p.2:3-11.) On August 14, 2002 this

22   Court, Judge Bluebond presiding, made its separate findings of fact and conclusions of law

23   in support of Corsair and AI's motion for summary judgment, which was entered August

24   14, 2002 ("Judge Bluebond's Findings") (App. Ex. 1; App. Ex. 12.) Judge Bluebond's

25   Findings adopted in large part the findings of fact and conclusions of law re: the SEC's

26   motion for summary judgment made by Judge Tevrizian in the SEC Action, as set forth

27   above. (App. Ex. 1.) Additionally, Judge Bluebond made additional specific findings with

28   respect to Corsair and AI with respect to the "short squeeze," i.e. fraudulent buy-ins of

Memorandum of Points and Authorities    17    Case No. ADV-06-01971-BB
LA-01-26497-BB

1   IBUY stock (App. Ex. 1, F.Ns. 47-50), in the subsequent Corsair District Court Action that

2   resulted in the Corsair Judgment (App. Ex. 1, F.Ns. 47-62).  Judge Bluebond's Findings

3   then issued the following Conclusions:

4   • The Corsair Judgment issued in the Corsair District Court Action "established the
willful, intentional nature of Perle's conduct, as well as the fact that it violated

5   Section 10(b) and Rule 10b-5, California state securities laws, and California's
unfair business practice statute." (App. Ex. 1, Conclusion No. 6.).

6

7   • The Corsair Judgment issued in the Corsair District Court Action "established as
true each of the allegations of their complaint in that action, and the fact of Perle's

8   liability on each of Plaintiffs' claims therein." (App. Ex. 1, Conclusion No. 7.).

9   • The Judgments against Perle in the Corsair District Court Action and in the SEC
Action, and the findings of fact and conclusions of law entered on the SEC's

10  summary judgment motion, "establish that Perle's conduct was "willful" within the
meaning of 11 U.S.C. § 523(a)(6)." (App. Ex. 1, Conclusion No.13.)

11  • The Judgments against Perle in the Corsair District Court Action and in the SEC
Action, and the findings of fact and conclusions of law entered on the SEC's

12  summary judgment motion, "establish that Perle's conduct was "malicious" within
the meaning of 11 U.S.C. § 523(a)(6)." (App. Ex. 1, Conclusion No.14.)

13

14  • The Judgments against Perle in the Corsair District Court Action and in the SEC
Action, and the findings of fact and conclusions of law entered on the SEC's

15  summary judgment motion, "establish that Perle inflicted a "willful and malicious
injury" upon Corsair and Al and/or their property, within the meaning of 11 U.S.C.

16  § 523(a)(6)." (App. Ex. 1, Conclusion No.15.)

17  • The issues which Corsair and Al sought to avoid relitigating in the Corsair Adversary
Proceeding with regard to § 523(a)(6) "were actually litigated against Perle in the

18  Corsair District Court Action and in the SEC Action." (App. Ex. 1, Conclusion No.
16.)

19  • The issues which Corsair and Al sought to avoid relitigating in the Corsair Adversary
Proceeding with regard to § 523(a)(6) "were actually necessarily decided against

20  Perle in the Corsair District Court Action and in the SEC Action." (App. Ex. 1,
Conclusion No. 17.)

21

22  • The Corsair Judgment "is entitled to collateral estoppel effect." (App. Ex. 1,
Conclusion No. 18.)

23  • The SEC Judgment entered in the SEC Action "is entitled to collateral estoppel

24  effect." (App. Ex. 1, Conclusion No. 19.), and

25  • The Corsair Judgment in the Corsair District Court Action and the SEC Judgment
in the SEC Action, and the findings of fact and conclusions of law entered on the

26  SEC's summary judgment motion, "establish that Perle's [sic] inflicted a willful and
malicious injury" upon Corsair and Al and/ or their property, within the meaning of

27  11 U.S.C. § 523(a)(6)," and that the Corsair Judgment against Perle "is therefore
excepted from discharge in bankruptcy pursuant to 11 U.S.C. §523(a)(6), and that

28  Plaintiffs are entitled to summary judgment in their favor," and that Judgment be
entered in Corsair's and Al's favor. (App. Ex. 1, Conclusions 23 and 24.)

On September 5, 2002, this Court entered its Final Summary Judgment of Nondischargeability of Debt Against Cery Bradley Perle in the Corsair Adversary Proceeding. (App. Ex. 12.) Thereafter, Perle appealed this Court's granting Final Summary Judgment. However, on April 29, 2002, Perle's appeal was dismissed for lack of prosecution. (App. Ex. 15.) On July 11, 2003, the Corsair Adversary Proceeding was closed. (App. Ex. 16.)

## I.    Fiero Bros. Assignment of the Fiero Judgment to Plaintiff

Fiero Bros. assigned the Fiero Judgment resulting from the NASD Arbitration to Plaintiff on March 1, 2006. (App. Ex. 11; J. Fiero Aff., ¶26, Ex. 9; Affidavit of Alfonso Fiero dated December 17, 2008, ¶2, Ex. 1.)

The conduct at issue in the Corsair District Court Action and in the SEC Action was the same conduct at issue in the Fiero Bros. NASD Arbitration against Perle, as well as in the instant Adversary Proceeding and Motion. Fiero Bros. was a victim of several of the same fraudulent buy-ins suffered by Corsair and Al.

Like Fiero Bros. Arbitration Award, the Corsair Judgment against Perle in the Corsair District Court Action did not contain express findings of fact regarding Perle's liability on a particular claim. However, the court records reflect that the Corsair Judgment against Perle was based on Judge Tevrizian's findings in the SEC Action that Perle had violated the antifraud provisions of the federal securities laws, particularly Section l0(b) of the 1934 Act and Rule l0(b)-5 thereunder. (App. Ex. 1, F.Ns. 59-61.)

## III.    ARGUMENT

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 applies to bankruptcy proceedings through Federal Bankruptcy Rule 7056. Albarran v. New Form, Inc. (In re Barboza), 545 F.3d 702, 707 (9th Cir. 2009). Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

1  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Federal Rule of Civil

2  Procedure 56 permits a court to grant summary judgment where (1) the moving party

3  demonstrates the absence of a genuine issue of material fact and (2) entitlement to

4  judgment as a matter of law.  In re Nat'l Western Life Ins. Deferred Annuities Litigation

5  U.S. Dist. LEXIS 62949 (S.D.CA. 2009), citing Celotex Corp. v. Catrett, 477 U.S. 317, 322,

6  106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

7      Summary judgment is proper when "the pleadings, the discovery and disclosure

8  materials on file, and any affidavits show that there is no genuine issue as to any material

9  fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

10 Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin), 525 F.3d 805, 810 (9th Cir. 2008).

11 An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable

12 fact finder could find for the nonmoving party, and a dispute is "material" only if it could

13 affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc.,

14 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

15     The moving party must "identify [ ] those portions of 'the pleadings, depositions,

16 answers to interrogatories, and admissions on file, together with affidavits, if any,' which

17 it believes demonstrate the absence of a genuine issue of material fact". Celotex Corp. v.

18 Catrett, supra 477 U.S. at 323 (quoting Fed.R.Civ.P. 56(c)). However, the nonmovant is

19 not thereby relieved of his own burden of producing in turn evidence that would support a

20 verdict in his favor; under Rule 56(e), a party opposing a properly supported motion for

21 summary judgment may not rest upon mere allegations or denials of his pleading, but must

22 set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S.

23 at 256.  When a motion for summary judgment is properly made and supported, the

24 non-movant cannot defeat the motion by resting upon the allegations or denials of its own

25 pleading.  Rather, the "non-moving party must set forth, by affidavit or as otherwise

26 provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"

27 Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A non-movant's bald

28 assertions or a mere scintilla of evidence in his favor are both insufficient to withstand

1   summary judgment. FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009). "[A] non-movant

2   must show a genuine issue of material fact by presenting affirmative evidence from which

3   a jury could find in his favor." Id. (emphasis in original).

4       In ruling on a motion for summary judgment, the court must consider all of the

5   evidence and all of the inferences reasonably drawn therefrom. Matsushita Elec. Industrial

6   Co. v. Zenith Radio 475 U.S. at p. 574, 587 [106 S. Ct. at 1348, 1356, 89 L. Ed. 2d 538

7   (1986).  However, no genuine issue of fact exists "[w]here the record taken as a whole

8   could not lead a rational trier of fact to find for the non-moving party." Pringle v. Water

9   Quality Ins. Syndicate, 2009 U.S. Dist. LEXIS 69478 (C.D. Ca. 2009), citing  Matsushita

10  Elec. Indus. Co. v. Zenith Radio Corp., supra 475 U.S. at 587.

11  **B.    Fiero Bros.' Arbitration Award and Resulting Fiero Judgment Against
12      Perle is Entitled to Collateral Estoppel and is Non-Dischargeable Under
        Bankruptcy Code Section 523(a)(6) and (a)(19)**

13      Relevant to Plaintiff's complaint, Federal Bankruptcy law provides that a debtor's

14  discharge of debts does not discharge an individual debtor from any debt, (1), for willful

15  and malicious injury by the debtor to another entity or to the property of another entity

16  (523(a)(6)); or, (2), for the violation of any of the Federal or State securities laws, or any

17  regulation or order issued under such Federal or State securities laws, common law fraud,

18  deceit, or manipulation in connection with the purchase or sale of any security which

19  results from any judgment, order, consent order, decree or settlement agreement entered

20  in any Federal or State judicial or administrative proceeding (523(a)(19)).

21      Fiero Brother's Second Amended Statement of Claim put forth three claims:

22  1)Violation of NASD Rule 11810(c)(1)(C); Violation of Section 10(b) of the Securities

23  Exchange Act and SEC Rule 10b-5 and fraud in connection with the buy ins; and 3) Breach

24  of fiduciary duty as a result of the fraudulent excessive markups for IBUY stock in the short

25  squeeze and fraudulent buy-ins.

26      Based on these claims-all of which would be nondischargeable claims- the NASD

27  awarded Fiero Bros. $350,000 in compensatory damages, which then became a judgment.

28  Fiero Bros.' NASD Arbitration Award confirmed as Judgment by the Los Angeles Superior

Memorandum of Points and Authorities      21            Case No. ADV-06-01971-BB
                                                                LA-01-26497-BB

1  Courts, Judge Tevrizian's findings and conclusions in the SEC Action, Judge Bluebond's

2  findings and conclusions in the Corsair Adversary Proceeding, all establish that the Fiero

3  Bros. Judgment is nondischargeable under the doctrine of collateral estoppel and

4  Bankruptcy Code Sections 523 (a)(6) and (a)(19).

5        The doctrine of collateral estoppel provides that a court's decision as to an issue of

6  fact or law necessary to its judgment is conclusive and may preclude re-litigation of the

7  issue in a different action. United States v. Mendoza, 464 U.S. 154, 158 (1984); Allen v.

8  McCurry, 449 U.S. 90, 94 (1980); United States v. Hernandez, 572 F.2d 218, 220 (9th Cir.

9  1978). This doctrine may be applied offensively by a plaintiff to prevent a defendant from

10 litigating an issue that a court previously determined against the defendant. Parklane

11 Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979); United States v. Mendoza, supra at 158;

12 United States v. Ortiz-Diaz, 849 F.Supp. 734, 737 (E.D.Ca. 1994); Waltz v. United States

13 Dep't of Agriculture, 251 F.R.D. 491, 497 (E.D. Cal. 2008); United States v. Boyce, 2000-1

14 U.S. Tax Cas. (CCH) P50,341  (S.D. Ca. 2000).

15        Application of the collateral estoppel doctrine protects litigants from the burden of

16 re-litigating issues already determined, promotes judicial economy by preventing needless

17 litigation, prevents inconsistent decisions and encourages reliance on adjudication.

18 Parklane, 439 U.S. at 326; Allen, 449 US. at 94; Montana v. United States, 440 U.S. at 153

19 (1979); see also 5 C. Wright & A. Miller, Federal Practice & Procedure § 1277 (1990).

20        The doctrine of collateral estoppel, or issue preclusion, applies in nondischargeabity

21 proceedings. Grogan v. Garner, 498 U.S. 279, 284-285 n. 11 (1991); In re Derebery, 324

22 B.R. 349, 353 (C.D.Ca. 2005); In re Elder, 262 B.R. 799, 806 (C.D. Ca. 2001).   The

23 principles of issue preclusion apply in dischargeability proceedings in bankruptcy. See,

24 Grogan, 498 U.S. at 284 & n.11, 111 S. Ct. at 657; In re Elder, 262 B.R. at 806; In re Jung

25 Sup Lee, 335 B.R. 130, 136 (9th Cir. BAP 2005). A confirmed private arbitration award is

26 eligible for issue preclusive effect under California law so as to be applied in a bankruptcy

27 nondischargeability action.   Khaligh v. Hadaegh (In re Khaligh), 338 B.R. 817, 823 (B.A.P.

28 9th Cir. 2006).

1  The NASD Arbitration Award, adjudicated both issued after four days of evidentiary

2  hearings, Fiero Bros. claims and Perle's cross-claims. The NASD Arbitration Panel issued

3  an award in the amount of $350,000 in favor of Fiero Bros. for compensatory damages;

4  all counter claims were denied.  The NASD also assessed all forum fees against

5  Respondents.

6  Fiero Brothers then petitioned the Los Angeles Superior Court to confirm the

7  Arbitration Award into Judgement. Perle did not attack the motion, or seek to vacate the

8  Arbitration Award. The Superior Court, after reviewing the pleadings and evidence, issued

9  the Order confirming the Arbitration Award, and Judgment was entered April 6, 2000.

10  Hence, Fiero Bros.' claims were fully litigated and adjudicated.

11  **C.   SUMMARY  JUDGMENT  SHOULD  BE  GRANTED  IN  FAVOR  OF
     PLAINTIFF.**

12  Plaintiff objects to discharge of the Fiero Bros. Judgment against Perle under

13  §526(a)(6), on the grounds that it is a debt "for willful and malicious injury" by Perle to Fiero

14  Bros. and/or its property. Additionally, Plaintiff objects to the discharge of the Fiero Bros.

15  Judgment under § 523(a)(19) on the ground that it evidences a debt resulting from an

16  arbitration award for securities violations as defined therein. As shown below, the issue

17  necessary to prove these claims are identical to those already decided adversely to Perle

18  in the NASD Arbitration, in the Corsair Adversary Proceeding and in the SEC Action.

19  Accordingly, Plaintiff is entitled to summary judgment on his claims for nondischargeability

20  under 11 U.S.C. § 523(a)(6) and (a)(19).

21  **(i)    Plaintiff' objection to discharge under Section 523(a)(6)**

22  Section 523 (a)(6) excepts from discharge any debt "for willful and malicious injury

23  by the debtor to another entity or to the property of another entity." This Bankruptcy Court

24  had already determined that Perle's conduct on many of the same trades was both willful

25  and malicious. (App. Ex. 1, Conclusion Nos. 13, 14 and 23.) As noted above, Perle's

26  wrongful intent was established in the SEC Action, and in the Corsair Adversary

27  Proceeding (as well as the Corsair District Court Action which led up to the Corsair

28  / / /

1  Adversary Proceeding). In the SEC Action, Judge Tevrizian made detailed findings of fact
2  regarding Perle's egregious conduct. (App. Ex. 2.)

3          Also as discussed above, Perle's wrongful intent and malice were further
4  established by Judge Tevrizian's findings that the Perle's conduct violated the securities
5  laws, that he acted intentionally ("with a high degree of scienter"), that his fraudulent,
6  manipulative conduct was egregious and resulted in distortion of the market for IBUY stock,
7  to his and Waldron's benefit and the detriment of others. (App. Ex. 2, pp. 25:10-28:11.)
8  Thus, the doctrine of collateral estoppel and res judicata based upon the judgments and
9  findings in the prior SEC Action and Corsair Adversary Proceeding establish that Perle's
10 conduct regarding the buy-in's violated Section 523(a)(6). To a large and relevant extent,
11 Judge Bluebond relied on Judge Tevrizian's findings and conclusion in reaching her
12 decision in the Corsair Adversary Proceeding that the Corsair Judgment was excepted
13 from discharge under 11 U.S.C. 523(a)(6).

14          a.    The Issues Were Necessarily Determined Against Perle.

15          The third requirement that must be met is, that the issue was "necessarily decided"
16 in the District Court action. In this Circuit it stands that a conceptual matter, if an issue was
17 necessarily decided in a prior proceeding, it was actually litigated." In re Bigelow, 271 B.R.
18 178, 185 (9th Cir. BAP 2001) (citation and internal quotes omitted). "A judgment must
19 indicate what was adjudicated, as distinguished from setting forth findings of fact and
20 conclusions of law." In re Younie, 211 B.R. 367, 374 (9th Cir. 1997). Moreover, in
21 discovering what issues were determined by the judgment in a prior action, the court in the
22 second action is free to examine the pleadings and the evidence in the prior action[4]. If the
23 rendering court made no express findings on issues raised by the pleadings or the
24 evidence, the court may infer that in the prior action a determination appropriate to the
25 judgment rendered was made as to each issue that was so raised, and the determination

26

27          [4] In an effort to conserve paper, Fiero Bros. Has not included copies of all of the evidence
     presented at the NASD arbitration. However, additional evidence can be presented if the Court wishes to
28  see the entire record of exhibits and testimony.

Memorandum of Points and Authorities    24          Case No. ADV-06-01971-BB
                                                    LA-01-26497-BB

1  of which was necessary to support the judgment. 18 Moore's Federal Practice,

2  §132.03[4][h] (Matthew Bender 3d Ed. 2002).

3         b.   The Issues Were Finally Decided on the Merits.

4       The requirement that an issue be finally decided requires a final judgment or

5  decision of the issue in the first action. 18 Moore's Federal Practice, §132.03[5][b] (3d ed.

6  2002). "The issue previously litigated must have been necessary to support a valid and

7  final judgment on the merits." Id.

8       In the Los Angeles Superior Court, Fiero Bros. filed the Petition to Confirm the

9  Arbitration Award and the Final Judgment was entered against Perle. (App. Exs. 5-10; J.

10  Fiero Aff., ¶¶ 17-25.)  Likewise, in both the SEC Action and the Corsair Adversary

11  Proceeding, judgments against Perle were entered and have become final.  In each of

12  these three proceedings, Perle had the opportunity and incentive to fully litigate and

13  defend, and even to cross-complaint.  Perle cannot now try to introduce new evidence at

14  the trial of this action on the issues that were determined in those proceedings some ten

15  years ago. 18 Moore's Federal Practice §132.03[5][b][l] (3d ed. 2002) ("a ruling that is final

16  on the issue of liability precludes the party against whom the decision ran from presenting

17  further evidence on the issue finally determined in the first action").

18         c.   Collateral Estoppel Bars the Discharge of Perle's Debt to Plaintiff.

19       Each of the factors above weighs in favor of excepting the debt the Fiero Judgment

20  from discharge under Section 523(a)(6) and (a)(19). Perle litigated the claims asserted by

21  and against Fiero Bros.  Perle also had the opportunity to defend himself in the SEC

22  Action, and in the actions brought by Corsair alleging the same wrongful conduct.  The

23  purpose of bankruptcy law is to afford relief to the "honest but unfortunate debtor." Cohen

24  v. de la Cruz, 523 U.S. 213, 217, 218-219 (1998); Petralia v. Jercich (In re Jercich), 238

25  F.3d 1202 (9th Cir.), cert. denied, 533 U.S. 930 (2001).  Perle's misconduct has been

26  established in at least three separate prior proceedings.

27      **D.**   **Plaintiff's Judgment Is Based on Securities Fraud and Manipulation and**

28           **is Thus Non-Dischargeable Under Bankruptcy Section 523(a)(19).**

1    Bankruptcy Section 523(a)(19), exempts from discharge judgments and arbitration

2  awards based upon or involving state or federal securities law violations and disallows the

3  discharge for any debt that:

4    (A) is for

5    (i) the violation of any of the Federal securities laws  (as that term is defined in
     section 3(a)(47) of the Securities Exchange Act of 1934 [15 USCS § 78c(a)(47)])[5],
6    any of the State securities laws, or any regulation or order issued under such
     Federal or State securities laws; or (ii) common law fraud, deceit, or manipulation
7    in connection with the purchase or sale of any security; and

8    (B) results from—

9    (i) any judgment, order, consent order, or decree entered in any Federal or State
     judicial or administrative proceeding; (ii) any settlement agreement entered into by
10   the debtor; or (iii) any court or administrative order for any damages, fine, penalty,
     citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other
11   payment owed by the debtor.

12    Section 523(a)(19) was added to the Bankruptcy Code by §803 of the

13  Sarbanes-Oxley Act of 2002. Pub. L. No. 107-24, 116 Stat. 745. Its purpose was to

14  "[a]mend the Bankruptcy Code to make judgments and settlements based upon securities

15  law violations nondischargeable, protecting victims' ability to recover their losses." In re

16  Chan, 355 B.R. 494, 593 (E.D. PA 2006), citing 148 Cong. Rec. S1787 (daily ed. March

17  12, 2002)(statement of Senator Leahy); see,  In re WorldCom, Inc., 329 B.R. 10, 16

18  (S.D.N.Y. 2005).   By its terms, §523(a)(19) encompasses both statutory securities

19  violations and common law fraud, deceit, or manipulation in connection with the purchase

20  or sale of a security. In re Civiello, 348 B.R. 459, 464 (Bankr. N.D. Ohio 2006).  The plain

21  language of Section 523(a)(19), aligning with the expressed legislative intent, indicates that

22  its coverage is broad. In re Civiello, supra at 459, 464.

23  / / /

24

_____

25    [5] The term "securities laws" means the Securities Act of 1933 (15 U.S.C. 77a et seq.),
     the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the Sarbanes-Oxley Act of 2002,
26   the Public Utility Holding Company Act of 1935 (15 U.S.C. 79a et seq.), the Trust Indenture Act
     of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act of 1940 (15 U.S.C. 80a-1 et
27   seq.), the Investment Advisers Act of 1940 (15 U.S.C. 80b et seq.), and the Securities Investor
     Protection Act of 1970 (15 U.S.C. 78aaa et seq.).
28

1    Fiero Bros.' Second Amended Statement of Claim asserted that it suffered damages

2  arising from Perles' IBUY stock, (1) forced buy-ins of Shopping.com stock against Fiero

3  Bros. at prices that were fraudulently inflated and above the market price in violation of

4  NASD Rule 11810(c)(1)(C), and (2) violated Rule 15 U.S.C. Section 78i(a) of the 1934

5  Securities Exchange Act and SEC Rule 10b-5 when it manipulated the price of IBUY stock

6  and engaged in forced buy-ins of IBUY stock at prices far in excess of the market price and

7  true value of said stock. The NASD Panel agreed and entered an award for $350,000 as

8  compensatory damages. Hence, Section 523(a)(19) precludes this claim from discharge.

9    NASD Rule 11810(c)(1)(C), regarding a seller's failure to deliver securities after

10  receipt of notice of buy-in, provides: "As provided in paragraph (c)(1)(A) and (B) hereof,

11  members must be prepared to defend the price at which the "buy-in" is executed relative

12  to the current market at the time of the "buy-in." This NASD Rule, was promulgated under

13  the authority of the Securities Exchange Act of 1934, under the powers of the SEC.[6] Its

14  violation serves as a basis for non-dischargeability under section 523 (a)(19).

15    15 U.S.C. §78i(a) of the Federal Securities Exchange Act of 1934 provides that it

16  is "unlawful for any person, directly or indirectly, by the use of the mails or any means or

17  instrumentality of interstate commerce, or of any facility of any national securities

18  exchange, or for any member of a national securities exchange–

19    (6) To effect either alone or with one or more other persons any series of
       transactions for the purchase and/or sale of any security registered on a national
20     securities exchange for the purpose of pegging, fixing, or stabilizing the price of
       such security in contravention of such rules and regulations as the Commission may

21

22    [6] FINRA  ARTICLE XI RULES

23  Sec. 1.  To promote and enforce just and equitable principles of trade and business, to maintain high
    standards of commercial honor and integrity among members of the Corporation, to prevent fraudulent and
    manipulative acts and practices, to provide safeguards against unreasonable profits or unreasonable rates
24  of commissions or other charges, to protect investors and the public interest, to collaborate with governmental
    and other agencies in the promotion of fair practices and the elimination of fraud, and in general to carry out
25  the purposes of the Corporation and of the Act, the Board is hereby authorized to adopt such rules for the
    members and persons associated with members, and such amendments thereto as it may, from time to time,
26  deem necessary or appropriate. If any such rules or amendments thereto are approved by the Commission
    as provided in the Act, they shall become effective Rules of the Corporation as of such date as the Board may
27  prescribe. The Board is hereby authorized, subject to the provisions of the By-Laws and the Act, to administer,
    enforce, suspend, or cancel any Rules of the Corporation adopted hereunder.

28

prescribe as necessary or appropriate in the public interest or for the protection of investors."

Additionally, Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful: for any person, directly or indirectly, . . . (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, <u>any manipulative or deceptive device or contrivance in contravention of such rules and regulations</u> as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j. Further, Rule 10b-5, adopted by the SEC in 1942, casts the Section 10(b) proscription in similar terms:

It shall be unlawful for any person, directly or indirectly. . .

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to <u>engage in any act, transaction practice, or course of business which operates or would operate as a fraud or deceit upon any person</u>, in connection with the purchase or sale of any security.

The SEC has consistently held that a dealer cannot charge prices not reasonable related to the prevailing market price without disclosing that fact. <u>U.S. SEC v. Zwick</u>, 2007 U.S. Dis. Lexis (19045) (SDNY 2007). Where a defendant "exacts unreasonable profits resulting from a price which bears no reasonable relation to the prevailing price" of the security, the anti-fraud provisions of the Securities Act and the Exchange Act are violated. <u>In the Matter of Duker & Duker</u>, 6 S.E.C. 386, 389 (1939). The legal standard for determining when a markup is excessive has long been whether, based on all of the facts and circumstances in a given case, the price charged was reasonably related to the prevailing market price. <u>SEC v. Feminella</u>, 947 F. Supp. 722, 729 (S.D.N.Y. 1996), citing to <u>In the Matter of Sheldon, Reid, and Pattison</u>, Exch. Act Rel. No. 31,475 (Nov. 18, 1992), 52 SEC Dkt. 3826, 3862.

In <u>Grandon v. Merrill Lynch & Co.</u>, 147 F. 3d 184, 191 (2nd Cir. 1998), the Court stated that mark ups for equity securities generally should not exceed five percent the prevailing market price. " (citing, <u>First Independent Group, Inc. v. SEC</u>, 37 F. 3d 30, 32

1  (2nd Cir. 1994), citing NASD Rules, section 4, Interpretation of Governors NASD mark up

2  policy.)   Charges above accepted 5% policy have been determined excessive. See,

3  Costello, Russotto & Co., Exchange Act Release No. 7729, 42 S.E.C. 798, 1965 WL 6611,

4  at *3 (Oct. 22, 1965) ("We have repeatedly held that mark-ups of more than 10 percent are

5  unfair even in the sale of low priced securities . . . ."); cf. Robert B. Orkin, Exchange Act

6  Release No. 32,035, 53 S.E.C. Docket 1963, 1993 WL 89023, at *4 n.30 (Mar. 23, 1993)

7  (markups ranging from 16% to 100% make challenge to 5% policy "largely academic"),

8  aff'd, 31 F.3d 1056 (11th Cir. 1994).

9        In the underlying NASD Arbitration, Fiero Bros. alleged and put forth evidence that

10  the prices charged by Perle and Waldron against Fiero in the forced buy-ins were as

11  follows:

| Date | Buy-In Price | Market Price | Quantity | % Markup | Excess Mark-Up |
|------|--------------|--------------|----------|----------|----------------|
| 2/12 | 25.25 | 24. | 35,350 | 3 % | 44,188 |
| 3/6 | 29 | 25.9375 | 25,455 | 11.6 % | 77,956 |
| 3/11 | 36 | 29.3125 | 36,428 | 18.6 % | 242,610 |
| 3/16 | 26.5 | 24.5 | 38,050 | 7.6 % | 76,100 |

17  (App. Ex. 23; J. Fiero Supp. Aff. ¶17-37, 40-43, Exs. 1-5, 9-11.)

18        In the Matter of the Application of Gary E. Bryant, 51 S.E.C. 463 (1993) the Court

19  found that mark ups of 10.8- 100% were excessive and fraudulent. In Almstead, Dempsey

20  & Co., 47 S.E.C. 1034, 1037 (1984), mark ups between 11.1-20%, held to be excessive.

21  In, In the Matter of Tennessee Securities, Inc. and Charles Roy Gaw, 1974 SEC LEXIS

22  1214 (1974), respondent broker-dealer and president consented to findings of misconduct

23  that they wilfully violated Section 17(a) of the Securities Act and Section 10(b) of the

24  Exchange Act and Rule 10b-5 thereunder by charging excessive markups and permitted

25  and arranged for artificial bid and asked quotations without disclosing such facts to

26  customers.  The excess mark-up above market price charged to Fiero Bros. by Perle to

27  buy-in Fiero Bros.'s short positions in IBUY stock on the dates in question exceeded 18.6%

28  on March16th. (App. Ex. 23.; J. Fiero Supp. Aff., ¶32-35, Ex. 4.)   Fiero Bros. suffered

1  damages from Perle and Waldron instigating the forced buy-ins of IBUY stocks at above

2  market prices  against market makers who were short the stock and could not get it

3  elsewhere other than Walsron.  Perle and Waldron profited from their unlawful domination

4  and control of IBUY stock in the aftermarket.

5  Broker-dealers violate the anti-fraud provisions of the Section 17(a) of the Securities

6  Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder when, acting with

7  scienter, they charge retail customers markups of more than 10% above the prevailing

8  market price at the time the customers make their purchases. See, D.E. Wine Investments,

9  Inc., 66 SEC Docket 0763, 0766 & n.3 (Jan. 6, 1998)); Almstead, Dempsey & Co., 47

10 S.E.C. 1034, 1035 (1985); In the Matter of Sky Scientific, Inc., S.E.C. Initial Decisions

11 Release No. 137, 1999 SEC LEXIS 475 (1999). Additionally, a person is closely involved

12 in the pricing of a security for a broker-dealer, he or she may be held personally liable for

13 excessive markups. See Richard R. Perkins, 1993 SEC LEXIS 882, 51 S.E.C. 380, 383-84

14 (1993) (holding trader and salesman personally liable for excessive markups on grounds

15 that both were closely involved in the pricing of the security and were aware of the market

16 for the security). The SEC has stated that where a firm dominates and controls the market,

17 mark ups should be computed using the contemporaneous prices that the firms paid other

18 broker-dealers for stock it purchased from them.  See Bryant, supra at 463; see also

19 Almstead supra at 1034, 1037.

20 In all but one transaction, the proven mark-up charged to Fiero Bros. exceeded the

21 generally established 5% rule; all but two transactions exceeded a 10% mark-up. (J. Fiero

22 Supp. Aff. ¶¶21-23, 27-29, 30-31, 32-35, and 36, Exs. 1-5.) Further, in the prior actions it

23 was established that Perle controlled Waldron (App. Ex. 2, F.Ns. 8,9), Perle and Waldron

24 controlled and dominated over 90% of the market for IBUY stock. (App. Ex. 2, F.Ns. 19-

25 25.) The excessiveness of the buy-in prices charged to Fiero Bros.is beyond question or

26 defense.

27 It is well established that a broker-dealer commits fraud (in violation of § 10(b) and

28 Rule 10b-5) by charging customers excessive markups without proper disclosure. See,

1 | Grandon supra at 184, 190-191; SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1469 (2nd
2 | Cir. 1996). Further, the failure to disclose an excessive mark up constitutes a violation of
3 | Section 17(a) of the Securities Act. See, SEC v. Feminella, supra at 722, 731.

4 |    Stock manipulation has been defined as the creation of deceptive value or market
5 | activity for a security, accomplished by an intentional interference with the free forces of
6 | supply and demand. In the Matter of Swartwood, Hesse, Inc., 50 S.E.C. 1301, 1307
7 | (1992), citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976). When individuals
8 | occupying a dominant market position engage in a scheme to distort the price of a security
9 | for their own benefit, they violate the securities laws by perpetrating a fraud on all public
10 | investors, violated Section 17(a) of the Securities Act and Section 10(b) of the Securities
11 | Exchange Act and Rule 10b-5 thereunder.

12 |    In the Matter of Pagel, Inc. 48 S.E.C. 223 (1985) is particularly instructive. In that
13 | case, an administrative law judge which found that respondents had manipulated the
14 | market price of the common stock of FilmTec Corporation ("FTC"), and violated various
15 | other provisions of the securities acts. The administrative law judge concluded that the
16 | registrant's broker-dealer registration should be revoked, that registrant should be expelled
17 | from membership in the National Association of Securities Dealers, and that the charged
18 | officers should be barred from association with any broker or dealer. The charged conduct
19 | stems from the after market trading activities in FTC stock immediately after it was taken
20 | public by respondents. During the seven trading days in question, the prices registrant
21 | charged customers who bought FTC shares continued to climb although customers sold
22 | 88,987 shares and only bought 66,680, a 33% excess of sales over purchases. All of the
23 | other dealers in FTC were experiencing a similar excess of customer sales. During that
24 | seven-day trading period, retail customers at other firms sold 20,675 shares of FTC while
25 | purchasing only 6,850 shares. By the close of business on April 10, 1979, seven dealers
26 | were short FTC in the total amount of 4,750 shares, and only registrant had a long position
27 | of 48,607 shares. By that time, the total holdings of registrant and its customers were
28 | 329,875 shares, or 93.7 percent of the 352,000-share public offering. And the retail price

that registrant was charging for FTC had climbed to a high of 10-1/2. Thus the price of FTC

had increased more than 300% above the offering price of 3-1/4 during a period in which

registrant's purchases of FTC substantially exceeded its sales. In the Matter of Pagel,

supra ,223. As the Court stated:

> It seems clear that, when an underwriter such as registrant sells 90% of an offering to its own customers and the remainder is fragmented among a number of other dealers, trading in the aftermarket is necessarily contingent on the underwriter's customers furnishing the supply. Because the identity of those customers is known only to the underwriter, tapping that supply for resale lies uniquely within the underwriter's control. The fact that... an underwriter is in a position to dominate and control the trading market does not necessarily produce a manipulation, but it does enable the underwriter to control wholesale pricing to such an extent as to include an independent competitive market from arising. . . .

> The price leadership resulting from [an] almost exclusive control of the source of supply empowers the underwriter to set prices arbitrarily. If that power is abused, the result is manipulation. . . . In essence, a manipulation is intentional interference with the free forces of supply and demand. Proof of a manipulation almost always depends on inferences drawn from a mass of factual detail. Findings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with free market forces. . .

In determining that the respondents in Pagel abused their control over the market supply

of FTC stock in the immediate first days of trading, the Pagel court stated:

> During that period, customer sales exceeded customer purchases by some 44,000 shares. But respondents did not allow the excess sales to depress FTC's market price, the result that would normally be expected in a free market. On the contrary, during the short span of eight trading days, the price of FTC rose sharply from the offering price of 3-1/4 to 10-1/2. Respondents simply absorbed the excess stock into inventory so that, at the end of the period, the firm's inventory corresponded almost exactly to the excess of customer sales over purchases, while all other dealers had a short position of some 4,750 shares. At that point, registrant and its customers held 93.7% of the 352,000-share public offering. The inference [*9] is compelling that respondents used registrant's control position to cause a sharp and totally unwarranted rise in the price of FTC stock, and thereby engaged in unlawful conduct. As we have previously pointed out:

>> "[I]nvestors and prospective investors . . . are . . . entitled to assume that the prices they pay and receive are determined by the unimpeded interaction of real supply and real demand so that those prices are the collective marketplace judgments that they purport to be. Manipulations frustrate these expectations. They substitute fiction for fact. . . . The vice is that the market has been distorted and made into 'a stage-managed performance.'" n8

/ / /

/ / /

1   *Pagel, Inc.*, supra 48 S.E.C. at 225-226; citing fn. 8, In the Matter of Edward J. Mawod &

2   Co., 46 S.E.C. 865, 871-872 (1977), aff'd sub nom. Edward J. Mawod & Co. v. SEC, 591

3   F.2d 588 (10th Cir. 1979).

4       Fiero alleged that Perle manipulated the market for Shopping.com. This claim was

5   also alleged by the SEC in its lawsuit against Perle and Waldron, and by Corsair in both

6   its underlying District Court case and in its Adversary Proceeding. Such wrongful conduct

7   violates the Federal Securities laws. See,. R. J. Koeppe & Co. v SEC, 95 F2d 550.

8   Likewise, courts have held that the artificially shoring up of the price of stock by means of

9   small purchases and secret inducements to buy, while a company is losing substantial

10  amounts of money, without disclosure is not reflection of genuine demand and is illegal

11  manipulation. United States v Stein (1972, CA2 NY) 456 F2d 844, CCH Fed Secur L Rep

12  P 93385, cert den (1972) 408 US 922, 33 L Ed 2d 333, 92 S Ct 2489, reh den (1972) 409

13  US 898, 34 L Ed 2d 157, 93 S Ct 101. This scenario was proven by the SEC and Corsair

14  with respect to Perle, Waldron and Shopping.com back in 1998. (App. Ex.2, F.Ns. 15-18,

15  41-76,83-143.)  It is irrefutable that the Judgment at issue in this nondischargeability

16  proceeding is nondischargeable under Section 523(a)(19).

17      Plaintiff has established by way of collateral estoppel and res judicata that Perle's

18  conduct has violated securities laws. The Fiero Judgment should be determined exempt

19  from discharge under Section 523(a)(19).

20  E.  **Plaintiff's Judgment is Based on Defendant's Wilful and Malicious Injury
and is Therefore Nondischargeable Under Bankruptcy Code Section**

21  **523(a)(6).**

22      Perle's intentional acts include artificially and fraudulently raising the price for IBUY

23  stock, and covering Fiero Bros.' short position in IBUY stock by executing the buy-ins

24  against Fiero at artificially inflated market prices.  11 U.S.C. §523(a)(6) exempts from

25  discharge debts "for willful and malicious injury by the debtor to another entity or to the

26  property of another entity." Sherman v. SEC (In re Sherman),491 F.3d 948, 9555 (9th Cir.

27  2007).  The malicious injury requirement of Section 523(a)(6) must be determined

28  / / /

1  separately from the willful injury requirement. Albarran v. New Form, Inc. (In re Barboza),

2  supra, 545 F.3d at 711.

3      Generally speaking, the willfulness requirement refers to conduct that is "deliberate"

4  or "intentional." 4 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy P523.12[2],

5  at 523-92.4 (15th rev. ed. 2007). The "willful" injury requirement of Section 523(a)(6) is met

6  "when it is shown either that the debtor had a subjective motive to inflict injury or that the

7  debtor believed that injury was substantially certain to occur as a result of his conduct."

8  Carrillo v. Su (In re Su), 290 F.3d 1140, 1144 (9th Cir. 2002), quoting Petralia v. Jercich

9  (In re Jercich), supra 1202, 1208; Structured Inv. Co. v. Vincent (In re Vincent),   2006

10  Bankr. Lexis 4106 (D.C. Nev 2006); Brandstetter v. Derebery (In re Derebery), 324 B.R.

11  349, 354 (C.D.Ca. 2005).  This element is proven where plaintiff shows that the debtor

12  either intended to injure plaintiff by doing some act (i.e., forcing buy-in of IBUY stock at

13  above market price which benefitted debtor), or that debtor must have understood that

14  damage was substantially certain to have occurred. Nat'l Gold Exchange, Inc. v. Stern (In

15  re Stern), 403 B.R. 58, 70 (C.D. Ca. 2009), citing, In re Su, 290 F.3d at 1146, n. 6.

16      Additionally, an injury is "malicious," as that term is used in Section 523(a)(6) when

17  the act is: "(1) wrongful,(2) intentional, (3) necessarily caused injury, and (4) was done

18  without just cause or excuse. Jett v. Sicroff (In re Sicroff), 401 F.3d 1101, 1106 (9th Cir.

19  2005); In re Su, supra at 1146-47; Hughes v. Arnold, 393 B.R. 712, 718 (E.D.C.A. 2008).

20  Within the plain meaning of this definition, it is the wrongful act that must be committed

21  intentionally rather than the injury itself. In re Sicroff, supra at 1106; see also, Murray.

22  Bammer (In re Bammer), 131 F.3d 788, 781 (9thg Cir. 1987)(en banc); see also,   Sec.

23  Alarm Fin. Enters., LP v. Terrell (In re Terrell), 2007 Bankr LEXIS 4330 (C.D. CA 2007)

24  ("malice" under Section 523(a)(6) "does not require a showing of biblical malice, i.e.,

25  personal hatred, spite or ill-will.").

26      Earlier in these proceedings, Perle moved to dismiss Plaintiff's 523(a)(6) claim from

27  the First Amended Complaint.  In denying Defendant's Motion, Judge Sheri Bluebond

28  stated:

1    Deny motion insofar as it relates to claim under section 523(a)(6). Such a claim
     need not be based solely on conversion. A willful and malicious injury will suffice.
2    Here, the allegation is that the debtor caused plaintiff to buy IBUY [i.e.
     Shopping.com] stock at prices that it knew his company had artificially and
3    unlawfully inflated. On these facts, defendant cannot seriously dispute that he knew
     injury to plaintiff would result. These allegations are therefore sufficient to support
4    a claim under section 523(a)(6).

5         Moreover, the evidence accepted by Judge Tevrizian in the SEC Action, and by this

6    Court in the Corsair Adversary Proceeding established that Perle and Waldron realized

7    approximately $1,759,279 in profits from the short squeeze, and more than $4.1 million in

8    profits from their manipulation scheme. (App. Ex. 1, F.N. 41; App. Ex. 2, pp. 24:1-25:7.)

9    This same profitable misconduct resulted in injury to Fiero Bros.

10        Based upon the facts presented to this Court in the Corsair Adversary Proceeding,

11   and the SEC enforcement action, Judge Bluebond concluded that, as a matter of law, that

12   Perle's conduct regarding Shopping.com was malicious and willful. (App. Ex. 1,

13   Conclusions 6-8, 13-17, and 23.) Fiero Bros. suffered alongside Corsair and Al from the

14   same willful and malicious acts by Perle. Therefore, Perle's debt to Fiero Bros., is also

15   exempt from discharge. The confirmed NASD Award evidences wilful and malicious acts

16   by Perle and thus was not discharged by Defendant's bankruptcy.

17   **IV.    CONCLUSION**

18        For all of the foregoing reasons, summary judgment should be granted in favor of

19   Plaintiff and against Perle as to all claims for nondischargeability at issue in the First

20   Amended Complaint. Alternatively, Plaintiff is entitled to summary adjudication as to each

21   of his claims.

22   DATED: September 30, 2009          LESLIE SCHWAEBE AKINS, A.L.C.

23

24                                      By: _____

25                                          Leslie Schwaebe Akins, Esq.
                                            Attorney for Plaintiff

26

27

28

Alfonso Fiero, v. Cery B. Perle
Case Number LA 01-26497-BB
Adv. No. 06-01971 BB

### PROOF OF SERVICE

STATE OF CALIFORNIA        )
                                          )
COUNTY OF SAN DIEGO    )

     I am employed in the County aforesaid; I am over the age of eighteen years and not a party to the within action; my business address is P.O. Box 131253, Carlsbad, California 92013.

     On **September 30, 2009**, I served **OPENING MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF ALFONSO FIERO'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT** on the interested parties in said action, by delivering it as follows:

   **X**  Service will be accomplished through an NEF for parties and counsel who are registered CM/ECF users.

**Electronic Mail Notice List**

**The following is the list of parties who are currently on the list to receive e-mail notices for this case.**

Darrell Palmer:  darrell.palmer@cox.net

United States Trustee (LA):
ustpregion16.la.ecf@usdoj.gov

Leslie S Akins:  lsa@stockmarketlaw.com

Pamela Labruyere:  pamela@sgsslaw.com

I Declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed **September 30, 2009**, at Carlsbad, California.

_Megaen Ericson_
Megaen Ericson

### PROOF OF SERVICE