1  Leslie Schwaebe Akins (SBN 138678)
   LESLIE SCHWAEBE AKINS, A LAW CORPORATION
2  7157 Argonauta Way
   Carlsbad, CA 92009
3  Tel: 760-931-2920
   Fax: 760-603-0547
4
   Attorney for Plaintiff,
5  Alfonso Fiero

6

7                    **UNITED STATES BANKRUPTCY COURT**

8    **FOR THE CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

9
     In re                              )   CASE NO. LA 01-26497-BB
10                                      )
     CERY BRADLEY PERLE,                )   [Chapter 7]
11                                      )
            Debtor.                     )   Adv. No.: ADV-06-01971-BB
12                                      )
     _____   )   The Honorable S. Bluebond - 626
13                                      )
     ALFONSO FIERO,                     )   **EXHIBIT 2 TO THE AFFIDAVIT OF**
14                                      )   **GREGORY C. GLYNN FILED IN**
                   Plaintiff,           )   **SUPPORT OF PLAINTIFF ALFONSO**
15                                      )   **FIERO'S MOTION FOR SUMMARY**
            vs.                         )   **JUDGMENT OR, ALTERNATIVELY,**
16                                      )   **FOR PARTIAL SUMMARY JUDGMENT**
     CERY BRADLEY PERLE,                )
17                                      )
                   Defendant.           )
18                                      )   **DATE: November 10, 2009**
                                        )   **TIME:  2:00 p.m.**
19                                      )   **CTRM: 1475**
                                        )
20                                      )   DATE FILED: September 13, 2006
                                        )   DISCOVERY CUT OFF: July 31, 2009
21                                      )   TRIAL DATE: None set
                                        )
22   _____   )

23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28

     _____
              EXHIBIT 2 TO THE AFFIDAVIT OF GREGORY C. GLYNN
                                    1

# EXHIBIT 2

# UNITED STATES

**FILE COPY**

## SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
)
SHOPPING.COM )
) **FILE No. LA-919**
)

**1998 JUN -3 AM II: 38**
**RECEIVED SEC**
**PRO**

WITNESS: KEEVIN LORINZO GILLESPIE

### *Condensed Transcript & Key Word Index*

PAGES: 1 through 140

PLACE: Los Angeles, California

DATE: May 27, 1998

## BAYLEY REPORTING, INC.
### *OFFICIAL FEDERAL REPORTERS*

New York          Washington, DC          Tampa, FL
(914) 337-3376    (202) 234-7787          (813) 225-3050

EXHIBIT 2 PAGE 12

BSA

## CONDENSED TRANSCRIPT

XMAX(1/1)

### Page 1

(1)　　　UNITED STATES SECURITIES AND EXCHANGE COMMISSION
(2)
(3)　In the Matter of:　　　　　　)
　　　　　　　　　　　　　　　　　)　　File No. LA-919
(4)　SHOPPING.COM　　　　　　　　)
(5)
　　　　　　　　　　　　Wednesday,
(6)　　　　　　　　　　　May 27, 1998
(7)　　　　　　　　　　　5670 Wilshire Blvd.
　　　　　　　　　　　　Eleventh Floor
(8)　　　　　　　　　　　Los Angeles, California 90036
(9)　　　　　The above-entitled matter came on for hearing,
(10) pursuant to notice, at 9:51 a.m.
(11)　APPEARANCES:
(12)　On behalf of the Securities & Exchange Commission:
(13)　　GREG HYATT, ESQ.
　　　　and
(14)　　DENNIS K. ARNOLD, ESQ.
　　　　and
(15)　　SOLOMON MANGOLINI, ESQ.
　　　　U.S. Securities and Exchange Commission
(16)　　5670 Wilshire Boulevard
　　　　Eleventh Floor
(17)　　Los Angeles, California 90036
　　　　(213) 965-3852
(18)
　　　　On behalf of the Witness:
(19)
　　　　GREGORY J. SHERWIN, ESQ.
(20)　　Fields, Fehn & Sherwin
　　　　11755 Wilshire Blvd.
(21)　　Fifteenth Floor
　　　　Los Angeles, CA 90025
(22)　　(310) 473-6338
(23)
(24)
(25)

### Page 2

(1)
　　　　　　　　　　　INDEX
(2)
(3)　WITNESS:　　　　　　　　EXAMINATION:
(4)　Keevin Gillespie　　　　　3
(5)
(6)　EXHIBITS:　　　PAGE　　　DESCRIPTION
(7)　Commission's:
(8)　　41　　　　　5　　　　Subpoena duces tecum
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

### Page 3

(1)　PROCEEDINGS
(2)　We're on the record at 9:51 a.m. on Wednesday, May 27, 1998.
(3)　Would you raise your right hand, please.
(4)　Whereupon,
(5)　KEEVIN GILLESPIE,
(6)　having been first duly sworn, was called as a witness herein
(7)　and was examined and testified as follows:
(8)　EXAMINATION
(9)　　BY MR. ARNOLD:
(10)　　Q　Okay. Would you please state and spell your full
(11)　name for the record.
(12)　　A　Keevin L. Gillespie, K-E-E-V-I-N, Lorinzo, L-O-R-
(13)　I-N-Z-O, Gillespie, G-I-L-L-E-s-P-I-E.
(14)　　Q　Okay. My name is Dennis Arnold. With me today
(15)　are Cliff Hyatt and Solomon Mangolini. We are Officers of
(16)　the Commission for the purposes of this proceeding. This is
(17)　an investigation by the United States Securities and
(18)　Exchange Commission in the matter of Shopping.com, Case No.
(19)　LA-919 to determine whether there have been violations of
(20)　certain provisions of the federal securities laws. However,
(21)　the facts developed in this investigation, might constitute
(22)　violations of other federal or state, civil or criminal
(23)　laws.
(24)　Mr. Gillespie, prior to the opening of the record
(25)　today, you were provided with a copy of the Formal Order of

### Page 4

(1)　Investigation in this matter. Have you had an opportunity
(2)　to review the Formal Order?
(3)　　A　Yes.
(4)　　Q　Okay. It will be available for your review
(5)　throughout your testimony today. Also prior to the opening
(6)　of the record, you were provided with the Commission's
(7)　Supplemental Information Form, which was previously marked
(8)　as Exhibit No. 1. Had you had an opportunity to read
(9)　Exhibit No. 1?
(10)　　A　Yes.
(11)　　Q　Okay. Do you have any questions about it?
(12)　　A　No.
(13)　　Q　Okay. Are you represented by counsel today?
(14)　　A　Yes.
(15)　　MR. ARNOLD:　Okay. Could counsel identify himself
(16)　for the record, please.
(17)　　MR. SHERWIN:　Gregory Sherwin, Fields, Fehn &
(18)　Sherwin.
(19)　　MR. ARNOLD:　And your representing Mr. Gillespie
(20)　today?
(21)　　MR. SHERWIN:　I am.
(22)　　MR. ARNOLD:　Okay.
(23)　　BY MR. ARNOLD:
(24)　　Q　I now show you what's been marked as Exhibit No.
(25)　41. This is a five-page document. The first two pages are

EXHIBIT 2 PAGE 13

**Page 5**

(1) a cover letter dated April 24, 1998 addressed to Keevin
(2) Gillespie, care of Gregory J. Sherwin. The third page is a
(3) subpoena duces tecum and the last two pages are an
(4) attachment to the subpoena duces tecum.
(5) Would you take a look at Exhibit No. 41 and tell
(6) if you've seen that before?
(7)    A    Prior to today, no.
(8)    (Whereupon the document
(9) referred to was marked for
(10) identification as Commission's
(11) Exhibit 41.)
(12) BY MR. ARNOLD:
(13)    Q    Right. You have not seen it prior to today?
(14)    A    Right.
(15)    Q    Okay.
(16)    MR. ARNOLD:    Mr. Sherwin, that subpoena calls for
(17) the production of any records. Are – are there any
(18) responsive records, do you know or –
(19)    MR. SHERWIN:    Well, let me say that this subpoena
(20) got buried on my desk and it was not provided to the
(21) witness. I have spoken with the witness this morning. I
(22) believe that there are accounts statements that are not at
(23) Waldron's that I was unaware of and that we will provide
(24) those to you.
(25)    MR. ARNOLD:    Okay.

**Page 6**

(1)    MR. SHERWIN:    There – you'll be asking that the
(2) witness I'm sure of that my understanding is that he had an
(3) account outside of Waldron where there was a purchase of I-
(4) Buy stock.
(5)    MR. ARNOLD:    Okay.
(6)    MR. SHERWIN:    And we will certainly provide those
(7) to you immediately.
(8)    MR. ARNOLD:    Okay.
(9) BY MR. ARNOLD:
(10)    Q    Mr. Gillespie could we get your current
(11) residential address and phone number, please.
(12)    A    32009 South Coast.
(13)    Q    And the city?
(14)    A    Laguna Beach.
(15)    Q    Okay.
(16)    A    92677.
(17)    Q    And phone number?
(18)    A    714-499-1958.
(19)    Q    Okay. And your current business address and
(20) phone?
(21)    A    19000 MacArthur, 84 Irvine 92612. Phone number is
(22) 261-1113. And that will be 714 area.
(23)    Q    Okay. And that's at Waldron & Company, right?
(24)    A    Right.
(25)    Q    How long have you been with Waldron & Company?

**Page 7**

(1)    A    October – late October.
(2)    Q    Of 1997?
(3)    A    Uh-hum.
(4)    Q    Okay. And what is your position with Waldron?
(5)    A    I'm the Branch Manager.
(6)    Q    Have you held any other positions there?
(7)    A    Broker as well.
(8)    Q    Okay. Okay, and what are your duties as Branch
(9) Manager?
(10)    A    * with the brokers, supervising brokers, managing
(11) trading and sales. Everything else that involved with that.
(12)    Q    Okay. Approximately, how many people do you
(13) supervise as Branch Manager?
(14)    A    The number kind of fluctuates depending on the
(15) staff at the time. It's been as high as maybe 40 and as low
(16) as 22.
(17)    Q    Okay. Are the people that you supervise just
(18) registered reps. or are there others that you supervise?
(19)    A    I'm somewhat responsible for the other people, but
(20) not as much as the – you know, the brokers.
(21)    Q    Okay. How about – you know, I understand you
(22) supervise the brokers, are there – are there people in
(23) other departments that you supervise? For instance, Sean
(24) Oudt?
(25)    A    No.

**Page 8**

(1)    Q    Anybody in the Corporate Finance Department?
(2)    A    No.
(3)    Q    Do you supervise Lainie Koch?
(4)    A    No.
(5)    Q    Okay. Do you supervise anybody outside of the
(6) Irvine office?
(7)    A    I have limited – oh, outside Irvine, no. I'm
(8) sorry, no.
(9)    Q    Okay. You started to say something about, you
(10) have limited –
(11)    A    Limited supervisory of everyone except for the –
(12) the sales assistants. I'm kind of involved in those.
(13)    Q    Okay. And what are sales assistants?
(14)    A    They kind of do the paperwork for the brokers.
(15)    Q    Okay. And who do you report to at Waldron?
(16)    A    Georgia French is my immediate supervisor and Cery
(17) Perle is who I report to.
(18)    Q    Okay. Is there anyone other than Ms. French and
(19) Mr. Perle that you report to?
(20)    A    No.
(21)    Q    Okay. Could you tell me how you are compensated
(22) at Waldron? Is it salary, commission a combination of both
(23) or something else?
(24)    A    Commission.
(25)    Q    Straight commission?

EXHIBIT 2 PAGE 14

BSA                                    CONDENSED TRANSCRIPT                                    XMAX(3/3)

## Page 9

(1)  A   Straight commission.

(2)  Q   Okay. And what's the commission rate that you'd

(3)  be compensated?

(4)  A   3 1/2 percent of the office production.

(5)  Q   Okay.

(6)  A   And my actual commissions, I'm compensated as 70

(7)  percent.

(8)  Q   Okay. So, it's 3 1/2 percent of the office plus

(9)  70 percent of your own sales?

(10)  A   Right.

(11)  Q   Okay. Any year-end bonuses, profit sharing,

(12)  anything like that?

(13)  A   We received a bonus of I-Buy once –

(14)  Q   Okay. What –

(15)  A   – in the year.

(16)  Q   When – do you remember approximately when that

(17)  was?

(18)  A   Christmas.

(19)  Q   Okay. How many warrants did you get?

(20)  A   Two thousand.

(21)  Q   Okay. And do you still hold the warrants?

(22)  A   I never received a certificate, I assume so, yes.

(23)  Q   Okay, but you haven't sold them or transferred

(24)  them to someone else?

(25)  A   No.

## Page 10

(1)  Q   Okay. Where are the warrants right now?

(2)  A   No, idea.

(3)  Q   Are they in a brokerage account somewhere?

(4)  A   I don't know.

(5)  Q   Okay. Do you know who the Branch Manager was

(6)  before you started to work at Waldron?

(7)  A   Jay Stern, I guess was the Branch Manager before I

(8)  started working there and the guy in Frisco. I'm losing his

(9)  name, I don't know. Joe Gerace, I guess was Branch

(10)  Management, some type of administrative form. I don't know

(11)  how the titles worked a little bit different then.

(12)  Q   Okay.

(13)  BY MR. HYATT:

(14)  Q   Excuse me. Just for clarification, Branch Manager

(15)  of the Irvine office, right? The Irvine branch?

(16)  A   Yeah, Joe was in the Irvine office.

(17)  Q   Excuse me, when you speak of the Branch Manager,

(18)  you're the Branch Manager of the Irvine branch; is that

(19)  correct?

(20)  A   That's correct.

(21)  Q   Okay.

(22)  BY MR. ARNOLD:

(23)  Q   As you understand it, who are the owners of

(24)  Waldron & Company?

(25)  A   As I understand it, Cery, a guy Ed, I don't know

## Page 11

(1)  much of him. As I understand it, those two and some other –

(2)  – I don't really know.

(3)  Q   Okay. Do you know Ed's last name?

(4)  A   Harris.

(5)  Q   Okay. Have you ever met him?

(6)  A   Yes.

(7)  Q   When was that?

(8)  A   Christmas – the Christmas party and once prior to

(9)  that.

(10)  Q   Okay. And what were the circumstances under which

(11)  you met him once prior to the Christmas party?

(12)  A   Hi, this is Ed.

(13)  Q   What – was it at Irvine's branch office?

(14)  A   Yeah.

(15)  Q   Okay. Do you have any understanding of why he

(16)  happened to be there at that time?

(17)  A   No.

(18)  Q   Okay. Do you know what the – the ownership

(19)  structure at Waldron was, for instance, how much Mr. Perle

(20)  owned and Mr. Harris owned?

(21)  A   No, I didn't.

(22)  Q   Okay. Who – who runs the day to day operations

(23)  at Waldron?

(24)  A   What do you mean?

(25)  Q   Who – who is the most senior person at Waldron

## Page 12

(1)  running the business on a day to day basis?

(2)  A   I still don't know of what aspect you mean,

(3)  because it's a big company and I don't know what you're

(4)  talking about when you say day to day. What aspects do you

(5)  mean?

(6)  Q   Is Mr. Perle the President of the company?

(7)  A   Yes.

(8)  Q   And is there anyone senior to him who's involved

(9)  in the day to day operations of the company?

(10)  A   Not to my knowledge.

(11)  Q   Okay. Have you heard of a company called, Aubrey

(12)  Perle Holdings?

(13)  A   I've seen that on like, documents and I – from my

(14)  understanding, that's part of an account or something and we

(15)  were paid brokers or whatever. But, I only know *

(16)  structure.

(17)  Q   What – what documents have you seen that name on?

(18)  A   Maybe a check or something like that.

(19)  Q   Do you remember when you saw the check?

(20)  A   I mean, I've seen it. I just – I can't tell you

(21)  when.

(22)  Q   Okay. You mentioned something about – you may

(23)  have something to do with paying brokers, what did you mean

(24)  by that?

(25)  A   I think I've seen a check or something that may

Page 9 to Page 12

EXHIBIT 2 PAGE 15

**CONDENSED TRANSCRIPT**

### Page 13

(1) have said Aubrey Perle on the account hit title of it

(2) instead of the Waldron's account's like that.

(3) Q   Uh-hum.

(4) A   That's all.

(5) Q   Okay. When you're paid, are you issued paychecks

(6) or do they direct deposit your compensation or how does that

(7) work?

(8) A   Paychecks.

(9) Q   Okay. On your paychecks, on whose accounts are

(10) the checks drawn?

(11) A   Waldron.

(12) Q   Okay. It's not Aubrey Perle?

(13) A   No.

(14) Q   Okay. Are you familiar with a company called

(15) Centura Investments?

(16) A   No.

(17) Q   Okay. Do you know the name John Aubrey?

(18) A   Yeah.

(19) Q   And how do you know that name?

(20) A   I may have actually met him. I don't remember if

(21) I did.

(22) Q   Okay. How do you know the name John Aubrey?

(23) A   I think he's one of the partners.

(24) Q   Partners in what?

(25) A   Waldron.

### Page 14

(1) Q   Okay.

(2) A   Or investors, I don't know.

(3) Q   Why do you think he may be one of the partners?

(4) A   I've heard the name and I know the name is – is

(5) on accounts.

(6) Q   Okay. Any other reason you think he may be a

(7) partner there?

(8) A   I mean, the name's there. I don't really ask

(9) questions about that.

(10) Q   Okay. Do you know anything about Mr. Aubrey?

(11) A   Uh-uh.

(12) Q   Do you know anything about Ed Harris other than

(13) what you've already told me?

(14) A   Uh-uh.

(15) Q   I think you need to say, no for the record.

(16) A   Oh, no.

(17) Q   Okay. So, that's no to Mr. Aubrey and to Mr.

(18) Harris?

(19) A   No, for both.

(20) Q   Okay. As you understand it, what are Georgia

(21) French's responsibilities at Waldron?

(22) A   She would be the Sales Trainer, more specifically,

(23) with the new brokers.

(24) Q   Okay. Any other responsibilities that she has, as

(25) you understand it?

### Page 15

(1) A   She does – mainly, the same responsibilities I

(2) have, but she would be – should would kind of oversee me

(3) and she would have similar things in which I do.

(4) Q   Okay. You said she was the National Trainer?

(5) A   Right.

(6) Q   Okay. So, am I correct she trains brokers for all

(7) of Waldron's offices?

(8) A   Yes, she's –

(9) Q   Okay. Do you know whether she has any clients of

(10) her own?

(11) A   Yes, she does.

(12) Q   And how do you know that?

(13) A   In my conversations with her.

(14) Q   Okay. Now, are – are these clients out of the

(15) office in South Carolina or are these clients out of the

(16) Irvine office?

(17) A   I'm confused.

(18) Q   Right. Maybe I should back up a second. Does she

(19) work out of Waldron's South Carolina office?

(20) A   She works out of both offices.

(21) Q   Out of both offices, okay. Do you know whether

(22) her clients are based mainly out of the South Carolina

(23) office or does she also have some out of the Irvine office?

(24) A   Her clients are wherever she goes.

(25) Q   Okay. As you understand it, who does Georgia

### Page 16

(1) French report to at Waldron?

(2) A   Cery Perle.

(3) Q   Does she report to anyone else as far as you know?

(4) A   No.

(5) Q   Okay. If Mr. Perle is the President of the

(6) company and I think as you acknowledged earlier, he is the

(7) most senior person involved in the day to day operations of

(8) the company, who is next in line below him, as you

(9) understand it?

(10) A   I really don't know how the other partner

(11) structure works. So, I really can't make a fair –

(12) Q   Is – is there someone that takes over when he's

(13) out of the office or on vacation or something like that?

(14) A   I just do the same things I do if he's there or if

(15) he's not. So, there's no added responsibility myself or

(16) Georgia may do more if he's there or not.

(17) Q   Do you remember any instances where Mr. Perle was

(18) out of the office and directed you to report to someone else

(19) in his absence?

(20) A   No.

(21) Q   Okay. What are Sean Outdt's responsibilities at

(22) Waldron as you understand it?

(23) A   He's the Head Trader.

(24) Q   Okay. And who does he report to?

(25) A   Mr. Perle.

EXHIBIT 2    PAGE 16

Page 17

(1)   Q   Is there anyone else that he reports to?

(2)   A   No.

(3)   Q   Okay. Does Georgia French have any supervisory

(4)   responsibility over Mr. Oudt as you understand it?

(5)   A   No,

(6)   Q   Okay. Are you familiar with a company called

(7)   Shopping.com?

(8)   A   Yes.

(9)   Q   What is Shopping.com?

(10)  A   It's an Internet retailer.

(11)  Q   Okay. And how is it that you know about

(12)  Shopping.com?

(13)  A   We brought the company public.

(14)  Q   Okay. And when was that?

(15)  A   Right around Thanksgiving.

(16)  Q   Okay. And do you have any understanding as to how

(17)  Waldron came to be the underwriter for this offering?

(18)  A   No.

(19)  Q   Okay. Did you ever ask that question?

(20)  A   No.

(21)  Q   Okay. Were there any other firms involved in the

(22)  underwriting?

(23)  A   Yes, there was a few firms.

(24)  Q   Do you remember the names of any of them?

(25)  A   Not offhand.

Page 18

(1)   Q   Okay. Do you remember how much of the offering

(2)   the other firms got?

(3)   A   No.

(4)   Q   Okay. Who at Waldron was involved in the

(5)   underwriting? Not the actual sales of the stock when the

(6)   IPO actually went up, but was involved in getting the

(7)   registration statement ready, talking to the issuer? Was

(8)   there someone at Waldron that was involved in that process?

(9)   A   I really don't know the paperwork side of it at

(10)  all.

(11)  Q   Okay. Do you know whether someone from Waldron's

(12)  Corporate Finance Department was involved in the

(13)  underwriting?

(14)  A   It would probably be Jack Myers --

(15)  Q   Okay.

(16)  A   -- because he's the finance guy.

(17)  Q   Okay. You said, probably. I mean, do you know if

(18)  whether he actually did any underwriting?

(19)  A   That's his responsibility.

(20)  Q   Okay. But, do you know whether he actually did

(21)  anything on the offering?

(22)  A   I can't tell you I know what he did, no.

(23)  Q   Okay. Did you ever have any conversations with

(24)  him about the offering?

(25)  A   Just in a sense of, are we ready to go yet?

Page 19

(1)   Q   Okay. Anything else?

(2)   A   No specifics, no,

(3)   Q   Okay. When you ask him, are we ready to go yet,

(4)   what was his response?

(5)   A   Soon we'll form target dates,

(6)   Q   Anything else?

(7)   A   No.

(8)   Q   Did he ever say anything to you about anything he

(9)   was doing in the offering?

(10)  A   Uh-uh. No,

(11)  Q   Does Mr. Myers have any other employees in the

(12)  Corporate Finance Department to help him?

(13)  A   Yes.

(14)  Q   Who is that?

(15)  A   Bill Sandro (phonetic) I think's his name.

(16)  Q   Okay, do you know how to spell that last name?

(17)  A   No.

(18)  Q   Okay. Do you know whether Mr. Sandro did any work

(19)  on the Shopping.com IPO?

(20)  A   I don't know,

(21)  Q   Okay. Do you know whether anyone from Waldron had

(22)  any meetings with Personnel from Shopping.com to talk about

(23)  the underwriting?

(24)  A   There was a due diligence meeting given a few

(25)  weeks prior to the underwriting.

Page 20

(1)   Q   Okay. And who attended this due diligence

(2)   meeting?

(3)   A   The entire sales staff.

(4)   Q   This is -- this is Waldron's sales staff? Okay.

(5)   A   At least the one in Irvine.

(6)   Q   Okay. And where did this meeting take place at?

(7)   A   In our little conference room.

(8)   Q   Okay. So, this was at the Irvine office?

(9)   A   Uh-hum.

(10)  Q   Okay. So, you have the sales staff from Waldron

(11)  there. And who else was there?

(12)  A   That's about it.

(13)  Q   Was there anyone from Shopping.com there?

(14)  A   Oh, yeah.

(15)  Q   Who was that?

(16)  A   McNulty. Another lady, I don't -- I never knew

(17)  her name.

(18)  Q   Okay. That's Robert McNulty?

(19)  A   Yes.

(20)  Q   Okay. Was Mr. Perle at the meeting?

(21)  A   He was in the office. He may have stepped in and

(22)  out. So, I guess he was there.

(23)  Q   Okay. How about Mr. Myers, was he there?

(24)  A   I think so.

(25)  Q   Okay. Lainie Koch?

EXHIBIT 2 PAGE 17

## Page 21

(1)  A    I don't know whether she actually attended the
(2)  meeting, but she was in the office.
(3)  Q    Okay. Any other persons you can recall being
(4)  there?
(5)  A    Just the brokers.
(6)  Q    Okay. And what happened at this due diligence
(7)  meeting?
(8)  A    It was just a normal due diligence presentation on
(9)  the merits of the company.
(10) Q    And who made the presentation?
(11) A    A couple of people. Rob made part of it and a
(12) couple of the other executives of the firm.
(13) Q    Okay. And when you said Rob, you were referring
(14) to Mr. McNulty?
(15) A    Yes.
(16) Q    Okay. So, there's a presentation by Mr. McNulty
(17) and --
(18) A    A couple other. It was one lady and it was
(19) another guy.
(20) Q    And they were both from Shopping.com?
(21) A    Yes.
(22) Q    Okay. Did anyone else speak at the meeting?
(23) A    I don't think so.
(24) Q    Okay. How long did the meeting last?
(25) A    Thirty minutes, thirty-five minutes.

## Page 22

(1)  Q    Okay. Do you remember anything that was said by
(2)  Mr. McNulty or these other individuals from Shopping.com?
(3)  A    It's all vague. No, I don't remember
(4)  specifically, no.
(5)  Q    Do you have any general recollection?
(6)  A    Just the structure of the company -- you know,
(7)  what their business plan and intent was, how they were going
(8)  to spend the money.
(9)  Q    Uh-hum. Do you remember what was said about their
(10) business plan and how they intended to spend the money?
(11) A    A big chunk on advertising, some to pay off the --
(12) the bridge loan and -- you know, hopefully increase the --
(13) make the site look a little better, other things that I
(14) don't remember off hand.
(15) Q    Okay. Do you remember how much the bridge loan
(16) was?
(17) A    I wasn't there for it. I don't know the exact
(18) details. It's in the Prospectus, but I don't remember.
(19) Q    Okay. Okay. Other than Mr. McNulty and these
(20) other individuals from Shopping.com, did anyone else speak
(21) at the meeting?
(22) A    I don't remember.
(23) Q    Okay.
(24) A    Cery may have spoke, but I don't remember.
(25) Q    Okay.

## Page 23

(1)  A    Jack may have spoke, but I don't remember.
(2)  Q    Did you say anything at the meeting?
(3)  A    I don't remember.
(4)  Q    Are there any minutes or any other documents that
(5)  you're aware of that refer to this meeting?
(6)  A    Not that I know of.
(7)  Q    Okay. Were there any materials distributed at the
(8)  meeting?
(9)  A    Maybe.
(10) Q    Okay. Why do you think there might have been?
(11) A    I don't know. I mean, I just don't remember
(12) whether or not we gave out the Prospectuses or any other --
(13) I don't remember. It could have been. I mean, typically
(14) most due diligence meetings they do give out something.
(15) But, I just don't remember whether anything was given out
(16) there.
(17) Q    Okay. After the meeting, did you discuss what
(18) happened at the meeting with anybody else?
(19) A    I don't remember.
(20) Q    Okay. And this was a couple of weeks before the
(21) IPO?
(22) A    Approximately.
(23) Q    Okay. So, this would probably be early November,
(24) maybe late October, somewhere in that area?
(25) A    Yeah. Yeah.

## Page 24

(1)  Q    Okay. Were there any other meetings to talk about
(2)  the IPO?
(3)  A    There may have been a lot of other conversation,
(4)  but formal meetings structured about Shopping.com, no.
(5)  Q    Okay. Do you recall having any other
(6)  conversations with anybody about the IPO?
(7)  A    I don't know. I mean, in what way?
(8)  Q    Before the IPO, other than this meeting you told
(9)  me about, did you talk to anybody about it?
(10) A    Probably, yeah.
(11) Q    Okay. Who do you remember speaking to about it?
(12) A    The whole office.
(13) Q    Okay. What -- what do you recall saying?
(14) A    Just explain the company's " risks, expanding what
(15) -- you know, potential award if it was to do well, and just
(16) explain the structure of the company, from my understanding.
(17) Q    Okay. What did you say about the risks?
(18) A    Start a company with no revenues.
(19) Q    Okay. And the rewards were what?
(20) A    That internet companies are looked at very
(21) frequently on Wall Street right now.
(22) Q    Okay. And who were you making these statements
(23) to?
(24) A    The brokers.
(25) Q    Okay. Was this in a meeting with all the brokers

BSA                              CONDENSED TRANSCRIPT                              XMAX(7/7)

### Page 25

(1) or was this to a certain broker or how – how did this take
(2) place?
(3)    A    That was just a general consensus on the
(4) conversations.
(5)    Q    Okay. Did – did you provide any instructions to
(6) the brokers on what to say to customers to try to sell
(7) Shopping.com stock in the IPO?
(8)    A    Just general speaking of the company.
(9)    Q    And what do you mean by speaking of the company?
(10)    A    Explaining – you know what the company do.
(11) Explaining some of the comparisons and explaining the risks,
(12) because they did not make any money.
(13)    Q    Who were the comparisons with?
(14)    A    Amazon would be used as a comparison. N2K we used
(15) as a comparison.
(16)    Q    And who determined to use those as comparisons?
(17)    A    That would be Jack.
(18)    Q    That's Mr. Myers?
(19)    A    Yes.
(20)    Q    Okay. Do you recall having a conversation with
(21) him about that?
(22)    A    I'm sure there was.
(23)    Q    Okay. And do you recall anything he said about
(24) using those companies as comparisons?
(25)    A    Just about the revenues and those kind of things,

### Page 26

(1) in comparison to future revenues of Shopping and – you
(2) know, just kind of the kind of comparison you should use.
(3)    Q    Okay. Do you remember approximately when he
(4) talked to you about this?
(5)    A    No.
(6)    Q    Was there anyone else present when he talked to
(7) you about it?
(8)    A    I don't remember.
(9)    Q    Okay. Were the brokers provided with any sales
(10) scripts or pitch sheets, anything like that to help them
(11) sell the stock?
(12)    A    No.
(13)    Q    Okay. Were there any written materials given to
(14) the brokers to assist them in selling new stock?
(15)    A    Prospectus – I don't remember anything else.
(16)    Q    Okay. Do you happen to recall what the date was
(17) of the Prospectus that the brokers were given to use?
(18)    A    No.
(19)    Q    Do you recall whether the Prospectus represented
(20) that Shopping.com stock would trade on the NASDAQ Small Cap
(21) Market or did the one that was given to the brokers say that
(22) it would trade on the Bulletin Board?
(23)    A    Initially, we had a Red Herring and have them
(24) trade on the Small Cap Market. The minute we thought that
(25) it wasn't going to make Small Cap, we pulled all of those

### Page 27

(1) and trash them all and circulate the new ones.
(2)    Q    Okay. And how did you find out it was not going
(3) to trade on the Small Cap Market?
(4)    A    From Cery.
(5)    Q    What did he say to you?
(6)    A    It's not going to trade on the Small Cap Market.
(7)    Q    Did he give you any explanation as to why?
(8)    A    Something was said to the timing and the hope to
(9) getting the deal effective sooner, because Shopping may need
(10) their money quicker. That's all I can remember.
(11)    Q    Do you remember how the timing fit into
(12) this? What was it about the time?
(13)    A    It was a lot of money and time – it was like –
(14) if I'm not mistaken, a value of money scenario where if they
(15) wait this much longer, it would get in and get money as
(16) opposed to – you know, waiting for maybe other
(17) documentation to provide the rest of the information to the
(18) SEC to get it effective. They felt that they could get it
(19) effective if they put the other documentation together
(20) however they wanted to – we felt it would be in the
(21) company's best interest to get the money in and use their
(22) proceeds if they wanted to use them,
(23)    Q    Okay. Do you know whether Mr. McNulty's
(24) background had any influence on the company's ability to
(25) either get on the Small Cap Market or not get on the Small

### Page 28

(1) Cap Market?
(2)    A    That was my understanding as well.
(3)    Q    Okay. Was anything said to you about his
(4) background?
(5)    A    Yes, it was – ended up being pretty much common
(6) knowledge –
(7)    Q    Okay.
(8)    A    – after that effect.
(9)    Q    What was said to you about his background?
(10)    A    He had some securities violations with the SEC.
(11) The specifics, he – I don't know all the specifics of
(12) eventually what happened.
(13)    Q    Uh-hum. Who was telling you that he had
(14) violations with the SEC?
(15)    A    I really don't know who said them, but it was
(16) like, common knowledge at that point, if you know he had
(17) that. I think it's in the Prospectus as well.
(18)    Q    Okay. Now, did you learn this before the IPO took
(19) place?
(20)    A    Yeah, we knew before it took place.
(21)    Q    Okay. Do you know approximately how far in
(22) advance of the IPO you learned this?
(23)    A    Probably almost right away.
(24)    Q    So, right – right before the IPO?
(25)    A    Right away I knew that – you know, we didn't have

EXHIBIT 2 PAGE 19

BSA | CONDENSED TRANSCRIPT | XMAX(8/8)

### Page 29

(1) the best pants.

(2) Q   Okay. All right. I think we're talking about two
(3) different things. Are you saying that you learned that
(4) right when the company started working on the IPO or are you
(5) saying that you learned it right before the IPO went
(6) effective?

(7) A   I learned it almost right when the time when I
(8) first started working.

(9) Q   Okay. So, that was in advance of the IPO then?

(10) A   Yeah, it was something that was spoken about.

(11) Q   Okay. Did Waldron purchase any computer equipment
(12) from Shopping.com?

(13) A   I know now that we did obviously.

(14) Q   And how – before the IPO took place, did you have
(15) any knowledge that Waldron purchased computer equipment from
(16) Shopping.com?

(17) A   I did hear that we may be buying some things from
(18) Shopping.com.

(19) Q   Okay. You said that you may be buying, did you
(20) know for sure or did you not know for sure?

(21) A   I can't say I knew for sure, but I figured that we
(22) may buy something from them.

(23) Q   Was there any discussion at Waldron about
(24) disclosing Waldron's computer equipment purchases from
(25) Shopping.com in the Prospectus?

### Page 30

(1) A   I don't know.

(2) Q   Okay. Were you ever a participant in any
(3) conversation on that subject?

(4) A   No.

(5) Q   Did you ever see any documents on that subject?

(6) A   No.

(7) Q   Okay. Do you know whether Mr. Perle ever loaned
(8) any money to Shopping.com?

(9) A   I have no idea.

(10) Q   Do you know whether Mr. Harris ever loaned any
(11) money to Shopping.com?

(12) A   No, idea.

(13) Q   And how about Mr. Aubrey, do you know whether he
(14) loaned any money?

(15) A   No, idea.

(16) Q   Okay. Do you have any understanding of what
(17) Shopping.com's financial condition was immediately before
(18) the IPO?

(19) A   Just from what was in the Prospectus.

(20) Q   And – and what did you learn from looking at the
(21) Prospectus?

(22) A   If they didn't get money, they were going to be in
(23) trouble.

(24) Q   Okay. Were there any discussions about that
(25) subject within Waldron?

### Page 31

(1) A   It's pretty much commonly known that this was a
(2) startup company, you need to have money to expand their
(3) business and grow.

(4) Q   Okay. And did you talk about that with anyone at
(5) Waldron?

(6) A   Yes.

(7) Q   Who was that?

(8) A   Everyone.

(9) Q   Okay. Including Mr. Perle?

(10) A   Everyone spoke about that. This was something
(11) that you would speak about in risk disclosure with your
(12) clients.

(13) Q   Okay. Was there anything more specific said on
(14) that subject such as, if Shopping.com doesn't get a cash
(15) infusion by such and such a date, there will be the
(16) following consequences?

(17) A   No.

(18) Q   It just was understood that the company needed
(19) cash?

(20) A   It's like any other offering you do is that
(21) they're looking for money to expand their business.

(22) Q   Okay. Would you say there was some sort of a
(23) reverse stock split before the IPO?

(24) A   I have no idea.

(25) Q   Okay. Do you have any understanding of how the

### Page 32

(1) IPO price was set?

(2) A   No.

(3) Q   Okay. Do you know whether Waldron had any plans
(4) to acquire for its inventory account Shopping.com stock
(5) after the IPO?

(6) A   No.

(7) Q   Were there indications of interest for the IPO?

(8) A   Yes.

(9) Q   Okay. And as you understand it, what's an
(10) indication of interest?

(11) A   A person indicates that they have an interest in
(12) buying the – the offering upon it coming effective. It has
(13) to be verified that they still want to buy the offering.

(14) Q   Okay. So, an indication of interest is something
(15) different than an actual order for the stock; is that
(16) correct?

(17) A   Right.

(18) Q   Okay. The indications of interest for the
(19) Shopping.com IPO, were there enough indications of interest
(20) to sell the entire offering?

(21) A   Yes.

(22) Q   And how do you know that?

(23) A   We calculated them all the time.

(24) Q   Okay. Do you recall what the total number of
(25) shares were that were covered by the indications of

## Page 33

(1) interest?

(2) A    I have no idea, because I was only responsible for

(3) my office.

(4) Q    Okay. How do you know that there were enough to

(5) cover the entire offering?

(6) A    Just from conversations, it was enough.

(7) Q    Conversations with who?

(8) A    Mr. Perle and Jack, I guess.

(9) Q    Jack is Mr. Myers?

(10) A    Yeah.

(11) Q    Okay. Did you ever see any documents that -- that

(12) totalled up all the indications of interest?

(13) A    No.

(14) Q    Okay. Did you ever see any that showed the total

(15) for the Irvine office?

(16) A    Yes.

(17) Q    Do you recall what the total was for the Irvine

(18) office?

(19) A    It fluctuated, because we kept a tally going every

(20) -- every day if people would give more indications.

(21) Q    Uh-hum. Do you recall approximately what the

(22) total was?

(23) A    In the end?

(24) Q    Yeah.

(25) A    I guess I need to rephrase that question, because

## Page 34

(1) there's two different answers to what it was indicated for

(2) and what was not.

(3) Q    Okay, what was indicated for?

(4) A    About 450 or so.

(5) Q    Okay. And indicated are -- are the shares that

(6) customers had indicated they were interested in purchasing.

(7) A    Right.

(8) Q    Okay. And what was the number that was actually

(9) done?

(10) A    Maybe a couple hundred.

(11) Q    Couple hundred thousand?

(12) A    Uh-hum.

(13) Q    Okay. Do you have any understanding of why there

(14) was a difference there?

(15) A    Yes.

(16) Q .   What was the reason for the difference?

(17) A    Some of them was because the stakes didn't receive

(18) the clearance and there was a lot of stakes that were

(19) pending and they didn't get final clearance. So, that was

(20) the big drop off. And we also had a drop off when the final

(21) Prospectuses were -- or final Red Herring's were given that

(22) it was going to go to the Bulletin Board instead of the

(23) Small Cap.

(24) Q    Uh-hum. Okay. When -- when the IPO went

(25) effective and customers were placed into the stock, were all

## Page 35

(1) the customers called in advance to verify that they actually

(2) wanted the stock?

(3) A    The customers were instructed to be called by

(4) their broker, whether each broker called, I don't know.

(5) Q    Okay. And did you give the instructions to the

(6) brokers in the Irvine office?

(7) A    Yes.

(8) Q    Okay. Do you know whether similar instructions

(9) were given to brokers in other Waldron offices?

(10) A    I can't say I know.

(11) Q    Okay. Do you know of any instances where a

(12) customer -- or a customer or customers were not called?

(13) A    If the broker wasn't present during the meetings

(14) in which they had to call the clients. Those clients may

(15) have not been called.

(16) Q    Okay. Do you know of any instances where a

(17) customer wasn't called?

(18) A    Those particular broker/clients.

(19) Q    Okay. Are there any -- do you recall any

(20) instances where customers contacted the firm and said -- and

(21) said, I was not called?

(22) A    Not that I remember. Not that I remember.

(23) Q    Do you remember seeing any documents on that

(24) subject?

(25) A    No.

## Page 36

(1) Q    Okay. How are -- how are customers selected to be

(2) solicited for the stock?

(3) A    Upon their interest, maybe. Upon their -- the

(4) type of things maybe they've done in the past that they have

(5) existing accounts.

(6) Q    Okay. Was Waldron using any specific criteria to

(7) select the customers?

(8) A    No.

(9) Q    No specific net worth requirements or anything

(10) like that?

(11) A    Oh, yes, there was specific requirements given for

(12) the State of California for the super-suitability that we

(13) had.

(14) Q    Okay. Any other criteria used?

(15) A    Well, yeah, net worth is always used for the more

(16) riskier deals.

(17) Q    Okay. Anything else?

(18) A    Investment experience. Typically, you wanted a

(19) guy who, at least if he wasn't experienced, he knew the

(20) risk.

(21) Q    Okay. Anything else?

(22) A    Suitability, investment experience -- no, that's

(23) about it.

(24) Q    Was there a -- any review within Waldron to make

(25) sure that those indicated an interest in the stock met the

EXHIBIT 2 PAGE 21

### Page 37

(1) criteria?

(2) A    Yeah, there was review in the sense of going to

(3) other brokers to make sure we had extensive review done

(4) through the State of California, because the super-

(5) suitability would kick back a lot of trades because they

(6) weren't suitable.

(7) Q    Okay. And who was doing this review within

(8) Waldron?

(9) A    Myself.

(10) Q    Okay. And that would be for the Irvine office?

(11) A    Yes.

(12) Q    Okay. Did you do it for any of the other offices?

(13) A    No.

(14) Q    Do you know whether any type of review of that

(15) type – that's a bad question. Do you know of any –

(16) whether any type of review was done for any of the other

(17) offices?

(18) A    I can't say, I know.

(19) Q    Okay. Were any clients selected to be solicited

(20) based on their having visited the web site?

(21) A    We – there was a few people selected like that,

(22) yes.

(23) Q    And how do you know that?

(24) A    There was a list that we had of clients who had

(25) visited the web site.

### Page 38

(1) Q    And where did you get that list?

(2) A    From Mr. Perle.

(3) Q    Okay. And when Mr. Perle got the list, did he say

(4) anything to you about where he got it from?

(5) A    I assumed Shopping.

(6) Q    Okay. Did he say anything else to you about the

(7) list?

(8) A    No.

(9) Q    Was there just one list?

(10) A    Uh-hum.

(11) Q    Okay.

(12) A    Yes.

(13) Q    Yeah, you need to answer. How long was the list?

(14) One page? Ten pages?

(15) A    It was a few pages. I don't know.

(16) Q    A few pages, okay. On the day of the IPO, did

(17) Waldron actually execute the trades to – to place the

(18) customers into Shopping.com stock or was that done by

(19) someone else?

(20) A    I don't really know how to answer the question.

(21) Q    Okay. Well – well, let me – let me do it this

(22) way. Did Wedbush Morgan, your clearing firm, did they

(23) assist in any way in executing the IPO trades?

(24) A    I think so.

(25) Q    Okay. What – what do you know about that?

### Page 39

(1) A    The sheets were given to Lainie. I don't know

(2) what she physically did from there, did she fax them over to

(3) Wedbush or just what?

(4) Q    Uh-hum.

(5) A    I assume she faxed them over to Wedbush and she

(6) would keep an ongoing tally of – you know, if there was

(7) more, if there was less and if you have a cancel here. Did

(8) we have a more buy here and it was balanced between her and

(9) Wedbush.

(10) Q    Okay. And when you say, Lainie you're referring

(11) to Ms. Koch.

(12) A    Lainie Koch, yes.

(13) Q    Okay. You said that the sheets, what sheets were

(14) you referring to?

(15) A    These were the indication of interest sheets –

(16) Q    Okay.

(17) A    – we used.

(18) Q    Were the indications of interest sheets used, were

(19) those indications that had already been verified, because

(20) the customers had been called or they were not?

(21) A    Rephrase that one, because –

(22) Q    You told me earlier there were indications of

(23) interest and that an indications is different than an order.

(24) A    Right.

(25) Q    Right. So, are the sheets with the indications of

### Page 40

(1) interest, are those for customers that had been called to

(2) verify that those customers actually want the order?

(3) A    No, the indication of interest sheets were just

(4) the initial preliminary sheet.

(5) Q    Okay.

(6) A    And the final sheet was like the same sheet, but

(7) it was basically who was going to stay on and who wasn't.

(8) So, it was the same sheet, but it was just kind of shrunk

(9) down.

(10) Q    Okay. So, the sheet that is actually given to

(11) Wedbush, is that the indication of interest sheet or is that

(12) the final sheet?

(13) A    I think they're all in the same. They just

(14) weren't shrunk down.

(15) Q    Okay. So, as you understand it, do you know

(16) whether the final sheet given to Wedbush contained just

(17) names of customers who had been called to verify their

(18) orders or were there also names on there of customers who

(19) had been called?

(20) A    Initially, there was both, because that's how we

(21) balanced the order.

(22) Q    Okay. So, walk me through the process. Lainie

(23) gets the sheets. She gives them to Wedbush, and then what

(24) happens?

(25) A    I really don't know when she gives them to

EXHIBIT 2 PAGE 22

**CONDENSED TRANSCRIPT**

**Page 41**

(1) Wedbush. We balance them ourselves and then finally, they
(2) end up going to Wedbush as they were balanced. Now, if
(3) there was some other balancing or adjustment done after they
(4) were with Wedbush, then she would make the call to do the
(5) balancing that needed to be done after that.
(6) Q   Okay.
(7) COURT REPORTER:   Counsel, can I switch sides?
(8) MR. ARNOLD:   Yeah.
(9) (Off the record.)
(10) BY MR. ARNOLD:
(11) Q   Okay. This balancing that you've referred to
(12) several times, is that the process you mentioned earlier of
(13) taking customers out who have canceled and – okay.
(14) A   Or for state reasons or for the super-suitability
(15) reason, which we didn't know about until – you know,
(16) clients had already been prior solicited in California,
(17) didn't meet the super-suitability requirements and we knew
(18) about it later. So, all those guys had to be yanked out of
(19) there too.
(20) Q   Okay. So, the – the balancing, that's happening
(21) before the sheets are given to Wedbush or do you know?
(22) A   Kind of at the same time. Before and after.
(23) Q   Okay.
(24) A   Because, you can't call all the clients at once
(25) and say, okay, let's balance it.

**Page 42**

(1) Q   Right.
(2) A   No, it doesn't work that way. It's –
(3) Q   Okay.
(4) BY MR. HYATT:
(5) Q   Excuse me. What does balancing mean again?
(6) A   It's just figuring out what's going to be the
(7) final outcome of shares indicated for.
(8) Q   Okay. So, it involves actually reducing a
(9) number –
(10) A   Reducing or adding –
(11) A   Or adding.
(12) A   Right.
(13) Q   Okay.
(14) BY MR. ARNOLD:
(15) Q   Okay. Do you know whether there are any customers
(16) who were placed into Shopping.com stock that hadn't been
(17) contacted or for whatever reason didn't want the stock?
(18) A   There were quite a few customers who didn't want
(19) the stock. And there was a few who wasn't contacted. The
(20) brokers who hadn't contacted all their clients, yes.
(21) Q   Okay. And how do you know there were – there
(22) were some that didn't want the stock and some that hadn't
(23) been contacted?
(24) A   I received calls from a few clients who said –
(25) you know, I don't want it, because it's Bulletin Board.

**Page 43**

(1) Q   Okay. Do you know the name Art Granito?
(2) A   No.
(3) Q   Stan LeLand?
(4) A   Not to my recollection, no.
(5) Q   Okay. On the day of the IPO, do you know whether
(6) there were – do you know whether there were any trades put
(7) into Mr. Harris' account?
(8) A   No, idea.
(9) Q   Do you know whether there were any trades put into
(10) Mr. Aubrey's account?
(11) A   No, idea.
(12) Q   Do you know the name William Long?
(13) A   I've seen the name when we had the * SEC here and
(14) I'd pull up an account with William Long.
(15) Q   Okay. Do you know anything about Mr. Long?
(16) A   No.
(17) Q   Do you know whether there were any Shopping.com
(18) shares placed into any of his accounts on the day of the
(19) IPO?
(20) A   No, idea.
(21) Q   Okay. How long after the IPO did it take for
(22) clients who had the stock and didn't want it to be – to
(23) have the stock taken out of their accounts?
(24) A   I really don't know when it was finally balanced
(25) out.

**Page 44**

(1) Q   Okay. Were you involved in any of the balancing?
(2) A   Not – I was involved in giving the cancellation
(3) orders or the add orders or the whatever order to Lainie.
(4) But, I wasn't involved in that process.
(5) Q   Okay. Do you know the names of anybody at Wedbush
(6) Morgan that Lainie was talking to?
(7) A   No, idea.
(8) Q   Okay. Do you know whether Mr. Perle talked to
(9) anyone at Wedbush Morgan on the day of the IPO?
(10) A   I can't say, I know.
(11) Q   Okay. How about after the IPO? Do you know
(12) whether he talked to anybody at Wedbush Morgan about the
(13) IPO?
(14) A   I can't say, I know.
(15) Q   Okay. Do you know of any instances where
(16) customers who were placed into the IPO stock when there
(17) wasn't funds in their accounts to pay for the stock?
(18) A   Many of the clients had fund – shares placed and
(19) they were called to send in the money – you know, and on
(20) effective date, they may – some may have had cash balances
(21) in their account prior to this, some may have had no money
(22) in the account prior to this.
(23) Q   Uh-hum.
(24) A   So, yes there was stock placed. It was kind of
(25) normal on any trade that you do.

**EXHIBIT 2 PAGE 23**

### Page 45

(1)    Q   Okay. Any instances that you can recall where
(2) there were -- there were a large -- there was a large block
(3) of shares placed into a client's account that didn't have
(4) money to pay for it?
(5)    A   Yes, there was a few orders that were canceled
(6) that I recall,
(7)    Q   Okay. What -- what can you recall about that?
(8)    A   There was a 20,000 share order placed by a client,
(9) Behna Gardner, was canceled.
(10)    Q   Okay. Any others?
(11)    A   Some of the other brokers did have orders that was
(12) canceled, but that one I do recall,
(13)    Q   Okay. Do you recall any larger than this 20 share
(14) -- 20,000 share trade?
(15)    A   That I -- no, not that I know.
(16)    Q   Okay. Why do you recall the name Behna Gardner?
(17) That particular trade?
(18)    A   She called in specifically to cancel her shares,
(19) because of the Bulletin Board status.
(20)    BY MR. MANGOLINI:
(21)    Q   Do you know when she called in to --
(22)    A   You know, a few days after -- you know, *.
(23)    Q   Was it done immediately? Was it immediately
(24) canceled?
(25)    A   I told Lainie -- I don't when -- there's sometimes

### Page 46

(1) a delay with Wedbush to actually cancel anything that
(2) happens. We give them the order and I don't know -- my
(3) hands are off after that point. It's going to be canceled
(4) and that's all I do.
(5)    Q   So, what's the procedure? The client calls you
(6) and then what do you do?
(7)    A   I take it. At that point, I took it to Lainie and
(8) said, this lady doesn't want it. She's not going to pay.
(9)    Q   And then do you know what Lainie does at that
(10) point?
(11)    A   I don't know what she did at that point.
(12)    Q   Do you know if there was a procedure in place to
(13) handle?
(14)    A   The only procedure I know that she was -- it
(15) wasn't really a procedure, because there's a procedure in
(16) keeping place to handle normal cancellations. But, not on
(17) the IPO, because it was done a little different.
(18)    BY MR. ARNOLD:
(19)    Q   Okay. For the IPO -- on the date of the IPO,
(20) November 25, were there order tickets prepared for the
(21) customer orders?
(22)    A   Yes.
(23)    Q   Okay. Who prepared the order tickets?
(24)    A   The brokers prepared the order tickets and gave
(25) them to me. They put their signature on them and -- you

### Page 47

(1) know, filled out other stuff,
(2)    Q   Okay. Now, were the order tickets just for the
(3) customers that they had contacted to verify the orders? Or
(4) were the other tickets for all the indication of interest?
(5)    A   The order tickets were initially filled out for
(6) the indications, because some of the cancellations we didn't
(7) know until the last minute. And then we pulled.
(8)    Q   Okay. And when were the order tickets filled out?
(9)    A   Maybe a few days before.
(10)    Q   Okay.
(11)    BY MR. HYATT:
(12)    Q   Before the IPO?
(13)    A   Yeah.
(14)    BY MR. ARNOLD:
(15)    Q   Okay. And that's in the Irvine office?
(16)    A   Yeah.
(17)    Q   Do you know whether a similar practice was
(18) followed in the other offices?
(19)    A   I can't say, I know.
(20)    Q   Okay. Did you ever see any -- any documents
(21) directing the various offices to follow that procedure?
(22)    A   I don't remember.
(23)    Q   Did Mr. Perle ever make any statements to you to
(24) have the order tickets filled out several days in advance?
(25)    A   I don't remember.

### Page 48

(1)    Q   Okay. Do you know who -- whose idea it was to
(2) fill them out several days in advance?
(3)    A   I don't remember. I -- just that was probably
(4) what we did. I can't remember.
(5)
(6)    BY MR. HYATT:
(7)    Q   Excuse me. I have just -- just one follow up.
(8) Just so I understand, the order tickets represent
(9) indications that have been confirmed or do they represent
(10) just indications?
(11)    A   It was kind of like a dupe of the other part, but
(12) we needed tickets to go in and we didn't know the procedure
(13) whether we're going to enter it through the computer system
(14) there or whether they were going to use the sheet. I -- we
(15) didn't know at that point. And finally, it was more
(16) convenient to use the original sheets than the tickets.
(17)    Q   The sheets of indications?
(18)    A   Right. Right,
(19)    Q   Okay. Right, I see. So, the indications were
(20) really a duplicate -- excuse me, the order tickets were
(21) really a duplicate of the indications of interest?
(22)    A   Of the indication, initially. And then at some
(23) point later, they had to be pulled to balance the same
(24) system out was my understanding.
(25)    Q   Okay. Okay.

EXHIBIT 2 PAGE 24

Page 49

(1)   BY MR. ARNOLD:
(2)   Q    As the IPOs occurring on November 25, do you know
(3)   whether Wedbush was reporting back to Waldron as to how many
(4)   trades have been processed or how the IPO was going somehow?
(5)   A    I don't know.
(6)   Q    Were you monitoring the situation somehow
(7)   yourself?
(8)   A    I was just doing the shares that -- for the
(9)   office. I -- I don't know.
(10)   Q    Okay. The -- as I understand it, it's Waldron's
(11)   inventory account that actually purchased the 1.3 million
(12)   shares in the IPO before they were sold to customers, is
(13)   that right?
(14)   A    I don't know.
(15)   Q    Don't know? Okay. Was there a -- a penalty bid    --
(16)   used in connection with the IPO?
(17)   A    Yes.
(18)   Q    What is a penalty bid?
(19)   A    It's kind of standard throughout many IPOs you do.
(20)   Had it done in other firms, which if a broker sells the
(21)   stock within whatever date that they use on the penalty
(22)   date, it's usually anywhere from a month to three months.
(23)   The commission would be taken from the broker in the buy and
(24)   the sell or the buy over the sell or whatever would be the
(25)   structure.

Page 50

(1)   Q    Okay. And as you understand it, what's the
(2)   purpose of a penalty bid?
(3)   A    To add stability to the stock, initially.
(4)   Q    What do you mean by add stability?
(5)   A    So, that it stays at a price long enough to add
(6)   the proceeds to the company so that the stock can really
(7)   trade.
(8)   Q    Any other purpose that you're aware of? Okay.
(9)   How do you know a penalty bid --
(10)   COURT REPORTER:    That was a no?
(11)   THE WITNESS:    No.
(12)   MR. ARNOLD:    Yeah, okay. I'm sorry.
(13)   BY MR. ARNOLD:
(14)   Q    How do you know a penalty bid was used in
(15)   connection with this IPO?
(16)   A    We had each broker sign a penalty bid letter as
(17)   they were giving us their indications of interest.
(18)   Q    When you say, we had them sign it, who are you
(19)   referring to as the we?
(20)   A    Me and Lainie sat with each broker.
(21)   Q    Okay. Was there anyone else present other than
(22)   you, Lainie and each broker?
(23)   A    Sometime, Cery was at some of the meetings.
(24)   Sometime, he wasn't -- you know --
(25)   Q    Okay. What did you say to these brokers about the

Page 51

(1)   penalty bid?
(2)   A    We said that you * that if you sell the stock --
(3)   you know, within the parameters of the penalty bid, you
(4)   would lose your commissions.
(5)   Q    Okay. Did you say anything else?
(6)   A    I think we -- some brokers had given us their
(7)   indications of interest and some of them we * back and said,
(8)   well, you indicated for this, we're going to give you this.
(9)   You know, and we just kind of had to make an indication of
(10)   interest print on their states and things of that sort of
(11)   what they would allocate if they wanted to do that.
(12)   Q    Okay. Anything else you said about the penalty
(13)   bid?
(14)   A    Uh-uh.
(15)   Q    Anything --
(16)   A    No.
(17)   Q    Anything that Lainie Koch said about the penalty
(18)   bid to the brokers?
(19)   A    No.
(20)   Q    Okay. Did all of the brokers sign a penalty bid
(21)   sheet?
(22)   A    All that was there during the time.
(23)   Q    Okay. Were there any brokers that you know of in
(24)   the Irvine office who did not sign a penalty bid?
(25)   A    Steve Lorenzo didn't sign a penalty bid, because

Page 52

(1)   he didn't come to work when the offering was about to be
(2)   done.
(3)   Q    Okay. Anyone else?
(4)   A    There could be someone else, but I don't know.
(5)   Q    Okay. How about in other Waldron offices? Was
(6)   the penalty bid used in other Waldron offices?
(7)   A    It was a firm thing. I knew that it was
(8)   throughout the firm.
(9)   Q    Okay. How did you know it was throughout the
(10)   firm?
(11)   A    Because, in the penalty bid situation, it wouldn't
(12)   just be selected for one. It would be throughout the firm
(13)   and the syndicate as well.
(14)   Q    Okay. Any other reason you think it was used
(15)   throughout the firm?
(16)   A    No.
(17)   Q    Did anyone make any statements to you that it was
(18)   being used throughout the firm?
(19)   A    No one made a statement that it was used
(20)   throughout the firm, but I knew this from my prior knowledge
(21)   of doing IPOs. It is not a situation where you give one
(22)   person a penalty bid and the other person doesn't have it.
(23)   Q    Okay. Did you ever talk to Mr. Perle about the
(24)   penalty bid?
(25)   A    Not specifically.

EXHIBIT 2 PAGE 25

#### Page 53

(1) Q   Do you recall any statements he ever made about
(2) the penalty bid?
(3) A   No.
(4) Q   Other than you and Lainie Koch talking to the
(5) brokers about the penalty bid, did you ever talk to anyone
(6) else about the penalty bid?
(7) A   In what manner? Just to describe it to the
(8) brokers, yes, but no other manner.
(9) Q   Okay. Okay. Were any brokers at Waldron ever
(10) penalized in any way for not selling Shopping.com stock or
(11) for not selling enough of it?
(12) A   No.
(13) Q   Were any brokers at Shopping.com ever told that
(14) they would be punished in some way if they didn't sell the
(15) stock?
(16) A   No.
(17) Q   Do you know of any instances where brokers at
(18) Shopping.com were fired from their job for not selling
(19) Shopping.com?
(20) A   Absolutely not.
(21) Q   Okay. Were brokers at Shopping.com ever given any
(22) instructions about what to do if a client wanted to sell
(23) Shopping.com stock while this penalty bid was in place?
(24) A   Not to me.
(25) Q   Okay. Were they ever told to find a home for the

#### Page 54

(1) stock in the account of another Waldron customer?
(2) A   No.
(3) Q   Okay.
(4) BY MR. HYATT:
(5) Q   Just, I'm going to question of who would be –
(6) whose idea was it to bring it to Waldron?
(7) A   I don't know.
(8) Q   Was it yours?
(9) A   No.
(10) Q   Was it Lainie Koch's?
(11) A   I don't think so.
(12) Q   Who else could it be then?
(13) A   I would assume Cery.
(14) Q   Only because he was the President?
(15) A   Yeah.
(16) Q   Okay.
(17) BY MR. ARNOLD:
(18) Q   Okay. After the IPO, do you know whether Ed
(19) Harris purchased any Shopping.com stock?
(20) A   No – no, idea.
(21) Q   Do you know whether Mr. Aubrey purchased any
(22) Shopping.com stock after the IPO?
(23) A   No, idea.
(24) Q   Do you know whether William Long purchased any
(25) after the IPO?

#### Page 55

(1) A   I don't know.
(2) Q   Okay.
(3) A   They may have, but I don't know.
(4) Q   Did Mr. Perle ever make any statements to you that
(5) – that Waldron was having trouble selling the IPO to
(6) customers?
(7) A   No.
(8) Q   Was this a firm commitment underwriting?
(9) A   Yes.
(10) Q   And how do you know that?
(11) A   Prospectus.
(12) Q   Okay. As you understand it, did Waldron have the
(13) financial resources to purchase the offering if it couldn't
(14) sell at all to its customers?
(15) A   I don't know.
(16) Q   Was that ever discussed with the firm?
(17) A   No.
(18) Q   Okay. Are there any instances you can recall.
(19) where Waldron customers contacted you complaining that they
(20) were having trouble selling their Shopping.com stock through
(21) their broker at Waldron?
(22) A   I had calls from customers who wanted to sell
(23) their stock, and I execute to sell someone's stock.
(24) Q   Do you recall whether any of those instances
(25) involved customers who were having trouble getting their

#### Page 56

(1) brokers to execute sell orders?
(2) A   Not that I recall.
(3) Q   How are the – the brokers at Waldron compensated
(4) for selling Shopping.com stock in the IPO?
(5) A   Commission.
(6) Q   Was the commission different than – than the
(7) normal commission structure or was it the same?
(8) A   Similar.
(9) Q   When you say, similar, was there something
(10) different about it?
(11) A   No, it's about the same.
(12) Q   Okay. Anything other than commission that was
(13) paid to the brokers?
(14) A   No.
(15) Q   Okay. Any additional compensation that you
(16) received in connection with the IPO?
(17) A   No.
(18) Q   Other than the warrants you mentioned earlier.
(19) A   Right. No.
(20) Q   Okay. Who else at Waldron got warrants issued as
(21) far as you know?
(22) A   All of the service assistants. Every – just the
(23) staff. It wouldn't – not including – excluding, the
(24) brokers received some type of warrants.
(25) Q   Okay. When you say the staff, that would include

EXHIBIT 2 PAGE 26

Page 57

(1) Mr. Perle?

(2)   A   He's the one who gave them so I doubt it.

(3)   Q   Okay. Who do you know for sure that got warrants

(4) besides yourself?

(5)   A   All of the service – from the girl that answers

(6) the phone – just basically, the clerical staff through the

(7) guys who do the paperwork through I think if – the guys

(8) that were on salary, basically. I'm not on salary, but the

(9) guys – the other guys who get were on salary received some

(10) type of warrants, I think they were like, maybe 500 to

(11) whatever number. I don't know who had the highest of all of

(12) this. I mean, 500 I think was the minimum.

(13)   Q   Okay. So, other than yourself and the people

(14) you've just mentioned, is there anyone else you know of who

(15) got warrants?

(16)   A   I – I can go for the names that I know of if you

(17) like. I mean, just Mike Suki, Leslie Merritt, Michelle – I

(18) don't know Michelle's last name, Pam, Lainie –

(19)   Q   Pam. What's Pam's full name?

(20)   A   I don't remember. She's the Receptionist.

(21)   Q   Okay.

(22)   A   Laura Gomez, Leslie Merritt, what's the other

(23) girl's name? I'm just loosing the names of them, but just

(24) the staff there.

(25)   Q   Okay. You mentioned the name Mike Suki, who is

Page 58

(1) that?

(2)   A   He's a CFO.

(3)   Q   And is he still with Waldron?

(4)   A   No.

(5)   Q   When did he leave?

(6)   A   About a month ago.

(7)   Q   Do you know why he left?

(8)   A   Not really.

(9)   Q   Was there any discussion in the office about why

(10) he left?

(11)   A   There was a discussion with me and Georgia saying

(12) it was – he left. It was a mutual thing. He'd be better

(13) off someplace else. It was a resignation.

(14)   Q   Okay. Anything else said about that subject?

(15)   A   Nothing other than he just left for no reason.

(16)   Q   As you understand it, did Mr. Suki have any

(17) role in the IPO for Shopping.com?

(18)   A   No. No.

(19)   Q   Okay. Okay. One of the things we've been a

(20) little curious about around here was the – price hike

(21) for Shopping.com stock. It started out at the IPO $8 or $9

(22) a share and at one point was up to around $32 a share. Do

(23) you have any understanding of why the stock rose in price

(24) the way it did?

(25)   A   My understanding is, because of the short – the

Page 59

(1) term, short squeeze.

(2)   Q   Okay. And how did you gain an understanding it

(3) might have been because of a short squeeze?

(4)   A   We knew that the Fieros had sold us stock in which

(5) they couldn't possibly own.

(6)   Q   And how did you know that?

(7)   A   From Mr. Perle and from the – the sheets that he

(8) spoke about, being the underwriter sheets, and knowing where

(9) the stock was.

(10)   Q   Okay. What are these – these sheets that you're

(11) talking about?

(12)   A   The DTC sheets or something like that.

(13)   Q   Okay. And where did Mr. Perle get these sheets?

(14)   A   No, idea.

(15)   Q   Do you know what he did with them after he got

(16) them?

(17)   A   No, idea.

(18)   Q   Okay. How did – how did Waldron know it was

(19) Fiero that was involved in the short squeeze?

(20)   A   They were market makers and they would

(21) specifically be on the box selling stock to our Trading

(22) Department.

(23)   Q   Okay. Was there any other reason?

(24)   A   Other than – I'm sure looking in the contra

(25) ticket and seeing them on the other side of it.

Page 60

(1)   Q   Okay. I guess what I'm wondering is, I'm sure

(2) there were a number of firms that were selling the stock and

(3) buying the stock *?

(4)   A   Right.

(5)   Q   Right. Was there some particular way Waldron was

(6) able to know that Fiero was short?

(7)   A   I don't know.

(8) BY MR. HYATT:

(9)   Q   Excuse me, sir. I thought you mentioned that from

(10) these sheets, Cery was able to tell who the shorts were?

(11)   A   No, who owned the stock.

(12)   Q   Who owned the stock.

(13)   A   Right.

(14)   Q   Okay.

(15) BY MR. ARNOLD:

(16)   Q   Okay. What did Mr. Perle say about the Fiero

(17) Brothers?

(18)   A   Specifically?

(19)   Q   Uh-hum.

(20)   A   I don't know, you have to ask –

(21)   Q   Do you have any general recollection of – of what

(22) he was saying about Fiero?

(23)   A   They're shorting our stock, that's it, You know –

(24)   –

(25)   Q   Okay. Anything else?

EXHIBIT 2 PAGE 27

## Page 61

(1)  A    Not that I can really remember.

(2)  Q    Do you recall anything that Mr. Perle did in

(3)  response to knowing that they were shorting the stock?

(4)  A    In what way?

(5)  Q    Did he instruct Mr. Oudt, for instance, to buy

(6)  more stock or to take some other action?

(7)  A    I don't know.

(8)  Q    Okay. Do you know whether Mr. Perle ever talked

(9)  to anyone at the Fiero Brother's firm?

(10)  A    I don't know.

(11)  Q    On how many occasions did Mr. Perle make a

(12)  statement to you that the Fiero Brothers were shorting the

(13)  stock?

(14)  A    I really can't say the statement was made like

(15)  that even. It just was kind of common knowledge when

(16)  everyone looked on the box, being the Bloomberg, and you

(17)  look at the Bloomberg and you see the market makers and you

(18)  see Fiero is on the offering and now, you know no one else

(19)  is on the offer. It's like common. I mean, I don't know

(20)  whether I want to retract a statement. I knew it was just

(21)  common knowledge. I can't really say the way it was said or

(22)  anything that Fiero was just shorting the stock.

(23)  Q    Right.

(24)  A    It's just when you look at a market maker Level 2

(25)  machine –

## Page 62

(1)  Q    Uh-hum.

(2)  A    You can see who is on the offering and obviously

(3)  the guy's not moving, he's selling stock.

(4)  Q    Okay. Do you recall during what period of time

(5)  the – the statements about Fiero Brothers being involved in

(6)  the short selling – what period of time was that taking

(7)  place?

(8)  A    I can't tell you exactly.

(9)  Q    Okay. Do you have any recollection of how long

(10)  after the IPO that started?

(11)  A    The only thing I can give you is price. If you

(12)  pull the chart, you can see when the stock was at 14 7/8 or

(13)  so 14 3/4, that's when we first had that come up. If you

(14)  pull the chart on that and pull the time frames, that's when

(15)  it first came up.

(16)  Q    Okay. Who at – at Waldron was making decisions

(17)  about whether or not Waldron would be going into the market

(18)  to buy the stock?

(19)  A    I don't know – understand the question.

(20)  Q    Is – is it just Sean Oudt in the Trading

(21)  Department or is it someone else?

(22)  A    You got to be more specific. Because, I mean, are

(23)  you speaking of retail or are you speaking of –

(24)  Q    I'm talking about for the – for the trading

(25)  account?

## Page 63

(1)  A    I have no knowledge of when they're going to

(2)  decide to buy, sell or do anything.

(3)  Q    Okay. Did you ever participate in any

(4)  conversations where it was talked about?

(5)  A    None.

(6)  Q    Did you ever overhear any conversations about the

(7)  subject?

(8)  A    No.

(9)  Q    Did you ever see any documents on that subject?

(10)  A    No.

(11)  Q    Did Mr. Perle ever make any statements to you

(12)  about what price he thought Shopping.com's stock should be

(13)  at?

(14)  A    A statement was made in the research report at

(15)  what price the stock should be at. It was backed up

(16)  quarterly in a research report.

(17)  Q    Okay. Any other instances?

(18)  A    Not specific numbers or anything like that, no.

(19)  Q    Okay. What is this research report you're

(20)  referring to?

(21)  A    The research report in which Waldron wrote up. I

(22)  can't think of the guy in Connecticut's name right now.

(23)  Q    Mr. Drummand? (phonetic)

(24)  A    Yeah.

(25)  Q    Okay. And what do you know about this research

## Page 64

(1)  report?

(2)  A    Just that it was a research report and it gave

(3)  some comparison, gave us all the view of the industry, the

(4)  type of products Shopping is selling on the internet. And

(5)  gave, if I'm not mistaking, models of where the other

(6)  companies were trading and according to their revenues and

(7)  their – you know, projected profitability and the type of

(8)  exposure that they have on their internet site as opposed to

(9)  Shopping.com which identified it as a value with the other

(10)  internet retailers out there.

(11)  Q    Okay. How is Mr. Drummand involved with this

(12)  report?

(13)  A    My understanding, he wrote it.

(14)  Q    And how did you gain that understanding that he

(15)  wrote it?

(16)  A    Because, I remember specific phone calls, was it

(17)  done yet? Was the research report done yet? Where we –

(18)  everyone wanted to know – you know, about a research report

(19)  that he may be doing or they could be doing.

(20)  Q    Phone calls between who and who?

(21)  A    I don't remember. I just know it was spoke that

(22)  he did it. I can't tell you who the phone calls were. I

(23)  mean, we knew that at some point he would probably put a

(24)  research report together.

(25)  Q    Okay. I'm showing you what's been previously

EXHIBIT 2 PAGE 28

**Page 65**

(1) marked as Exhibit No. 22. This is an eight-page document.
(2) At the top it says, Yahoo Finance and a little below that it
(3) says, Thursday, March 12, 12:39 P.M. Easter Time, Company
(4) Press Release, Shopping.com Stock Up On Waldron & Company
(5) Buy Recommendation.
(6) Could you take a moment and look through this
(7) Exhibit and tell me if you've seen it before, please?
(8)   A    Not in the Yahoo format, but yes, I've seen the
(9) original documents.
(10)   Q    Okay. Is this the -- the report you were
(11) referring to?
(12)   A    Yes.
(13)   Q    Okay. The date on here -- it indicates it was
(14) issued on March 12, is that consistent with your
(15) recollection of the report?
(16)   A    Yeah.
(17)   Q    Okay. Do you have any understanding of why it was
(18) issued on March 12?
(19)   A    No.
(20)   Q    Do you know why Waldron was issuing a research
(21) report, in the first place, on the stock?
(22)   A    It's sort of like, typical that you would do that,
(23) I mean --
(24)   Q    Okay. Do you think is there any other reason that
(25) you're aware of?

**Page 66**

(1)   A    No.
(2)   Q    Okay. Around the time of this research report
(3) with Waldron's buy recommendation, do you know whether there
(4) were any other firms issuing reports with sell
(5) recommendations?
(6)   A    Yes.
(7)   Q    And what do you know about that?
(8)   A    I know that Sandy Greenberg issued a sell
(9) recommendation.
(10)   Q    Okay. And how do -- how do you know that?
(11)   A    * news right on the -- the web.
(12)   Q    What -- was any of the reason for issuing this
(13) report to counteract that sell recommendation by Mr.
(14) Greenberg?
(15)   A    I can't say I know specifically, no.
(16)   Q    Were there any conversations with Waldron about
(17) why this report was being issued when it was?
(18)   A    No.
(19)   Q    Okay. Do you know -- did you ever talk to Mr.
(20) Perle about this report?
(21)   A    Yeah.
(22)   Q    Okay. What did you talk to him about?
(23)   A    Just kind of went over the report a little bit --
(24) you know,
(25)   Q    Okay. Anything specific in there that you can

**Page 67**

(1) recall talking to him about?
(2)   A    No.
(3)   Q    Okay. Who at Waldron actually issued this report?
(4) This was apparently put on the business wire. Do you know
(5) who actually directed that it be put on the business wire?
(6)   A    No, idea.
(7)   Q    Okay. On the day that the report was issued,
(8) March 12, do you know whether Waldron's inventory account
(9) was buying stock at that time -- Shopping.com stock?
(10)   A    No, idea.
(11)   Q    Okay. Did you talk to anyone else about this
(12) research report? You mentioned you may have had a
(13) conversation with Mr. Drummand. You may have talked to Mr.
(14) Perle about it. Was there anyone else?
(15)   A    At what point?
(16)   Q    At any time.
(17)   A    To the brokers.
(18)   Q    Okay. Anyone else?
(19)   A    Uh-uh. No.
(20)   Q    Were -- were the brokers told that there was going
(21) to be a research report issued?
(22)   A    They were told that we may have a research report
(23) and if at some point the stock would be restricted a few
(24) days before the report.
(25)   Q    What do you mean, restricted?

**Page 68**

(1)   A    They couldn't buy -- solicit buyer/sellers before
(2) the report.
(3)   Q    And was the stock actually restricted
(4) before this report?
(5)   A    Yes.
(6)   Q    Okay.
(7)   A    I mean, solicit buyer/sellers,
(8)   Q    Right. Other than Mr. Drummand, do you
(9) know of anyone else within Waldron who may have had a role
(10) in either drafting this report or editing it or reviewing
(11) it?
(12)   A    Not that I know of.
(13)   Q    Okay. Before the report was issued, do you know
(14) the names of anybody who received copies of it?
(15)   A    I don't know.
(16)   Q    Okay. When the report was issued on the twelfth,
(17) was anything done with it other than send it to the business
(18) wire? Were -- were copies of it mailed to anybody or faxed
(19) to anybody or used for any other purpose?
(20)   A    To our clients.
(21)   Q    Okay. Which clients?
(22)   A    All of the clients who had stock.
(23)   Q    Okay. And what was the purpose of sending this to
(24) all the clients who had the stock?
(25)   A    To let them know that there was a buyer report,

EXHIBIT 2 PAGE 29

BSA                                 CONDENSED TRANSCRIPT                                 XMAX(18/18)

### Page 69

(1) let them read it and if we understand the company a little
(2) bit better, maybe buy more or determine what they wanted to
(3) do or maybe sell.
(4)   Q   Any other reason for sending them the report?
(5)   A   No.
(6)   Q   Whose idea was it to send the report to the
(7) customers?
(8)   A   It was kind of expected that they would get a copy
(9) of the report.
(10)  Q   Well, was there someone within Waldron that
(11) directed that it be done?
(12)  A   I don't know specifically, but it was kind of
(13) expected that the clients would get a copy of the research
(14) report. It's like if they own something, they want to see
(15) it. It's almost like customer service to them.
(16)  Q   Okay. Do you know whether Jack Myers had any
(17) involvement in drafting this research report?
(18)  A   I don't know. Maybe. I don't know.
(19)  Q   Do you know whether anybody at Shopping.com saw
(20) the research report before it was issued?
(21)  A   I don't know.
(22)  Q   Do you know the name Pam Constantino?
(23)  A   Yes.
(24)  Q   Who is that?
(25)  A   She is the – was the promotion company for

### Page 70

(1) Shopping.com.
(2)   Q   Okay. And do you know whether she had any
(3) involvement with this research report?
(4)   A   No.
(5)   Q   Who was it at Waldron that decided Shopping.com
(6) would be a buy recommendation as opposed to a hold or a sell
(7) or some other recommendation?
(8)   A   I really don't know. It started out.
(9)   Q   Okay. Was there any discussion within Waldron
(10) about how Waldron could be issuing a buy recommendation for
(11) a stock when there had just been issued a sell
(12) recommendation for it?
(13)  A   I don't know.
(14)  Q   Well, I guess what I'm wondering is, Sandy
(15) Greenberg issues the sell recommendation and now we have
(16) Waldron issuing a buy recommendation. Is there any
(17) discussion in the firm about how two different firms can
(18) come to such different conclusions about the stock?
(19)  A   I guess I still don't know how to answer the
(20) question.
(21)  Q   Okay. Were there any discussions about that?
(22)  A   There was discussion that Sandy Greenberg had
(23) issued a sell recommendation and I – if I'm not mistaken,
(24) we went over the sell recommendation. We found a lot of
(25) things that were actually false about the company and

### Page 71

(1) acquired things he hadn't done proper due diligence on to
(2) make statements that he had made.
(3)   Q   What were the things that were false?
(4)   A   I don't remember right now, but we went over
(5) these. I think it was myself and Jack Myers going over the
(6) specifics about certain things – we went over specifics
(7) about the company and particular areas that were wrong.
(8)   Q   Did you talk to anyone at Shopping.com about the
(9) Sandy Greenberg report?
(10)  A   No.
(11)  Q   Okay. How was it that you were sure that the
(12) report contained inaccuracies?
(13)  A   If – if I'm not mistaken, in the Prospectus,
(14) there was a couple of things that were wrong in comparison
(15) that were still the same and has been a material change of
(16) the company.
(17)  Q   Okay. Why don't we take a short –
(18)  MR. MANGOLINI:   Can I ask a question?
(19)  MR. ARNOLD:   Yeah, okay.
(20)  BY MR. MANGOLINI:
(21)  Q   Did it seem strange or odd to you that Sandy
(22) Greenberg would issue a sell rec. and Waldron would issue a
(23) buy rec.?
(24)  A   It seemed rare – strange and very odd to me that
(25) Sandy Greenberg would issue a sell recommendation on this –

### Page 72

(1) on the stock in the first place. But, it didn't seem rare
(2) that we were issuing a buy recommendation.
(3)   Q   Why would it seem strange that you would issue a
(4) sell rec. in the first place?
(5)   A   The stock wasn't shortable. The stock – he had
(6) no interest or responsibility with in any way, shape or
(7) form. I felt that was very odd and peculiar that he would
(8) even care to issue a sell recommendation about something in
(9) which his clients didn't even want to be involved.
(10)  Q   In your experience with business, is it usual for
(11) one firm to issue a sell rec. while another would issue a
(12) buy rec. around the same time?
(13)  A   Yes. It does happen where they kind of collide
(14) like that.
(15)  BY MR. HYATT:
(16)  Q   How many sell recs. do you see period?
(17)  A   You know, you don't see too many sell recs. and
(18) for the idea – I mean, every once in a while, you'll see a
(19) sell rec. on – you know, some stock out there that – you
(20) know, is just – it just doesn't look really good right now.
(21) Usually, they go from hold to buy –
(22)  Q   Usually, just hold – the hold?
(23)  A   The progression is something like that which
(24) standardize, typically, means sell –
(25)  Q   Right.

EXHIBIT 2 PAGE 30

Page 73

(1)
(2) put a sell recommendation on it in the first place was
(3) extremely peculiar to everyone involved as to is there some
(4) other reason he would want to put a sell recommendation?
(5)     BY MR. MANGOLINI:
(6)     Q  I know Dennis may have asked you this, but I'm not
(7) sure I understood it. What was discussed within Waldron?
(8) What were some of the reasons that were kicked around about
(9) issuing a sell rec.?
(10)    A  It was kind of common and maybe he's short. I
(11) mean, it was like -- you know, it was just speculation.
(12) People wondered whether he was short, whether he had an
(13) interest in seeing a stock go down. And that's our
(14) understanding as to why else would he do it, unless that was
(15) the case,
(16)    Q  Do you know if anybody in Waldron actually
(17) contacted him to ask him why he had issued the sell rec.?
(18)    A  He contacted me prior to issuing the sell rec.
(19)    Q  He contacted you?
(20)    A  Yeah.
(21)    Q  Can you tell us about that conversation?
(22)    A  He called me and he kind of really bad-mouthed my
(23) firm, bad-mouthed my decision for being at the firm. And
(24) basically said that -- you know, I'm about to write a report
(25) on Shopping.com.

Page 74

(1)     BY MR. HYATT:
(2)     Q  When did he call you?
(3)     A  I don't know specifically, but I mean, it was
(4) probably within a week or so of the buy rec.
(5)     BY MR. MANGOLINI:
(6)     Q  And -- or do you mean, the sell rec.?
(7)     A  I mean, the sell rec., yeah.
(8)     Q  And why did he call you, specifically?
(9)     A  I used to work for Chatfield Inc. (phonetic).
(10)    Q  Oh, so you had a relation -- a prior relationship
(11) with him?
(12)    A  Yes.
(13)    Q  Okay. When you say he bad-mouthed you and your
(14) firm and your decision to work for Waldron -- is that
(15) accurate? Did you say that?
(16)    A  Yeah.
(17)    Q  What is that -- do you know why he would do that?
(18)    A  I don't know why. A guy has his reasons to do
(19) that.
(20)    Q  What are some of your theories why he would do
(21) that?
(22)    BY MR. HYATT:
(23)    Q  Other than what he's already testified to?
(24)    BY MR. MANGOLINI:
(25)    Q  Other than what you already testified to?

Page 75

(1)     A  Maybe he would want to see the stock go down or me
(2) leave the firm and induce the stock or to change -- have
(3) brokers change the -- and go with me to another place and
(4) sell their stock. It could be a variety of reasons. He
(5) would call me specifically in the hope of making me -- you
(6) know, maybe encourage other people to leave, in which would
(7) cause the stock -- * value the stock to go down because of
(8) selling.
(9)     Q  Did you tell anyone within Waldron that you had
(10) received a call from Sandy Greenberg?
(11)    A  Yes.
(12)    Q  Who did you tell?
(13)    A  I told -- I received several calls by the way.
(14)    Q  From Sandy Greenberg?
(15)    A  Yes.
(16)    Q  On the same day?
(17)    A  No, just prior to that as well. I told Cery,
(18) Georgia, I think that was about it.
(19)    Q  And what was Cery's response?
(20)    A  A little off. A little upset.
(21)    Q  What do you mean by that? Can you elaborate?
(22)    A  I think he kind of -- he was upset, but at the
(23) same time, he wasn't shocked.
(24)    COURT REPORTER:   Counsel, can I switch tapes?
(25)    MR. MANGOLINI:   Sure.

Page 76

(1)     (Off the record.)
(2)     BY MR. MANGOLINI:
(3)     Q  Did Cery tell you to respond to him in any
(4) particular way? To * in any particular way?
(5)     A  Either send him to me -- meaning, Cery, send him
(6) to Cery or just have no comment on the hang-up.
(7)     Q  Do you know if Cery himself called Sandy
(8) Greenberg?
(9)     A  I know that Sandy called Cery at one point. I
(10) know I've sent a call to Sandy -- to Cery from Sandy.
(11)    Q  Well, do you know what -- what the substance of
(12) those calls were?
(13)    A  No.
(14)    MR. MANGOLINI:   That's all I have, Dennis.
(15)    MR. ARNOLD:   Why don't we take a short break.
(16) It's 11:20.
(17)    (Brief recess.)
(18)    BY MR. ARNOLD:
(19)    Q  Okay. We're back on the record at 11:35 a.m. Mr.
(20) Gillespie, do you know what a buy-in transaction is?
(21)    A  Yes.
(22)    Q  Can you tell me what a buy-in is?
(23)    A  It's a transaction where another firm is short in
(24) stock and they have to provide physical delivery of the
(25) certificate. And if they don't provide a physical delivery

EXHIBIT 2  PAGE 31

### Page 77

(1) of a certificate, they actually may be bought-in at some
(2) price.
(3) Q    Okay. Do you know of any instances where there
(4) were buy-in transactions involving Shopping.com stock?
(5) A    Yes.
(6) Q    What do you know about that?
(7) A    I just know that they were done.
(8) Q    Done by who?
(9) A    I looked at the tape after the market, and know
(10) that the transactions were done after the market and I
(11) assume they were buy-ins.
(12) Q    Okay. And when were these transactions done that
(13) you saw on the tape?
(14) A    I know the dates, but -- you know, I'm sure --
(15) Q    Do you have any recollection of approximately when
(16) it was?
(17) A    When the stock was in as new 20s.
(18) Q    Okay. Do you know whether Waldron was involved in
(19) any of the buy-in transactions?
(20) A    I really don't know specifically how that
(21) happened.
(22) Q    Okay. Was there ever any discussion at Waldron
(23) about buy-in transactions for Shopping.com?
(24) A    That there may be buy-ins due, no specifics about
(25) when or what price or anything like that.

### Page 78

(1) Q    Who was saying there may be buy-ins due?
(2) A    I don't remember. Cery may have said there's buy-
(3) in -- there may be buy-ins due.
(4) Q    Do you recall when he may have said this?
(5) A    No, not exactly.
(6) Q    Okay. You said, he may have said this. Do you
(7) have a specific recollection?
(8) A    It's just kind of general.
(9) Q    Okay. Do you recall whether there was anyone else
(10) present when he said it?
(11) A    I don't remember.
(12) Q    Is there anything else you can recall about what
(13) he said concerning buy-ins?
(14) A    No.
(15) Q    Okay. Do you know whether Waldron's inventory
(16) account profited from any trades in Shopping.com stock after
(17) the IPO?
(18) A    I don't remember.
(19) Q    Okay.
(20) BY MR. MANGOLINI:
(21) Q    I have a couple of questions Mr. Gillespie. Early
(22) this morning you testified that you had received calls from
(23) customers who want to sell their I-Buy shares and then you
(24) executed the trades; is that correct?
(25) A    Uh-hum. Yes. Yes.

### Page 79

(1) Q    These customers that called you, were they your
(2) customers?
(3) A    Not during that time frame.
(4) Q    Oh. Why would they call you then?
(5) A    The customers that called either called because
(6) the broker wasn't there or wasn't there that day or had just
(7) resigned or just was out and they couldn't reach their
(8) broker at the time.
(9) Q    Would you happen to recall any of the -- the names
(10) of the customers whose trades you executed * the broker?
(11) A    No.
(12) Q    If I were to read some names to you, you can tell
(13) me whether they sound familiar to you?
(14) A    I'll try.
(15) Q    Do you recall a name of a gentleman called David
(16) Saghy, S-A-G-H-Y?
(17) A    Can I see the name? S? I'll write it.
(18) Q    S-A-G-H-Y? First name David.
(19) A    Maybe, I don't know
(20) Q    Would it surprise you to learn that he said that
(21) he had a very difficult time in trying to sell his stock and
(22) that he -- he spoke to you and even you gave him a difficult
(23) time and finally he was able to sell it. Does that sound
(24) familiar to you at all?
(25) A    And he sold the stock *.

### Page 80

(1) Q    So -- it's your testimony that you never, don't
(2) want to use the word pressure, but you never tried to
(3) convince the clients who want to sell to hold onto the
(4) stock?
(5) A    We explain the full story of the company.
(6) Sometimes, they would see one broker saying one thing and
(7) one thing -- and at every point in the conversation, we say,
(8) look it's your money you can do whatever you like to do with
(9) your money. And you -- I may explain the company a little
(10) bit. And say, well, just make sure you know what you're
(11) doing. Just like anything else. On a buy to sell
(12) recommendation. A buy recommendation is just as important
(13) as the sell.
(14) Q    In relation to this stock, were there any -- any
(15) orders -- sell orders that you did not or refused to --
(16) A    Absolutely not.
(17) Q    Do you recall a customer by the name of Douglas
(18) Grimes, G-R-I-M-E-S?
(19) A    That one's a little familiar.
(20) Q    Would it surprise you to learn that he said -- he
(21) would say that he was unable to sell the stock when he
(22) wanted to do so?
(23) A    That would shock me.
(24) Q    How about the name of a Soccoro Cobbarrubias?
(25) I'll spell it for you. The first name is S-O-C-C-O-R-R-O.

EXHIBIT 2 PAGE 32

BSA                                    CONDENSED TRANSCRIPT                                    XMAX(21/21)

### Page 81

(1) Last name is C-O-B-B as in boy, A-R-R-U-B-J-A-S. Does that
(2) name sound familiar to you?
(3)    A    It doesn't look familiar, but it – that doesn't
(4) mean I didn't talk to him.
(5)    Q    Okay. Would it surprise you to learn that – that
(6) she would say that she wanted to sell some stock and was not
(7) allowed to do so.
(8)    A    Absolutely.
(9)    Q    And how about the name Velma McKibben, M-C-K-I-B
(10) as in boy, B as in boy, E-N?
(11)    A    I don't recall the name.
(12)    Q    Okay. Would it surprise you to learn that she
(13) would say that she had a difficult time of – was not
(14) allowed to sell her stock when she wanted to do so?
(15)    MR. SHERWIN:    Are you saying that she spoke with
(16) this witness – do you recall speaking with her?
(17)    THE WITNESS:    I don't recall.
(18)    BY MR. MANGOLINI:
(19)    Q    How about Connie Davis? Does that name sound
(20) familiar to you?
(21)    A    That name sounds a little familiar, yeah.
(22)    Q    Why is that?
(23)    A    I just remember the name somehow. It sound
(24) familiar to me.
(25)    Q    Okay. Do you recall speaking with her?

### Page 82

(1)    A    I don't recall. Okay, but I could have spoke to
(2) her.
(3)    Q    So, I've asked you this before, but I'll ask you
(4) again, all of – all of these names that I've read to you,
(5) it's your testimony that you do not recall speaking with
(6) them and also that you did not refuse to place their sell
(7) orders?
(8)    A    That's correct.
(9)    Q    Okay, then.
(10)    BY MR. HYATT:
(11)    Q    I just have a couple of follow up questions.
(12) Okay, Mr. Gillespie just starting at the beginning. Your
(13) supervisory duties – could you go a little more detail on
(14) that, with the day involves?
(15)    A    I supervise new accounts as new accounts get into
(16) the firm.
(17)    Q    Uh-hum.
(18)    A    Check the suitability when one of the guys open up
(19) a new account. He's – you know, doesn't have a big enough
(20) net worth to buy the type of stock he's buying or the type
(21) of risk that he's getting involved in doing.
(22)    Q    Did you review new account information forms?
(23)    A    Yes.
(24)    Q    Did you sign them?
(25)    A    Yes.

### Page 83

(1)    Q    And one of the things you've looked for in terms
(2) of reviewing a new account information form was suitability?
(3)    A    Suitability, the state they're in, according to
(4) you know, the blue sky regulations what the issues.
(5)    Q    Uh-hum.
(6)    A    You review what they're doing, what the trade
(7) itself.
(8)    Q    Uh-hum.
(9)    A    Does it seem to make sense?
(10)    Q    Did you look at every order ticket?
(11)    A    I – part of my responsibility is to look at order
(12) tickets. I can't physically look at every order ticket, but
(13) I do review trades.
(14)    Q    On a daily basis?
(15)    A    Yes.
(16)    Q    Did you sign order tickets?
(17)    A    I signed order tickets myself or Cliff Page, Cery
(18) signed order tickets, Georgia signs order tickets.
(19)    Q    Okay. When you sign that's – that's a review?
(20)    A    That's the review –
(21)    Q    Yeah, right.
(22)    A    – to see in – I mean, I also sign what we're
(23) sending over to trading as well. All of the registered
(24) principles.
(25)    Q    Now, when you mentioned before that you sign new

### Page 84

(1) account commission forms, is that just for the Irvine
(2) branch?
(3)    A    Yes.
(4)    Q    Not for any other branch?
(5)    A    Right.
(6)    Q    Okay. Any other supervisory duties? Do you do
(7) any training at all?
(8)    A    Yes.
(9)    Q    Okay. And do you do any hiring at all?
(10)    A    Yes.
(11)    Q    Can you name anybody that you hired off the top of
(12) your head? Was there more than one?
(13)    A    Yeah, quite a few.
(14)    Q    Okay, that's fine. Did you ever fire anybody at
(15) Waldron, I'm talking?
(16)    A    I've asked people to resign, yes.
(17)    Q    Okay. More than one?
(18)    A    Yes.
(19)    Q    Okay. I think very early on, your counsel
(20) mentioned that you can provide us with some documents
(21) concerning that account outside of Waldron that you used to
(22) buy I-Buy stock. Is – what broker/dealer is that?
(23)    A    Schneider Securities.
(24)    Q    Schneider?
(25)    A    Yeah, S-C-H-N-E-I-D-E-R.

EXHIBIT 2 PAGE 33

### Page 85

(1)   Q   When was that purchased?

(2)   A   It's around when the stock was $24, $25 and I sold

(3)   it the same day I think it was or something around there.

(4)   Q   You bought and sold the same day?

(5)   A   Yeah.

(6)   Q   How many shares?

(7)   A   A thousand shares.

(8)   Q   What did you buy it at? You bought it at $24?

(9)   A   I don't know the exact price, but I made $600.

(10)  Five hundred dollars on the trade and I was like, what am I

(11)  doing? I need to go to work.

(12)  Q   Okay. So, you made about $600?

(13)  A   Yes.

(14)  Q   Why did you do something like that? Why -- why

(15)  didn't you just put it through Waldron?

(16)  A   I had money at that account and I had -- I used to

(17)  work at that firm and I still had the account there and --

(18)  Q   Okay.

(19)  A   -- to tell you the truth, I was just too lazy to

(20)  transfer all the money over at that time. Because, I think

(21)  about everyone else before I do prices the same, because my

(22)  commissions are discounted so I just never did do it. Since

(23)  then, I've transferred a lot of monies over, but I just

(24)  hadn't done it at that time.

(25)  Q   I understand.

### Page 86

(1)   A   It was still rather new in the transition *.

(2)   Q   Was that your only purchase of I-Buy stock outside

(3)   of Waldron?

(4)   A   I hadn't -- didn't purchase any -- any you know,

(5)   period.

(6)   Q   Okay. So, other than this 1,000 share purchase,

(7)   you never purchased I-Buy stock?

(8)   A   No.

(9)   Q   You sold it the same day you said?

(10)  A   Maybe it's two days. I think the same day. It

(11)  was very close.

(12)  Q   Okay. You think you made about $600?

(13)  A   Six, seven hundred dollars. It wasn't much.

(14)  Q   I believe Dennis asked you a question earlier as

(15)  to whether sales scripts were given to brokers at -- at

(16)  Waldron and I believe your answer was no; is that correct?

(17)  A   He said on Shopping.com.

(18)  Q   On Shopping.com. Okay. thanks for correcting me.

(19)  Your answers, no?

(20)  A   Right.

(21)  Q   Were sales scripts given to brokers on any other

(22)  issue at Waldron?

(23)  A   It's possible some sales scripts that were in

(24)  their possession from Jay Stern or some of the other

(25)  management. Specifically, I never gave out sales scripts.

### Page 87

(1)   Q   Okay. For any stock?

(2)   A   For any stock.

(3)   Q   Now, did you ever see any sales scripts for

(4)   Shopping.com? Not that you gave out, did you ever see any?

(5)   A   I don't remember seeing any sales scripts in

(6)   Shopping.

(7)   Q   But, you saw some other ones for other issues?

(8)   A   I saw some other ones for other issues.

(9)   Q   Do you remember those issues?

(10)  A   I saw one on the Simulations Plus.

(11)  Q   Uh-hum. How did you see that one? Did someone

(12)  just give it to you or --

(13)  A   It was in a brokers possession and we had a

(14)  meeting about them. We said that we really prefer for them

(15)  not to use the sales scripts and we trashed all the sales

(16)  scripts. I've told them to trash -- we informed them to

(17)  trash the sales scripts.

(18)  Q   When was that, approximately?

(19)  A   Around -- as soon as I got there.

(20)  Q   Okay.

(21)  A   Around that time.

(22)  Q   Now -- now, why not use -- why should they not use

(23)  sales scripts?

(24)  A   My understanding is that you know, you can't use

(25)  someone else's words. It needs to be your -- your words, I

### Page 88

(1)   don't really know the quite -- the clarification of how a

(2)   script can -- let's leave on that. So, rather than go into

(3)   the technicalities of a sales script, I just thought that if

(4)   they want to put something together, they can put an outline

(5)   form together --

(6)   Q   Right.

(7)   A   -- in their own handwriting instead of having --

(8)   being coached specifically to say something or you know,

(9)   lead them in the direction. This is the way I wanted them

(10)  to be trained, so that we can -- you know, we can kind of

(11)  explain what they might want to -- how to write -- just

(12)  present something, but not to tell them specifically this is

(13)  what to -- you know, put it in writing like that. We may

(14)  tell them, you might want to say, this and this and this.

(15)  But, not in writing.

(16)  Q   Okay. Was it okay for brokers to use bullet

(17)  points?

(18)  A   Yeah, that was fine.

(19)  Q   Okay. And did you ever hand out bullet points to

(20)  the brokers?

(21)  A   Possibly. Or I give a meeting to outline bullet

(22)  points.

(23)  Q   Okay. Did you ever give a meeting to outline

(24)  bullet points for Shopping.com?

(25)  A   Probably.

Page 85 to Page 88

**EXHIBIT** 2 **PAGE 34**

Page 89

(1) Q Did you ever pass out a document of bullet points
(2) for Shopping.com?
(3) A I don't know whether there was a sheet passed out
(4) like that. It could have been.
(5) Q Uh-hum. What did that sheet say?
(6) A I don't really remember whether there was a sheet
(7) passed out like that. I don't remember.
(8) Q Okay. In the meeting about bullet points in
(9) Shopping.com, what was including? Things that they should
(10) say about Shopping.com?
(11) A Speak about some of the other internet
(12) comparisons, some speak about –
(13) Q Comparisons, right.
(14) A – the speed in which some of these guys increase
(15) their earnings and revenues and similar to what would be in
(16) the – in the buyer report.
(17) Q Buy rec.?
(18) A Yeah.
(19) Q Uh-hum. Any projections as to a future stock
(20) price?
(21) A Stay away from projections in a presentation.
(22) That was something that was very clear to my brokers.
(23) Q Why?
(24) A My understanding, whenever you would recommend a
(25) stock or anything like that, you would stay away from

Page 90

(1) projections because you – you're really tying yourself to
(2) something like that. You really don't know. You can make
(3) comparisons. This is what these stocks – I don't know what
(4) this one is and – and point out the risks. This is worth
(5) playing with – you know, * risky game. This is the market
(6) and this is a startup company – you know, and it's
(7) something which is not right for everyone. And you know,
(8) and you kind of explain that to them. And that at the
(9) point, you say well, some of these other companies did this.
(10) Not to say this can do this and not to say it – you have a
(11) management or the experience or decidings to do it.
(12) Q Right. No, that was .com went to 90 or 100?
(13) A Right.
(14) Q What's wrong to say then?
(15) A That's – well, no. That's what we would explain
(16) to them and tell them that.
(17) Q Right.
(18) A And say, you know, I don't know. It could
(19) happen – you know, we're giving the company money,
(20) obviously because we think they should follow through on
(21) their business plan and do what they said they can do.
(22) Q Uh-hum.
(23) A And if they follow in it, it probably would.
(24) Q You mentioned – earlier, * your question why the
(25) stock went up, why the price of the stock went up and you

Page 91

(1) mentioned a short squeeze. Was a short squeeze ever
(2) mentioned to brokers?
(3) A I mean, as far as a short squeeze – this is one
(4) of the things that was kind of speculated all throughout.
(5) It was something that was never really said that that's why
(6) the stock went up. It was just kind of speculated that –
(7) Q Uh-hum.
(8) A – it went up and we really, truly – as far as
(9) the stock going up, if I'm not mistaken, when we looked at
(10) the Level 2's we never were the – were the first bidders to
(11) start the stock to go up –
(12) Q Right.
(13) A – in Level 2.
(14) Q I'm going to get into that though, sir. Let me
(15) start with my shorts. Was that ever sort of mentioned to
(16) brokers or something that could be told to clients that
(17) there's a stock – it's involved in a short squeeze and the
(18) price goes up. I mean, people know a price goes up then
(19) there's a short squeeze?
(20) A It could have been mentioned by brokers, but
(21) specifically, we told the brokers specifically to not speak
(22) about the short squeeze to speak about the company going up
(23) on merit that have to do with maybe future earnings and
(24) things that of that sort of projections that may be in the
(25) research report.

Page 92

(1) Q Okay.
(2) A The brokers never made projections on their own,
(3) just to pick a number. We always had to try to find
(4) something. A document or something to support that and
(5) that's – this was the way were – you know, told to speak
(6) about this.
(7) Q Uh-hum. Okay.
(8) A So, short squeeze is like, you know, they were
(9) sad. This is why people were – all over the street and the
(10) comments on the internet and everything else was spoke about
(11) short squeeze, but as far as people – that's what they were
(12) saying was going on. We said, look this is what the other
(13) companies were trading at. This could trade –
(14) Q *?
(15) A Yeah, it could –
(16) Q Now, what does a short squeeze mean to you? And
(17) how does that they get stock to go up?
(18) A My understanding is when you have a short – you
(19) have a point where someone has to buy stock back and create
(20) more of a demand for stock out there at that particular
(21) point.
(22) Q How does it get the stock to go up? I mean, if
(23) you have to buy stock to cover, that's what shorts do all
(24) the time, how does that get the stock to go up? Where's the
(25) squeeze element is what I'm saying?

EXHIBIT 2 PAGE 35

Page 93

(1)    A    I don't know where the squeeze -- it's just a
(2)    term, you know, squeeze what? You know --
(3)    Q    Right, that's my question what do you squeeze?
(4)    A    I don't know. It's a term in the market and it's
(5)    kind of a lingo thing --
(6)    Q    Right.
(7)    A    -- but what happens with that, I don't know. I
(8)    just know that if you have "x" number of shares on the offer
(9)    of one stock at one given time, and then -- you know, you
(10)   have -- someone has to buy it back, that's going to create
(11)   more demand for it at that particular time, which more
(12)   demand, more buying would constitute a higher price. And
(13)   that's my understanding of the way it's always been and we
(14)   just constitute a higher price at that time. And you know,
(15)   just like anyone else if -- you know, this guy was buying
(16)   "x" number of shares, it would just do that. That's been my
(17)   understanding of short squeeze. Now, I don't know where
(18)   that part goes in, but I just understood that it's more
(19)   buying,
(20)   Q    Well, certainly if some insured in the stock,
(21)   there's going to be somewhere down on the road some demand
(22)   to cover the short, correct?
(23)   A    Right,
(24)   Q    Yeah. I know in other stocks -- exchanges in
(25)   stocks, they talk about short interest a lot in NASDAQ

Page 94

(1)    stocks --
(2)    A    Right,
(3)    Q    And that's a -- sort of a measure -- a future
(4)    demand for a stock.
(5)    A    Right,
(6)    Q    And I think that's what you're describing.
(7)    A    Right.
(8)    Q    I just don't understand the squeeze part of it.
(9)    A    I don't even know -- I think it's a fictitious
(10)   made thing that just happened. I don't really -- what the
(11)   squeeze part is -- is I don't know. Is it the point in
(12)   where a person is buying more stock back? I don't know, I
(13)   mean, the term itself.
(14)   Q    Okay. Now, does it have anything to do with buy-
(15)   ins do you know?
(16)   A    I guess, it could. I don't know.
(17)   Q    Okay.
(18)   A    I never thought about that, you know?
(19)   Q    Okay. Now, we mentioned -- we talked about buy-
(20)   ins earlier and we know that Waldron filled buy-ins. Do you
(21)   understand Waldron filled buy-ins?
(22)   A    Yeah. Yeah.
(23)   Q    Do you have any idea how many?
(24)   A    I don't know.
(25)   Q    Was it more than five, ten thousand shares?

Page 95

(1)    A    Oh, yeah.
(2)    Q    Have you seen it?
(3)    A    It was a lot of prints, I don't know exactly,
(4)    Q    Right. Now, did -- where did Waldron get the
(5)    stock to fill the buy-ins?
(6)    A    I don't know.
(7)    Q    Did they get it from your customers?
(8)    A    Oh, oh. Some customer accounts did --
(9)    Q    Uh-hum. Do you know which ones?
(10)   A    It might -- it was a few of Cery's clients.
(11)   Q    A few of Cery's clients, okay. Were they your
(12)   clients?
(13)   A    No.
(14)   Q    How come?
(15)   A    *.
(16)   Q    Your clients were used for buy-ins?
(17)   A    I don't know.
(18)   Q    You know the buy-ins were like 34, 35, 39. They
(19)   were way over the closing price of the shares that day. I
(20)   guess my question is, how come your clients or anyone else's
(21)   clients were permitted to participate in the buy-ins? There
(22)   was a lot of money to be made there?
(23)   A    My understand was that the brokers would be able
(24)   to participate in the buy-ins at some dates and everything
(25)   started happening -- it was going to be -- it was going to

Page 96

(1)    be allocated on how many shares were done per each broker
(2)    - and things of that sort. You may *. You did "x" amount of
(3)    shares you would be able to get this many thousand shares of
(4)    buy-in stock. And this was everyone's hope and -- you know,
(5)    that that was happening.
(6)    Q    Did that ever happen?
(7)    A    It was scheduled to, but it didn't,
(8)    Q    When was it scheduled then?
(9)    A    It was like a week or so, a little after, one of
(10)   the last buy-ins or something like that.
(11)   Q    When is this now? I'm lost now.
(12)   A    I don't -- the last --
(13)   Q    This before the suspension or after?
(14)   A    Yeah, exactly.
(15)   Q    Before the suspension?
(16)   A    Yeah, yeah, yeah.
(17)   Q    Whose plan was that to allow the brokers to
(18)   participate -- who had their clients --
(19)   A    Cery. Cery.
(20)   Q    -- participate in the buy-ins? Cery. Were you
(21)   aware that the vast majority of the buy-ins were filled by
(22)   Waldron inventory?
(23)   A    I wasn't aware of that.
(24)   Q    That surprising?
(25)   MR. SHERWIN:    Well, wait a second. You're making

Page 93 to Page 96

EXHIBIT 2 PAGE 36

CONDENSED TRANSCRIPT

Page 97

(1)  a representation there.
(2)      MR. HYATT:    I know. I am. Absolutely.
(3)  BY MR. HYATT:
(4)      Q    Were you aware of that, sir? And your answer was
(5)  no. And does that surprise you?
(6)      MR. SHERWIN:    I'm not sure that that
(7)  representation is correct.
(8)      MR. HYATT:    I'm not saying it is or it isn't. I'm
(9)  making representation. You can question if you like, right?
(10)      MR. SHERWIN:    Well, I want this question to be
(11)  clear that you are making a representation of think and you
(12)  are asking this witness to accept that representation of
(13)  think to be true and then to –
(14)      MR. HYATT:    Let me back up. I think I can solve
(15)  your problem.
(16)  BY MR. HYATT:
(17)      Q    Do you have any reason to believe that's not true?
(18)  That the vast majority of shares were filled at Waldron's
(19)  inventory. Do you have any reason to believe that's not
(20)  true?
(21)      A    No.
(22)      Q    Okay. Does it surprise you that the vast majority
(23)  of shares were filled by Waldron's inventory?
(24)      MR. SHERWIN:    Again, that question is based upon
(25)  the assumption that your effect has stated his true?

Page 98

(1)      MR. HYATT:    Absolutely.
(2)      MR. HYATT:    And you're asking him to believe
(3)  that to be true and to give his opinion on that statement.
(4)      MR. HYATT:    Absolutely, I understand that.
(5)  BY MR. HYATT:
(6)      Q    Does that surprise you?
(7)      A    It doesn't do anything for me.
(8)      Q    Okay.
(9)      A    It doesn't create any emotion.
(10)      Q    What if I said, three, four hundred thousand
(11)  shares were filled from Waldron inventory. Would that
(12)  surprise you?
(13)      A    I really don't have any knowledge or think that's
(14)  the – that's the corporation.
(15)      Q    But, does that bother you at all? Because, I
(16)  mean, you have clients and you had brokers you have clients
(17)  who were not allowed to participate in their buy-ins. Does
(18)  that bother you now as you sit here?
(19)      A    I work for a company, no.
(20)      Q    Okay.
(21)      A    If you go to work for any place you go for, you
(22)  expect that a company would make a profit or you wouldn't be
(23)  there.
(24)      Q    But, you were promised though down the road that
(25)  your clients would be allowed to –

Page 99

(1)      A    The brokers were looking to participate in the
(2)  buy-ins, right.
(3)      Q    And it was to be based on how many –
(4)      A    The share – the allocation – that the shares in
(5)  which they had.
(6)      Q    Okay. How many do your clients have? How many
(7)  shares do your clients have?
(8)      A    At what point?
(9)      Q    Say, currently?
(10)      A    Probably 20,
(11)      Q    Twenty thousand?
(12)      A    Uh-hum.
(13)      Q    What's the range from the beginning for the price?
(14)      A    Price on it?
(15)      Q    No. no. Not the price. I'm just saying, volume.
(16)  The amount. Is that the most it's ever been?
(17)      A    It's been maybe as high as twenty-eight closer to
(18)  thirty, maybe thirty-two was the highest.
(19)      Q    The highest?
(20)      A    And currently, it's about maybe twenty-one, twenty
(21)  something,
(22)      Q    Okay. Did your clients ever ask to participate to
(23)  fill in the buy-ins?
(24)      A    No.
(25)      Q    Did it concern you that your clients have the

Page 100

(1)  stock at a basis of less than the price of the buy-ins?
(2)      A    I don't understand.
(3)      Q    Well, let me give you an example. Suppose, I'm a
(4)  client, I buy at $20 a share.
(5)      A    Okay.
(6)      Q    I buy at $20 – I buy the stock at $20 I-Buy at
(7)  $20 a share and a buy-in gets * at $39 a share. That
(8)  concern you?
(9)      A    I looked at it as if I'm not responsible, it's not
(10)  my place to be concerned with that.
(11)      Q    Okay. Did any clients ever sell I-Buy?
(12)      A    Yes.
(13)      Q    What's the price range usually of the sales,
(14)  roughly – ballpark?
(15)      A    Eighteen to maybe $26, $27.
(16)      Q    Now, buy-ins are being filled at $34, $35, $39 a
(17)  share. Don't you think some of your clients had a right to
(18)  receive some of that money, if they're selling it between
(19)  $18 and $26 a share? As you sit here now, don't you think
(20)  they have a right to receive that?
(21)      A    I didn't take the rest of the inventory. I
(22)  don't – I don't know, I mean –
(23)      Q    Were they ever offered an opportunity to
(24)  participate in those $35, $36, $39 buy-ins?
(25)      A    Uh-uh. We thought at some point that we would get

EXHIBIT 2 PAGE 37

Page 101

(1) that so it wasn't questioned. It wasn't thought is if it
(2) was unfair that they didn't get it or anything like that.
(3) Everyone was with anticipation that you know, hopefully at
(4) some point – you know, we may have a buy-ins to deal with
(5) then,
(6)     Q    Did you ever get the idea they would be as much as
(7) $35, $36, $39 a share?
(8)     A    Well, you know, it was one of those things where –
(9) - you know, the stock could have gone higher.
(10)    Q    Right.
(11)    A    So, we – it wasn't like I was consumed with
(12) thinking about whether or not they got filled fair.
(13) Because, I've looked at other stocks in the past that were
(14) shorted heavily, Pres Tag and some of those other shorts in
(15) the history of the stocks that I've seen short. And it's
(16) like, you know, hindsight saying – you know, well, if you
(17) could have sold it at $39 if the stock was maybe at $70
(18) and – you know, months later, was it a good idea? So, I
(19) mean, I really didn't ever look at it as if I was being
(20) cheated or – you know, not dealt with properly because of
(21) that. Because at that point, they still have the stock and
(22) even the guy doesn't.
(23)    Q    Well, what about those clients that we saw at $18,
(24) $19, $20? They don't have the stock anymore. And they
(25) weren't given an opportunity to sell out, to fill in at $34,

Page 102

(1) $35, $39 a share. What about those points?
(2)     MR. SHERWIN:    Wait a second. What kind of
(3) question is that? If they sell the stock and they no longer
(4) own it and, therefore, they don't have an opportunity at
(5) some point in the future?
(6)     MR. HYATT:    No, no. I'm not saying the future it
(7) filled in at $39. It filled in in the past at $39 –
(8)     MR. SHERWIN:    Well –
(9)     MR. HYATT:    – and these clients weren't given an
(10) opportunity to participate. What about those clients who
(11) sold, who were not given an opportunity to participate.
(12) Didn't they have a right?
(13)    MR. SHERWIN:    Well, you're assuming for those
(14) clients still held it at the time of the buy-ins?
(15)    MR. HYATT:    Yeah.
(16)    MR. SHERWIN:    Is that true?
(17)    THE WITNESS:    I'm lost.
(18) BY MR. HYATT:
(19)    Q    Did any clients hold the stock at the time of the
(20) buy-ins?
(21)    A    Yeah.
(22)    MR. SHERWIN:    The ones – the ones who he's
(23) mentioned have sold at $18 to $26.
(24)    MR. HYATT:    I'm going to get back to that.
(25)    MR. SHERWIN:    Okay.

Page 103

(1) BY MR. HYATT:
(2)     Q    Did any of the clients sell their stock during the
(3) period of the buy-ins, during the weeks of the buy-ins, did
(4) any of your clients sell that stock?
(5)     A    I'm sure. Yeah.
(6)     Q    Were they ever given an opportunity to sell into a
(7) market for $35, $36, $39 a share that the buy-ins were?
(8)     A    I answered that. No, we weren't given an
(9) opportunity at that point.
(10)    Q    And were those clients ever informed that
(11) Waldron's inventory was selling it – all these buy-ins at
(12) $34, $35 and $39 a share? Were they ever informed of that,
(13) those clients? Who sold?
(14)    A    I think at some point maybe some clients did know
(15) that some people – that there were buy-ins, but really no
(16) one really knew including myself – you know, until recently
(17) –
(18)    Q    Uh-hum.
(19)    A    – what pricing –
(20)    Q    Did you ever inform your clients who sold that
(21) there were buy-ins?
(22)    A    Yes.
(23)    Q    Okay. Did you ever inform as to the price of the
(24) buy-ins –
(25)    A    Yes.

Page 104

(1)    Q    – as to the price of the buy-ins?
(2)    A    Yes.
(3)    Q    Which ones?
(4)    A    I don't remember. A few,
(5)    Q    Did they know the buy-ins would be filled at a
(6) price higher than what they were selling at?
(7)    A    Correct. They –
(8)    Q    They were comfortable with that?
(9)    A    They knew that the buy-ins were done at a higher
(10) price and it's like, well – you know, wow. I said, well,
(11) maybe we'll get that price at some time down the road. I –
(12) not a seller just yet. You know, and since they wanted to
(13) sell – you know, they may have got – they got – they
(14) could sell at any point.
(15)    Q    Yeah, but then – my point is, if you do a buy –
(16) you form buy-ins at $39 a share, these clients are selling
(17) at $24 and $25, didn't they have a problem with that? Or
(18) did they not know?
(19)    MR. SHERWIN:    Wait a second. Can I have that –
(20) can you read that question back to me?
(21) BY MR. HYATT:
(22)    Q    If you're doing – doing buy-ins at $35, $36, $39
(23) a share and you're selling these clients out at $18 to $26,
(24) they didn't have a problem with that or did they not know?
(25)    A    They sell prints at higher prices. Some of my

EXHIBIT 2 PAGE 38

Page 105

(1) clients would tell me there were prints at high prices.
(2)    Q    Yeah, but there were not prints for those $39,
(3) $36, $35 buy-ins.
(4)    A    No, you could – you could see prints on
(5) Bloombergs and on – no, you could see a print if you pulled
(6) up a Bloomberg right now, you would be able to see those
(7) prints. That's how I knew about the buy-ins in the first
(8) place through the prints and things that I saw. And some of
(9) my clients would see that print and say, wow, the trades
(10) there. I was like, yeah. You know, and they had asked, I'd
(11) say, well short coverage and short coverage on that they had
(12) to buy back the stock – you know, at that point.
(13)    Q    And did they ask you why they did not participate
(14) in that?
(15)    A    I may have clients ask, yeah,
(16)    Q    And what did you tell them?
(17)    A    I don't have anything to do with that right now.
(18) Maybe at some point we will be able to.
(19)    Q    Okay. This is just not opposed to general
(20) procedures a the Irvine branch, not necessarily Irvine.
(21) But, suppose I'm a potential customer, I call, you don't
(22) know me. And I want to buy let's say a thousand shares of
(23) ABC stock, what do you do?
(24)    A    You call in?
(25)    Q    Yeah, I called in to speak to any old – any

Page 106

(1) broker. I say, I want to buy a thousand shares of ABC
(2) stock, as a new customer, what's the procedure?
(3)    A    The broker would probably fill out an account
(4) form.
(5)    Q    New account information form, right.
(6)    A    Try to explain to the best of his knowledge what
(7) the broker is doing – I mean, what the client is doing.
(8)    Q    Uh-hum.
(9)  . A    Kind of maybe get to know the client a little
(10) bit –
(11)    Q    Okay.
(12)    A    – you know, a little small talk to try to figure
(13) out a little more about his investment experience, past
(14) types of things he's done.
(15)    Q    Do procedures require that I fill out the new
(16) account information form before I can enter the order?
(17)    A    Not necessarily. That – upon receiving the
(18) account form, the broker will try to get – get to know your
(19) client –
(20)    Q    Right.
(21)    A    – * whatever it is. He'll go – then he'll bring
(22) that documentation to me, I'll review it and I specifically
(23) will ask, did the client call in, because I don't know in
(24) our business we don't get a lot of call-ins. And if there's
(25) a call-in – you know, I may – I'll tell them I would feel

Page 107

(1) more comfortable if he got the money in first before you
(2) actually execute the trade. And I instruct the brokers –
(3)    Q    Will there ever be any situation with a new
(4) customer that you'd execute a trade before you got the
(5) money?
(6)    A    Yes,
(7)    Q    With a new customer?
(8)    A    Yes.
(9)    Q    How do you know the customer's going to pay? You
(10) know, that's a new customer. You don't know the customer.
(11)    A    It's one of those things that's generally done
(12) through the – everywhere and every – in the brokers
(13) community that through speaking to him, through talking to
(14) him and talking about their investment experience and
(15) preference and things of that sort. If you develop enough
(16) rapport with the client and you typically call up the client
(17) and spoke to him about – you know, what's happening, they
(18) will pay. It's not even an issue. People – you know,
(19) stand for something, typically, and you know, they will pay
(20) for their trades. They know what they did and they
(21) understand – if it was explained properly to them, they
(22) will pay for the trade. This – on call-ins, I'm a little
(23) more – you know, cautious of which we received a ton of
(24) call-ins during the I-Buy scenario which were bogus trades.
(25)    Q    So, did that make you cautious?

Page 108

(1)    A    Very cautious.
(2)    Q    Tell me about those call-ins you got involved in
(3) for bogus trades?
(4)    A    We would recently – a broker may open up a call-
(5) in account in which they were all in the State of New York.
(6) The broker may question this one and – you know, and go
(7) through all the procedure work of doing that. And we'll get
(8) the clients who – you know, come through and we had one
(9) particular scenario where the client actually paid for the
(10) trade and the – he gave referrals – four or five other
(11) referrals and typically in the business if a broker is to
(12) get a referral, a referral is usually going to pay from the
(13) other guy and the broker kind of takes that for granted that
(14) they will pay. What will happen is the other referrals were
(15) bogus and they didn't pay and it created an illusion as if
(16) someone was parking stock. And I was pretty upset about it,
(17) because in some cases it caused the brokers a financial hit
(18) between the bid and the * of the stock at that time and
(19) where the stock was bought at and sold at.
(20)    Q    Who was the broker?
(21)    A    The brokers. There was a few brokers.
(22)    Q    It was a few brokers?
(23)    A    They had financial hits because of it.
(24)    Q    And these – these are all at the Irvine branch?
(25)    A    Yeah.

EXHIBIT 2 PAGE 39

BSA

## CONDENSED TRANSCRIPT

XMAX(28/28)

### Page 109

(1) Q  These were all -- what did it start with this one
(2) woman who called?
(3) A  It started with a few people -- like I said, they
(4) were all from New York and they called in to place orders in
(5) Shopping and it almost seemed orchestrated.
(6) Q  When did this occur?
(7) A  Right around when the stock was between $17 and
(8) $25. If you pull the charts between that --
(9) Q  Sure.
(10) A  -- you can figure out the time frames.
(11) Q  Yeah. * probably February sometime or March.
(12) A  Yeah.
(13) Q  And they all called around -- you know, the same
(14) date or same --
(15) A  Yeah, it was within a good three weeks we received
(16) all of those call-ins like that.
(17) Q  And who were the brokers who took the call-ins?
(18) A  Christina Calpo, (phonetic)
(19) Q  How do you spell the last name.
(20) A  I don't know.
(21) Q  Who else?
(22) A  Chris -- I can't think of Chris' last name, and
(23) Hank Lim.
(24) Q  Hank Lim?
(25) A  Uh-hum.

### Page 110

(1) Q  L-E-M?
(2) A  L-I-M, I think it is.
(3) Q  Okay.
(4) A  And Sergio Sanchez, I think is --
(5) Q  Uh-hum. These are all still brokers at the office
(6) now?
(7) A  Some are, some aren't.
(8) Q  Who is and who's not?
(9) A  Christina's not. Hank is.
(10) Q  What about Sergio?
(11) A  Sergio's not. And Chris is not as well. Who else
(12) had a call in? I received several calls. When we felt this
(13) was happening, I -- the calls were all directed to me and --
(14) Q  All from New York?
(15) A  All from New York. All New York addresses, all
(16) New York -- you know, everything.
(17) Q  What were their names?
(18) A  You know, it was -- sometime it was the same voice
(19) and then it would say a different name.
(20) Q  The voice was the same?
(21) A  Obvious to me, yes.
(22) Q  Same voice, different names?
(23) A  I would get sometimes, tons of calls -- it would
(24) almost be -- Georgia received call-ins as well the same way
(25) about -- you know, the whole matter and everything.

### Page 111

(1) Q  Now, how did these calls work? I mean, did they -
(2) - explain it to me.
(3) A  I don't --
(4) COURT REPORTER:  I'm sorry, before -- can I switch
(5) sides?
(6) MR. HYATT:  Yeah.
(7) (Off the record.)
(8) BY MR. HYATT:
(9) Q  Okay. So, typically, how did these calls -- how
(10) did they start?
(11) A  You know, I'm interested in Shopping.com --
(12) Q  All right,
(13) A  -- what's going on? What are you guys doing? Are
(14) you guys pushing it now? When are you guys doing these buy-
(15) in stuff? You guys are short squeezing it aren't you?
(16) What's going on? Guys, I want some of that, I want some of
(17) that. So, obviously --
(18) A  That sounds a little suspicious, doesn't it?
(19) Q  Obviously, when I would get a call like that that
(20) was -- in our business, we make outgoing calls. I mean,
(21) it's not that easy -- you know, so -- you know, when a guy
(22) calls you and -- and you know, he's like give me the goods,
(23) give me the goods -- kind of that kind of call and they were
(24) all real heavy New York accents -- you know, what's going on
(25) -- you know, things of that sort. So, I would speak to the

### Page 112

(1) people and you know, I would really almost as if I was --
(2) you know, speaking -- * because I didn't know -- I was very
(3) suspicious -- you know, of the call because I really thought
(4) something was peculiar about it. So, I would just very
(5) carefully -- you know, ask them questions and are they --
(6) you know, do they know what their doing, they know what they
(7) want to -- and I would explain -- they were very -- for a
(8) long time, grill me constantly on the stock. And while it -
(9) - well, you know, are you guys having a meeting to do
(10) something with it? You guys going to make a big push on it?
(11) Q  Okay.
(12) A  People get orders as they get orders. You know,
(13) it was almost hilarious to here and at that point, I would
(14) tell them, if you have an interest in buying stock -- you
(15) know, we'll accept a wire in your account. We can open up a
(16) new account -- send new account documentation to you and
(17) if -- once we get cleared funds in the account, we'll
(18) execute a trade for you. And that -- I would actually be hostile
(19) if I didn't execute the trade for them right then.
(20) Q  Right then and there?
(21) A  Yes. I mean, completely hostile. What do you
(22) mean you're not going to execute? I can call so and so and
(23) get them to execute the trade. And it was always bigger
(24) orders. You know --
(25) Q  How big?

EXHIBIT 2  PAGE 40

Page 113

(1)   A   – five, ten thousand share orders – you know,
(2)   they would want the execute – executed the orders right
(3)   then and there and you know, I got yelled at. I got a
(4)   couple of guys that literally – you know, sweared at me and
(5)   cursed me out because I didn't do that. Come on – I mean,
(6)   don't you want – you want to make the commissions and
(7)   everything, don't you? So, and I just – I just tried to be
(8)   very cordial and nice to the guys and I would just say, hey
(9)   look we need – we are not able to lend you the money. And
(10)  that's all this is, basically a loan.
(11)  Q   Absolutely. So, did you get the money from these
(12)  people?
(13)  A   No.
(14)  Q   Not once?
(15)  A   No.
(16)  Q   How did the conversation end?
(17)  A   Okay, well, send the account information and then
(18)  I may get a call back – you know, I got – I say, well, you
(19)  know, send us the check. Well, come on just buy it for me.
(20)  I got referrals for you. They try to bait me as though they
(21)  had a lot of business. I do lots of business in the market.
(22)  I trade – you know, every day. I'm a very active trader
(23)  and I don't mind the risk. I mean, it was almost – things
(24)  just don't happen like this with people. People are very
(25)  cautious these days about everything they do, and they want

Page 114

(1)   to be careful about their money. And these guys just –
(2)   something too good to be true? Yeah, it just smelled like
(3)   that.
(4)   Q   Now, did you send them account information?
(5)   A   Sure.
(6)   Q   Can I get the names of those people?
(7)   A   I don't have documentation to support those names
(8)   of the people that we send out. I may be able to get
(9)   something.
(10)  Q   Okay.
(11)  A   Do – do some of the messages. I –
(12)  Q   Sure.
(13)  A   – don't know. I'll try.
(14)  Q   I mean, if someone's out there scheming Waldron
(15)  about – you know –
(16)  A   We can – I can definitely give you –
(17)  Q   – I need to know that.
(18)  A   – I can definitely give you support documentation
(19)  upon the people who didn't pay and the – we actually gave
(20)  that to one of you guys.
(21)      MR. SHERWIN:   I think we've already given some
(22)  information.
(23)      THE WITNESS:   Yeah, a lot of that – to
(24)  documentation that showed the people who called in, the
(25)  people who didn't pay, the referrals, the whole chain that

Page 115

(1)   didn't and things of that sort. But, it was –
(2)      BY MR. HYATT:
(3)   Q   Now, this is the latter stages what we just
(4)   described, but let's – as I gathered from what you're
(5)   telling me, this was what you did after you got stung.
(6)   A   While I – after we got stung once, which there
(7)   will still tickets in the pipeline –
(8)   Q   Right.
(9)   A   – that were like that –
(10)  Q   Right.
(11)  A   – because – you know, a lot of time they would
(12)  leave the guy on and the guy may even sign for an extension.
(13)  Saying, oh yeah, I put – you didn't get it in the mail yet?
(14)  You know, it's in the mail. And our broker would file for
(15)  an extension, being check in the mail – that's what an
(16)  extension is for.
(17)  Q   Right.
(18)  A   And it's like – and then all of a sudden he would
(19)  just–
(20)  Q   So, initially –
(21)  A   – casually disappear.
(22)  Q   Initially, you did put through the trades?
(23)  A   Yeah, before we figured out – we already had
(24)  trades in the system already before we figured out one of
(25)  them was a sell out. And after we figured out it was a sell

Page 116

(1)   out, there were already trades in the system that we
(2)   didn't – we couldn't do anything about. They were already
(3)   there.
(4)   Q   But, I gathered though – stepping back a little
(5)   earlier – initially, you had these New York folks calling
(6)   up, want to buy big positions, didn't have money in their
(7)   accounts and you guys executed those trades, initially?
(8)   A   We executed trades upon that – simply because the
(9)   – one of them paid –
(10)  Q   One of them paid.
(11)  A   The one that paid and – you know typically, when
(12)  there's a referral, the other people –
(13)  Q   Right.
(14)  A   – you know, will pay. You know, this is my best
(15)  friend. You know, he's good for – he's good for the money
(16)  and you know, believe it or not, the business is still done
(17)  like this everywhere you call around the firm.
(18)  Q   What about the one who paid? .
(19)  A   They ACATed their stock out and if I'm not
(20)  mistaken one of them complained saying that they weren't
(21)  allowed to sell their stock. And that complaint was with
(22)  Sergio.
(23)  Q   Can we have a name of that person? What's the
(24)  name of that –
(25)      MR. MANGOLINI:   Connie Davis with the –

EXHIBIT  PAGE 41

BSA **CONDENSED TRANSCRIPT** XMAX(30/30)

### Page 117

(1) THE WITNESS: That's why that * came out.
(2) Exactly. That's the one. That's the one.
(3) BY MR. HYATT:
(4) Q    She was the first customer to call?
(5) A    That was the one — that was the one that
(6) complained on that. That's why that name sounded familiar.
(7) Q    So, she was the one who paid?
(8) A    She's the one that paid. And she ACATed her stock
(9) out and we have the supporting documentation that shows that
(10) ACAT going out. It was almost — it was a real — I think
(11) it was the real fast ACAT like, the DTC transfer. So,
(12) before — I mean, I heard conversations with Sergio it was
(13) like, no. And all of a sudden she — you know, transfers
(14) out.
(15) Q    And she referred all those other people?
(16) A    She gave referrals to some of the other people.
(17) There was another guy that paid as well. I think that gave
(18) a referral. So, it should be in some of the supporting
(19) documentation you guys have.
(20) Q    And these other people called and they didn't pay?
(21) A    Yeah, the other ones it was just total flakes.
(22) Q    And this is the information you think you already
(23) gave to us, right?
(24) MR. SHERWIN:    I think we gave you some info. on
(25) that.

### Page 118

(1) MR. HYATT:    Okay.
(2) THE WITNESS:    Georgia may have more to elaborate
(3) on it. Because, actually she was responsible for putting
(4) together some of the stuff for that to the original guys
(5) that were in the office.
(6) BY MR. ARNOLD:
(7) Q    You mean, ACAT, you mean transferred out to
(8) another broker, right?
(9) A    Right. Automated account — I don't know what
(10) it's called.
(11) Q    Okay. And just — just so that I understand you —
(12) - you said, you may not know the exact name, but how many
(13) accounts — you know, how many customers are we talking
(14) about who fall in this category? Who called in and never
(15) paid? Was it a handful, five, six, something like that or
(16) more?
(17) A    At least six to eight, something like that.
(18) Q    Six to eight, okay.
(19) A    No more than ten, but probably no more than — not
(20) under five or six.
(21) Q    Okay, five or six.
(22) A    Actually — you know, there could have been some
(23) others in another office. I don't know. They've been in my
(24) office.
(25) Q    Uh-hum. And then you introduced a procedure where

### Page 119

(1) you wanted — you spoke directly to these people and you
(2) wanted the money up front,
(3) A    Any call-ins, I — inquiring about Shopping.com, I
(4) spoke to the person from the switchboard.
(5) Q    You got all the calls in Shopping.com later on?
(6) A    Yes.
(7) Q    Did any of these calls ever — ever actually pay
(8) up front?
(9) A    Uh-uh. None. And again, most insisted that I
(10) should execute the trades.
(11) Q    Right. And you did not at that point, right?
(12) A    No,
(13) Q    Okay.
(14) MR. HYATT:    You guys have any questions on that
(15) topic?
(16) MR. MANGOLINI:    No.
(17) BY MR. HYATT:
(18) Q    We talked earlier about —
(19) (Off the record.)
(20) MR. HYATT:    We were just off the record for a
(21) second. We had a phone call. No matters were discussed,
(22) right counsel?
(23) MR. SHERWIN:    Correct.
(24) BY MR. HYATT:
(25) Q    Okay. Dennis asked you a little earlier about the

### Page 120

(1) penalty bid and — and the terms thereof, and I believe you
(2) mentioned that penalty bids were standard in the industry?
(3) A    Yes.
(4) Q    So, you've seen them before?
(5) A    Yes.
(6) Q    Where did you see them?
(7) A    I've seen them through Paulson deals. I've seen
(8) them through Chatfield deals. I've seen them through
(9) Schneider deals. I've seen them through — I think some
(10) Smith Barney deals as well. I've seen them — everywhere —
(11) a lot of — many places I've seen offerings, I've seen
(12) penalty bids.
(13) Q    When you mean deals, you mean IPOs, right?
(14) A    Yeah.
(15) Q    Okay. And let's say if you want to check the ones
(16) at Chatfield, you said it was just several at Chatfield?
(17) A    Several.
(18) Q    What were the duration of those?
(19) A    Usually three months.
(20) Q    Were they ever longer than three months?
(21) A    No — I — usually, that's pretty rare.
(22) Q    Have you ever seen one longer than three months?
(23) A    I don't think I've even seen more than three
(24) months.
(25) Q    Seen it shorter than three months?

EXHIBIT 2  PAGE 42

**Page 121**

(1) A   Yeah, 1 – and I've seen them taken off.
(2) Q   Taken off means, canceled or something?
(3) A   Yeah, like ours was never enforced, because after
(4) the selling came in – I think in a penalty bid, it's like a
(5) 20 or 30 – it's like so much percentage return upon that
(6) part. They automatically just yank them, because they –
(7) there's others enforced. It's probably in your guys books
(8) somewhere, you know.
(9) Q   You lost me there.
(10) A   If the stock traded at nine on the penalty –
(11) Q   Right.
(12) A   – let say with Shopping –
(13) Q   Yeah.
(14) A   – after it goes up 30 percent or something like
(15) that the penalty bid can't be enforced.
(16) Q   I don't think that – that was in the terms of *.
(17) right?
(18) A   I – no, it's typically like that with all penalty
(19) – it's like industry standard that after a certain
(20) percentage is not enforced in which the penalty – the
(21) people who sold with this one, it wasn't enforced – you
(22) know, basically because the guys who sold –
(23) Q   Okay.
(24) A   – you know, it was above that level.
(25) Q   I understand. And what was the percentage at

**Page 122**

(1) Waldron, do you know?
(2) A   I don't know. 1 – it was like – I think it was
(3) like 30 or 40 percent, I don't know. I don't know exactly.
(4) Q   But – but there was a bench mark somewhere?
(5) A   Yes, a bench mark in all penalty bids. It's like,
(6) kind of standard.
(7) Q   It was not in the actual written terms of this
(8) penalty bid though was it? I mean, I can show it to you, it
(9) wasn't? I mean –
(10) A   Oh, okay. Well, it wasn't. Maybe it wasn't. I
(11) don't know.
(12) Q   Was it described to the brokers when they sat down
(13) –
(14) A   Yes.
(15) Q   – of what the bench mark was?
(16) A   Well – you know, they say, what if the stock goes
(17) to 20 and we sell? I mean, you know, it's like, yes – you
(18) know, if it's at that point – you know, the penalty bids
(19) typically lifted. And you know, I don't think we ever just
(20) said, this is what's going to happen like this. But,
(21) they're typically lifted if – you know, the market comes
(22) that way.
(23) Q   Okay. So, you never actually gave them a number,
(24) when they saw –
(25) A   Because, I didn't – I didn't know the exact

**Page 123**

(1) number as well.
(2) Q   Okay. Well, who determined what the number was?
(3) A   You know, a lot of the things – it's not like
(4) someone said this, but this is kind of like industry
(5) standard. So, a lot of things are not generally said. So,
(6) when you guys say, well, did someone say it? It's kind of
(7) like expected. That's why I have a look on my face –
(8) Q   I understand.
(9) A   – like, well, it's kind of expected, you know.
(10) Q   Okay. And the penalty bid was never enforced at
(11) Waldron for I-Buy?
(12) A   Not to my knowledge.
(13) Q   And you mentioned earlier, before we talked about
(14) the – the percentage increase before it gets suspended,
(15) that there were some that you know of, penalty bids in which
(16) duration was less than three months. What's the shortest
(17) penalty bid you've ever seen?
(18) A   Thirty days,
(19) Q   Three days?
(20) A   Thirty days.
(21) Q   Thirty days.
(22) A   Thirty days.
(23) Q   So, the reason it would be thirty days to three
(24) months – in that range, what's the most common penalty bid
(25) that you've seen, personally?

**Page 124**

(1) A   Probably three months is more common than any.
(2) Q   Most common, you think?
(3) A   Yeah.
(4) Q   Those are the ones you saw at Chatfield right?
(5) A   Schneider.
(6) Q   Schneider too?
(7) A   I saw some twos. I saw some threes,
(8) Q   Okay. Getting back now to the IPO and the
(9) processing of the trades for the IPO. Now, we talked
(10) earlier about the indication of interest sheet and we talked
(11) about order tickets and we talked about the indication of
(12) interest sheet – the names of the sheet being confirmed by
(13) the brokers. And correct me if I'm wrong, was the duty of
(14) the brokers to confirm that their clients were actually
(15) interested in buying the securities, correct?
(16) A   Yes.
(17) Q   Okay. And then in the process of the trades, that
(18) indication of interest sheet – I think in your words were
(19) balanced – I guess that means adjusted up or down,
(20) depending on what the brokers came back with, right?
(21) A   Right.
(22) Q   Okay. And eventually an indication of interest
(23) sheet was – was used to enter the trades –
(24) A   Right.
(25) Q   – into the books and records. And I don't know

### Page 125

(1) if you testified to this, but I'll testify to this, it was
(2) done through Wedbush. Okay, that – those indication of
(3) interest sheets were given to Wedbush and Wedbush then made
(4) the entries there. Were you aware of that, sir?
(5)    A    No. It sounds about right though.
(6)    Q    Okay.
(7)    A    It sounds about right though, yeah.
(8)    Q    Okay. And that – those indication of interest
(9) sheets were then sent to Wedbush and they were sent by
(10) Lainie Koch. Were you aware of that?
(11)   A    That sounds about right.
(12)   Q    Okay. Right. And getting back to the adjustments
(13) made to the indication of interest, I need a little more
(14) details as to procedures. I know the brokers were required
(15) to contact their customers and to verify whether they were
(16) interested in buying. If a customer was interested in
(17) buying, what did the broker do then?
(18)   A    If the customer wanted to buy stock?
(19)   Q    Yeah. Well, say for instance, the indication of
(20) interest says, Cliff Hyatt –
(21)   A    Uh-hum,
(22)   Q    – you know, a thousand shares. Right. And
(23) you're my broker. And you call me up and you say, Cliff, it
(24) says, indication of interest a thousand shares. Do you want
(25) to buy a thousand shares. I say, yes, go a thousand shares.

### Page 126

(1) What did you do then?
(2)    A    At what point in time was this?
(3)    Q    This is about – just right around the time of the
(4) IPO. * you know, were processing the IPO.
(5)    A    It kind of depends on what time – what time frame
(6) it is. Did you want me to give you two –
(7)    Q    Yeah, give me – give me the range, okay.
(8)    A    Okay, if it was done early as an indication of
(9) interest, the client may have been called back to say, we're
(10) hoping to go effective around this time.
(11)   Q    Right.
(12)   A    – you know, and they kind of confirmed it to
(13) see –
(14)   Q    Right.
(15)   A    – you know, whether he's – you know, still has
(16) interest. I say, you know, I'm still interested.
(17)   Q    Okay.
(18)   A    – you know, I – and we did receive call-ins on
(19) that too.
(20)   Q    I understand. Let's say, the end now. I mean,
(21) the deal is done. Okay, it's going down. All right, you
(22) got a closing date and Cliff Hyatt indication of interest a
(23) thousand shares. But, now you want to convert that to an
(24) order. All right, for a thousand shares. So, you call me
(25) up, right?

### Page 127

(1)    A    Uh-hum. Yes. Yes.
(2)    Q    And I say, yes a thousand shares. So, what was
(3) the procedure then?
(4)    A    The broker – you know, were instructed to call
(5) the clients back to confirm the orders –
(6)    Q    Right.
(7)    A    – and tell them – you know, okay, we're going –
(8) you know, trading around this date. You know, keep in mind,
(9) we thought it was going to trade a few days before. So,
(10) each time it was like – they were calling us. Are we
(11) trading yet? Are we trading yet? So, I mean – you know,
(12) that was the kind of process that happened.
(13)   Q    But, I'm talking about the original – the
(14) purchase of the IPO shares. Now, I've – you've confirmed
(15) it with me. So, now what did you do to communicate that to
(16) Lainie that that indication of interest was good?
(17)   A    That was good just by default, because nothing
(18) else was said.
(19)   Q    Okay, I understand. Now, suppose I said five
(20) hundred shares. Now, I don't want a thousand. I want five
(21) hundred. Then, what did you do?
(22)   A    I took the orders to Lainie or the broker took the
(23) order – And some of them weren't actually taken through the
(24) broker. This guy is going to cancel. This is going to do
(25) this. This is going to do this. And it just balanced out.

### Page 128

(1)    Q    And then what did she do though to the indication
(2) of interest sheet? Did she scratch it out and put five
(3) hundred or did she like, retype it? Or how did that work?
(4) Because, I know we have the indication of interest sheets
(5) that were sent.
(6)    A    I have no idea exactly what she did. She had her
(7) own little particular way of doing it. I don't know what
(8) she did to actually do that.
(9)    Q    Okay. But, the default was, for the lack of a
(10) better word, if you said nothing, the indication of interest
(11) was good, right?
(12)   A    Right.
(13)   Q    Okay, understood. Okay. Now, you mentioned
(14) earlier that there were some clients who didn't get
(15) confirmed.
(16)   A    Right.
(17)   Q    Okay, do you know any of those clients?
(18)   A    The – Steve Lorenzo's clients were not confirmed,
(19) because he didn't report to work during that time.
(20)   Q    Anyone else? Steve Lorenzo's a broker, right?
(21)   A    Right.
(22)   Q    Okay. Anyone else?
(23)   A    Possibly, but I don't know.
(24)   Q    Okay. Now, Steve Lorenzo, was he an Irvine
(25) broker?

EXHIBIT 2 PAGE 44

## Page 129

(1)   A   Yes.

(2)   Q   So, he reported to you then, right?

(3)   A   Yes.

(4)   Q   And he didn't report to work like, was it for a

(5)   day or a couple of days or –

(6)   A   A couple of days,

(7)   Q   Okay. So, whose job was it to confirm these

(8)   clients then if he wasn't at work?

(9)   A   Myself.

(10)  Q   Did you do it?

(11)  A   Yeah, I called some of the clients and the clients

(12)  they didn't call – I didn't call – they called in – you

(13)  know, because some of them were a little shocked that they

(14)  saw confirmations. Like, wait a minute, I – you know, they

(15)  were kind of a little bit torn in between well, did we buy

(16)  it or not? They wasn't quite sure what was going on. When

(17)  some of them saw confirmations by default, they were – you

(18)  know, that was there, because we didn't need to see

(19)  anything. And he – I didn't know his communication with

(20)  his clients at that point, so obviously stock came in those

(21)  accounts and as needed to be when those clients say, no, I

(22)  don't want it, they were canceled.

(23)  Q   Understood. Were you surprised that Mr. Lorenzo

(24)  didn't contact his customers? He could have done it from

(25)  home. He didn't have to do it from the office.

## Page 130

(1)   A   Well, they're not instructed to do that. I mean,

(2)   it's – they're supposed to call their clients when

(3)   they're – but, then he could have. He actually could have,

(4)   I wasn't sure of whether he had really spoke to them or not,

(5)   because – you know, when the date – it was confusing as to

(6)   what date he spoke to his last clients or how close that was

(7)   to the – to the day in which we will call him back – or in

(8)   public. That was kind of distinct. I don't remember that

(9)   exactly right now.

(10)  Q   Okay.

(11)  A   It was surprising to me that some of the clients

(12)  blatantly said that it was an unauthorized trade. I didn't

(13)  want it. I didn't even say I had an interest in it. So –

(14)  Q   But, even some of Mr. Lorenzo's clients who said

(15)  that?

(16)  A   Yeah. So, I immediately canceled the orders and

(17)  you know, went from there.

(18)  Q   Did you discipline Mr. Lorenzo for this?

(19)  A   He never came back to work after that.

(20)  Q   So, he quit? He never came back?

(21)  A   Never came back to work.

(22)  Q   Did he quit? I assume he resigned?

(23)  A   I – I end up terminating – what is by – what is

(24)  default, I think it's two, three days or something like

(25)  that. It was job abandonment.

## Page 131

(1)   Q   Okay.

(2)   A   You know, so –

(3)   Q   So, basically he left and didn't tell you.

(4)   A   Right.

(5)   Q   Okay.

(6)   A   We may have seen a letter a couple of weeks later

(7)   or something like that, but we didn't know at that time that

(8)   he was gone.

(9)   Q   Were there any other brokers whose customers were

(10)  not confirmed?

(11)  A   I don't remember.

(12)  Q   Okay. All right. And I have one other topic.

(13)  Okay. And when you were talking about – Dennis initially

(14)  when he asked you a question about the – about the price

(15)  when up and it was during that short squeeze. You mentioned

(16)  that Mr. – Mr. Perle had underwriter sheets or DTC sheets,

(17)  right?

(18)  A   That's what I've seen at the *.

(19)  Q   And I asked you even a follow up question about

(20)  it.

(21)  A   That's what I – I assume that's what he had.

(22)  Q   But, you brought that up, sir.

(23)  A   Right.

(24)  Q   Okay. And then I even asked you a follow up

(25)  question, because I thought you said that – that Cery can

## Page 132

(1)   tell from these sheets where the shorts were, but –

(2)   A   No, no, no.

(3)   Q   – you corrected – you corrected me.

(4)   A   Right.

(5)   Q   You corrected me and you said that Cery can tell

(6)   from the sheets who owned the stock.

(7)   A   Who owned the stock, right.

(8)   Q   Right. Okay. And –

(9)   A   Which is kind of normal, by the way.

(10)  Q   Explain that to me.

(11)  A   The underwriter may do a deal and they just want

(12)  to see the retention of the deal and while they – if you

(13)  know, different houses – house A and house B and house D is

(14)  the one that did the deal and the other house sold the

(15)  stock. Well, they would actually enforce the penalty bid.

(16)  Q   Well, the penalty bid's against their houses?

(17)  A   Yes, that's what I explained before. I don't

(18)  think you understood me.

(19)  Q   No, I – no – yeah, I did. I'm sorry.

(20)  A   Yeah –

(21)  Q   I know of one of your brokers – your own personal

(22)  brokers –

(23)  A   No, the penalty bids are all – when I participate

(24)  in someone else's deal, they've had penalty bids as well.

(25)  Q   Okay, so now in 1-Buy, were there penalty bids

Page 129 to Page 132

EXHIBIT 2 PAGE 45

BSA | CONDENSED TRANSCRIPT | XMAX(34/34)

### Page 133

(1) against other brokers?
(2) A  Yes.
(3) Q  A broker/dealers?
(4) A  Broker/dealers, yes.
(5) Q  Who?
(6) A  That's how they -- I don't know the broker/dealers
(7) that did it.
(8) Q  Okay.
(9) A  I can find out.
(10) Q  Okay. But, that's the way for Cery to monitor
(11) that?
(12) A  Right. Because, he can figure out -- you know,
(13) who sold it so they would monitor the penalty bid.
(14) Q  And is that why he used -- is that --
(15) A  That's typically why they use it.
(16) Q  Is that why you use those DTC sheets?
(17) A  Yes.
(18) Q  Okay. And do you know how long you used them for?
(19) A  I don't know.
(20) Q  Okay. All right. Do you have any other use for
(21) those DTC sheets?
(22) A  With us?
(23) Q  Yes.
(24) A  No.
(25) Q  Okay.

### Page 134

(1) BY MR. ARNOLD:
(2) Q  Okay. Mr. Gillespie, we have no further questions
(3) for you at this time. Is there anything you'd like to add
(4) to the statements you've made today or clarify for the
(5) record?
(6) MR. SHERWIN:  There's just area that you asked him
(7) about and that was his conversations with Mr. Greenberg.
(8) You talked about some conversation you had with Mr.
(9) Greenberg in which he was bad-mouthing the firm and giving
(10) you warnings. Do you recall any specifics of those
(11) conversations with Mr. Greenberg?
(12) THE WITNESS:  On one conversation -- I mean,
(13) actually on several conversations, he threatened me to the
(14) point of you guys are doing a lot of bad things and you guys
(15) are going to get in trouble and the SEC and the NASD are
(16) going to be all over you. But, that wasn't his exact
(17) comment it was more profanity involved. He said that he
(18) knew that there was going to be letter written to the press
(19) about me and Waldron.
(20) And he actually said that -- he asked me the
(21) brokers that recently left your firm, were they disgruntled
(22) brokers or is this just whatever, hearsay? I was like,
(23) well, what are you talking about? And he responded by
(24) saying, I know that there's going to be some letters in the
(25) press about Waldron and you and things that happened with

### Page 135

(1) Waldron and you. And I said, what are you talking about?
(2) You know, and he says, well, he labeled off a few names of
(3) people. He named some of the prior brokers. Do you know
(4) Barom? Do you know Brigette? Do you know Steven Lorenzo?
(5) Do you know -- I was like, yeah, those are brokers that work
(6) with me.
(7) And he asked me, well, did you ever not allow
(8) these guys to sell stock or are they just complaining just
(9) to complain? I was like, I told him absolutely not. I
(10) never not allow a broker to sell stock or anything like
(11) that. Why are you asking me this? What's your -- you know,
(12) what do you know? Well, I know you guys are doing bad stuff
(13) and you got -- you really need to get out of there before
(14) you get yourself in a lot of serious trouble with the SEC
(15) and your license is the most precious thing in the world and
(16) -- you know, you really need to get out of there, because --
(17) you know, you just -- you just should. And you know,
(18) something to that appoint.
(19) He continued to tell me about all these articles
(20) that are coming out. And you guys are really going to be in
(21) a little street -- I mean, a lot of heat and you don't want
(22) to be involved in that.
(23) MR. SHERWIN:  And did that conversation happen
(24) before articles started appearing on the net?
(25) THE WITNESS:  Yes, that happened about four to --

### Page 136

(1) maybe almost a week before the article came out.
(2) MR. SHERWIN:  And the names of the brokers that
(3) you just mentioned, did that conversation take place during
(4) the letters from those brokers purportedly to the NASD were
(5) published on the net?
(6) THE WITNESS:  He told me he had copies of those
(7) letters that were written to the NASD and he actually read
(8) segments of those letters to me and what they said and it
(9) was consistent with everything that happened with the
(10) letters and the names and everything.
(11) MR. SHERWIN:  Okay, but did that conversation take
(12) place before they were actually published on the net?
(13) THE WITNESS:  Yes.
(14) MR. SHERWIN:  Okay. I have nothing further.
(15) BY MR. HYATT:
(16) Q  I have a follow up, Mr. Gillespie. Do you have
(17) any reason to believe that Sandy Greenberg may be involved
(18) in those call-ins at all? Those bogus call-ins we talked
(19) about a little while ago?
(20) A  I really don't know his true motives. I -- I
(21) could speculate that he could be involved in that along with
(22) some other things that happened. Just --
(23) Q  Well, I'm just thinking -- I mean, was this a --
(24) like, part of his motives operandi as far as you know? Did
(25) you know that him or anyone associated with him doing

EXHIBIT 2 PAGE 46

### Page 137

(1) something like that, say earlier? You worked with him for a
(2) while you might know something like that.
(3) A    Not the call-in kind of stuff.
(4) Q    Do you know of anyone else who's done that before
(5) to -- for nefarious reason?
(6) A    Actually, there was an article, I think it was in
(7) Forbes Magazine, about -- it was in connection with the
(8) Fiero Brothers and debacle that happened with --
(9) Q    Hanover Sterling?
(10) A    Hanover Sterling and they mentioned that about
(11) something like that, as well as, another instance where
(12) another broker who had Fiero shorting their stock. One of
(13) my brokers commented that his client -- the -- in talking to
(14) the broker, that they had the exact same thing happen to
(15) them when their stock was being shorted. Where they would
(16) receive unsolicited call-ins to buy the stock and not pay
(17) for it.
(18) So, it was almost mimicked the exact same way.
(19) And this was a stock in which Fiero was shorting the same
(20) way. I could find out more from the broker exactly --
(21) exacts of what happened and probably the person would want
(22) to say what happened. But, it was almost a mimic and we
(23) couldn't believe it when we found out it was a total mimic
(24) of when Fiero was shorting that stock as opposed to with our
(25) stock. The same type of call-ins and the same type of --

### Page 138

(1) you know, I want to buy and the exact same.
(2) Q    All right.
(3) MR. SHERWIN:    Do you know if any association
(4) between Mr. Fiero and Mr. Greenberg?
(5) THE WITNESS:    I don't know of any. I've heard
(6) speculation and rumors, but I can't say I know of any.
(7) MR. SHERWIN:    What speculation and rumors have you
(8) heard?
(9) THE WITNESS:    That they're buddies.
(10) MR. ARNOLD:    Anything else?
(11) MR. SHERWIN:    No.
(12) MR. ARNOLD:    Then we are off the record at 12:50.
(13) (Whereupon, at 12:50 p.m., the testimony was
(14) concluded.)
(15) \
(16) \
(17) \
(18) \
(19) \
(20) \
(21) \
(22) \
(23) \
(24) \
(25) \

### Page 139

(1) U.S. SECURITIES AND EXCHANGE COMMISSION
(2) REPORTER'S CERTIFICATE
(3)
(4)
(5) I, Paul Clarke , reporter, hereby certify that the
(6) foregoing transcript consisting of
(7) 138 pages is a complete, true, and accurate transcript of
(8) the testimony indicated, held on Wednesday, May 27, 1998
(9) at 5670 Wilshire Boulevard, Los Angeles, California 90037
(10) In the Matter of: Shopping.com; File No. LA-919
(11) I further certify that this proceeding was recorded by
(12) me, and that the foregoing transcript has been prepared
(13) under my direction.
(14)
(15) Date:
(16)
(17)
(18) Official Reporter
(19) Bayley Reporting, Inc.
(20) 733 15th Street, N.W.
(21) Suite 800
(22) Washington, D.C. 20005
(23)
(24)
(25)

### Page 140

(1) PROOFREADER'S CERTIFICATE
(2)
(3) In the Matter of: Shopping.Com
(4) Witness: Keevin Gillespie
(5) File Number: LA-919
(6) Date: May 29, 1998
(7) Location: Los Angeles, CA
(8)
(9) This is to certify that I, John Duffy (the
(10) undersigned), do hereby swear and affirm that the attached
(11) proceedings before the U.S. Securities and Exchange .
(12) Commission were held according to the record and that this
(13) is the original, complete, true and accurate transcript that
(14) has been compared to the reporting or recording accomplished
(15) at the hearing.
(16)
(17)
(18) 6/2/98
(19) (Proofreader's Name) (Date)
(20)
(21)
(22)
(23)
(24)
(25)

EXHIBIT 2 PAGE 47

BSA

# TRANSCRIPT CONCORDANCE

Look-See(36)

**Look-See Concordance Report**

. . .

UNIQUE WORDS: 1,617
TOTAL OCCURRENCES: 7,419
NOISE WORDS: 384
TOTAL WORDS IN FILE: 25,044

. . .

SINGLE FILE CONCORDANCE

. . .

CASE SENSITIVE

. . .

COVER PAGES = 2

. . .

INCLUDES ALL TEXT OCCURRENCES

. . .

DATES ON

. . .

INCLUDES PURE NUMBERS

. . .

POSSESSIVE FORMS ON

## – DATES –

6/2/98 [1]
 140:18
April 24, 1998 [1]
 5:1
February [1]
 109:11
March [1]
 109:11
March 12 [4]
 65:3, 14, 18; 67:8
May 27, 1998 [2]
 3:2; 139:8
May 29, 1998 [1]
 140:6
November [1]
 23:23
November 25 [2]
 46:20; 49:2
October [3]
 7:1; 23:24

## – $ –

$17 [1]
 109:7
$18 [4]
 100:19; 101:23; 102:23;
 104:23
$19 [1]
 101:24
$20 [5]
 100:4, 6, 7; 101:24
$24 [3]
 85:2, 8; 104:17
$25 [3]
 85:2; 104:17; 109:8
$26 [4]
 100:15, 19; 102:23; 104:23
$27 [1]
 100:15
$32 [1]
 58:22
$34 [3]
 100:16; 101:25; 103:12
$35 [8]
 100:16, 24; 101:7; 102:1;

103:7, 12; 104:22; 105:3
$36 [5]
 100:24; 101:7; 103:7; 104:22;
 105:3
$39 [13]
 100:7, 16, 24; 101:7, 17;
 102:1, 7; 103:7, 12; 104:16,
 22; 105:2
$600 [3]
 85:9, 12; 86:12
$70 [1]
 101:17
$8 [1]
 58:21
$9 [1]
 58:21

## – 1 –

1 [2]
 4:8, 9
1,000 [1]
 86:6
1.3 [1]
 49:11
1/2 [2]
 9:4, 8
100 [1]
 90:12
11:20 [1]
 76:16
11:35 [1]
 76:19
12 [4]
 65:3, 14, 18; 67:8
12:39 [1]
 65:3
12:50 [2]
 138:12, 13
138 [1]
 139:7
14 [2]
 62:12, 13
15th [1]
 139:20
19000 [1]
 6:21
1997 [1]
 7:2
1998 [4]
 3:2; 5:1; 139:8; 140:6

## – 2 –

2 [2]
 61:24; 91:13
2's [1]
 91:10
20 [4]
 45:13; 99:10; 121:5; 122:17
20,000 [2]
 45:8, 14
20005 [1]
 139:22
20s [1]
 77:17
22 [2]
 7:16; 65:1
24 [1]
 5:1
25 [2]
 46:20; 49:2

261-1113 [1]
 6:22
27 [2]
 3:2; 139:8
29 [1]
 140:6

## – 3 –

3 [2]
 9:4, 8
3/4 [1]
 62:13
30 [3]
 121:5, 14; 122:3
32009 [1]
 6:12
34 [1]
 95:18
35 [1]
 95:18
39 [1]
 95:18

## – 4 –

40 [2]
 7:15; 122:3
41 [3]
 4:25; 5:5, 11
450 [1]
 34:4

## – 5 –

500 [2]
 57:10, 12
5670 [1]
 139:9

## – 6 –

6/2/98 [1]
 140:18

## – 7 –

7/8 [1]
 62:12
70 [2]
 9:6, 9
714 [1]
 6:22
714-499-1958 [1]
 6:18
733 [1]
 139:20

## – 8 –

800 [1]
 139:21
84 [1]
 6:21

## – 9 –

90 [1]
 90:12
90037 [1]
 139:9
92612 [1]
 6:21
92677 [1]

6:16
9:51 [1]
 3:2

## – A –

A-R-R-U-B-I-A-S [1]
 81:1
a.m. [2]
 3:2; 76:19
abandonment [1]
 130:25
ABC [2]
 105:23; 106:1
ability [1]
 27:24
able [9]
 60:6, 10; 79:23; 95:23; 96:3;
 105:6, 18; 113:9; 114:8
absence [1]
 16:19
Absolutely [7]
 53:20; 80:16; 81:8; 97:2;
 98:1, 4; 113:11
absolutely [1]
 135:9
ACAT [3]
 117:10, 11; 118:7
ACATed [2]
 116:19; 117:8
accents [1]
 111:24
accept [2]
 97:12; 112:15
accomplished [1]
 140:14
according [3]
 64:6; 83:3; 140:12
account [35]
 6:3; 10:3; 12:14; 13:1; 32:4;
 43:7, 10, 14; 44:21, 22; 45:3;
 49:11; 54:1; 62:25; 67:8;
 78:16; 82:19, 22; 83:2; 84:1,
 21; 85:16, 17; 106:3, 5, 16,
 18; 108:5; 112:15, 16, 17;
 113:17; 114:4; 118:9
account's [1]
 13:2
accounts [8]
 5:22; 13:9; 14:5; 36:5; 43:18,
 23; 44:17; 82:15; 95:8; 116:7;
 118:13; 129:21
accurate [3]
 74:15; 139:7; 140:13
acknowledged [1]
 16:6
acquire [1]
 32:4
acquired [1]
 71:1
action [1]
 61:6
active [1]
 113:22
actual [4]
 9:6; 18:5; 32:15; 122:7
add [5]
 44:3; 50:3, 4, 5; 134:3
added [1]
 16:15
adding [2]

EXHIBIT 2 PAGE 48

BSA
## TRANSCRIPT CONCORDANCE
Look-See(37)

42:10, 11
**additional** [1]
56:15
**address** [2]
6:11, 19
**addressed** [1]
5:1
**addresses** [1]
110:15
**adjusted** [1]
124:19
**adjustment** [1]
41:3
**adjustments** [1]
125:12
**administrative** [1]
10:10
**advance** [5]
28:22; 29:9; 35:1; 47:24; 48:2
**advertising** [1]
22:11
**affirm** [1]
140:10
**allocate** [1]
51:11
**allocated** [1]
96:1
**allocation** [1]
99:4
**allow** [3]
96:17; 135:7, 10
**allowed** [5]
81:7, 14; 98:17, 25; 116:21
**Amazon** [1]
25:14
**amount** [2]
96:2; 99:16
**Angeles** [2]
139:9; 140:7
**answer** [5]
38:13, 20; 70:19; 86:16; 97:4
**answered** [1]
103:8
**answers** [3]
34:1; 57:5; 86:19
**anticipation** [1]
101:3
**Anybody** [1]
8:1
**anybody** [13]
8:5; 23:18; 24:6, 9; 44:5, 12;
68:14, 18, 19; 69:19; 73:16;
84:11, 14
**anymore** [1]
101:24
**anywhere** [1]
49:22
**apparently** [1]
67:4
**appearing** [1]
135:24
**appoint** [1]
135:18
**Approximately** [2]
7:12; 23:22
**approximately** [6]
9:16; 26:3; 28:21; 33:21;
77:15; 87:18
**April** [1]
5:1
**area** [3]

6:22; 23:24; 134:6
**areas** [1]
71:7
**aren't** [2]
110:7; 111:15
**ARNOLD** [29]
3:9; 4:15, 19, 22, 23; 5:12,
16, 25; 6:5, 8, 9; 10:22; 41:8,
10; 42:14; 46:18; 47:14; 49:1;
50:12, 13; 54:17; 60:15;
71:19; 76:15, 18; 118:6;
134:1; 138:10, 12
**Arnold** [1]
3:14
**Art** [1]
43:1
**article** [2]
136:1; 137:6
**articles** [2]
135:19, 24
**asking** [4]
6:1; 97:12; 98:2; 135:11
**aspect** [1]
12:2
**aspects** [1]
12:4
**assist** [2]
26:14; 48:23
**assistants** [3]
8:12, 13; 56:22
**associated** [1]
136:25
**association** [1]
138:3
**assume** [6]
9:22; 39:5; 54:13; 77:11;
130:22; 131:21
**assumed** [1]
38:5
**assuming** [1]
102:13
**assumption** [1]
97:25
**attached** [1]
140:10
**attachment** [1]
5:4
**attended** [2]
20:1; 21:1
**Aubrey** [9]
12:11; 13:1, 12, 17, 22;
14:10, 17; 30:13; 54:21
**Aubrey's** [1]
43:10
**Automated** [1]
118:9
**automatically** [1]
121:6
**available** [1]
4:4
**award** [1]
24:15
**aware** [8]
23:5; 50:8; 65:25; 96:21, 23;
97:4; 125:4, 10

## – B –

**backed** [1]
63:15
**background** [3]

27:24; 28:4, 9
**bad-mouthed** [3]
73:22, 23; 74:13
**bad-mouthing** [1]
134:9
**bait** [1]
113:20
**balance** [3]
41:1, 25; 48:23
**balanced** [6]
39:8; 40:21; 41:2; 43:24;
124:19; 127:25
**balances** [1]
44:20
**balancing** [6]
41:3, 5, 11, 20; 42:5; 44:1
**ballpark** [1]
100:14
**Barney** [1]
120:10
**Barom** [1]
135:4
**based** [4]
15:22; 37:20; 97:24; 99:3
**basically** [7]
40:7; 57:6, 8; 73:24; 113:10;
121:22; 131:3
**basis** [3]
12:1; 83:14; 100:1
**Bayley** [1]
139:19
**Beach** [1]
6:14
**Behna** [2]
45:9, 16
**believe** [10]
5:22; 86:14, 16; 97:17, 19;
98:2; 116:16; 120:1; 136:17;
137:23
**bench** [3]
122:4, 5, 15
**besides** [1]
57:4
**bid** [31]
49:15, 18; 50:2, 9, 14, 16;
51:1, 3, 13, 18, 20, 24, 25;
52:6, 11, 22, 24; 53:2, 5, 6,
23; 108:18; 120:1; 121:4, 15;
122:8; 123:10, 17, 24;
132:15; 133:13
**bid's** [1]
132:16
**bidders** [1]
91:10
**bids** [8]
120:2, 12; 122:5, 18; 123:15;
132:23, 24, 25
**bigger** [1]
112:23
**Bill** [1]
19:15
**bit** [6]
10:11; 66:23; 69:2; 80:10;
106:10; 129:15
**blatantly** [1]
130:12
**block** [1]
45:2
**Bloomberg** [3]
61:16, 17; 105:6
**Bloombergs** [1]

105:5
**blue** [1]
83:4
**Board** [4]
26:22; 34:22; 42:25; 45:19
**bogus** [4]
107:24; 108:3, 15; 136:18
**bonus** [1]
9:13
**bonuses** [1]
9:11
**books** [2]
121:7; 124:25
**bother** [2]
98:15, 18
**bought** [3]
85:4, 8; 108:19
**bought-in** [1]
77:1
**Boulevard** [1]
139:9
**box** [2]
59:21; 61:16
**boy** [3]
81:1, 10
**Branch** [9]
7:5, 8, 13; 10:5, 7, 9, 14, 17,
18
**branch** [7]
10:15, 18; 11:13; 84:2, 4;
105:20; 108:24
**break** [1]
76:15
**bridge** [2]
22:12, 15
**Brief** [1]
76:17
**Brigette** [1]
135:4
**Broker** [2]
7:7; 133:4
**broker** [41]
25:1; 35:4, 13, 18; 49:20, 23;
50:16, 20, 22; 55:21; 79:6, 8,
10; 80:6; 84:22; 96:1; 106:1,
3, 7, 18; 108:4, 6, 11, 13, 20;
115:14; 118:8; 125:17, 23;
127:4, 22, 24; 128:20, 25;
133:3, 6; 135:10; 137:12, 14,
20
**brokerage** [1]
10:3
**brokers** [80]
7:10, 20, 22; 8:14; 12:15, 23;
14:23; 15:6; 21:5; 24:24, 25;
25:6; 26:9, 14, 17, 21; 35:6,
9; 37:3; 42:20; 45:11; 46:24;
50:25; 51:6, 18, 20, 23; 53:5,
8, 9, 13, 17, 21; 56:1, 3, 13,
24; 67:17, 20; 75:3; 86:15,
21; 87:13; 88:16, 20; 89:22;
91:2, 16, 20, 21; 92:2; 95:23;
96:17; 98:16; 99:1; 107:2, 12;
108:17, 21, 22; 109:17;
110:5; 122:12; 124:13, 14,
20; 125:14; 131:9; 132:21,
22; 133:1; 134:21, 22; 135:3,
5; 136:2, 4; 137:13
**Brother's** [1]
61:9
**Brothers** [4]

BSA

## TRANSCRIPT CONCORDANCE

Look-See(38)

60:17; 61:12; 62:5; 137:8
**buddies** [1]
 138:9
**bullet** [6]
 88:16, 19, 21, 24; 89:1, 8
**Bulletin** [4]
 26:22; 34:22; 42:25; 45:19
**buried** [1]
 5:20
**business** [17]
 6:19; 12:1; 22:7, 10; 31:3, 21;
 67:4, 5; 68:17; 72:10; 90:21;
 106:24; 108:11; 111:20;
 113:21; 116:16
**Buy** [2]
 65:5; 89:17
**buy** [41]
 29:22; 32:13; 39:8; 49:23, 24;
 61:5; 62:18; 63:2; 66:3; 68:1;
 69:2; 70:6, 10, 16; 71:23;
 72:2, 12, 21; 74:4; 80:11, 12;
 82:20; 84:22; 85:8; 92:19, 23;
 93:10; 100:4, 6; 104:15;
 105:12, 22; 106:1; 113:19;
 116:6; 125:18, 25; 129:15;
 137:16; 138:1
**buy-in** [9]
 76:20, 22; 77:4, 19, 23; 78:2;
 96:4; 100:7; 111:14
**buy-ins** [40]
 77:11, 24; 78:1, 3, 13; 94:14,
 19, 20, 21; 95:5, 16, 18, 21,
 24; 96:10, 20, 21; 98:17;
 99:2, 23; 100:1, 16, 24;
 101:4; 102:14, 20; 103:3, 7,
 11, 15, 21, 24; 104:1, 5, 9,
 16, 22; 105:3, 7
**buyer** [4]
 68:1, 7, 25; 89:16
**buying** [14]
 29:17, 19; 32:12; 60:3; 67:9;
 82:20; 93:12, 15, 19; 94:12;
 112:14; 124:15; 125:16, 17

### – C –

**C-O-B-B** [1]
 81:1
**CA** [1]
 140:7
**calculated** [1]
 32:23
**California** [4]
 36:12; 37:4; 41:16; 139:9
**call** [29]
 35:14; 41:4, 24; 74:2, 8; 75:5,
 10; 76:10; 79:4; 105:21, 24;
 106:23; 107:16; 110:12;
 111:19, 23; 112:3, 22;
 113:18; 116:17; 117:4;
 119:21; 125:23; 126:24;
 127:4; 129:12; 130:2, 7
**call-in** [3]
 106:25; 108:4; 137:3
**call-ins** [13]
 106:24; 107:22, 24; 108:2;
 109:16, 17; 110:24; 119:3;
 126:18; 136:18; 137:16, 25
**calling** [2]
 116:5; 127:10
**calls** [19]

5:16; 42:24; 46:5; 55:22;
 64:16, 20, 22; 75:13; 76:12;
 78:22; 110:12, 13, 23; 111:1,
 9, 20, 22; 119:5, 7
**Culpo** [1]
 109:18
**cancel** [4]
 39:7; 45:18; 46:1; 127:24
**canceled** [9]
 41:13; 45:5, 9, 12, 24; 46:3;
 121:2; 129:22; 130:16
**cancellation** [1]
 44:2
**cancellations** [2]
 46:16; 47:6
**Cap** [8]
 26:20, 24, 25; 27:3, 6, 25;
 28:1; 34:23
**care** [2]
 5:2; 72:8
**careful** [1]
 114:1
**carefully** [1]
 112:5
**Carolina** [3]
 15:15, 19, 22
**Case** [1]
 3:18
**case** [1]
 73:15
**cases** [1]
 108:17
**cash** [3]
 31:14, 19; 44:20
**casually** [1]
 115:21
**category** [1]
 118:14
**caused** [1]
 108:17
**cautious** [4]
 107:23, 25; 108:1; 113:25
**Centura** [1]
 13:15
**CERTIFICATE** [2]
 139:2; 140:1
**certificate** [3]
 9:22; 76:25; 77:1
**certify** [3]
 139:5, 11; 140:9
**Cery** [23]
 8:16; 10:25; 16:2; 22:24;
 27:4; 50:23; 54:13; 60:10;
 75:17; 76:3, 5, 6, 7, 9, 10;
 78:2; 83:17; 96:19, 20;
 131:25; 132:5; 133:10
**Cery's** [3]
 75:19; 95:10, 11
**CFO** [1]
 58:2
**chain** [1]
 114:25
**change** [3]
 71:15; 75:2, 3
**chart** [2]
 62:12, 14
**charts** [1]
 109:8
**Chatfield** [5]
 74:9; 120:8, 16; 124:4
**cheated** [1]

101:20
**Check** [1]
 82:18
**check** [6]
 12:18, 19, 25; 113:19;
 115:15; 120:15
**checks** [1]
 13:10
**Chris** [3]
 109:22; 110:11
**Christina** [1]
 109:18
**Christina's** [1]
 110:9
**Christmas** [4]
 9:18; 11:8, 11
**chunk** [1]
 22:11
**circulate** [1]
 27:1
**circumstances** [1]
 11:10
**city** [1]
 6:13
**civil** [1]
 3:22
**clarification** [2]
 10:14; 88:1
**clarify** [1]
 134:4
**Clarke** [1]
 139:5
**clear** [2]
 89:22; 97:11
**clearance** [2]
 34:18, 19
**cleared** [1]
 112:17
**clearing** [1]
 38:22
**clerical** [1]
 57:6
**client** [13]
 45:8; 46:5; 53:22; 100:4;
 106:7, 9, 19, 23; 107:16;
 108:9; 126:9; 137:13
**client's** [1]
 45:3
**clients** [72]
 15:9, 14, 15, 22, 24; 31:12;
 35:14, 18; 37:19, 24; 41:16,
 24; 42:20, 24; 43:22; 44:18;
 68:20, 21, 22, 24; 69:13;
 72:9; 80:3; 91:16; 95:10, 11,
 12, 16, 20, 21; 96:18; 98:16,
 25; 99:6, 7, 22, 25; 100:11,
 17; 101:23; 102:9, 10, 14, 19;
 103:2, 4, 10, 13, 14, 20;
 104:16, 23; 105:1, 9, 15;
 108:8; 124:14; 127:5; 128:14,
 17, 18; 129:8, 11, 20, 21;
 130:2, 6, 11, 14
**Cliff** [5]
 3:15; 83:17; 125:20, 23;
 126:22
**closer** [1]
 99:17
**closing** [2]
 95:19; 126:22
**coached** [1]
 88:8

**Coast** [1]
 6:12
**Cobbarrubias** [1]
 80:24
**collide** [1]
 72:13
**com** [1]
 90:12
**combination** [1]
 8:22
**comfortable** [2]
 104:8; 107:1
**coming** [2]
 32:12; 135:20
**comment** [2]
 76:6; 134:17
**commented** [1]
 137:13
**comments** [1]
 92:10
**COMMISSION** [1]
 139:1
**Commission** [5]
 3:16, 18; 8:24; 56:5; 140:12
**commission** [9]
 8:22, 25; 9:1, 2; 49:23; 56:6,
 7, 12; 84:1
**Commission's** [2]
 4:6; 5:10
**commissions** [4]
 9:6; 51:4; 85:22; 113:6
**commitment** [1]
 55:8
**common** [9]
 28:5, 16; 61:15, 19, 21;
 73:10; 123:24; 124:1, 2
**commonly** [1]
 31:1
**communicate** [1]
 127:15
**communication** [1]
 129:19
**community** [1]
 107:13
**companies** [5]
 24:20; 25:24; 64:6; 90:9;
 92:13
**Company** [5]
 6:23, 25; 10:24; 65:3, 4
**company** [32]
 12:3, 6, 9, 11; 13:14; 16:6, 8;
 17:6, 13; 21:9; 22:6; 24:16,
 18; 25:8, 9, 10; 29:4; 31:2,
 18; 50:6; 69:1, 25; 70:25;
 71:7, 16; 80:5, 9; 90:6, 19;
 91:22; 98:19, 22
**company's** [3]
 24:14; 27:21, 24
**compared** [1]
 140:14
**comparison** [6]
 25:14, 15; 26:1, 2; 64:3;
 71:14
**Comparisons** [1]
 89:13
**comparisons** [6]
 25:11, 13, 16, 24; 89:12; 90:3
**compensated** [4]
 8:21; 9:3, 6; 56:3
**compensation** [2]
 13:6; 56:15

BSA
**TRANSCRIPT CONCORDANCE**
Look-See(39)

complain [1]
*135:9*

complained [2]
*116:20; 117:6*

complaining [2]
*55:19; 135:8*

complaint [1]
*116:21*

complete [2]
*139:7; 140:13*

completely [1]
*112:21*

computer [4]
*29:11, 15, 24; 48:13*

concern [2]
*99:25; 100:8*

concerned [1]
*100:10*

concerning [2]
*78:13; 84:21*

concluded [1]
*138:14*

conclusions [1]
*70:18*

condition [1]
*30:17*

conference [1]
*20:7*

confirm [3]
*124:14; 127:5; 129:7*

confirmations [2]
*129:14, 17*

confirmed [7]
*48:9; 124:12; 126:12; 127:14; 128:15, 18; 131:10*

confused [1]
*15:17*

confusing [1]
*130:5*

Connecticut's [1]
*63:22*

connection [4]
*49:16; 50:15; 56:16; 137:7*

Connie [2]
*81:19; 116:25*

consensus [1]
*25:3*

consequences [1]
*31:16*

consistent [2]
*65:14; 136:9*

consisting [1]
*139:6*

Constantino [1]
*69:22*

constantly [1]
*112:8*

constitute [3]
*3:21; 93:12, 14*

consumed [1]
*101:11*

contact [2]
*125:15; 129:24*

contacted [10]
*35:20; 42:17, 19, 20, 23; 47:3; 55:19; 73:17, 18, 19*

contained [2]
*40:16; 71:12*

continued [1]
*135:19*

contra [1]

---

*59:24*

convenient [1]
*48:16*

conversation [12]
*24:3; 25:20; 30:3; 67:13; 73:21; 80:7; 113:16; 134:8, 12; 135:23; 136:3, 11*

Conversations [1]
*33:7*

conversations [12]
*15:13; 18:23; 24:6; 25:4; 33:6; 63:4, 6; 66:16; 117:12; 134:7, 11, 13*

convert [1]
*126:23*

convince [1]
*80:3*

copies [3]
*68:14, 18; 136:6*

copy [3]
*3:25; 69:8, 13*

cordial [1]
*113:8*

Corporate [3]
*8:1; 18:12; 19:12*

corporation [1]
*98:14*

corrected [3]
*132:3, 5*

correcting [1]
*86:18*

Counsel [2]
*41:7; 75:24*

counsel [4]
*4:13, 15; 84:19; 119:22*

counteract [1]
*66:13*

Couple [1]
*34:11*

couple [12]
*21:1, 12, 18; 23:20; 34:10; 71:14; 78:21; 82:11; 113:4; 129:5, 6; 131:6*

COURT [4]
*41:7; 50:10; 75:24; 111:4*

cover [4]
*5:1; 33:5; 92:23; 93:22*

coverage [2]
*105:11*

covered [1]
*32:25*

create [3]
*92:19; 93:10; 98:9*

created [1]
*108:15*

criminal [1]
*3:22*

criteria [3]
*36:6, 14; 37:1*

curious [1]
*58:20*

current [2]
*6:10, 19*

currently [2]
*99:9, 20*

cursed [1]
*113:5*

customer [17]
*35:12, 17; 46:21; 54:1; 69:15; 80:17; 95:8; 105:21; 106:2; 107:4, 7, 10; 117:4; 125:16,*

---

*18*

customer's [1]
*107:9*

customers [37]
*25:6; 34:6, 25; 35:1, 3, 12, 20; 36:1, 7; 38:18; 39:20; 40:1, 2, 17, 18; 41:13; 42:15, 18; 44:16; 47:3; 49:12; 55:6, 14, 19, 22, 25; 69:7; 78:23; 79:1, 2, 5, 10; 95:7; 118:13; 125:15; 129:24; 131:9*

— D —

D.C. [1]
*139:22*

daily [1]
*83:14*

Date [3]
*139:15; 140:6, 19*

date [12]
*26:16; 31:15; 44:20; 46:19; 49:21, 22; 65:13; 109:14; 126:22; 127:8; 130:5, 6*

dated [1]
*5:1*

dates [3]
*19:5; 77:14; 95:24*

David [2]
*79:15, 18*

Davis [1]
*81:19; 116:25*

day [27]
*11:22; 12:1, 4, 9; 16:7; 33:20; 38:16; 43:5, 18; 44:9; 67:7; 75:16; 79:6; 82:14; 85:3, 4; 86:9, 10; 95:19; 113:22; 129:5; 130:7*

days [17]
*45:22; 47:9, 24; 48:2; 67:24; 86:10; 113:25; 123:18, 19, 20, 21, 22, 23; 127:9; 129:5, 6; 130:24*

deal [7]
*27:9; 101:4; 126:21; 132:11, 12, 14, 24*

dealer [1]
*84:22*

dealers [1]
*133:3, 4, 6*

deals [6]
*36:16; 120:7, 8, 9, 10, 13*

dealt [1]
*101:20*

debacle [1]
*137:8*

decide [1]
*63:2*

decided [1]
*70:5*

decidings [1]
*90:11*

decision [2]
*73:23; 74:14*

decisions [1]
*62:16*

default [4]
*127:17; 128:9; 129:17; 130:24*

definitely [2]
*114:16, 18*

---

delay [1]
*46:1*

delivery [2]
*76:24, 25*

demand [5]
*92:20; 93:11, 12, 21; 94:4*

Dennis [6]
*3:14; 73:6; 76:14; 86:14; 119:25; 131:13*

Department [5]
*8:1; 18:12; 19:12; 59:22; 62:21*

departments [1]
*7:23*

depending [2]
*7:14; 124:20*

depends [1]
*126:5*

deposit [1]
*13:6*

describe [1]
*53:7*

described [2]
*115:4; 122:12*

describing [1]
*94:6*

desk [1]
*5:20*

detail [1]
*82:13*

details [2]
*22:18; 125:14*

determine [1]
*3:19; 69:2*

determined [2]
*25:16; 123:2*

develop [1]
*107:15*

developed [1]
*3:21*

difference [2]
*34:14, 16*

difficult [3]
*79:21, 22; 81:13*

diligence [6]
*19:24; 20:1; 21:6, 8; 23:14; 71:1*

direct [1]
*13:6*

directed [4]
*16:18; 67:5; 69:11; 110:13*

directing [1]
*47:21*

direction [2]
*88:9; 139:13*

disappear [1]
*115:21*

discipline [1]
*130:18*

disclosing [1]
*29:24*

disclosure [1]
*31:11*

discounted [1]
*85:22*

discuss [1]
*23:17*

discussed [3]
*55:16; 73:7; 119:21*

discussion [7]
*29:23; 58:9, 11; 70:9, 17, 22;*

From **complain** to **discussion**

EXHIBIT 2 PAGE 51

**77:22**

**discussions** [2]
30:24; 70:21

**disgruntled** [1]
134:21

**distinct** [1]
130:8

**distributed** [1]
23:7

**document** [5]
4:25; 5:8; 65:1; 89:1; 92:4

**documentation** [9]
27:17, 19; 106:22; 112:16;
114:7, 18, 24; 117:9, 19

**documents** [10]
12:13, 17; 23:4; 30:5; 33:11;
35:23; 47:20; 63:9; 65:9;
84:20

**doesn't** [12]
31:14; 42:2; 46:8; 52:22;
72:20; 81:3; 82:19; 98:7, 9;
101:22; 111:18

**dollars** [2]
85:10; 86:13

**doubt** [1]
57:2

**Douglas** [1]
80:17

**drafting** [2]
68:10; 69:17

**drawn** [1]
13:10

**drop** [2]
34:20

**Drummand** [4]
63:23; 64:11; 67:13; 68:8

**DTC** [5]
59:12; 117:11; 131:16;
133:16, 21

**duces** [2]
5:3, 4

**due** [9]
19:24; 20:1; 21:6, 8; 23:14;
71:1; 77:24; 78:1, 3

**Duffy** [1]
140:9

**duly** [1]
3:6

**dupe** [1]
48:11

**duplicate** [2]
48:20, 21

**duration** [2]
120:18; 123:16

**duties** [3]
7:8; 82:13; 84:6

**duty** [1]
124:13

— E —

**E-N** [1]
81:10

**Early** [1]
78:21

**early** [3]
23:23; 84:19; 126:8

**earnings** [2]
89:15; 91:23

**Easter** [1]
65:3

**easy** [1]
111:21

**Ed** [4]
10:25; 11:12; 14:12; 54:18

**Ed's** [1]
11:3

**editing** [1]
68:10

**effect** [2]
28:8; 97:25

**effective** [8]
27:9, 18, 19; 29:6; 32:12;
34:25; 44:20; 126:10

**eight** [2]
118:17, 18

**eight-page** [1]
65:1

**Eighteen** [1]
100:15

**elaborate** [2]
75:21; 118:2

**element** [1]
92:25

**else's** [3]
87:25; 95:20; 132:24

**emotion** [1]
98:9

**employees** [1]
19:11

**encourage** [1]
75:6

**end** [5]
33:23; 41:2; 113:16; 126:20;
130:23

**ended** [1]
28:5

**enforce** [1]
132:15

**enforced** [1]
121:3, 7, 15, 20, 21; 123:10

**enter** [3]
48:13; 106:16; 124:23

**entries** [1]
125:4

**equipment** [3]
29:11, 15, 24

**eventually** [2]
28:12; 124:22

**everyone's** [1]
96:4

**exact** [8]
22:17; 85:9; 118:12; 122:25;
134:16; 137:14, 18; 138:1

**Exactly** [1]
117:2

**exactly** [8]
62:8; 78:5; 95:3; 96:14;
122:3; 128:6; 130:9; 137:20

**exacts** [1]
137:21

**EXAMINATION** [1]
3:8

**examined** [1]
3:7

**example** [1]
100:3

**except** [1]
8:11

**EXCHANGE** [1]
139:1

**Exchange** [2]

**3**:18; 140:11

**exchanges** [1]
93:24

**excluding** [1]
56:23

**Excuse** [5]
10:14, 17; 42:5; 48:7; 60:9

**excuse** [1]
48:20

**execute** [11]
38:17; 55:23; 56:1; 107:2, 4;
112:18, 19, 22, 23; 113:2;
119:10

**executed** [5]
78:24; 79:10; 113:2; 116:7, 8

**executing** [1]
38:23

**executives** [1]
21:12

**Exhibit** [7]
4:8, 9, 24; 5:5, 11; 65:1, 7

**existing** [1]
36:5

**expand** [2]
31:2, 21

**expanding** [1]
24:14

**expect** [1]
98:22

**expected** [4]
69:8, 13; 123:7, 9

**experience** [6]
36:18, 22; 72:10; 90:11;
106:13; 107:14

**experienced** [1]
36:19

**Explain** [1]
132:10

**explain** [10]
24:14, 16; 80:5, 9; 88:11;
90:8, 15; 106:6; 111:2; 112:7

**explained** [1]
107:21; 132:17

**Explaining** [2]
25:10, 11

**explaining** [1]
25:11

**explanation** [1]
27:7

**exposure** [1]
64:8

**extension** [3]
115:12, 15, 16

**extensive** [1]
37:3

**extremely** [1]
73:3

— F —

**face** [1]
123:7

**facts** [1]
3:21

**fair** [2]
16:11; 101:12

**fall** [1]
118:14

**false** [2]
70:25; 71:3

**familiar** [11]

13:14; 17:6; 79:13, 24; 80:19;
81:2, 3, 20, 21, 24; 117:6

**fast** [1]
117:11

**fax** [1]
39:2

**faxed** [2]
39:5; 68:18

**February** [1]
109:11

**federal** [2]
3:20, 22

**feel** [1]
106:25

**Fehn** [1]
4:17

**felt** [4]
27:18, 20; 72:7; 110:12

**fictitious** [1]
94:9

**Fields** [1]
4:17

**Fiero** [14]
59:19; 60:6, 16, 22; 61:9, 12,
18, 22; 62:5; 137:8, 12, 19,
24; 138:4

**Fieros** [1]
59:4

**figure** [3]
106:12; 109:10; 133:12

**figured** [4]
29:21; 115:23, 24, 25

**figuring** [1]
42:6

**File** [2]
139:10; 140:5

**file** [1]
115:14

**fill** [6]
48:2; 95:5; 99:23; 101:25;
106:3, 15

**filled** [15]
47:1, 5, 8, 24; 94:20, 21;
96:21; 97:18, 23; 98:11;
100:16; 101:12; 102:7; 104:5

**final** [7]
34:19, 20, 21; 40:6, 12, 16;
42:7

**Finance** [4]
8:1; 18:12; 19:12; 65:2

**finance** [1]
18:16

**financial** [4]
30:17; 55:13; 108:17, 23

**find** [5]
27:2; 53:25; 92:3; 133:9;
137:20

**fine** [2]
84:14; 88:18

**fire** [1]
84:14

**fired** [1]
53:18

**firm** [25]
21:12; 35:20; 38:22; 52:7, 8,
10, 12, 15, 18, 20; 55:8, 16;
61:9; 70:17; 72:11; 73:23;
74:14; 75:2; 76:23; 82:16;
85:17; 116:17; 134:9, 21

**firms** [7]
17:21, 23; 18:2; 49:20; 60:2;

BSA
## TRANSCRIPT CONCORDANCE
Look-See(41)

66:4; 70:17

**First** [1]
*79:18*

**first** [14]
*3:6; 4:25; 29:8; 62:13, 15;
65:21; 72:1, 4; 73:2; 80:25;
91:10; 105:7; 107:1; 117:4*

**fit** [1]
*27:11*

**Five** [1]
*85:10*

**five** [9]
*94:25; 108:10; 113:1; 118:15,
20, 21; 127:19, 20; 128:2*

**five-page** [1]
*4:25*

**flakes** [1]
*117:21*

**fluctuated** [1]
*33:19*

**fluctuates** [1]
*7:14*

**folks** [1]
*116:5*

**follow** [8]
*47:21; 48:7; 82:11; 90:20, 23;
131:19, 24; 136:16*

**followed** [1]
*47:18*

**following** [1]
*31:16*

**follows** [1]
*3:7*

**Forbes** [1]
*137:7*

**foregoing** [2]
*139:6, 12*

**Form** [1]
*4:7*

**form** [10]
*10:10; 19:5; 72:7; 83:2; 88:5;
104:16; 106:4, 5, 16, 18*

**Formal** [2]
*3:25; 4:2*

**formal** [1]
*24:4*

**format** [1]
*65:8*

**forms** [2]
*82:22; 84:1*

**found** [2]
*70:24; 137:23*

**four** [3]
*98:10; 108:10; 135:25*

**frame** [2]
*79:3; 126:5*

**frames** [2]
*62:14; 109:10*

**French** [4]
*8:16, 18; 16:1; 17:3*

**French's** [1]
*14:21*

**frequently** [1]
*24:21*

**friend** [1]
*116:15*

**Frisco** [1]
*10:8*

**front** [2]
*119:2, 8*

**full** [3]

3:10; 57:19; 80:5

**fund** [1]
*44:18*

**funds** [2]
*44:17; 112:17*

**future** [6]
*26:1; 89:19; 91:23; 94:3;
102:5, 6*

### – G –

**G-I-L-L-E-S-P-I-E** [1]
*3:13*

**G-R-I-M-E-S** [1]
*80:18*

**gain** [2]
*59:2; 64:14*

**game** [1]
*90:5*

**Gardner** [2]
*45:9, 16*

**gathered** [2]
*115:4; 116:4*

**gave** [16]
*23:12; 46:24; 57:2; 64:2, 3, 5;
79:22; 86:25; 87:4; 108:10;
114:19; 117:16, 17, 23, 24;
122:23*

**gentleman** [1]
*79:15*

**Georgia** [10]
*8:16; 14:20; 15:25; 16:16;
17:3; 58:11; 75:18; 83:18;
110:24; 118:2*

**Gerace** [1]
*10:9*

**gets** [3]
*40:23; 100:7; 123:14*

**GILLESPIE** [1]
*3:5*

**Gillespie** [12]
*3:12, 13, 24; 4:19; 5:2; 6:10;
76:20; 78:21; 82:12; 134:2;
136:16; 140:4*

**girl** [1]
*57:5*

**girl's** [1]
*57:23*

**give** [20]
*23:14; 27:7; 33:20; 35:5;
46:2; 51:8; 52:21; 62:11;
87:12; 88:21, 23; 98:3; 100:3;
111:22, 23; 114:16, 18;
126:6, 7*

**given** [24]
*19:24; 23:15; 26:13, 17, 21;
34:21; 35:9; 36:11; 39:1;
40:10, 16; 41:21; 51:6; 53:21;
86:15, 21; 93:9; 101:25;
102:9, 11; 103:6, 8; 114:21;
125:3*

**gives** [2]
*40:23, 25*

**giving** [4]
*44:2; 50:17; 90:19; 134:9*

**goes** [6]
*15:24; 91:18; 93:18; 121:14;
122:16*

**Gomez** [1]
*57:22*

**goods** [2]

111:22, 23

**Granito** [1]
*43:1*

**granted** [1]
*108:13*

**Greenberg** [15]
*66:8, 14; 70:15, 22; 71:9, 22,
25; 75:10, 14; 76:8; 134:7, 9,
11; 136:17; 138:4*

**Gregory** [2]
*4:17; 5:2*

**grill** [1]
*112:8*

**Grimes** [1]
*80:18*

**grow** [1]
*31:3*

**guess** [13]
*10:7, 9; 20:22; 33:8, 25; 60:1;
70:14, 19; 94:16; 95:20;
124:19*

**guy** [15]
*10:8, 25; 18:16; 21:19; 36:19;
63:22; 74:18; 93:15; 101:22;
108:13; 111:21; 115:12;
117:17; 127:24*

**guy's** [1]
*62:3*

**Guys** [1]
*111:16*

**guys** [29]
*41:18; 57:7, 9; 82:18; 89:14;
111:13, 14, 15; 112:9, 10;
113:4, 8; 114:1, 20; 116:7;
117:19; 118:4; 119:14; 121:7,
22; 123:6; 134:14; 135:8, 12,
20*

### – H –

**hadn't** [12]
*42:16, 20, 22; 71:1; 85:24;
86:4*

**hand** [3]
*3:3; 22:14; 88:19*

**handful** [1]
*118:15*

**handle** [2]
*46:13, 16*

**hands** [1]
*46:3*

**handwriting** [1]
*88:7*

**hang-up** [1]
*76:6*

**Hank** [3]
*109:23, 24; 110:9*

**Hanover** [2]
*137:9, 10*

**happening** [5]
*41:20; 95:25; 96:5; 107:17;
110:13*

**happens** [3]
*40:24; 46:2; 93:7*

**Harris** [7]
*11:4, 20; 14:12, 18; 30:10;
43:7; 54:19*

**haven't** [1]
*9:23*

**He'd** [1]
*58:12*

**He'll** [1]
*106:21*

**he'll** [1]
*106:21*

**He's** [4]
*16:23; 57:2; 58:2; 82:19*

**he's** [17]
*13:23; 16:12, 14, 15, 16;
18:16; 62:3; 73:10; 74:23;
82:20, 21; 102:22; 106:14;
111:22; 116:15; 126:15*

**Head** [1]
*16:23*

**head** [1]
*84:12*

**hear** [1]
*29:17*

**heard** [5]
*12:11; 14:4; 117:12; 138:5, 8*

**hearing** [1]
*140:15*

**hearsay** [1]
*134:22*

**heat** [1]
*135:21*

**heavily** [1]
*101:14*

**heavy** [1]
*111:24*

**held** [4]
*7:6; 102:14; 139:8; 140:12*

**help** [2]
*19:12; 26:10*

**hereby** [2]
*139:5; 140:10*

**herein** [1]
*3:6*

**Herring** [1]
*26:23*

**Herring's** [1]
*34:21*

**hey** [1]
*113:8*

**Hi** [1]
*11:12*

**high** [3]
*7:15; 99:17; 105:1*

**higher** [6]
*93:12, 14; 101:9; 104:6, 9, 25*

**highest** [3]
*57:11; 99:18, 19*

**hike** [1]
*58:20*

**hilarious** [1]
*112:13*

**hindsight** [1]
*101:16*

**hired** [1]
*84:11*

**hiring** [1]
*84:9*

**history** [1]
*101:15*

**hit** [2]
*13:1; 108:17*

**hits** [1]
*108:23*

**hold** [7]
*9:21; 70:6; 72:21, 22; 80:3;
102:19*

**Holdings** [1]

BSA

**TRANSCRIPT CONCORDANCE**

Look-See(42)

12:12

home [2]
53:25; 129:25

hope [3]
27:8; 75:5; 96:4

hopefully [2]
22:12; 101:3

hoping [1]
126:10

hostile [2]
112:18, 21

house [4]
132:13, 14

houses [2]
132:13, 16

hundred [8]
34:10, 11; 85:10; 86:13;
98:10; 127:20, 21; 128:3

HYATT [35]
10:13; 42:4; 47:11; 48:6;
54:4; 60:8; 72:15; 74:1, 22;
82:10; 97:2, 3, 8, 14, 16;
98:1, 4, 5; 102:6, 9,:15, 18,
24; 103:1; 104:21; 111:6, 8;
115:2; 117:3; 118:1; 119:14,
17, 20, 24; 136:15

Hyatt [3]
3:15; 125:20; 126:22

**– I –**

I'd [2]
43:14; 105:10

I've [26]
12:13, 20, 25; 14:4; 43:13;
65:8; 76:10; 82:3, 4; 84:16;
85:23; 87:16; 101:13, 15;
120:7, 8, 9, 10, 11, 23; 121:1;
127:14; 131:18; 138:5

I-Buy [11]
6:3; 9:13; 78:23; 84:22; 86:2,
7; 100:6, 11; 107:24; 123:11;
132:25

idea [24]
10:2; 30:9, 12, 15; 31:24;
33:2; 43:8, 11, 20; 44:7; 48:1;
54:6, 20, 23; 59:14, 17; 67:6,
10; 69:6; 72:18; 94:23; 101:6,
18; 128:6

Identification [1]
5:10

identified [1]
64:9

identify [1]
4:15

illusion [1]
108:15

immediate [1]
8:16

immediately [5]
6:7; 30:17; 45:23; 130:16

important [1]
80:12

inaccuracies [1]
71:12

Inc [2]
74:9; 139:19

include [1]
56:25

increase [3]
22:12; 89:14; 123:14

indicated [8]
34:1, 3, 5, 6; 36:25; 42:7;
51:8; 139:8

indicates [2]
32:11; 65:13

indication [23]
32:10, 14; 39:15; 40:3, 11;
47:4; 48:22; 51:9; 124:10, 11,
18, 22; 125:2, 8, 13, 19, 24;
126:8, 22; 127:16; 128:1, 4,
10

indications [19]
32:7, 18, 19, 25; 33:12, 20;
39:18, 19, 22, 23, 25; 47:6;
48:9, 10, 17, 19, 21; 50:17;
51:7

individuals [2]
22:2, 20

induce [1]
75:2

industry [4]
64:3; 120:2; 121:19; 123:4

influence [1]
27:24

info [1]
117:24

inform [2]
103:20, 23

Information [1]
4:7

information [9]
27:17; 82:22; 83:2; 106:5, 16;
113:17; 114:4, 22; 117:22

informed [3]
87:16; 103:10, 12

infusion [1]
31:15

initial [1]
40:4

Initially [3]
26:23; 40:20; 115:22

initially [7]
47:5; 48:22; 50:3; 115:20;
116:5, 7; 131:13

inquiring [1]
119:3

insisted [1]
119:9

instance [5]
7:23; 11:19; 61:5; 125:19;
137:11

instances [11]
16:17; 35:11, 16, 20; 44:15;
45:1; 53:17; 55:18, 24; 63:17;
77:3

instruct [1]
61:5; 107:2

instructed [1]
35:3; 127:4; 130:1

instructions [4]
25:5; 35:5, 8; 53:22

insured [1]
93:20

intended [1]
22:10

intent [1]
22:7

interest [43]
27:21; 32:7, 10, 11, 14, 18,
19; 33:1, 12; 36:3, 25; 39:15,
18, 23; 40:1, 3, 11; 47:4;

48:21; 50:17; 51:7, 10; 72:6;
73:13; 93:25; 112:14; 124:10,
12, 18, 22; 125:3, 8, 13, 20,
24; 126:9, 16, 22; 127:16;
128:2, 4, 10; 130:13

interested [6]
34:6; 111:11; 124:15; 125:16;
126:16

Internet [1]
17:10

internet [6]
24:20; 64:4, 8, 10; 89:11;
92:10

introduced [1]
118:25

inventory [10]
32:4; 49:11; 67:8; 78:15;
96:22; 97:19, 23; 98:11;
100:21; 103:11

Investigation [1]
4:1

investigation [2]
3:17, 21

Investment [1]
36:18

investment [3]
36:22; 106:13; 107:14

Investments [1]
13:15

Investors [1]
14:2

involved [26]
7:11; 8:12; 12:8; 16:7; 17:21;
18:4, 6, 8, 12; 44:1, 2, 4;
55:25; 59:19; 62:5; 64:11;
72:9; 73:3; 77:18; 82:21;
91:17; 108:2; 134:17; 135:22;
136:17, 21

involvement [2]
69:17; 70:3

involves [2]
42:8; 82:14

involving [1]
77:4

IPO [53]
18:6; 19:19; 23:21; 24:2, 6, 8;
25:7; 28:18, 22, 24; 29:4, 5,
9, 14; 30:18; 31:23; 32:1, 5,
7, 19; 34:24; 38:16, 23; 43:5,
19, 21; 44:9, 11, 13, 16;
46:17, 19; 47:12; 49:4, 12,
16; 50:15; 54:18, 22, 25;
55:5; 56:4, 16; 58:17, 21;
62:10; 78:17; 124:8, 9; 126:4;
127:14

IPOs [4]
49:2, 19; 52:21; 120:13

Irvine [22]
6:21; 8:6, 7; 10:15, 16, 18;
15:16, 23; 20:5, 8; 33:15, 17;
35:6; 37:10; 47:15; 51:24;
84:1; 105:20; 108:24; 128:24

Irvine's [1]
11:13

issue [9]
71:22, 25; 72:3, 8, 11; 86:22;
107:18

issued [15]
13:5; 56:20; 65:14, 18; 66:8,
17; 67:3, 7, 21; 68:13, 16;
69:20; 70:11, 23; 73:17

issuer [1]
18:7

issues [5]
70:15; 83:4; 87:7, 8, 9

issuing [8]
65:20; 66:4, 12; 70:10, 16;
72:2; 73:9, 18

**– J –**

Jack [7]
18:14; 23:1; 25:17; 33:8, 9;
69:16; 71:5

Jay [2]
10:7; 86:24

job [3]
53:18; 129:7; 130:25

Joe [2]
10:9, 16

John [3]
13:17, 22; 140:9

**– K –**

K-E-E-V-I-N [1]
3:12

keep [2]
39:6; 127:8

keeping [1]
46:16

KEEVIN [1]
3:5

Keevin [3]
3:12; 5:1; 140:4

kept [1]
33:19

kick [1]
37:5

kicked [1]
73:8

knowing [2]
59:8; 61:3

knowledge [11]
12:10; 28:6, 16; 29:15; 52:20;
61:15, 21; 63:1; 98:13; 106:6;
123:12

Koch [3]
8:3; 20:25; 39:11, 12; 51:17;
53:4; 125:10

Koch's [1]
54:10

**– L –**

L-E-M [1]
110:1

L-I-M [1]
110:2

L-O-R-I-N-Z-O [1]
3:12

LA-919 [3]
3:19; 139:10; 140:5

labeled [1]
135:2

lack [1]
128:9

lady [3]
20:16; 21:18; 46:8

Laguna [1]
6:14

Lainie [20]
8:3; 20:25; 39:1, 10, 12;

BSA
**TRANSCRIPT CONCORDANCE**
Look-See(43)

40:22; 44:3, 6; 45:25; 46:7, 9;
50:20, 22; 51:17; 53:4; 54:10;
57:18; 125:10; 127:16, 22
**large** [2]
45:2
**larger** [1]
45:13
**Last** [1]
81:1
**last** [11]
5:3; 11:3; 19:16; 21:24; 47:7;
57:18; 96:10, 12; 109:19, 22;
130:6
**late** [2]
7:1; 23:24
**latter** [1]
115:3
**Laura** [1]
57:22
**laws** [2]
3:20, 23
**lazy** [1]
85:19
**lead** [1]
88:9
**learn** [6]
28:18; 30:20; 79:20; 80:20;
81:5, 12
**learned** [4]
28:22; 29:3, 5, 7
**leave** [5]
58:5; 75:2, 6; 88:2; 115:12
**LeLand** [1]
43:3
**lend** [1]
113:9
**Leslie** [2]
57:17, 22
**Let's** [1]
126:20
**let's** [5]
41:25; 88:2; 105:22; 115:4;
120:15
**letter** [4]
5:1; 50:16; 131:6; 134:18
**letters** [5]
134:24; 136:4, 7, 8, 10
**Level** [3]
61:24; 91:10, 13
**level** [1]
121:24
**license** [1]
135:15
**lifted** [2]
122:19, 21
**Lim** [2]
109:23, 24
**Limited** [1]
8:11
**limited** [2]
8:7, 10
**line** [1]
16:8
**lingo** [1]
93:5
**list** [6]
37:24; 38:1, 3, 7, 9, 13
**literally** [1]
113:4
**loan** [3]
22:12, 15; 113:10

**loaned** [3]
30:7, 10, 14
**Location** [1]
140:7
**loosing** [1]
57:23
**Lorenzo** [5]
51:25; 128:24; 129:23;
130:18; 135:4
**Lorenzo's** [3]
128:18, 20; 130:14
**Lorinzo** [1]
3:12
**Los** [2]
139:9; 140:7
**lose** [1]
51:4
**losing** [1]
10:8
**lost** [3]
96:11; 102:17; 121:9
**lot** [19]
24:3; 27:13; 34:18; 37:5;
70:24; 85:23; 93:25; 95:3, 22;
106:24; 113:21; 114:23;
115:11; 120:11; 123:3, 5;
134:14; 135:14, 21
**lots** [1]
113:21
**low** [1]
7:15

– M –

**M-C-K-I-B** [1]
81:9
**MacArthur** [1]
6:21
**machine** [1]
61:25
**Magazine** [1]
137:7
**mail** [3]
115:13, 14, 15
**mailed** [1]
68:18
**mainly** [2]
15:1, 22
**majority** [3]
96:21; 97:18, 22
**maker** [1]
61:24
**makers** [2]
59:20; 61:17
**Management** [1]
10:10
**management** [2]
86:25; 90:11
**Manager** [8]
7:5, 9, 13; 10:5, 7, 14, 17, 18
**managing** [1]
7:10
**MANGOLINI** [13]
45:20; 71:18, 20; 73:5; 74:5,
24; 75:25; 76:2, 14; 78:20;
81:18; 116:25; 119:16
**Mangolini** [1]
3:15
**manner** [2]
53:7, 8
**March** [5]

65:3, 14, 18; 67:8; 109:11
**mark** [3]
122:4, 5, 15
**marked** [4]
4:7, 24; 5:9; 65:1
**Market** [6]
26:21, 24; 27:3, 6, 25; 28:1
**market** [11]
59:20; 61:17, 24; 62:17; 77:9,
10; 90:5; 93:4; 103:7; 113:21;
122:21
**material** [1]
71:15
**materials** [2]
23:7; 26:13
**Matter** [2]
139:10; 140:3
**matter** [3]
3:18; 4:1; 110:25
**matters** [1]
119:21
**May** [3]
3:2; 139:8; 140:6
**McKibben** [1]
81:9
**McNulty** [6]
20:16, 18; 21:14, 16; 22:2, 19
**McNulty's** [1]
27:23
**mean** [59]
11:24; 12:2, 5, 20, 23; 14:8;
18:17; 23:11, 13; 24:7; 25:9;
42:5; 50:4; 57:12, 17; 61:19;
62:22; 64:23; 65:23; 67:25;
68:7; 72:18; 73:11; 74:3, 6, 7;
75:21; 81:4; 83:22; 91:3, 18;
92:16, 22; 94:13; 98:16;
100:22; 101:19; 106:7; 111:1,
20; 112:21, 22; 113:5, 23;
114:14; 117:12; 118:7;
120:13; 122:8, 9, 17; 126:20;
127:11; 130:1; 134:12;
135:21; 136:23
**meaning** [1]
76:5
**means** [3]
72:24; 121:2; 124:19
**measure** [1]
94:3
**meet** [1]
41:17
**meeting** [21]
19:24; 20:2, 6, 20; 21:2, 7,
22, 24; 22:21; 23:2, 5, 8, 17,
18; 24:8, 25; 87:14; 88:21.
23; 89:8; 112:9
**meetings** [6]
19:22; 23:14; 24:1, 4; 35:13;
50:23
**mentioned** [22]
12:22; 41:12; 56:18; 57:14,
25; 60:9; 67:12; 83:25; 84:20;
90:24; 91:1, 2, 15, 20; 94:19;
102:23; 120:2; 123:13;
128:13; 131:15; 136:3;
137:10
**merit** [1]
91:23
**merits** [1]
21:9
**Merritt** [2]

57:17, 22
**messages** [1]
114:11
**Michelle** [1]
57:17
**Michelle's** [1]
57:18
**Mike** [2]
57:17, 25
**million** [1]
49:11
**mimic** [2]
137:22, 23
**mimicked** [1]
137:18
**mind** [2]
113:23; 127:8
**minimum** [1]
57:12
**minute** [3]
26:24; 47:7; 129:14
**minutes** [3]
21:25; 23:4
**mistaken** [5]
27:14; 70:23; 71:13; 91:9;
116:20
**mistaking** [1]
64:5
**models** [1]
64:5
**moment** [1]
65:6
**money** [32]
22:8, 10; 25:12; 27:10, 13,
14, 15, 21; 30:8, 11, 14, 22;
31:2, 21; 44:19, 21; 45:4;
80:8, 9; 85:16, 20; 90:19;
95:22; 100:18; 107:1, 5;
113:9, 11; 114:1; 116:6, 15;
119:2
**monies** [1]
85:23
**monitor** [2]
133:10, 13
**monitoring** [1]
49:6
**month** [2]
49:22; 58:6
**months** [10]
49:22; 101:18; 120:19, 20,
22, 24, 25; 123:16, 24; 124:1
**Morgan** [4]
38:22; 44:6, 9, 12
**morning** [2]
5:21; 78:22
**motives** [2]
136:20, 24
**moving** [1]
62:3
**MR** [106]
3:9; 4:15, 17, 19, 21, 22, 23;
5:12, 16, 19, 25; 6:1, 5, 6, 8,
9; 10:13, 22; 41:8, 10; 42:4,
14; 45:20; 46:18; 47:11, 14;
48:6; 49:1; 50:12, 13; 54:4,
17; 60:8, 15; 71:18, 19, 20;
72:15; 73:5; 74:1, 5, 22, 24:
75:25; 76:2, 14, 15, 18;
78:20; 81:15, 18; 82:10;
96:25; 97:2, 3, 6, 8, 10, 14,
16, 24; 98:1, 2, 4, 5; 102:2, 6,

From large to **MR**

**EXHIBIT 2 PAGE 55**

8, 9, 13, 15, 16, 18, 22, 24;
25; 103:1; 104:19, 21; 111:6,
8; 114:21; 115:2; 116:25;
117:3, 24; 118:1, 6; 119:14,
16, 17, 20, 23, 24; 134:1, 6;
135:23; 136:2, 11, 14, 15;
138:3, 7, 10, 11, 12

**Mr [73]**
3:24; 4:19; 5:16; 6:10; 8:19;
11:19, 20; 12:6; 14:10, 17;
16:5, 17, 25; 17:4; 19:11, 18;
20:20, 23; 21:14, 16; 22:2,
19; 25:18; 27:23; 30:7, 10,
13; 31:9; 33:8, 9; 38:2, 3;
43:7, 10, 15; 44:8; 47:23;
52:23; 54:21; 55:4; 57:1;
58:16; 59:7, 13; 60:16; 61:2,
5, 8, 11; 63:11, 23; 64:11;
66:13, 19; 67:13; 68:8; 76:19;
78:21; 82:12; 129:23; 130:14,
18; 131:16; 134:2, 7, 8, 11;
136:16; 138:4

**Ms [2]**
8:18; 39:11

**mutual [1]**
58:12

**Myers [7]**
18:14; 19:11; 20:23; 25:18;
33:9; 69:16; 71:5

**Myself [2]**
37:9; 129:9

**myself [4]**
16:15; 71:5; 83:17; 103:16

**– N –**

**N.W. [1]**
139:20

**N2K [1]**
25:14

**Name [1]**
140:19

**name [44]**
3:11, 14; 10:9; 11:3; 12:17;
13:17, 19, 22; 14:4; 19:15,
16; 20:17; 43:1, 12, 13;
45:16; 57:18, 19, 23, 25;
63:22; 69:22; 79:15, 17, 18;
80:17, 24, 25; 81:1, 2, 9, 11,
19, 21, 23; 84:11; 109:19, 22;
110:19; 116:23, 24; 117:6;
118:12

**name's [1]**
14:8

**named [1]**
135:3

**names [18]**
17:24; 40:17, 18; 44:5; 57:16,
23; 68:14; 79:9, 12; 82:4;
110:17, 22; 114:6, 7; 124:12;
135:2; 136:2, 10

**NASD [3]**
134:15; 136:4, 7

**NASDAQ [2]**
26:20; 93:25

**National [1]**
15:4

**needs [1]**
87:25

**nefarious [1]**
137:5

**net [6]**
36:9, 15; 82:20; 135:24;
136:5, 12

**news [1]**
66:11

**nice [1]**
113:8

**nine [1]**
121:10

**normal [5]**
21:8; 44:25; 46:16; 56:7;
132:9

**November [3]**
23:23; 46:20; 49:2

**Number [1]**
140:5

**number [15]**
6:11, 17, 21; 7:14; 32:24;
34:8; 42:9; 57:11; 60:2; 92:3;
93:8, 16; 122:23; 123:1, 2

**numbers [1]**
63:18

**– O –**

**Obvious [1]**
110:21

**Obviously [1]**
111:19

**obviously [5]**
29:13; 62:2; 90:20; 111:17;
129:20

**occasions [1]**
61:11

**occur [1]**
109:6

**occurring [1]**
49:2

**October [3]**
7:1; 23:24

**odd [3]**
71:21, 24; 72:7

**offer [2]**
61:19; 93:8

**offered [1]**
100:23

**offering [14]**
17:17; 18:1, 21, 24; 19:9;
31:20; 32:12, 13, 20; 33:5;
52:1; 55:13; 61:18; 62:2

**offerings [1]**
120:11

**offhand [1]**
17:25

**office [2]**
8:6; 9:4, 8; 10:15, 16; 11:13;
15:15, 16, 19, 23; 16:13, 18;
20:8, 21; 21:2; 24:12; 33:3,
15, 18; 35:6; 37:10; 47:15;
49:9; 51:24; 58:9; 110:5;
118:5, 23, 24; 129:25

**Officers [1]**
3:15

**offices [10]**
15:7, 20, 21; 35:9; 37:12, 17;
47:18, 21; 52:5, 6

**Official [1]**
139:18

**Oh [8]**
14:16; 20:14; 36:11; 74:10;
79:4; 95:1, 8; 122:10

**oh [3]**
8:7; 95:8; 115:13

**Okay [397]**
3:10, 14; 4:4, 11, 13, 15, 22;
5:15, 25; 6:5, 8, 15, 19, 23;
7:4, 8, 12, 17, 21; 8:5, 9, 13,
19, 21, 23; 10:1, 5, 12, 21;
11:3, 5, 10, 15, 18, 22; 12:11,
22; 13:5, 9, 12, 14, 17, 22;
14:1, 6, 10, 17, 20, 24; 15:4,
6, 9, 14, 25; 16:5, 21, 24;
17:3, 6, 11, 14, 16, 19, 21;
18:1, 4, 11, 15, 17, 20, 23;
19:1, 3, 16, 18, 21; 20:1, 4, 6,
8, 10, 18, 20, 23, 25; 21:3, 6,
13, 16, 22, 24; 22:1, 15, 19,
23, 25; 23:7, 10, 17, 20, 23;
24:1, 5, 11, 13, 17, 19, 22,
25; 25:5, 20, 23; 26:3, 9, 13,
16; 27:2, 11, 23; 28:3, 7, 18,
21; 29:2, 9, 11, 19; 30:2, 7,
16, 24; 31:4, 9, 13, 22, 25;
32:3, 9, 14, 18, 24; 33:4, 11,
14; 34:3, 5, 8, 13, 24; 35:5, 8,
11, 16, 19; 36:1, 6, 14, 17,
21; 37:7, 10, 12, 19; 38:3, 6,
11, 21, 25; 39:10, 13, 16;
40:5, 10, 15, 22; 41:6, 11, 20,
23; 42:3, 8, 13, 15, 21; 43:1,
5, 15, 21; 44:1, 5, 8, 11, 15;
45:1, 7, 10, 13, 16; 46:19, 23;
47:2, 8, 10, 15, 20; 48:1, 19,
25; 49:10, 15; 50:1, 8, 21, 25;
51:5, 12, 20, 23; 52:3, 5, 9,
14, 23; 53:9, 21, 25; 54:3, 16,
18; 55:2, 12, 18; 56:12, 15,
20, 25; 57:3, 13, 21, 25;
58:14, 16, 19; 59:2, 10, 13,
18, 23; 60:1, 14, 16, 25; 61:8;
62:4, 9, 16; 63:3, 17, 19, 25;
64:11, 25; 65:10, 13, 17, 24;
66:2, 10, 19, 22, 25; 67:3, 7,
11, 18; 68:3, 6, 13, 16, 21,
23; 69:16; 70:2, 9, 21; 71:11,
17; 74:13; 76:19; 77:3, 12,
18, 22; 78:6, 9, 15, 19; 81:5,
12, 25; 82:1, 9, 12; 84:6, 9,
14, 17, 19; 85:12, 18; 86:6,
12, 18; 87:1, 20; 88:16, 19,
23; 89:8; 92:1, 7; 94:14, 17,
19; 97:22; 98:8, 20; 99:6, 22;
100:5, 11; 102:25; 103:23;
105:19; 106:11; 110:3; 111:9;
112:11; 113:17; 114:10;
118:1, 11, 21; 119:13, 25;
120:15; 121:23; 122:23;
123:2, 10; 124:8, 17, 22;
125:2, 6, 8, 12; 126:8, 17, 21;
127:19; 128:9, 13, 17, 22, 24;
129:7; 130:10; 131:1, 5, 12,
13, 24; 132:8, 25; 133:8, 10,
18, 20, 25; 134:2; 136:11, 14

**okay [12]**
15:21; 38:16; 41:13, 25;
50:12; 71:19; 88:16; 95:11;
118:18; 122:10; 126:7; 127:7

**old [1]**
105:25

**one's [1]**
80:19

**ones [10]**
27:1; 87:7, 8; 95:9; 102:22;
104:3; 117:21; 120:15; 124:4

**ongoing [1]**
39:6

**open [3]**
82:18; 108:4; 112:15

**opening [2]**
3:24; 4:5

**operandi [1]**
136:24

**operations [3]**
11:22; 12:9; 16:7

**opinion [1]**
98:3

**opportunity [9]**
4:1, 8; 100:23; 101:25; 102:4,
10, 11; 103:6, 9

**opposed [5]**
27:16; 64:8; 70:6; 105:19;
137:24

**orchestrated [1]**
109:5

**Order [2]**
3:25; 4:2

**order [27]**
32:15; 39:23; 40:2, 21; 44:3;
45:8; 46:2, 20, 23, 24; 47:2,
5, 8, 24; 48:8, 20; 83:10, 11,
12, 16, 17, 18; 106:16;
124:11; 126:24; 127:23

**orders [20]**
40:18; 44:3; 45:5, 11; 46:21;
47:3; 56:1; 80:15; 82:7;
109:4; 112:12, 24; 113:1, 2;
127:5, 22; 130:16

**original [5]**
48:16; 65:9; 118:4; 127:13;
140:13

**Oudt [4]**
7:24; 17:4; 61:5; 62:20

**ours [1]**
121:3

**ourselves [1]**
41:1

**outcome [1]**
42:7

**Outdt's [1]**
16:21

**outgoing [1]**
111:20

**outline [1]**
88:4, 21, 23

**outside [5]**
6:3; 8:5, 7; 84:21; 86:2

**overhear [1]**
63:6

**oversee [1]**
15:2

**owned [6]**
11:20; 60:11, 12; 132:6, 7

**owners [1]**
10:23

**ownership [1]**
11:18

**– P –**

**P.M. [1]**
65:3

**p.m. [1]**

BSA
**TRANSCRIPT CONCORDANCE**
Look-See(45)

138:13

**Page** [1]
  83:17

**page** [2]
  5:2; 38:14

**pages** [6]
  4:25; 5:3; 38:14, 15, 16;
  139:7

**paid** [12]
  12:15; 13:5; 56:13; 108:9;
  116:9, 10, 11, 18; 117:7, 8,
  17; 118:15

**Pam** [3]
  57:18, 19; 69:22

**Pam's** [1]
  57:19

**pants** [1]
  29:1

**paperwork** [3]
  8:14; 18:9; 57:7

**parameters** [1]
  51:3

**parking** [1]
  108:16

**part** [9]
  12:14; 21:11; 48:11; 83:11;
  93:18; 94:8, 11; 121:6;
  136:24

**participant** [1]
  30:2

**participate** [13]
  63:3; 95:21, 24; 96:18, 20;
  98:17; 99:1, 22; 100:24;
  102:10, 11; 105:13; 132:23

**partner** [2]
  14:7; 16:10

**Partners** [1]
  13:24

**partners** [2]
  13:23; 14:3

**party** [2]
  11:8, 11

**pass** [1]
  89:1

**passed** [2]
  89:3, 7

**Paul** [1]
  139:5

**Paulson** [1]
  120:7

**pay** [17]
  22:11; 44:17; 45:4; 46:8;
  107:9, 18, 19, 22; 108:12, 14,
  15; 114:19, 25; 116:14;
  117:20; 119:7; 137:16

**Paychecks** [1]
  13:8

**paychecks** [2]
  13:5, 9

**paying** [1]
  12:23

**peculiar** [3]
  72:7; 73:3; 112:4

**penalized** [1]
  53:10

**penalty** [43]
  49:15, 18, 21; 50:2, 9, 14, 16;
  51:1, 3, 12, 17, 20, 24, 25;
  52:6, 11, 22, 24; 53:2, 5, 6,
  23; 120:1, 2, 12; 121:4, 10,
  15, 18, 20; 122:5, 8, 18;

123:10, 15, 17, 24; 132:15,
  16, 23, 24, 25; 133:13

**pending** [1]
  34:19

**People** [4]
  73:12; 107:18; 112:12;
  113:24

**people** [30]
  7:12, 17, 19, 22; 21:11;
  33:20; 37:21; 57:13; 75:6;
  84:16; 91:18; 92:9, 11;
  103:15; 109:3; 112:1; 113:12,
  24; 114:6, 8, 19, 24, 25;
  116:12; 117:15, 16, 20;
  119:1; 121:21; 135:3

**percent** [6]
  9:4, 7, 8, 9; 121:14; 122:3

**percentage** [4]
  121:5, 20, 25; 123:14

**period** [5]
  62:4, 6; 72:16; 86:5; 103:3

**Perle** [32]
  8:17, 19; 11:19; 12:6, 12;
  13:1, 12; 16:2, 5, 17, 25;
  20:20; 30:7; 31:9; 33:8; 38:2,
  3; 44:8; 47:23; 52:23; 55:4;
  57:1; 59:7, 13; 60:16; 61:2, 8,
  11; 63:11; 66:20; 67:14;
  131:16

**permitted** [1]
  95:21

**person** [9]
  11:25; 16:7; 32:11; 52:22;
  94:12; 116:23; 119:4; 137:21

**personal** [1]
  132:21

**personally** [1]
  123:25

**Personnel** [1]
  19:22

**persons** [1]
  21:3

**Phone** [2]
  6:21; 64:20

**phone** [7]
  6:11, 17, 20; 57:6; 64:16, 22;
  119:21

**phonetic** [4]
  19:15; 63:23; 74:9; 109:18

**physical** [2]
  76:24, 25

**physically** [2]
  39:2; 83:12

**pick** [1]
  92:3

**pipeline** [1]
  115:7

**pitch** [1]
  26:10

**place** [22]
  20:6; 25:2; 28:19, 20; 29:14;
  38:17; 46:12, 16; 53:23; 62:7;
  65:21; 72:1, 4; 73:2; 75:3;
  82:6; 98:21; 100:10; 105:8;
  109:4; 136:3, 12

**placed** [8]
  34:25; 42:16; 43:18; 44:16,
  18, 24; 45:3, 8

**places** [1]
  120:11

**plan** [4]

22:7, 10; 90:21; 96:17

**plans** [1]
  32:3

**playing** [1]
  90:5

**please** [5]
  3:3, 10; 4:16; 6:11; 65:7

**Plus** [1]
  87:10

**plus** [1]
  9:8

**point** [35]
  28:16; 46:3, 7, 10, 11; 48:15,
  23; 58:22; 64:23; 67:15, 23;
  76:9; 80:7; 90:4, 9; 92:19, 21;
  94:11; 99:8; 100:25; 101:4,
  21; 102:5; 103:9, 14; 104:14,
  15; 105:12, 18; 112:13;
  119:11; 122:18; 126:2;
  129:20; 134:14

**points** [7]
  88:17, 19, 22, 24; 89:1, 8;
  102:1

**position** [1]
  7:4

**positions** [2]
  7:6; 116:6

**possession** [2]
  86:24; 87:13

**potential** [2]
  24:15; 105:21

**practice** [1]
  47:17

**precious** [1]
  135:15

**prefer** [1]
  87:14

**preference** [1]
  107:15

**preliminary** [1]
  40:4

**prepared** [4]
  46:20, 23, 24; 139:12

**Pres** [1]
  101:14

**present** [5]
  26:6; 35:13; 50:21; 78:10;
  88:12

**presentation** [4]
  21:8, 10, 16; 89:21

**President** [3]
  12:6; 16:5; 54:14

**Press** [1]
  65:4

**press** [2]
  134:18, 25

**pressure** [1]
  80:2

**pretty** [4]
  28:5; 31:1; 108:16; 120:21

**previously** [2]
  4:7; 64:25

**Price** [1]
  99:14

**price** [27]
  32:1; 50:5; 58:20, 23; 62:11;
  63:12, 15; 77:2, 25; 85:9;
  89:20; 90:25; 91:18; 93:12,
  14; 95:19; 99:13, 15; 100:1,
  13; 103:23; 104:1, 6, 10, 11;
  131:14

**prices** [3]
  85:21; 104:25; 105:1

**pricing** [1]
  103:19

**principles** [1]
  83:24

**print** [3]
  51:10; 105:5, 9

**prints** [7]
  95:3; 104:25; 105:1, 2, 4, 7, 8

**Prior** [1]
  5:7

**prior** [14]
  3:24; 4:5; 5:13; 11:8, 11;
  19:25; 41:16; 44:21, 22;
  52:20; 73:18; 74:10; 75:17;
  135:3

**problem** [3]
  97:15; 104:17, 24

**procedure** [11]
  46:5, 12, 14, 15; 47:21;
  48:12; 106:2; 108:7; 118:25;
  127:3

**procedures** [3]
  105:20; 106:15; 125:14

**proceeding** [2]
  3:16; 119:11

**proceedings** [1]
  140:11

**proceeds** [2]
  27:22; 50:6

**process** [6]
  18:8; 40:22; 41:12; 44:4;
  124:17; 127:12

**processed** [1]
  49:4

**processing** [2]
  124:9; 126:4

**production** [2]
  5:17; 9:4

**products** [1]
  64:4

**profanity** [1]
  134:17

**profit** [2]
  9:11; 98:22

**profitability** [1]
  64:7

**profited** [1]
  78:16

**progression** [1]
  72:23

**projected** [1]
  64:7

**projections** [5]
  89:19, 21; 90:1; 91:24; 92:2

**promised** [1]
  98:24

**promotion** [1]
  69:25

**PROOFREADER'S** [1]
  140:1

**Proofreader's** [1]
  140:19

**proper** [1]
  71:1

**properly** [2]
  101:20; 107:21

**Prospectus** [10]
  22:18; 26:15, 17, 19; 28:17;
  29:25; 30:19, 21; 55:11;

BSA
**TRANSCRIPT CONCORDANCE**
Look-See(46)

71:13
**Prospectuses [2]**
23:12; 34:21
**provide [7]**
5:23; 6:6: 25:5; 27:17; 76:24,
25; 84:20
**provided [4]**
3:25; 4:6; 5:20; 26:9
**provisions [1]**
3:20
**public [2]**
17:13; 130:8
**published [2]**
136:5, 12
**pull [5]**
43:14; 62:12, 14; 109:3
**pulled [4]**
26:25; 47:7; 48:23; 105:5
**punished [1]**
53:14
**purchase [7]**
6:3; 29:11; 55:13; 86:2, 4, 6;
127:14
**purchased [7]**
29:15; 49:11; 54:19, 21, 24;
85:1; 86:7
**purchases [1]**
29:24
**purchasing [1]**
34:6
**purportedly [1]**
136:4
**purpose [4]**
50:2, 8; 68:19, 23
**purposes [1]**
3:16
**push [1]**
112:10
**pushing [1]**
111:14
**putting [1]**
118:3

**– Q –**

**quarterly [1]**
63:16
**question [21]**
17:19; 33:25; 37:15; 38:20;
54:5; 62:19; 70:20; 71:18;
86:14; 90:24; 93:3; 95:20;
97:9, 10, 24; 102:3; 104:20;
108:6; 131:14, 19, 25
**questioned [1]**
101:1
**questions [7]**
4:11; 14:9; 78:21; 82:11;
112:5; 119:14; 134:2
**quicker [1]**
27:10
**quit [2]**
130:20, 22

**– R –**

**raise [1]**
3:3
**range [4]**
99:13; 100:13; 123:24; 126:7
**rapport [1]**
107:16
**rare [3]**

71:24; 72:1; 120:21
**rate [1]**
9:2
**reach [1]**
79:7
**read [6]**
4:8; 69:1; 79:12; 82:4;
104:20; 136:7
**real [3]**
111:24; 117:10, 11
**reason [16]**
14:6; 34:16; 41:15; 42:17;
52:14; 58:15; 59:23; 65:24;
66:12; 69:4; 73:4; 97:17, 19;
123:23; 136:17; 137:5
**reasons [4]**
41:14; 73:8; 74:18; 75:4
**rec [13]**
71:22, 23; 72:4, 11, 12, 19;
73:9, 17, 18; 74:4, 6, 7; 89:17
**recall [37]**
21:3; 24:5, 13; 25:20, 23;
26:16, 19; 32:24; 33:17, 21;
35:19; 45:1, 6, 7, 12, 13, 16;
53:1; 55:18, 24; 56:2; 61:2;
62:4; 67:1; 78:4, 9, 12; 79:9,
15; 80:17; 81:11, 16, 17, 25;
82:1, 5; 134:10
**receive [5]**
34:17; 100:18, 20; 126:18;
137:16
**received [14]**
9:13, 22; 42:24; 56:16, 24;
57:9; 68:14; 75:10, 13; 78:22;
107:23; 109:15; 110:12, 24
**receiving [1]**
106:17
**recently [3]**
103:16; 108:4; 134:21
**Receptionist [1]**
57:20
**recess [1]**
76:17
**recollection [7]**
22:5; 43:4; 60:21; 62:9;
65:15; 77:15; 78:7
**recommend [1]**
89:24
**Recommendation [1]**
65:5
**recommendation [18]**
66:3, 9, 13; 70:6, 7, 10, 12,
15, 16, 23, 24; 71:25; 72:2, 8;
73:2, 4; 80:12
**recommendations [1]**
66:5
**record [15]**
3:2, 11, 24; 4:6, 16; 14:15;
41:9; 76:1, 19; 111:7; 119:19,
20; 134:5; 138:12; 140:12
**recorded [1]**
139:11
**recording [1]**
140:14
**records [3]**
5:17, 18; 124:25
**recs [2]**
72:16, 17
**Red [2]**
26:23; 34:21
**Reducing [1]**

42:10
**reducing [1]**
42:8
**refer [1]**
23:5
**referral [4]**
108:12; 116:12; 117:18
**referrals [6]**
108:10, 11, 14; 113:20;
114:25; 117:16
**referred [3]**
5:9; 41:11; 117:15
**referring [6]**
21:13; 39:10, 14; 50:19;
63:20; 65:11
**refuse [1]**
82:6
**refused [1]**
80:15
**registered [2]**
7:18; 83:23
**registration [1]**
18:7
**regulations [1]**
83:4
**relation [2]**
74:10; 80:14
**relationship [1]**
74:10
**Release [1]**
65:4
**remember [49]**
9:16; 12:19; 13:20; 16:17;
17:24; 18:1; 22:1, 3, 9, 14,
15, 18, 22, 24; 23:1, 3, 11,
13, 15, 19; 24:11; 26:3, 8, 15;
27:10, 11; 35:22, 23; 47:22,
25; 48:3, 4; 57:20; 61:1;
64:16, 21; 71:4; 78:2, 11, 18;
81:23; 87:5, 9; 89:6, 7; 104:4;
130:8; 131:11
**Rephrase [1]**
39:21
**rephrase [1]**
33:25
**report [51]**
8:15, 17, 19; 16:1, 3, 18, 24;
63:14, 16, 19, 21; 64:1, 2, 12,
17, 18, 24; 65:10, 15, 21;
66:2, 13, 17, 20, 23; 67:3, 7,
12, 21, 22, 24; 68:2, 4, 10,
13, 16, 25; 69:4, 6, 9, 14, 17,
20; 70:3; 71:9, 12; 73:24;
89:16; 91:25; 128:19; 129:4
**reported [1]**
129:2
**REPORTER [4]**
41:7; 50:10; 75:24; 111:4
**Reporter [1]**
139:18
**reporter [1]**
139:5
**REPORTER'S [1]**
139:2
**Reporting [1]**
139:19
**reporting [2]**
49:3; 140:14
**reports [2]**
17:1; 66:4
**represent [2]**

48:8, 9
**representation [5]**
97:1, 7, 9, 11, 12
**represented [2]**
4:13; 26:19
**representing [1]**
4:19
**reps [1]**
7:18
**require [1]**
106:15
**required [1]**
125:14
**requirements [3]**
36:9, 11; 41:17
**research [19]**
63:14, 16, 19, 21, 25; 64:2,
17, 18, 24; 65:20; 66:2;
67:12, 21, 22; 69:13, 17, 20;
70:3; 91:25
**residential [1]**
6:11
**resign [1]**
84:16
**resignation [1]**
58:13
**resigned [2]**
79:7; 130:22
**resources [1]**
55:13
**respond [1]**
76:3
**responded [1]**
134:23
**response [3]**
19:4; 61:3; 75:19
**responsibilities [4]**
14:21, 24; 15:1; 16:21
**responsibility [5]**
16:15; 17:4; 18:19; 72:6;
83:11
**responsible [4]**
7:19; 33:2; 100:9; 118:3
**responsive [1]**
5:18
**rest [2]**
27:17; 100:21
**restricted [3]**
67:23, 25; 68:3
**retail [1]**
62:23
**retailer [1]**
17:10
**retailers [1]**
64:10
**retention [1]**
132:12
**retract [1]**
61:20
**return [1]**
121:5
**retype [1]**
128:3
**revenues [3]**
24:18; 25:25; 26:1; 64:6;
89:15
**reverse [1]**
31:23
**review [14]**
4:2, 4; 36:24; 37:2, 3, 7, 14,
16; 82:22; 83:6, 13, 19, 20;

BSA

**TRANSCRIPT CONCORDANCE**

Look-See(47)

106:22

reviewing [2]
68:10; 83:2

rewards [1]
24:19

Right [65]
5:13, 14; 6:24; 9:10; 15:5, 18;
17:15; 28:25; 32:17; 34:7;
39:24, 25; 42:1, 12; 48:18,
19; 56:19; 60:4, 5, 13; 61:23;
68:8; 72:25; 84:5; 86:20;
88:6; 90:12, 13, 17; 91:12;
93:3, 6, 23; 94:2, 5, 7; 95:4;
101:10; 106:20; 109:7;
112:20; 115:8, 10, 17;
116:13; 118:9; 119:11;
121:11; 124:21, 24; 125:12,
22; 126:11, 14; 127:6;
128:12, 16, 21; 131:4, 23;
132:4, 8; 133:12

right [55]
3:3; 6:23; 10:1, 15; 24:21;
28:23, 24; 29:2, 4, 5, 7;
49:13; 63:22; 66:11; 71:4;
72:20; 83:21; 89:13; 90:7;
97:9; 99:2; 100:17, 20;
102:12; 105:6, 17; 106:5;
111:12; 112:19; 113:2;
117:23; 118:8; 119:11, 22;
120:13; 121:17; 124:4, 20;
125:5, 7, 11; 126:3, 21, 24,
25; 128:11, 20; 129:2; 130:9;
131:12, 17; 132:7; 133:20;
138:2

risk [4]
31:11; 36:20; 82:21; 113:13

riskier [1]
36:16

risks [4]
24:14, 17; 25:11; 90:4

risky [1]
90:5

road [3]
93:21; 98:24; 104:11

Rob [2]
21:11, 13

Robert [1]
20:18

role [2]
58:17; 68:9

room [1]
20:7

rose [1]
58:23

roughly [1]
100:14

rumors [2]
138:6, 7

running [1]
12:1

runs [1]
11:22

— S —

S-A-G-H-Y [2]
79:16, 18

S-C-H-N-E-I-D-E-R [1]
84:25

S-O-C-C-O-R-R-O [1]
80:25

sad [1]
92:9

Saghy [1]
79:16

salary [4]
8:22; 57:8, 9

Sales [1]
14:22

sales [21]
7:11; 8:12, 13; 9:9; 18:5;
20:3, 4, 10; 26:9; 86:15, 21,
23, 25; 87:3, 5, 15, 17, 23;
88:3; 100:13

Sanchez [1]
110:4

Sandro [2]
19:15, 18

Sandy [1]
66:8; 70:14, 22; 71:9, 21, 25;
75:10, 14; 76:7, 9, 10; 136:17

sat [2]
50:20; 122:12

Saying [1]
115:13

saying [16]
24:13; 29:3, 5; 58:11; 60:22;
78:1; 80:6; 81:15; 92:12, 25;
97:8; 99:15; 101:16; 102:6;
116:20; 134:24

scenario [3]
27:14; 107:24; 108:9

scheduled [2]
96:7, 8

scheming [1]
114:14

Schneider [5]
84:23, 24; 120:9; 124:5, 6

scratch [1]
128:2

script [2]
88:2, 3

scripts [11]
26:10; 86:15, 21, 23, 25;
87:3, 5, 15, 16, 17, 23

Sean [3]
7:23; 16:21; 62:20

SEC [6]
27:18; 28:10, 14; 43:13;
134:15; 135:14

second [5]
15:18; 96:25; 102:2; 104:19;
119:21

SECURITIES [1]
139:1

Securities [3]
3:17; 84:23; 140:11

securities [3]
3:20; 28:10; 124:15

segments [1]
136:8

select [1]
36:7

selected [4]
36:1; 37:19, 21; 52:12

sell [65]
25:6; 26:11; 32:20; 49:24;
51:2; 53:14, 22; 55:14, 22,
23; 56:1; 63:2; 66:4, 8, 13;
69:3; 70:6, 11, 15, 23, 24;
71:22, 25; 72:4, 8, 11, 16, 17,
19, 24; 73:2, 4, 9, 17, 18;

74:6, 7; 75:4; 78:23; 79:21,
23; 80:3, 11, 13, 15, 21; 81:6,
14; 82:6; 100:11; 101:25;
102:3; 103:2, 4, 6; 104:13,
14, 25; 115:25; 116:21;
122:17; 135:8, 10

seller [1]
104:12

sellers [2]
68:1, 7

selling [19]
26:14; 53:10, 11, 18; 55:5,
20; 56:4; 59:21; 60:2; 62:3, 6;
64:4; 75:8; 100:18; 103:11;
104:6, 16, 23; 121:4

sells [1]
49:20

send [10]
44:19; 68:17; 69:6; 76:5;
112:16; 113:17, 19; 114:4, 8

sending [3]
68:23; 69:4; 83:23

senior [3]
11:25; 12:8; 16:7

sense [3]
18:25; 37:2; 83:9

Sergio [4]
110:4, 10; 116:22; 117:12

Sergio's [1]
110:11

serious [1]
135:14

service [3]
56:22; 57:5; 69:15

seven [1]
86:13

shape [1]
72:6

share [19]
45:8, 13, 14; 58:22; 86:6;
99:4; 100:4, 7, 17, 19; 101:7;
102:1; 103:7, 12; 104:16, 23;
113:1

shares [35]
32:25; 34:5; 42:7; 43:18;
44:18; 45:3, 18; 49:8, 12;
78:23; 85:6, 7; 93:8, 16;
94:25; 95:19; 96:1, 3; 97:18,
23; 98:11; 99:4, 7; 105:22;
106:1; 125:22, 24, 25;
126:23, 24; 127:2, 14, 20

sharing [1]
9:11

She's [3]
46:8; 57:20; 117:8

she's [1]
15:8

sheet [19]
40:4, 6, 8, 10, 11, 12, 16;
48:14; 51:21; 89:3, 5, 6;
124:10, 12, 18, 23; 128:2

sheets [27]
26:10; 39:1, 13, 15, 18, 25;
40:3, 23; 41:21; 48:16, 17;
59:7, 8, 10, 12, 13; 60:10;
125:3, 9; 128:4; 131:16;
132:1, 6; 133:16, 21

SHERWIN [29]
4:17, 21; 5:19; 6:1, 6; 81:15;
96:25; 97:6, 10, 24; 98:2;
102:2, 8, 13, 16, 22, 25;

104:19; 114:21; 117:24;
119:23; 134:6; 135:23; 136:2,
11, 14; 138:3, 7, 11

Sherwin [4]
4:17; 18; 5:2, 16

shock [1]
80:23

shocked [2]
75:23; 129:13

Shopping [7]
26:1; 27:9; 38:5; 64:4; 87:6;
109:5; 121:12

Shopping.Com [1]
140:3

Shopping.com [59]
3:18; 17:7, 9, 12; 19:19, 22;
20:13; 21:20; 22:2, 20; 24:4;
25:7; 26:20; 29:12, 16, 18,
25; 30:8, 11; 31:14; 32:4, 19;
38:18; 42:16; 43:17; 53:10,
13, 18, 19, 21, 23; 54:19, 22;
55:20; 56:4; 58:17, 21; 64:9;
65:4; 67:9; 69:19; 70:1, 5;
71:8; 73:25; 77:4, 23; 78:16;
86:17, 18; 87:4; 88:24; 89:2,
9, 10; 111:11; 119:3, 5;
139:10

Shopping.com's [2]
30:17; 63:12

shortable [1]
72:5

shorted [2]
101:14; 137:15

shortest [1]
123:16

shorting [7]
60:23; 61:3, 12, 22; 137:12,
19, 24

shorts [5]
60:10; 91:15; 92:23; 101:14;
132:1

show [2]
4:24; 122:8

showing [1]
64:25

shows [1]
117:9

shrunk [2]
40:8, 14

sides [2]
41:7; 111:5

sign [11]
50:16, 18; 51:20, 24, 25;
82:24; 83:16, 19, 22, 25;
115:12

signature [1]
46:25

signed [2]
83:17, 18

signs [1]
83:18

Simulations [1]
87:10

sir [5]
60:9; 91:14; 97:4; 125:4;
131:22

sit [2]
98:18; 100:19

site [4]
22:13; 37:20, 25; 64:8

situation [4]

**BSA**                          **TRANSCRIPT CONCORDANCE**                          Look-See(48)

49:6; 52:11, 21; 107:3
**Six** [2]
86:13; 118:18
**six** [4]
118:15, 17, 20, 21
**sky** [1]
83:4
**smelled** [1]
114:2
**Smith** [1]
120:10
**Soccorro** [1]
80:24
**sold** [17]
9:23; 49:12; 59:4; 79:25;
85:2, 4; 86:9; 101:17; 102:11,
23; 103:13, 20; 108:19;
121:21, 22; 132:14; 133:13
**solicit** [2]
68:1, 7
**solicited** [3]
36:2; 37:19; 41:16
**Solomon** [1]
3:15
**solve** [1]
97:14
**somehow** [3]
49:4, 6; 81:23
**someone** [17]
9:24; 16:12, 18; 18:8, 11;
38:19; 52:4; 62:21; 69:10;
87:11, 25; 92:19; 93:10;
108:16; 123:4, 6; 132:24
**someone's** [2]
55:23; 114:14
**someplace** [1]
58:13
**somewhat** [1]
7:19
**somewhere** [5]
10:3; 23:24; 93:21; 121:8;
122:4
**sooner** [1]
27:9
**sorry** [4]
8:8; 50:12; 111:4; 132:19
**sort** [10]
31:22; 51:10; 65:22; 91:15,
24; 94:3; 96:2; 107:15;
111:25; 115:1
**sound** [5]
79:13, 23; 81:2, 19, 23
**sounded** [1]
117:6
**sounds** [5]
81:21; 111:18; 125:5, 7, 11
**South** [4]
6:12; 15:15, 19, 22
**Speak** [1]
89:11
**speak** [10]
10:17; 21:22; 22:20; 31:11;
89:12; 91:21, 22; 92:5;
105:25; 111:25
**speaking** [10]
24:11; 25:8, 9; 62:23; 81:16,
25; 82:5; 107:13; 112:2
**specific** [9]
31:13; 36:6, 9, 11; 62:22;
63:18; 64:16; 66:25; 78:7
**Specifically** [2]

60:18; 86:25
**specifically** [16]
14:22; 22:4; 45:18; 52:25;
59:21; 66:15; 69:12; 74:3, 8;
75:5; 77:20; 88:8, 12; 91:21;
106:22
**specifics** [7]
19:2; 28:11; 71:6; 77:24;
134:10
**speculate** [1]
136:21
**speculated** [2]
91:4, 6
**speculation** [3]
73:11; 138:6, 7
**speed** [1]
89:14
**spell** [6]
3:10; 19:16; 80:25; 109:19
**spend** [2]
22:8, 10
**split** [1]
31:23
**spoke** [14]
22:24; 23:1; 31:10; 59:8;
64:21; 79:22; 81:15; 82:1;
92:10; 107:17; 119:1, 4;
130:4, 6
**spoken** [2]
5:21; 29:10
**squeeze** [20]
59:1, 3, 19; 91:1, 3, 17, 19,
22; 92:8, 11, 16, 25; 93:1, 2,
3, 17; 94:8, 11; 131:15
**squeezing** [1]
111:15
**stability** [2]
50:3, 4
**staff** [8]
7:15; 20:3, 4, 10; 56:23, 25;
57:6, 24
**stages** [1]
115:3
**stakes** [2]
34:17, 18
**Stan** [1]
43:3
**stand** [1]
107:19
**standard** [5]
49:19; 120:2; 121:19; 122:6;
123:5
**standardize** [1]
72:24
**Start** [1]
24:18
**start** [4]
91:11, 15; 109:1; 111:10
**started** [11]
8:9; 10:6, 8; 29:4, 8; 58:21;
62:10; 70:8; 95:25; 109:3;
135:24
**starting** [1]
82:12
**startup** [2]
31:2; 90:6
**State** [3]
36:12; 37:4; 108:5
**state** [4]
3:10, 22; 41:14; 83:3
**stated** [1]

97:25
**statement** [7]
18:7; 52:19; 61:12, 14, 20;
63:14; 98:3
**statements** [10]
5:22; 24:22; 47:23; 52:17;
53:1; 55:4; 62:5; 63:11; 71:2;
134:4
**States** [1]
3:17
**states** [1]
51:10
**status** [1]
45:19
**Stay** [1]
89:21
**stay** [2]
40:7; 89:25
**stays** [1]
50:5
**stepped** [1]
20:21
**stepping** [1]
116:4
**Sterling** [2]
137:9, 10
**Stern** [2]
10:7; 86:24
**Steve** [4]
51:25; 128:18, 20, 24
**Steven** [1]
135:4
**Stock** [1]
65:4
**stock** [150]
6:4; 18:5; 25:7; 26:11, 14, 20;
31:23; 32:4, 15; 34:25; 35:2;
36:2, 25; 38:18; 42:16, 17,
19, 22; 43:22, 23; 44:16, 17,
24; 49:21; 50:3, 6; 51:2;
53:10, 15, 23; 54:1, 19, 22;
55:20, 23; 56:4; 58:21, 23;
59:4, 9, 21; 60:2, 3, 11, 12,
23; 61:3, 6, 13, 22; 62:3, 12,
18; 63:12, 15; 65:21; 67:9,
23; 68:3, 22, 24; 70:11, 18;
72:1, 5, 19; 73:13; 75:1, 2, 4,
7; 76:24; 77:4, 17; 78:16;
79:21, 25; 80:4, 14, 21; 81:6,
14; 82:20; 84:22; 85:2; 86:2,
7; 87:1, 2; 89:19, 25; 90:25;
91:6, 9, 11, 17; 92:17, 19, 20,
22, 23, 24; 93:9, 20; 94:4, 12;
95:5; 96:4; 100:1, 6; 101:9,
17, 21, 24; 102:3, 19; 103:2,
4; 105:12, 23; 106:2; 108:16,
18, 19; 109:7; 112:8, 14;
116:19, 21; 117:8; 121:10;
122:16; 125:18; 139:20;
132:6, 7, 15; 135:8, 10;
137:12, 15, 16, 19, 24, 25
**stocks** [6]
90:3; 93:24, 25; 94:1; 101:13,
15
**story** [1]
80:5
**Straight** [2]
8:25; 9:1
**strange** [3]
71:21, 24; 72:3
**Street** [2]

24:21; 139:20
**street** [2]
92:9; 135:21
**structure** [7]
11:19; 12:16; 16:11; 22:6;
24:16; 49:25; 56:7
**structured** [1]
24:4
**stuff** [5]
47:1; 111:15; 118:4; 135:12;
137:3
**stung** [2]
115:5, 6
**subject** [8]
30:3, 5, 25; 31:14; 35:24;
58:14; 63:7, 9
**subpoena** [4]
5:3, 4, 16, 19
**substance** [1]
76:11
**sudden** [2]
115:18; 117:13
**Suitability** [2]
36:22; 83:3
**suitability** [2]
82:18; 83:2
**suitable** [1]
37:6
**Suite** [1]
139:21
**Suki** [3]
57:17, 25; 58:16
**super-suitability** [4]
36:12; 37:4; 41:14, 17
**supervise** [8]
7:13, 17, 18, 22, 23; 8:3, 5;
82:15
**supervising** [1]
7:10
**supervisor** [1]
8:16
**supervisory** [4]
8:11; 17:3; 82:13; 84:6
**Supplemental** [1]
4:7
**support** [3]
92:4; 114:7, 18
**supporting** [2]
117:9, 18
**Suppose** [1]
100:3
**suppose** [2]
105:21; 127:19
**supposed** [1]
130:2
**surprise** [8]
79:20; 80:20; 81:5, 12; 97:5,
22; 98:6, 12
**surprised** [1]
129:23
**surprising** [2]
96:24; 130:11
**suspended** [1]
123:14
**suspension** [2]
96:13, 15
**suspicious** [2]
111:18; 112:3
**swear** [1]
140:10
**sweared** [1]

Six to sweared

**EXHIBIT** 2 **PAGE 60**

BSA
**TRANSCRIPT CONCORDANCE**
Look-See(49)

113:4
**switch** [3]
41:7; 75:24; 111:4
**switchboard** [1]
119:4
**sworn** [1]
3:6
**syndicate** [1]
52:13
**system** [4]
48:13, 24; 115:24; 116:1

**– T –**

**Tag** [1]
101:14
**takes** [2]
16:12; 108:13
**talk** [13]
19:22; 24:1, 9; 31:4; 52:23;
53:5; 66:19, 22; 67:11; 71:8;
81:4; 93:25; 106:12
**talked** [15]
26:4, 6; 44:8, 12; 61:8; 63:4;
67:13; 94:19; 119:18; 123:13;
124:9, 10, 11; 134:8; 136:18
**talking** [17]
12:4; 18:7; 29:2; 44:6; 53:4;
59:11; 62:24; 67:1; 84:15;
107:13, 14; 118:13; 127:13;
131:13; 134:23; 135:1;
137:13
**tally** [2]
33:19; 39:6
**tape** [2]
77:9, 13
**tapes** [1]
75:24
**target** [1]
19:5
**technicalities** [1]
88:3
**tecum** [2]
5:3, 4
**telling** [2]
28:13; 115:5
**Ten** [1]
38:14
**ten** [3]
94:25; 113:1; 118:19
**term** [4]
59:1; 93:2, 4; 94:13
**terminating** [1]
130:23
**terms** [4]
83:1; 120:1; 121:16; 122:7
**testified** [5]
3:7; 74:23, 25; 78:22; 125:1
**testify** [1]
125:1
**testimony** [5]
4:5; 80:1; 82:5; 138:13; 139:8
**thanks** [1]
86:18
**Thanksgiving** [1]
17:15
**theories** [1]
74:20
**There's** [1]
134:6
**there's** [13]

16:15; 21:16; 34:1; 45:25;
46:15; 78:2; 91:17, 19; 93:21;
106:24; 116:12; 121:7;
134:24
**thereof** [1]
120:1
**They're** [1]
60:23
**they're** [11]
31:21; 40:13; 63:1; 83:3, 6;
100:18; 122:21; 130:1, 2, 3;
138:9
**They've** [1]
118:23
**they've** [2]
36:4; 132:24
**think's** [1]
19:15
**thinking** [2]
101:12; 136:23
**third** [1]
5:2
**Thirty** [5]
21:25; 123:18, 20, 21, 22
**thirty** [2]
99:18; 123:23
**thirty-five** [1]
21:25
**thirty-two** [1]
99:18
**thousand** [18]
9:20; 34:11; 85:7; 94:25;
96:3; 98:10; 99:11; 105:22;
106:1; 113:1; 125:22, 24, 25;
126:23, 24; 127:2, 20
**threatened** [1]
134:13
**Three** [1]
123:19
**three** [12]
49:22; 98:10; 109:15; 120:19,
20, 22, 23, 25; 123:16, 23;
124:1; 130:24
**threes** [1]
124:7
**Thursday** [1]
65:3
**ticket** [3]
59:25; 83:10, 12
**tickets** [19]
46:20, 23, 24; 47:2, 4, 5, 8,
24; 48:8, 12, 16, 20; 83:12,
16, 17, 18; 115:7; 124:11
**times** [1]
41:12
**timing** [2]
27:8, 11
**title** [1]
13:1
**titles** [1]
10:11
**ton** [1]
107:23
**tons** [1]
110:23
**topic** [2]
119:15; 131:12
**torn** [1]
129:15
**total** [6]
32:24; 33:14, 17, 22; 117:21;

137:23
**totalled** [1]
33:12
**trade** [22]
26:20, 22, 24; 27:3, 6; 44:25;
45:14, 17; 50:7; 83:6; 85:10;
92:13; 107:2, 4, 22; 108:10;
112:18, 19, 23; 113:22;
127:9; 130:12
**traded** [1]
121:10
**Trader** [1]
16:23
**trader** [1]
113:22
**trades** [23]
37:5; 38:17, 23; 43:6, 9; 49:4;
78:16, 24; 79:10; 83:13;
105:9; 107:20, 24; 108:3;
115:22, 24; 116:1, 7, 8;
119:10; 124:9, 17, 23
**Trading** [2]
59:21; 62:20
**trading** [8]
7:11; 62:24; 64:6; 83:23;
92:13; 127:8, 11
**trained** [1]
88:10
**Trainer** [2]
14:22; 15:4
**training** [1]
84:7
**trains** [1]
15:6
**transaction** [2]
76:20, 23
**transactions** [5]
77:4, 10, 12, 19, 23
**transcript** [4]
139:6, 7, 12; 140:13
**transfer** [2]
85:20; 117:11
**transferred** [3]
9:23; 85:23; 118:7
**transfers** [1]
117:13
**transition** [1]
86:1
**trash** [3]
27:1; 87:16, 17
**trashed** [1]
87:15
**trouble** [6]
30:23; 55:5, 20, 25; 134:15;
135:14
**true** [10]
97:13, 17, 20, 25; 98:3;
102:16; 114:2; 136:20; 139:7;
140:13
**truly** [1]
91:8
**truth** [1]
85:19
**twelfth** [1]
68:16
**Twenty** [1]
99:11
**twenty** [1]
99:20
**twenty-eight** [1]
99:17

**twenty-one** [1]
99:20
**twos** [1]
124:7
**tying** [1]
90:1
**type** [13]
10:10; 36:4; 37:14, 15, 16;
56:24; 57:10; 64:4, 7; 82:20;
137:25
**types** [1]
106:14
**typical** [1]
65:22
**Typically** [1]
36:18
**typically** [11]
23:13; 72:24; 107:16, 19;
108:11; 111:9; 116:11;
121:18; 122:19, 21; 133:15

**– U –**

**U.S.** [2]
139:1; 140:11
**Uh-hum** [33]
7:3; 13:3; 20:9; 22:9; 28:13;
33:21; 34:12, 24; 38:10; 39:4;
44:23; 60:19; 62:1; 78:25;
82:17; 83:5, 8, 19; 87:11;
89:5, 19; 90:22; 91:7; 92:7;
95:9; 99:12; 103:18; 106:8;
109:25; 110:5; 118:25;
125:21; 127:1
**Uh-uh** [5]
14:11, 14; 19:10; 51:14;
67:19; 100:25; 119:9
**unable** [1]
80:21
**unauthorized** [1]
130:12
**unaware** [1]
5:23
**undersigned** [1]
140:10
**understand** [31]
7:21; 10:23, 25; 11:1; 14:20,
25; 15:25; 16:9, 22; 17:4;
32:9; 40:15; 48:8; 49:10;
50:1; 55:12; 58:16; 62:19;
69:1; 85:25; 94:8, 21; 95:23;
98:4; 100:2; 107:21; 118:11;
121:25; 123:8; 126:20;
127:19
**understanding** [22]
6:2; 11:15; 12:14; 17:16;
24:16; 28:2; 30:16; 31:25;
34:13; 48:24; 58:23, 25; 59:2;
64:13, 14; 65:17; 73:14;
87:24; 89:24; 92:18; 93:13,
17
**Understood** [1]
129:23
**understood** [5]
31:18; 73:7; 93:18; 128:13;
132:18
**underwriter** [4]
17:17; 59:8; 131:16; 132:11
**underwriting** [7]
17:22; 18:5, 13, 18; 19:23,
25; 55:8

**From switch to underwriting**

EXHIBIT 2 PAGE 61

BSA

**TRANSCRIPT CONCORDANCE**

Look-See(50)

unfair [1]
 101:2
United [1]
 3:17
unsolicited [1]
 137:16
upset [3]
 75:20, 22; 108:16
usual [1]
 72:10

**– V –**

vacation [1]
 16:13
vague [1]
 22:3
value [3]
 27:14; 64:9; 75:7
variety [1]
 75:4
vast [3]
 96:21; 97:18, 22
Velma [1]
 81:9
verified [2]
 32:13; 39:19
verify [5]
 35:1; 40:2, 17; 47:3; 125:15
view [1]
 64:3
violations [4]
 3:19, 22; 28:10, 14
visited [2]
 37:20, 25
voice [3]
 110:18, 20, 22
volume [1]
 99:15

**– W –**

Wait [2]
 102:2; 104:19
wait [3]
 27:15; 96:25; 129:14
waiting [1]
 27:16
Waldron [84]
 6:3, 23, 25; 7:4; 8:15, 22;
 10:6, 24; 11:19, 23, 25;
 13:11, 25; 14:21; 16:1, 22;
 17:17; 18:4, 8; 19:21; 20:10;
 29:11, 15, 23; 30:25; 31:5;
 32:3; 35:9; 36:6, 24; 37:8;
 38:17; 49:3; 52:5, 6; 53:9;
 54:1, 6; 55:5, 12, 19, 21;
 56:3, 20; 58:3; 59:18; 60:5;
 62:16, 17; 63:21; 65:4, 20;
 66:16; 67:3; 68:9; 69:10;
 70:5, 9, 10, 16; 71:22; 73:7,
 16; 74:14; 75:9; 77:18, 22;
 84:15, 21; 85:15; 86:3, 16,
 22; 94:20, 21; 95:4; 96:22;
 98:11; 114:14; 122:1; 123:11;
 134:19, 25; 135:1
Waldron's [14]
 5:23; 13:2; 15:7, 19; 18:11;
 20:4; 29:24; 49:10; 66:3;
 67:8; 78:15; 97:18, 23;
 103:11
walk [1]

40:22
Wall [1]
 24:21
wanted [17]
 27:20, 22; 35:2; 36:18; 51:11;
 53:22; 55:22; 64:18; 69:2;
 80:22; 81:6, 14; 88:9; 104:12;
 119:1, 2; 125:18
warnings [1]
 134:10
warrants [9]
 9:19, 21; 10:1; 56:18, 20, 24;
 57:3, 10, 15
Washington [1]
 139:22
we'll [5]
 19:5; 104:11; 108:7; 112:15,
 17
We're [2]
 3:2; 76:19
we're [7]
 29:2; 48:13; 51:8; 83:22;
 90:19; 126:9; 127:7
we've [2]
 58:19; 114:21
web [3]
 37:20, 25; 66:11
Wedbush [20]
 38:22; 39:3, 5, 9; 40:11, 16,
 23; 41:1, 2, 4, 21; 44:5, 9, 12;
 46:1; 49:3; 125:2, 3, 9
Wednesday [2]
 3:2; 139:8
week [3]
 74:4; 96:9; 136:1
weeks [5]
 19:25; 23:20; 103:3; 109:15;
 131:6
weren't [7]
 37:6; 40:14; 101:25; 102:9;
 103:8; 116:20; 127:23
What's [8]
 57:19; 90:14; 99:13; 100:13;
 111:16; 116:23; 123:16;
 135:11
what's [14]
 4:24; 9:2; 32:9; 42:6; 46:5;
 50:1; 57:22; 64:25; 106:2;
 107:17; 111:13, 24; 122:20;
 123:24
whenever [1]
 89:24
Where's [1]
 92:24
Whereupon [3]
 3:4; 5:8; 138:13
wherever [1]
 15:24
who's [3]
 12:8; 110:8; 137:4
William [3]
 43:12, 14; 54:24
Wilshire [1]
 139:9
wire [4]
 67:4, 5; 68:18; 112:15
WITNESS [12]
 50:11; 81:17; 102:17; 114:23;
 117:1; 118:2; 134:12; 135:25;
 136:6, 13; 138:5, 9
Witness [1]

140:4
witness [6]
 3:6; 5:21; 6:2; 81:16; 97:12
woman [1]
 109:2
wondered [1]
 73:12
wondering [2]
 60:1; 70:14
word [2]
 80:2; 128:10
words [3]
 87:25; 124:18
work [21]
 10:6; 13:7; 15:19; 19:18;
 42:2; 52:1; 74:9, 14; 85:11,
 17; 98:19, 21; 108:7; 111:1;
 128:3, 19; 129:4, 8; 130:19,
 21; 135:5
worked [2]
 10:11; 137:1
working [3]
 10:8; 29:4, 8
works [2]
 15:20; 16:11
world [1]
 135:15
worth [4]
 36:9, 15; 82:20; 90:4
wouldn't [3]
 52:11; 56:23; 98:22
wow [2]
 104:10; 105:9
write [3]
 73:24; 79:17; 88:11
writing [2]
 88:13, 15
written [4]
 26:13; 122:7; 134:18; 136:7
wrong [4]
 71:7, 14; 90:14; 124:13
wrote [3]
 63:21; 64:13, 15

**– Y –**

Yahoo [2]
 65:2, 8
yank [1]
 121:6
yanked [1]
 41:18
Yeah [59]
 10:16; 11:14; 13:18; 23:25;
 28:20; 29:10; 33:10, 24; 37:2;
 38:13; 41:8; 47:13, 16; 50:12;
 54:15; 63:24; 65:16; 66:21;
 71:19; 73:20; 74:16; 83:21;
 84:13, 25; 85:5; 88:18; 89:18;
 92:15; 93:24; 94:22; 96:14,
 16; 102:15, 21; 103:5;
 104:15; 105:2, 25; 108:25;
 109:11, 12, 15; 111:6; 114:2,
 23; 115:23; 117:21; 120:14;
 121:1, 3, 13; 124:3; 125:19;
 126:7; 129:11; 130:16;
 132:20
yeah [14]
 20:14; 24:10; 36:15; 74:7;
 81:21; 95:1; 96:16; 105:10,
 15; 115:13; 125:7; 132:19;

135:5
year [1]
 9:15
year-end [1]
 9:11
yelled [1]
 113:3
York [8]
 108:5; 109:4; 110:14, 15, 16;
 111:24; 116:5
you'd [3]
 9:2; 107:4; 134:3
you'll [2]
 6:1; 72:18
you've [11]
 5:6; 14:13; 41:11; 57:14;
 65:7; 83:1; 120:4; 123:17, 25;
 127:14; 134:4
yours [1]
 54:8
yourself [5]
 49:7; 57:4, 13; 90:1; 135:14

unfair to yourself

**EXHIBIT 2 PAGE 62**