Leslie Schwaebe Akins (SBN 138678)
LESLIE SCHWAEBE AKINS, A LAW CORPORATION
7157 Argonauta Way
Carlsbad, CA 92009
Tel: 760-931-2920
Fax: 760-603-0547

Attorney for Plaintiff,
Alfonso Fiero

# UNITED STATES BANKRUPTCY COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re | CASE NO. LA 01-26497-BB |
| CERY BRADLEY PERLE, | [Chapter 7] |
| Debtor. | Adv. No.: ADV-06-01971-BB |
| | The Honorable S. Bluebond - 626 |
| ALFONSO FIERO, | **EXHIBIT 3 TO THE AFFIDAVIT OF GREGORY C. GLYNN FILED IN SUPPORT OF PLAINTIFF ALFONSO FIERO'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiff, | |
| vs. | |
| CERY BRADLEY PERLE, | |
| Defendant. | |
| | **DATE: November 10, 2009** **TIME:  2:00 p.m.** **CTRM: 1475** |
| | DATE FILED: September 13, 2006 DISCOVERY CUT OFF: July 31, 2009 TRIAL DATE: None set |

/ / /

/ / /

/ / /

/ / /

/ / /

EXHIBIT 3 TO THE AFFIDAVIT OF GREGORY C. GLYNN

1

# EXHIBIT 3

# UNITED STATES **FILE COPY**

# SECURITIES AND EXCHANGE COMMISSION

=======================================================

In the Matter of:                              )
                                               )
SHOPPING.COM                                   )          File No. LA-919

Witness: **GEORGIA PATRICIA FRENCH**

RECEIVED SEC
1998 JUN -3 AM 11:40
PRO

_Condensed Transcript & Key Word Index_

PAGES: 1 through 49

PLACE: Los Angeles, California

DATE:   May 27, 1998

=======================================================

# BAYLEY REPORTING, INC.
## *OFFICIAL FEDERAL REPORTERS*

| New York | Washington, DC | Tampa, FL |
|---|---|---|
| (914) 337-3376 | (202) 234-7787 | (813) 225-3050 |

EXHIBIT 3 PAGE 63

## Page 1

```
( 1 )        UNITED STATES SECURITIES AND EXCHANGE COMMISSION
        In the Matter of:                    )
( 2 )                                         )
     SHOPPING.COM                             )
( 3 )                                         )    File No. LA-919
                                                   Wednesday
                                                   May 27, 1998
( 4 )                                              Securities and Exchange
                                                   Commission
( 5 )                                              Pacific Regional Office
                                                   5670 Wilshire Blvd.
( 6 )                                              Los Angeles, CA 90036
( 7 )        The above-entitled matter came on for hearing,
( 8 )   pursuant to notice, at 2:00 p.m.
( 9 )        APPEARANCES:
(10)         On behalf of the Securities & Exchange Commission:
(11)         DENNIS K. ARNOLD, ESQ.
(12)         Senior Counsel
(13)         Office of Enforcement
(14)         Securities and Exchange Commission
(15)         5670 Wilshire Blvd.
(16)         11th Floor
(17)         Los Angeles, California 90036
(18)         (213) 965-3852
(19)         On behalf of the Witness:
(20)         GREGORY J. SHERWIN, ESQ.
(21)         Fields, Fehn & Sherwin
(22)         11755 Wilshire Blvd.
(23)         15th Floor
(24)         Los Angeles, California 90025
(25)         (310) 463-6338
```

## Page 2

```
( 1 ) EXHIBITS:            PAGE    DESCRIPTION
( 2 ) 42                   5       Subpoena Duces Tecum with
( 3 )                                cover letter
( 4 )        Bayley Reporting, Inc.
( 5 )
( 6 )
( 7 )
( 8 )
( 9 )
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 3

(1)   **P R O C E E D I N G S**

(2)   (2:13 P.M.)

(3)   MR. ARNOLD:   We're on the record at 2:13 p.m. on

(4)   Wednesday, May 27, 1998. Would you raise your right hand

(5)   please?

(6)   Whereupon,

(7)   GEORGIA FRENCH

(8)   having been first duly sworn, was called as a

(9)   witness herein, and was examined and testified as follows:

(10)  EXAMINATION

(11)  BY MR. ARNOLD:

(12)  Q   Would you please state and spell your full name

(13)  for the record?

(14)  A   Georgia G-E-O-R-G-I-A Patricia P-A-T-R-I-C-I-A

(15)  French F-R-E-N-C-H.

(16)  Q   Okay, my name is Dennis Arnold and with me today

(17)  is Solomon Mangolini. We are both Officers of the

(18)  Commission for the purposes of this proceeding. This is an

(19)  investigation by the United States Securities and Exchange

(20)  Commission in the matter of Shopping.com, Case No. LA-919 to

(21)  determine whether there have been violations of certain

(22)  provisions of the federal securities laws. However, the

(23)  facts developed in this investigation might constitute

(24)  violations of other federal or state, civil or criminal

(25)  laws. Ms. French, prior to the opening of the record today

## Page 4

(1)   you were provided with the Commission's Formal Order of

(2)   Investigation. Have you had an opportunity to review the

(3)   Formal Order?

(4)   A   Yes, I have.

(5)   Q   Okay. It will be available for your review

(6)   throughout your testimony today. Also, prior to the opening

(7)   of the record you were provided with the Commission's

(8)   Supplemental Information Form which was marked as Exhibit

(9)   number 1. Have you had an opportunity to read Exhibit

(10)  number 1?

(11)  A   Yes, sir.

(12)  Q   Do you have any questions about it?

(13)  A   No.

(14)  Q   Are you represented by counsel today?

(15)  A   Yes.

(16)  MR. ARNOLD:   Would counsel identify himself for

(17)  the record?

(18)  MR. SHERWIN:   Gregory Sherwin of Fields, Fehn &

(19)  Sherwin.

(20)  MR. ARNOLD:   And you are representing Ms. French

(21)  today?

(22)  MR. SHERWIN:   I am.

(23)  BY MR. ARNOLD:

(24)  Q   And, I'm also showing you what has been marked as

(25)  Exhibit number 42. This is a five-page document. The first

EXHIBIT 3 PAGE 64

## Page 5

(1)  two pages are a cover letter dated April 24, 1998 and
(2)  addressed to Georgia French care of Gregory J. Sherwin. The
(3)  third page is a Subpoena Duces Tecum, again addressed to
(4)  Georgia French care of Gregory J. Sherwin and the last two
(5)  pages are an attachment to the Subpoena Duces Tecum.
(6)      (The document referred to was
(7)  marked for identification as
(8)  Exhibit 42.)
(9)  Would you take a look at Exhibit number 42 and
(10) tell me if you've seen that before?
(11)    A    No sir.
(12)    Q    You have not, okay. Did you have an opportunity
(13) to read that before we started today?
(14)    A    No.
(15)    Q    Do you want to take a few minutes to read that?
(16)    MR. ARNOLD:    We'll go off the record at 2:15.
(17)    MR. ARNOLD:    We're back on the record at 2:17.
(18)    BY MR. ARNOLD:
(19)    Q    Have you had an opportunity to read Exhibit number
(20) 42?
(21)    A    Okay. Yes.
(22)    MR. ARNOLD:    Counsel, can we have an agreement
(23) as we did this morning that any responsive documents will be
(24) produced to us as soon as possible?
(25)    MR. SHERWIN:    Yes. I think the only thing that

## Page 6

(1)  would be produced would be the -- she has an account
(2)  statement at Waldron which I think you already have in which
(3)  there is some IBUY stock. So, if you don't have it then
(4)  we'll certainly produce that.
(5)    MR. ARNOLD:    Okay.
(6)    BY MR. ARNOLD:
(7)    Q    Could we get your current residential address and
(8)  phone number please?
(9)    A    Yes. 967 Scottland S-C-O-T-T-L-A-N-D Drive, Mt.
(10) Pleasant, South Carolina 29464.
(11)    Q    Do you have any other residences?
(12)    A    No.
(13)    Q    Okay. Can we get your current business address
(14) and phone?
(15)    A    Yes. 288 Meeting Street, 2nd Floor, Charleston,
(16) South Carolina 29401.
(17)    Q    And the phone?
(18)    A    (803) 958-0001 and my residence is (803) 881-4969.
(19)    Q    And where are you currently employed?
(20)    A    Waldron & Company.
(21)    Q    And that's in it's South Carolina branch office?
(22)    A    Yes.
(23)    Q    Do you work in any of the other offices?
(24)    A    Yes.
(25)    Q    Which ones?

## Page 7

(1)    A    The Irvine branch.
(2)    Q    Okay and how much of your time is spent in the
(3)  Irvine branch?
(4)    A    As much as necessary.
(5)    Q    During the last year approximately how much --
(6)  what percentage of your time would you estimate?
(7)    A    40%.
(8)    Q    40%, okay. How long have you been with Waldron?
(9)    A    Since mid-July.
(10)    Q    Of 1997?
(11)    A    1997.
(12)    Q    And what is your position with Waldron?
(13)    A    I'm the Managing Director of Retail Sales.
(14)    Q    Have you had any positions with Waldron?
(15)    A    No, sir.
(16)    Q    What are your duties in that job?
(17)    A    Numerous.
(18)    Q    Can you list them for me?
(19)    A    There's --
(20)    Q    As best you can.
(21)    A    Okay. I manage pretty much all the retail aspects
(22) of Waldron, the training of the brokers, just brokers in
(23) general and their activity.
(24)    Q    Are you sort of like a national sales manager?
(25)    A    Yes.

## Page 8

(1)    Q    Anything other than being involved with the sales
(2)  side of Waldron, do you have any other responsibilities?
(3)    A    No, sir.
(4)    Q    Who do you report to at Waldron?
(5)    A    Mr. Perle.
(6)    Q    Okay. Is there anyone else that you report to?
(7)    A    No.
(8)    Q    Okay. Other than sales personnel at Waldron, is
(9)  there anybody else that you would supervise at Waldron?
(10)    A    No.
(11)    Q    How many people work in Waldron's South Carolina
(12) office?
(13)    A    Brokers or entire staff?
(14)    Q    Entire staff.
(15)    A    Ten.
(16)    Q    And out of that ten, how many are brokers?
(17)    A    Six.
(18)    Q    Okay. How did Waldron come to have an office in
(19) South Carolina?
(20)    A    That's where I reside and so, I did not want to
(21) move.
(22)    Q    Okay. So, this was just a convenience for you?
(23)    A    Yes.
(24)    Q    Okay, I wanted to talk to you a little bit today
(25) about the IPO for Shopping.com. Do you know how Waldron

EXHIBIT 3 PAGE 65

## Page 9

(1) came to be the underwriter for this IPO?

(2) A   No.

(3) Q   Did you have any involvement in preparing the

(4) registration statement?

(5) A   No.

(6) Q   Do you know who at Waldron if anybody, did?

(7) A   No.

(8) Q   Did you ever talk to anyone about anything

(9) relating to the registration statement?

(10) A   No.

(11) Q   Was there some sort of a reverse stock split for

(12) Shopping.com prior to the IPO?

(13) A   I don't know.

(14) Q   Do you know whether Waldron purchased any computer

(15) equipment from Shopping.com?

(16) A   Yes.

(17) Q   And what do you know about that?

(18) A   The computer equipment for the Charleston, South

(19) Carolina branch was purchased through Shopping.com.

(20) Q   And approximately when was that?

(21) A   July or August '97.

(22) Q   Do you know whether there was any other computer

(23) equipment purchased by Waldron from Shopping.com?

(24) A   I don't know.

(25) Q   Do you know the name Ed Harris?

## Page 10

(1) A   Yes.

(2) Q   Who's Ed Harris?

(3) A   One of the firm's partners.

(4) Q   And how do you know he's one of the firm's

(5) partners?

(6) A   That's what I was told when I came to work at

(7) Waldron.

(8) Q   And who told you that?

(9) A   Mr. Perle.

(10) Q   Did he tell you anything else about Mr. Harris?

(11) A   No.

(12) Q   Do you know the name John Aubry?

(13) A   Yes.

(14) Q   Who is that?

(15) A   Another partner of the firm's.

(16) Q   And did you also learn about him from Mr. Perle?

(17) A   Yes.

(18) Q   What did he tell you about Mr. Aubry?

(19) A   Nothing else.

(20) Q   Do you know whether Mr. Perle ever loaned any

(21) money to Shopping.com?

(22) A   Don't know.

(23) Q   Do you know whether Mr. Harris ever did?

(24) A   Don't know.

(25) Q   How about Mr. Long?

## Page 11

(1) A   Don't know.

(2) Q   Okay.

(3) MR. SHERWIN:   Can we take a break for a second?

(4) MR. ARNOLD:   Off the record

(5) MR. ARNOLD:   We're back on the record at 2:24.

(6) BY MR. ARNOLD:

(7) Q   Do you know who at Waldron was involved in helping

(8) Shopping.com prepare the registration statement for the IPO?

(9) A   No, I don't.

(10) Q   Did you ever see any drafts of the registration

(11) statement?

(12) A   No, sir.

(13) Q   That would include any drafts of the prospectus?

(14) A   No.

(15) Q   For the IPO of Shopping.com how did Waldron

(16) determine which clients would be solicited to find out if

(17) they were interested in buying the stock?

(18) A   Could you rephrase that, I'm sorry.

(19) Q   Were all the clients called or were there certain

(20) criteria used to determine which clients would be solicited?

(21) How did that work?

(22) A   Clients were solicited based on suitability.

(23) Q   Okay. And, what were the suitability terms?

(24) A   The suitability terms were super suitability for

(25) the State of California and whatever other states applied to

## Page 12

(1) that.

(2) Q   Any other criteria?

(3) A   Not that I'm aware of, no.

(4) Q   Can you tell me what your understanding is of what

(5) an indication of interest is?

(6) A   What my understanding is?

(7) Q   Right.

(8) A   Contacting prospective people that would be

(9) interested in purchasing new issue stock that would be

(10) suitable for that particular investment and asking them if

(11) they would be interested in participating in an initial

(12) public offering of that such company.

(13) Q   Were there indications of interest for the

(14) Shopping.com IPO?

(15) A   Yes.

(16) Q   And how do you know that?

(17) A   There were forms that were filled out by each

(18) individual broker indicating the customer's name that was

(19) interested in participating.

(20) Q   Now did you see indications of interest for all of

(21) the Waldron offices?

(22) A   Yes, sir.

(23) Q   Do you remember approximately what the total

(24) number of shares were that were covered by the indications

(25) of interest?

EXHIBIT 3 PAGE 66

## Page 13

(1) A   I don't remember.

(2) Q   Do you remember whether the indications of

(3) interest were collectively large enough so that all of the

(4) shares would be sold if all of the indications of interest

(5) were acted on?

(6) A   I wouldn't remember.

(7) Q   Were you at the Irvine office on the date of the

(8) IPO, November 25th?

(9) A   Yes, sir.

(10) Q   Okay. How did the actual trades get processed for

(11) the IPO? Do you have an understanding of that?

(12) A   No.

(13) Q   Do you know who handled that at Waldron?

(14) A   Lainie Koch.

(15) Q   How do you know it was Lainie Koch?

(16) A   Because she told me she was responsible for that

(17) area.

(18) Q   Were the clients who had indicated their interest

(19) in the offering, were they contacted before the IPO to find

(20) out if they actually wanted to place an order?

(21) A   I don't understand your question.

(22) Q   Well, in other words, as I understand it, Waldron

(23) has lists of clients who have given their indications of

(24) interest, but an indication of interest isn't a firm order.

(25) A   That is correct.

## Page 14

(1) Q   Okay, so, when the IPO is ready to go on the 25th

(2) of November, had the brokers called the clients to find out

(3) do you definitely want this stock, did that occur or not?

(4) A   An indication of interest was originally collected

(5) when we started taking indications of interest we were told

(6) to go ahead and do that. Indications of interest were again

(7) taken when Shopping.com was not going to be listed and it

(8) was going to go bulletin board.

(9) Q   Right.

(10) A   So, we redid our indications of interest again

(11) because some people fell out.

(12) Q   Right.

(13) A   And then the date that Shopping.com became

(14) effective after the effective time all clients were

(15) contacted again and told that this was the time it went

(16) effective and orders were confirmed.

(17) Q   Okay. I guess my question is in the sequence of

(18) events are the customers being placed into the stock on the

(19) date of the IPO before or after they're called to confirm

(20) their order?

(21) A   After they're called.

(22) Q   Okay. Are there any instances that you know of

(23) where customers were placed into the stock before they had

(24) been called?

(25) A   I'm not aware of that.

## Page 15

(1) Q   Was Wedbush Morgan somehow involved in processing

(2) the IPO trades?

(3) A   I don't know.

(4) Q   Do you know whether Mr. Perle purchased any shares

(5) of the IPO?

(6) A   I don't know.

(7) Q   Do you know whether Ed Harris did?

(8) A   I don't know.

(9) Q   Do you know whether John Aubry did?

(10) A   I don't know.

(11) Q   Do you know the name William Long?

(12) A   I've hear the name.

(13) Q   And where have you heard the name William Long?

(14) A   When the NASD asked me to pull his file.

(15) Q   Had you heard it before that?

(16) A   No, sir.

(17) Q   Do you happen to know whether he purchased any

(18) shares in the IPO?

(19) A   No, I don't know.

(20) Q   Do you know the name Art Granito?

(21) A   No, sir.

(22) Q   Stan Leland?

(23) A   Heard the name.

(24) Q   Where have you heard the name?

(25) A   Also the NASD requested that name to be pulled.

## Page 16

(1) Q   Okay, but you hadn't heard it before then?

(2) A   No, sir.

(3) Q   For the IPO, when were the order tickets prepared?

(4) A   I don't remember.

(5) Q   Was it on the date of the IPO or some other time?

(6) A   I don't remember.

(7) Q   Do you remember reviewing any of the IPO order

(8) tickets for any reason?

(9) A   No, sir.

(10) Q   Was there a penalty bid used in connection with

(11) the IPO?

(12) A   Yes.

(13) Q   And how do you know there was a penalty bid?

(14) A   Because I was told there was one.

(15) Q   Okay, and who told you that?

(16) A   Mr. Perle.

(17) Q   What did he say to you?

(18) A   That there was a penalty bid in effect.

(19) Q   Okay. Did he tell you what the terms of the

(20) penalty bid were?

(21) A   No, he did not.

(22) Q   Did you ever see any documents explaining what the

(23) terms were?

(24) A   No, sir.

(25) Q   Were any of the brokers in the South Carolina

EXHIBIT 3 PAGE 67

Page 17

(1) office told about the penalty bid?

(2) A At the time I only had one broker.

(3) Q Okay.

(4) A And yes, he was informed.

(5) Q Okay, by who?

(6) A By myself.

(7) Q Okay, what did you tell the broker?

(8) A That there was a penalty bid.

(9) Q Do you know the term of the penalty bid? How long

(10) it was supposed to be in place?

(11) A I believe it was ninety days.

(12) Q Okay. And, do you have an understanding of what

(13) the purpose was for the penalty bid for this IPO?

(14) A No.

(15) Q Did you ever ask?

(16) A No.

(17) Q For the brokers selling Shopping.com stock in the

(18) IPO and even in the months after the IPO, were there any

(19) sales scripts used?

(20) A No, sir.

(21) Q And, why do you believe there weren't any sales

(22) scripts used?

(23) A Because I won't allow them.

(24) Q Were there any lists of bullet points used to help

(25) them sell a stock?

Page 18

(1) A Yes, sir.

(2) Q What can you tell me about that?

(3) A The list of bullet points was derived by the

(4) corporate finance department.

(5) Q And who in corporate finance?

(6) A Mr. Jack Meyers.

(7) Q How do you know that came from corporate finance?

(8) A Because he gave it to me.

(9) Q Okay and when was that?

(10) A Some time between the new issue went public and

(11) the time that we started soliciting indications of interest.

(12) Q Okay. How long was this document with the bullet

(13) points, how many pages?

(14) A One page.

(15) Q Approximately how many bullet points, do you

(16) recall?

(17) A I don't remember.

(18) Q Do you remember what any of the bullet points

(19) were?

(20) A No sir.

(21) Q Did you discuss the bullet point document with Mr.

(22) Meyers?

(23) A I don't remember.

(24) Q Okay. What did you do with the bullet point

(25) document after you received it from Mr. Meyers?

Page 19

(1) A Made photocopies and handed it to the brokers.

(2) Q Okay. This was in Irvine?

(3) A Yes.

(4) Q Okay. Did you send the bullet point document to

(5) any of the other offices?

(6) A I sent it to the South Carolina branch.

(7) Q How about any of the other Waldron offices?

(8) A No.

(9) Q Okay. Why only Irvine and South Carolina?

(10) A Those are my responsibility.

(11) Q But you don't oversee for instance, San Francisco?

(12) A Not as of yet.

(13) Q Who oversees that office?

(14) A Mr. Joe Gerace is the branch manager.

(15) Q Was the L.A. office still open at that time?

(16) A Yes, sir.

(17) Q Did you oversee that office at that time?

(18) A No sir.

(19) Q Is there some reason that your responsibilities

(20) were limited to just two offices at that time?

(21) A That's all I can handle.

(22) Q Was there any other reason?

(23) A No.

(24) Q So, who was it within Waldron that was performing

(25) your responsibilities or responsibilities similar to yours

Page 20

(1) at the offices that you didn't oversee?

(2) A In the San Francisco branch it was Joe Gerace

(3) who's the branch manager.

(4) Q Right.

(5) A And, as far as Los Angeles is concerned, I don't

(6) remember.

(7) Q Okay. Keevin Gillespie's the branch manager in

(8) Irvine, correct?

(9) A Yes, sir.

(10) Q And, does he report to you?

(11) A Yes.

(12) Q Okay. Were there any meetings of the brokers to

(13) discuss the IPO?

(14) A Yes.

(15) Q When was that?

(16) A Throughout the course.

(17) Q Okay. Do you remember approximately how many

(18) there were?

(19) A I don't remember.

(20) Q Less than five?

(21) A More.

(22) Q More than ten?

(23) A I don't remember the exact number but I know that

(24) there were many.

(25) Q What do you recall occurring at these meetings?

EXHIBIT 3 PAGE 68

CONDENSED TRANSCRIPT

## Page 21

(1) A    The meetings that I held for the brokers were
(2) discussing the bullet points of the company, how indications
(3) of interest should be taken, suitability, who in effect
(4) qualifies for a new issue and who doesn't based on
(5) suitability, how the risks need to be disclosed during the
(6) presentation that prospectuses or red herrings need to be
(7) sent out to all people that you are discussing it with
(8) regardless of whether they indicate or not, how indications
(9) of interest should be taken, the form that was going to be
(10) used for the indications of interest, if changes were to be
(11) made who should they be reported to, I mean, a variety of
(12) things were discussed in the meetings.
(13) Q    So, this is more the mechanics of what the broker
(14) should do?
(15) A    Yes.
(16) Q    Were there any meetings with personnel from
(17) Shopping.com?
(18) A    One meeting.
(19) Q    Approximately when was that?
(20) A    It was prior to the new issue.
(21) Q    Do you remember approximately when?
(22) A    No.
(23) Q    Is there any way you can narrow it down, was it a
(24) couple of weeks before the IPO or a month or any way you can
(25) narrow it down for me?

## Page 22

(1) A    Probably a few weeks.
(2) Q    And this was at the Irvine office?
(3) A    Yes.
(4) Q    And what do you recall occurring at this meeting?
(5) A    It was just a presentation to the brokers.
(6) Q    Who was making the presentation?
(7) A    I don't remember.
(8) Q    Was it someone from Shopping.com?
(9) A    Yes.
(10) Q    Was there anyone from Waldron that spoke at this
(11) meeting?
(12) A    No.
(13) Q    Who from Waldron was there other than the brokers?
(14) A    Myself.
(15) Q    Who else?
(16) A    I don't remember.
(17) Q    Okay, was Mr. Perle there?
(18) A    I don't remember if he was there or not.
(19) Q    How about Mr. Meyers?
(20) A    Yes, he was there.
(21) Q    Okay. And Lanie Koch?
(22) A    Yes.
(23) Q    Okay. Mr. Gillespie?
(24) A    Yes.
(25) Q    Are there any instances that you're aware of where

## Page 23

(1) salesmen were told their jobs would be in jeopardy if they
(2) didn't sell Shopping.com stock?
(3) A    I'm not aware of any incidents.
(4) Q    Do you know of any instances where brokers at
(5) Waldron were fired because they didn't sell Shopping.com
(6) stock?
(7) A    No.
(8) Q    Do you know any instances where brokers were told
(9) to discourage clients from reselling Shopping.com stock?
(10) A    No.
(11) Q    Do you know of any instances where brokers were
(12) told to find a home for Shopping.com stock if a client
(13) really wanted to sell by placing the stock into another
(14) client's account?
(15) A    No.
(16) Q    Do you know the name Fiero Brothers?
(17) A    Yes.
(18) Q    What is Fiero Brothers?
(19) A    They are a group of traders out of New York.
(20) Q    And how do you know they're a group of traders out
(21) of New York?
(22) A    Just being in the industry you just know who they
(23) are.
(24) Q    Do you know whether anyone at Waldron ever
(25) communicated with the Fiero Brothers?

## Page 24

(1) A    No, I don't know.
(2) Q    Do you know whether the Fiero Brothers ever traded
(3) any Shopping.com stock?
(4) A    Yes.
(5) Q    What do you know about that?
(6) A    I can see it on my Bloomberg.
(7) Q    Okay. During what period of time do you remember
(8) seeing it on your Bloomberg?
(9) A    I don't remember.
(10) Q    And, did you ever talk to Mr. Perle about Fiero
(11) Brothers?
(12) A    In passing.
(13) Q    Okay. What do you recall in passing?
(14) A    Just that they were shorting our stock.
(15) Q    How could you tell they were shorting?
(16) A    I can't.
(17) Q    How did you know they were shorting?
(18) A    Because I was told they were.
(19) Q    By whom?
(20) A    By Mr. Perle.
(21) Q    Did he tell you how he knew they were shorting?
(22) A    No.
(23) Q    Did you ask?
(24) A    No.
(25) Q    Do you have any understanding as to why

**EXHIBIT 3 PAGE 69**

## Page 25

(1) Shopping.com stock rose from its IPO price of about $9.00
(2) all the way up to about $32.00 in the course of several
(3) months?
(4)     A   No.
(5)     Q   Do you know who at Waldron was placing bid prices
(6) for the stock?
(7)     A   No.
(8)     Q   Do you know whether Mr. Perle ever instructed Mr.
(9) Oudt to raise the bid price for the stock?
(10)    A   No.
(11)    Q   Do you know the name Kensington Capital Corp.?
(12)    A   No.
(13)    Q   Do you know a brokerage firm L.T. Lawrence?
(14)    A   Yes.
(15)    Q   What is that?
(16)    A   It's a brokerage firm out of New York.
(17)    Q   Okay. Do you know whether this L.T. Lawrence firm
(18) traded any Shopping.com stock?
(19)    A   I don't know that.
(20)    Q   Do you know whether Mr. Perle is acquainted with
(21) anybody at L.T. Lawrence?
(22)    A   I don't know.
(23)    Q   Do you know the name of a brokerage firm that has
(24) the word Quantum in its name?
(25)    A   No.

## Page 26

(1)    Q   Did you ever see Mr. Perle with any documents that
(2) were lists of firms that held positions of Shopping.com
(3) stock?
(4)    A   No.
(5)    Q   Did he ever make any statements to you that he had
(6) gotten some documents from the depository trust company
(7) showing which brokerage firms had positions in Shopping.com
(8) stock?
(9)    A   No.
(10)    Q   Did he ever make any statements to you that he had
(11) received documents from Shopping.com showing firms that had
(12) positions in Shopping.com stock?
(13)    A   No.
(14)    Q   Do you know the names of any other brokerage firms
(15) that were involved in the underwriting?
(16)    A   I don't remember.
(17)    Q   How much of the IPO was allocated to the South
(18) Carolina office?
(19)    A   I don't know the exact number.
(20)    Q   Can you give me an approximate number?
(21)    A   About 25 to 30 thousand shares.
(22)    Q   Okay. Were they all sold?
(23)    A   Yes.
(24)    Q   Okay. How is your annual compensation determined?
(25) Is it salary or commission or something else?

## Page 27

(1)    A   It's both.
(2)    Q   Can you tell me what the terms are?
(3)    A   Yes. I have a salary. Do you want to know the
(4) amount?
(5)    Q   Yes.
(6)    A   $60,000.00 a year salary. I get a 2 1/2% override
(7) on product from the Irvine branch and the South Carolina
(8) branch and then I receive a 60% payout on my gross
(9) commissions from my production, my individual production.
(10)    Q   Okay. Anything else? Year-end bonuses, profit
(11) sharing anything like that?
(12)    A   There's no set -- there's nothing in writing.
(13) there's nothing concrete. I mean, if I got a bonus then I
(14) would get a bonus but there's nothing in writing that says
(15) that I get one.
(16)    Q   Did you get one for the year 1997?
(17)    A   No, sir.
(18)    Q   Did you receive any Shopping.com warrants?
(19)    A   Yes, sir.
(20)    Q   How many?
(21)    A   5,000.
(22)    Q   And what did you do with the warrants?
(23)    A   I just have a paper that says I get them.
(24)    Q   Okay. You haven't sold them or transferred them
(25) to anybody else?

## Page 28

(1)    A   No.
(2)    Q   Have you purchased or sold any Shopping.com stock?
(3)    A   Personally?
(4)    Q   Yeah.
(5)    A   For my clients or for myself?
(6)    Q   Just for yourself.
(7)    A   Yes.
(8)    Q   When was that?
(9)    A   I purchased it, I don't know the date.
(10)    Q   Do you recall approximately when it was?
(11)    A   No.
(12)    Q   I take it, it was after the IPO?
(13)    A   Yes.
(14)    Q   Okay. Do you recall approximately how many
(15) shares?
(16)    A   500.
(17)    Q   This was 500 purchased?
(18)    A   Yes.
(19)    Q   Do you still hold those?
(20)    A   Yes.
(21)    Q   Okay. Any other transactions?
(22)    A   No.
(23)    Q   Do you have any understanding of what Shopping.com
(24) planned to do with the proceeds of the IPO?
(25)    A   Yes.

EXHIBIT 3 PAGE 70

Page 29

(1)  Q   What was that?

(2)  A   Just continuing business.

(3)  Q   And why do you think it was just continuing
(4)  business?

(5)  A   Because the company didn't have – the cash was to
(6)  continue their business.

(7)  Q   Do you know of any plan by Waldron to keep the
(8)  price of Shopping.com above the IPO price a few months after
(9)  the IPO?

(10) A   No.

(11) Q   Did you ever hear anyone discuss that?

(12) A   No.

(13) Q   Could you tell me what your understanding is of
(14) the term "buy-in?"

(15) A   I wouldn't be accurate.

(16) Q   Do you know what a "short squeeze" is?

(17) A   I wouldn't be accurate on that either.

(18) Q   Did you ever hear anyone at Waldron use the term
(19) buy-in with relation to Shopping.com stock?

(20) A   Yes.

(21) Q   When was that?

(22) A   I don't know.

(23) Q   Who made the statement?

(24) A   Mr. Perle.

(25) Q   Do you have any general recollection of what he

Page 30

(1)  said?

(2)  A   No.

(3)  Q   Was there anyone else present when he mentioned
(4)  that term to you?

(5)  A   Not that I remember now.

(6)  Q   Okay. Did Mr. Perle ever make any statements to
(7)  you that the shares in the IPO couldn't have been sold – if
(8)  all of the shares in the IPO couldn't have been sold if M.
(9)  Harris and Mr. Aubry and Mr. Long hadn't stepped in and
(10) purchased big blocks?

(11) A   No, he never mentioned that to me.

(12) Q   Okay. Did he ever say anything to you about
(13) Waldron having trouble selling the offer?

(14) A   No.

(15) Q   Was there a road show for this IPO?

(16) A   Yes.

(17) Q   Did you attend any of the road show meetings?

(18) A   Yes.

(19) Q   Which ones?

(20) A   The one in Charleston, South Carolina and the one
(21) in our office in Irvine.

(22) Q   And what do you recall about the one in
(23) Charleston?

(24) A   Can you be more specific?

(25) Q   Well, I mean, who were the speakers, what happened

Page 31

(1)  to the best of your recollection?

(2)  A   Okay. It was a description of the company, how to
(3)  shop on the Internet. Mr. McNulty was present. Mr. Winkler
(4)  was present and that's all that I can remember. Mr. Perle
(5)  was present. Mr. Jack Meyers was present. That's all I can
(6)  remember.

(7)  Q   And how about the one in Irvine, what do you
(8)  recall about that?

(9)  A   That one was done in the office.

(10) Q   And who was present for that?

(11) A   There were two gentlemen from Shopping.com. You
(12) know, audio visual guys. I mean, I don't know their names
(13) and Mr. Winkler was present.

(14) Q   Okay. Who else?

(15) A   Mr. McNulty.

(16) Q   Okay, and from Waldron who was there?

(17) A   You asked me that question before and I don't
(18) remember the ones. The people that I do remember was Keevin
(19) Gillespie, he was present, Lanie, Jack Meyers, that's all
(20) that I can remember was there.

(21) Q   Prior to the IPO had Waldron helped Shopping.com
(22) raise money?

(23) A   I don't know.

(24) Q   Do you know whether any part of the IPO proceeds
(25) was going to be used to retire a bridge loan that

Page 32

(1)  Shopping.com had?

(2)  A   I don't know.

(3)  Q   Do you know whether Mr. Perle was receiving any
(4)  pressure from Mr. Harris or Mr. Aubry to make Waldron
(5)  profitable?

(6)  A   I don't know.

(7)  MR. ARNOLD:   Why don't we take a short break.
(8)  We're off at 2:51.

(9)  MR. ARNOLD:   We're back on the record at 3:06.

(10) BY MR. MANGOLI:

(11) Q   Ms. French, how long have you been in the
(12) securities industry?

(13) A   Nine years.

(14) Q   And your first position was with which firm?

(15) A   Power Securities.

(16) Q   Located where?

(17) A   Santa Barbara, California.

(18) Q   And how long were you with Power?

(19) A   Long enough to get a license. A month, a couple,
(20) that was it.

(21) Q   And were you ever employed by a firm called
(22) Chatfield Dean?

(23) A   Yes.

(24) Q   And when did you start at Chatfield Dean?

(25) A   Some time in '89.

EXHIBIT 3 PAGE 71

## Page 33

(1) Q   And you left when?
(2) A   June 14, 1994.
(3) Q   Why are you so sure of the day you left?
(4) A   It was a memorable day for me, I guess.
(5) Q   Did you know Keevin Gillespie while you were
(6) employed there?
(7) A   Yes.
(8) Q   And when you left was Mr. Gillespie still employed
(9) at Chatfield Dean?
(10) A   Yes.
(11) Q   How many IPO's have you been involved in?
(12) A   I can't say for sure.
(13) Q   Can you give me an estimate?
(14) A   More than ten.
(15) Q   And your involvement has, I assume, been in
(16) various levels. Would that be a fair statement?
(17) A   Can you elaborate on that?
(18) Q   For instance for Waldron, you were the National
(19) Retail Sales Manager, is that correct?
(20) A   Right.
(21) Q   Did you hold that title with any other firms?
(22) A   No.
(23) Q   Did you play any role in the Shopping.com IPO?
(24) A   As far as?
(25) Q   Were you employed by Waldron at the time the IPO

## Page 34

(1) went effective?
(2) A   Yes.
(3) Q   Okay, so what role, if any, did you play in the
(4) IPO?
(5) A   As a manager or as a broker?
(6) Q   As a manager, start with that.
(7) A   As a manager I supervised the brokers.
(8) Q   Okay.
(9) A   And Mr. Gillespie.
(10) Q   Okay.
(11) A   And, as a broker, I participated in the IPO. My
(12) clients did.
(13) Q   Okay. Now your title is National Sales Manager?
(14) A   Yes. Actually, no, Managing Director of Retail
(15) Sales.
(16) Q   Yeah, because I was going to ask you if it was
(17) national, why is it you would only have two offices, if you
(18) were National Sales Manager?
(19) A   My understanding with Mr. Perle was that we would
(20) start with one branch at a time and as the personnel grew
(21) larger and was able to, so that I could afford to, you know,
(22) travel all the time, then at that time, then my
(23) responsibilities would increase as the firm increased.
(24) That's why I don't oversee San Francisco and I did not
(25) oversee Los Angeles.

## Page 35

(1) Q   Okay and so we have – what other offices of
(2) Waldron are there? We have San Francisco, Los Angeles,
(3) Irvine, South Carolina, any others?
(4) A   Connecticut.
(5) Q   Any others?
(6) A   That's it.
(7) Q   How long have you lived in South Carolina?
(8) A   Since '96.
(9) Q   And how did you come to be associated with Waldron
(10) or employed by Waldron?
(11) A   Cary called me.
(12) Q   Do you know why? Had you had a previous
(13) relationship with Cary?
(14) A   Yes.
(15) Q   And can you tell me about that?
(16) A   Yes. I met him at Prudential Securities.
(17) Q   So you both worked at the same time at Prudential
(18) Securities?
(19) A   Yes. I worked at Prudential Securities in the
(20) Irvine branch.
(21) Q   And when was that?
(22) A   When I lived in Irvine, California before I moved
(23) to Charleston, South Carolina.
(24) Q   So, when did you work for Prudential, what years?
(25) A   1994, '95, '96, '97, yes.

## Page 36

(1) Q   Actually, would it have been '96 if you moved to
(2) South Carolina in '96?
(3) A   I had moved with Prudential.
(4) Q   Oh, they moved to South Carolina.
(5) A   I moved to the South Carolina Prudential branch.
(6) Q   Got it. And, you said you worked with Mr. Perle
(7) at the Irvine office of Prudential, is that correct?
(8) A   Yes.
(9) Q   And then he called you when? In reference to the
(10) Waldron job, he called you when?
(11) A   When he first moved into the Irvine branch
(12) building.
(13) Q   Okay. When would that have been?
(14) A   I don't know the date.
(15) Q   An approximation, please?
(16) A   I was still living in California, so some time in
(17) '96, I think.
(18) Q   Okay. So, he called you and told you he was
(19) moving over to Waldron and did he offer you a job at that
(20) time?
(21) A   I don't think he went directly to Waldron after
(22) Prudential. So, no, he did not offer me a job at that time.
(23) Q   Okay. So, I guess my question is then when did
(24) Mr. Perle call you and offer you a job at Waldron?
(25) A   When I was at Prudential Securities living in

EXHIBIT 3  PAGE 72

**Page 37**

(1) Charleston, South Carolina in 1996, that's when it started.

(2) Q  So, your relationship began in 1996 with Waldron?

(3) A  No. He started calling me at that time. It took

(4) me a year to make a decision.

(5) Q  Okay, so he called you and you said I can't do it

(6) at this time?

(7) A  Right.

(8) Q  And what job did he offer you when he started

(9) calling you?

(10) A  He wanted me to train his brokers.

(11) Q  And did he want you to move from South Carolina to

(12) Irvine?

(13) A  Yes.

(14) Q  And did you tell him you would do that?

(15) A  No.

(16) Q  So, you testified earlier about the South Carolina

(17) office that that was sort of like a concession for you to be

(18) employed that you would have that South Carolina office, is

(19) that correct?

(20) A  Right.

(21) Q  So, was that like the compromise that you made

(22) with Cary that you would work for him but only if you could

(23) do it in the South Carolina office?

(24) A  That is correct.

(25) Q  So, that's your understanding of how Waldron came

**Page 38**

(1) to have a South Carolina office?

(2) A  Waldron has a South Carolina office because I

(3) reside there.

(4) Q  Does Waldron have managers meetings?

(5) A  Yes.

(6) Q  On a regular basis?

(7) A  Yes.

(8) Q  And when are those meetings held?

(9) A  Monday after the market close, 1:30 California

(10) time, 4:30 South Carolina time.

(11) Q  So I assume you participate by phone?

(12) A  Yes.

(13) Q  And I assume during the time, let's say the month

(14) of November, 1997, Waldron was still having these weekly

(15) manager's meetings?

(16) A  Yes.

(17) Q  During the month of November, during these

(18) manager's meetings, was there ever any discussion of the

(19) indications of interest or what the process would be and

(20) firming them up?

(21) A  Yes.

(22) Q  And can you tell me a little about what the

(23) process was for handling the indications of interest?

(24) A  They were mostly handled by Ms. Lanie Koch.

(25) Q  So you had no role in –

**Page 39**

(1) A  I reported to her regarding new issue. I mean,

(2) regarding IPO that was her department and I reported to her.

(3) So, what happened after that I'm not aware of.

(4) Q  Even though you're a manager you still wouldn't be

(5) aware of anything that happened after that?

(6) A  No, because I'm not responsible for syndication.

(7) Q  Okay. So, in these meetings are different

(8) departments' issues discussed while you're on the line?

(9) A  What was discussed is how many indications of

(10) interest have been turned in, meaning which brokers have

(11) turned theirs in, which brokers have not, which brokers will

(12) participate, which brokers will not participate. That was

(13) my area. As far as number of shares, clients individual

(14) names, who got a red herring, all of that, that's all

(15) syndication. That's not my area.

(16) Q  But would those things have been discussed during

(17) any of these manager's meetings?

(18) A  No.

(19) Q  What types of issues are discussed during these

(20) manager's meetings in November of 1997, let's say?

(21) A  I don't remember. I mean, exactly I don't

(22) remember what was discussed.

(23) Q  That's okay, you can give me a ballpark, an

(24) approximation. I mean, as a manager, you don't remember

(25) what were some of the topics of the meetings?

**Page 40**

(1) A  Like I said, which brokers have turned in their

(2) indications of interest, which ones have not, which ones

(3) will participate, which ones will not. We had a manager's

(4) meeting regarding the stock, regarding Shopping.com not

(5) being listed. We had a manager's meeting regarding

(6) Shopping.com's new red herrings going out. We had several

(7) manager's meetings regarding every aspect of Shopping.com we

(8) had a manager's meeting. What was specifically and

(9) accurately discussed, I can't remember.

(10) Q  Are the participants in the meetings always the

(11) same? The people who take part in them?

(12) A  For the manager's meetings, yes.

(13) Q  And who are they?

(14) A  That would be Mr. Keevin Gillespie, Mr. Joe

(15) Gerace, myself and Mr. Cary Perle.

(16) Q  And I suppose Mr. Gerace would also be on the

(17) phone conferenced from San Francisco?

(18) A  Oh yes.

(19) Q  Do you find it difficult to fulfill your

(20) responsibilities as the Retail Sales Manager when you're so

(21) far away from the main office of Waldron?

(22) A  No.

(23) Q  And, can you elaborate on that? Does the distance

(24) not make it – is not a factor in fulfilling your job

(25) responsibilities?

EXHIBIT 3  PAGE 73

### Page 41

(1)  A   No.

(2)  Q   Do you know the name Charles Drummond?

(3)  A   Yes.

(4)  Q   Who is that?

(5)  A   He was an institutional analyst that was hired in

(6)  the Connecticut, Westport, Connecticut branch.

(7)  Q   Do you know when he was hired?

(8)  A   I don't know.

(9)  Q   And is he currently still employed by Waldron?

(10) A   No.

(11) Q   Do you know when he left?

(12) A   I don't know.

(13) Q   And do you know what his duties were as

(14) institutional analyst?

(15) A   To write research.

(16) Q   Did you ever see any – or did Mr. Drummond ever

(17) produce any research while he was employed by Waldron?

(18) A   Yes.

(19) Q   Did you ever see any of his research?

(20) A   Yes.

(21) Q   Do you recall how many reports he produced?

(22) A   No.

(23) Q   And do you recall when you had seen the report he

(24) produced?

(25) A   No.

### Page 42

(1)  Q   Do you know what the report was for and the reason

(2)  it was produced?

(3)  A   It was by recommendation.

(4)  Q   For IBUY?

(5)  A   Yes.

(6)  Q   And is that the only report you recall seeing

(7)  produced by Mr. Drummond?

(8)  A   No. He had one other report I recall seeing was

(9)  on the Silicon Valley Group.

(10) Q   And do you know when that would have been

(11) produced?

(12) A   No.

(13) Q   Do you recall when you may have seen it?

(14) A   Before Shopping.com.

(15) Q   Are you aware of any situations where Waldron had

(16) a number of ghost accounts or people who called to open

(17) accounts for Shopping.com and then never paid for them?

(18) A   Yes.

(19) Q   Can you tell me what your knowledge is of that

(20) situation?

(21) A   Can you be more specific?

(22) Q   Well we heard that there were a number of people

(23) who called in from a specific area of the country who opened

(24) accounts and wanted to buy Shopping.com and placed the

(25) orders, the orders were executed but they never paid for

### Page 43

(1)  them. Would that be accurate?

(2)  A   Yes.

(3)  Q   What do you know about this situation?

(4)  A   I don't know the specific names. I do know that

(5)  accounts were opened by brokers on call-in's regarding

(6)  Shopping.com mainly from the State of New York purchasing

(7)  shares and never paying for them.

(8)  Q   Do you have any idea when this may have occurred?

(9)  A   I don't remember the exact dates.

(10) Q   Was there any discussion of these accounts in your

(11) manager's meetings?

(12) A   Yes.

(13) Q   Will you tell us just a little bit about what was

(14) discussed?

(15) A   We were not to take any phone orders for

(16) Shopping.com unless money was wired in.

(17) Q   And that came directly from Mr. Perle?

(18) A   Yes.

(19) Q   Earlier you testified that you wouldn't be

(20) accurate if you were to define the term "buy-in" do you

(21) recall testifying to that?

(22) A   Yes.

(23) Q   Could you still give me what your definition of

(24) the "buy-in" might be or what you understand a "buy-in" to

(25) be?

### Page 44

(1)  A   My understanding of a "buy-in" is if somebody

(2)  sells short the stock and the persons that buys the stock

(3)  requests for it to be delivered, then the stock must be

(4)  delivered in good faith. That's it.

(5)  Q   And how about the term "short.squeeze?" What is

(6)  your definition of that or your understanding of what that

(7)  term means?

(8)  A   When a stock is to be delivered in good faith and

(9)  a short seller cannot deliver the security or cannot find

(10) securities on the street in order to deliver and, therefore,

(11) they have to purchase the stock at the market price.

(12) Q   They have to purchase the stock at the market

(13) price?

(14) A   Whatever price the market deems fit, that stock is

(15) of value on that day.

(16) Q   Are you aware of any buy-in's being conducted on

(17) Shopping.com stock?

(18) A   No.

(19) Q   Were buy-in's ever discussed during these

(20) manager's meetings?

(21) A   No.

(22) Q   Do you know if Waldron, in fact, did any buy-in's

(23) on the Shopping.com stock?

(24) A   I know Waldron did buy-in's on Shopping.com stock.

(25) I don't know how they were done.

**EXHIBIT 3 PAGE 74**

## Page 45

(1)   Q   How do you know that Waldron did buy-in's on the
(2)   stock?
(3)   A   Because Cary told me.
(4)   Q   And when would he have told you this?
(5)   A   I don't know.
(6)   Q   In what context would he have told you?
(7)   A   I'm sorry.
(8)   Q   And what context -- would he just pick up the
(9)   phone and say, hey Georgia we're doing some buy-in's, I
(10)  mean, what context would he have told you?
(11)  A   Not as far as we're doing some buy-in's, there are
(12)  buy-in's being done on Shopping.com, I was not aware that
(13)  it was us or who it was. I don't know anything about that.
(14)  Q   And do you know why he would tell you that?
(15)  A   Because, I believe the question was referred to as
(16)  to why was there a large share order done at the close of
(17)  the market which was noticed on the Bloomberg machine.
(18)  Q   Okay, so you asked that question of him or he
(19)  asked you?
(20)  A   Somebody asked the question of him.
(21)  Q   Okay. So, I'm trying to get, how did the question
(22)  become translated to you from him that --
(23)  A   I am the delivery system to the brokers. So, he
(24)  would say -- he, basically he said to me if there's a
(25)  question on the buy-in's, there are buy-in's being done. If

## Page 46

(1)   there are questions on the large blocks traded at the close
(2)   of the market, they are buy-in's. That was the context of
(3)   it.
(4)   Q   Okay. And how would you define large blocks?
(5)   A   I don't know, over 5,000 shares, 10,000 shares.
(6)   Q   I'm not going to be argumentative, please don't
(7)   take this the wrong way, but you responded I don't know to a
(8)   fair number of questions and as a manager I would -- I'm a
(9)   little confused as to your lack of knowledge on certain
(10)  questions. Is there an objection?
(11)  MR. SHERWIN:    Is there a question?
(12)  MR. MANGOLINI:    Yes.
(13)  BY MR. MANGOLINI:
(14)  Q   Have you ever had the feeling that you've been
(15)  left out of the loop as far as the workings of Waldron &
(16)  Company?
(17)  A   Yes.
(18)  Q   And, why do you have these feelings?
(19)  A   Those are just not my job responsibilities.
(20)  That's just not my area.
(21)  Q   Have you ever brought your concerns to Cary or
(22)  anyone else at Waldron?
(23)  A   No.
(24)  Q   I have no further questions. Dennis do you?
(25)  BY MR. ARNOLD:

## Page 47

(1)   Q   Do you know the name Mike Suki?
(2)   A   Yes.
(3)   Q   Who is Mike Suki?
(4)   A   He was the CFO for Waldron.
(5)   Q   When you say was, is he no longer with the firm?
(6)   A   He's no longer with the firm.
(7)   Q   When did he leave?
(8)   A   I don't know the exact date.
(9)   Q   Do you know why he left?
(10)  A   I don't know.
(11)  Q   Was there any discussion of that at the firm?
(12)  A   I don't know.
(13)  Q   Ms. French, we don't have any further questions
(14)  for you today, is there anything you'd like to add to the
(15)  statements that you've made or clarify for the record?
(16)  A   No, sir.
(17)  MR. ARNOLD:    Counsel do you have any questions
(18)  for the witness?
(19)  MR. SHERWIN:    No.
(20)  MR. ARNOLD:    Okay, then we are off at 3:26.
(21)
(22)
(23)
(24)
(25)

## Page 48

(1)   U.S. SECURITIES AND EXCHANGE COMMISSION
(2)   REPORTER'S CERTIFICATE
(3)
(4)
(5)   I, PAUL G. CLARKE , hereby certify the foregoing
(6)   transcript consisting of 47 pages is a complete, true,
(7)   and accurate transcript of the testimony indicated, held on
(8)   5/27/98 , at LA. PACIFIC REGIONAL OFFICE
(9)   .
(10)  In the matter of: SHOPPING.COM LA-919 .
(11)  I further certify that this proceeding was recorded by
(12)  me, and that the foregoing transcript has been prepared
(13)  under my direction.
(14)
(15)  BAYLEY REPORTING, INC. 5/27/98
(16)  Reporter Date
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

EXHIBIT 3 PAGE 75

Page 49

(1)  PROOFREADER'S CERTIFICATE

(2)

(3)  In the Matter of: SHOPPING.COM

(4)  Witness: GEORGIA FRENCH

(5)  File Number: LA-919

(6)  Date: MAY 27, 1998

(7)  Location: LOS ANGELES, CALIFORNIA

(8)

(9)  This is to certify that I, Robby Graham (the

(10) undersigned), do hereby swear and affirm that the attached

(11) proceedings before the U.S. Securities and Exchange

(12) Commission were held according to the record and that this

(13) is the original, complete, true and accurate transcript that

(14) has been compared to the reporting or recording accomplished

(15) at the hearing.

(16)

(17)

(18) 6/02/98

(19)    (Proofreader's Name) (Date)

(20)

(21)

(22)

(23)

(24)

(25)

EXHIBIT 3 PAGE 76

BSA
Look-See(14)

**Look-See Concordance Report**

- - -

UNIQUE WORDS: 840
TOTAL OCCURRENCES: 2,383
NOISE WORDS: 384
TOTAL WORDS IN FILE: 7,600

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

COVER PAGES = 2

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES ON

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS ON

**– DATES –**

5/27/98 [2]
  48:8, 15
6/02/98 [1]
  49:18
April 24, 1998 [1]
  5:1
August [1]
  9:21
July [1]
  9:21
June 14, 1994 [1]
  33:2
MAY 27, 1998 [1]
  49:6
May 27, 1998 [1]
  3:4
November [2]
  14:2; 38:17
November, 1997 [1]
  38:14
November 25th [1]
  13:8
November of 1997 [1]
  39:20

**– $ –**

$32.00 [1]
  25:2
$60,000.00 [1]
  27:6
$9.00 [1]
  25:1

**– 1 –**

1 [2]
  4:9, 10
1/2% [1]
  27:6
10,000 [1]
  46:5
14 [1]
  33:2
1994 [2]
  33:2; 35:25
1996 [2]

37:1, 2
1997 [5]
  7:10, 11; 27:16; 38:14; 39:20
1998 [3]
  3:4; 5:1; 49:6
1:30 [1]
  38:9

**– 2 –**

2 [1]
  27:6
24 [1]
  5:1
25 [1]
  26:21
25th [2]
  13:8; 14:1
27 [2]
  3:4; 49:6
288 [1]
  6:15
29401 [1]
  6:16
29464 [1]
  6:10
2:13 [2]
  3:2, 3
2:15 [1]
  5:16
2:17 [1]
  5:17
2:24 [1]
  11:5
2:51 [1]
  32:8
2nd [1]
  6:15

**– 3 –**

30 [1]
  26:21
3:06 [1]
  32:9
3:26 [1]
  47:20

**– 4 –**

40% [2]
  7:7, 8
42 [4]
  4:25; 5:8, 9, 20
47 [1]
  48:6
4:30 [1]
  38:10

**– 5 –**

5,000 [2]
  27:21; 46:5
5/27/98 [2]
  48:8, 15
500 [2]
  28:16, 17

**– 6 –**

6/02/98 [1]
  49:18
60% [1]

27:8

**– 8 –**

803 [2]
  6:18
881-4969 [1]
  6:18
89 [1]
  32:25

**– 9 –**

95 [1]
  35:25
958-0001 [1]
  6:18
96 [5]
  35:8, 25; 36:1, 2, 17
967 [1]
  6:9
97 [2]
  9:21; 35:25

**– A –**

able [1]
  34:21
accomplished [1]
  49:14
according [1]
  49:12
account [2]
  6:1; 23:14
accounts [5]
  42:16, 17, 24; 43:5, 10
accurate [6]
  29:15, 17; 43:1, 20; 48:7; 49:13
accurately [1]
  40:9
acquainted [1]
  25:20
acted [1]
  13:5
activity [1]
  7:23
actual [1]
  13:10
add [1]
  47:14
address [2]
  6:7, 13
addressed [2]
  5:2, 3
affirm [1]
  49:10
afford [1]
  34:21
agreement [1]
  5:22
allocated [1]
  26:17
allow [1]
  17:23
amount [1]
  27:4
analyst [2]
  41:5, 14
ANGELES [1]
  49:7
Angeles [3]

20:5; 34:25; 35:2
annual [1]
  26:24
anybody [4]
  8:9; 9:6; 25:21; 27:25
applied [1]
  11:25
approximate [1]
  26:20
Approximately [2]
  18:15; 21:19
approximately [7]
  7:5; 9:20; 12:23; 20:17; 21:21; 28:10, 14
approximation [2]
  36:15; 39:24
April [1]
  5:1
area [5]
  13:17; 39:13, 15; 42:23; 46:20
argumentative [1]
  46:6
ARNOLD [19]
  3:3, 11; 4:16, 20, 23; 5:16, 17, 18, 22; 6:5, 6; 11:4, 5, 6; 32:7, 9; 46:25; 47:17, 20
Arnold [1]
  3:16
Art [1]
  15:20
asking [1]
  12:10
aspect [1]
  40:7
aspects [1]
  7:21
associated [1]
  35:9
assume [3]
  33:15; 38:11, 13
attached [1]
  49:10
attachment [1]
  5:5
attend [1]
  30:17
Aubry [5]
  10:12, 18; 15:9; 30:9; 32:4
audio [1]
  31:12
August [1]
  9:21
available [1]
  4:5
aware [9]
  12:3; 14:25; 22:25; 23:3; 39:3, 5; 42:15; 44:16; 45:12

**– B –**

ballpark [1]
  39:23
Barbara [1]
  32:17
based [2]
  11:22; 21:4
basically [1]
  45:24
basis [1]
  38:6

---

5/27/98 to basis

EXHIBIT 3 PAGE 77

BSA
TRANSCRIPT CONCORDANCE
Look-See(15)

**BAYLEY** [1]
48:15
**believe** [3]
17:11, 21; 45:15
**bid** [10]
16:10, 13, 18, 20; 17:1, 8, 9,
13; 25:5, 9
**bit** [2]
8:24; 43:13
**blocks** [3]
30:10; 46:1, 4
**Bloomberg** [3]
24:6, 8; 45:17
**board** [1]
14:8
**bonus** [2]
27:13, 14
**bonuses** [1]
27:10
**branch** [16]
6:21; 7:1, 3; 9:19; 19:6, 14;
20:2, 3, 7; 27:7, 8; 34:20;
35:20; 36:5, 11; 41:6
**break** [2]
11:3; 32:7
**bridge** [1]
31:25
**broker** [6]
12:18; 17:2, 7; 21:13; 34:5,
11
**brokerage** [5]
25:13, 16, 23; 26:7, 14
**Brokers** [1]
8:13
**brokers** [23]
7:22; 8:16; 14:2; 16:25;
17:17; 19:1; 20:12; 21:1;
22:5, 13; 23:4, 8, 11; 34:7;
37:10; 39:10, 11, 12; 40:1;
43:5; 45:23
**Brothers** [5]
23:16, 18, 25; 24:2, 11
**building** [1]
36:12
**bullet** [9]
17:24; 18:3, 12, 15, 18, 21,
24; 19:4; 21:2
**bulletin** [1]
14:8
**business** [4]
6:13; 29:2, 4, 6
**buy** [1]
42:24
**buy-in** [6]
29:14, 19; 43:20, 24; 44:1
**buy-in's** [11]
44:16, 19, 22, 24; 45:1, 9, 11,
12, 25; 46:2
**buying** [1]
11:17
**buys** [1]
44:2

**– C –**

**CALIFORNIA** [1]
49:7
**California** [5]
11:25; 32:17; 35:22; 36:16;
38:9
**call** [1]
36:24
**call-in's** [1]
43:5
**calling** [2]
37:3, 9
**Capital** [1]
25:11
**care** [2]
5:2, 4
**Carolina** [26]
6:10, 16, 21; 8:11, 19; 9:19;
16:25; 19:6, 9; 26:18; 27:7;
30:20; 35:3, 7, 23; 36:2, 4, 5;
37:1, 11, 16, 18, 23; 38:1, 2,
10
**Cary** [6]
35:11, 13; 37:22; 40:15; 45:3;
46:21
**Case** [1]
3:20
**cash** [1]
29:5
**CERTIFICATE** [2]
48:2; 49:1
**certify** [3]
48:5, 11; 49:9
**CFO** [1]
47:4
**changes** [1]
21:10
**Charles** [1]
41:2
**Charleston** [6]
6:15; 9:18; 30:20, 23; 35:23;
37:1
**Chatfield** [3]
32:22, 24; 33:9
**civil** [1]
3:24
**clarify** [1]
47:15
**CLARKE** [1]
48:5
**client** [1]
23:12
**client's** [1]
23:14
**Clients** [1]
11:22
**clients** [11]
11:16, 19, 20; 13:18, 23;
14:2, 14; 23:9; 28:5; 34:12;
39:13
**collected** [1]
14:4
**collectively** [1]
13:3
**COMMISSION** [1]
48:1
**Commission** [3]
3:18, 20; 49:12
**commission** [1]
26:25
**Commission's** [2]
4:1, 7
**commissions** [1]
27:9
**communicated** [1]
23:25
**Company** [2]
6:20; 46:16

**company** [5]
12:12; 21:2; 26:6; 29:5; 31:2
**compared** [1]
49:14
**compensation** [1]
26:24
**complete** [2]
48:6; 49:13
**compromise** [1]
37:21
**computer** [3]
9:14, 18, 22
**concerned** [1]
20:5
**concerns** [1]
46:21
**concession** [1]
37:17
**concrete** [1]
27:13
**conducted** [1]
44:16
**conferenced** [1]
40:17
**confirm** [1]
14:19
**confirmed** [1]
14:16
**confused** [1]
46:9
**Connecticut** [3]
35:4; 41:6
**connection** [1]
16:10
**consisting** [1]
48:6
**constitute** [1]
3:23
**contacted** [2]
13:19; 14:15
**Contacting** [1]
12:8
**context** [4]
45:6, 8, 10; 46:2
**continue** [1]
29:6
**continuing** [2]
29:2, 3
**convenience** [1]
8:22
**Corp** [1]
25:11
**corporate** [3]
18:4, 5, 7
**Counsel** [2]
5:22; 47:17
**counsel** [2]
4:14, 16
**country** [1]
42:23
**couple** [2]
21:24; 32:19
**course** [2]
20:16; 25:2
**cover** [1]
5:1
**covered** [1]
12:24
**criminal** [1]
3:24
**criteria** [2]

**company** (cont.)
11:20; 12:2
**current** [2]
6:7, 13
**currently** [2]
6:19; 41:9
**customer's** [1]
12:18
**customers** [2]
14:18, 23

**– D –**

**Date** [3]
48:16; 49:6, 19
**date** [7]
13:7; 14:13, 19; 16:5; 28:9;
36:14; 47:8
**dated** [1]
5:1
**dates** [1]
43:9
**day** [3]
33:3, 4; 44:15
**days** [1]
17:11
**Dean** [3]
32:22, 24; 33:9
**decision** [1]
37:4
**deems** [1]
44:14
**define** [2]
43:20; 46:4
**definitely** [1]
14:3
**definition** [2]
43:23; 44:6
**deliver** [2]
44:9, 10
**delivered** [3]
44:3, 4, 8
**delivery** [1]
45:23
**Dennis** [2]
3:16; 46:24
**department** [2]
18:4; 39:2
**departments** [1]
39:8
**depository** [1]
26:6
**derived** [1]
18:3
**description** [1]
31:2
**determine** [3]
3:21; 11:16, 20
**determined** [1]
26:24
**developed** [1]
3:23
**difficult** [1]
40:19
**direction** [1]
48:13
**Director** [2]
7:13; 34:14
**disclosed** [1]
21:5
**discourage** [1]
23:9

From **BAYLEY** to discourage

EXHIBIT 3 PAGE 78

BSA

discuss [3]
  18:21; 20:13; 29:11
discussed [9]
  21:12; 39:8, 9, 16, 19, 22;
  40:9; 43:14; 44:19
discussing [2]
  21:2, 7
discussion [3]
  38:18; 43:10; 47:11
distance [1]
  40:23
document [6]
  4:25; 5:6; 18:12, 21, 25; 19:4
documents [5]
  5:23; 16:22; 26:1, 6, 11
doesn't [1]
  21:4
drafts [2]
  11:10, 13
Drive [1]
  6:9
Drummond [3]
  41:2, 16; 42:7
Duces [2]
  5:3, 5
duly [1]
  3:8
duties [2]
  7:16; 41:13

### – E –

Ed [3]
  9:25; 10:2; 15:7
effect [2]
  16:18; 21:3
effective [4]
  14:14, 16; 34:1
elaborate [2]
  33:17; 40:23
employed [9]
  6:19; 32:21; 33:6, 8, 25;
  35:10; 37:18; 41:9, 17
equipment [3]
  9:15, 18, 23
estimate [2]
  7:6; 33:13
events [1]
  14:18
exact [4]
  20:23; 26:19; 43:9; 47:8
exactly [1]
  39:21
EXAMINATION [1]
  3:10
examined [1]
  3:9
EXCHANGE [1]
  48:1
Exchange [2]
  3:19; 49:11
executed [1]
  42:25
Exhibit [6]
  4:8, 9, 25; 5:8, 9, 19
explaining [1]
  16:22

### – F –

F-R-E-N-C-H [1]
  3:15

fact [1]
  44:22
factor [1]
  40:24
facts [1]
  3:23
fair [2]
  33:16; 46:8
faith [2]
  44:4, 8
federal [2]
  3:22, 24
feeling [1]
  46:14
feelings [1]
  46:18
Fehn [1]
  4:18
fell [1]
  14:11
Fields [1]
  4:18
Fiero [5]
  23:16, 18, 25; 24:2, 10
File [1]
  49:5
file [1]
  15:14
filled [1]
  12:17
finance [3]
  18:4, 5, 7
find [6]
  11:16; 13:19; 14:2; 23:12;
  40:19; 44:9
fired [1]
  23:5
firm [11]
  13:24; 25:13, 16, 17, 23;
  32:14, 21; 34:23; 47:5, 6, 11
firm's [3]
  10:3, 4, 15
firming [1]
  38:20
firms [5]
  26:2, 7, 11, 14; 33:21
first [4]
  3:8; 4:25; 32:14; 36:11
fit [1]
  44:14
five [1]
  20:20
five-page [1]
  4:25
Floor [1]
  6:15
follows [1]
  3:9
foregoing [2]
  48:5, 12
Form [1]
  4:8
form [1]
  21:9
Formal [2]
  4:1, 3
forms [1]
  12:17
Francisco [5]
  19:11; 20:2; 34:24; 35:2;
  40:17

FRENCH [2]
  3:7; 49:4
French [7]
  3:15, 25; 4:20; 5:2, 4; 32:11;
  47:13
fulfill [1]
  40:19
fulfilling [1]
  40:24
full [1]
  3:12

### – G –

G-E-O-R-G-I-A [1]
  3:14
gave [1]
  18:8
gentlemen [1]
  31:11
GEORGIA [2]
  3:7; 49:4
Georgia [4]
  3:14; 5:2, 4; 45:9
Gerace [4]
  19:14; 20:2; 40:15, 16
ghost [1]
  42:16
Gillespie [6]
  22:23; 31:19; 33:5, 8; 34:9;
  40:14
Gillespie's [1]
  20:7
give [4]
  26:20; 33:13; 39:23; 43:23
given [1]
  13:23
gotten [1]
  26:6
Graham [1]
  49:9
Granito [1]
  15:20
Gregory [3]
  4:18; 5:2, 4
grew [1]
  34:20
gross [1]
  27:8
Group [1]
  42:9
group [2]
  23:19, 20
guess [3]
  14:17; 33:4; 36:23
guys [1]
  31:12

### – H –

hadn't [2]
  16:1; 30:9
hand [1]
  3:4
handed [1]
  19:1
handle [1]
  19:21
handled [2]
  13:13; 38:24
handling [1]
  38:23

Harris [7]
  9:25; 10:2, 10, 23; 15:7; 30:9;
  32:4
haven't [1]
  27:24
He's [1]
  47:6
he's [1]
  10:4
hear [3]
  15:12; 29:11, 18
Heard [1]
  15:23
heard [5]
  15:13, 15, 24; 16:1; 42:22
hearing [1]
  49:15
held [5]
  21:1; 26:2; 38:8; 48:7; 49:12
help [1]
  17:24
helped [1]
  31:21
helping [1]
  11:7
hereby [1]
  48:5; 49:10
herein [1]
  3:9
herring [1]
  39:14
herrings [1]
  21:6; 40:6
hey [1]
  45:9
hired [2]
  41:5, 7
hold [2]
  28:19; 33:21
home [1]
  23:12

### – I –

I've [1]
  15:12
IBUY [2]
  6:3; 42:4
idea [1]
  43:8
identification [1]
  5:7
identify [1]
  4:16
INC [1]
  48:15
incidents [1]
  23:3
include [1]
  11:13
increase [1]
  34:23
increased [1]
  34:23
indicate [1]
  21:8
indicated [2]
  13:18; 48:7
indicating [1]
  12:18
indication [3]

12:5; 13:24; 14:4

**Indications** [1]
14:6

**indications** [16]
12:13, 20, 24; 13:2, 4, 23;
14:5, 10; 18:11; 21:2, 8, 10;
38:19, 23; 39:9; 40:2

**individual** [3]
12:18; 27:9; 39:13

**industry** [2]
23:22; 32:12

**Information** [1]
4:8

**informed** [1]
17:4

**initial** [1]
12:11

**instance** [2]
19:11; 33:18

**instances** [5]
14:22; 22:25; 23:4, 8, 11

**institutional** [2]
41:5, 14

**instructed** [1]
25:8

**interest** [21]
12:5, 13, 20, 25; 13:3, 4, 18,
24; 14:4, 5, 6, 10; 18:11;
21:3, 9, 10; 38:19, 23; 39:10;
40:2

**interested** [4]
11:17; 12:9, 11, 19

**Internet** [1]
31:3

**Investigation** [1]
4:2

**investigation** [2]
3:19, 23

**investment** [1]
12:10

**involved** [5]
8:1; 11:7; 15:1; 26:15; 33:11

**involvement** [2]
9:3; 33:15

**IPO** [39]
8:25; 9:1, 12; 11:8, 15; 12:14;
13:8, 11, 19; 14:1, 19; 15:2,
5, 18; 16:3, 5, 7, 11; 17:13,
18; 20:13; 21:24; 25:1; 26:17;
28:12, 24; 29:8, 9; 30:7, 8,
15; 31:21, 24; 33:23, 25;
34:4, 11; 39:2

**IPO's** [1]
33:11

**Irvine** [16]
7:1, 3; 13:7; 19:2, 9; 20:8;
22:2; 27:7; 30:21; 31:7; 35:3,
20, 22; 36:7, 11; 37:12

**issue** [5]
12:9; 18:10; 21:4, 20; 39:1

**issues** [2]
39:8, 19

– J –

**Jack** [3]
18:6; 31:5, 19

**jeopardy** [1]
23:1

**job** [8]
7:16; 36:10, 19, 22, 24; 37:8;

40:24; 46:19

**jobs** [1]
23:1

**Joe** [3]
19:14; 20:2; 40:14

**John** [2]
10:12; 15:9

**July** [1]
9:21

**June** [1]
33:2

– K –

**keep** [1]
29:7

**Keevin** [4]
20:7; 31:18; 33:5; 40:14

**Kensington** [1]
25:11

**knowledge** [2]
42:19; 46:9

**Koch** [4]
13:14, 15; 22:21; 38:24

– L –

**L.A.** [1]
19:15

**L.T.** [3]
25:13, 17, 21

**LA** [1]
48:8

**LA-919** [3]
3:20; 48:10; 49:5

**lack** [1]
46:9

**Lainie** [2]
13:14, 15

**Lanie** [3]
22:21; 31:19; 38:24

**large** [4]
13:3; 45:16; 46:1, 4

**larger** [1]
34:21

**last** [2]
5:4; 7:5

**Lawrence** [3]
25:13, 17, 21

**laws** [2]
3:22, 25

**learn** [1]
10:16

**leave** [1]
47:7

**Leland** [1]
15:22

**let's** [2]
38:13; 39:20

**letter** [1]
5:1

**levels** [1]
33:16

**license** [1]
32:19

**limited** [1]
19:20

**line** [1]
39:8

**list** [2]
7:18; 18:3

**listed** [2]

14:7; 40:5

**lists** [3]
13:23; 17:24; 26:2

**lived** [2]
35:7, 22

**living** [2]
36:16, 25

**loan** [1]
31:25

**loaned** [1]
10:20

**Located** [1]
32:16

**Location** [1]
49:7

**loop** [1]
46:15

**LOS** [1]
49:7

**Los** [3]
20:5; 34:25; 35:2

– M –

**machine** [1]
45:17

**main** [1]
40:21

**mainly** [1]
43:6

**manage** [1]
7:21

**Manager** [4]
33:19; 34:13, 18; 40:20

**manager** [10]
7:24; 19:14; 20:3, 7; 34:5, 6,
7; 39:4, 24; 46:8

**manager's** [11]
38:15, 18; 39:17, 20; 40:3, 5,
7, 8, 12; 43:11; 44:20

**managers** [1]
38:4

**Managing** [2]
7:13; 34:14

**MANGOLI** [1]
32:10

**MANGOLINI** [2]
46:12, 13

**Mangolini** [1]
3:17

**marked** [3]
4:8; 24; 5:7

**market** [6]
38:9; 44:11, 12, 14; 45:17;
46:2

**Matter** [1]
49:3

**matter** [2]
3:20; 48:10

**MAY** [1]
49:6

**May** [1]
3:4

**McNulty** [2]
31:3, 15

**mean** [8]
21:11; 27:13; 30:25; 31:12;
39:1, 21, 24; 45:10

**meaning** [1]
39:10

**means** [1]

44:7

**mechanics** [1]
21:13

**Meeting** [1]
6:15

**meeting** [6]
21:18; 22:4, 11; 40:4, 5, 8

**meetings** [19]
20:12, 25; 21:1, 12, 16;
30:17; 38:4, 8, 15, 18; 39:7,
17, 20, 25; 40:7, 10, 12;
43:11; 44:20

**memorable** [1]
33:4

**mentioned** [2]
30:3, 11

**Meyers** [6]
18:6, 22, 25; 22:19; 31:5, 19

**mid-July** [1]
7:9

**Mike** [2]
47:1, 3

**minutes** [1]
5:15

**Monday** [1]
38:9

**money** [3]
10:21; 31:22; 43:16

**month** [4]
21:24; 32:19; 38:13, 17

**months** [3]
17:18; 25:3; 29:8

**Morgan** [1]
15:1

**morning** [1]
5:23

**mostly** [1]
38:24

**move** [2]
8:21; 37:11

**moved** [6]
35:22; 36:1, 3, 4, 5, 11

**moving** [1]
36:19

**MR** [28]
3:3, 11; 4:16, 18, 20, 22, 23;
5:16, 17, 18, 22, 25; 6:5, 6;
11:3, 4, 5, 6; 32:7, 9, 10;
46:11, 12, 13, 25; 47:17, 19,
20

**Mr** [48]
8:5; 10:9, 10, 16, 18, 20, 23,
25; 15:4; 16:16; 18:6, 21, 25;
19:14; 22:17, 19, 23; 24:10,
20; 25:8, 20; 26:1; 29:24;
30:6, 9; 31:3, 4, 5, 13, 15;
32:3, 4; 33:8; 34:9, 19; 36:6,
24; 40:14, 15, 16; 41:16;
42:7; 43:17

**Ms** [5]
3:25; 4:20; 32:11; 38:24;
47:13

**Mt** [1]
6:9

**Myself** [1]
22:14

**myself** [3]
17:6; 28:5; 40:15

– N –

**Name** [1]
49:19

**name** [18]
3:12, 16; 9:25; 10:12; 12:18;
15:11, 12, 13, 20, 23, 24, 25;
23:16; 25:11, 23, 24; 41:2;
47:1

**names** [4]
26:14; 31:12; 39:14; 43:4

**narrow** [2]
21:23, 25

**NASD** [2]
15:14, 25

**National** [3]
33:18; 34:13, 18

**national** [2]
7:24; 34:17

**Nine** [1]
32:13

**ninety** [1]
17:11

**noticed** [1]
45:17

**November** [5]
13:8; 14:2; 38:14, 17; 39:20

**Number** [1]
49:5

**number** [14]
4:9, 10, 25; 5:9, 19; 6:8;
12:24; 20:23; 26:19, 20;
39:13; 42:16, 22; 46:8

**Numerous** [1]
7:17

### – O –

**objection** [1]
46:10

**occur** [1]
14:3

**occurred** [1]
43:8

**occurring** [2]
20:25; 22:4

**offer** [5]
30:13; 36:19, 22, 24; 37:8

**offering** [2]
12:12; 13:19

**OFFICE** [1]
48:8

**office** [19]
6:21; 8:12, 18; 13:7; 17:1;
19:13, 15, 17; 22:2; 26:18;
30:21; 31:9; 36:7; 37:17, 18,
23; 38:1, 2; 40:21

**Officers** [1]
3:17

**offices** [8]
6:23; 12:21; 19:5, 7, 20; 20:1;
34:17; 35:1

**Oh** [2]
36:4; 40:18

**Okay** [64]
3:16; 4:5; 6:5, 13; 7:2, 21;
8:6, 8, 18, 22, 24; 11:2, 23;
13:10; 14:1, 17, 22; 16:1, 15,
19; 17:3, 5, 7, 12; 18:9, 12,
24; 19:2, 4, 9; 20:7, 12, 17;
22:17, 21, 23; 24:7, 13;
25:17; 26:22, 24; 27:10, 24;
28:14, 21; 30:6, 12; 31:2, 14,

16; 34:3, 8, 10, 13; 35:1;
36:13, 18, 23; 37:5; 39:7;
45:18, 21; 46:4; 47:20

**okay** [3]
5:12; 7:8; 39:23

**ones** [6]
6:25; 30:19; 31:18; 40:2, 3

**open** [2]
19:15; 42:16

**opened** [1]
42:23; 43:5

**opening** [2]
3:25; 4:6

**opportunity** [4]
4:2, 9; 5:12, 19

**Order** [2]
4:1, 3

**order** [7]
13:20, 24; 14:20; 16:3, 7;
44:10; 45:16

**orders** [4]
14:16; 42:25; 43:15

**original** [1]
49:13

**originally** [1]
14:4

**Oudt** [1]
25:9

**override** [1]
27:6

**oversee** [5]
19:11, 17; 20:1; 34:24, 25

**oversees** [1]
19:13

### – P –

**P-A-T-R-I-C-I-A** [1]
3:14

**P.M.** [1]
3:2

**p.m.** [1]
3:3

**PACIFIC** [1]
48:8

**page** [2]
5:3; 18:14

**pages** [4]
5:1, 5; 18:13; 48:6

**paid** [2]
42:17, 25

**paper** [1]
27:23

**part** [2]
31:24; 40:11

**participants** [1]
40:10

**participate** [4]
38:11; 39:12; 40:3

**participated** [1]
34:11

**participating** [2]
12:11, 19

**partner** [1]
10:15

**partners** [2]
10:3, 5

**passing** [2]
24:12, 13

**Patricia** [1]
3:14

**PAUL** [1]
48:5

**paying** [1]
43:7

**payout** [1]
27:8

**penalty** [8]
16:10, 13, 18, 20; 17:1, 8, 9,
13

**people** [8]
8:11; 12:8; 14:11; 21:7;
31:18; 40:11; 42:16, 22

**percentage** [1]
7:6

**performing** [1]
19:24

**period** [1]
24:7

**Perle** [21]
8:5; 10:9, 16, 20; 15:4; 16:16;
22:17; 24:10, 20; 25:8, 20;
26:1; 29:24; 30:6; 31:4; 32:3;
34:19; 36:6, 24; 40:15; 43:17

**Personally** [1]
28:3

**personnel** [3]
8:8; 21:16; 34:20

**persons** [1]
44:2

**phone** [7]
6:8, 14, 17; 38:11; 40:17;
43:15; 45:9

**photocopies** [1]
19:1

**pick** [1]
45:8

**place** [2]
13:20; 17:10

**placed** [3]
14:18, 23; 42:24

**placing** [2]
23:13; 25:5

**plan** [1]
29:7

**planned** [1]
28:24

**play** [2]
33:23; 34:3

**Pleasant** [1]
6:10

**please** [5]
3:5, 12; 6:8; 36:15; 46:6

**point** [3]
18:21, 24; 19:4

**points** [6]
17:24; 18:3, 13, 15, 18; 21:2

**position** [2]
7:12; 32:14

**positions** [4]
7:14; 26:2, 7, 12

**Power** [2]
32:15, 18

**prepare** [1]
11:8

**prepared** [2]
16:3; 48:12

**preparing** [1]
9:3

**present** [8]
30:3; 31:3, 4, 5, 10, 13, 19

**presentation** [3]

**21:6; 22:5, 6**

**pressure** [1]
32:4

**pretty** [1]
7:21

**previous** [1]
35:12

**price** [7]
25:1, 9; 29:8; 44:11, 13, 14

**prices** [1]
25:5

**Prior** [1]
31:21

**prior** [4]
3:25; 4:6; 9:12; 21:20

**proceeding** [2]
3:18; 48:11

**proceedings** [1]
49:11

**proceeds** [2]
28:24; 31:24

**process** [2]
38:19, 23

**processed** [1]
13:10

**processing** [1]
15:1

**produce** [2]
6:4; 41:17

**produced** [7]
5:24; 6:1; 41:21, 24; 42:2, 7,
11

**product** [1]
27:7

**production** [2]
27:9

**profit** [1]
27:10

**profitable** [1]
32:5

**PROOFREADER'S** [1]
49:1

**Proofreader's** [1]
49:19

**prospective** [1]
12:8

**prospectus** [1]
11:13

**prospectuses** [1]
21:6

**provided** [2]
4:1, 7

**provisions** [1]
3:22

**Prudential** [9]
35:16, 17, 19, 24; 36:3, 5, 7,
22, 25

**public** [2]
12:12; 18:10

**pull** [1]
15:14

**pulled** [1]
15:25

**purchase** [2]
44:11, 12

**purchased** [7]
9:14, 19, 23; 15:4, 17; 28:2,
9, 17; 30:10

**purchasing** [2]
12:9; 43:6

**purpose** [1]

17:13
**purposes** [1]
·3:18

**– Q –**

**qualifies** [1]
21:4
**Quantum** [1]
25:24
**question** [10]
13:21; 14:17; 31:17; 36:23;
45:15, 18, 20, 21, 25; 46:11
**questions** [7]
4:12; 46:1, 8, 10, 24; 47:13,
17

**– R –**

**raise** [3]
3:4; 25:9; 31:22
**read** [4]
4:9; 5:13, 15, 19
**reason** [4]
16:8; 19:19, 22; 42:1
**recall** [14]
18:16; 20:25; 22:4; 24:13;
28:10, 14; 30:22; 31:8; 41:21,
23; 42:6, 8, 13; 43:21
**receive** [2]
27:8, 18
**received** [2]
18:25; 26:11
**receiving** [1]
32:3
**recollection** [2]
29:25; 31:1
**recommendation** [1]
42:3
**record** [12]
3:3, 13, 25; 4:7, 17; 5:16, 17;
11:4, 5; 32:9; 47:15; 49:12
**recorded** [1]
48:11
**recording** [1]
49:14
**red** [3]
21:6; 39:14; 40:6
**redid** [1]
14:10
**reference** [1]
36:9
**referred** [2]
5:6; 45:15
**regarding** [7]
39:1, 2; 40:4, 5, 7; 43:5
**regardless** [1]
21:8
**REGIONAL** [1]
48:8
**registration** [4]
9:4, 9; 11:8, 10
**regular** [1]
38:6
**relating** [1]
9:9
**relation** [1]
29:19
**relationship** [2]
35:13; 37:2
**remember** [32]
12:23; 13:1, 2, 6; 16:4, 6, 7;

18:17, 18, 23; 20:6, 17, 19,
23; 21:21; 22:7, 16, 18; 24:7,
9; 26:16; 30:5; 31:4, 6, 18,
20; 39:21, 22, 24; 40:9; 43:9
**rephrase** [1]
11:18
**report** [7]
8:4, 6; 20:10; 41:23; 42:1, 6,
8
**reported** [3]
21:11; 39:1, 2
**Reporter** [1]
48:16
**REPORTER'S** [1]
48:2
**REPORTING** [1]
48:15
**reporting** [1]
49:14
**reports** [1]
41:21
**represented** [1]
4:14
**representing** [1]
4:20
**requested** [1]
15:25
**requests** [1]
44:3
**research** [3]
41:15, 17, 19
**reselling** [1]
23:9
**reside** [2]
8:20; 38:3
**residence** [1]
6:18
**residences** [1]
6:11
**residential** [1]
6:7
**responded** [1]
46:7
**responsibilities** [8]
8:2; 19:19, 25; 34:23; 40:20,
25; 46:19
**responsibility** [1]
19:10
**responsible** [2]
13:16; 39:6
**responsive** [1]
5:23
**Retail** [4]
7:13; 33:19; 34:14; 40:20
**retail** [1]
7:21
**retire** [1]
31:25
**reverse** [1]
9:11
**review** [2]
4:2, 5
**reviewing** [1]
16:7
**Right** [7]
12:7; 14:9, 12; 20:4; 33:20;
37:7, 20
**right** [1]
3:4
**risks** [1]
21:5

**road** [2]
30:15, 17
**Robby** [1]
49:9
**role** [3]
33:23; 34:3; 38:25
**rose** [1]
25:1

**– S –**

**S-C-O-T-T-L-A-N-D** [1]
6:9
**salary** [1]
26:25; 27:3, 6
**Sales** [6]
7:13; 33:19; 34:13, 15, 18;
40:20
**sales** [5]
7:24; 8:1, 8; 17:19, 21
**salesmen** [1]
23:1
**San** [5]
19:11; 20:2; 34:24; 35:2;
40:17
**Santa** [1]
32:17
**Scotland** [1]
6:9
**scripts** [2]·
17:19, 22
**second** [1]
11:3
**SECURITIES** [1]
48:1
**Securities** [7]
3:19; 32:15; 35:16, 18, 19;
36:25; 49:11
**securities** [3]
3:22; 32:12; 44:10
**security** [1]
44:9
**sell** [4]
17:25; 23:2, 5, 13
**seller** [1]
44:9
**selling** [2]·
17:17; 30:13
**sells** [1]
44:2
**send** [1]
19:4
**sequence** [1]
14:17
**share** [1]
45:16
**shares** [12]
12:24; 13:4; 15:4, 18; 26:21;
28:15; 30:7, 8; 39:13; 43:7;
46:5
**sharing** [1]
27:11
**SHERWIN** [6]
4:18, 22; 5:25; 11:3; 46:11;
47:19
**Sherwin** [4]
4:18, 19; 5:2, 4
**shop** [1]
31:3
**SHOPPING.COM** [2]
48:10; 49:3

**Shopping.com** [46]
3:20; 8:25; 9:12, 15, 19, 23;
10:21; 11:8, 15; 12:14; 14:7,
13; 17:17; 21:17; 22:8; 23:2,
5, 9, 12; 24:3; 25:1, 18; 26:2,
7, 11, 12; 27:18; 28:2, 23;
29:8, 19; 31:11, 21; 32:1;
33:23; 40:4, 7; 42:14, 17, 24;
43:6, 16; 44:17, 23, 24; 45:12
**Shopping.com's** [1]
40:6
**shorting** [1]
24:14, 15, 17, 21
**show** [2]
30:15, 17
**showing** [3]
4:24; 26:7, 11
**Silicon** [1]
42:9
**sir** [22]
4:11; 5:11; 7:15; 8:3; 11:12;
12:22; 13:9; 15:16, 21; 16:2,
9, 24; 17:20; 18:1, 20; 19:16,
18; 20:9; 27:17, 19; 47:12, 16
**situation** [2]
42:20; 43:3
**situations** [1]
42:15
**Six** [1]
8:17
**sold** [6]
13:4; 26:22; 27:24; 28:2;
30:7, 8
**solicited** [3]
11:16, 20, 22
**soliciting** [1]
18:11
**Solomon** [1]
3:17
**Somebody** [1]
45:20
**somebody** [1]
44:1
**somehow** [1]
15:1
**someone** [1]
22:8
**sorry** [2]
11:18; 45:7
**sort** [3]
7:24; 9:11; 37:17
**South** [26]
6:10, 16, 21; 8:11, 19; 9:18;
16:25; 19:6, 9; 26:17; 27:7;
30:20; 35:3, 7, 23; 36:2, 4, 5;
37:1, 11, 16, 18, 23; 38:1, 2,
10
**speakers** [1]
30:25
**specific** [3]
30:24; 42:21, 23; 43:4
**specifically** [1]
40:8
**spell** [1]
3:12
**spent** [1]
7:2
**split** [1]
9:11
**spoke** [1]
22:10

From **purposes** to **spoke**

EXHIBIT *3* PAGE 82

squeeze [2]
  29:16; 44:5
staff [2]
  8:13, 14
Stan [1]
  15:22
start [3]
  32:24; 34:6, 20
started [6]
  5:13; 14:5; 18:11; 37:1, 3, 8
State [2]
  11:25; 43:6
state [2]
  3:12, 24
statement [7]
  6:2; 9:4, 9; 11:8, 11; 29:23;
  33:16
statements [4]
  26:5, 10; 30:6; 47:15
States [1]
  3:19
states [1]
  11:25
stepped [1]
  30:9
stock [37]
  6:3; 9:11; 11:17; 12:9; 14:3,
  18, 23; 17:17, 25; 23:2, 6, 9,
  12, 13; 24:3, 14; 25:1, 6, 9,
  18; 26:3, 8, 12; 28:2; 29:19;
  40:4; 44:2, 3, 8, 11, 12, 14,
  17, 23, 24; 45:2
Street [1]
  6:15
street [1]
  44:10
Subpoena [2]
  5:3, 5
suitability [6]
  11:22, 23, 24; 21:3, 5
suitable [1]
  12:10
Suki [2]
  47:1, 3
super [1]
  11:24
supervise [1]
  8:9
supervised [1]
  34:7
Supplemental [1]
  4:8
suppose [1]
  40:16
supposed [1]
  17:10
swear [1]
  49:10
sworn [1]
  3:8
syndication [2]
  39:6, 15
system [1]
  45:23

– T –

talk [3]
  8:24; 9:8; 24:10
Tecum [2]
  5:3, 5

Ten [1]
  8:15
ten [3]
  8:16; 20:22; 33:14
term [7]
  17:9; 29:14, 18; 30:4; 43:20;
  44:5, 7
terms [5]
  11:23, 24; 16:19, 23; 27:2
testified [3]
  3:9; 37:16; 43:19
testifying [1]
  43:21
testimony [2]
  4:6; 48:7
theirs [1]
  39:11
There's [2]
  7:19; 27:12
there's [4]
  27:12, 13, 14; 45:24
they're [3]
  14:19, 21; 23:20
third [1]
  5:3
thousand [1]
  26:21
tickets [2]
  16:3, 8
title [2]
  33:21; 34:13
topics [1]
  39:25
total [1]
  12:23
traded [3]
  24:2; 25:18; 46:1
traders [2]
  23:19, 20
trades [2]
  13:10; 15:2
train [1]
  37:10
training [1]
  7:22
transactions [1]
  28:21
transcript [4]
  48:6, 7, 12; 49:13
transferred [1]
  27:24
translated [1]
  45:22
travel [1]
  34:22
trouble [1]
  30:13
true [2]
  48:6; 49:13
trust [1]
  26:6
types [1]
  39:19

– U –

U.S. [2]
  48:1; 49:11
undersigned [1]
  49:10
understand [3]

  13:21, 22; 43:24
understanding [11]
  12:4, 6; 13:11; 17:12; 24:25;
  28:23; 29:13; 34:19; 37:25;
  44:1, 6
underwriter [1]
  9:1
underwriting [1]
  26:15
United [1]
  3:19

– V –

Valley [1]
  42:9
value [1]
  44:15
variety [1]
  21:11
violations [2]
  3:21, 24
visual [1]
  31:12

– W –

Waldron [58]
  6:2, 20; 7:8, 12, 14, 22; 8:2,
  4, 8, 9, 18, 25; 9:6, 14, 23;
  10:7; 11:7, 15; 12:21; 13:13,
  22; 19:7, 24; 22:10, 13; 23:5,
  24; 25:5; 29:7, 18; 30:13;
  31:16, 21; 32:4; 33:18, 25;
  35:2, 9, 10; 36:10, 19, 21, 24;
  37:2, 25; 38:2, 4, 14; 40:21;
  41:9, 17; 42:15; 44:22, 24;
  45:1; 46:15, 22; 47:4
Waldron's [1]
  8:11
wanted [5]
  8:24; 13:20; 23:13; 37:10;
  42:24
warrants [2]
  27:18, 22
We'll [1]
  5:16
we'll [1]
  6:4
We're [5]
  3:3; 5:17; 11:5; 32:8, 9
we're [2]
  45:9, 11
Wedbush [1]
  15:1
Wednesday [1]
  3:4
weekly [1]
  38:14
weeks [2]
  21:24; 22:1
weren't [1]
  17:21
Westport [1]
  41:6
Whereupon [1]
  3:6
Who's [1]
  10:2
who's [1]
  20:3
William [2]

  15:11, 13
Winkler [2]
  31:3, 13
wired [1]
  43:16
Witness [1]
  49:4
witness [2]
  3:9; 47:18
won't [1]
  17:23
word [1]
  25:24
words [1]
  13:22
work [6]
  6:23; 8:11; 10:6; 11:21;
  35:24; 37:22
worked [3]
  35:17, 19; 36:6
workings [1]
  46:15
wouldn't [5]
  13:6; 29:15, 17; 39:4; 43:19
write [1]
  41:15
writing [2]
  27:12, 14
wrong [1]
  46:7

– Y –

Yeah [2]
  28:4; 34:16
year [4]
  7:5; 27:6, 16; 37:4
Year-end [1]
  27:10
years [2]
  32:13; 35:24
York [4]
  23:19, 21; 25:16; 43:6
you'd [1]
  47:14
you've [3]
  5:10; 46:14; 47:15
yours [1]
  19:25
yourself [1]
  28:6