1  Leslie Schwaebe Akins (SBN 138678)
   LESLIE SCHWAEBE AKINS, A LAW CORPORATION
2  7157 Argonauta Way
   Carlsbad, CA 92009
3  Tel: 760-931-2920
   Fax: 760-603-0547
4
   Attorney for Plaintiff and Creditor
5  Alfonso Fiero

6

7            **UNITED STATES BANKRUPTCY COURT**
      **FOR THE CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

8

In re                                )   CASE NO. LA 01-26497-BB
9                                     )
CERY BRADLEY PERLE,                   )   [Chapter 7]
10                                    )
         Debtor.                      )   Adv. No.: ADV-06-01971-BB
11   _____ )
                                      )   The Honorable S. Bluebond - 626
12   ALFONSO FIERO,                   )
                                      )   **SUPPLEMENTAL AFFIDAVIT OF JOHN**
13              Plaintiffs,           )   **FIERO FILED IN SUPPORT OF**
                                      )   **PLAINTIFF ALFONSO FIERO'S**
14        vs.                         )   **MOTION FOR SUMMARY JUDGMENT**
                                      )   **OR, ALTERNATIVELY, FOR PARTIAL**
15   CERY BRADLEY PERLE,              )   **SUMMARY JUDGMENT**
                                      )
16              Defendant.            )
                                      )   **DATE: November 10, 2009**
17                                    )   **TIME:  2:00 p.m.**
                                      )   **CTRM: 1475**
18                                    )
                                      )
19                                    )   DATE FILED: September 13, 2006
                                      )   DISCOVERY CUT OFF: July 31, 2009
20                                    )   TRIAL DATE: None set
                                      )
21   _____ )

22  John J. Fiero, being duly sworn, deposes and says:

23        1.    I am a resident of the state of Florida, and am the former President, sole

24  owner and Director of Fiero Brothers, Inc. ("Fiero Bros."). I am also the uncle of Alfonso

25  Fiero, the plaintiff and assignee of the Assignment of Judgment dated March 1, 2006 by

26  Fiero Brothers, Inc. I have personal knowledge as to all facts set forth in my affidavit and

27  could competently testify thereto if called upon to do so. As to those facts set forth on

28  information and belief I believe them to be true.

---

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO
1

1       2.     Fiero Bros. is a judgment creditor of the debtor and defendant Cery B. Perle

2 ("Perle"), which is reflected in the Judgment entered April 6, 1999 by the Los Angeles

3 Superior Court in the case entitled *Fiero Brothers, Inc. v. Waldron & Co. and Cery Perle*,

4 Los Angeles Superior Court Case No. BS055659 ("the Judgment"). The Judgment

5 resulted from the Los Angeles Superior Court granting Fiero Bros.' Petition to Confirm

6 Arbitration Award for $350,000, which arbitration award was rendered in the National

7 Association of Securities Dealers ("NASD") arbitration proceeding entitled *Fiero Brothers,*

8 *Inc. v. Waldron & Co., Inc., Cery Perle, Wedbush Morgan Securities, Inc. and Ed*

9 *Wedush*, NASD Case No. 98-00587 (the "NASD Arbitration").

10       3.     The events that gave rise to Fiero Bros.'s NASD Arbitration against

11 defendant Perle, his former broker-dealer Waldron & Co., Inc. ("Waldron"), its clearing

12 firm Wedbush, Morgan, Securities, Inc. ("Wedbush"), and its president Ed Wedbush took

13 place in 1997 and 1998. During that time I was the president of Fiero Bros. and testified

14 on behalf of Fiero Bros. at the NASD Arbitration that took place from September 1-4,

15 1998.

16 **Fiero Bros. As a Market Maker and Short-Seller of Stock.**

17       4.     In 1998, Fiero Bros. was a registered securities broker-dealer located in New

18 York, New York, and was a member of the NASD. As of that time, I had been in the

19 securities business since the early 1980s, and founded Fiero Bros. in 1991. Fiero Bros.

20 did not have retail accounts, but traded for its own account.

21       5.     Additionally, Fiero Bros. was a registered "market maker" for numerous

22 securities trading on the NASDAQ system. A "market maker" is a person or a firm who

23 quotes both a buy and a sell price in a security hoping to make a profit on the turn or the

24 bid/offer spread. A "market maker" has an obligation to buy when there is an excess of

25 sell orders and to sell when there is an excess of buy orders. Each market maker

26 competes for customer order flow by displaying buy and sell quotations for a guaranteed

27 number of shares. Once an order is received, the market maker immediately sells from its

28 own inventory or seeks an offsetting order.

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1       6.    The NASDAQ Stock Exchange, employ several competing official market

2   makers in a security. These market makers are required to maintain two-sided markets

3   during exchange hours and are obligated to buy and sell at their displayed bids and offers.

4   They typically do not receive the trading advantages a specialist does, but they do get

5   some, such as the ability to naked short a stock, i.e. selling it without a borrow. In most

6   situations only official market makers are permitted to engage in naked shorting, and are

7   exempt from the NASDAQ short sale rule.

8       7.    As a registered market maker, Fiero Bros. at times had to sell shares of a

9   stock that it did not own, which in the securities industry is commonly referred to as taking

10   a "short" position in a stock. Taking a "short" position is a procedure whereby an investor

11   who considers a stock to be overvalued in the market (i.e., its market price is higher than

12   its actual worth) sells shares that he does not then own, believing that the market price will

13   correct and drop to reflect the true value of the stock. The goal of the short seller is to

14   "cover" his short position, i.e., purchase shares of the stock he has shorted, at a price that

15   is less then the price that he previously sold said stock. If that occurs, then the investor

16   has made a profit on the transaction, as measured by the difference between what he sold

17   the stock for and the price he was able to repurchase said stock in the market.

18       8.    Fiero Bros. cleared its securities trades through King Financial Services, Inc.

19   ("King"), which was a registered broker-dealer and clearing firm. Clearing firms are

20   independent intermediaries that specialize in clearing trades for brokers/dealers through

21   the exchange-run clearing house. "Clearing" is necessary for the matching of all buy and

22   sell orders in the market. It provides smoother and more efficient markets, as parties can

23   make transfers to the clearing corporation, rather than to each individual party with whom

24   they have transacted.

25       9.    Both Fiero Bros. and King were members of the National Securities Clearing

26   Corporation ("NSCC") (now a subsidiary of Depository Trust & Clearing Corporation

27   ("DTCC") which is the major clearing house for securities transactions on the major stock

28   exchanges in the United States. King, cleared its trades (including those executed for

1   Fiero Bros.) through the NSCC. Trades cleared through NSCC are subject to NSCC's

2   continuous net settlement ("CNS") process. CNS is an automated book-entry accounting

3   system that centralizes the settlement of compared transactions and maintains an efficient

4   flow of security and money balances. During the CNS process, there are reports that are

5   generated which document the movements of money and securities.

6   **Waldron, Wedbush and Shopping.com.**

7         10.    In 1997, Waldron was a registered broker-dealer and NASD member

8   headquarters in Irvine, California. In 1997 and through mid-1998, Waldron cleared its

9   trades through Wedbush, another registered broker-dealer and NASD member. Part of

10   Waldron's business was acting as an underwriter for privately held companies that wanted

11   to go "public", by selling their stock in an "initial public offering" ("IPO"). An IPO is when

12   a company (the "issuer") issues common stock or shares to the public for the first time.

13         11.    In an IPO, the issuer may obtain the assistance of an underwriting firm,

14   which helps it determine what type of security to issue (common or preferred), best

15   offering price and time to bring it to market. Waldron was the lead underwriter of IBUY

16   shares when Shopping.com went public in late November 1997. Additionally, Waldron

17   was the primary market maker in IBUY shares after its IPO.

18         12.    After Shopping.com's IPO, its stock (ticker symbol "IBUY") traded on the

19   NASDAQ Bulletin Board. The NASDAQ Bulletin Board is an electronic quotation medium

20   by which market makers, such as Fiero Bros., post bid and ask quotations in real time.

21   Under the Rules of the NASD, now consolidated with the NYSE as the Financial Industry

22   Regulatory Association ("FINRA"), each trade is reported to NASDAQ and made public

23   within 90 seconds by virtue of an ACT report that prints to the tape. Under this system, a

24   Bulletin Board stock's price and volume information is made public almost instantaneously.

25   Further, this information is published by internet sites such as "Yahoo" to the public on a

26   fifteen-minute delay: last trade, change, previous close, volume, day's range, bid, ask,

27   open, 52 week range, performance charts, SEC filings and news. Thus, the NASDAQ

28   Bulletin Board market has transparency that is similar to that of a major stock exchange

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   such as the New York Stock Exchange.

2   **Fiero Bros. Justifiably Relied on Information Available in the Market in Determining**

3   **to Sell Short Shopping.com**

4       13.   As a market maker, Fiero Bros. was continuously researching stocks to

5   identify potential trading opportunities. In January 1998, I came across Shopping.com

6   and, based on my review of publicly available information on Shopping.com, I determined

7   that the stock was overvalued, and that it may be a suitable stock for Fiero Bros. to short

8   and make a market. My opinion was based on the information contained in the filings

9   made by Shopping.com with the Securities and Exchange Commission ("SEC"), my

10  research of Shopping.com itself, including its management, its history and profitability in

11  the marketplace, its underwriting firm ( Waldron) and its management led by defendant

12  Perle, and information set forth in articles published about the company including in

13  Bloomberg, and information available through NASDAQ.

14      14.   Based upon my experience in the securities industry, I am knowledgeable

15  and experienced in the operational aspects of securities purchase and settlement of

16  transactions, including the NASD's rules related thereto. By way of background, in a short

17  sale, a "buy-in" transaction occurs where a seller is unable to deliver to its buyer on the

18  settlement date or thereafter the shares of the stock it has sold. In that instance, the buyer

19  of the stock may, after making demand upon the seller, buy the shares from a third party

20  elsewhere in the market. If the shares are purchased at a price higher than the price at

21  which they were sold to the buyer by the seller, the difference is charged to the seller's

22  account. This procedure of purchasing the shares from a third party is referred to as

23  "buying in" for the seller's account because, in terms of mechanics, the original buyer is

24  causing the original seller to buy the shares from the third party and to resell them to the

25  buyer at the original contract price.

26      15.   "Buying-in" is regulated by the rules of the NASD, which require the party

27  who causes the buy-in to occur to justify the price of the shares "bought-in." Specifically,

28  Rules 11810(c)(1(C) of the NASD Uniform Practice Code ("the Code") provides in

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1 | pertinent part, as follows:

2 | [where a buy-in is executed] members must be prepared to defend the price at
3 | which the "buy-in" is executed relative to the current market at the time of the "buy-
4 | in."

5 | 16.    The NASD rules contemplate and require that shares bought-in for the
6 | account of the seller be purchased at the "best available market", and a seller who is
7 | subject to a buy-in transaction relies upon compliance with the rules by others in taking a
8 | short position. It was determined in the NASD Arbitration that Fiero Bros was damaged
9 | in the amount of $350,000 as a result of Perle's manipulation of the stock.

10 | **Timing and Pricing of Fiero Bros.' Stock Sales and Purchases**

11 | 17.    In January 1998, Fiero Bros. registered as a market maker of Shopping.com
12 | stock. Fiero Bros. was the only market maker in IBUY stock that cleared its trades through
13 | King Financial Services, Inc. (Clearing No. 8301).  Hence, all trade tickets and trading
14 | records showing King as the contra party were, in reality, against Fiero Bros. as the party/
15 | ultimate account holder.

16 | 18.    Fiero Bros. first started its market making in Shopping.com stock, and first
17 | took a short position in Shopping.com stock on January 28, 1998.  Between January 28,
18 | 1998 and February 11, 1998, Fiero Bros. bought and sold Shopping.com stock, posting
19 | its bid and ask prices on the NASDAQ Bulletin Board, and acquiring a short position of
20 | 78,432 shares, with a weighted average cost of $22.89 per share.

21 | 19.    On the afternoon of February 11, 1998, I received notice from my clearing
22 | firm King, that Waldron, through its clearing firm Wedbush, would be effecting a "buy-in"
23 | of a large portion of my short position in Shopping.com stock the next day.  A "buy-in" in
24 | the securities industry it refers to a process by which the buyer of securities, whose seller
25 | fails to deliver the securities contracted for, can 'buy in' the securities from a third party at
26 | the market price with the defaulting seller to make good.

27 | 20.    On February 12, 1998 I was informed that late in the day Waldron had
28 | conducted a buy-in of Shopping.com stock against Fiero Bros. of 35,350 shares at $25.25

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1  per share. However, I did not see a report of this trade made to NASDAQ Bulletin Board
2  as is required under the rules.  The prices at which Shopping.com traded that day were
3  between $21.25 an $24.875 per share, closing that day at $21.75, which fact was printed
4  in NASDAQ Bulletin Board Time and Sales Reports.

5      21.    Attached hereto as **Exhlbit 1** is a true and correct of an eleven page OTC
6  (over the counter) Time and Sales Report for Shopping.com for February 12, 1998, which
7  indicates that it was published by Nasdaq Trading & Market Services.  This OTC Report
8  was produced by my attorney Martin Russo, Esq. to defendant Perle in the underlying
9  NASD Arbitration, as indicated by its Bates Stamp F008107-8117.  Exhibit 1 depicts the
10  activity of market makers buying and selling shares of Shopping.com on February
11  12,1998. The trade date is reflected in the first column, the time of the trade is reflected
12  in the second column, the identity of the various market makers executing the trades are
13  identified in the fourth column, the buy/sell is reflected in the fifth column, the volume of
14  the trade is reflected in the sixth column, the price that the trade was executed at is
15  reflected in the seventh column, and the contra-market maker is identified in the eighth
16  column.    Exhibit 1 reflects that thirty market makers bought and sold shares of
17  Shopping.com in 404 transactions, none of which exceeded $24.875 per share.

18      22.    As a result of Waldron's above market buy-in, Fiero Bros. was charged a
19  $.75 per share premium, resulting in Fiero Bros. paying an extra $26,513 more than the
20  then prevailing market price for Shopping.com stock.

21      23.    As a result of the above-market buy-in, Fiero Bros.' account was
22  automatically debited when Waldron and Perle bought Fiero Bros. in at the above-market
23  price. In a short sale, the cash which Fiero Bros. derived from the sale was credited to the
24  account of its clearing firm, King, at the NSCC, until the covering shares were bought.
25  When Waldron and Wedbush went into the market and decided to buy in IBUY stock at
26  a price higher than the market, they directly debited the account with the above-market
27  buy-in price. As a result of the buy-in, Fiero Bros.' account was debited for the entire
28  amount  necessary to satisfy the buy-in. The funds taken from Fiero Bros.' King' account

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1    were paid to the people who did the buy-in: Perle and Wedbush.

2        24.    On February 17, 1998, Fiero Bros. filed a Statement of Claim and Demand

3    for Arbitration in the NASD Arbitration, and sought monetary damages resulting from the

4    above market buy-in of Shopping.com stock.  Fiero Bros. also filed a separate lawsuit in

5    the Los Angeles Superior Court, Case No. BC-186952, entitled *Fiero Brothers, Inc. v.*

6    *Waldron & Co., Inc., Cery Perle, and Wedbush Morgan, Inc.*, seeking to enjoin said

7    defendants from engaging in additional buy-ins of Shopping.com stock at above market

8    prices, in violation of NASD Rules, and Federal and State securities laws.

9        25.    On March 5, 1998, Fiero Bros. was again notified that Waldron was effecting

10    a buy-in against Fiero Bros. of its short position of Shopping.com the next day.

11        26.    On March 6, 1998, Waldron, through Wedbush, executed a buy-in against

12    Fiero Bros. of 25,455 of Shopping.com stock at $29.00 per share.  However, from the

13    information available through NASDAQ, Shopping.com only traded at prices between

14    $25.875 and $25.975per share that day.  Further, other short sales made by Fiero Bros.

15    that day were at $25.97.  Hence, a buy-in at market price would have resulted in negligible

16    gain or loss.    Nevertheless, the only trade reported at the $29.00 per share price was

17    Waldron's forced buy-in against Fiero Bros. and others.  As a result, Fiero Bros. was

18    forced to pay more than $77,956 above the then prevailing market price for the buy-in of

19    Shopping.com by Perle and Waldron.

20        27.    Attached hereto as **Exhibit 2** is a true and correct of an OTC Time and Sales

21    Report for Shopping.com for March 6, 1998, which indicates that it was published by

22    Nasdaq Trading & Market Services.  This OTC Report was produced by my attorney

23    Martin Russo to defendant Perle in the underlying NASD Arbitration, as indicated by its

24    Bates Stamp F008118-F008119.  Exhibit 2 reflects that thirty market makers bought and

25    sold shares of Shopping.com in 57 other transactions, none of which exceeded $ 25.9675

26    per share.

27        28.    Fiero Bros. continued its efforts to enjoin Perle's and Waldron's forced buy-

28    ins of Shopping.com stock at above market prices, both in the NASD Arbitration and in the

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   companion Los Angeles Superior Court action.  In March 1998, Fiero Bros. filed its First

2   Amended SOC in the NASD Arbitration, and moved to restrain further buy-ins in the Los

3   Angeles Superior Court action.

4       29.   On March 10 ,1998, Fiero Bros. held a short position in Shopping.com. That

5   day, I was again informed that Waldron was going to execute the next day a buy-in of

6   Shopping.com stock at a price far in excess of the market price unless I could cover Fiero

7   Bros short position with guaranteed delivery.  By this time I had determined that Waldron

8   owned or controlled more than 90% of the public float of Shopping.com stock, at that I

9   would not be able to obtain sufficient stock on the open market to cover Fiero Bros.' short

10  position for next day guaranteed delivery.  As a result, on March 11, 1998, Perle and

11  Waldron, through Wedbush, executed a buy-in of 34,428 shares of Shopping.com stock

12  against Fiero Bros. at the price of $36.00 per share.  This price was more than $6.00 per

13  share above the market price of the stock that day, and resulted in Fiero Bros. paying an

14  extra $282,998 for the IBUY stock, over and above the existing market price.

15      30.   Attached hereto as **Exhibit 3** is a true and correct of an OTC Time and Sales

16  Report for Shopping.com for March 11, 1998, which indicates that it was published by

17  Nasdaq Trading & Market Services.  This OTC Report was produced by my attorney

18  Martin Russo to defendant Perle in the underlying NASD Arbitration, as indicated by its

19  Bates Stamp F008875-F008879.  Exhibit 3 reflects that the only transactions were

20  executed at a price greater than $29.4375 per share other than those at the end of the day

21  by Waldron.

22      31.   Again, on March 16, 1998, while Fiero Bros. was short, Perle and Waldron,

23  through Wedbush, executed another buy-in of Shopping.com stock against, among others,

24  Fiero Bros., buying in 38,057 shares at $26.50 per share.  The market price for

25  Shopping.com stock traded that days at prices between $22 and $26 per share. At the

26  time of the buy-in, the Shopping.com was trading at $24.50 per share, i.e. $2.00 per share

27  less than the buy-in price.  As a result of Perle and Waldron's forced buy-in, Fiero Bros.

28  paid an extra $2.00 per share, for an extra amount of $76,114.

---

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   32.   Attached hereto as **Exhibit 4** is a true and correct of an OTC Time and Sales

2   Report for Shopping.com for March 16, 1998, which indicates that it was published by

3   Nasdaq Trading & Market Services.  This OTC Report was produced by my attorney

4   Martin Russo to defendant Perle in the underlying NASD Arbitration, as indicated by its

5   Bates Stamp F008897-F008918.

6   33.   On March 18, 1998, Fiero Bros. filed its Second Amended SOC in the NASD

7   Arbitration, claiming monetary damages for the four above-market buy-ins identified

8   above. (See Exhibit 3 to my December 18, 2008, filed concurrently herewith.)

9   34.   The Second Amended SOC included much more of the information learned

10  since Fiero Bros. filed its original SOC.  Specifically, Fiero Bros. asserted that since the

11  time of Shopping.com's IPO in November 1997, Waldron controlled more than 90% of the

12  public float, supported the price of IBUY shares through artificial market making activity,

13  illegal "parking" arrangements with its brokers and third parties, gave improper guarantees

14  against loss and fraudulent buy-in activities.

15  35.   Further, the day after Fiero Bros. filed its Second Amended SOC in the

16  NASD Arbitration, suffered an additional forced buy-in by Perle and Waldron of

17  Shopping.com stock. On March 19, 1998, Waldron, through Wedbush, executed a buy-in

18  against Fiero Bros. of 28,954 shares of Shopping.com stock at $39.00 per share.  That

19  day the market price for Shopping.com stock that day varied between $24 and $26.00 per

20  share, meaning that Waldron executed this buy-in at approximately 50% above the market

21  price.  This excessive price premium resulted in Fiero Bros .paying an extra $372,783

22  above market to cover of its short position in IBUY stock.

23  36.   Attached hereto as **Exhibit 5** is a true and correct of an OTC Time and Sales

24  Report for Shopping.com for March 16, 1998, which indicates that it was published by

25  Nasdaq Trading & Market Services.  This OTC Report was produced by my attorney

26  Martin Russo to defendant Perle in the underlying NASD Arbitration, as indicated by its

27  Bates Stamp F008934-F008937.

28  / / /

1     37.    At the NASD Arbitration hearing, Fiero Bros. also produced evidence that

2    Perle and Waldron attempted to effect the March 19, 1998 buy-ins of Shopping.com stock

3    at the even higher price of $44.00 per share, but backed down to $39.00. If this occurred,

4    the per share price would have been approximately $20.00 greater than the market price

5    for said stock- i.e., an over charge of approximately 75%. Attached hereto as **Exhibit 6**

6    is a true and correct copy of one page of Fiero Bros. Arbitration Exhibit 58 (Bates Stamp

7    F007023), which is the hand written trade ticket attempting this even greater buy-in of

8    IBUY stock at $44.00 per share (reduced to $39.00). This buy-in of IBUY stock was

9    effected against Fiero Bros. at $39. When the market price was far less. The benefit of

10    the excess mark up in price above the then prevailing market price was received by

11    Waldron and Perle.

12     38.    On March 24, 1998, the SEC suspended trading in Shopping.com stock.

13    Attached hereto as **Exhibits 7** and **8** are true and correct copies of an Order of

14    Suspension of Trading in IBUY stock (NASD Arbitration Exhibit 24 (F006465), issued by

15    the SEC, and an article which was published on the Bloomberg news service on or about

16    March 24, 1998 (Fiero NASD Arbitration Exhibit 28 (F006481-F006484), relating that the

17    SEC had suspended trading in the stock, respectively

18    **Fiero Bros.' Out-of-Pocket Damages Resulting From Manipulation of the**

19    **Market for Shopping.com**

20     39.    At the NASD Arbitration, Fiero Bros. presented more than 68 pre-numbered

21    exhibits, totaling thousands of pages of documents. Copies of these documents were

22    produced by my former attorney Martin Russo at his deposition taken in this adversary

23    proceeding. Additionally, Fiero Bros. called ten witnesses who testified at the arbitration

24    hearing including myself John Fiero (regarding Fiero Bros., short-selling of IBUY, forced

25    buy-ins of IBUY stock, damages), Robert Paset (Wedbush participation in Waldron and

26    Perle's buy-ins of IBUY stock), Wendy Rae (Wedbush participation in Waldron and Perle's

27    forced buy-ins of IBUY stock), Joseph Gerace(former Chief Operating Officer at Waldron

28    regarding large stock positions in Waldron inventory account and net capital violation), Ed

1  Wedbush ( Wedbush participation in Perle and Waldron's buy-ins of IBUY stock), Cery
2  Perle (control of IBUY stock, forced buy-ins above market price), Wayne Sewell (Waldron
3  and Perle's market manipulation of IBUY stock), Steve Ehlers (Perle and Waldron's offer
4  to participate in market manipulation of IBUY stock), Michael Vanbcanos (other market
5  maker caught in forced buy-in of IBUY stock), Dean Hillsick (Fiero Bros. accountant
6  regarding damages), Walter J. Robertson (expert witness regarding market manipulation
7  of IBUY stock and securities violations by Waldron and Perle).

8       40.    At the NASD Arbitration, Fiero Bros. presented evidence that it suffered
9  damages as a result of Perle and Waldron's forced buy-ins at prices that greatly exceeded
10 the market price for IBUY stock. The total amount of Fiero Bros.' damages, i.e., its
11 out-of-pocket costs resulting from the above-market buy-ins identified in Fiero Bros.'
12 Second Amended SOC (i.e., February 12, 1998, March 6, 1998, March 11, 1998, and
13 March 16, 1998) was $789,255. This damage figure was determined by calculating the
14 difference between the buy-in price and the weighted average cost per share received by
15 Fiero Bros. in selling Shopping.com stock. At the NASD Arbitration, Fiero Bros. presented
16 an alternative calculation of its damages based on the excessive buy-in prices charged
17 compared to the market price of IBUY stock on the buy-in dates. Under this alternative
18 methodology, Fiero Bros.' out of pocket damages on the four buy-ins identified in Fiero
19 Bros.' Second Amended SOC was $463,581 (or if include the 3/19 buy-in then
20 $1,187,932) when measured against the buy-in price as compared to the market price at
21 the time of buy-ins. Attached hereto as **Exhibit 9** is a true and correct copy of a Summary
22 of Fiero Bros.' damages, which was designated by Fiero Bros. as Arbitration Exhibit 68 in
23 the NASD Arbitration (Bates Stamp F007221-7228), and was introduced and discussed
24 at the arbitration and admitted into evidence. I compiled Exhibit 68 along with Fiero
25 Bros.'accountant Dean Hillsick from my records, specifically, from documents.

26      41.    Attached hereto as **Exhibit 10** is a true and correct copy of Fiero Bros.'
27 NASD Arbitration Exhibit 53, which is its Daily Trade Activity in IBUY, generated by its
28 clearing firm King, reflecting the trades for IBUY stock from February 1998 through March

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   31, 1998 (Bates Stamp F006822-6833).  This document was provided to Perle and
2   admitted into evidence at the NASD Arbitration, and used to establish the foundation for
3   Exhibit 68 which summarize the damages suffered by Fiero Bros. from the above market
4   buy-ins.  Further, this document was produced by my former attorney Martin P. Russo,
5   Esq. pursuant to subpoena in the instant matter.

6       42.    Under the two alternative damage calculations presented at the NASD
7   Arbitration, Fiero Bros.'s damages were as follows:

| Date | No. Shares | Buy-In $ | Market Price | Damage | Weighted Ave | Damage |
|------|-----------|----------|--------------|--------|--------------|--------|
| 2/12/98 | 35,350 | 25.25 | 24.5 | 26,513 | 22.93 | 82,063 |
| 3/6/98 | 25,455 | 29.00 | 25.9375 | 77,956 | 20.85 | 207,564 |
| 3/11/98 | 34,428 | 39.00 | 29.3125 | 282,998 | 21.09 | 513,236 |
| 3/16/98 | 38,057 | 26.50 | 24.50 | 76,114 | 26.62 | 4,637 |
| 3/19/98 | 28,954 | 39.00 | 26.125 | 372,783 | 25.54 | 389,707 |

15  Exhibit 68 summarized, and totalled loss from the four buy-ins of $789,255 (or $1,187,932
16  if include the 3/19 buy-in).

17      43.    Attached hereto as **Exhibit 11** is a true and correct copy of Fiero Bros.'
18  NASD Arbitration Exhibit 59 (Bates Stamp F007031-F07034) and is an OTC Daily Trading
19  Summary published by Nasdaq Trading and Market Services, for Shopping.com stock for
20  the period from December 1, 1997 through April 30, 1998. Exhibit 59 reflects the high and
21  low prices, closing price and volume of Shopping.com shares traded on each day during
22  that period. Exhibit 59 establishes that, the fact buy-ins of IBUY Stock exceeded the
23  trading range reported on the buy-in dates.

24  **Fiero Bros. Had No Knowledge of Perle's Fraudulent Scheme at the Times They Sold**
25  **Shopping.com Stock Short and When They Were Bought In Above-Market.**

26      44.    While Fiero Bros. believed that Shopping.com stock was overvalued at the
27  time it became a market maker for Shopping.com stock, and at the times when it sold
28  Shopping.com stock short, I had no knowledge of Perle's fraudulent scheme with regard

1   to Shopping.com either at the time Fiero Bros. engaged in the short sales or at the times
2   when Fiero Bros. was bought in at above-market prices.

3       45.    Based upon the information learned in the NASD arbitration proceeding, and
4   subsequently in the SEC's District Court lawsuit, also filed in 1998, it was established that,
5   in this case Waldron improperly obtained from Shopping.com's then president, a
6   confidential reports from Depository Trust Company ("DTC"), which identified   the
7   brokerage firms held Shopping.com stock in the market, and which firms were "short"
8   IBUY stock (including Fiero Bros.). By obtaining these DTC Reports Waldron and Perle
9   were able to know where to go to buy up any remaining public shares of Shopping.com
10  stock, and who would be affected by force buy-ins of Shopping.com stock.  Hence, Perle
11  and Waldron knew at all times who was "short", when Fiero Bros. was short IBUY stock,
12  and that Fiero Bros. would be injured if Perle and Waldron instituted  forced buy-ins of
13  IBUY at above-market prices.

14      46.    Attached hereto as **Exhibit 12** is a true and correct copy of  NASD
15  Arbitration Chart A (F005004), which is a summarization of the information relayed on
16  Exhibit 1 (F005010-F005149), which is the DTC Position Report for IBUY stock from 1/98-
17  4/15/98.  These documents were provided to Perle and the NASD arbitration panel during
18  the NASD Arbitration, admitted in the arbitration, and show each clearing firm's position
19  in IBUY stock as of the date reported.   Since Waldron cleared through Wedbush
20  (participant no. 0103), the positions stated for Wedbush are, in reality, for Waldron.

21      47.    Just as alleged by Fiero Bros. in the NASD Arbitration, in the SEC
22  enforcement action brought against Perle,  the District Court found that Waldron
23  conducted unauthorized trades in Shopping.com stock, parked stock in fictitious accounts
24  and the accounts of other Waldron customers, restricted customer sales of Shopping.com
25  stock, refused customer requests to sell shares of Shopping.com stock, and penalized
26  employees who carried out customer sell instructions. (Please see Finding Nos. 19-165
27  of the District Court on the SEC's Motion for Summary Judgment in the SEC enforcement
28  action, which is filed as App. Ex. 2  in support of this motion.) .

1    48.    Fiero Bros. would not have acted as a market maker of IBUY stock, nor

2   taken short positions in Shopping.com if it was public knowledge at the time that the price

3   of the stock was being artificially manipulated, that Perle was obtaining proprietary DTC

4   Reports so he knew which market makers were short in the stock, and if it were publicly

5   known that Waldron directly or indirectly controlled more than 90% of the public float in

6   Shopping.com.

7   **Due to Perle's Control of the Market for Shopping.com Stock. Fiero Bros. Could Not**

8   **Have Purchased Stock on the Open Market to Cover Their Short Sales, and Were**

9   **Bought In by Perle and Waldron at Grossly Inflated Prices.**

10    49.    Because of Perle and Waldron's control over the virtually all of IBUY stock

11   (See, Exhibit 14 (NASD Arbitration Ex. 1 and Chart A)), even if Fiero Bros. had received

12   sufficient advance notice of the buy-ins to cover its short positions on the open market, it

13   would not have been able to do so because at the time of the buy-ins of IBUY stock, Perle

14   and Waldron controlled the market for IBUY stock, and had so restricted the supply of the

15   stock on the open market such that it was  impossible for Fiero Bros. (or for that matter,

16   the other short sellers who were bought in) of IBUY stock to find sufficient shares to cover

17   its short positions.

18    50.    During the initial public offering ("IPO") of Shopping.com conducted by

19   Waldron, the company raised $1 1.7 million on the sale of 1.3 million shares of common

20   stock at a price of $9.00. (Please see Finding No. 14 of the District Court on the SEC's

21   Motion for Summary Judgment in the SEC enforcement action, App. Ex. 2, See also

22   **Exhibit 12.**    After the IPO, 1.3 million Shopping.com shares traded publicly in the

23   over-the-counter ("OTC") market. (Please see App. Ex. 2 , at Finding Nos. 14 and 15 .)

24    51.    In the SEC enforcement action the District Court made detailed findings of

25   fact regarding Perle's and Wedbush Morgan's activities to control and restrict the supply

26   of IBUY stock, and to prop up the price. Specifically, the SEC District Court found that

27   Waldron acted as the primary market maker for Shopping.com, meaning that Waldron

28   posted bid and ask prices to the public and stood ready to buy or sell the stock at the

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1  posted prices. (App. Ex. 2, Finding No. 16). From November 1997 through at least April

2  1998, Waldron controlled nearly all of the Shopping.com shares available for public

3  trading. Between November 25, 1997 and March 23, 1998, Shopping.com's stock price

4  increased 255% from $9.00 to $32.13 per share, despite the company's dismal financial

5  performance. (App. Ex. 2, Finding Nos. 17-18.) As of December 19, 1997, Waldron held

6  253,295 shares of Shopping.com stock in its inventory accounts, and its customers held

7  972,320 shares of the stock in their accounts. Thus, as of December 19, 1997, Waldron

8  controlled 94.3% of the 1.3 million publicly tradable shares, and continued to hold over

9  90% of those shares from December 19, 1997 through April 3, 1998. (App. Ex. 2, Finding

10  Nos. 19-22.)

11      52.    The inability of Fiero Bros. to purchase shares on the open market to cover

12  its short positions on February 12, and March 6, 11, 16 and 19, 1998 due to the lack of

13  shares available on the open market is illustrated by a chart which was used by Fiero

14  Bros.' counsel as a demonstrative exhibit at the arbitration of the NASD Arbitration.

15  **Exhibit 12** attached hereto provides a weekly breakdown for the period from January 17,

16  1998 through April 3,1998, of stock held in the proprietary accounts of Waldron and its

17  customers at Wedbush Morgan, of: (1) the total shares of Shopping.com held on the

18  books of its clearing agent, Wedbush Morgan, (2) total shares on Wedbush's books,

19  divided by the number of (supposedly) freely trading IPO shares of Shopping.com (1.3

20  million); (3) the number of shares actually received (held) by Wedbush Morgan; (4) the

21  number of shares on the street; and (5) the weekly trading volume.

22      53.    The information on **Exhibit 12** (Chart A in particular) is derived from two

23  documents designated by Fiero Bros. in the NASD arbitration as Fiero Bros. Exhibits 1,

24  as well as Fiero Bros.' NASD Arbitration Exhibit 9 which is Wedbush Morgan's Stock

25  Record for IBUY (Bates Stamp F005870-F06133) is Wedbush Morgan Securities Stock

26  Record Weekly Position Report for the period from November 1997 through April 1998.

27  A true and correct copy of Fiero Bros.' Arbitration Exhibit 9 is attached hereto as **Exhibit**

28  **13.** This document was also provided to Perle and the NASD arbitrators and offered at

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   the NASD Arbitration. Copies of this document were provided to Perle and to the NASD

2   arbitrators at the NASD Arbitration.

3       54.    Attached hereto as **Exhibit 11** is a true and correct copy of Fiero Bros.'

4   Arbitration Exhibit 59 and referenced previously, is a Nasdaq OTC Daily Trading Summary

5   for Shopping.com for the period from December 7, 1997 through April 30, 1998. The

6   information in the "Shares Received by Wedbush" column is also reflected in Fiero Bros.'

7   NASD Arbitration Exhibit 1, which is a Depository Trust Company Automated Call Lottery

8   System Participant Position Report for Shopping.com for the period January 1998 through

9   April 15,1998. A true and correct copy of Fiero Bros.' NASD Arbitration Exhibit 1, which

10  shows on a daily basis the identities of all holders of Shopping.com shares, the amounts

11  they held, and whether those shares were pledged for guaranteed delivery (and therefore

12  unavailable to for purchase by a short seller seeking to buy stock to cover his short

13  position, or to avoid being bought in) or unpledged.

14      55.    Review of these documents reveal that during the weeks ending February

15  6, 1998 through March 20, 1998 (including the dates when Fiero Bros. were bought in at

16  the above-market price), Wedbush Morgan actually held on its books, in the proprietary

17  accounts of Waldron and its customers, more shares than existed in the public float.

18  Shopping.com's IPO was for 1.3 million shares; yet, during this time, Wedbush Morgan

19  held up to 1,566,338 shares (120.49%). From mid-February through mid-March there were

20  only about 80,000 shares available on the street, and during the week ending March 13,

21  1998, when Fiero Bros. was bought in above-market for $39 per share, there were only

22  45,686 shares available for purchase on the open market. Yet during that week,

23  supposedly 1,577,000 shares traded hands (weekly volume). This was also proven to this

24  Court in the Corsair Adversary Proceeding.

25      56.    Fiero Bros.' Arbitration Exhibit Chart C entitled IBUY Shares in "Friendly"

26  Customer Accounts (F005006), which is a summary of the information set forth in Fiero

27  Bros.' NASD Arbitration Exhibit 65, a true and correct copy of which is attached hereto as

28  **Exhibit 14.** Attached hereto as **Exhibit 15** is a true and correct copy of Fiero Bros.'

1  Arbitration Exhibit 65 (Bates Stamp F007104-F007174), which are account statements for
2  the "friendly" customers for IBUY stock, where IBUY stock was held to keep the stock in
3  control of Perle and Waldron.   Chart C and Exhibit 65 show the total number of
4  Shopping.com shares held in the accounts of (1) Cery Perle, (2) Perle's  partners in
5  Aubry/Perle holdings, the holding company which owned Waldron, Jon Aubry and Ed
6  Harris ("Harris"), and related persons and trusts, (3) William D. Long, a close friend and
7  business associate of Harris for about 25 years, and related persons, and (4) Lisa, Patrick
8  and Sean Oudt. (a Waldron employee) Chart C and supporting Exhibit 65 were discussed
9  at the NASD Arbitration hearing, and was identified by this Court in its Findings of fact and
10  Conclusions of Law when granting summary judgment to Corsair Capital Partners in its
11  adversary proceeding against Perle.   Chart C and Exhibit 65 reveals that between
12  December 1997 through March 1998, Harris and Long owned or controlled approximately
13  459,131 to 634,431 of the 1.3 million shares of Shopping.com available for public trading.

14      57.     In fact, there were nowhere near that many shares available for trading.
15  Waldron and Wedbush Morgan further restricted the availability of Shopping.com shares,
16  forcing its price upward, by demanding guaranteed delivery of shares which they were
17  buying in. See **Exhibit 16** (Fiero Bros. NASD Arbitration Exhibit 13 which are Wedbush
18  Morgan Buy-In Tickets for IBUY (Bates Stamp F006181-F006202) (noting "gtee del" or
19  "guaranteed delivery," along with the above-market buy-in price.)    These documents
20  were provided to Perle and the NASD arbitrators for the NASD Arbitration. Fiero Bros. was
21  bought in by Wedbush as part of the four (4) buy-ins reflected on February 12, 1998, and
22  March 6, 11 and 16, 1998.

23      58.     Notably, during the week encompassing both March 16 and 19, 1998, when
24  Wedbush conducted buy-ins of a total of 127,406 shares of Shopping.com (45,997 shares
25  on March 16 and 81,409 shares on March 19), there were only 45,686 shares available
26  on the street for purchase **(Exhibit 12**, NASD Arbitration Chart A (F005004). At the same
27  time, Wedbush held 1,216,679 pledged shares in its accounts on Monday, March 16
28  (while the preceding Friday, March 13, its entire holdings of 1,216,585 shares had been

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   unpledged), and 1,222,585 pledged shares in its accounts on March 19. (See, **Exhibit 12**,

2   which is a true and correct copy of Fiero Bros. Arbitration Exhibit 1 (Bates Stamp

3   F005049-50 and F005055-54.) As such, none of the shares in the Waldron and Wedbush

4   accounts were available to satisfy the buy-ins.

5         59.      By demanding guaranteed delivery of shares which it controlled and

6   effectively pulled off the market, Perle, Waldron and Wedbush in fact guaranteed fails,

7   that the short sellers would not be able to deliver the shares which Perle, Waldron and

8   Wedbush controlled. In this manner they guaranteed that they would be able to buy the

9   short sellers in and boost the stock price. Thus, on March 16, 1998, when the stock price

10  was $25.3125, they were able to buy in 45,997 shares at $26.50, and on March 19, 1998,

11  they were able to buy in 81,409 shares at $39 when the stock price was $25.75. Attached

12  hereto as **Exhibit 17** is a true and correct copy of a chart that Fiero Bros. presented at the

13  NASD Arbitration, Chart E, entitled "FAILS IN IBUY" (Bates Stamp No. F005008.)

14  Attached hereto as **Exhibit 18** is a true and correct copy of Fiero Bros.' Arbitration Exhibit

15  2 (Bates Stamp F005150-F005203) which is the "NSCC Fail to Deliver/ Receive Journals"

16  for IBUY (Jan 1998- April 1998). These documents were presented to Perle and the

17  NASD arbitrators for the NASD Arbitration.

18        60.      At the NASD Arbitration, Fiero Bros. presented its case against Perle,

19  Waldron and Wedbush through the testimony of Waldron's officers and employees,

20  Wedbush's president and employees (Ed Wedbush, Rob Paset, and Wendy Rae), John

21  Fiero, the testimony of third party witnesses involved in the trading of Shopping.com

22  (including and Perle, the testimony of expert witnesses and damage witnesses, and the

23  introduction of thousands of pages documents contained in Fiero Bros.' Arbitration

24  Exhibits 1-72 and Charts A through E, and Respondents' documents. Many of the

25  documents used by Fiero Bros. to prove its case in the NASD Arbitration, which resulted

26  in an arbitration award in its favor, are the same documents used by the SEC in the SEC's

27  own enforcement action filed against Perle and Waldron, and by Corsair Capital Partners

28  in its District Court and Adversary Proceeding.

1       61.     In the SEC Enforcement Action, the SEC filed and prevailed against Perle

2  on a motion for summary judgment, wherein it was found and determined as a matter of

3  law, that Perle and Waldron committed securities fraud and manipulated the market for

4  Shopping.com stock, during the time they engaged in the buy-ins of Shopping.com stock

5  against Flero Bros. and others.

6       62.     In addition to the SEC Enforcement Action, many of these same exhibits and

7  witness testimony used to support and prove Fiero Bros.' NASD Arbitration, were later

8  used by Corsair Capital Partners, LP ("Corsair") and Alternative Investments, LP ("AI") in

9  their District Court lawsuit against Cery Perle, Waldron and Wedbush, which action

10 resulted in a default judgment against Perle and Waldron in the amount of $685,825, and

11 Corsair's subsequent adversary proceeding filed against Perle.   Corsair's and AI's

12 nondischargeability adversary proceeding filed in the Bankruptcy Court of the Central

13 District of California as Adversary Proceeding No. AD 01-02219, in the Perle Bankruptcy,

14 which was heard by Bankruptcy Judge Sherry Bluebond ("Corsair Adversary Proceeding").

15      63.     Following Corsair's motion for summary judgment, Judge Bluebond made

16 findings of fact and conclusions of law based on the same conduct by Perle which

17 resulted in the NASD Award and resulting Judgment in favor of the Fiero Bros.   Judge

18 Bluebond determined, that Perle's conduct at issue in both the instant action and in the

19 Corsair Adversary Proceeding, resulted in the debt due Corsair/AI being non-

20 dischargeable under 11 U.S.C. Section 523(a)(6).

21      64.     Fiero Bros. was a victim of Perle's market manipulation in exactly the same

22 manner as Corsair/AI. Fiero Bros. was a victim of Perle's buy-ins at artificially high prices.

23      65.     Between February 12, 1998 and March 16, 1998, Fiero Bros. had a sizeable

24 short position in Shopping.com stock. Further, at the time Fiero Bros. established its short

25 position in IBUY stock, it reasonably relied upon and contemplated that, in the process of

26 a buy-in of IBUY stock, the other party or parties to the transaction would comply with the

27 NASD rules concerning the buying-in of stock, as well as all other applicable rules, laws

28 and regulations. Nevertheless, Fiero Bros. became a victim of fraudulent buy-in activity

1   of IBUY stock by Perle through Waldron. During this time frame, Perle coordinated buys

2   of IBUY stock among "friendly" market makers in order to drive up the price of IBUY stock.

3   Attached hereto as **Exhibit 19** is a true and correct copy of Fiero Bros. NASD Arbitration

4   Exhibit Chart B (F005005), a copy of which was provided to Perle and the NASD

5   arbitrators at the NASD Arbitration. Attached hereto as **Exhibit 20** is a true and correct

6   copy of Fiero Bros.' NASD Arbitration Exhibit 47 (F006749-F006756), which is Wien's

7   Daily Trade Activity for IBUY for February 1998. A copy of this document was provided

8   to Perle and to the NASD arbitrators for the NASD Arbitration.

9       66. Attached hereto as **Exhibit 21** is a true and correct copy of Fiero Bros.' NASD

10   Arbitration Chart D entitled "GUNALLEN TRADES "PAINT THE TAPE" FOR WALDRON"

11   (F005007). A copy of this document was provided to Perle and to the NASD arbitrators

12   for the NASD Arbitration. Attached hereto as **Exhibit 22** is a true and correct copy of

13   NASD Arbitration Exhibit 50 which are the Gunnallen Trade Tickets for IBUY (2/13/98-

14   2/17/98) (Bates Stamp F006771-F006794). A copy of this document was provided to

15   Perle and to the NASD arbitrators for the NASD Arbitration. Waldron also made its

16   brokers purchase IBUY stock for their clients, and prevented them from selling IBUY stock

17   to keep the price artificially high. Attached hereto as **Exhibit 23** is a true and correct copy

18   of Fiero Bros. NASD Arbitration Exhibit 46 (Bates Stamp F006742-F06748) which are

19   letters from former Waldron brokers. These documents were provided to Perle and the

20   NASD arbitrators for the NASD Arbitration.

21       67.   Once the price of IBUY stock was artificially high, Perle executed the

22   buy-ins of IBUY stock above the artificial price he created.  (See, **Exhibit 16**

23   (F006199); see also **Exhibit 24**, which is a true and correct copy of Fiero Bros.

24   Arbitration Exhibit 16, which are the NSCC Buy In Confirmations, and particularly for

25   dates February 12, 1998 (F06351-6352), March 6, 1998 (F006337-6339), March 11,

26   1998 (F006332-6336), March 16, 1998 (F006329-6331), and March 19, 1998

27   (F006325-6327). In fact, F006199 shows where another market maker (QTMG)

28   agreed to sell 10,000 shares at 22.75 and then, at Perle's direction, Quantum asked to

1   break its commitment- which is unheard of, but was later accepted by Wedbush.  This

2   allowed Waldron to dictate the price of its own forced buy-in of IBUY stock against

3   those holding short positions, i.e., Fiero Bros., as it controlled the stock, and kept

4   others out of the buy-ins.

5        68.    Attached hereto as **Exhibit 25** is a true and correct copy of Fiero Bros.

6   NASD Arbitration Exhibit 6, which is the Market Maker Price Movement Report for

7   February 2, 6 and 12, 19/98 (Bates Stamp F005340-5368). This document was

8   provided to Perle and to the NASD arbitrators.

9        69.    Attached hereto as **Exhibit 26** is a true and correct copy of Fiero Bros.

10  NASD Arbitration Exhibit 7, which is the Market Maker Price Movement Report for

11  March 3, 6, 11, 13, 16, 19, 20 and 23, 19/98 (Bates Stamp F005369-5439). This

12  document was provided to Perle and to the NASD arbitrators.

13       70.    As a result of Perle and Waldron's intentional market manipulation and

14  forced buy-ins that rewarded and benefitted only Waldron and Perle, Fiero Bros. was

15  awarded $350,000 in the NASD Arbitration and was the stated reason Judge Bluebond

16  determined that the Corsair/AI debt was nondischargeable in the Corsair Adversary

17  Proceeding. As the evidence proved in the SEC Action against Perle and Waldron,

18  and as it again proved in the Corsair Adversary Proceeding, Perle engaged in the

19  same fraudulent "buy-in" misconduct of IBUY stock for other market makers of IBUY

20  stock, including Fiero Bros. The manipulative scheme described in Judge Bluebond's

21  Findings and the Court in the SEC action is the exact same scheme that damaged the

22  Fiero Bros., just as it did Corsair and AI. During the relevant time period, Fiero Bros

23  was acting in exactly the same manner and capacity as was Corsair and AI as was

24  damaged by Perle in exactly the same way that caused Judge Bluebond to find the

25  Corsair/AI claim to be nondischargeable.

26       71.    The "buy-ins" that were adjudicated in the Fiero NASD Arbitration

27  occurred during the same time that has already been determined in the SEC Action

28  and by Judge Bluebond in the Corsair Adversary Proceeding that Perle ran a

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1 manipulative scheme to keep the price of Shopping.com stock artificially high and to

2 control the public float, that is from mid-February 1998 through mid-March 1998. This

3 finding is contained in Judge Bluebond's Findings of Fact and Conclusions of Law in

4 the Corsair Adversary Proceeding entered August 14, 2002, finding of fact number 48

5 ("Judge Bluebond's Findings"). Judge Bluebond went on to find that Perle "conducted

6 numerous illegal buy-ins above the already manipulated market price," (Judge

7 Bluebond's Finding No. 48). The Fiero Bros' buy-ins described in hereinabove are

8 some of the "numerous illegal buy-ins" she would have been referring to.

9      72.     Based on the defendants' misconduct, on February 17, 1998, Fiero Bros.

10 filed its Statement of Claim before NASD Regulation, Inc. ("NASD"), in Arbitration No.

11 98-00587, In the Matter of the Arbitration Among Fiero Brothers, Inc. vs. Waldron &

12 Co., Cery Perle, Ed Harris, Wedbush Morgan Securities, Inc. and Ed Wedbush,

13 alleging that defendants engaged in fraudulent, artificial market-making activity,

14 parking arrangements, guarantees against loss, and fraudulent purchasing or "buy-in"

15 of Shopping.com stock on February 12, 1998.

16      73.     On or about March 18, 1998, Fiero Bros. filed its Second  Amended

17 Statement of Claim ("Fiero SOC") in the NASD Arbitration.  The  Fiero SOC expanded

18 the dates and number of fraudulent "buy-ins" to  include February 12, March 6, 11 and

19 16, 1998.  (A true and correct copy of this amended claim is attached as Exhibit "1" to

20 my December 18, 2008 Affidavit, filed concurrent herewith.)

21      74. The Fiero SOC further alleged that Perle and Waldron with others

22 manipulated the price of the stock by (1) controlling the supply, purchasing large

23 blocks of stock to reduce the amount of shares available for public trading, executing

24 unauthorized trades and parking stock in customer and fictitious accounts, and

25 restricting customers from selling Shopping.com stock in their accounts; (2) creating

26 artificial demand for the stock, by issuing a false and misleading press release,  and

27 while Waldron was acting as a market maker, raising the bid for the stock without

28 economic justification, and (3) executing a  short squeeze by fraudulently buying-ins

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

1   Shopping.com stock at above-market prices.

2          75. Following hearings which took place over September 1-4,1998, NASD
3   Regulation, Inc. in Case No. 98-00587 issued an Award finding Waldron, Perle and Ed
4   Harris jointly and severally liable to Fiero Bros. for $350,000.00 in compensatory
5   damages, and $50,000 against  respondent Wedbush, Morgan Securities, Inc.
6   ("Wedbush") in compensatory damages.  Attached as Exhibit "2" to my December 18,
7   2008 Affidavit is a true and correct copy of the Award in the NASD Arbitration,. filed
8   concurrent herewith.)

9          76.    On February 10, 1999, Fiero Bros. filed a Petition to Confirm the
10   Arbitration Award in the Los Angeles Superior Court, Los Angeles Superior Court Case
11   No BS055659 ("the Petition").  Attached to my December 18, 2008 Affidavit as Exhibit
12   "3 is a true and correct copy of this amended claim, filed concurrent herewith.)

13          77.   The Petition stated that on or about February 17, 1998, Fiero Brothers
14   submitted to arbitration before the NASD  a controversy against respondents Cery
15   Perle and others that arose in connection with the sale of securities, as set forth in the
16   Second Amended Statement of Claim, Case No. 98-00587.  (Exhibit "3" to December
17   18, 2008 Affidavit, ¶ 2.)

18          78.    The Petition reflected that on September 17, 1998, the arbitrators in the
19   NASD Arbitration made their Award in favor of Fiero Bros., determining all issues
20   submitted to them, and awarded Fiero Bros. the sum of $350,000 in compensatory
21   damages against Waldron, Perle and Ed Harris,  and the sum of $50,000 against
22   Wedbush (Exhibit "3" to December 18, 2008 Affidavit, ¶6).  Fiero Bros. was
23   represented in the Petition, by its California counsel, The Law Offices of Mark Steven
24   Kessler.

25          79.    On March 17, 1999, Fiero Bros.' Petition came on for hearing.  Attached
26   hereto as Exhibit "4" is a true and correct copy of the Minutes of the March 17, 1999
27   8:30 am hearing on the Petition, with accompanying Ruling on Petition to Confirm
28   Arbitration Award as to Respondents Waldron & Co., Inc., Cery Perle, Wedbush

0024

1  Morgan Securities, Inc., Ed Wedbush, and Key West Securities, Inc., and to Vacate

2  Award as to Respondent Ed Wedbush.   The Ruling indicates that the Court received

3  no opposition to the Petition. (See Exhibit "4" attached to my December 18, 2008

4  Affidavit, filed concurrent herewith.)

5       80.    On April 6, 1999, the Los Angeles Superior Court, in Case No. BS

6  055659 issued its Order Confirming  Fiero Bros.'s Arbitration Award.  Attached as

7  Exhibit "5" to my December 18, 2008 Affidavit and incorporated therein is a true and

8  correct copy of the Court's April 6, 1998 Order, which is filed concurrent herewith.

9       81.    On April 6, 1999 the Los Angeles Superior Court, in Case No.

10  BS5055659 also entered Judgment in favor of Fiero Bros. against Perle and Waldron,

11  in the amount of $350,000 in compensatory damages.  Attached as Exhibit "6" to my

12  December 18, 2008 Affidavit and incorporated therein is a true and correct copy of the

13  April 6, 1999 Judgment entered in favor of Fiero Bros., which is filed concurrent

14  herewith.

15      82.    On April 20, 1999, Fiero Bros. filed and served its Notice of Entry of

16  Judgment in the Los Angeles Superior Court in case no. BS055659 on all parties.

17  Attached  as Exhibit "7" to my December 18, 2008 Affidavit and incorporated therein is

18  a true and correct copy of the April 20, 1999 Notice of Entry of Judgment, which is filed

19  concurrent herewith.

20      83.    On January 4, 2000, the Abstract of Judgment was filed in the Los

21  Angeles Superior Court, Case No. BS 055659 by Fiero Bros. through its attorney Peter

22  D. Lepiscopo, Esq. of Law Offices of Peter D. Lepiscopo.  Attached as Exhibit "8" to

23  my December 18, 2008 Affidavit and incorporated therein is a true and correct copy of

24  the January 4, 2000 Abstract of Judgment in Los Angeles Superior Court Case No. BS

25  055659, which is filed concurrent herewith.

26      84.    On March 1, 2006 Fiero Bros. assigned the Judgment to Alfonso Fiero

27  for good and valuable consideration.  Attached as Exhibit "9" to my December 18,

28  2008 Affidavit and incorporated therein is a true and correct copy of the March 1, 2006

**0025**

1    Assignment which is filed concurrent herewith.

2

3

4                                        John J. Fiero,

5    Sworn to me a Notary Public, this ___ day of September, 2009.

6

7

8    Notary Public

9

10

11    Williams Augustin, Alicia
      Notary Public State of New York
      No.01W16202716
12    Qualified in Kings County
      Commission Expires 3/23/2013

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL AFFIDAVIT OF JOHN J. FIERO

26

0026

Alfonso Fiero, v. Cery B. Perle
Case Number LA 01-26497-BB
Adv. No. 06-01971 BB

## PROOF OF SERVICE

STATE OF CALIFORNIA        )
                           )
COUNTY OF SAN DIEGO        )

      I am employed in the County aforesaid; I am over the age of eighteen years and not a party to the within action; my business address is P.O. Box 131253, Carlsbad, California 92013.

      On **September 30, 2009**, I served **SUPPLEMENTAL AFFIDAVIT OF JOHN FIERO FILED IN SUPPORT OF PLAINTIFF ALFONSO FIERO'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT WITH EXHIBITS 1-26** on the interested parties in said action, by delivering it as follows:

   **X**   Service will be accomplished through an NEF for parties and counsel who are registered CM/ECF users.

**Electronic Mail Notice List**

**The following is the list of parties who are currently on the list to receive e-mail notices for this case.**

Darrell Palmer:   darrell.palmer@cox.net

United States Trustee (LA):
ustpregion16.la.ecf@usdoj.gov

Leslie S Akins:   lsa@stockmarketlaw.com

Pamela Labruyere:   pamela@sgsslaw.com

I Declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed **September 30, 2009**, at Carlsbad, California.

*Megaen Ericson*
Megaen Ericson

## PROOF OF SERVICE