# EXHIBIT 4

844

NATIONAL ASSOCIATION OF SECURITIES DEALERS
------------------------------------------x
In the Matter of:

    FIERO BROTHERS,

        Claimant,           Case Number
                           CV 99-4670 ER

    - against -

    WALDRON & COMPANY, WEDBUSH
    MORGAN SECURITIES, INC.,



      Respondents.

------------------------------------------x

                        September 2, 1999

      BEFORE:   CHAIRMAN ROBERT L. SCHOUWEILER,
             ESQ.



E S Q U I R E™
DEPOSITION SERVICES

216 East 45th Street, 8th Floor
New York, NY 10017-3304
212.687.8010 • 800.662.3287
Fax 212.557.5972

EXHIBIT 4 PAGE 27

1

2      and it's already been, I believe,

3      stated and stipulated to that there

4      is no further nor additional

5      evidence that's going to be

6      presented in this case.   Everyone

7      has indicated that they have rested

8      their case in chief, and   I am

9      required as chair to have the

10     record reflect that there is none

11     and that if there is none, is there

12     any evidence that has been offered

13     that has been unfairly denied?

14          Have you had a fair opportunity

15     to present all of the evidence

16     which you wish to present in the

17     ~~course of the arbitration hearing?~~

18          ~~MALE VOICE:   Yes, sir.~~

19     PANEL CHAIRPERSON:   Now,

20     closing remarks, argument as we all

21     know, are not evidence, so their

22     value is nothing more than a

23     summary of what you believe we've

24     heard, and we can tell you that

25     there are no hearing aids or

EXHIBIT 4 PAGE 28

1

2    difficulties, deficiencies in

3    hearing, so we've heard everything

4    that has been presented, as well as

5    testimony that has been stated.

6        We have a tape recording of the

7    proceedings, so I would hope that

8    you minimize what you might

9    consider to be the importance of

10   closing arguments which I'm not

11   trying to say that they have no

12   value, that they do.  But

13   oftentimes, if they're longer than

14   is necessary, their value is less.

15   There's an attrition that sets in

16   as to the value of the closing

17   argument.

18       So, claimant goes first:  Can

19   we all agree that we only want to

20   hear from Mr. Russo once?

21       MALE VOICE:  I don't want to

22   hear from him at all.

23       PANEL CHAIRPERSON:  I may

24   indicate to him that I believe that

25   he ought to be able to make a

EXHIBIT 4 PAGE 29

2    statement of summary of this

3    evidence and why he should prevail

4    and how many dollars he can

5    anticipate or should anticipate the

6    panel to decide that Mr. Fiero

7    receive, and that his arrangement

8    with Mr. Fiero guarantees his

9    participation and compensation, and

10   likewise, you people, and that he

11   ought to be able to do that

12   probably within 20 minutes or so.

13        I'm leaving this room at 5:00,

14   so you'll not be talking to me if

15   you're still here. And so 20

16   minutes. Now, I'm not going to

17   shut you down. You've reserved 10

18   of a half an hour for any rebuttal,

19   comments that you want to make.

20   The other side gets 20 each and if

21   Mr. Fehn wants to go before Ms.

22   Eaton, or Ms. Eaton before Mr.

23   Fehn, they can work that out,

24   between the two.

25        It's now 10 minutes to 4:00.

EXHIBIT 4 PAGE 30

1

2            Ten minutes after 4:00, I'm going

3            to tell you that it is 10 minutes

4            after 4:00 and you'll sit down and

5            then we'll give Mr. Fehn and Ms.

6            Eaton.

7                MR. RUSSO:  Well, sir, I'm very

8            --

9                PANEL CHAIRPERSON:  You might

10            want to reserve your closing

11            remarks till after you hear from

12            Mr. Fehn and Ms. Eaton, but that's

13            entirely up to you.  Reserve a

14            rebuttal statement.

15                MR. RUSSO:  I will skip the

16            initial ....

17                PANEL CHAIRPERSON:  All right,

18            fine.

19 **PERLE**       MR. FEHN:  Ms. Eaton has

20            decided to take the ...

21                PANEL CHAIRPERSON:  Okay.  Or

22            test the water first.

23 **WEDBUSH** MS. EATON:  Again I won't

24            belabor points that I made in my

25            motion ... [unintelligible] ...

**EXHIBIT 4 PAGE 31**

1

2      of the box ... our finances.

3      Surely because someone suggested

4      [unintelligible] ....

5          I'm going to leave it up to

6      you, and if you only award us $10,

7      $1,000, $5,000, I would like you to

8      be the measure of what it takes to

9      build up a reputation and then have

10     someone come and crash it down.

11     Thank you very much.

12         PANEL CHAIRPERSON:  Thank you,

13     Ms. Eaton.

14         MR. FEHN:  Before I start my

15     remarks in chief, I'd like to say

16     something about my friends at

17     Wedbush.  I have had the pleasure

18     of suing them many, many times over

19     the years, and I have to tell you

20     that every time I did that, they

21     were wrong.  This time, they're

22     right.  They didn't do anything

23     wrong.

24         I'm not so sure that closing

25     argument ever makes any difference,

**EXHIBIT 4 PAGE 32**

1

2          when we talk about it in a circle

3          of people who do this kind of work,

4          you sometimes come to the

5          conclusion that arbitrators by this

6          time in a proceeding have made up

7          their mind about liability, and the

8          only thing left to discuss is how

9          much.

10          I have had other arbitrators

11          tell me, however, that if somebody

12          is on the fence about something, it

13          can make a difference.  I think it

14          has a value.  And I think it has a

15          value in a case like this, in order

16          to abate confusion.

17          I told you in the beginning of

18          this case, that it was a unique,

19          unusual, difficult to understand

20          set of problems.  I think you have

21          seen now that it has been.  There

22          are a lot of concepts here that you

23          understand better than you did in

24          the beginning, but your

25          understanding of some of them may

EXHIBIT 4 PAGE 33

1

2    still be .....

3         My goal in my closing arguments

4    is to try to focus you on what I

5    believe is important and abate any

6    misunderstandings that I fear may

7    have been created.  And that's it.

8         Let me tell you what we want

9    you to do at the end of this

10    hearing.  First of all, we want you

11    to dismiss the claim against

12    Waldron .... Secondly, we want you

13    to consider whether or not the

14    totality of Mr. Fiero's activity in

15    this case constitutes some sort of

16    defamation.

17         And if you do, then we want you

18    to consider some damages for that.

19    We have not given you any numbers,

20    because we are wholly unable to do

21    so.  We cannot quantify it.  The

22    law recognizes that difficulty and

23    holes, as I know you lawyers on the

24    panel know, that when you have a

25    defamation claim, you're not

EXHIBIT 4 PAGE 34

1
937

2          required to prove specific damages

3          resulting from it; you can, if you

4          are able to, but you're not

5          required to do that.

6              So we would be delighted, if

7          you agree with us -- obviously, if

8          you don't, then that's another

9          case.  But if you agree with us,

10         give us $10 or $100 or some other

11         number, we don't really case.  It's

12         not the money, it's the bragging

13         rights, as they say.  We'd like to

14         win this war.

15             That's what we want.  Now, let

16         me review with you what the issues

17         are.  I told you in opening

18         statement there were two claims,

19         and thus two sets of issues.

20             The first issue is it is

21         claimed that this market was

22         manipulated.  It wasn't.  By whom?

23         And if it was by us, then how did

24         Mr. Fiero sustained any damages as

25         a result of that?  And of course,

EXHIBIT 4 PAGE 35

2        if he did sustain damages, what are

3        they?

4            And #2, the claim seems to be

5        that the buy-in prices that were

6        used were unfair.  It started out

7        that any buy-in premium was unfair,

8        and I think now the state of the

9        testimony is no, fair is a

10       subjective test.  You have to look

11       at all the totality of the

12       circumstances and decide what's

13       fair.

14           Our answer is going to be to

15       that issue is what happened did

16       constitute a premium, but it was

17       fair.  I have in mind when dealing

18       with this issue that there is no

19       articulated standard.  You are ot

20       given any guidance by any NASD rule

21       about any decided case, by Russo or

22       Mr. Fiero, or either of these

23       experts.  Everybody has seemed to

24       touch upon this soft concept of

25       fairness.

**EXHIBIT 4 PAGE 36**

1

2          I believe an interesting

3     document, not just because I wrote

4     it, is the letter to Barry

5     Goldsmith at the NASD which

6     summarizes a series of

7     conversations that we had on this

8     subject and Barry Goldsmith, by the

9     way, it doesn't get any higher than

10    that.   That's where things like

11    this are decided as a matter of

12    policy.

13          It accurately speaks -- ... to

14    the answer you know, it accurately

15    sets forth, I believe, what

16    happened in those conversations.

17    What was said by what parties and

18    what our position is and what our

19    position remains, and you do not

20    have before you any response

21    because there hasn't been one,

22    because I believe that the contents

23    of that letter, and the analysis it

24    contains, is correct.

25          That leaves it so you.   If you

EXHIBIT 4 PAGE 37

940

2     are disturbed by the amount of

3     these buy-in prices, I would expect

4     you to award Mr. Fiero some money.

5     If you are not disturbed by them, I

6     would suggest that you leave them

7     alone.

8         But the issue really is one of

9     fairness and there's no sign posts.

10        Those are the issues.  Now let

11    me talk about the witnesses.  I'm

12    not going to talk about all of the

13    witnesses, because many of the

14    people who sat here in this chair

15    contributed little or nothing to

16    the evidence important to you in

17    these proceedings.  I'm just going

18    to skip over them.  I'm going to

19    talk about the few, and there were

20    a few who had anything to say that

21    you might find actually useful.

22        Mr. Robertson I must discount

23    immediately, because Mr. Robertson

24    came in here and told you that this

25    market was manipulated, and then he

EXHIBIT 4 PAGE 38

1

2      turned around and told you he had

3      done absolutely no analysis to

4      demonstrate that fact.  Didn't make

5      any schedules, didn't study

6      anything, didn't make any

7      computations, hasn't got a clue.

8      But like many experts are fond of

9      doing, sat in the chair over there

10     and came to all sorts of

11     conclusions.

12          I point out Mr. Robertson

13     because Mr. Robertson is

14     characteristic of the claimant's

15     case.  The claimant's case was not

16     based on any evidence.  It's based

17     on conjecture, supposition,

18     speculation, innuendo, no evidence.

19          Just like Mr. Fiero's

20     declaration in the Superior Court

21     action was based upon his

22     information and belief formulated

23     as a result of the receipt of

24     hearsay evidence which would not

25     have been admissible.  Perhaps that

EXHIBIT 4 PAGE 39

1

942

2   the reason why the Judge didn't ...

3   too seriously.

4       The entire case is

5   characterized that same way.  You

6   don't have before you any evidence

7   that supports this claim, or let me

8   put it to you this way.  You don't

9   have sufficient evidence to support

10  this claim, you do have some.

11  That's why I mention Mr. Robertson.

12      Mr. Lowery[ph], our expert

13  witness.  I told you in advance of

14  his appearance, that Mr. Lowery

15  knows what he's talking about.  I

16  believe after his testimony, you

17  have probably arrived at the

18  conclusion that he knows what he's

19  talking about.

20      He did a lot of work, he

21  analyzed the trading, he explained

22  to you or illustrated for you, is a

23  more precise word, some patterns

24  which defy explanation.

25      He came to the conclusion that

EXHIBIT 4 PAGE 40

2        the stock was manipulated.  It was

3        manipulated by Mr. Fiero, in an

4        upward fashion.  Now that is a very

5        peculiar phenomenon and I will come

6        back to that and explain to you why

7        that apparent inconsistency in Mr.

8        Fiero's behavior is necessary for

9        this game to succeed.

10        Next we have, and I'm sorry I

11        didn't take the time to look up in

12        my notes, and I can't pronounce his

13        name, but it was Mikey

14        Entimziono[ph] or whatever his name

15        was.  He was a pretty good witness.

16        MALE VOICE:  [unintelligible]

17        MR. FEHN:  Thank you.  He was a

18        pretty good witness because he said

19        something that was really kind of

20        important.  He was a relatively

21        sophisticated securities industry

22        participant who had the same

23        problem that Mr. Fiero had.  He had

24        a naked short position that was

25        going to get bought in.  What did

EXHIBIT 4 PAGE 41

he do that's notable?

He did two very sane things.
He went to where the stock was and
he negotiated a deal, and he bought
some stock at 33 and he covered his
short position, and he left town.
He didn't do it again.  It was a
loser for him.  He stood up, he
answered the call, he fixed the
problem and he left the game.  Now
that's what somebody should do in
the circumstances like this.

But that's not what Mr. Fiero
did.  Mr. Perle, I don't know
really what to say about Mr. Perle.
And at first I thought I wouldn't
say anything about him at all, even
though he's my client and he'd
probably be incensed by that
oversight.

Mr. Perle is a guy that brought
a deal back in November of 1997 and
had some problems.  He all at once
when he thought he was going to

EXHIBIT 4 PAGE 42

2       have a NASDAQ deal ended up with

3       the bulletin board deal, and he

4       ended up with far more of it than

5       he ever wanted.  He dealt with it

6       the best he could.

7           The stock traded, it didn't do

8       much.  Went from 9, you remember

9       his testimony, it went down, it

10      went up, it went down, it hung

11      around.  Until late January when

12      Mr. Fiero appears and it's about

13      14.  It's reasonable performance

14      given the fact that these Internet

15      stocks like Amazon and the ones I'm

16      sure you know about, that there's

17      just nothing any hotter in the same

18      time period; they're going crazy.

19      Their values are unreal.

20          There's an article in here from

21      the L.A. Times that comments on

22      that right around the middle of

23      March, it says these values, nobody

24      can explain them.  They're crazy.

25      Beware, it's kind of a cautionary -

EXHIBIT 4 PAGE 43

Mr. Perle then gets confronted
with what is nothing more than an
attack by the shorts, led by Mr.
Fiero, which is wholly outside of
his experience as a trader.  He's
not too well acquainted with what's
going to happen here, but he does
his best, and he supports the stock
as best he can, and he has some
problems with that, but ultimately
it works for him.

That leaves us really with only
one major character and that's John
Fiero.  And John Fiero is what this
story is all about.  Masquerading
as a NASDAQ bulletin board market
maker, John Fiero is really a naked
short seller.  John sells what he
doesn't own, believing that he'll
later be able to buy it back and
cover his position.

Now, that's not illegal.  That
is permitted by the rules.  There

EXHIBIT 4 PAGE 44

1

2      are many people who think it should

3      be illegal, but it's not, it's

4      legal.

5          It is also extremely dangerous,

6      and the more the stock, the more

7      complexities there are to the

8      underlying issuer, the more

9      dangerous it becomes.

10         And Mr. Fiero knows that,

11     because he's been doing it a long

12     time.  He's had prior bad

13     experiences.  Mr. Fiero has got ice

14     water in the blood, and he can do

15     that, he can take that kind of

16     risk, he can do it calmly until of

17     course it starts to go wrong.

18         He loses a million dollars

19     here.  He's not very happy about

20     that.  He knows the risk inherent

21     in this sort of transaction as far

22     back and I'm sure farther, as far

23     back as early 1995, when he has the

24     difficulties with Adler Coleman.

25         Here, in this situation, the

EXHIBIT 4 PAGE 45

2   very first time he's faced with a

3   buy-in, he loses because he can't

4   find any stock.  He can't deliver.

5   He doesn't lose a lot of money that

6   time, but he now understands the

7   game.

8       Recall this, he said to you

9   that he had identified IBUY as a

10  good short sale ... because, and he

11  gave all the factors.  Now when it

12  didn't work and he loses $17,000,

13  what does Mr. Fiero do?

14      He naturally doesn't like

15  losing, but he also doesn't get out

16  of the way.  He comes back and

17  recreates his short position after

18  the February 12th buy-in and five

19  days later, on February 17th, he's

20  in court.  He's got lawsuits, he's

21  got arbitration claims, he's

22  looking for injunctions.  He's not

23  getting them.  Nobody is listening

24  to Mr. Fiero.

25      They didn't listen to him in

**EXHIBIT 4 PAGE 46**

2    1995 in connection with the Adler

3    Coleman, he didn't get any relief

4    from the court then either.   So

5    does he fold his tent?   No.   He

6    keeps selling short at ever

7    increasing levels and he gets on

8    the phone and on the typewriter and

9    he starts calling everybody that'll

10    listen to him.

11    In this volume of stuff, you

12    see all sorts of things.   You see

13    these letters that some of the

14    reports talk about that he gets

15    from the former employees of

16    Waldron that he talks about.   All

17    these articles by Chris Byron of

18    CNBC that's writing about Waldron

19    and IBUY and this whole short

20    squeeze.

21    Everybody who's anybody knows

22    about this.   Mr. Elgindy knows

23    about it.   He writes a research

24    report.   Sandy Greenberg at

25    [unintelligible] knows about it, he

EXHIBIT 4 PAGE 47

1

2      writes a research report.

3          And guess what happens?  It

4      still isn't working.  The stock is

5      still going up.  Mr. Fiero is still

6      taking short positions.  Mr. Fiero

7      is still losing money when he gets

8      bought in and still can't find the

9      stock.

10         That's not the way things

11     usually work for Mr. Fiero, so he

12     redoubles his efforts, and finally

13     he writes a letter to Senator

14     D'Amato on March 12th, and he's

15     well into the program by now.  It

16     isn't just Senator D'Amato by the

17     way, on your Tab 4.

18         There's a letter to Lisa

19     Johnson here at the NASD on

20     February 18th.  There's another to

21     Jim Bolan at Market Integrity in

22     Washington on February 18th.

23     Here's one to Elaine, the regional

24     director of our SEC, on February

25     20th.  And here's one to Senator

**EXHIBIT 4 PAGE 48**

1

2          D'Amato on March 12th.

3              What does he say to Senator

4          D'Amato, whom you remember he

5          doesn't know.  He's never had any

6          contact with, he's never made a

7          contribution to -- I forgot to ask

8          him if he voted for him, but I

9          don't suppose that would matter

10         much -- he writes a letter to

11         Senator D'Amato and he said, I'm

12         the president of Fiero Brothers,

13         and I write to appeal to you for

14         assistance in an unusual criminal

15         situation.  Remember from law

16         school, allegation of criminal

17         activity, invitation to criminal

18         activity is slander per se.

19             He's now accusing Waldron and

20         Shopping dot com I guess, of

21         criminal behavior, without any

22         basis for that statement

23         whatsoever.

24             The next paragraph he refers to

25         himself as having been the victim

**EXHIBIT 4 PAGE 49**

of a terrible stock manipulation.

Distinguished somehow I guess from

the routine stock manipulation.

He goes on down, it's best

characterized as a pump and dump

chop house.  By virtue of Waldron's

unabashed manipulation -- I won't

bore you any further with the

rhetoric -- ....

Now apparently for reasons

which are beyond my comprehension,

the very next day Senator D'Amato

gets excited too, and forwards the

letter to the SEC.  That creates an

SEC investigation, and you haven't

heard the results of that SEC

investigation, because there

haven't been any.  No action has

been taken.  Not that there won't

be, but it hasn't been yet.

Now that's what happened,

that's the objective reality of

what happened.  Now, I'm going to

talk a little bit about what really

EXHIBIT 4 PAGE 50

1

2          happened here.  How this really

3          works.

4              Here's how it works.  A short

5          seller like Mr. Fiero, identifies

6          the short selling situation on over

7          valued stock, which he believes

8          through a variety of devices he

9          will ultimately be able to crush.

10         He goes out and he starts to sell

11         it short.

12              Now this is a real good

13         candidate.  It's a thinly traded

14         stock, the supply is locked up

15         pretty good.  Nobody knows about

16         this company.  It is extremely

17         speculative.  It has never earned a

18         quarter, it's a development stage

19         company.  It's in a very volatile

20         market sector, anything that's

21         Internet related, driven, these

22         stocks are all over the place.

23              It's got a relatively, and he

24         told you this what he thought,

25         remember, it's got a relatively

EXHIBIT 4 PAGE 51

inexperienced underwriter and

principal market maker.  It's got,

who has a clearing firm of unknown

dimension, at least unknown to him.

Clearing firms are kind of skittish

about things like this sometimes,

and they jump off the boat the

first time it starts rocking.

There's no research about this

company, no analyst follows it.

This is a good situation for Mr.

Fiero who is short.  And here's how

this works.

It's not a good idea to short

it at 14.  There's no enough money

in it.  So what you have to do

first is you have to drive it up.

So you drive it up, as Mr. Lowery

said, and while you're driving it

up, you short into it at ever

increasing prices, establishing a

nice fat short position.  And then

when it gets up there, you figure

to kill it.  By a barrage of short

EXHIBIT 4 PAGE 52

2          selling and adverse information and

3          telephone combat and call in the

4          regulators and call in your Senator

5          and call in the baby brokers and

6          send in the baby brokers letters to

7          Chris Byron at MSNBC so they can

8          all get on the Internet, and just

9          creating so much hoopla that this

10         thing becomes unsustainable.

11             The problem with this plan in

12         this particular case is it didn't

13         work.  There are several reasons

14         why it didn't work.  And here they

15         are.

16             Waldron was not broke or thinly

17         capitalized.  For a small firm of

18         its size, it had plenty of money.

19         That's the first thing .... The

20         second thing that made it not work

21         is Cery Perle is not as

22         inexperienced as Mr. Fiero thought

23         he was.  He may be a relatively

24         novice trader, but he's not stupid.

25             Ed Wedbush is not a wimp.  When

EXHIBIT 4 PAGE 53

2        this thing got active, he didn't do

3        what clearing firms typically do

4        which is run for the hills.  He

5        stayed there and supported his

6        correspondent and did his job.

7           Mr. Fiero got more and more

8        desperate, and then he started

9        getting hit with the buy-ins.  The

10       buy-ins were costing him money.  It

11       wasn't working.  Instead of getting

12       out of the game, he stayed in and

13       redoubled his position.  It still

14       didn't work.

15          And finally in the end, he gets

16       killed.  All of the time when he

17       knew exactly what he was doing.  He

18       told us all that he knew exactly

19       what he was doing way back here in

20       his declaration, which I spoke to

21       him about, where he said, I wish to

22       make it clear that Fiero Brothers

23       is not seeking to protect itself

24       from the buy-ins at all.  Fiero

25       Brothers acknowledges that in

**EXHIBIT 4 PAGE 54**

1

2  taking short position in the shares

3  of IBUY it accepted the risk that

4  buy-ins of IBUY might be affected

5  . . . .

6      There is no question at all,

7  Mr. Fiero knew exactly what he was

8  doing.  He even tells you in his

9  pleading, he knew he was doing it

10  in a market that he considered to

11  be manipulative.  We disagree.  We

12  have that much confidence in his

13  ability to be a short selling

14  terrorist and kill this stock but

15  he was in there anyway.  And it

16  didn't work.

17      Now he's coming in here and

18  he's saying to you, well I think

19  I'm entitled to a fair price on

20  those bonds.  What's a fair price?

21  Well it could be anything, it

22  didn't have to be 25, 32, 36, 39,

23  it could have been 104.

24      At some point I acknowledge to

25  you that differential will probably

EXHIBIT 4 PAGE 55

2    shock the conscience.  But it's a

3    free and open market.  These guys

4    are not fiduciaries, vis a vis, one

5    another.  They're adversaries.

6        There is an old saying in this

7    business that's kind of a cute

8    homily.  I'm going to end with it.

9    I was going to make a sampler and

10   give it to each one of you.  But

11   here's what it is.  It used to say

12   he who sells what isn't his'n, buys

13   it back or goes to prison.

14       That's all I have to say.

15   Thank you for your attention.

16       PANEL CHAIRPERSON:  Does

17   anybody need the bathroom before we

18   conclude with our argument or

19   statement that Mr. Russo is going

20   to make?  Okay?

21       Anybody is free to go and leave

22   the room is they want.  Mr. Russo,

23   let me say something because we are

24   pushing for time and I don't want

25   us to all leave here without you

EXHIBIT 4 PAGE 56

## C E R T I F I C A T E

I, _Barbara M. Johnson_ certify that the
foregoing transcript was prepared using standard
electronic transcription equipment and is a true
and accurate recording.

Signature: _Barbara M. Johnson_ A.E.

Date: _3-9-00_

EXHIBIT 4 PAGE 57