# EXHIBIT 7

```
 1  WHITMAN BREED ABBOTT & MORGAN LLP
         Mark S. Shipow (STATE BAR NO. 91134)
 2  633 West Fifth Street
    21st Floor                              LOS ANGELES SUPERIOR COURT
 3  Los Angeles, California 90071
    (213) 896-2400                              MAR 0 3 1998
 4
    Attorneys for Plaintiff Fiero Brothers, JOHN A. CLARKE, CLERK
 5
                                            BY YVETTE GONZALES, DEPUTY
 6
              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 7                  FOR THE COUNTY OF LOS ANGELES

 8
    FIERO BROTHERS, INC., a New York   )    CASE NO. B C186952
 9  corporation,                       )
                                       )
10           Plaintiff,                )    Judge _____
                                       )
11      vs.                            )    COMPLAINT
                                       )
12  WALDRON & CO. and WEDBUSH, MORGAN  )    Fraud and Injunctive
    SECURITIES, INC., AND DOES         )    Relief
13  1 THROUGH 20, INCLUSIVE            )
                   Defendants.         )
14  _____)

15

16          COMES NOW Fiero Brothers, Inc. ("Fiero Bros.") and

17  alleges as follows against the defendants:

18              FACTS COMMON TO ALL CAUSES OF ACTION

19          1.   Fiero Bros. is a New York corporation, a registered

20  securities broker-dealer and a member of the National Association

21  of Securities Dealers, Inc. ("NASD"), with offices at 120

22  Broadway, New York, New York.

23          2.   Upon information and belief, Defendant Waldron & Co.

24  ("Waldron") is a registered securities broker-dealer and a member

25  of the NASD, with offices at 19000 MacArthur Boulevard, Irvine,

26  California.

27          3.   Upon information and belief, defendant Wedbush,

28  Morgan Securities, Inc. ("Wedbush") is a registered securities
```

EXHIBIT 7 PAGE 71

broker-dealer and a member of the NASD with offices at 1000 Wilshire Boulevard, Los Angeles, California. Wedbush acts as clearing agent for Waldron.

4. This action is being commenced, on an emergency basis, in order to obtain injunctive relief to prevent defendants from consummating a fraudulent securities transaction, described below, which transaction if not enjoined will cause plaintiff to suffer immediate irreparable harm.

5. Among other activities in which it engages, Fiero Bros. acts and at all relevant times did act as a market maker for numerous securities trading on the NASDAQ system.

6. As a market maker, Fiero Bros. is responsible for maintaining an orderly, non-volatile market in each issue for which it makes a market and as such is obliged to purchase or sell securities in each such issue, for its own account, as market conditions may warrant. As a result, a market maker such as Fiero Bros. must at least occasionally sell shares that it does not own, which in the securities industry is commonly referred to as taking a "short" position.

7. At all relevant times Fiero Bros. cleared its trades through King Financial Services, Inc. ("King Financial"), which is a member of the National Securities Clearing Corporation ("NSCC"). King Financial, in turn, clears its trades (and, hence, Fiero Bros.' trades) through the NSCC, which is the major clearing house in the United States for securities transactions on the major stock exchanges as well as those effected through the NASDAQ system. Among other things, the NSCC debits and credits its members' accounts for purchase and sale transactions as they

settle, so that each member's account is "netted" each day. The NSCC's daily debiting and crediting of members' accounts, commonly referred to as continuous net settlement, is automatic.

8. At all relevant times, Fiero Bros. made a market in the shares of a company known as Shopping.com (known by its symbol as "IBUY"). Trades by Fiero Bros. in the shares of IBUY thus were and are cleared through NSCC and subject to the NSCC's continuous net settlement process. Defendant Waldron acted as an underwriter of IBUY shares when Shopping.com went public in or about late November of 1997, and is the primary market maker in that security.

9. As alleged in greater detail below, since the time of Shopping.com's initial public offering last November, and continuing to date, Waldron has supported the price of the IBUY shares through artificial market making activity, illegal "parking" arrangements, improper guarantees against loss and fraudulent purchases and sales.

10. The public "float" of IBUY shares, i.e., the number of shares available for trading, is approximately 1,300,000 shares. Waldron dominates the market for IBUY and, upon information and belief, has cornered the market for those shares through purchases for its own proprietary accounts and those of its principals and customers made over the past three months.

11. In or about January of 1998, the supply of IBUY shares exceeded the demand for the same period. Rather than allow the price of IBUY to fall, Waldron commenced purchasing a large quantity of those shares for its own account. Upon information

1  and belief, Waldron's net capital eventually became insufficient
2  to permit it to purchase additional IBUY shares for its own
3  account, whereupon Waldron then began "parking" IBUY shares in
4  customer accounts, i.e., purchasing shares of IBUY for customers'
5  accounts without authority to do so, so that it might continue to
6  prop up the price.

7       12. Upon information and belief, Waldron found it
8  increasingly expensive and difficult to park stock in customers'
9  accounts and in accounts that Waldron controls at other firms.  To
10 avoid being closed by regulators due to insufficient net capital,
11 Carey Perle, president of Waldron, wrongfully directed Waldron's
12 trading personnel not to accept sell orders from Waldron customers
13 and, also, improperly pressured Waldron's registered
14 representatives to purchase IBUY shares for their customers'
15 accounts without regard to the suitability of the investment.
16 Upon information and belief, some registered representatives
17 complied with Carey Perle's direction, but others resigned from
18 Waldron to protect their customers.

19      13. The departing registered representatives sold the
20 IBUY shares in their customers' accounts, which caused additional
21 pressure on the price of IBUY shares.  Nevertheless, apparently
22 determined not to allow the price of the stock to fall, Waldron
23 continued to absorb the oversupply by purchasing such shares.
24 Upon information and belief, at or about this time defendant
25 Wedbush became aware of Waldron's scheme.  Since Wedbush clears
26 for Waldron, its records undoubtedly reflected that Waldron had

-4-

effectively cornered the market in IBUY, i.e., that Waldron and its customers owned nearly the entire public float of IBUY shares.

14. Upon information and belief, Wedbush realized that Waldron's huge long position in IBUY threatened both Waldron's and Wedbush's viability. Were Waldron to close its doors, Wedbush, as Waldron's clearing agent, would be responsible for Waldron's losses and market obligations. The potential loss to Wedbush exceeded $10,000,00 -- a net capital hit which Wedbush could not survive. Upon information and belief, faced with these dire circumstances Wedbush decided to join Waldron's scheme rather than allow (or require) Waldron to close its doors. To this end, upon information and belief, Wedbush conspired and agreed with Waldron to further manipulate the price of IBUY and conduct fraudulent "buy-in" transactions at artificially inflated prices.

15. A buy-in transaction comes about where a seller is unable to deliver to its buyer on the settlement date or thereafter the shares it has sold. In such an instance, the buyer of those shares may, after making demand upon the seller, buy the shares from a third party elsewhere in the market. If the shares are purchased at a price higher than the price at which they were sold to the buyer by the seller, the difference is charged to the seller's account. This procedure of purchasing the shares from a third party is referred to as "buying in" for the seller's account because, in terms of mechanics, the original buyer is causing the original seller to buy the shares from the third party and to resell them to the buyer at the original contract price.

16. Buying-in is regulated by, among other things, the rules of the NASD, which require that the party who causes the buy-in to occur justify the price of the shares bought-in. Specifically, Rule 11810(c)(1)(C) of the NASD Uniform Practice Code (the "Code") provides in pertinent part, as follows:

> [Where a buy-in is executed] members must be prepared to defend the price at which the "buy-in" is executed relative to the current market at the time of the "buy-in".

The NASD rules thus contemplate and require that shares bought-in for the account of the seller be purchased at the "best available market", and a seller who is subject to a buy-in transaction relies upon compliance with the rules by others in taking a short position.

17. As of February 1998, Fiero Bros. held a sizeable short position in the shares of IBUY.

18. In taking its short position in the shares of IBUY, Fiero Bros. reasonably relied upon and expected that, in the event of a buy-in involving IBUY shares, the other party or parties to the transaction would comply with the buying-in rules of the NASD and other applicable laws, rules and regulations.

19. Fiero Bros. has already been the victim of one fraudulent buy-in transaction orchestrated by Waldron and Wedbush involving the shares of IBUY, on February 12, 1998. Upon information and belief, on that date, Waldron contacted certain "friendly" market makers in IBUY and asked them to raise their bids, i.e., the price at which they notified the market they were prepared to buy shares of IBUY. Upon information and belief, in order to persuade those other market makers to raise their bids,

-6-

Waldron agreed to purchase any stock sold to those market makers at the higher prices, and to indemnify those market makers against loss. By virtue of this orchestrated activity, Waldron artificially created the appearance of upward momentum in the price of IBUY shares. As a result, the price of IBUY rose several points over a few hours on February 12, 1998.

20. Waldron then published to other market makers a sham order to buy 25,000 shares of IBUY at $24.75. Minutes later, Wedbush -- knowing that Waldron effectively controlled all of the IBUY shares -- pretended to poll various market makers for "guaranteed delivery" of IBUY shares. Given Waldron's controlling position in IBUY, however, there was no need for "guaranteed delivery". Wedbush's demand for "guaranteed delivery" was a pretense, which Waldron and Wedbush used to complete their fraud.

21. Once the artificial price was sufficiently high to shore-up Waldron's net capital, Wedbush and Waldron cashed in on the scheme by buying-in shares of IBUY <u>above</u> the artificial price they had created. Specifically, Waldron, through Wedbush, executed a buy-in against Fiero Bros. for 35,350 shares of IBUY, at a price of $25.25 per share. Because it already controlled virtually all of the IBUY shares, Waldron in reality did nothing more than sell shares to itself at a price significantly higher than what it originally paid. Thus the February 12, 1998 buy-in against Fiero Bros. was not completed in an arms-length transaction, and was instead a fictitious trade intended to fraudulently enrich Waldron at Fiero Bros.' expense. Waldron did

-7-

1  not timely report the trade to NASDAQ through ACT, the automated
2  system through which the market is notified of trading activity.
3          22.  Within minutes of the February 12 buy-in, the price
4  of IBUY shares began to fall, finally closing at $21.875 that day.
5  Realizing that the price of IBUY was falling fast -- and that
6  Waldron needed to sell more stock at high prices in order to stay
7  in business -- Waldron liquidated half of its proprietary position
8  before the market opened on February 13, 1998.  Upon information
9  and belief, Wedbush then prohibited Waldron from making a market
10 in IBUY shares. Waldron sold approximately 170,000 shares of IBUY
11 at $20 per share -- $1.875 per share less than the closing price
12 and a full <u>$5.25 below the February 12, 1998 buy-in price</u> --
13 <u>before</u> the market opened the next day on February 13, 1998. Upon
14 information and belief, Waldron was acting on Wedbush's
15 instructions in effecting such sales.
16         23.  Without Waldron to support the market on February
17 13, 1998, the price of IBUY shares fell as low as $16 per share
18 that day.
19         24.  In addition to the fraudulent buy-in effected
20 against Fiero Bros. on February 12, 1998, there have been other
21 fraudulent buy-ins of IBUY shares during the past several weeks
22 effected for the accounts of others, all of them, upon information
23 and belief, orchestrated by Waldron and Wedbush.
24         25.  Upon information and belief, the buy-in of 35,350
25 shares of IBUY at $25.25 per share for Fiero Bros.' account on
26 February 12, 1998 was a pre-planned orchestration by Waldron and

-8-

Wedbush, and constituted a patent fraud upon Fiero Bros. and the market.

26. The buy-in price of $25.25 per share was not the best price available for the shares of IBUY at the time the February 12, 1998 buy-in transaction was effected and bore no reasonable relationship to the prevailing market price or best available market for IBUY shares on that date.

27. Upon information and belief, the buy-in price of $25.25 per share was known by Waldron and Wedbush to be fictitious and was created by them in an illegal attempt to realize substantial profits, fraudulently, at Fiero Bros.' expense.

28. On February 17, 1998, just five days after the fraudulent buy-in described above, Fiero Bros. commenced an arbitration against Waldron, Wedbush, and certain of their principals alleging the fraudulent nature of the February 12, 1998 buy-in transaction involving the shares of IBUY and seeking an award of damages on account thereof. The respondents in that arbitration have not yet appeared or answered in that proceeding.

29. Unfortunately, the commencement of the arbitration on February 17, 1998 has not persuaded Waldron and Wedbush to cease their fraudulent activities.

30. On March 2, 1998, Fiero Bros. was notified that Waldron, through its clearing agent Wedbush, intended to effect another buy-in of IBUY shares for Fiero Bros.' account on Tuesday, March 3, 1998. Fiero Bros. was further informed that Waldron and Wedbush intend to effect a buy-in of 63,000 IBUY shares and, upon information and belief, they intend to execute the buy-in at a

-9-

price of approximately $32 per share. Shares of IBUY closed on March 2, 1998 at 23 1/4 bid, 23 5/16 ask.

31. There is no conceivable justification for a buy-in to be effected at $32 per share, which would be nearly $9 per share in excess of the last closing price for IBUY shares.

32. As alleged above, under Rule 11810(c)(1)(C) of the Code, it is the burden of the party effecting the buy-in to justify the price at which the buy-in is made. Defendants cannot justify buying-in shares of IBUY for Fiero Bros.' account at $32 or more per share, when the shares of that stock closed on March 2, 1998 at 23 1/4 bid, 23 5/16 ask. Indeed, those prices are themselves fraudulent, being the product of a market manipulation orchestrated and perpetrated by these defendants.

33. If the buy-in threatened to occur on March 3, 1998 is permitted to proceed, Fiero Bros. stands to suffer losses of nearly $600,000 ($9/share x 63,000 shares) even without giving consideration to the market manipulation that has been perpetrated by Waldron and Wedbush. Fiero Bros.' demonstrable loss will actually be greater than that amount once it proves, as it will prove, that the prevailing market price for IBUY shares is itself fraudulent.

34. Fiero Bros. is powerless to stop the buy-in from occurring due to the manner in which securities trades are cleared and settled. As alleged above, the NSCC's daily debiting and crediting of members' accounts is automatic. Accordingly, as a NSCC member, the NSCC account of Fiero Bros.' clearing agent will be automatically debited by NSCC for the purchase price of the

shares of IBUY that are bought-in for its account by defendants, and Fiero Bros. will in turn automatically become indebted to its clearing agent for a like sum. This leaves Fiero Bros. no choice but to seek recourse for its economic losses through arbitration, as well as injunctive relief to prevent continuing and imminently threatened harm.

35. Relegating Fiero Bros. to a claim for money damages in arbitration will provide Fiero Bros. with an empty remedy. Upon information and belief, neither Waldron nor Wedbush has the financial wherewithal to satisfy a claim in excess of $600,000, and neither will have such financial capacity when Fiero Bros. ultimately obtains an award against them in arbitration. Fiero Bros. thus faces an immediate threat of irreparable harm, and has no adequate remedy of law, because neither Waldron nor Wedbush will able to respond fully in money damages as and when their liability for their fraud is finally and conclusively established. In addition, if respondents are permitted to continue effecting fraudulent buy-in transactions for Fiero Bros.' account, Fiero Bros. will be forced to pursue respondents not once but repeatedly for damages arising out of what is potentially a continuing series of transactions spread out over weeks or even months. There is no reason why Fiero Bros. should be forced to pursue potentially multiple claims against the same parties, all arising out of the same course of conduct. Nor is there any reason to require Fiero Bros. to sit and wait to be injured again and again by defendants, when it is within the Court's power to maintain the status quo pending the outcome of the arbitration that Fiero Bros. has

-11-

already initiated by prohibiting respondents from continuing their conduct in the interim. Absent immediate injunctive relief, therefore, Fiero Bros. has no effective remedy or recourse against the respondents in that arbitration.

### FIRST CAUSE OF ACTION

36. Plaintiff realleges and incorporates by reference, as though set forth in full, the allegations contained in the preceding paragraphs of this Complaint.

37. The conduct of defendants as alleged above constitutes egregious and continuing fraud which if not enjoined threatens to cause plaintiff to suffer irreparable injury.

38. Plaintiff has no adequate remedy at law.

39. By reason of the foregoing, plaintiff is entitled to injunctive relief preliminarily and permanently prohibiting defendants from effecting any buy-in of IBUY shares for plaintiff's account at any price other than the prevailing market price on the day on which any such buy-in transaction is effected.

### SECOND CAUSE OF ACTION

40. Plaintiff realleges and incorporates by reference, as though set forth in full, the allegations contained in the preceding paragraphs of this Complaint.

41. The conduct of defendants as alleged above constitutes continuing and repeated violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder which if not enjoined threaten to cause plaintiff to suffer irreparable injury.

42. Plaintiff has no adequate remedy at law.

y411747.rfm20999100

EXHIBIT 7 PAGE 82

43. By reason of the foregoing, plaintiff is entitled to injunctive relief preliminarily and permanently prohibiting defendants from effecting any buy-in of IBUY shares for plaintiff's account at any price other than the prevailing market price on the day on which any such buy-in transaction is effected.

## PRAYER FOR RELIEF ON ALL CAUSES OF ACTION

WHEREFORE, Fiero Brothers, Inc. prays for relief as follows:

1. For injunctive relief preliminarily and permanently enjoining defendants from effecting any buy-in of IBUY shares for plaintiff's account at any price other than the prevailing market price on the day on which any such buy-in transaction is effected; and

2. For such other and further relief as the Court deems just and proper.

Dated: March 3, 1998

WHITMAN BREED ABBOTT & MORGAN LLP
Mark S. Shipow

By: *[signature]*
Mark S. Shipow

Attorneys for Plaintiff
Fiero Brothers, Inc.

-13-

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| SHORT CASE TITLE: FIERO BROTHERS, INC. v. WALDRON & CO.; WEDBUSH, MORGAN SECURITIES, INC.; and DOES 1 through 20, Inclusive | CASE NUMBER |
|---|---|
| | **CERTIFICATE OF ASSIGNMENT** |

File this certificate with all cases presented for filing in all districts of the Los Angeles Superior Court.

[X] JURY TRIAL   [ ] NON-JURY TRIAL   TIME ESTIMATED FOR TRIAL  5   [ ] HOURS/ [X] DAYS.

[ ] The undersigned declares that the above entitled matter is filed for proceedings in the **CENTRAL** District of the Los Angeles Superior Court under Section 392 et seq., Code of Civil Procedure and Rule 2 (c) and (d) of this court for the reasons checked below. The address of the accident, performance, party, detention, place of business, or other factor which qualifies this case for filing in the above designated district is (address information not required for non-tort cases filed in Central District):

NAME: (INDICATE TITLE OR OTHER QUALIFYING FACTOR)  Wedbush Morgan
ADDRESS: 1000 Wilshire Blvd.
(CITY) Los Angeles  (STATE) CA  (ZIP CODE) 90071

### CHECK ONLY ONE NATURE OF ACTION

| NATURE OF ACTION | GROUND | NATURE OF ACTION | GROUND |
|---|---|---|---|
| [ ] A7100 Vehicle Accident | Local Rule 2 sets forth the provisions for mandatory filings in the Central District and optional filings in the Central District or District other than the Central District in "Los Angeles County." | No. of Minors Involved: | One or more of the party litigants resides within the district.** (Not a requirement for filing in Central District - Rule 2) |
| [ ] A7210 Med Malpractice | | [ ] A5520 Regular Dissolution | |
| [ ] A7200 Other Personal Inj. | | [ ] A5525 Summary Dissolution | |
| [ ] A7220 Product Liability | | [ ] A5530 Nullity | |
| [ ] A6050 Other Malpractice | | [ ] A5510 Legal Separation | |
| [ ] A6012 Collection/Note | | [ ] A6135 Foreign Support | |
| [ ] A6040 Injunct Relief | | [ ] A6136 Foreign Custody | |
| [ ] A6030 Declar Relief | | [ ] A6122 Domestic Violence | |
| [ ] A6170 Late Claim Relief | If this is a Class Action mark this box: [ ] Class Action | [ ] A6130 Family Law Complaint-Other | |
| [ ] A6000 Other Complaint (Specify): | | No. of Minors Involved: | Child resides or deceased father's probate would be filed in the district.** |
| [X] A6011 Contract/Commercial | Performance in the district is expressly provided for.** | [ ] A6080 Paternity | |
| | | [ ] A6131 DA Paternity (DA use only) | |
| | | [ ] A6133 DA Agreement (DA use only) | |
| [ ] A7300 Eminent Domain Inverse Condemnation No. of Parcels ____ | The property is located within the district.** | [ ] A6600 Habeas Corpus Family Law | Child is held within the district.** |
| | | [ ] A6101 Agency Adoption | Petitioner resides within the district.** |
| [ ] A6020 Landlord/Tenant (UD) | | [ ] A6102 Independent Adoption | |
| [ ] A6060 Real Property Rights | | [ ] A6104 Stepparent Adoption | |
| | | [ ] A6103 Adult Adoption | Consent to out-of-state adoption, conservor resides within the district.** |
| [ ] A6140 Admin Award | The administrative tribunal is located within the district** | [ ] A6106 Sole Custody Petition | |
| | | [ ] A6105 Abandonment | |
| | | [ ] A6210 Probate Will-Letters Testamentary | Decedent resided within the district** or Decedent resided out of the district, but held property within the district** or Petitioner, conservatee or ward resides within this district.** |
| [ ] A6160 Abstract | The judgment debtor holds property within the district** | [ ] A6211 Probate Will-Letters Administration | |
| [ ] A6141 Sister State Judgment | | [ ] A6212 Letters of Administration | |
| [ ] A6107 Confession of Judgment | | [ ] A6213 Letters of Special Administration | |
| [ ] A7221 Asbestos Pers. Inj. | Must be filed in the Central District | [ ] A6214 Set Aside Sm. Estate (6602 PC) | |
| [ ] A6070 Asbestos Prop. Dam. | | [ ] A6215 Spousal Property | |
| [ ] A6137 RESL Initiating Petition | | [ ] A6216 Succession to Real Property | |
| [ ] A6138 RESL Responding Petition | | [ ] A6217 Summary Probate (7660 PC) | |
| [ ] A6139 RESL Reg. of Foreign Support | | [ ] A6218 Real Prop./Sm. Estate (13200 PC) | |
| [ ] A6111 Minor's Contract | | [ ] A6230 Conservatorship P & E | |
| [ ] A6180 Election Contest | | [ ] A6231 Conservatorship Person | |
| | | [ ] A6232 Conservatorship Estate | |
| [ ] A6110 Name Change | One or more of the party litigants resides within the district.** | [ ] A6233 Medical Treatment without Consent | |
| [ ] A6121 Civil Harassment | | [ ] A6240 Guardianship P & E | |
| [ ] A6100 Other Petition (Specify): | | [ ] A6241 Guardianship Person | |
| | | [ ] A6242 Guardianship Estate | |
| | | [ ] A6243 Spouse Lacks Capacity | |
| [ ] A6151 Mandamus* | The defendant functions wholly within the district.** | [ ] A6254 Trust Proceedings | |
| [ ] A6152 Prohibition* | | [ ] A6260 Comp Minor's Claim | |
| [ ] A6150 Other Writ* (Specify): | | [ ] A6190 Petition to Establish Fact of Birth, Death or Marriage | |
| | | [ ] A6200 Probate Other (Specify): | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on **MARCH 2, 1998** at **LOS ANGELES, CA**, California.

(SIGNATURE OF ATTORNEY/FILING PARTY)   MARK S. SHIPOW

* Perogative writs concerning a court of inferior jurisdiction shall be filed in Central District.
** Rule 2 allows optional filing in Central District.

THE COURT MAY IMPOSE SANCTIONS OR OTHER PENALTIES FOR FAILURE TO FILE IN THE PROPER DISTRICT

| 4 | 78C134 RC 013/R5-96 | **CERTIFICATE OF ASSIGNMENT** | RULE 2 LASCR LA-4 |

EXHIBIT 7 PAGE 84

```
H Thomas Fehn - SBN 43341
Gregory J. Sherwin - SBN 69395
FIELDS, FEHN & SHERWIN
11755 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-1521
(310) 473-6338

Attorneys for Defendant
WALDRON & CO., INC.
```

**FILED**
LOS ANGELES SUPERIOR COURT

MAR 10 1998

JOHN A. CLARKE, CLERK

BY E. ALVAREZ, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| FIERO BROTHERS, INC., <br><br> Plaintiff, <br><br> v. <br><br> WALDRON & CO.; WEDBUSH, MORGAN SECURITIES, INC.; and DOES 1 20, inclusive, <br><br> Defendants. | Case No. BC 186952 <br><br> DEFENDANT WALDRON & CO., INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR CONTINUANCE OF FILING AND HEARING DATES AND FOR EXPEDITED DISCOVERY <br><br> Date: March 10, 1998 <br> Time: 8:30 a.m. <br> Dept.: 86 |

Defendant WALDRON & CO., INC. ("Waldron") presents the following Memorandum of Points and Authorities in Opposition to Plaintiff's Ex Parte Application to continue the dates for filing supplemental papers and for the hearing on the OSC, and Plaintiff's request for expedited discovery.

EXHIBIT 7 PAGE 85

```
 1  H Thomas Fehn - SBN 43341
    Gregory J. Sherwin - SBN 69395                    FILED
 2  FIELDS, FEHN & SHERWIN                   LOS ANGELES SUPERIOR COURT
    11755 Wilshire Boulevard, 15th Floor
 3  Los Angeles, CA 90025-1521
    (310) 473-6338                                 MAR 10 1998
 4
    Attorneys for Defendant                    JOHN A. CLARKE, CLERK
 5  WALDRON & CO., INC.
 6                                            BY E. ALVAREZ, DEPUTY
 7
             SUPERIOR COURT OF THE STATE OF CALIFORNIA
 8
                  FOR THE COUNTY OF LOS ANGELES
 9
10  FIERO BROTHERS, INC.,          )   Case No. BC 186952
                                   )
11               Plaintiff,        )
                                   )   DEFENDANT WALDRON & CO.,
12        v.                       )   INC.'S OPPOSITION TO
                                   )   PLAINTIFF'S EX PARTE
13  WALDRON & CO.; WEDBUSH, MORGAN )   APPLICATION FOR
    SECURITIES, INC.; and DOES 1   )   CONTINUANCE OF FILING AND
14  20, inclusive,                 )   HEARING DATES AND FOR
                                   )   EXPEDITED DISCOVERY
15               Defendants.       )
    _____)
                                       Date: March 10, 1998
16                                     Time: 8:30 a.m.
                                       Dept.: 86
17
18
19
20       Defendant WALDRON & CO., INC. ("Waldron") presents the
21  following Memorandum of Points and Authorities in Opposition to
22  Plaintiff's Ex Parte Application to continue the dates for filing
23  supplemental papers and for the hearing on the OSC, and
24  Plaintiff's request for expedited discovery.
25
26
27
28
```

EXHIBIT 7 PAGE 16