# EXHIBIT 14

```
 1              UNITED STATES BANKRUPTCY COURT

 2                Adv. Proc. No. ADV06-01971BB

 3      ---------------------------------

 4     In re                          )

 5          CERY B. PERLE             )

 6              Debtor                 )

 7          ALFONSO FIERO             ) Case No. LA 01-25497-BB

 8              Plaintiff             )

 9                 v.                  )

10          CERY B. PERLE             )

11              Defendant             )

12      ---------------------------------

13

14

15          Deposition of MARTIN P. RUSSO, taken

16          at 380 Madison Avenue, New York,

17          New York 10017, commencing at

18          10:45 a.m., Monday, December 29, 2008

19          before Jineen Pavesi,

20

21

22

23

24

25     PAGES 1 - 61
```

                                                                      1

EXHIBIT 14 PAGE 124

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR ALFONSO FIERO

 4        AKINS & VILLAVICENCIO, ESQS.

 5        7157 Argonauta Way

 6        Carlsbad, California 92009

 7        BY: LESLIE AKINS, ESQ.

 8            (via telephone)

 9

10    FOR CERY PERLE

11        DARRELL PALMER, LL.M.

12        603 North Highway 101, Suite A

13        Solana Beach, California 92075

14        BY: DARRELL PALMER, ESQ.

15            darrell.palmer@cox.net

16

17    FOR MARTIN RUSSO

18        BUTZEL LONG

19        380 Madison Avenue

20        New York, New York 10017

21        BY: ERIC FISHER, ESQ.

22            fishere@butzel.com

23

24

25
```

2

EXHIBIT 14 PAGE 125

1                    RUSSO

2    left.

3         Q.      I just didn't want to

4    mispronounce Kurzman.

5         A.      K-U-R-Z-M-A-N.

6         Q.      You're fairly certain that if

7    you reviewed the privileged documents, you

8    would be able to more specifically state

9    the date upon which your representation of

10   Mr. Fiero ended, is that correct, sir?

11        A.      Yes.

12        Q.      Other than that last matter

13   that you can't identify for privileged

14   reasons, what was the next-to-the-last

15   matter that you represented Mr. Fiero in?

16        A.      I don't recall.

17        Q.      When did you first begin

18   representing Mr. Fiero?

19        A.      1995.

20        Q.      Would it be fair to say that

21   from 1995 to 2004 or 2005 your

22   representation of him was continuous

23   throughout that period?

24                MR. FISHER:  Objection to form.

25        A.      I need to correct something.

                                              11

EXHIBIT 14 PAGE 126

1               RUSSO

2               1995 was the first time I began

3    representing Fiero Brothers; I don't know

4    when the first time I represented John

5    Fiero was.

6        Q.        I was going to get there, we

7    can break it down.

8        A.        Well, I don't know if I can

9    break it down, that's what I am trying to

10   say.

11               The first matter was a Fiero

12   Brothers matter.

13       Q.        Let's stick with Fiero Brothers

14   for a minute; when was the last time you

15   represented Fiero Brothers?

16       A.        I am not sure.

17       Q.        What's your best estimate?

18       A.        My best guess would be when the

19   NASD disciplinary proceeding concluded and

20   I don't know whether I was involved in the

21   NAC appeal, I think I was, but that's my

22   best guess.

23       Q.        Would it also be your best

24   estimate?

25       A.        It is my best estimate, yes,

12

1          RUSSO

2     the documents that you produced this

3     morning?

4          A.      There may be, yes.

5          Q.      Speaking of settlements --

6          A.      And I think the number is 75, I

7     want to be clear, I am not sure it was 75,

8     but the papers will certainly tell you.

9          Q.      Were you involved with the

10    settlement that was ultimately reached

11    between Corsair and Cery Perle?

12         A.      Yes.

13         Q.      Did you prepare any of the

14    settlement documents?

15         A.      What do you mean by prepare?

16         Q.      Did you draft settlement

17    agreements, for instance.

18         A.      I don't remember whether I

19    drafted it or not; I know I commented on

20    the papers.

21         Q.      That was a bad question.

22         A.      Okay.

23         Q.      My real question is, do you

24    think a copy of those settlement documents

25    would be among the files that are at

                                              20

EXHIBIT 14 PAGE 128

```
 1                      RUSSO
 2              Did you draft that document?
 3              (Witness perusing document.)
 4     A.      I am not sure if I drafted this
 5     document; either I or someone working for
 6     me did.
 7              I certainly edited it before it
 8     was filed and I signed it.
 9     Q.      Let me direct your attention to
10     page 9 of the claim, the first claim for
11     relief, and in paragraph 40, 39 and 40, it
12     refers to --  let's focus on paragraph 39
13     --  it states that "Fiero Brothers was
14     damaged in the amount of $510,000"; do you
15     see that?
16     A.      Yes.
17     Q.      Likewise, if we look --  let's
18     turn to page 12, that's probably easier,
19     in the prayer, Fiero Brothers asks for
20     $510,000 for the first claim and $510,000
21     for the third claim and $3.25 million on
22     the second claim.
23              My question for you is can you
24     explain the difference between these
25     claims for damages and the actual award
```

25

EXHIBIT 14 PAGE 129

```
 1                    RUSSO
 2    that was made against the various
 3    defendants?
 4              MR. FISHER:  Objection as to
 5    form and I am going to instruct the
 6    witness not to answer to the extent the
 7    question calls for work product
 8    information.
 9       A.       No, the arbitrators determined
10    they wanted to award $400,000.
11       Q.       Do you know why they awarded
12    only $400,000 when the claim itself asked
13    for more?
14       A.       They must have done a
15    calculation of damages which they thought
16    differed from the calculation of damages
17    that Fiero Brothers presented.
18       Q.       But that would be speculation
19    on your part, correct?
20       A.       Right, it is clear that they
21    determined that 400,000 was the
22    appropriate award.
23       Q.       Since the time the award was
24    made, did you ever discuss the basis for
25    the award with any of the arbitrators?
```

                                              26

EXHIBIT 14 PAGE 130

```
 1                    RUSSO

 2       A.      No.

 3       Q.      So you have no personal

 4   knowledge as to the actual basis for the

 5   award, did you?

 6       A.      Well, no, except that all three

 7   claims have a common thread, which is

 8   excessive markups, which is fraudulent

 9   under the securities laws.

10              So all three of them definitely

11   related to fraudulent activities in some

12   way, whether it being excessive markups

13   solely or scheme to defraud, but

14   everything was fraudulent.

15       Q.      What is the basis of that

16   statement?

17       A.      Well, each one of these claims

18   talks about markups and excessive markups

19   or a theory of a scheme to defraud.

20              If you can't justify a markup,

21   it is excessive and so that's the basis;

22   that was the common theme that we had

23   going through our entire arbitration,

24   which was markups were excessive and

25   fraudulent.
```

27

EXHIBIT 14 PAGE 131

1                    RUSSO

2    hearing?

3                MR. PALMER:   That's right.

4        A.       Just to clarify, I am mostly on

5    the defense side.

6                I don't believe I have ever had

7    another plaintiff's case or claimant's

8    case in arbitration where I have used a

9    testifying expert.

10               I have also used Richard

11   Tucker, who is former head of the SEC in

12   California, I have used him in quite a few

13   defense arbitrations.

14               Many times I didn't have an

15   expert at all.

16       Q.       Those are the only two you can

17   recall, Tucker and the fellow you used in

18   this case?

19       A.       Right now; and the only reason

20   I remember Mr. Robertson is because I

21   happened when looking through these files,

22   I saw his resume, otherwise I probably

23   wouldn't have remembered his name either.

24       Q.       Did you ever represent Fiero

25   Brothers in any other NASD matters?

29

EXHIBIT 14 PAGE 132

1                          RUSSO

2          A.       Yes.

3          Q.       Approximately how many?

4          A.       Two or three.

5          Q.       Can you give me the time frame,

6      approximate time frame where those

7      representations occurred?

8          A.       Between 1997 and 2001.

9          Q.       Do you remember the names of

10     any other parties in those cases?

11         A.       I think Southwest, First

12     Southwest Securities, maybe they were on

13     the other side, I don't remember, and I

14     think there was another one against

15     Southwest Securities.

16                   There was another case that

17     involved a broker/dealer in lower New York

18     and I don't remember the name of it, it

19     might have been Sharp Capital, something

20     like that.

21         Q.       Any others?

22         A.       That's all I can remember at

23     this time.

24         Q.       I will represent to you that

25     Mr. Fiero stated at his deposition that he

30

EXHIBIT 14 PAGE 133

```
 1                    RUSSO

 2    if any?

 3        A.        There was a disciplinary

 4    proceeding, we have talked about that, I

 5    have mentioned that.

 6                    There was regulatory issues

 7    that I have discussed with the NASD, I

 8    believe.

 9                    And when I -- you asked Fiero

10    Brothers, right?

11        Q.        Correct.

12        A.        There is always regulatory

13    issues.

14                    There may have been a contract

15    dispute or two with a vendor.

16        Q.        Anything else?

17        A.        That's all I can remember.

18                    I am not even sure about the

19    contract dispute, but I think there was

20    one.

21        Q.        Were you ever registered with

22    New York State as Fiero Brothers' agent

23    for service of process?

24        A.        I don't know.

25        Q.        I will refresh your
```

                                                    32

EXHIBIT 14 PAGE 134

```
  1                   RUSSO
  2    recollection.
  3              MR. PALMER:  While you look for
  4    the exhibit you want to show Mr. Russo, so
  5    that I don't forget later, under the
  6    Federal rules, I am going to request an
  7    opportunity to review and sign the
  8    transcript.
  9              And also just to be clear,
 10    because we're operating under the Federal
 11    rules in the Southern District of New
 12    York, all objections except as to
 13    objections to form are preserved for
 14    trial.
 15              MR. PALMER:  Agreed.
 16              We're taking a look at the New
 17    York State biennial statements that I
 18    faxed over to you a little bit ago,
 19    Leslie.
 20              I am going to mark the set I
 21    gave to Martin as Exhibit 2 to his
 22    deposition.
 23              (Russo Exhibit 2, New York
 24    State biennial statements, was marked for
 25    identification, as of this date.)
```
                                               33

EXHIBIT 14 PAGE 135

1                    RUSSO

2          Q.      Mr. Russo, if you look at the

3    next-to-last page of Exhibit 2, which is a

4    biennial statement for the Division of

5    Corporations for New York Department of

6    State with the filing period, the only

7    date I see on that particular page, August

8    '04, it identifies the agent for service

9    of process as MPR Law Practice PC.

10         A.      I am looking at the

11   second-to-last page, it says Ivan

12   Greenstein.

13                 (Discussion off the record.)

14         Q.      On the second-to-last page, it

15   does say Ivan Greenstein, but below that,

16   in the bottom left-hand corner, it also

17   says MPR Law Practice, do you see that?

18         A.      Yes, I do, I see that, okay.

19         Q.      My question is, at that time

20   were you the agent for service of process

21   for Fiero Brothers?

22                 MR. FISHER:  What time period

23   are you talking about.

24         A.      As of August 2004.

25         A.      I don't recall ever being the

                                                34

EXHIBIT 14 PAGE 136

```
 1              RUSSO
 2    agent for service of process, but I am
 3    familiar with this form and I can tell you
 4    that the changes are made above and so at
 5    this point in 2004, Fiero Brothers was
 6    changing the service of process address to
 7    Ivan Greenstein.
 8       Q.       Let me have Exhibit 2 back.
 9                (Witness handing.)
10                MR. PALMER:  I am going to
11    number these pages.
12                MS. AKINS:  Can you tell me
13    what you're starting with?
14                MR. PALMER:  On Exhibit 2,
15    Leslie, it is the certification dated May
16    4, 2007, and then behind it are all the
17    documents we faxed to you related to the
18    New York Department of State.
19                I am going to mark the first
20    page as page 1 and just consecutively
21    number them to make it easier, something
22    that Martin's associate or paralegal would
23    have done far in advance if he was taking
24    this deposition.
25                MS. AKINS:  How many pages
```

                                                    35

EXHIBIT 14 PAGE 137

1                    RUSSO

2    knowledge as to whether he was in fact the

3    agent for service of process.

4         Q.       Have you ever acted as an agent

5    for service of process for any

6    corporation, Mr. Russo?

7         A.       For my own PC only.

8         Q.       That's the only one that you

9    have personal knowledge of?

10        A.       Yes, I don't know of any

11   others.

12                 Just to be clear, I don't

13   remember if I ever was with respect to

14   Fiero Brothers.

15        Q.       Did you ever represent Fiero

16   Brothers in any proceedings in bankruptcy

17   court?

18        A.       Yes.

19        Q.       Tell me which matters you

20   represented them in in bankruptcy court?

21        A.       I only recall one and it was an

22   adversary proceeding brought in the

23   Southern District of New York in the In re

24   Adler Coleman bankruptcy.

25        Q.       Have you ever represented John

                                                    39

EXHIBIT 14 PAGE 138

```
 1                    RUSSO

 2    dismissal in the Adler bankruptcy matter.

 3                (Russo Exhibit 4, stipulation

 4    and order of dismissal in the Adler

 5    bankruptcy matter, was marked for

 6    identification, as of this date.)

 7        Q.       The document itself on page 2

 8    is dated May 2, 2002, and the judge signed

 9    it electronically it looks like on May 31,

10    2002.

11                Did your representation of

12    Fiero Brothers in the Adler matter

13    continue for any period past May 31, 2002,

14    for instance, maybe the processing of the

15    settlement, that sort of thing?

16                (Witness perusing document.)

17        A.       I think I was technically still

18    on the docket, but at this point in time

19    Marty Kaplan was handling the Fiero

20    Brothers/Adler Coleman thing, nothing had

21    happened in the case for a while, Kaplan

22    engaged in all the negotiations and

23    drafted with Michigan -- I guess it was

24    Michigan's counsel, which would have been

25    Cleary Gottlieb and Milbank -- drafted the
```

42

EXHIBIT 14 PAGE 139

```
 1                      RUSSO

 2    settlement agreement.

 3               So the answer is I may have

 4    still been on the docket, but I really

 5    wasn't actively doing anything at this

 6    point in time.

 7         Q.      Were you still on the service

 8    list?

 9         A.      Probably, yes, I would say.

10         Q.      Is that your signature on page

11    3 of Exhibit 4, Russo Exhibit 4?

12         A.      Yes, so I guess both Marty and

13    I signed it.

14               If I referred to Mr. Kaplan as

15    Kaplan, I meant no disrespect.

16         Q.      I show you Exhibit 5, a

17    decision, would it be appropriately called

18    a disciplinary matter?

19         A.      Yes.

20         Q.      It is the disciplinary matter

21    of the NASD against Fiero Brothers, Inc.,

22    arising out of the Adler Coleman matter,

23    would that be an accurate description?

24               (Russo Exhibit 5, decision

25    October 28, 2002, before the National
```

43

EXHIBIT 14 PAGE 140

```
 1                    RUSSO

 2     paragraph.

 3              (Witness perusing document.)

 4     A.     Yes.

 5     Q.     Did your representation of

 6     Fiero Brothers in this matter continue

 7     beyond the date of this decision?

 8     A.     I don't recall if I actually

 9     represented him in front of the NAC, if I

10     represented Fiero Brothers in front of the

11     NAC, I may have.

12     Q.     The NAC --

13     A.     National Adjudicatory Council;

14     but this is the lower body decision, this

15     is a panel decision.

16     Q.     There were subsequent decisions

17     in this matter?

18     A.     Yes, I believe it was appealed

19     to the NAC.

20     Q.     Your representation may have

21     continued through that process?

22     A.     May have, I don't remember.

23     Q.     What do you recall about the

24     underlying allegations in the Sterling

25     Hanover matter made against Fiero
```

45

EXHIBIT 14 PAGE 141

```
 1                    RUSSO
 2   Fiero personally in any bankruptcy court
 3   proceedings?
 4        A.       I don't think so.
 5                 MR. PALMER:  Let's take a
 6   break.
 7                 (Recess taken.)
 8                 MR. PALMER:  We will mark that
 9   as Russo Exhibit 3.
10                 (Russo Exhibit 3, substitution
11   agreement, was marked for identification,
12   as of this date.)
13        Q.       Look at page 2 of Exhibit 3 and
14   tell me is that your signature on page 2.
15                 (Witness perusing document.)
16        A.       Yes.
17        Q.       This was the substitution where
18   you substituted in as Fiero Brothers'
19   attorney in the Adler Coleman matter,
20   correct?
21        A.       Yes, but I had previously been
22   at Kasowitz Benson, I was representing
23   Fiero Brothers there, so I just left
24   Kasowitz Benson and was substituting the
25   firm MPR Law Practice.
```

40

EXHIBIT 14 PAGE 142

1                          RUSSO

2      business, I'm sure.

3           Q.      What's his business called?

4           A.      I have to check, but I think it

5      is Acme Alpha.

6           Q.      Have you ever represented Acme

7      Alpha?

8           A.      Yes.

9           Q.      When is the last time you

10     represented them?

11          A.      I think we have done things on

12     their behalf even this year, 2008.

13          Q.      What kind of business is Acme

14     Alpha in?

15          A.      It is a hedge fund.

16                  There is a management company,

17     I am not sure which one we represent, but

18     the management company and hedge fund.

19          Q.      Do you recall when you first

20     received notice of Cery Perle's chapter 7

21     bankruptcy?

22          A.      No.

23          Q.      Are there any documents that .

24     exist that would help you remember what

25     that date was?

                                                    52

EXHIBIT 14 PAGE 143

1                        RUSSO

2        A.        I don't know.

3                  Just to be clear, when you say

4    notice, I don't know that I ever got

5    formal notice, I may have.

6                  But I certainly at some point

7    was contacted by Greenberg Traurig to be

8    trial counsel at the bankruptcy level if

9    we had to retry the fraud allegations.

10       Q.        In the adversary case?

11       A.        Right, so when you used the

12   word notice and I responded, I wasn't

13   talking about technical notice; when I

14   first became aware of would be a better

15   way to define the way I was interpreting

16   the question.

17       Q.        Who was your contact at

18   Greenberg?

19       A.        Jeff Scott.

20       Q.        Are you still in touch with

21   Jeff?

22       A.        Jeff and I have on and off

23   spoken.

24                 There was a point that I spoke

25   with Jeff this year when Cery Perle's

53

EXHIBIT 14 PAGE 144

1                          RUSSO

2    have a couple of questions for Mr. Russo?

3                    MS. AKINS:  Yes.

4                    MR. PALMER:  Why don't you go

5    ahead, I am pretty much done.

6    EXAMINATION BY

7    MS. AKINS:

8         Q.      Did you receive formal notice

9    of the Cery Perle bankruptcy on behalf of

10   Fiero Brothers?

11        A.      I don't think so.

12        Q.      Where was your business address

13   in May of 2001?

14        A.      May of 2001, Peekskill, the

15   Atrium at Rae Park, I think it was John

16   Walsh Boulevard, I don't remember exactly,

17   8 John Walsh Boulevard in Peekskill, New

18   York.

19                    I moved in December of 2000.

20        Q.      Where did you move from?

21        A.      From the Lincoln Building, 60

22   East 42nd Street.

23                    MR. FISHER:  Do you have

24   anything else?

25                    MS. AKINS:  No.

                                              55

EXHIBIT 14 PAGE 145