DARRELL PALMER (125147)
Law Offices of Darrell Palmer
603 N. Hwy 101, Suite A
Solana Beach, CA 92075
Telephone: (858) 792-5600
Facsimile: (858) 792-5655

Attorney for Defendant, CERY B. PERLE

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>CERY B. PERLE,<br><br>Debtor,<br><br>_____<br><br>ALFONSO FIERO, an individual, as Assignee of the Judgment issued April 6, 1999 in favor of Judgment Creditor FIERO BROTHERS, INC., Assignor, pursuant to the Assignment dated March 1, 2006,<br><br>Plaintiff,<br><br>vs.<br><br>CERY B. PERLE<br><br>Defendant | Case No.: LA 01-26497-BB<br><br>ADV06-01971BB<br><br>**DECLARATION OF CERY B. PERLE IN SUPPORT OF DEBTOR'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 10, 2009<br>Time: 2:00p.m.<br>Place: Courtroom 1475<br>Judge: Hon. Sheri Bluebond |

1

I, Cery Bradley Perle, declare and state as follows:

1.     The following is based on my personal knowledge and if called upon as a witness I could competently testify thereto.

2.     I am the debtor/defendant in this action. Plaintiff Alfonso Fiero filed this action seeking a declaration that a judgment obtained by plaintiff's assignee Fiero Brothers, Inc. ("Fiero Brothers) is non-dischargeable in bankruptcy. Plaintiff's claim is based on an 1998 arbitration award rendered in favor of the Fiero Brothers by the National Association of Securities Dealers ("NASD").

3.     On February 17, 1998, Fiero Brothers commenced an arbitration proceeding before the NASD against me, Waldron & Co., Inc., and Wedbush, Morgan, Securities, Inc. ("Wedbush") in Case No. 98-00587 ("NASD Arbitration"). Fiero Brothers alleged three causes of action in its complaint. Fiero Brothers' claims relate to their own short selling activities in shopping.com.

4.     Shopping.com is a California company that sold retail goods on the internet. Shopping.com went public in November 1997. Waldron acted as its underwriter. Shopping.com shares traded on the NASDAQ bulletin board market under the ticker IBUY. After IBUY's initial public offering, Waldron acted as a market maker in the stock along with 12-20 other market makers.

5.     The bulletin board market is similar to the ancient dealer market known as the over-the-counter market. The difference is that in the bulletin board market, dealers post their quotes and report their trades into an electronic medium known as the bulletin board. In 1997-98, the bulletin board market was less regulated than the NASDAQ, but there were rules that governed short selling in the bulletin board market. All retail public customers and broker dealers who were not market makers were required, when engaging in naked short selling into the bulletin board market, to make an affirmative determination that the stock is borrowable in the event a demand for delivery is made.

2

Since market makers were exempt from this requirement, it was possible for market makers to sell short stock that they could not borrow and did not own. Fiero Brothers was a market maker in IBUY who misused their ability to sell naked shorts.

6. Shopping.com first came public in November 1997 at $9.00/share. The price shortly rose to $34.00. Around this point, Fiero Brothers began its market manipulative activities. Fiero Brothers registered as a marker maker in Shopping.com and began to naked short sell IBUY. A naked short sale occurs when a short seller sells shares it does not own. Generally, a short seller anticipates that the price of the share will fall. However, contrary to Fiero Brothers' expectation IBUY prices did not fall. In response, Fiero Brothers increased the size of its short positions. Waldron purchased many of the shares sold by Fiero Brothers.

7. As the purchaser of IBUY shares with a future delivery date, Waldron had a right to demand delivery of the securities it purchased. Waldron exercised that right to demand delivery by sending a notice through Wedbush. Waldron clears through Wedbush. When the seller (later identified as Fiero Brothers) failed to deliver, Wedbush acting on behalf of Waldron had to go to the marketplace and buy the shares for the account of the short selling broker (Fiero). All of the buy-in transactions were conducted through Wedbush. I did not know the identity of the short seller.

8. When a clearing house buys on the account of a short seller who fails to delivery, the clearing house will poll each and every one of the published market makers to see if any can sell shares with guaranteed delivery. If there was a failed to deliver, Wedbush polled the published market makers for IBUY shares. Wedbush would purchase the IBUY shares from the market makers who could guarantee delivery. If other market makers could not guarantee delivery, then Waldron caused the IBUY shares to be bought in for the account of the uncovered short seller from either its own inventory or from Waldron's customers who were willing to sell. Since there were no

3

other sellers and no established guaranteed market price, Waldron had to set the price. Therefore, Waldron set the price above the last available open market price.

9. There were no regulations governing the setting of prices on a buy-in transaction. For instance, NASD *does not* require that the buy-in be conducted at the last reported price. NASD also *does not* require that the buy-in be conducted at any particular range above the last reported price. When the buy-in prices set by Waldron started to become the subject of NASDR inquiry, Waldron contacted NASD personnel to confirm whether there were any NASD provisions governing the buy-in prices. Waldron was told that there were none.

10. Fiero Brothers claimed that four buy-in transactions executed on February 12, 1998; March 6, 1998; March 11, 1998 and March 16, 1998 were excessive.

11. On March 3, 1998, Fiero Brothers filed an ex parte application in the Los Angeles Superior Court seeking an injunction to prevent Wedbush and Waldron from executing a buy-in on Fiero Brothers' short position. The court denied Fiero Brothers' request.

12. At the NASD Arbitration, Fiero Brothers sought damages for the alleged excessive buy-ins. Fiero Brothers also sought damages for fraud allegedly perpetuated by me.

13. In response to Fiero Brother's complaint, I filed an answer and a counter-claim. In my counter claim, I alleged claims against the Fiero Brothers for defamation and tortuous interference with business relations. I alleged that Fiero Brothers had engaged in manipulative short selling in IBUY. I also alleged that Fiero Brothers had published defamatory statement with the intention of driving down the price of IBUY.

14. **Fiero brothers' fraudulent conduct re IBUY:** I believe that Fiero Brothers intention when it registered as a market maker in IBUY and when it engaged in short selling was to force a bear raid on shopping.com. Fiero Brothers' naked short selling in IBUY was similar to Fiero Brothers' conduct in the Hanover securities.

4

15. Although Fiero Brothers was bought in at what it believed was excessively high prices, it continued to sell short.

16. The NASD Arbitration proceeding concluded with a four day arbitration which was held between September 1-4, 1998. Mr. Martin Russo appeared on behalf of Fiero Brothers in the NASD Arbitration. Mr. Russo conducted the four day arbitration on behalf of Fiero Brothers. Mr. Russo presented multiple witnesses, and more than 75 exhibits, and presented closing arguments. Although Fiero Brothers alleged at the arbitration that Defendant engaged in stock parking arrangement, it did not identify even one customer in whose account such activities had taken place.

17. During the NASD Arbitration, Defendant introduced evidence of Fiero Brothers' fraudulent activity in Shopping.com. Defendant's expert testified that between February and March 1998, Fiero Brothers had been responsible for manipulating the market in shopping.com (Ex. 8, 9). Defendant also introduced evidence of the defamatory statements published by Fiero Brothers.

18. On September 17, 1998, Fiero Brothers received a $350,000 award against Waldron & Co. and me ("NASD Award"). The panel denied Fiero Brothers' claim for punitive damages.

19. I did not receive any notice of entry of the NASD Award into a judgment of the Los Angeles Superior Court.

20. On May 25, 2001, I filed a voluntary Chapter 7 bankruptcy petition. I represented myself in pro se in my bankruptcy. I also filed all of the schedules and creditor's matrix in support of my bankruptcy.

21. The first date set for the first meeting of creditors was June 29, 2001. Fiero Brothers did not file an adversarial proceeding before August 28, 2001. I received a discharge on March 11, 2002.

22. In February 2006, Fiero Brothers attempted to levy on my retirement account. I then became aware for the first time that Fiero Brothers claimed that the

Judgment had not been discharged in bankruptcy. Following this there was again no activity until October 2006 when this adversary proceeding was filed by Plaintiff.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: _____

Cery B. Perle