# EXHIBIT 1

H THOMAS FEHN, ESQ.
GREGORY J. SHERWIN, ESQ.
ELIZABETH LOWERY, ESQ.
FIELDS, FEHN & SHERWIN
11755 Wilshire Blvd.
15th Floor
Los Angeles, CA 90025
(310) 473-6338

Attorneys for WALDRON & CO.,
 CERY PERLE and ED HARRIS


### ARBITRATION BEFORE THE

### NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.


| | |
|---|---|
| FIERO BROTHERS, INC.,      ) <br><br>         Claimant,   ) <br><br> v.                  ) <br><br> WALDRON & CO., CERY PERLE,   ) <br> ED HARRIS, WEDBUSH MORGAN   ) <br> SECURITIES, INC., and ED WEDBUSH, ) <br><br>        Respondents.   ) | CASE NO. 98-00587 <br><br> STATEMENT OF ANSWER <br> OF WALDRON & CO., <br> CERY PERLE and ED HARRIS; <br><br> COUNTER CLAIM AGAINST <br> CLAIMANT FIERO BROTHERS; <br><br> CROSS CLAIM AGAINST THIRD <br> PARTY RESPONDENT KEY WEST <br> SECURITIES, INC. |

FIERO BROTHERS, INC.,                    )          CASE NO. 98-00587

                        Claimant,        )          STATEMENT OF ANSWER
                                         )          OF WALDRON & CO.,
v.                                       )          CERY PERLE and ED HARRIS;
                                         )
WALDRON & CO., CERY PERLE,               )          COUNTER CLAIM AGAINST
ED HARRIS, WEDBUSH MORGAN                )          CLAIMANT FIERO BROTHERS;
SECURITIES, INC., and ED WEDBUSH,        )
                                         )          CROSS CLAIM AGAINST THIRD
                        Respondents.     )          PARTY RESPONDENT KEY WEST
_____  )          SECURITIES, INC.
                                         )
WALDRON & CO., CERY PERLE,               )          MOTION TO DISMISS
and ED HARRIS,                           )          RESPONDENT ED HARRIS
                                         )
                        Cross-Claimants, )
v.                                       )
                                         )
FIERO BROTHERS, INC.,                    )
                                         )
                        Cross-Respondents. )
_____  )
WALDRON & CO., CERY PERLE,               )
                                         )
                        Cross-Claimants, )
v.                                       )
                                         )
KEY WEST SECURITIES, INC.                )
                                         )
                        Third-Party Respondent. )
_____  )

1

F 002387

Respondents Waldron & Company, Cery Perle and Ed Harris deny generally and specifically each and every allegation of the Statement of Claim and set forth the true facts as follows.

## INTRODUCTION

This is a claim brought by a well known, notorious over-the-counter short seller broker dealer because he lost money.  No public customers are involved.  Claimant seeks in the first instance to enjoin buy-ins of uncovered and undelivered short positions and then to recover money damages equal to the amount of money he lost in his short selling strategy.  Claimant has already been rebuffed in its efforts to obtain injunctive relief, and damages should be denied as well.  Moreover, a third party respondent, Key West Securities, Inc. in collusion with claimant, should be added as a third party respondent and finally, by its counter claim, respondent Waldron seeks to recover considerable amounts of damages done to it by claimant.

In short, claimant has engaged in corrupt market practices, has attempted to pervert the arbitration process and should pay the price.

## THE PLAYERS

### Shopping.com, Inc. ("IBUY")

IBUY is a recently formed company engaged in the business of selling retail goods over the internet.  Founded in early 1997, IBUY went public in November, 1997.  Respondent Waldron acted as

2

its underwriter.

### Waldron & Co., Inc.

Waldron is a general securities firm employing approximately 75 brokers in four branch offices.  Following the completion of IBUY's initial public offering, Waldron acted as a market maker in the stock of IBUY along with approximately 12 to 20 other market makers.

### Fiero Brothers, Inc.

Fiero Brothers is a broker dealer headquartered in New York. It has acquired a national reputation as an aggressive short seller and gained considerable adverse publicity for its short selling activities in connection with the 1995 failure of Hanover Sterling, an over-the-counter firm and its clearing firm, Adler Coleman.  It is widely reported that both firms failed as a result of Fiero's aggressive short selling activities (See Exhibit "A" attached).  Fiero is the subject of an NASD enforcement complaint arising from those very same activities, a copy of which is attached as Exhibit "B" to this response.

### Key West Securities, Inc.

Key West is a licensed broker dealer operating out of Texas. Respondents believe it is a one man shop and has acted in collusion with and at the specific instance and request of claimant Fiero Brothers.

3

## THE SHORT SELLING SCENARIO

IBUY shares trade on a market known as the NASDAQ bulletin
board.  This market is very different from the more automated
NASDAQ stock market or the NASDAQ small cap market.  The bulletin
board market is nothing more than the historically ancient dealer
market known as the over-the-counter market.  The difference is
that modern over-the-counter dealers post their quotes and report
their trades into an electronic medium known as the bulletin
board.  There are numerous and complex rules applicable to
securities traded on stock exchanges and in the NASDAQ market.
There are almost no rules with respect to the bulletin board
market.  However, among the rules that do exist is one governing
short sales.  Retail public customers and broker dealers who are
not market makers are required, when selling short into the
bulletin board market, to borrow the subject stock for future
delivery or to make an "affirmative determination" that the stock
is borrowable in the event a demand for delivery is made.  Market
makers are exempt from this borrowing requirement and may
effectively sell naked shorts into the bulletin board market.
This enables market makers to sell short stock which they cannot
borrow, cannot identify, and do not own.  Although there is no
precise definition of what constitutes a market maker,
conventional wisdom holds that market makers are dealers that
hold themselves out to both buy and sell stock in identifiable
quantities to any person desiring to be on the other side of a
particular trade.  If a dealer who purports to be a market maker

4

is not acting as one, then the exemption from the borrowability
rule for market makers would not be available.

IBUY stock first came public in November at $9.00 per share.
It ultimately rose to more than $34.00. Along the way it
attracted the attention of notorious short seller, claimant,
Fiero Brothers, Inc. ("Fiero"). Normally, a short seller sells
short because he believes the market is about to move down and he
will be able to cover his short position by re-buying the stock
at a lower price. In this particular instance, the behavior of
IBUY stock defied the short seller's belief and continued to go
up instead of down. In response, claimant Fiero increased the
size of his short positions. Fiero's anticipation of market
direction continued to be wrong although the stock did fluctuate
on the way up. As it turns out, many of the shares that were
sold short by Fiero were bought by Waldron.

## THE BUY-IN PROCEDURE

Any broker-dealer such as Waldron has the right to demand
delivery of the securities it purchases. Waldron exercised that
right without knowing who was on the other side of its purchase
trade. Since Waldron clears through Wedbush Morgan Securities,
it was Wedbush Morgan who was responsible for the mechanics of
following Waldron's direction. Wedbush was not a principal in
any of Waldron's trades and acted solely as a clearing agent.
When the seller of the shares to Waldron failed to deliver
consistent with its obligation, Waldron was faced with the

5

necessity of going to the marketplace and buying the shares for the account of the short selling broker to meet its delivery obligations.  Mechanically it did this by means of polling each and every one of the published market makers to see if any would sell shares with guaranteed delivery.  In each and every instance where shares were available from other market makers, they were purchased.  If there were any shares as yet undelivered and they were not available from other market makers, Waldron caused them to be bought in for the account of the uncovered short seller, either from its own inventory or from Waldron customers who may have been willing to sell.  Since there was no stock available from other sources, Waldron was required to set the price.  In each and every instance it set the price above the last open market price, because there were no other sellers available to constitute the market and there was no established guaranteed delivery market price.  NASD Rules do not require that a buy-in be conducted at the last reported trade price.  This buy-in procedure ultimately became the subject of an NASDR inquiry in which the NASDR advised Waldron that there was no regulation of the buy-in price.  Attached as Exhibit "C"  is Waldron's formal response and summary of conversations it had with NASDR.

## THE SHORT SELLERS REIGN OF TERROR

It was not too long after it established short positions that claimant Fiero Brothers recognized that its judgment was wrong.  For every dollar that the price of IBUY moved up, Fiero

6

lost money.  Despite Fiero's allegation in the Statement of Claim
that the IBUY market was "manipulated" as early as February,
1998, Fiero continued to <u>voluntarily</u> execute new short positions
in IBUY, continued to fail to deliver IBUY stock by settlement
date, and thus chose to continue to subject itself to buy-ins.
Because Fiero refused to stop shorting IBUY, it needed to do
something drastic to stop the losses.  Fiero immediately embarked
upon a reign of terror which included almost every conceivable
vehicle to create confusion, fear and panic in the market for
IBUY shares.  Included in the actions either taken or created by
Fiero were:

- The filing of a Superior Court action similar to this one to
  enjoin the buy-ins;
- The scurrilous, defamatory allegations contained in the
  pleading were circulated to anyone who would listen;
- The filing of another similar action by a Florida resident
  doing business through a Canadian brokerage firm (where no
  short sale rules apply) in the New York District Court where
  relief was denied;
- The publication of defamatory rumors about the merits of
  IBUY shares;
- The solicitation of false and defamatory letters by former
  employees of Waldron which have become the subject of a
  defamation lawsuit attached as Exhibit "D";
- The wholesale making of telephone calls to Waldron's
  business associates in which the return number was that of

7

Belleview Mental Hospital in New York;

- The naming of Ed Harris and Ed Wedbush as defendants in this case for the sole purpose of harassing them;

- The publication of research reports by Chatfield Dean and Key West which were negative with respect to IBUY;

- The execution of manipulative price movements in the stock of IBUY;

- The solicitation of Senator Alfonse D'amato of New York to use his influence to cause the SEC to initiate an investigation which ultimately led to a 10 day trading suspension in the stock of IBUY;

- The reporting of false information to various press sources;

- The naming of Wedbush as a respondent without probable cause in the hope of intimidating Wedbush to cease clearing for Waldron; and

- Various other activities which have yet to be discovered.

## THE OUTCOME

Despite the expenditure of enormous resources by claimant Fiero and an occasional successful strike, the overall result has been ineffective.  Shopping.com continues to perform according to its original projections.  The stock has resumed trading at levels approximating where it traded before the SEC suspended it. The SEC and NASD investigations to date have produced no enforcement activity.  The shareholders of IBUY continue to hope that their faith in the innovative but untested business plan

8

will remain justified.  The lawyers for all parties have been
kept busy and therefore made prosperous trying to make order of
the chaos that claimant Fiero's actions have attempted to create.

### RELIEF SOUGHT

Respondent Harris requests he be dismissed from this
proceeding since he had nothing to do with the events in
question.  Respondents Waldron and Perle request general and
special damages according to proof from claimant Fiero Brothers
and third-party respondent Key West.  Respondents Waldron, Cery
Perle and Ed Harris request that all claims asserted by claimant
Fiero be dismissed in their entirety and that respondents/cross-
claimants be awarded their costs in defending this matter.


Dated:  April 16, 1998                    FIELDS, FEHN & SHERWIN
                                          Attorney for respondents
                                          WALDRON & COMPANY,
                                          CERY PERLE, and ED HARRIS


9

F 002395

★ THURSDAY, APRIL 16, 1998    **D3**

# NASD Alleges 4 Firms Colluded Against Rival

*From Bloomberg News*

Executives at four brokerages colluded to drive down prices for stocks sold by another firm, eventually running the rival out of business in a scheme that involved tips passed to financial journalist Dan Dorfman, industry regulators alleged Wednesday.

The National Assn. of Securities Dealers charged that the owners of New York-based **Fiero Bros.** Inc. and three now-defunct brokerages—including one that has been investigated for possible links to organized crime—made $6.4 million in illegal profits by joining to drive down prices on 10 stocks sold by the **Hanover Sterling & Co.** brokerage. The NASD made the complaint public Wednesday.

The complaint alleges that owners of the firms targeted stocks sold by Hanover for "short" selling.

Some of the brokerage owners contacted Dorfman, when he worked at the CNBC cable network, offering critical information about stocks sold by Hanover and about Hanover itself, the NASD alleged.

Dorfman, who was not charged with any wrongdoing, aired a "negative report" on Jan. 20, 1995, about Hanover and some stocks it was selling, the NASD said.

Hours before Dorfman's broad-cast, the NASD charged, Fiero Bros., **Aspen Capital Group** of Denver and **Falcon Trading Group** of Boca Raton, Fla. sold short a total of more than 60,000 shares of the Hanover stocks. The firms then told Hanover—which was losing money from the short-selling—that they would stop the short sales if Hanover provided them with stock at below-market prices, the NASD charged. Hanover agreed, the NASD alleged. Hanover, a penny stock firm, went out of business in February 1995.

A lawyer for Fiero and its owner, John Fiero, denied the NASD allegations.

The NASD, an industry group that polices U.S. brokers and brokerages, is seeking restitution and other unspecified sanctions.

Aspen and Falcon are defunct, as is the other firm that was charged, **Sovereign Equity Management** of Boca Raton.

The lawyer for Sovereign and Falcon did not respond to a request for comment. Carlson, who is not represented by a lawyer, could not be reached. A lawyer representing Dorfman also could not be reached.

**F 002396**



**EXHIBIT** "A"

NASD REGULATION, INC.
OFFICE OF HEARING OFFICERS

DEPARTMENT OF ENFORCEMENT,      :
                                :
         Complainant,           :
                                :
    v.                          :
                                :
STEPHEN CARLSON (CRD 1008099),  :      Disciplinary Proceeding
FALCON TRADING GROUP, INC. (CRD :      No. CAF980002
30361), JOHN FIERO (CRD 1190133), :
FIERO BROTHERS, INC. (CRD 27269), :
MARK IACONO (CRD 1154923),      :
ROBERT SHERMAN (CRD 1667470),   :
SOVEREIGN EQUITY MANAGEMENT     :      Hearing Officer --
CORP. (CRD 20016), GLEN VITTOR  :
(CRD 1565323),  and GREG VITTOR :
(CRD 1864219),                  :
                                :
         Respondents.           :

## COMPLAINT

Upon information and belief, the Department of Enforcement alleges as follows:

### SUMMARY

1.  During the period from the middle of January 1995 until the end of February 1995,

Respondents Fiero Brothers, Inc., Falcon Trading Group, Inc., Sovereign Equity Management

Corp., John Fiero, Steven Carlson, and Glen Vittor, acting in collusion, engaged in a

manipulative "bear raid" to drive down the price of ten Nasdaq securities underwritten by

Hanover Sterling & Co., Ltd. ("Hanover"), a now-defunct broker/dealer.  Those Respondents,

acting through their own proprietary trading and market making accounts, and in conjunction

with others, engaged in a month-and-a-half long program of short selling these securities.  During

**F 002397**

**EXHIBIT** "B"

the course of the short selling program, certain of the Respondents participated in the

promulgation of negative stories about Hanover Sterling and certain of the securities over a

nationally-televised cable broadcast.  Certain Respondents and associated retail accounts made

over $1 million by coercing Hanover Sterling into selling them stock below the existing market

price. This conduct resulted in the collapse of Hanover Sterling, which was quickly followed by

the demise of its clearing firm, Adler, Coleman Clearing Corp.  By this conduct, Respondents

Fiero Brothers, Inc., Falcon Trading Group, Inc., Sovereign Equity Management Corp., John

Fiero, Steven Carlson, and Glen Vittor violated Section 10(b) of the Securities Exchange Act of

1934, Rule 10b-5 thereunder, and NASD Rules of Conduct 2110 and 2120.

        2.  In addition, all of the above Respondents, as well as Respondents Mark Iacono, Greg

Vittor, and Robert Sherman, violated NASD Conduct Rules 3370 and 2110 by engaging in short

sales for proprietary or customer accounts without making any of the affirmative determinations

required for short sales.  Lastly, Respondent Mark Iacono failed to mark certain order tickets as

short sales, thereby violating Conduct Rules 3110 and 2110.

RESPONDENTS

**Respondents Associated with Aspen Capital Corp.**

        3.  **Stephen Carlson**, age 38, resides in Denver and has been registered with the NASD

as a general securities representative since September 1981 and a general securities principal

since April 1985.  During the review period, Carlson was a general securities principal and sole

owner of Aspen Capital Group, Inc. ("Aspen"), a now-defunct firm which played a principal role

in this matter.  Aspen was registered with the NASD from November 8, 1985 until it went out of

business and filed a Form BDW on January 25, 1996.  Aspen Capital was located in Denver,

Colorado, and maintained one branch office.  In an earlier action, C3A940064, Carlson and

2

**F 002398**

Aspen were sanctioned by the District Business Conduct Committee for District 3 based on charges that they violated the predecessor section to Rule 2120 by attempting to obtain stock at below market prices by threatening to act to cause the price of stock to decline below the level necessary for continued Nasdaq listing. Carlson and the firm were censured and fined $10.000. jointly and severally, on June 21, 1996, and Carlson was suspended from association with any NASD member in any capacity for 30 days. On September 19, 1997, the NBCC upheld the decision of the DBCC, but increased Carlson's sanction to a permanent bar. Carlson's appeal to the Securities and Exchange Commission is pending.

4. **Robert Sherman**, age 39, resides in Wheat Ridge. Colorado and has been registered as a general securities representative since April 1987, a registered options principal since October 1987, and a general securities principal since February 1988. During the review period, Sherman was a registered representative, head trader and compliance officer in Aspen's main office. Sherman has been employed by three member firms since April 1987, and was, until recently, employed by Chatfield Dean & Co., Inc.

**Respondents Associated with Falcon Trading Group, Inc. and Sovereign Equity Management Corp.**

5. **Falcon Trading Group, Inc.** ("Falcon") had been registered with the NASD from February 19, 1993 until its expulsion (described below) in May 1997. It was located in Boca Raton, Florida, and conducted only market making and proprietary trading.

6. **Sovereign Equity Management Corp.** (later Tuscany Equity Management Corp.) ("Sovereign") had been registered with the NASD from July 21, 1987 until November 1997, at which time it was expelled for failure to pay fees. Sovereign was located at the same address as

3

Falcon was in Boca Raton. The firm maintained five branches, and engaged in proprietary and retail activity.

7. **Glen Vittor**, age 36, was president of both firms, and owned 10% of Falcon and 100% of Sovereign. He resides in Boca Raton. He has been registered as a general securities representative since 1986, an options principal since 1990, a financial operations principal since 1990 and a general securities principal since 1989. He was also the head trader at Falcon. He had been employed by eight member firms from October 1987 until March 1997, and is not currently registered with any firm.

8. **Greg Vittor**, age 33, was the vice president and head trader of Sovereign. Greg, who is Glen Vittor's brother and a resident of Boca Raton, has been registered with the NASD as a general securities principal since September 1991. He was registered with Sovereign Equity until its demise, and is currently registered with Metro Trading, Inc.

9. In a prior case, CMS940010, Glen Vittor and Falcon were censured, fined $50,000 each, fined $200,000 jointly and severally, and ordered to pay restitution of $189,125 for failure to honor trade commitments with other member firms and permitting the association of an individual whose NASD registration had been revoked. On December 21, 1995, the SEC affirmed the NASD's disciplinary actions, and suspended Glen Vittor for one year in all capacities, barred him from acting in all principal capacities, required him to requalify as a registered representative, and suspended the firm in all capacities for thirty business days. The U.S. Court of Appeals for the District of Columbia upheld the SEC action on December 20, 1996. On May 16, 1997, Falcon was expelled and Glen Vittor's registration was revoked by the NASD for failure to pay the fines. Greg Vittor has no formal disciplinary history.

F 002400

**Respondents Associated with Fiero Brothers, Inc.**

10. **Fiero Brothers, Inc.** ("Fiero Bros.") has been registered with the NASD since February 11, 1991. It is located in New York, New York, and maintains a branch office in Fort Lauderdale, Florida. Fiero Brothers has not been the subject of any prior formal disciplinary history.

11. **John Fiero**, age 36, resides in Jersey City, New Jersey. He has been registered with the NASD as a general securities representative since September 1983, financial operations principal since October 1990 and general securities principal since September 1990. John Fiero is the head trader and sole owner of Fiero Brothers. He has been employed by six member firms from January 1985 to the present. He is currently employed by Fiero Brothers.

**Respondent Associated with A.T. Brod & Co., Inc.**

12. **Mark Iacono**, age 37, resides in Smithtown, New York, and has been registered with the NASD as a general securities representative since August 1984 and as a general securities principal since May 1995. During the period of the review, Iacono was a registered representative and trader for A.T. Brod & Co., Inc. ("Brod"), which was registered with the NASD from January 23, 1983 until October 1, 1995, when its registration was canceled for failure to pay fees.

13. Iacono has been employed by fourteen member firms since October 1984, including Goldis Financial Group, Inc. from February 1996 through December 1997, and with Parker Financial Group since January 1998. He previously worked with John Fiero, and went to work for Sovereign within two months of the events at issue in this case. Iacono has no prior formal disciplinary history.

**F 002401**

ıᴄ

### FIRST CAUSE OF ACTION

#### MANIPULATION THROUGH COLLUSIVE TRADING ACTIVITY

**Violations of Section 10(b) of the Securities
Exchange Act of 1934, Rule 10b-5 Promulgated
Thereunder, and Conduct Rules 2110 and 2120
by Respondents Carlson, Falcon, John Fiero, Fiero
Bros., Sovereign, and Glen Vittor**

14. The allegations set forth above in paragraphs 1-13 are realleged for purposes of this
cause of action.

#### Initiation of the Manipulative Trading

15. Prior to the beginning of the trading at issue. Hanover underwrote ten securities ("the
Hanover stocks") which became the subject of the manipulation. Those securities are All-Pro
Products. Inc. units (APROU); American Toy, Inc. common stock (ATOY) and warrants
(ATOYZ); Envirometrics. Inc. common stock (EVRM); Mister Jay Fashions International. Inc.
common stock (MRJY); Panax Pharmaceutical Co. Ltd. units (PNXU); Play Co. Toys common
stock (PLCO), units (PLCOU), and warrants (PLCOW); and Porter McLeod National Retail. Inc.
common stock (PMNR).

16. By the middle of January 1995, Glen Vittor (acting primarily through Falcon), Fiero
(acting through Fiero Bros.), and Carlson (acting through Aspen), who had long-standing
business relations with each other. agreed. expressly or implicitly, to target Hanover stocks for
short selling with the intention of, at a minimum. driving down the price of the stocks and, at a
maximum. driving Hanover out of business. During the time period discussed herein, they were
in frequent communication with each other.

17. In addition to these Respondents, there were numerous retail accounts, mostly
domiciled outside the United States and interrelated with each other and with Falcon, maintained

6                    **F 002402**

at different brokerage firms, which engaged in similar short selling activity to that of the firms identified above. These retail accounts included one very active participant in the scheme, Roddy DiPrimo, S.A., maintained at Brod. The registered representative for this account was Respondent Iacono, who had no other retail customers. In addition, two of the relevant retail accounts were maintained at Sovereign.

18. Beginning approximately January 16, 1995, the Respondents and some of the retail accounts began establishing significant short positions in most of the Hanover stocks, and continued to increase those positions over the next few days. The cumulative value of the group's closing short position in the Hanover stocks was approximately $689,800 on January 16; $1,560,000 on January 17; $3,374,000 on January 18; and $4,131,000 on January 19.

19. Specifically, the Roddy DiPrimo account began shorting APROU, ATOY, EVRM, MRJY, PMNR, and PLCOU on January 16 and 17, and either maintained or increased its position in each stock every day until January 26. Falcon began shorting the exact same six securities on January 17 (except for MRJY, for which Falcon was short on January 16). Falcon began shorting PANXU on January 20, and DiPrimo did so on the next trading day (January 23). Fiero Bros. began shorting PMNR on January 19, and APROU, ATOY, EVRM, MRJY, and PLCOU on the following day.

20. By January 19, 1995, Fiero Bros., Aspen, and other firms through which they sold short registered as market makers in some or most of the Hanover stocks.

21. In order to hide the identity of the short sellers, Fiero Bros., Falcon, Sovereign, and Brod diverted many of their sell orders through other firms, which sold the shares short out of their own proprietary accounts and then covered their short positions by "buying" the stock from

**F 002403**

the Respondent firms. Some of these diverted trades were done by Fiero Bros. while it was
registered as a market maker.

22. Most of the shares being sold short were sold, either directly or indirectly, to Hanover.

23. Fiero Bros. posted SelectNet messages showing large sell orders for one or more of
the Hanover stocks.

24. Throughout the period of the cause of action, and as discussed more fully in the
Second Cause of Action, which is incorporated herein by reference, the Respondents engaged in
hundreds of short sales in violation of the rule requiring them to affirmatively determine that they
will either take delivery of the securities or be able to borrow them.

**The Dorfman Report**

25. As part of the plan to drive down the price of the Hanover stocks, Carlson contacted
financial journalist Dan Dorfman regarding Hanover's recent offering of units in Panax
Pharmaceutical Co., Ltd. and Hanover itself. Carlson called Dorfman's office at least six times
on the morning of January 20, 1995, and faxed materials to Dorfman regarding the Hanover
securities.

26. John Fiero was contacted by Dorfman regarding the Hanover stocks, and faxed
Dorfman information about some of the Hanover stocks.

27. Dorfman aired a negative report on the Panax Pharmaceuticals issue, and on Hanover,
on his regular show, "The Nasdaq Stock Market Dorfman Report," at 12:36 p.m. on January 20,
1995, on CNBC.

28. Dorfman stated in his broadcast that Steve Carlson of Aspen Capital rated Panax
Pharmaceutical units "a joke, as well as two other Hanover Sterling offerings - Mr. Jay Fashion
and Envirometrics."

8                              **F 002404**

29. The afternoon before Dorfman's report was aired, Fiero Bros. registered as a market maker in most of the Hanover stocks, allowing it to begin making markets on the morning the Dorfman report was to be broadcast. In a five minute period on January 19, 1995, Fiero Bros. registered as a market maker in all of the Hanover stocks except one (in which it became a market maker four days later).

30. On January 20, prior to the Dorfman broadcast, three of the Respondent firms and two of the retail accounts engaged in significant short selling in Hanover stocks. Aspen, whose principal (Carlson) was a significant impetus for the Dorfman report, sold short a total of 10,000 shares of the three securities he discussed with Dorfman. Falcon sold short a total of 48,350 of the Hanover stocks. Fiero Bros. sold short a total of 3,100 shares of three of the Hanover stocks. The Roddy DiPrimo account at Brod sold short a total of 60,000 shares of six of the Hanover stocks, and one of the retail accounts at Sovereign sold short 30,000 shares of one of the stocks.

31. The morning of the Dorfman broadcast, a trader at Hanover received a sell order for Panax Pharmaceutical units from an unidentified trader at Aspen, who told the trader to watch Dan Dorfman.

**The Coerced Stock Deal**

32. As Hanover continued to accumulate shares of the Hanover stocks on its books as a result of the short selling, it began to face serious net capital pressure. On or about January 20, 1995, representatives acting on behalf of Hanover sought out the short sellers, and entered into negotiations with an individual purporting to act on behalf of the short sellers.

**F 002405**

33. The individual indicated to one of Hanover's representatives that he could stop the shorting if Hanover would provide the short sellers with stock at below market prices, for a total discount of $800,000-900,000, for all the short positions he was to identify. He negotiated the price for each stock, but not the number of shares.

34. While these events were unfolding, the Respondents and other short sellers continued to exert significant pressure on the Hanover stocks by continuing to sell short those securities. The cumulative short position generally continued to increase, reaching approximately $6,280,000 on January 20; $5,430,000 on January 23, $7,617,000 on January 24; and $7,870,000 on January 25.

35. The individual representing the short sellers identified John Fiero as the broker who would receive the below-market stock from Hanover and disperse among the recipients. John Fiero called a representative of Hanover, and they effected the trades on January 26 and 27, one stock at a time. Fiero Bros. bought the stocks at a total discount of approximately $866,500, and proceeded to distribute the stocks, with a slight mark-up, to other Respondent firms and other firms brokering on their behalf.

36. Specifically, Fiero Bros. obtained 90,000 shares of APROU from Hanover at a discount of $11,200 below the contemporaneous inside bid; 115,000 shares of ATOY at a discount of $100,625; 34,000 shares of ATOYZ with no discount; 66,000 shares of EVRM at a discount of $33,000; 126,000 shares of MRJY at a discount of $157,500; 287,000 shares of PANXU at a discount of $358,750; 175,000 shares of PLCOU at a discount of $175,500; and 81,000 shares of PMNR at a discount of $30,375.

37. When Fiero Bros. resold the stock, the resales to Brod (for Roddy DiPrimo) and Falcon were always below the bid, whereas some of the other purchasers bought at or above the

10

inside bid (but always below the inside offer). Fiero Bros. profited both by covering its own short positions, and by marking up its resale to the other participants.

38. Falcon received the largest cut of the stock, taking between 28% and 62% of the shares of each stock in which it was short. A.T. Brod received a large portion, ranging from 18% to 46% of the shares. All of those shares were passed along to Iacono's only client, the Roddy DiPrimo account.

39. The amount of stock provided by Hanover to Fiero Bros. actually exceeded the outstanding short position of the participants, resulting in additional profits to some of them. Falcon made profits of approximately $562,400 by covering its short position, and an additional $102,000 from selling the excess stock at market prices; Fiero Bros. made approximately $228,800 by covering its short positions and an additional $388,900 from selling additional stock; the Roddy DiPrimo account at Brod made approximately $347,100 by covering its short positions, and an additional $142,000 from the additional stock it received; and a retail customer at Sovereign made $30,470 dollars by covering its short positions (but no additional profits).

40. Aspen did not participate in the distribution from Fiero Bros., but still made a profit of approximately $87,000 because of the declining prices of the Hanover stocks.

**The Continued Short Selling and Demise of Hanover**

41. Almost immediately after the transaction between Hanover and Fiero Bros., Falcon, Sovereign, and the Roddy DiPrimo account, and to a lesser extent Aspen, began to reestablish short positions in the same Hanover stocks. By Friday, February 3, 1995, they reestablished a total short position of 176,500 shares of Hanover stocks; by February 10, 1995, the short position exceeded 473,000 shares; by the following Friday, February 17, the total short position was over

**F 002407**

1.020,000 shares: and by the end of the last full week of February, and the last full week of Hanover's existence. the total short position had reached over 1,744.000 shares.

42. As a result of this continued short selling activity, Hanover attempted, unsuccessfully, to negotiate a second deal whereby it would give stock to the short sellers at a discount of $2 million. along with other concessions. in return for cessation of the short selling. By February 24, 1995, Hanover ceased operations. It was eventually placed into receivership under the Securities Investor Protection Act of 1970. After the firm ceased operations and was placed into receivership, the prices of all of the Hanover stocks fell precipitously. The court-appointed trustee reduced some of the profits to the short sellers by "buying them in" at pre-collapse prices after the short sellers were unable to make delivery of the shares upon demand of the trustee.

43. By the end of February, Falcon had total realized profits of $3,614,000 from the selling of Hanover stocks. along with an additional $4.763,000 of unrealized profits negated by the trustee's actions. Fiero Bros. had total realized profits of $1,847,000 and unrealized profits of $1.324,000. Aspen realized total profits of $707,000 (with no unrealized profits). Roddy DiPrimo, S.A., had realized profits of $980,000 and unrealized profits of $1,625,000. The retail customers of Sovereign had realized profits of approximately $159,000, and unrealized profits of over $1,000,000. Sovereign itself had realized profits of $35,000 and unrealized profits of $171,000. Other retail customers had realized profits totaling $725,000 and unrealized profits of almost $2,500,000.

44. By virtue of this conduct, Respondents Stephen Carlson, Falcon Trading Group, Inc., John Fiero, Fiero Brothers. Inc., Sovereign Equity Management Corp., and Glen Vittor engaged manipulative conduct in violation of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, and NASD Rules of Conduct 2110 and 2120.

F 002408

## SECOND CAUSE OF ACTION

### VIOLATIONS OF THE AFFIRMATIVE DETERMINATION REQUIREMENTS

### Violations of Conduct Rules 3370
### and 2110 by all Respondents

45. The allegations set forth above in paragraphs 1-13 and 15-43 are realleged for purposes of this cause of action.

46. Conduct Rule 3370 applies specific requirements for short selling in customer and proprietary accounts. For proprietary short sales, Rule 3370(b)(2)(B), requires that the firm make an affirmative determination that the stock can be borrowed. That rule makes an exception for bona fide market making transactions, but that exception is inapplicable here. For customer short sales, Rule 3370(b)(2)(A) requires that firms undertake and document steps to ascertain whether the seller of stock will be able to deliver the shares for settlement, or whether the shares are available to be borrowed.

47. Between January 16, 1995, and February 28, 1995, as alleged more specifically in paragraphs 48-52, Aspen, Brod, Fiero Bros., Falcon, and Sovereign each engaged in proprietary short selling while not registered as market makers without making the requisite affirmative determination that they could borrow the stock. Specifically:

48. Aspen, at the direction of Respondent Carlson and through the actions of Respondent Sherman, made 2 short sales of APROU, 1 of ATOYZ, and 7 of PANXU, for a total of 10 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

13

F 002409

49. Brod, at the direction of Respondent Iacono, made 1 short sale of EVRM, 1 of MRJY, and 2 of PLCOU, for a total of 4 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

50. Falcon, at the direction of Respondent Glen Vittor, made 10 short sales of APROU, 14 of ATOY, 4 of ATOYZ, 15 of EVRM, 21 of MRJY, 33 of PANXU, 13 of PLCOU, 9 of PLCO, 10 of PLCOW, and 19 of PMNR, for a total of 148 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

51. Fiero Bros., at the direction of John Fiero, made 3 short sales of APROU, 6 of ATOY, 2 of ATOYZ, 8 of EVRM, 1 of MRJY, 17 of PANXU, 2 of PLCOU, 4 of PLCO, 1 of PLCOW, and 7 of PMNR, for a total of 51 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

52. Sovereign, at the direction of Glen Vittor and through the actions of Greg Vittor, made 1 short sale of APROU, 1 of ATOY, 1 of ATOYZ, 1 of EVRM, 5 of MRJY, 13 of PANXU, 1 of PLCOU, 10 of PLCO, 1 of PLCOW, and 4 of PMNR, for a total of 38 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

53. In addition, as set forth in paragraphs 54-55 below, Aspen and Fiero engaged in numerous short sales in violation of the affirmative determination requirements while registered as market makers, but in transactions that were not bona fide market making transactions. Specifically:

54. Aspen, at the direction of Respondent Carlson and through the actions of Respondent Sherman, made 11 short sales of ATOY, 18 of EVRM, 11 of MRJY, 44 of PANXU, 18 of

14                    **F 002410**

PLCOU, 8 of PLCO, 1 of PLCOW, and 7 of PMNR, for a total of 118 violative trades, in proprietary accounts (while registered as a market maker) without making the requisite affirmative determination.

55. Fiero Bros., at the direction of John Fiero, made 26 short sales of APROU, 23 of ATOY, 1 of ATOYZ, 18 of EVRM, 22 of MRJY, 51 of PANXU, 37 of PLCOU, 17 of PLCO, and 26 of PMNR, for a total of 221 violative trades, in proprietary accounts (while registered as a market maker) without making the requisite affirmative determination.

56. Between January 11, 1995, and February 28, 1995, as set forth in paragraphs 57-58 below, two of the firms, Brod and Sovereign, engaged in short sales in customer accounts without ascertaining whether or not the customers would deliver the securities or that the securities could be borrowed for the customers' accounts. Specifically:

57. Brod, acting at the direction of Respondent Iacono, made 4 short sales of APROU, 3 of ATOY, 3 of EVRM, 4 of MRJY, 17 of PANXU, 7 of PLCOU, 2 of PLCO, and 3 of PMNR, for a total of 43 violative trades, in customer accounts without complying with the requirements of Rule 3370(b)(2)(A).

58. Sovereign, acting at the direction of Glen Vittor and through the actions of Greg Vittor, made 1 short sale of MRJY and 3 of PANXU, for a total of 4 violative trades, in customer accounts without complying with the requirements of Rule 3370(b)(2)(A).

59. By virtue of this conduct, Respondents Carlson, Falcon Trading Group, Inc., John Fiero, Fiero Brothers, Inc., Mark Iacono, Robert Sherman, Sovereign Equity Management Corp., Glen Vittor, and Greg Vittor violated NASD Conduct Rules 3370 and 2110.

15

**F 002411**

### THIRD CAUSE OF ACTION

### FAILURE TO MARK ORDER TICKETS LONG OR SHORT

#### Violations of Conduct Rules 3110
#### and 2110 by Respondent Iacono

60.     The allegations set forth above in paragraphs 1-13, 15-43, and 57 are realleged for

purposes of this cause of action.

61. Rule 3110(b)(1) requires that order tickets contain a designation as whether each

order is long or short.

62. In making the short sales for a customer described in paragraph 57 above. Iacono

failed to comply with this requirement.

63. By virtue of this conduct, Iacono violated Conduct Rules 3110 and 2110.

### PRAYER FOR RELIEF

WHEREFORE, the Complainant respectfully requests:

A.  Findings of fact and conclusions of law that the Respondents committed the

violations charged and alleged herein;

B.  An order imposing fitting sanctions upon the Respondents in accordance with

NASD Procedural Rule 8310, as well as an order requiring Respondents to

fully disgorge (together with interest) any and all ill-gotten gains and/or make

full and complete restitution;

C.  An order imposing such costs of any proceeding as are deemed fair and

appropriate under the circumstances in accordance with NASD Procedural

Rule 8330; and

16                          **F 002412**

D. An order granting all further relief, legal or equitable, that is warranted under

the circumstances.

Dated: February 6, 1998

Department of Enforcement
NASD Regulation, Inc.
1801 K Street, NW
Washington, DC  20006-1500
(202) 974-2804

by: Roger B. Sherman, Esq.
Vice President and Director

Thomas B. Lawson
Chief Counsel

Jonathan I. Golomb
Senior Attorney

Of Counsel:
Rory C. Flynn, Esq.
Chief Litigation Counsel
Department of Enforcement
NASD Regulation, Inc.
1801 K Street, NW
Washington, DC  20006-1500

17                                          **F 002413**

# FIELDS, FEHN & SHERWIN

### ATTORNEYS
11755 WILSHIRE BOULEVARD, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90025
310/473-6338

H THOMAS FEHN

March 27, 1998

Barry Goldsmith,
 Executive Vice President
**NATIONAL ASSOCIATION OF
 SECURITIES DEALERS, INC.**
1735 K Street, N.W.
Washington, D.C. 20006

Dear Mr. Goldsmith:

 This is a follow up to our recent conversation on March 20,
1998, concerning Waldron & Company and its transactions in the
common stock of Shopping.com identified on the NASDAQ bulletin
board market as IBUY.  Specifically you inquired about the
fairness of the buy-in of naked short positions conducted after
appropriate notice and failure by the short sellers to deliver.
Our client's position is set forth herein.

### Background

 Shopping.com ("IBUY") is a California company engaged in
selling consumer goods through an internet website.  Its initial
public offering occurred in November of 1997 at $9.  Since that
time the stock has traded on the NASDAQ bulletin board at prices
as high as the low 30's.  During the time the buy-ins occurred in
February and March, as many as 15+ firms were market makers in
IBUY.  On the way from $9 to its highest market price, IBUY
attracted the attention of certain short sellers who we believe
are led by the notorious short seller, Fiero Brothers of New
York.  Fiero Brothers and its controlling person, John Fiero, are
subjects of NASD Complaint No. CAF980002 in which it is alleged
that Fiero Brothers manipulated the market and violated the short
selling rules in certain stocks originally underwritten by
Hanover Sterling.  The Division of Enforcement alleges that the
violative activity caused the failure of Hanover Sterling and the
subsequent failure of its clearing firm, Adler Coleman.  These
events have received considerable attention in the press and led
to allegations that the NASD was lax in its oversight of Hanover
Sterling which turns out to have been one of the most notorious
chop shops to have existed in the 1990s.

F 002414

**EXHIBIT** "C"

7 8

Barry Goldsmith,
 Executive Vice President
March 27, 1998
Page 2

### The Short Selling Scenario

Our client believes that Fiero Brothers and other entities
acting under its control conducted massive short sales and later
disseminated false information, filed lawsuits and arbitration
claims and generally engaged in activities which were designed to
drive down the price of IBUY so that the short sellers could
cover at a profit.  These tactics did not work and the price of
IBUY continued to rise.  The buy-ins began to be conducted as
early as February and continued thereafter whenever naked short
sellers did not deliver the short shares.  An analysis of market
making activity will demonstrate that frequently short sellers
were responsible for increasing the bids and moving the market.
As the price of IBUY continued to move up, short sellers
increased the size of their short positions.

### The Buy-Ins

When a buy-in of a short position became necessary,
Waldron's clearing member, Wedbush Morgan Securities would canvas
market makers to determine if any shares were available for
guaranteed delivery and at what price.  When and if those shares
were available in the market, they were the first utilized as the
selling shares for the buy-in transaction for the account of the
short seller.  When shares were not available in the open market
from other market makers, Waldron provided the selling shares
from its long inventory or, if available, from Waldron's
customers.

When no shares were available to supply the buy-ins from
market makers at prices set by the market makers, Waldron was
forced to determine the buy-in price so that the transaction
could be executed.  This determination was made taking into
consideration the size of the transaction, the need for
guaranteed settlement and market risk.  Measuring the fairness of
these prices turned out to be difficult because there are no
established NASD guidelines which are available to assist in
setting the price.  The NASD rules do not establish either a
mechanism or a methodology for doing so.  Indeed, you informed me
that in your opinion the only rules applicable are the general
fairness guidelines contained in Conduct Rule 2100.  In the
particular context of naked short sales, it is not clear that
this Rule is applicable.  These fairness guidelines were
implemented primarily to govern relationships between members and
their customers and not one another, and thus are of limited
utility in this context.  The NASD Rules in every particular

Barry Goldsmith,
Executive Vice President
March 27, 1998
Page 3

recognize that transactions between industry professionals are
arms-length.  In our conversation, you suggested that a
reasonable premium above previous interdealer prices would be
appropriate.  However, you are unable to assist in determining
the envelope of reasonableness.

### The Buy-in Pricing

In making its determination of the price at which IBUY
shares would be purchased for the account of other broker dealers
with undelivered short positions, Waldron considered a number of
factors.  Because these factors are necessarily amorphous and
without officially published guidelines, none is prominent or
conclusive.  Instead, all factors are considered in a variable,
unweighted mix of information leading to a price determination.
The factors include the following:

1.    The market valuation of other similar companies.  There
are a number of Internet merchandise providers which are public
companies.  Typically, these enterprises are newly formed and are
in their early stages of development.  Many are priced at
multiples far exceeding IBUY.  Attached is a recent Los Angeles
Times article commenting on this phenomenon.  Apparently, the
market price of these issuers is based on the anticipation of
long term results rather than on present value.  Thus, Waldron's
determination of the value of IBUY shares is based upon the same
concepts.  For example, the holder of IBUY shares who believes on
a day when the last trade is $20, that the market would price the
shares at $40 within the next 30 days, might well decide that his
personal selling price is $30, thus expressing his willingness to
discount anticipated profit.

2.    The volume and activity in the market.  By itself,
significant activity in the market would indicate a viability of
the stock price and therefore justify a higher buy-in price than
if the stock were thinly traded.  For example, on March 16, 17
and 18, Waldron did not engage in market making.  Yet on those
days there was significant volume and while the price went down,
IBUY was not especially volatile.  Waldron also considered the
existence of a large amount of market-maker short sale activity.
Since Waldron had experienced prior buy-ins where no seller would
deliver subject to guaranteed delivery, Waldron could assume that
when it came time for the shorts to cover positions, there would
be substantial upward pressure on the stock.  Since NASD Rules
permit naked short selling by market makers as distinguished from
public customers, Waldron understood that any naked short seller

F 002416

Barry Goldsmith,
 Executive Vice President
March 27, 1998
Page 4

fully comprehended its own market risk.  The policy of requiring
public customers to make an affirmative determination concerning
the borrowability of short sale stock as contrasted to the policy
of allowing market makers unlimited risk, suggests that it is the
NASD's belief that independent industry professionals are allowed
to assess their own risk and do not need the protection of
limiting regulation.  Since buy-ins occurred in the stock over
several months at increasing prices, it would seem sensible that
if the naked short sellers could not tolerate the market risk to
which they willingly exposed themselves, they would stop selling
short.  Indeed the ring leader of the short sellers, Fiero
Brothers, on two occasions attempted to stop buy-ins by filing
actions for injunctive relief in Los Angeles County Superior
Court and before the NASD arbitration forum (as of March 23, USDC
in New York joined this unsympathetic chorus).  All attempts were
rebuffed.  Having been told by both courts and an arbitrator that
they would not interfere in professional market making decisions,
Waldron felt confident that the short sellers acted with full
awareness.

    <u>No Guidelines</u>

    Our confidence was enhanced during conversations with the
District 2 staff on Monday, March 16, 1998, who advised that
there were no definitive guidelines and in my conversation with
you wherein you advised exactly the same.  The confusion created
by the absence of guidelines was illustrated during our
conversation of March 20, 1998 by the suggestion that in
executing buy-ins where public customers were sellers, that the
customer's broker would have an obligation to limit the
customer's price determination to a defensible price.  I am sure
you will acknowledge that such a limitation is a breach of
fiduciary duty to the customer and flies in the face of the
industry customer protection policy.  In such a situation the
customers are directly in conflict with the short seller.  Thus,
while the suggestion is insupportable, it is understandably the
result of a failure to recognize that the NASD simply cannot
objectively determine the fairness of transactions between
industry professionals and it has no business telling public
customers what they can or cannot do.

    The real villain in this scenario is the short selling rule
that permits market-makers to establish short positions without
the intent to make bona-fide two sided markets.  While short
selling may in some situations have the salutary effect of
damping upward price movements, that benefit is difficult to

Barry Goldsmith,
 Executive Vice President
March 27, 1998
Page 5

reconcile to the notion that a market- maker can sell something
that does not exist (i.e. can't be located, can't be bought and
can't be borrowed).  Further a market maker continuing to sell
short in such a situation is not engaging in bona fide market
making activities.  He is engaged in manipulation in the sense
that he is manufacturing artificial supply in the presence of
real demand.  As long as the short sellers actions are not
limited, it would be manifestly unfair to constrain his buyer
from exercising his remedies when the short seller fails to honor
his obligation.

     Needless to say, the complexities discussed in this letter
present difficult regulatory challenges.  We are happy to
exchange views to assist the association in its deliberations.

     Thank you for your consideration.

                              Very truly yours,

                              FIELDS,  FEHN & SHERWIN

                              H THOMAS FEHN

HTF:tk
Enclosure

cc:  Waldron & Company