# EXHIBIT 2

**FIELDS, FEHN & SHERWIN**
ATTORNEYS
11755 WILSHIRE BOULEVARD, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90025
310/473-6338

H THOMAS FEHN

March 27, 1998

Barry Goldsmith,
  Executive Vice President
**NATIONAL ASSOCIATION OF
  SECURITIES DEALERS, INC.**
1735 K Street, N.W.
Washington, D.C. 20006

Dear Mr. Goldsmith:

    This is a follow up to our recent conversation on March 20, 1998, concerning Waldron & Company and its transactions in the common stock of Shopping.com identified on the NASDAQ bulletin board market as IBUY. Specifically you inquired about the fairness of the buy-in of naked short positions conducted after appropriate notice and failure by the short sellers to deliver. Our client's position is set forth herein.

### Background

    Shopping.com ("IBUY") is a California company engaged in selling consumer goods through an internet website. Its initial public offering occurred in November of 1997 at $9. Since that time the stock has traded on the NASDAQ bulletin board at prices as high as the low 30's. During the time the buy-ins occurred in February and March, as many as 15+ firms were market makers in IBUY. On the way from $9 to its highest market price, IBUY attracted the attention of certain short sellers who we believe are led by the notorious short seller, Fiero Brothers of New York. Fiero Brothers and its controlling person, John Fiero, are subjects of NASD Complaint No. CAF980002 in which it is alleged that Fiero Brothers manipulated the market and violated the short selling rules in certain stocks originally underwritten by Hanover Sterling. The Division of Enforcement alleges that the violative activity caused the failure of Hanover Sterling and the subsequent failure of its clearing firm, Adler Coleman. These events have received considerable attention in the press and led to allegations that the NASD was lax in its oversight of Hanover Sterling which turns out to have been one of the most notorious chop shops to have existed in the 1990s.

F 000502

Barry Goldsmith,
 Executive Vice President
March 27, 1998
Page 2

### The Short Selling Scenario

Our client believes that Fiero Brothers and other entities acting under its control conducted massive short sales and later disseminated false information, filed lawsuits and arbitration claims and generally engaged in activities which were designed to drive down the price of IBUY so that the short sellers could cover at a profit. These tactics did not work and the price of IBUY continued to rise. The buy-ins began to be conducted as early as February and continued thereafter whenever naked short sellers did not deliver the short shares. An analysis of market making activity will demonstrate that frequently short sellers were responsible for increasing the bids and moving the market. As the price of IBUY continued to move up, short sellers increased the size of their short positions.

### The Buy-Ins

When a buy-in of a short position became necessary, Waldron's clearing member, Wedbush Morgan Securities would canvas market makers to determine if any shares were available for guaranteed delivery and at what price. When and if those shares were available in the market, they were the first utilized as the selling shares for the buy-in transaction for the account of the short seller. When shares were not available in the open market from other market makers, Waldron provided the selling shares from its long inventory or, if available, from Waldron's customers.

When no shares were available to supply the buy-ins from market makers at prices set by the market makers, Waldron was forced to determine the buy-in price so that the transaction could be executed. This determination was made taking into consideration the size of the transaction, the need for guaranteed settlement and market risk. Measuring the fairness of these prices turned out to be difficult because there are no established NASD guidelines which are available to assist in setting the price. The NASD rules do not establish either a mechanism or a methodology for doing so. Indeed, you informed me that in your opinion the only rules applicable are the general fairness guidelines contained in Conduct Rule 2100. In the particular context of naked short sales, it is not clear that this Rule is applicable. These fairness guidelines were implemented primarily to govern relationships between members and their customers and not one another, and thus are of limited utility in this context. The NASD Rules in every particular

F 000503

Barry Goldsmith,
 Executive Vice President
March 27, 1998
Page 3

recognize that transactions between industry professionals are arms-length. In our conversation, you suggested that a reasonable premium above previous interdealer prices would be appropriate. However, you are unable to assist in determining the envelope of reasonableness.

### The Buy-in Pricing

In making its determination of the price at which IBUY shares would be purchased for the account of other broker dealers with undelivered short positions, Waldron considered a number of factors. Because these factors are necessarily amorphous and without officially published guidelines, none is prominent or conclusive. Instead, all factors are considered in a variable, unweighted mix of information leading to a price determination. The factors include the following:

1.  The market valuation of other similar companies. There are a number of Internet merchandise providers which are public companies. Typically, these enterprises are newly formed and are in their early stages of development. Many are priced at multiples far exceeding IBUY. Attached is a recent Los Angeles Times article commenting on this phenomenon. Apparently, the market price of these issuers is based on the anticipation of long term results rather than on present value. Thus, Waldron's determination of the value of IBUY shares is based upon the same concepts. For example, the holder of IBUY shares who believes on a day when the last trade is $20, that the market would price the shares at $40 within the next 30 days, might well decide that his personal selling price is $30, thus expressing his willingness to discount anticipated profit.

2.  The volume and activity in the market. By itself, significant activity in the market would indicate a viability of the stock price and therefore justify a higher buy-in price than if the stock were thinly traded. For example, on March 16, 17 and 18, Waldron did not engage in market making. Yet on those days there was significant volume and while the price went down, IBUY was not especially volatile. Waldron also considered the existence of a large amount of market-maker short sale activity. Since Waldron had experienced prior buy-ins where no seller would deliver subject to guaranteed delivery, Waldron could assume that when it came time for the shorts to cover positions, there would be substantial upward pressure on the stock. Since NASD Rules permit naked short selling by market makers as distinguished from public customers, Waldron understood that any naked short seller

Barry Goldsmith,
 Executive Vice President
March 27, 1998
Page 4

fully comprehended its own market risk. The policy of requiring public customers to make an affirmative determination concerning the borrowability of short sale stock as contrasted to the policy of allowing market makers unlimited risk, suggests that it is the NASD's belief that independent industry professionals are allowed to assess their own risk and do not need the protection of limiting regulation. Since buy-ins occurred in the stock over several months at increasing prices, it would seem sensible that if the naked short sellers could not tolerate the market risk to which they willingly exposed themselves, they would stop selling short. Indeed the ring leader of the short sellers, Fiero Brothers, on two occasions attempted to stop buy-ins by filing actions for injunctive relief in Los Angeles County Superior Court and before the NASD arbitration forum (as of March 23, USDC in New York joined this unsympathetic chorus). All attempts were rebuffed. Having been told by both courts and an arbitrator that they would not interfere in professional market making decisions, Waldron felt confident that the short sellers acted with full awareness.

### No Guidelines

Our confidence was enhanced during conversations with the District 2 staff on Monday, March 16, 1998, who advised that there were no definitive guidelines and in my conversation with you wherein you advised exactly the same. The confusion created by the absence of guidelines was illustrated during our conversation of March 20, 1998 by the suggestion that in executing buy-ins where public customers were sellers, that the customer's broker would have an obligation to limit the customer's price determination to a defensible price. I am sure you will acknowledge that such a limitation is a breach of fiduciary duty to the customer and flies in the face of the industry customer protection policy. In such a situation the customers are directly in conflict with the short seller. Thus, while the suggestion is insupportable, it is understandably the result of a failure to recognize that the NASD simply cannot objectively determine the fairness of transactions between industry professionals and it has no business telling public customers what they can or cannot do.

The real villain in this scenario is the short selling rule that permits market-makers to establish short positions without the intent to make bona-fide two sided markets. While short selling may in some situations have the salutary effect of damping upward price movements, that benefit is difficult to

F 000505