# EXHIBIT 6

# MPR Law Practice, P.C.

60 East 42nd Street, Suite 843
New York, New York 10165
(212) 557-1115

Martin P. Russo, Esq.

August 26, 1998

By Facsimile and U.S. Mail

Mike S. Edmiston, Esq.
NASD Regulation, Inc.
300 South Grand Avenue, Suite 1620
Los Angeles, California 90071

Re:    Fiero Brothers, Inc. v. Waldron & Co., Inc., et al., 98-00587

Dear Mr. Edmiston:

We represent Fiero Brothers, Inc. ("Fiero") and submit this letter in opposition to
Waldron & Co.'s ("Waldron") and Cery Perle's motion to dismiss. The motion to raises two
meritless issues: (1) whether Fiero's first claim for relief states a cognizable action and (2)
whether Fiero pled its second claim (*i.e.,* the securities fraud) with sufficient particularity. As set
forth more fully below, the motion to dismiss should be denied for, *inter alia*, the following
reasons:

- Fiero's first claim is <u>not</u> an attempt to create a private right of action based on the
  NASD buy-in rules;

- Fiero's first claim states a cause of action for unjust enrichment – to wit, that
  Waldron and Wedbush wrongfully and improperly obtained possession of Fiero's
  funds and unjustly have been enriched by the same at Fiero's expense;

- This motion to dismiss for purported insufficiency of the pleadings – especially
  with respect to the particularity of the fraud allegations -- is untimely and
  Respondents have had more than adequate time to request and discover any
  information they require to prepare a defense to Fiero's claims;

- This arbitration is not subject to the stringent pleading requirements of Federal
  Rule of Civil Procedure 9;

- Even if this proceeding were subject to the pleading requirements of the Federal
  Rules, Fiero has pled its securities fraud claim with sufficient particularity to give
  the Respondents notice of the claims; and

- Fiero's statement of claim is a road map to the Respondents' fraud.

**F 002572**

Westchester Office: 43 Powder Horn Road • Cortlandt Manor • New York 10566 • (914) 739-6000

MPR Law Practice, P.C.

Mike Edmiston, Esq.
August 26, 1998
Page 2

## FIERO STATES A CLAIM FOR UNJUST ENRICHMENT

Fiero states a cause of action for unjust enrichment, not violation of NASD Rule
11810(c)(1)(c). Respondent's assertion that Fiero is attempting to create a private right of action
where none exists is misplaced. The NASD Rule – which requires that Respondents be prepared
to defend the price at which a buy-in was executed relative to the market price – is set forth in
the statement of claim to support Fiero's claim that the buy-in price should be the market price
and, therefore, Respondents' possession of the funds is wrongful and they unjustly have been
enriched. In the statement of claim, Fiero alleges that Respondents wrongfully and improperly
conducted illegal above-market buy-ins of IBUY shares, and unjustly were enriched by their acts
at Fiero's expense. (Second Amended Statement of Claim, p. 9). These facts as alleged state a
cause of action for unjust enrichment. Accordingly, the motion to dismiss for lack of standing
should be denied.

## FIERO PLED ITS SECURITIES FRAUD CLAIM WITH SUFFICIENT PARTICULARITY

Fiero's securities fraud claim is pled with sufficient particularity. Respondents' assertion
that Fiero is required to plead its securities fraud claim as it would be required in federal court is
disingenuous. This is a businessman's forum and the federal rules are not governing.
Nevertheless, Fiero's fraud allegations are sufficient to satisfy both the federal standard and the
NASD's pleading requirements.

Fiero's Second Amended Statement of Claim (annexed hereto) is very detailed and gave
Respondents notice of the allegations against them when it was filed. At this late date,
Respondents argue that they "should not be forced to guess which of its many customers' account
Fiero is alleging was involved" and that the term "artificial" market making is vague and
ambiguous. These notice arguments are meritless. First, this motion is untimely and should have
been made at the commencement of the case. Had this motion been granted, Fiero would have
sought leave to amend its statement of claim to cure any deficiency. Such leave routinely is
granted. Second, there has been extensive discovery in this case and Respondents have failed to
request the information they now claim places them at a disadvantage. Third, Respondents have
superior knowledge of the identity of the customers and market makers with which it parked
stock and/or manipulated the price of IBUY. Indeed, this exactly is why Respondents did not
conduct discovery of the same. Accordingly, the motion to dismiss for insufficient particularity
should be denied.

Fiero provides below a summary of the evidence it intends to present at the hearing in this
action regarding the Respondents' securities fraud. This summary is not intended to be complete
or to any way limit Fiero's presentation of evidence at the hearing; rather, it is provided so that

F 002573

MPR Law Practice, P.C.

Mike Edmiston, Esq.
August 26, 1998
Page 3

the panel may compare the "notice" given by the statement of claim to the acts actually committed by Respondents. Fiero's statement of claim is a virtual roadmap to the complained of securities fraud. At the hearing, Fiero will introduce the following and other evidence:[1]

Waldron has controlled nearly the entire public float since the IBUY initial public offering ("IPO") in November 1997. (Claimant's Exhibits ("Cl. Ex.") 1 and 9). Initially, IBUY was to be a NASDAQ small cap stock. When NASDAQ regulators – due to concerns over CEO Robert McNulty's shady history – relegated IBUY to the NASDAQ Bulletin Board, the majority of IBUY's syndicate participant underwriters refused to sell the stock. (Cl. Ex.31, p 1420). Waldron was left to sell nearly the entire public offering on its own. (Id.). The remaining syndicate participants indirectly sold (i.e., "backdoored) all of their IPO allotment to Waldron. The IPO was sold on a best efforts basis and Waldron just managed to distribute the minium 1.3 million shares (the "Public Float") to its customers. (Cl. Ex. 18, p. 1337, and 21, p. 1354).

As of December 31, 1997 – one month after the public offering – Waldron and its customers held 95% of the public float (approximately 1.25 million shares), and would continue to hold that approximate amount of the float through April 1998. (See Chart A annexed hereto). At all times relevant hereto, Wedbush knew that Waldron had cornered the market in IBUY. (Cl. Ex. 9). It cannot be disputed that Waldron dominated and controlled the market for IBUY.

Waldron also took measures to insure that it would maintain domination and control over IBUY. Indeed, just prior to the IPO Waldron instituted a policy they dubbed "Penalty Bid". (Cl. Ex. 54). The Penalty Bid was a negative incentive imposed on registered representatives whose customers chose to sell IBUY prior to 90 days after their initial purchase. If a customer sold his or her IBUY shares within 90 days of the purchase, the registered representative would forfeit his commissions for both the purchase and sale. Thus, Waldron provided its registered representatives with a very strong incentive not to allow their customers to sell IBUY. Not only did this policy restrict the supply of IBUY shares that could reach the open market, but it also encouraged registered reps to breach their fiduciary duty to their customers by interposing a financial motive to convince customers not to sell IBUY, even when a sale was in the customers best interest.

A second device used by Waldron was the "no net selling" rule, Waldron's registered representative were not permitted to submit a customer sell order with out a corresponding buy order. In addition, registered representatives were pressured to sell IBUY to their customers regardless of suitability. (Cl. Ex. 46). This policy had the effect of keeping IBUY shares in Waldron's control without forcing Waldron to use its own capital.

---

[1]     At the hearing, Fiero also will introduce ample evidence of the impropriety of the buy-ins as well as the damages it sustained.

MPR Law Practice, P.C.

Mike Edmiston, Esq.
August 26, 1998
Page 4

       With all of the IBUY stock "in house" (*i.e.*, there rarely was more than 75,000 shares on the open market), Waldron steadily moved the price of the stock from the November IPO price of $9.00 to approximately $ 15.00 in late January 1998. (Cl. Ex. 5, pp. 221-222, and 43, p. 1503). IBUY grossly was overvalued and its price continued to rise notwithstanding the lack of any positive information. (Cl. Ex. 5 ). Indeed, the upward manipulation of the share price continued despite Shopping.com's large losses and meager revenues (the majority of which were attributable to $342,000 in purchases by Waldron). (Cl. Ex. 30, pp. 1406-1407, and 18, p. 1339).

       There also was an apparent increase in the volume of IBUY which seemed to signal that market makers – who profit by purchasing low and selling high ( the "spread") – could benefit by providing liquidity to the market. As more broker-dealers began making markets in IBUY, Waldron recruited "friendly" market makers to help it support the market for the stock. One of those broker dealers was Wien Securities ("WIEN"). During the month of February, Waldron commissioned WIEN to assist it in supporting the stock by agreeing to pay a small premium for any IBUY shares WIEN purchased as a market maker. WIEN would accumulate stock and sell the same to Waldron later in the day as a matter of course. (Cl. Ex. 47). In addition, to mask its manipulative scheme Waldron paid WIEN to take offers from market makers and force the price of IBUY to rise. (See *e.g.*, at Chart B annexed hereto). Any shares purchased by WIEN in assisting this manipulation, subsequently would be sold to Waldron for a small profit.[2] By this means, Waldron created the impression that other broker-dealers had "demand" for IBUY shares. Neither Waldron nor WIEN disclosed their illegal arrangement to Fiero or the public.

       In or about early February 1998, Waldron began to experience net capital pressure. Waldron's net capital dilemma directly was a result of its efforts to support IBUY and manipulate the stock's price upward. Waldron continued to purchase IBUY shares from whomever they wished to sell them – even though it had full knowledge that its customers owned all but 5% of the public float. Not only would Waldron religiously purchase IBUY shares, but it had to pay a premium "friendly" market makers so that they would purchase shares and support the stock price. Waldron, together with its customers, had purchased more shares than existed in the public float. (Cl. Ex. 9, pp. 936 and 947). It then began a program of above market buy-ins with a dual purpose: (a) to profit by buying-in above the market price and (2) to discourage market makers who were not "friendly" co-conspirators from posting bid and ask quotations in IBUY.

_____

      [2]     The most telling indication of this scheme is the fact that WIEN uniformly would sell IBUY shares to Waldron at prices that were inconsistent with Waldron's market.

F 002575

MPR Law Practice, P.C.

Mike Edmiston, Esq.
August 26, 1998
Page 5

At or about this time, Waldron recruited Quantum Group Limited ("Quantum") to assist it first by purchasing stock and supporting the market, and later by parking large blocks of stock . Waldron paid Quantum handsomely for its cooperation.  Perhaps the most telling market activity is that of February 12th and 13th, 1998. On February 12th , Waldron was facing net capital difficulties that threatened its viability. It could not afford to purchase any more IBUY shares, so it enlisted Quantum to support the market by purchasing shares from other market makers with the implicit agreement that Waldron later would repurchase the shares from Quantum at a premium. Quantum purchased shares all day and sold the same to Waldron at the end of the day within minutes of the first fraudulent buy-in. (Cl. Ex. 8, p. 556). The illegal buy-in permitted Waldron sufficient capital to purchase the stock from Quantum and Wien but left it in net capital distress.

To stay in business, Waldron approached Quantum after the close and requested that Quantum "park" 50,000 shares of IBUY.  Quantum purchased the shares and the trade printed at $20 – five (5) points lower than the previous day's illegal buy-in price – at the opening.  In addition, Waldron parked 100,000 shares in an account controlled by William Long. (Cl. Ex. 14, p. 1170). The Long trade particularly is suspicious for several reasons. First, it was a $2,000,000 trade. Second, the IBUY shares were purchased for a trust account for which they were not suitable. Third, the trade printed at the opening – to wit, 6:30 am in Mr. Long's home state (Nevada) – and was a "trust" fund investment in a security whose price had declined 5 points in the last twenty minutes of the previous trading day. Fourth, Mr. Long has a close association with Ed Harris.[3] (Cl. Ex. 10, pp. 1081, 1089 and 1103). The net effect of these parking transactions was to provide Waldron with $3,000,000 in cash and relieve it of the $1,350,000 haircut that would have been required on its IBUY position.[4]   Waldron failed to disclose its parking arrangements to Fiero or the public.

---

[3]      The Long trade brought the total amount of shares controlled by Waldron insiders to nearly fifty percent (50%) of the public float. (See Chart C annexed hereto).

[4]      Just prior to the February 12th buy-in, Waldron likely was out of net capital.  It held nearly 275,000 shares of IBUY with a market price of approximately 24.75. (Cl. Ex. 14, pp.1169-1170). Thus, Waldron required more than $6,500,000 in cash to pay for those shares. Waldron did not have sufficient capital to pay for that amount of stock. (See February 28, 1998 FOCUS Report).

F 002576

MPR Law Practice, P.C.

Mike Edmiston, Esq.
August 26, 1998
Page 6

     Notwithstanding these parking arrangements, Waldron's capital remained thin and Wedbush refused to allow Waldron to make a market in IBUY on February 13th.[5]  With Waldron out of the market for IBUY, the price of IBUY shares fell dramatically until Waldron recruited another "friendly" market maker to support the stock. (Cl. Ex. 5, p. 246-253). Gunallen Financial, Inc. ("Gunallen") began to make a market in IBUY in the late morning of February 13th, but it merely was acting on Wadlron's behalf. Waldron paid Gunallen 1/32 for every share it purchased while Waldron was not permitted to make a market in IBUY. The manipulative pattern is striking – almost simultaneous with each purchase Gunallen made, it sold the same amount of shares to Waldron at 1/32 (occasionally, 2/32) above the purchase price. (Cl. Ex. 50; See Chart D annexed hereto). Waldron recommenced market making in IBUY on February 17th and Gunallen ceased its activity almost simultaneously.

     Having profited from its February 12th above-market buy-in, Waldron was now determined to shore up its net capital by pumping up the IBUY stock price and conducting additional buy-ins. Waldron continued to post the high bid in IBUY with the intention that the public and other market makers would sell it stock which Waldron knew could not be delivered inasmuch as it controlled 95% of the float. (Cl. Ex. 1, 2 and 9). In addition, Waldron targeted broker-dealers that were not "friendly" co-conspirators and took their offers. Such buying forced the market price of IBUY upward and created the fails that Waldron later would seek to remedy through above-market buy-ins. Waldron set out to create fails by taking offers. As a result, the number of fails to receive and fails to deliver increased dramatically. (Cl. Ex. 2). Since Waldron, controlled the public float, nearly every market maker trade caused a set of fails.

     On March 13, 1998, IBUY was under selling pressure due to "sell" recommendations issued by two independent firms. (Cl. Ex. 19 and 20). Waldron purchased a tremendous amount of stock in an effort to support the market price. Because it was thinly capitalized, Waldron's "Supercap" went on – indicating that it could no longer afford to purchase shares. (Cl. Ex. 52, p. 1712). Notwithstanding its net capital deficiency, Waldron continued to purchase more than 70,000 shares ($2,200,000) with the knowledge that it would not have to honor its trades. (Cl. Ex. 8, pp. 695-698, and 48, pp. 1662-1665). Those trades were not honored by Waldron. (Id.). On Monday, March 16, 1998, Wedbush notified the NASD that it would not clear for Waldron and Waldron went "Clearing Delete" on NASDAQ. (Cl. Ex. 52, p. 1713). Without Waldron's support, the price of IBUY fell more than 10 points from the previous day. (Cl. Ex. 5, pp. 292-305).

     The SEC suspended all trading in IBUY on March 24, 1998. (Cl. Ex. 4).

---

    [5]    Wedbush's involvement in the scheme with Waldron is amplified by the annexed tape trancript excerpt in which Wendy Rea explains Wedbush's postion on allowing Waldron to do above-market buy-ins.

F 002577

MPR Law Practice, P.C.

Mike Edmiston, Esq.
August 26, 1998
Page 7


       Based upon the foregoing, the motion to dismiss should be denied in its entirety.  Please forward this letter, its attachments and the previously provided exhibit binders to the Panel. Thank you for your cooperation.

                     Sincerely,

                     Martin P. Russo


cc:    All counsel

## WALDRON'S CONTROL OF SHOPPING.COM

| DATE | WALDRON SHARES | PERCENTAGE of PUBLIC FLOAT | SHARES on the STREET |
|------|----------------|----------------------------|----------------------|
| 12/31/97 | 1,252,923 | 96.38% | 47,077 |
| 01/02/98 | 1,257,923 | 96.76% | 42,077 |
| 01/09/98 | 1,247,965 | 96.00% | 52,045 |
| 01/16/98 | 1,230,425 | 94.65% | 69,575 |
| 01/23/98 | 1,184,691 | 91.13% | 115,309 |
| 01/30/98 | 1,184,343 | 91.10% | 115,657 |
| 02/06/98 | 1,192,838 | 91.75% | 107,162 |
| 02/13/98 | 1,209,038 | 93.00% | 90,962 |
| 02/20/98 | 1,222,578 | 94.04% | 77,422 |
| 02/27/98 | 1,218,585 | 93.74% | 81,415 |
| 03/06/98 | 1,218,585 | 93.74% | 81,415 |
| 03/13/98 | 1,216,585 | 93.58% | 83,415 |
| 03/20/98 | 1,254,314 | 96.49% | 45,686 |
| 03/27/98 | 1,228,097 | 94.47% | 71,903 |
| 03/31/98 | 1,228,097 | 94.47% | 71,903 |
| 04/03/98 | 1,235,097 | 95.01% | 64,903 |
| 04/09/98 | 1,234,497 | 94.96% | 65,903 |
| 04/17/98 | 1,214,647 | 93.43% | 85,353 |
| 04/24/98 | 1,193,797 | 91.83% | 106,203 |
| 04/30/98 | 1,168,697 | 89.80% | 131,303 |

F 002579

CHART A

# WIEN TAKES OFFERS AND MOVES THE PRICE UP

| Market | Tick | Time | Activity |
|---|---|---|---|
| 20 5/8- 21 1/4 | | | |
| | +1/8 | 15:24 | WIEN uptick (20 5/8 - 22) |
| | +1/8 | 15:24 | WIEN uptick (20 3/4 - 22 1/8) |
| 20 3/4 - 21 1/4 | | | |
| | | 15:27 | WIEN takes FAHN offer 200 @ 21 1/4 |
| 21 - 21 3/4 | | | |
| | | 15:29 | WIEN takes FRAN offer 200 @ 21 3/4 |
| | | 15:30 | WIEN takes HILL offer 200 @ 21 3/4 |
| | | 15:30 | WIEN takes HILL offer 200 @ 21 15/16 |
| | | 15:30 | WIEN takes KEYS offer 200 @ 21 15/16 |
| | +7/8 | 15:30 | WIEN uptick (21 5/8 - 23) |
| 21 5/8 - 22 | | | |
| | | 15:34 | WIEN takes FRAN offer 200 @ 22 |
| | +1/8 | 15:34 | WIEN uptick ( 21 3/4 - 23 1/8) |
| | +1/8 | 15:35 | WIEN uptick (21 7/8 - 23 1/4) |
| 21 7/8 - 22 | | | |
| | | 15:35 | WIEN takes SRRA OFFER 200 @ 22 |
| | +1/8 | 15:35 | WIEN uptick (22 - 23 3/8) |
| | +1/8 | 15:35 | WIEN uptick (22 1/8 - 23 ½ ) |
| 22 1/8 -22 5/8 | | | |
| **22 ½ - 22 7/8** | | **15:39** | **FAHN bid = 22 ½ WALD bid = 21 ½** |
| | | **15:39** | **WIEN sells 10,000 shares to WALD@ 22 ½** |
| | +1/4 | 15:39 | WIEN uptick ( 22 3/8 - 23 3/4) |
| | +1/8 | 15:39 | WIEN uptick (22 ½ - 23 7/8) |
| | +1/8 | 15:39 | WIEN uptick (22 5/8 - 23 1/8) |
| 22 5/8 - 23 1/8 | | | |
| | | 15:42 | PFCO hits WIEN bid 1100 @ 22 5/8 |
| | -1/8 | 15:42 | WIEN downtick (22 ½ - 23 7/8) |
| 22 ½ - 22 3/4 | | | |
| | | 15:42 | WIEN takes SRRA offer 5000 @ 22 3/4 |
| | -1/8 | 15:43 | WIEN downtick (22 3/8 - 23 3/4) |
| **22 3/8 - 22 3/4** | | **15:45** | **WALD bid = 22** |
| | | **15:45** | **WIEN sells 8600 to WALD @ 22 3/4 (inside offer)** |
| | -1/8 | 15:46 | WIEN downtick (22 1/4 - 23 5/8) |
| 22 1/4 - 22 3/4 | | | |
| | | 15:53 | PEAN hits WIEN bid 1000 @ 22 1/4 |
| | -1/8 | 15:53 | WIEN downtick (22 1/8 - 23 5/8) |
| 22 1/8 - 22 23/32 | | | |
| | | 15:57 | GSCF hits WIEN bid 500 @ 22 1/8 |
| | -1/8 | 15:58 | WIEN downtick (22 - 23 3/8 ) |
| 22 - 22 3/8 | | | |
| | | 15:59 | GSCF hits WIEN bid 500 @ 22 |

F 002580

**CHART B**

G

## WALDRON CONTROLLED POSITIONS
## IN SHOPPING.COM

| "CUSTOMER" NAME | 12/12/98 | 1/9/98 | 2/13/98 | 3/13/98 | 3/20/98 |
|---|---|---|---|---|---|
| Cery Perle | 6,000 | 6,000 | 0 | 0 | 0 |
| Jon Aubry | 26,000 | 26,420 | 26,420 | 26,420 | 26,420 |
| Sharon Aubry | | 20,000 | 20,000 | 20,000 | . 20,000 |
| BEK Investments TR | 0 | 0 | 0 | 11,000 | 11,000 |
| Ed Harris | 59,823 | 59,823 | 59,823 | 59,823 | 59,823 |
| Michelle N. Harris | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Harris Asset REV TR | 18,495 | 17,495 | 16,759 | 16,759 | 16,759 |
| Harris TR | 245,000 | 245,000 | 220,000 | 220,000 | 220,000 |
| Harris Fam CH REM TR | 29,813 | 29,813 | 29,813 | 29,813 | 29,813 |
| David B. Long | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Richard Long | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| William D. Long | 50,000 | 50,000 | 60,000 | 60,000 | 60,000 |
| Long Trust | | 50,000 | 150,000 | 140,000 | 192,000 |
| Lisa Lynn Oudt | 2,500 | 2,500 | 3,350 | 3,350 | 3,050 |
| Patrick Shawn Oudt | 4,000 | 4,000 | 4,000 | 4,000 | 2,000 |
| Stuart Oudt | 0 | 1,100 | 1,000 | 0 | 0 |
| **TOTAL** | 467,631 | 544,151 | 623,165 | 623,165 | 672,865 |
| **MARKET VALUE** | | $6,393,774 | $12,073,821 | $19,941,280 | $19,465,983 |
| **PERCENTAGE OF PUBLIC FLOAT** | 35.97% | 41.86% | 47.93% | 47.93% | 51.76% |

F 002581

**CHART C**

# GUNALLEN TRADES
## "PAINT THE TAPE" FOR WALDRON

### 2/13/98

**10:41**  Buy 5000 shares from FSCO @ 17          **10:47**  Sell 5000 shares toWALD @ 17 1/32

**12:56**  Buy 2500 shares from WSEI @ 18 31/32    **12:57**  Sell 2500 shares to WALD @ 19

**13:03**  Buy 500 shares from ALEX @ 18 28/32
**13:04**  Buy 200 shares from FAHN @ 18 28/32
**13:04**  Buy 200 shares from FAHN @ 19          **13:12**  Sell 900 shares toWALD @ 18 31/32

Average Buy Price: 18 29/32

**14:35**  Buy 1000 shares from FAHN @ 19 24/32
**14:38**  Buy 800 shares from SLOW @ 19 24/32    **14:38**  Sell 1800 shares toWALD @ 19 25/32

Average Buy Price: 19 24/32

**14:47**  Buy 500 shares from WIEN @ 19 24/32
**14:49**  Buy 2000 shares from SHRP @ 19 24/32   **14:53**  Sell 2500 shares to WALD @ 19 25/32

Average Buy Price: 19 24/32

**15:04**  Buy 3000 shares from FAHN @ 19 24/32   **15:05**  Sell 3000 shares to WALD @ 19 25/32

**15:26**  Buy 2000 shares from SHRP @ 19 24/32   **15:27**  Sell 2000 shares to WALD @ 19 25/32

### 2/17/98

**10:55**  Buy 3000 shares from FAHN @ 21 4/32    **10:58**  Sell 3000 shares to WALD @ 21 5/32

**14:31**  Buy 200 shares from FSCO  @ 21 16/32   **14:44**  Sell 200 shares to WALD @ 21 18/32

**F 002582**

**CHART D**

9

# EXERPT FROM TAPED WEDBUSH TRADING LINE

2 | special tool -- oh, you already got it?

3 | Tina (waldron)    A.    Hello, Trading?

4 | huh    Q.    Yeah, Tina?

5 | Tina    A.    Yeah.

6 | Rob Paget (wedbush)    Q.    Is Shawn or Cary there?

7 | Tina    A.    Cary wanted to speak to you.    Let me

8 | transfer you.

9 | Rob    Q.    Okay.

10 | Tina    A.    It's Rob.

11 | Hold on, Shawn is going to pick you

12 | up.

13 | Rob    Q.    Okay.

14 | NEXT CONVERSATION:

15 | Shawn Oudt (waldron)    A.    Yeah, Rob?

16 | Rob    Q.    Yeah, Shawn?

17 | Shawn    A.    Yeah?

18 | Rob    Q.    Can you buy some IBUY on a

19 | guaranteed-delivery basis, can you help me out?

20 | Shawn    A.    Yes, I can.

21 | Rob    Q.    I would like to buy 40,000 shares

22 | exactly of IBUY guaranteed delivery.

23 | Shawn    A.    Okay.

24 | Rob    Q.    What can you do it at?

25 | Shawn    A.    Hold on one sec'.

**F 002583**

MANHATTAN REPORTING CORP.

10

| | | |
|---|---|---|
| 1 | | |
| 2 | *Rob* Q. | Okay. |
| 3 | *Cery Perle (waldron)* ANOTHER SPEAKER: | Tell him 40,000 at |
| 4 | 29. | |
| 5 | *Shawn* A. | 40,000 at $29 for guaranteed |
| 6 | delivery. | |
| 7 | *Rob* Q. | $29.  Let me call you right back. |
| 8 | *Shawn* A. | Okay, you call me back. |
| 9 | *Rob* Q. | Okay. |
| 10 | *Shawn* A. | Thanks. |
| 11 | | NEXT CONVERSATION: |
| 12 | *Secretary (Wedbush)* A. | Wendy Rays' office. |
| 13 | *Rob* Q. | Yeah, is she around? |
| 14 | *Secretary* A. | No, she has gone to lunch. |
| 15 | *Rob* Q. | She has gone to lunch? |
| 16 | *Secretary* A. | Yeah. |
| 17 | *Rob* Q. | Very good. |
| 18 | *Secretary* A. | Do you need to be beeped? |
| 19 | *Rob* Q. | Where is she, do you know? |
| 20 | *Secretary* A. | I don't know where she is. |
| 21 | *Rob* Q. | Okay, I will get back to you? |
| 22 | *Secretary* A. | All right. |
| 23 | | NEXT CONVERSATION: |
| 24 | *Rob* Q. | If she doesn't have her phone I have |
| 25 | to page her, right?  Do you have their phone | |

11

1

2      number?  I am going to just page her and tell

3      her -- how could her pager be busy?  (Expletive.)

4                      NEXT CONVERSATION:

5      Rob    Q.    Hi, ~~John~~. Shawn

6      Shawn  A.    Hey, Rob.  You're calling me back?

7      Rob    Q.    I am going to.  I want to get

8      clearance on that price.  That seems much higher

9      than usual.

10     Shawn  A.    You got it.

11     Rob    Q.    Okay.

12                     NEXT CONVERSATION:

13     Cery Perle Q.    Hello, Rob --

14     Rob    A.    Yeah?

15     Cery   A.    Hello, Rob, it's Cary.

16     Rob    Q.    Yeah.

17     Cery   A.    It is 11 percent above the market,

18     the $29 mark.  Is there a problem with that one?

19     Rob    Q.    I just want to get approval.

20     Cery   A.    We have 3 minutes to do a print.

21     Rob    Q.    We can do it as a late trade, too.

22     Cery   A.    We can do it as a late trade?

23     Rob    Q.    Uh-huh.

24     Cery   A.    It still is 11 percent.

25                 Who are we getting it approved by?

F 002585

12

1

2    Rob  Q.    I want to get ahold of Wendy.

3    Cery  A.    And she is out to lunch?

4    Rob  Q.    We are trying to get her; I hope --

5    we have a guy trying to get her.

6    Cery  A.    Okay, you know what I will do?

7    Within 10 percent, then we will drop to then.

8    Rob  Q.    Let me -- I mean --

9    Cery  A.    Because we have been doing 10 percent

10   the whole time.

11   Rob  Q.    You are bringing it down to what

12   price?

13   Cery  A.    I will bring it down to twenty-eight

14   sixty; that's 10 percent.

15   Rob  Q.    Twenty-eight sixty?

16   Cery  A.    Yep.

17   Rob  Q.    I will get right back to you.

18   Cery  A.    Well, are you going to --

19   Rob  Q.    I got somebody else on the phone with

20   her.

21   Cery  A.    Okay, bye.

22   Rob  Q.    Okay.

23            NEXT CONVERSATION:

24   Reception (Wellwish)  A.    Reception.

25   Rob  Q.    Yeah, can you page Wendy Ray to 4400?

13

1
2    Reception A.    4400?
3    Rob Q.    Right.
4    Reception A.    Okay.
5    Rob Q.    Thank you.
6    NEXT CONVERSATION:
7    Cary A.    Trading.
8    Rob Q.    Shawn?
9    Cary A.    No, it is Cary.
10    Rob Q.    Hi, Cary, did you say 28 and 5/8s?
11    Cary A.    Huh?
12    Rob Q.    What did you want to do it at, 28 and
13    5/8s?
14    Cary A.    No, I wanted to do it -- I wanted to
15    do it originally at 29, and that was 11 percent
16    in the Market.
17    Rob Q.    Okay.
18    Cary A.    Can I do it at 29?
19    Rob Q.    I can't get ahold of anybody.
20    Cary A.    Normally, I can do anything within 10
21    to 11 if --
22    Rob Q.    That may be her.  Hang on.  Hang on.
23    NEXT CONVERSATION:
24    Rob Q.    Hello.
25    Unknown A.    Hi.  I think Wendy's out to lunch.

MANHATTAN REPORTING CORP.

F 002587

14

1

2  *Rob*  Q.    Yeah, we know she is out to lunch.

3  We thought we knew what restaurant, but we can't

4  get ahold of her there.

5  *unknown* A.    Do you want me to run down?

6  (unclear).

7            What about her pager?

8  *Rob*  Q.    It doesn't work.

9  *unknown* A.    Oh, for God's sake.

10  *Rob*  Q.    It is busy all the time.

11  *unknown* A.    Oh.

12  *Rob*  Q.    I got a real delicate situation.    I

13  do not want to do this trade.

14  *unknown* A.    What about Denice's?  Denice has

15  hers.

16  *Rob*  Q.    Denice -- do you have her pager

17  number?

18  *unknown* A.    I can   get it for you.   Hang on.   I

19  will call it right back.

20  *Rob*  Q.    Okay.

21            NEXT CONVERSATION:

22  *Rob*  Q.    Hello?

23  *Wendy Rea
(Wedbush)* A.    Hi, what's going on?

24  *Rob*  Q.    We are trying to reach you.

25  *Wendy* A.    Well, you got me.

F 002588

15

1

2   *Rob* Q.   Any ways, Cary wants to do the buy at

3   $29.

4   *Wendy* A.   And what is the price of the --

5   *Rob* Q.   25 and 31, 32, so a hair under 26.

6   He wants to go three and a thirty second hi.

7   *Wendy* A.   Is Ed around?

8   *Rob* Q.   Huh?  No, I thought he was with you.

9   *Wendy* A.   Ed's is not, no.

10   *Rob* Q.   So, he is not around, so --

11   *Wendy* A.   What is 15 percent?

12   *Rob* Q.   He said that is 11 percent above the

13   Market.  I am not so sure that's right.  Let me

14   get my calculator.

15           Then he says, well, we will do it 10

16   percent of the Market; that is twenty-eight

17   sixty.  So I am just concerned if there is a

18   problem --

19   *Wendy* A.   I think part of his feeling is, we

20   are being sued anyway.  So, if we are being sued

21   anyway --

22   *Rob* Q.   Yeah; but, let's say he goes out of

23   business and we get hit with this thing?  I mean,

24   this is, you know, this is --

25   A.   Well --
    *Wendy*

16

1

2  *Rob* Q.    I am getting nervous about this.

3  *Wendy* A.    Well, I told Ed he was talking about

4  10 to 15 percent above the Market at various

5  times.  He said, okay.  So, I don't know if he

6  realizes how much that is.  That is why I was

7  wondering if that's really -- sounds like more

8  than 10 percent above the Market.

9  *Rob* Q.    No, it is not.  It is more than 10;

10  it is 11-1/2.

11  *Wendy* A.    Really?  The market is 25 and we are

12  doing 28, basically.

13  *Rob* Q.    It is almost 26 and we are doing it

14  at 29.  The people are going to scream

15  unbelievable, because the high --

16  *Wendy* A.    Wait a minute.  Wait, wait, wait.

17  They are screaming if you are one penny over the

18  market.

19  *Rob* Q.    No, no, this is --

20  *Wendy* A.    I know, what I am telling you, is, we

21  have to defend the suit either way, that is what

22  I am saying.  That is his point.  I understand

23  what his point is.  You probably, you might be

24  able to justify 10 percent above the Market.  So

25  if you have to go into arbitration and spend all

F 002590

17

1

2    that money anyway, you might as well go in there

3    for a reason; it is something you might even be

4    able to walk away with.  And Ed has always said

5    it is better -- why is he going above the

6    market?  That does not make any sense to me, you

7    know.

8    Rob  Q.    All I am saying, we have had some

9    discussion on it, the ante, every time we have

10   one of these, the ante is going up, I mean, our

11   exposure goes up every time.

12   Wendy A.    Yeah.  What we could consider is

13   keeping some of the profitability in a reserve

14   account or something.

15   Rob  Q.    Maybe.  Or, we got to maybe not do

16   these so frequently.  Okay.

17   Wendy A.    Okay.  Go ahead and do it.  I mean,

18   all we can do is talk to Ed when he gets in.

19   Rob  Q.    I am just going to ask him for the

20   best price.

21   Wendy A.    Did you try to page me?  Because my

22   beeper --

23   Rob  Q.    Your pager does not work; we tried

24   paging you for 15 minutes.

25   Wendy A.    Yes, it is probably inside the

F 002591

18

1
2  building, it is not working.
3  *Rob* Q.    Were you at Cardini's?
4  *Wendy* A.    Yeah.
5  *Rob* Q.    We tried to --
6  *Wendy* A.    That is where I am, I am at
7  Cardini's, they called me and got me.
8  *Rob* Q.    Oh, they did get you?
9  *Wendy* A.    You said it was a party of three; it
10  is a party of six.
11  *Rob* Q.    Oh.  Okay.
12  *Wendy* A.    It is probably under (unclear).
13  *Rob* Q.    Let me go do this trade.  The market
14  is closed but we will have to do a late print.
15  *Wendy* A.    Would you tell Ed, still?
16  *Rob* Q.    When I see him.
17  *Wendy* A.    Yeah, leave message for him.
18  *Rob* Q.    Okay.
19  *Wendy* A.    Okay, bye.
20         NEXT CONVERSATION:
21  *Cary* A.    Yeah.
22  *Rob* Q.    Cary?
23  *Cary* A.    Hi, Rob.
24  *Rob* Q.    Yeah, Cary.
25  *Cary* A.    Yeah.