# EXHIBIT 13

NATIONAL ASSOCIATION OF SECURITIES DEALERS
----------------------------------------x
In the Matter of:

    FIERO BROTHERS,

       Claimant,           Case Number
                            98-00587

    - against -

    WALDRON & COMPANY
    WEDBUSH MORGAN SECURITIES, INC.,

       Respondents.



**ORIGINAL**

----------------------------------------x

                     September 1, 1999

      BEFORE:   CHAIRMAN ROBERT L. SCHOUWEILER,
            ESQ.

APPEARANCES:  MARTIN RUSSO, ESQ.
             Attorney for Claimant
             60 East 42nd Street
             Suite 843
             New York, New York 10165

             THOMAS FEHN, ESQ.
             ELIZABETH LOWERY, ESQ.
             Attorneys for Respondent Waldron
              and Cary Perle

             MARIE EATON, ESQ.
             Attorney for Respondent
              Wedbush Morgan Securities



E S Q U I R E™
DEPOSITION SERVICES

216 East 45th Street, 8th Floor
New York, NY 10017-3304
212.687.8010 • 800.662.3287
Fax 212.557.5972

| Witnesses | Direct | Cross | Re-Direct | Re-Cross |
|-----------|--------|-------------|-----------|----------|
| Robert Paset | 81 | 151 (Eaton) | 156 | |
| | | 155 (Fehn) | | |
| Joseph Gerace | 164 | | | |
| Ed Wedbush | 175 | 241 (Eaton) | 247 | |

| Exhibit | Description | In |
|---------|-------------|-----|

Respondent

| 13 | Wedbush buying tickets. | 101 |

1

2      let's put on the record right now

3      that motion Ms. Eaton presented to

4      the panel prior to the recess,

5      dismissing Mr. Wedbush as an

6      individual respondent is granted.

7           MS. EATON:   Thank you sir.

8           THE ARBITRATOR:   And your

9      expert witness.

10          MR. FEHN:   Right,

11     [unintelligible] Lowery

12     [unintelligible].

13          THE ARBITRATOR:   If you'll

14     raise your right hand, and do you

15     swear and affirm to tell the truth,

16     the whole truth and nothing but the

17     truth in the testimony that you're

18     about to give in this case?

19          MR. LOWERY:   I do.

20          MR. FEHN:   I have three sets of

21     schedules which Mr. Lowery is going

22     to talk about.   They're not

23     [unintelligible] for comparative

24     purposes.   They are also not in the

25     order they are marked.

[Off the record.]

[END OF TAPE 7, SIDE 1]

THE ARBITRATOR:  So like tab 2, book 1.  And Mr. Russo, sometimes it helps if you have any more [unintelligible] that you might wish to engage in as far as qualifications or resume or expert witness.

MR. RUSSO:  I'm not going to challenge his credentials.

THE ARBITRATOR:  Whatever [unintelligible] in your cross-examination.  So the record can reflect that your witness is accepted and qualified.

DIRECT EXAMINATION

BY MR. FEHN:

Q   Without then going over your resume, tell the panel about what you did for the last say five years when you were at the Commission.

A   I was at the Securities and Exchange Commission for a total of almost

thirty years, the last five years I was a

senior accountant in the Division of Market

Regulation.  My work responsibilities

included primarily conducting broker-dealer

examinations, working with the Division of

Enforcement, prosecuting securities

litigation.  I testified as an expert in one

matter in 1990, I testified as a summary

witness in another matter in 1994, and I

testified for the Department of Justice in

another criminal matter in 1995.  I have

been since May 1995 I retired from the SEC,

I went to work for Prudential Insurance

Company.  I was a director in the Corporate

Compliance Department.  I was there for a

year, I left to start my own consulting

firm, and since I started my own firm in May

of 1996, I have been retained by the

Securities and Exchange Commission on four

cases.  I am presently retained by the State

of New Jersey in a matter, by the State of

Arizona in a securities matter.  I have been

retained as an expert in probably somewhere

between twenty and thirty arbitration cases.

2    Some of them settled and some of them have

3    gone to hearing.  Others are pending.

4        Q    Can you tell the panel what if any

5    subject matter experience you acquired while

6    at the Commission or otherwise in the matter

7    of manipulated over the counter markets?

8        A    I have been accepted as an expert

9    in cases where I've offered testimony in

10   market manipulation, over-the-counter

11   trading practices, mark ups, excessive mark

12   ups and mark downs.  And since I've started

13   my own firm I've testified in federal court

14   here in Los Angeles last summer in a market

15   manipulation case which in fact was referred

16   to in this case by Mr. Elgindy.  I was the

17   expert in that case.  Currently I have been

18   retained by the SEC in a market manipulation

19   case that's will be tried in New York in

20   early part of 1999.

21       Q    Are market manipulation cases

22   common?

23       A    Probably more common than

24   prosecuted but the over-the counter,

25   particularly the trading in the over-the-

1

2   counter market is less visible than the

3   equity markets and the list of stocks.  I

4   really prefer not saying that they're common

5   but you do find them.

6       Q    Do they present any special

7   challenges [unintelligible].

8       A    Actually the proof is usually in

9   relying on the records.  The records of the

10  trading activity, since the early 1990s even

11  in a bulletin board stock, all the trades

12  are recorded and the records of the

13  quotations are made so the challenge is

14  reading the records, making sense of the

15  records, making schedules that detail what

16  happen so that they can be presented in a

17  succinct fashion to the trier of fact.

18      Q    Have you arrived at any opinions in

19  this particular case with respect to when

20  the market in IBUY was attempted to be

21  manipulated or in fact manipulated?

22      A    Yes I have.

23      Q    And arriving at those opinions what

24  documents have you examined and what

25  examination have you conducted.

1

2     A    I reviewed the NASD equity trade

3  reports of IBUY from February and March of

4  1998.

5     Q    Identified as which exhibit?

6          MR. RUSSO:  Plaintiff's Exhibit

7       A.

8     A    Plaintiff's Exhibit A, I've

9  referred to the market maker price movement

10  report which is also has been referred to as

11  .  .  .

12          MR. RUSSO:  I'm not sure

13        [unintelligible] we had different

14        ones that your counsel

15        [unintelligible] .  .  .

16     A    I believe as a result of my

17  request, I've reviewed all the price market

18  maker movement reports for the months of

19  February and March 1998.

20     Q   Let me stop you there.  Did Mr.

21  Robertson accurately describe what a market

22  maker price movement report is?

23     A    I think I got the right answer out

24  of his answer but I could make it clearer.

25  The market maker price movement report

499

2   records changes in the market maker

3   quotations on a real time basis so that at

4   any given time you know what each market

5   maker was bidding for stock and asking for

6   stock at a given time on a given day and

7   that record is maintained by the NASD.

8       Q    You were giving us a list of what

9   you looked at.

10      A    I looked at the statement of claim

11  and the amended statement of claim, I

12  reviewed the Fiero purchases and sale

13  blotter.  I reviewed the purchase and sale

14  blotter for several other market maker

15  including bond stock, Wall Street equities,

16  Keywest DuPont. I believe that's it.

17      Q    Waldron?

18      A    Certainly I reviewed Waldron's

19  trade records from January, February and

20  March of 1998.  I reviewed the prospectus.

21  I reviewed the news accounts, the press

22  releases, the items on the internet, the

23  Chris Byron articles.  I reviewed

24  correspondence from Mr. Fiero to regulators

25  to Senator D'Amato.

500

1

2      Q    As a result of reviewing these

3    documents that you described, have you come

4    up with any schedules, work product as a

5    result of your examination.

6      A    Yes I have.  What I tried to do

7    with my schedules is to summarize the

8    immense documents that have been presented

9    so far and to prepare schedules which

10   succinctly describe my findings.

11     Q    Approximately how much time did you

12   devote to the analysis of the stock trading

13   records of the various firms of NASDAQ?

14     A    I didn't break my time down

15   precisely but I would say thirty hours.

16     Q    Okay, if you would then go through

17   the schedules in the order in which you

18   prefer, explaining to the panel what they

19   are and how you derived them

20     A    I'm going to start with schedule C,

21   which is a schedule of Fiero Brothers

22   trading summary shopping.com buys and sales

23   and it's from January 28th to March 23,

24   1998.  The first column is trade date, the

25   second column is long or short inventory

1

2    position, the third column total buys for

3    the day, the fourth column is total sales

4    buy the day and the fifth column is buy-ins.

5    And there were five buy-ins and they are

6    recorded for each date.  And then I totaled

7    the buys and the sells and the buy-ins and

8    the long-short position at the end on March

9    23, 1998 correspondence to the Fiero

10   purchase and sale blotter that there was

11   their inventory position as of that date.

12       Q    Specifically what [unintelligible]

13   are your referring to?  Which numbers.

14       A    For 3/23/98 the seventy-three

15   thousand eight hundred fifty shares short

16   position.  The second schedule is a schedule

17   . .

18             THE ARBITRATOR:  Is it B Mr.

19        Lowery?

20             THE WITNESS:  Yes it is.

21        Schedule B.  It looks like an E to

22        me.

23             MR. RUSSO:  Is it an E.

24             THE WITNESS:  I believe it's an

25        E.  This schedule is a trade by

1

2  trade of all Fiero's trade for the

3  same time period January 28, 1998

4  to March 23, 1998 and I sorted it

5  by trade date and by time.  And I

6  must indicate that I used, well let

7  me go through the columns.  The

8  first column is a number that I

9  assign to each transaction so I

10  could sort it in the actual order

11  that I recorded from the Fiero

12  record, the second column is the

13  trade date, the third column is

14  identified as reported time.  That

15  is not from the Fiero record.  What

16  I found in the Fiero record was, it

17  was a truncated time, it included

18  the hour with a colon and then it

19  had another number.  The other

20  number turned out to be the last

21  digit of the minute.  So if it was

22  fifty-five or fifty-six, it was a

23  six.  If it was ten twenty-five it

24  was ten colon five.  So I went to

25  the equity trade report on every

1

2    trade and I recorded the actual

3    time reported to the NASD for that

4    particular trade.  The next column

5    is actually contains two pieces of

6    information.  It's identified as

7    contra broker, the first column is

8    the number of the clearing firm and

9    the second column is the actual

10   identity of the broker-dealer that

11   did the trade.  I should point out

12   that the Fiero record, if you look

13   at the fourth record down it's, the

14   contra broker is identified as

15   four-one-two and the broker is

16   identified as S-h-r-p that Sharp

17   and I believe it's Sharp Capital,

18   I'm not sure.  But four-one-two is

19   the old clearing number for Adler

20   Coleman and the Fiero record

21   actually identified that trade as a

22   trade with Adler Coleman.  But I

23   know because I testified in the

24   case Adler Coleman has been out of

25   the business in since 1995.  So

1
2      Sharp - when I went to the equity

3      trade report, this trade was

4      actually reported as a trade with

5      sharp and not with Adler Coleman.

6      The next column is buy so Fiero

7      bought, I have a number there.  The

8      next column is sells, if Fiero sold

9      I have a number there.  The next

10     column is price and that's the

11     price that was reported.  The next

12     is CXL that was a column on the

13     Fiero purchase and sale blotter and

14     on certain pages you'll see the

15     word CXL that matched up trades

16     when they were cancelled. So if a

17     trade was cancelled you'll see one

18     number, a positive number and

19     another number in the same column

20     is a negative number which again

21     was exception from the way Fiero

22     did it.  Fiero chose sale and the

23     cancellation would be recorded as a

24     buy.  So this is a - whenever I

25     reconstruct records I use this

methodology.  I find it's actually

better because it shows the real

number if they should cancel a

trade it gives us the number of

sales and the number of buys.  The

next is a trade by trade position

long and short and it so, for each

trade it is accumulative and the

next column the number of shares

bought on a particular day, it's a

running total and then the next

column is daily sold and that's a

running total and then to help

identify at the end of the day you

see 1/28 is marked end of the day

because that was the only

transaction.  Further down the page

on 2/3 it's marked end the day

because there are a handful of

trades above it.  The next chart,

mines not marked, schedule A sorted

by contra broker is an identical

schedule.  The difference here is

that instead of sorting by time I

1

2        sorted it by contra broker and you

3        can see for any trades that Fiero

4        had with any broker dealer you see

5        all the trades in one place and

6        it's sorted by trade date and time.

7        The next schedule is Schedule D it

8        is shopping.com quotations and it's

9        for January 2, 1998 to February 12,

10       1998.  The reason I chose February

11       12th is that was one that was the

12       date of the first buy-in and it was

13       also based on my review.  The price

14       during this time rose from ten

15       dollar and seventy-eights to on, I

16       believe it's on 2/10 the price went

17       above twenty-six dollars.

18            MR. RUSSO:  You lost me for

19       second, you're on Schedule D.  What

20       is it entitled?

21            THE WITNESS:  Market maker bid

22       and ask.  The reason I chose

23       February 12th was that was the date

24       of the first buy-in and as you see,

25       if you turn to page seven the price

on that day, here at 32727 for

example the price was twenty-six

and a half. I did not recall all

market maker changes but I did

recall every change where a market

maker increased the bid and I also

indicated where Fiero changed his

bid whether it was or was not the

high bid. And the way I

distinguished one from the other is

if you look on page three, on the

date 2/5 you see at 9:30 Fiero's

bid was seventeen and one-sixteenth

- seventeen point zero six two

five. And I marked - I indicated

that with FSCO and an asterisk

whereas above earlier in the day

there high bid, they raised the bid

from sixteen and seven-eighths to

sixteen point nine three seven

five. To go on, I did three

additional schedules. And Mr.

Robertson is correct, you don't

have a report which shows a market

1

2          maker changes along with the

3          transactions so I would I try to do

4          is give us one, for purposes of

5          this case, and I pick three

6          different trading dates.  I picked

7          February 4, 1998, and that's

8          exhibit Schedule B and I did one

9          for February 6, 1998 and that is

10         exhibit F and I also did one for

11         February 12, and that's G.

12    Q    And again these, D, F and G combine

13  both the trade which occurred and the quotes

14  which occurred.

15    A    Correct.

16    Q    Now starting back through these

17  schedules from the very first one. Can you

18  tell us the significance of the results

19  portrayed on them as they affect your

20  opinion concerning the market in IBUY.

21    A    Well I'd like to preface my

22  response by saying that one I looked at the

23  trading activity, I started by looking at

24  all the trading activity and I prepared

25  schedules on the basis of what I saw as a

19

1

2      need for understanding the trading activity

3      that saw.  And these schedules reflect that

4      . . .

5                      MR. RUSSO:  Could you say what

6                  schedule you're looking at?

7          A     Schedule C, the first schedule

8      which is the daily record of buys and sells

9      by Fiero.  I noted from this report that

10     from beginning January 28th which is

11     consistent with Mr. Fiero's testimony that

12     he took a short - this chart reflects that

13     he took a short position of four thousand

14     six hundred shares and that, if you look

15     through the chart in the second there

16     column, there was one day February 12th

17     where he had a positive inventory balance -

18     a loan position.  On all the other days he

19     had a negative balance.  On some days - on

20     March 4th he had a balance of short position

21     of ninety-seven thousand two hundred thirty-

22     six shares.

23         Q     Is there anything else that this

24     schedule tell you?

25         A     Yeah, I noted that Mr. Fiero's

19

1

2  complaint was after the March 12th buy-in

3  and had nothing else happened he would have

4  had a long position, he would no longer had

5  any - he realized what had happened in the

6  market, he realized that he was seeing an

7  above the market buy-in and his response to

8  that was on February 13 was he sold seventy-

9  two thousand shares seventy-two thousand

10  three hundred sixty-four shares.  He offset

11  that with the purchases amounting to

12  seventeen thousand four hundred and it gave

13  him the end of the day short position of

14  fifty-three thousand seven hundred and

15  forty-six shares.  To me that indicated that

16  while Mr. Fiero appeared to recognize the

17  risk of the buy-ins he made a concerted

18  effort on February 13th to take the short

19  position.  Schedule E if you turn to page

20  six, you see that on staring with

21  transaction 191 which is midway through the

22  page at nine thirty-four he started by

23  selling two hundred shares to broker LAWR

24  which I believe is LP Lawrence.  Two hundred

25  shares at nineteen and a half, and if you

2       look between 9:30 and 10:50 he had a short

3       position.  His short position had climbed up

4       to sixty-six thousand forty-six shares in a

5       little more than an hour.

6                    THE ARBITRATOR:  And what does

7                    that tell us.

8                    THE WITNESS:  That tells us

9                    that Mr. Fiero, even despite the

10                   buy-in, was ready to immediately go

11                   into the market with unprecedented

12                   selling during the previous dates

13                   the most shares that he had sold on

14                   any given day was on the 11th,

15                   fifty-one thousand but his selling

16                   in that first hour exceeded his

17                   total sales for any given day prior

18                   to that day and the average selling

19                   on any given day was in the range

20                   of fifteen to twenty thousand.  So

21                   his selling on the 13th was

22                   unprecedented.  And that to me that

23                   provided evidence to me that Mr.

24                   Fiero was willing to assume the

25                   risk of going short in the market

knowing that he had already been

subjected to a buy-in at above-

market price.  I also going back to

the trading activity, I heard

testimony this morning that

indicated that somebody started

trading the stock when it was

trading at twenty dollars.  He

timed it in December and schedule D

shows that the market for the stock

on January 2nd the bid was 10.875,

the ask was 11.75.  I don't see a

trade in the range of twenty until

the February 6th, more than two

months after the witness testified

that he started trading the stock.

I also noted that the quotations

for the stock remain, well I

shouldn't say they remain the same,

but they increased from 10.875 to

14.75 in that four-week period when

Fiero first started to make the

market and it was only after Fiero

started to make the market that you

see the transactions or the price

moving, if you see the open on

February 4, the bid was 14.75 and

at the end of the day it was

16.875. So in one day, after Fiero

entered the market, the bid price

went up more than two dollars when

it had gone up four dollars the

previous four weeks. The next day

on February 5th the market opened

at 16.875 and turning to page four,

it enclosed at 18.375. The second

day it went up a point and a half.

The third day it opened at 18.375

and it closed at 22. So in little

more than three days, the 4th, 5th

and 6th, the price of the stock

double. Now this chart is very

instructive because it tells you

which market-maker was moving the

bid. And if you look on page two,

beginning of the day, you see that

FSCO is the primary market-maker

moving the price. FSCO is the

2    symbol for Fiero.

3    Q    Then again if there's no asterisk

4    that also means Fiero was the high bid.

5    A    They increased the bid.  And on

6    February 5th you see that again, the

7    majority of the changes in the quote are

8    attributable to FSCO.  And that continues

9    through the 6th, so the price of the stock

10    doubled form February 4th to February 6th.

11    And what was Fiero doing at the time.  You

12    go back to the first schedule, schedule C.

13    Now I'm losing my schedules.  But Fiero was

14    taken [unintelligible] short and was

15    shorting throughout that time period.  On

16    February 4th he sold sixty-seven hundred

17    shares, he bought a thousand shares.  On the

18    5th he sold eleven thousand shares, he

19    bought forty-two hundred shares and on the

20    6th he sold fifty-eight hundred shares and

21    he bought two hundred shares.  So the price

22    is doubling and the majority - not the

23    majority but the clear majority of the bid

24    increases during this time period was FSCO

25    Fiero.  And based on my experience I saw the

1

2  only plausible, the most likely explanation

3  was that Fiero was raising the bid to

4  increase the price that was selling the

5  stock into the market.  He had other

6  alternatives.  If he wanted to short stock,

7  he did not have to raise the bid.  He could

8  have gone to other dealers and sold stock to

9  them - bought stock from them at the offer.

10  Each time he raised the bid, he raised his

11  cost of either buying or selling stock.  If

12  he wanted to sell stock he would sell it to

13  bid.  If he wanted to buy stock he would buy

14  at the offer.  But he could go to market

15  makers and he buy and sell without having to

16  raise his bids.  He was short and at some

17  point in time you expect a short seller -

18  the one thing you know when somebody shorts

19  and doesn't have a supply of stock, you

20  can't buy the stock back. He has to go into

21  the market and buy the stock; and that in

22  fact is a dynamic in the market.  He creates

23  demand.  So you increase the real - the so-

24  called retail demand the buys, the people

25  who want to buy the stock because they like

1

2    the stock, added to that number, whatever

3    that number is, that x you and y which is

4    the short sellers who are have sold the

5    stock and their only way of ever closing out

6    the position is buying the stock back.  So

7    what they do, and they sell the stock they

8    have to hope that the price of the stock

9    goes down so when they buy the stock back,

10   they buy at a lower price.  There is no

11   other way they can make money than waiting

12   for the stock to go down.  When they sell

13   short and based on my years of experience at

14   the SEC, you got more calls from short

15   sellers saying look at this stock, this

16   stock is being manipulated.  Whether it was

17   being manipulated or not, as I looked at

18   this case I found that same phenomenon. Mr.

19   Fiero is complaining not just to Bill

20   McGlukas at the SEC, and not just to Senator

21   D'Amato, he's complaining to anybody he can

22   talk saying the stock is being manipulated.

23   And I looked at the records and I thought

24   well you know, Waldron, because it must have

25   really been pushing the price up.  But if

you look at the 4th, 5th and 6th, the symbol

WALD doesn't appear once. So why is the

price going up? What purpose would there be

for Mr. Fiero to raise the bid except to

create an illusion the market is being

manipulated. He is right in two accounts.

Short selling is a form of manipulation

because when you sell stock you don't own.

You're artificially increasing the supply of

the stock. You heard Mr. Robertson testify

that the float was a hundred thousand

shares. Well the day before the first buy-

in that's complained in this case, February

11th, an obscure [unintelligible] broker-

dealer I've never heard of sold fifty-six

thousand shares into the market. All of

them bought by Fahnstock. Fahnstock is a

broker-dealer who has a trading relationship

with Fiero Brothers. And I'll explain as we

get to the trading on February 12th. Fiero

Brothers and Fahnstock trade frequently.

And it was at the end of that day on the

12th, the reason I was looking at Fahnstock

is Fiero again, Fiero is short, it's going

1

2     to be subject to a buy-in and what is it

3     doing, but at the end of the day it sells to

4     two broker-dealer.  One broker-dealer is

5     Fahnstock and the other broker-dealer is

6     Sharp.  And from the time it sells those

7     shares until the close of the day, a period

8     of about ten minutes, the price of IBUY

9     falls from twenty-four and a half to twenty-

10    one.  Three and a half dollars.  A measure

11    of affecting the buy-in price.  At the same

12    day, the very same day, the price of IBUY

13    goes up substantially on the basis of bid

14    increases by Fiero Brothers.

15         Q    Can you show the panel that

16    phenomenon on the schedule.

17         A    Sure.  That is on schedule D.  I'm

18    sorry that's not schedule D.  Is it G.

19              THE ARBITRATOR:  February 12th?

20              THE WITNESS:  yes.

21              THE ARBITRATOR:  Yes, G.

22              THE WITNESS:  Turn to page four

23         and you see a trade at 3:37 p.m.

24              THE ARBITRATOR:  I'm sorry,

25         what page?

1

2          THE WITNESS:  Page four.

3          MR. FEHN:  If I could request

4     claimant's exhibit A, which is, if

5     I could have a copy of that in

6     going through this

7          THE WITNESS:  Actually, can I

8     use notes that I made of these

9     trades?

10          THE ARBITRATOR:  You're going

11     to have to share them with Mr.

12     Russo.

13          Russo;  What date are these

14     trades.

15          THE WITNESS:  February 12th.

16          MR. RUSSO:  I ask that you not

17     destroy those notes and that you

18     bring them with you so that I can

19     use them when I cross-examination .

20     . .

21          THE ARBITRATOR:  He'll copy

22     them for you.

23          MR. RUSSO:  A copy would be

24     great.

25          THE WITNESS:  A three thirty-

seven on page four, and you see

that for a majority of the day,

under the transaction column with

only few exceptions Fiero is buying

stock.  If you look at the column

on the left, the quotations, you

see that at the beginning of the

trade during the day, Fiero is

actually increasing the bid price.

And again, based on my experience,

if Fiero was a buyer that day,

Fiero knew it had a buy-in but it

wouldn't want to raise the bid it

would want to buy the stock for as

low as price as it could.  So why

did it raise the bid.  It could

take offers, it might move the

price, but by moving the bid,

you're not taking the chance that

you're going to get the stock for

less money.  But any way, there's a

sale to Sharp.  And again remember

if you look at the Fiero trading

record and if I could see that

1

2      exhibit, the Fiero P and s blotter.

3          MR. RUSSO:  Your counsel has

4      the books and those are the

5      exhibits that are being used.  And

6      I'm sure that Mr. Fehn or Mr.

7      lowery can provide . . .

8          THE WITNESS:  All right, I'll

9      be glad to during the next break

10     pull it out.  But you can take –

11     I'll testify that if you look at

12     Mr. Fiero's purchase and sale

13     blotter you will not find the name

14     of Sharp on it, anywhere, you would

15     see Adler Coleman on it.  And then

16     we've been told about trades going

17     back and forth, but you see at 3:37

18     Fiero's sells three thousand shares

19     to Sharp and then at 3:41 buys

20     twenty-one hundred shares from

21     Sharp.  At the same time, looking

22     at exhibit A, page 557, you look

23     and you see that Sharp is selling

24     to other broker-dealers.  At 3:55

25     sells two hundred shares to GBRC.

1

2      MR. RUSSO:  I'm sorry what page

3  is that sir.

4      THE WITNESS:  Page 557 and it's

5  at 3:5512.

6      THE ARBITRATOR:  What time, I'm

7  sorry.

8      THE WITNESS:  It'll show 15:55.

9  Sells two hundred to GBRC.  Then at

10  3:5535 which is Sharp sells two

11  hundred shares to WSEI Wall Street

12  equities, at 23-1/8.  The next

13  sale, Sharp sells at 3:5643 sells

14  two hundred shares to WSEI at

15  22.625.  It's next trade is two

16  hundred shares at 3:5753 to WSEI at

17  22.125 and it has a sale of five

18  hundred to Frankel at 22.125.  So

19  in a period of just a few minutes

20  after the sale by Fiero to Sharp,

21  Sharp sells most of the stock back

22  to Fiero and then goes out and

23  sales into the market and the price

24  moves from, if you see on page 557,

25  the price at the top of the page is

1

2    24.625 and within a few minutes the

3    price is now down to, further down

4    the page it's down to 21.8125. And

5    with very little trading volume and

6    trades primarily between accounts

7    of two broker-dealers, Sharp and

8    another broker-dealer FAHN which is

9    Fahnstock. That price change and

10    the trading between Fiero, Sharp

11    and Fahnstock lead me to the

12    opinion that Fahnstock and Sharp

13    were working with Fiero to lower

14    the price and currently the same

15    time the price was dropping, Fiero

16    is moving is bid, looking at page

17    four, at 3:4503 Fahnstock has a bid

18    of 24.6975. By the end of the day,

19    Fiero's closing bid is 20.4375. So

20    concurrent to the trading activity,

21    that drops the price from 24-1/2 to

22    less than twenty-two dollars, Fiero

23    is dropping it bid at a time when

24    it needs stock and is subject and

25    is subject to a buy-in.

1

2          Q    Well why would he do that.

3          A    It's my opinion that he was

4     manipulating the market.  To get a lower

5     price for the buy-in.  Go to schedule B.

6     This chart shows that between, actually if

7     you look at the schedule, there's no changes

8     in the quotations all day.  From the

9     beginning of the day.  The stock opens at

10    14-3/4.  The first bid change is at 3:13 in

11    the afternoon.  So all day, nothing is going

12    on.  No changes to the quotation.  If you

13    look at Fiero's report which is sorted by

14    reported time, you see that on February 4th

15    . . .

16              MR. RUSSO:  We're looking at

17              Fiero's report?

18              MR. FEHN:  We're looking at

19              schedule B,

20              THE WITNESS:  No, the report

21              that Fiero's trade sorted by date.

22              THE ARBITRATOR:  That's

23              schedule E.

24              THE WITNESS:  I hope this

25              enables to us to work these

1

2  schedules a little bit but I'll

3  certainly testify that I prepared

4  these precisely from the schedules

5  and to the best of my ability they

6  accurately contain everything.  But

7  I think it does succinctly show all

8  the trades Fiero's trades and the

9  report time.  The first trade was

10  at 3:03 in the afternoon.  So again

11  looking at Schedule B which is the

12  report which puts together the

13  quotes with the trades, you see

14  that the first quote change was at

15  3:1347 and Fiero raised the bid

16  from 14.75 to 14.7813.  It again,

17  then it sold two hundred shares to

18  Waldron at that price and then it

19  sold an additional two hundred

20  shares to Waldron at 14.8438.  Its

21  next action was at 3:1622 it raised

22  the bid 14.8438.  The bid came back

23  down and then at 3:19 Waldron

24  raised the bid to 14.7875.  The

25  next change at 3:20, in between the

next quote change, Fiero sells five

hundred shares to FRAN Frankel at

14.9688.  Fiero raises the bid at

3:20.04 to 14.9375.  Again with no

trades, raises the bid to 14.9688.

Waldron inserts a bid of 15.  Fiero

without any more trades raises the

bid to 15.0313.  Then Fiero sells

to Frankel two hundred shares

between 3:2504 and 3:2835, Fiero

raises the bid four times from

15.03 to 15.156 with no trades.  It

then sells a thousand shares to

Frankel at 15.2188.  Frankel raises

the bid, it's long and it raises

the bid. I wouldn't understand

that.  Usually when you're long -

unless you really want stock, you

don't necessarily, almost a moment

after a trade it raises the bid

then Fiero matches the bid then

raises the bid to 15.2188. Sharp

raises the bid to 15.25.  Fiero

raises the bid to 15.28.  And then

1

2    three seconds later, look at that,

3    it's 3:3402 it raises the bid from

4    15.25 to 15.28 and then three

5    seconds later, no trades raises the

6    bid again to 15.3438.  Then it

7    sells two hundred shares to Sharp

8    at 15.4688.  The next six bid

9    increases are all attributed to

10    Fiero.  From 3:3607 to 3:4130.  In

11    five minutes Fiero raises the bid

12    six times.

13    MR. RUSSO:  I'm sorry, what was

14    the time period for that.

15    THE WITNESS:  3:3607 to 3:4130

16    it raises the bid six times.  He

17    then sells two hundred shares to

18    Weed.  So Fiero is telling

19    everybody on the box that he's a

20    buyer and every trade so far during

21    the day he's the seller.  Then the

22    next one, two, three, four, five

23    trades, the quotes changes between

24    3:4220 and 3:50 a period of eight

25    minutes, Fiero tells the box again

I'm a buyer he raises the bid five

more times.  15.9688, 16.09, 16.21,

16.34, 16.46 and then he buys five

hundred shares from SEILL which is

Spear Leads that's 16.4688 and then

Sharp raises the bid, Fiero raises

the bid two more times, Sharp

raises the bid, Fiero raises the

bid, now the bid is up to 16.78.

Remember less than an hour earlier

the bid was at 14-3/4.  The bid is

now up two dollars.  And during

that time Fiero has bought 500

shares and sold somewhere around

three thousand shares.  The bidding

and the trading don't match.  He's

bidding the price up and selling

stock and what's even more

outstanding and I'm using the word

outstanding because just to

identify something you can't

explain, all these quote changes

occur at 3 o'clock in the afternoon

and there's nothing that I've heard

1

2        about this case would indicate that

3        at 3 o'clock on the 4th some news

4        announcement or some announcement

5        about the company that would be

6        attributable to such incredible

7        quote changing in such a short

8        amount of time.  And that Fiero

9        certainly was the - Fiero accounted

10       for somewhere between two-thirds

11       and three-quarters of all the quote

12       changes during that hour.

13              MR. RUSSO:  I'm sorry sir,

14       would you repeat that?

15              THE WITNESS:  I said between 3

16       and 4 o'clock, Fiero was attributed

17       to between two-thirds and three-

18       quarters of all the increases in

19       the bid.  I haven't calculated that

20       number specifically so my number is

21       off, I think that with the record

22       of what I've prepared speaks for

23       itself.  Another phenomenon

24       occurred on February 6th.

25    Q    Which schedule is that?

2      A    Now schedule F if you look at that

3    along with schedule D you'll see that the

4    market closed on February 5th at 18-3/8 and

5    between 9:38 a.m. and 10:25 a.m. Fiero,

6    Fahnstock and Frankel raised the bid to

7    21.5625. And again if you look at the

8    trades, and you look at Fiero's trades

9    throughout that entire period.  The raise

10   the bid more than any of the other market

11   makers and think my count was fourteen

12   times.  Fiero was the seller the whole time.

13   So his first sale was to Pond at 18.375 and

14   his last sale was to Pond at 21.375.  Again,

15   moving the market up three dollars in little

16   less than an hour on February 6th.

17     Q    Is my reading of this schedule

18   correct that there were no price movement by

19   Waldron?

20     A    ·Yes, you're correct.  And you

21   didn't ask this question but there are no

22   trades we couldn't figure out when Waldron

23   could be accounted for on that date.

24            THE ARBITRATOR:  We're on

25            schedule G now?

THE WITNESS:  Yes.  If you look
at schedule G with schedule C,
schedule c is the day-by-day
summary, you'll see that Fiero's
short position grew every day.  On
the 11th it increased from forty-
seven thousand to seventy-eight
thousand shares.  It sold fifty-one
thousand four hundred shares on the
11th. So in the teeth of a buy-in
it was going shorter.  And on the
12th, as I explained before, the
dynamics of short position
ultimately requires the broker
taking the short position to buy it
back.  And instead of buying it
back over the course of the time
that it had received notice of the
buy-in, its action the previous day
was not to reduce the short
position, not to shrink the short
position, but to grow the short
position and to grow the short
position by a substantial amount,

1

2     by thirty-one thousand shares.  But

3     on the 12th they were a buyer and

4     if you look at schedule G,

5     throughout the day, with I think a

6     total of three exceptions, they

7     buy.  But again, just to show like

8     on the 4th and on the 6th they're

9     buying and now there first buy is

10    at 23.475.  They're able to buy

11    shares below the market.  But what

12    has happened is their first bid,

13    actually what happens is the bid

14    opens at 24, it goes down, Fiero

15    raises the bid at 23.5625 but over

16    the next few minutes the bids just

17    drops way off at Fiero is able to

18    buy at lower prices.  Then when

19    after it's finished its buying, you

20    see Fiero raising the bid to

21    21.875.  The bid goes down, now the

22    next bid increases by Fiero at

23    9:52, raises it to 21.875 and to 22

24    at 9:54 no trades.  It raises the

25    price from by more than a quarter

point.  It sells . . . there are

four sales on the first page.  it

sells four hundred shares to Sharp

and the price goes down.  He buys

more shares from Sharp, he sells a

thousand shares to Keywest.

Keywest like Sharp, did not appear

on the bureau purchase and sale

blotter.  What appeared was the

number 111 and that is the symbol

for a broker-dealer that's been out

of business for several years

Franklin Lord.  And Keywest is not

shown.  I was able to establish it

was Keywest by using the NASD

equity trade report.  Now if you go

to page 2 you see that between

Quantum and Fiero and Ryco which is

Ryan and Company the bid is moving

and forth.  These are the broker-

dealers.  The reason you see, and

to explain the chart, I only record

it when a bid goes up and what

would happen is that if somebody

1

2       the high bid and reduced the bid,

3       another market-maker would rise to

4       the top even though it didn't

5       change its bid and it would remain

6       at that level until that market-

7       maker either reduced its bid or

8       raised its bid. To give you an

9       example, if the bid was 22 and

10      another market-maker had a bid of

11      21-3/4, the market-maker who was

12      bidding at 22 reduces it to 22-1/2

13      so 21-3/4 would be the high.  But

14      Fiero, turn to page 3, Fiero again

15      between 1:20 and 1:21 raises the

16      bid from here 1:18 raises the bid

17      from 23-1/2 and by 1:21 raises the

18      bid to 24 dollars.  And is buying.

19      Then he buys and 24. The bid goes

20      down, he raises it back up.  So

21      Fiero, based on my review, is

22      trying to be the high bid.  And as

23      a buyer that would be expected to

24      be the high bid on a day when you

25      need to cover your short position.

114

Again at 2:01 to 2:11, Fiero raises

the bid four more times with no

intervening trades.  On page four,

from 2:27 to 2:30, raises the bid

twice before it has a trade.  And

then as if a switch was turned at

3:45 Fiero went from being the high

bidder, knowing it had to buy stock

to dropping its bid from 24-3/4 to

21.625 in the next fifteen minutes.

MR. RUSSO:  What time are you

talking about.

THE WITNESS:  3:45 to 4

o'clock.

THE ARBITRATOR:  Page 45.

Q    Is that the extent of the

inferences you can draw from

[unintelligible].

A    No, there's one more.  And that is

that short selling to the market, ordinary

short selling in a liquid market doesn't

have a great impact.  But short selling in a

market which is - well there are lot of

market participants buying and selling the

1

2    stock, there wasn't a lot of stock to be

3    traded.   And it appears that away from

4    Waldron there was a hundred thousand shares

5    but there was short selling, it wasn't just

6    by Fiero.   It was a Canadian broker-dealer,

7    going to page, exhibit 8, plaintiff's

8    exhibit 8, the symbol is NCMF.

9        Q    Do you know who that is?

10       A    McDermott . . .

11              [Off the record.]

12              [END OF TAPE 7, SIDE 2]

# C E R T I F I C A T E

I, _Sean Rockoff_ ---------certify that the

foregoing transcript of proceedings in the -----

-----Court of-------------v.-------------, Index

No. ----------was prepared using standard

electronic transcription equipment and is a true

and accurate record of the proceedings.


Tape #_____

Counter #s_____ to _____

Signature _Sean    Rockoff    A13._


Date _3-9-00_____

47

537

NATIONAL ASSOCIATION OF SECURITIES DEALERS

-------------------------------------------x

In the Matter of:

    FIERO BROTHERS,

        Claimant,             Case Number
                                   CV 99-4670 ER

    - against -

    WALDRON & COMPANY, WEDBUSH
    MORGAN SECURITIES, INC.,

        Respondents.

# ORIGINAL

-------------------------------------------x

                            September 2, 1999

        BEFORE:    CHAIRMAN ROBERT L. SCHOUWEILER,
                  ESQ.



ESQUIRE™
DEPOSITION SERVICES

216 East 45th Street, 8th Floor
New York, NY 10017-3304
212.687.8010 • 800.662.3287
Fax 212.557.5972

1

2    [Begin Tape 8]

3        A    I didn't know who McDermott St.

4    Lawrence was before this morning and in

5    fact, I had seen the symbol trading.  I

6    didn't make anything out of it, but I saw.

7    as my schedule would indicate that

8    Fonstock[phonetic] was selling, excuse me,

9    buying and selling with McDermott St.

10   Lawrence that day, but over the previous few

11   days it was buying a substantial amount of

12   stock.  And I kept going through the

13   schedule, looking for when McDermott St.

14   Lawrence was covering a short position, and

15   I never found it covering a short position.

16          It appears that McDermott St.

17   Lawrence, because it's a Canadian firm and

18   it doesn't sell its trees apparently through

19   an SEC, because it doesn't have a ... with a

20   trading desk and there's no symbol for it,

21   it doesn't appear that it was bought in, or

22   if it was bought in, it was not effectively

23   bought in.

24          So selling into the market -- so on

25   just the 11th, they sold 56,000 shares to

49

2      just one broker-dealer, Fonstock.  So that

3      increased the outside public float by more

4      than 50%, and on the same day, 100,000 to

5      156,000.  And on the same day Fiero sold

6      short another 72,000 shares -- I'm sorry,

7      51,000 shares, so these short sales would

8      have a deflating effect on the market and

9      these sales were artificial.  Because they

10     didn't own the stock, and they didn't have

11     the stock.  They couldn't find the stock;

12     they couldn't borrow the stock.  There was

13     no stock for them to get.  The only way they

14     could get the stock back was to buy it.

15              So initially in the sales -- would

16     deflate the price of the stock, and then

17     their intention was that by consistently

18     selling the stock and raising this aura of

19     manipulation, that the stock would lose its

20     value because the public would hear about

21     it, and the demand would decrease, and the

22     declining demand would cause the price to

23     fall.

24              While it sounds, where there are

25     some things in this case that are not, you

1

2    know, I've looked at the trading throughout,

3    but I've seen this happen before.  As

4    recently as three years ago when another

5    broker-dealer, Hanover Sterling, was the

6    recipient of a short sales campaign -- and

7    it wasn't just one short sell, it was by a

8    group of short sellers.  And these short

9    sellers put more stock into the market than

10    Hanover Sterling could sell.  And

11    ultimately, Hanover Sterling failed because

12    it committed fraud, and in fact, the fraud

13    that it committed was it wrote fictitious

14    tickets, and the clearing firm didn't check

15    on those tickets to make sure that they were

16    real, and that the clearing firm ultimately

17    failed, Adler Coleman failed, because some

18    debits were a million dollars and once the

19    price of the stock fell, Adler Coleman was

20    out of business.

21          Wendy Rea, I heard, call up one of

22    the firms and ask, is your buyer real?

23    Well, if Adler Coleman had used those

24    practices, Adler Coleman might still be in

25    business today because it was that obvious,

51

2    because -- So a clearing firm does have a

3    duty to monitor trades, to make sure that

4    when a customer, or another broker is

5    buying, that the buys are real.

6        Q    Were you still with the SEC at the

7    time of the Adler Coleman failure?

8        A    Yes, I was.

9        Q    Okay, have we now exhausted the

10   enlightenment contained in your schedules?

11       A    Probably not, but certainly --

12       Q    Before we close today, I'd like to

13   just talk briefly about this buy-in.

14       A    Okay.

15       Q    Is there anything unusual about the

16   buy-in practices ....

17            MALE VOICE:  I just wanted you

18            to know that this is a copy of the

19            notes that we promised Mr. Russo,

20            and it's two pages.

21            MR. RUSSO:  Thank you.

22       Q    That is to say buy-ins happen.

23       A    Yes, they do.

24       Q    And you heard, I think , several

25   people testify about canvassing the markets.

1

2      A    Yes.

3      Q    Is that the customary practice or

4   is there something unusual about that?

5      A    Well I don't think there's anything

6   unusual about that, because whenever a

7   broker has an order, whether it's a buy

8   order or a sell order, its obligation is to

9   get the best market price, the best price in

10  the market.  And if you're doing a retail

11  trade, you go out and get the best price,

12  and if you're doing a buy-in, you go out and

13  get the best price.

14         What Wedbush did was it contacted,

15  it polled the market makers for sources of

16  stock that could be delivered on a guarantee

17  basis, and that's very common.

18     Q    And I take it from the testimony,

19  the only place they found that stock was

20  Waldron.

21     A    At Waldron, yes.  With the

22  exceptions that we noted today.

23     Q    Is there any regulation, either at

24  the NASD or SEC level that says, Waldron is

25  not entitled to charge what it pleases for

53

1

2    that stock?

3    A    I think I agree with Mr. Robertson

4    that the price should be reasonable and --

5    [interposing]

6             MALE VOICE:   Fair.

7    A    Fair, fair, okay, fair.

8             MALE VOICE:   That's the word he

9       used.

10    Q    And is there any published criteria

11    to determine what's fair?

12    A    Well I think the market determines

13    that and the securities business is not like

14    any other business when a buyer must buy

15    stock and the supply is limited, that the

16    price, the price demanded for the stock is

17    up to the seller.   That the buyer doesn't

18    have, doesn't really have a lot of choice.

19    It's similar to a real estate transaction

20    where the last parcel always sells for more

21    than the first parcel.

22    Q    There were some buy-ins in the

23    Adler Coleman liquidation.

24    A    Not in time to save Adler, but

25    approximately, let's see, Adler Coleman

2   failed in February 24th, and I believe in

3   the middle of March, March 20th, the civic

4   trustee, Claire Gottlieb, issued notices of

5   buy-in to all the short sellers, and the

6   buy-in prices were at or higher than the

7   prices that the short sellers sold, even

8   though the market for the stock had declined

9   by as much as 80% to 90% of the sales price.

10      Q    And Mr. Fiero was one of those

11   short sellers who bought in, wasn't he?

12      A    Yes, he did, and he was also one of

13   the litigants who sued the trustee, saying

14   that the buy-in prices were not fair.

15      Q    Do you know the outcome?

16      A    The trustee prevailed.

17      Q    Well the trustee prevailed so far

18   as Mr. Fiero's civil injunctive action,

19   correct?

20      A    Correct.

21      Q    To enjoin the buy-ins.

22      A    Correct.

23      Q    The buy-ins were not enjoined but

24   were allowed to go forward.

25      A    They were allowed to go forward.