# EXHIBIT 17

NASD REGULATION, INC.
OFFICE OF HEARING OFFICERS

|  |  |
|---|---|
| DEPARTMENT OF ENFORCEMENT,  :  |  |
| Complainant,  :  |  |
| v.  :  |  |
| STEPHEN CARLSON (CRD 1008099),  :  | Disciplinary Proceeding |
| FALCON TRADING GROUP, INC. (CRD  :  | No. CAF980002 |
| 30361), JOHN FIERO (CRD 1190133),  :  |  |
| FIERO BROTHERS, INC. (CRD 27269),  :  |  |
| MARK IACONO (CRD 1154923),  :  |  |
| ROBERT SHERMAN (CRD 1667470),  :  |  |
| SOVEREIGN EQUITY MANAGEMENT  :  | Hearing Officer -- |
| CORP. (CRD 20016), GLEN VITTOR  :  |  |
| (CRD 1565323), and GREG VITTOR  :  |  |
| (CRD 1864219),  :  |  |
| Respondents.  :  |  |

## COMPLAINT

Upon information and belief, the Department of Enforcement alleges as follows:

### SUMMARY

1. During the period from the middle of January 1995 until the end of February 1995, Respondents Fiero Brothers, Inc., Falcon Trading Group, Inc., Sovereign Equity Management Corp., John Fiero, Steven Carlson, and Glen Vittor, acting in collusion, engaged in a manipulative "bear raid" to drive down the price of ten Nasdaq securities underwritten by Hanover Sterling & Co., Ltd. ("Hanover"), a now-defunct broker/dealer. Those Respondents, acting through their own proprietary trading and market making accounts, and in conjunction with others, engaged in a month-and-a-half long program of short selling these securities. During

F 002397

the course of the short selling program, certain of the Respondents participated in the promulgation of negative stories about Hanover Sterling and certain of the securities over a nationally-televised cable broadcast. Certain Respondents and associated retail accounts made over $1 million by coercing Hanover Sterling into selling them stock below the existing market price. This conduct resulted in the collapse of Hanover Sterling, which was quickly followed by the demise of its clearing firm, Adler, Coleman Clearing Corp. By this conduct, Respondents Fiero Brothers, Inc., Falcon Trading Group, Inc., Sovereign Equity Management Corp., John Fiero, Steven Carlson, and Glen Vittor violated Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, and NASD Rules of Conduct 2110 and 2120.

2. In addition, all of the above Respondents, as well as Respondents Mark Iacono, Greg Vittor, and Robert Sherman, violated NASD Conduct Rules 3370 and 2110 by engaging in short sales for proprietary or customer accounts without making any of the affirmative determinations required for short sales. Lastly, Respondent Mark Iacono failed to mark certain order tickets as short sales, thereby violating Conduct Rules 3110 and 2110.

### RESPONDENTS

**Respondents Associated with Aspen Capital Corp.**

3. **Stephen Carlson**, age 38, resides in Denver and has been registered with the NASD as a general securities representative since September 1981 and a general securities principal since April 1985. During the review period, Carlson was a general securities principal and sole owner of Aspen Capital Group, Inc. ("Aspen"), a now-defunct firm which played a principal role in this matter. Aspen was registered with the NASD from November 8, 1985 until it went out of business and filed a Form BDW on January 25, 1996. Aspen Capital was located in Denver, Colorado, and maintained one branch office. In an earlier action, C3A940064, Carlson and

2

Aspen were sanctioned by the District Business Conduct Committee for District 3 based on charges that they violated the predecessor section to Rule 2120 by attempting to obtain stock at below market prices by threatening to act to cause the price of stock to decline below the level necessary for continued Nasdaq listing. Carlson and the firm were censured and fined $10,000, jointly and severally, on June 21, 1996, and Carlson was suspended from association with any NASD member in any capacity for 30 days. On September 19, 1997, the NBCC upheld the decision of the DBCC, but increased Carlson's sanction to a permanent bar. Carlson's appeal to the Securities and Exchange Commission is pending.

4. **Robert Sherman**, age 39, resides in Wheat Ridge, Colorado and has been registered as a general securities representative since April 1987, a registered options principal since October 1987, and a general securities principal since February 1988. During the review period, Sherman was a registered representative, head trader and compliance officer in Aspen's main office. Sherman has been employed by three member firms since April 1987, and was, until recently, employed by Chatfield Dean & Co., Inc.

**Respondents Associated with Falcon Trading Group, Inc. and Sovereign Equity Management Corp.**

5. **Falcon Trading Group, Inc.** ("Falcon") had been registered with the NASD from February 19, 1993 until its expulsion (described below) in May 1997. It was located in Boca Raton, Florida, and conducted only market making and proprietary trading.

6. **Sovereign Equity Management Corp.** (later Tuscany Equity Management Corp.) ("Sovereign") had been registered with the NASD from July 21, 1987 until November 1997, at which time it was expelled for failure to pay fees. Sovereign was located at the same address as

3

F 002399

Falcon was in Boca Raton. The firm maintained five branches, and engaged in proprietary and retail activity.

7. **Glen Vittor**, age 36, was president of both firms, and owned 10% of Falcon and 100% of Sovereign. He resides in Boca Raton. He has been registered as a general securities representative since 1986, an options principal since 1990, a financial operations principal since 1990 and a general securities principal since 1989. He was also the head trader at Falcon. He had been employed by eight member firms from October 1987 until March 1997, and is not currently registered with any firm.

8. **Greg Vittor**, age 33, was the vice president and head trader of Sovereign. Greg, who is Glen Vittor's brother and a resident of Boca Raton, has been registered with the NASD as a general securities principal since September 1991. He was registered with Sovereign Equity until its demise, and is currently registered with Metro Trading, Inc.

9. In a prior case, CMS940010, Glen Vittor and Falcon were censured, fined $50,000 each, fined $200,000 jointly and severally, and ordered to pay restitution of $189,125 for failure to honor trade commitments with other member firms and permitting the association of an individual whose NASD registration had been revoked. On December 21, 1995, the SEC affirmed the NASD's disciplinary actions, and suspended Glen Vittor for one year in all capacities, barred him from acting in all principal capacities, required him to requalify as a registered representative, and suspended the firm in all capacities for thirty business days. The U.S. Court of Appeals for the District of Columbia upheld the SEC action on December 20, 1996. On May 16, 1997, Falcon was expelled and Glen Vittor's registration was revoked by the NASD for failure to pay the fines. Greg Vittor has no formal disciplinary history.

F 002400

**Respondents Associated with Fiero Brothers, Inc.**

10. Fiero Brothers, Inc. ("Fiero Bros.") has been registered with the NASD since February 11, 1991. It is located in New York, New York, and maintains a branch office in Fort Lauderdale, Florida. Fiero Brothers has not been the subject of any prior formal disciplinary history.

11. **John Fiero**, age 36, resides in Jersey City, New Jersey. He has been registered with the NASD as a general securities representative since September 1983, financial operations principal since October 1990 and general securities principal since September 1990. John Fiero is the head trader and sole owner of Fiero Brothers. He has been employed by six member firms from January 1985 to the present. He is currently employed by Fiero Brothers.

**Respondent Associated with A.T. Brod & Co., Inc.**

12. **Mark Iacono**, age 37, resides in Smithtown, New York, and has been registered with the NASD as a general securities representative since August 1984 and as a general securities principal since May 1995. During the period of the review, Iacono was a registered representative and trader for A.T. Brod & Co., Inc. ("Brod"), which was registered with the NASD from January 23, 1983 until October 1, 1995, when its registration was canceled for failure to pay fees.

13. Iacono has been employed by fourteen member firms since October 1984, including Goldis Financial Group, Inc. from February 1996 through December 1997, and with Parker Financial Group since January 1998. He previously worked with John Fiero, and went to work for Sovereign within two months of the events at issue in this case. Iacono has no prior formal disciplinary history.

## FIRST CAUSE OF ACTION

### MANIPULATION THROUGH COLLUSIVE TRADING ACTIVITY

**Violations of Section 10(b) of the Securities
Exchange Act of 1934, Rule 10b-5 Promulgated
Thereunder, and Conduct Rules 2110 and 2120
by Respondents Carlson, Falcon, John Fiero, Fiero
Bros., Sovereign, and Glen Vittor**

14. The allegations set forth above in paragraphs 1-13 are realleged for purposes of this cause of action.

**Initiation of the Manipulative Trading**

15. Prior to the beginning of the trading at issue, Hanover underwrote ten securities ("the Hanover stocks") which became the subject of the manipulation. Those securities are All-Pro Products, Inc. units (APROU); American Toy, Inc. common stock (ATOY) and warrants (ATOYZ); Envirometrics, Inc. common stock (EVRM); Mister Jay Fashions International, Inc. common stock (MRJY); Panax Pharmaceutical Co. Ltd. units (PNXU); Play Co. Toys common stock (PLCO), units (PLCOU), and warrants (PLCOW); and Porter McLeod National Retail, Inc. common stock (PMNR).

16. By the middle of January 1995, Glen Vittor (acting primarily through Falcon), Fiero (acting through Fiero Bros.), and Carlson (acting through Aspen), who had long-standing business relations with each other, agreed, expressly or implicitly, to target Hanover stocks for short selling with the intention of, at a minimum, driving down the price of the stocks and, at a maximum, driving Hanover out of business. During the time period discussed herein, they were in frequent communication with each other.

17. In addition to these Respondents, there were numerous retail accounts, mostly domiciled outside the United States and interrelated with each other and with Falcon, maintained

at different brokerage firms, which engaged in similar short selling activity to that of the firms identified above. These retail accounts included one very active participant in the scheme, Roddy DiPrimo, S.A., maintained at Brod. The registered representative for this account was Respondent Iacono, who had no other retail customers. In addition, two of the relevant retail accounts were maintained at Sovereign.

18. Beginning approximately January 16, 1995, the Respondents and some of the retail accounts began establishing significant short positions in most of the Hanover stocks, and continued to increase those positions over the next few days. The cumulative value of the group's closing short position in the Hanover stocks was approximately $689,800 on January 16; $1,560,000 on January 17; $3,374,000 on January 18; and $4,131,000 on January 19.

19. Specifically, the Roddy DiPrimo account began shorting APROU, ATOY, EVRM, MRJY, PMNR, and PLCOU on January 16 and 17, and either maintained or increased its position in each stock every day until January 26. Falcon began shorting the exact same six securities on January 17 (except for MRJY, for which Falcon was short on January 16). Falcon began shorting PANXU on January 20, and DiPrimo did so on the next trading day (January 23). Fiero Bros. began shorting PMNR on January 19, and APROU, ATOY, EVRM, MRJY, and PLCOU on the following day.

20. By January 19, 1995, Fiero Bros., Aspen, and other firms through which they sold short registered as market makers in some or most of the Hanover stocks.

21. In order to hide the identity of the short sellers, Fiero Bros., Falcon, Sovereign, and Brod diverted many of their sell orders through other firms, which sold the shares short out of their own proprietary accounts and then covered their short positions by "buying" the stock from

the Respondent firms. Some of these diverted trades were done by Fiero Bros. while it was registered as a market maker.

22. Most of the shares being sold short were sold, either directly or indirectly, to Hanover.

23. Fiero Bros. posted SelectNet messages showing large sell orders for one or more of the Hanover stocks.

24. Throughout the period of the cause of action, and as discussed more fully in the Second Cause of Action, which is incorporated herein by reference, the Respondents engaged in hundreds of short sales in violation of the rule requiring them to affirmatively determine that they will either take delivery of the securities or be able to borrow them.

**The Dorfman Report**

25. As part of the plan to drive down the price of the Hanover stocks, Carlson contacted financial journalist Dan Dorfman regarding Hanover's recent offering of units in Panax Pharmaceutical Co., Ltd. and Hanover itself. Carlson called Dorfman's office at least six times on the morning of January 20, 1995, and faxed materials to Dorfman regarding the Hanover securities.

26. John Fiero was contacted by Dorfman regarding the Hanover stocks, and faxed Dorfman information about some of the Hanover stocks.

27. Dorfman aired a negative report on the Panax Pharmaceuticals issue, and on Hanover, on his regular show, "The Nasdaq Stock Market Dorfman Report," at 12:36 p.m. on January 20, 1995, on CNBC.

28. Dorfman stated in his broadcast that Steve Carlson of Aspen Capital rated Panax Pharmaceutical units "a joke, as well as two other Hanover Sterling offerings - Mr. Jay Fashion and Envirometrics."

29. The afternoon before Dorfman's report was aired, Fiero Bros. registered as a market maker in most of the Hanover stocks, allowing it to begin making markets on the morning the Dorfman report was to be broadcast. In a five minute period on January 19, 1995, Fiero Bros. registered as a market maker in all of the Hanover stocks except one (in which it became a market maker four days later).

30. On January 20, prior to the Dorfman broadcast, three of the Respondent firms and two of the retail accounts engaged in significant short selling in Hanover stocks. Aspen, whose principal (Carlson) was a significant impetus for the Dorfman report, sold short a total of 10,000 shares of the three securities he discussed with Dorfman. Falcon sold short a total of 48,350 of the Hanover stocks. Fiero Bros. sold short a total of 3,100 shares of three of the Hanover stocks. The Roddy DiPrimo account at Brod sold short a total of 60,000 shares of six of the Hanover stocks, and one of the retail accounts at Sovereign sold short 30,000 shares of one of the stocks.

31. The morning of the Dorfman broadcast, a trader at Hanover received a sell order for Panax Pharmaceutical units from an unidentified trader at Aspen, who told the trader to watch Dan Dorfman.

**The Coerced Stock Deal**

32. As Hanover continued to accumulate shares of the Hanover stocks on its books as a result of the short selling, it began to face serious net capital pressure. On or about January 20, 1995, representatives acting on behalf of Hanover sought out the short sellers, and entered into negotiations with an individual purporting to act on behalf of the short sellers.

33. The individual indicated to one of Hanover's representatives that he could stop the shorting if Hanover would provide the short sellers with stock at below market prices, for a total discount of $800,000-900,000, for all the short positions he was to identify. He negotiated the price for each stock, but not the number of shares.

34. While these events were unfolding, the Respondents and other short sellers continued to exert significant pressure on the Hanover stocks by continuing to sell short those securities. The cumulative short position generally continued to increase, reaching approximately $6,280,000 on January 20; $5,430,000 on January 23, $7,617,000 on January 24; and $7,870,000 on January 25.

35. The individual representing the short sellers identified John Fiero as the broker who would receive the below-market stock from Hanover and disperse among the recipients. John Fiero called a representative of Hanover, and they effected the trades on January 26 and 27, one stock at a time. Fiero Bros. bought the stocks at a total discount of approximately $866,500, and proceeded to distribute the stocks, with a slight mark-up, to other Respondent firms and other firms brokering on their behalf.

36. Specifically, Fiero Bros. obtained 90,000 shares of APROU from Hanover at a discount of $11,200 below the contemporaneous inside bid; 115,000 shares of ATOY at a discount of $100,625; 34,000 shares of ATOYZ with no discount; 66,000 shares of EVRM at a discount of $33,000; 126,000 shares of MRJY at a discount of $157,500; 287,000 shares of PANXU at a discount of $358,750; 175,000 shares of PLCOU at a discount of $175,500; and 81,000 shares of PMNR at a discount of $30,375.

37. When Fiero Bros. resold the stock, the resales to Brod (for Roddy DiPrimo) and Falcon were always below the bid, whereas some of the other purchasers bought at or above the

inside bid (but always below the inside offer). Fiero Bros. profited both by covering its own short positions, and by marking up its resale to the other participants.

38. Falcon received the largest cut of the stock, taking between 28% and 62% of the shares of each stock in which it was short. A.T. Brod received a large portion, ranging from 18% to 46% of the shares. All of those shares were passed along to Iacono's only client, the Roddy DiPrimo account.

39. The amount of stock provided by Hanover to Fiero Bros. actually exceeded the outstanding short position of the participants, resulting in additional profits to some of them. Falcon made profits of approximately $562,400 by covering its short position, and an additional $102,000 from selling the excess stock at market prices; Fiero Bros. made approximately $228,800 by covering its short positions and an additional $388,900 from selling additional stock; the Roddy DiPrimo account at Brod made approximately $347,100 by covering its short positions, and an additional $142,000 from the additional stock it received; and a retail customer at Sovereign made $30,470 dollars by covering its short positions (but no additional profits).

40. Aspen did not participate in the distribution from Fiero Bros., but still made a profit of approximately $87,000 because of the declining prices of the Hanover stocks.

**The Continued Short Selling and Demise of Hanover**

41. Almost immediately after the transaction between Hanover and Fiero Bros., Falcon, Sovereign, and the Roddy DiPrimo account, and to a lesser extent Aspen, began to reestablish short positions in the same Hanover stocks. By Friday, February 3, 1995, they reestablished a total short position of 176,500 shares of Hanover stocks; by February 10, 1995, the short position exceeded 473,000 shares; by the following Friday, February 17, the total short position was over

11

1,020,000 shares; and by the end of the last full week of February, and the last full week of Hanover's existence, the total short position had reached over 1,744,000 shares.

42. As a result of this continued short selling activity, Hanover attempted, unsuccessfully, to negotiate a second deal whereby it would give stock to the short sellers at a discount of $2 million, along with other concessions, in return for cessation of the short selling. By February 24, 1995, Hanover ceased operations. It was eventually placed into receivership under the Securities Investor Protection Act of 1970. After the firm ceased operations and was placed into receivership, the prices of all of the Hanover stocks fell precipitously. The court-appointed trustee reduced some of the profits to the short sellers by "buying them in" at pre-collapse prices after the short sellers were unable to make delivery of the shares upon demand of the trustee.

43. By the end of February, Falcon had total realized profits of $3,614,000 from the selling of Hanover stocks, along with an additional $4,763,000 of unrealized profits negated by the trustee's actions. Fiero Bros. had total realized profits of $1,847,000 and unrealized profits of $1,324,000. Aspen realized total profits of $707,000 (with no unrealized profits). Roddy DiPrimo, S.A., had realized profits of $980,000 and unrealized profits of $1,625,000. The retail customers of Sovereign had realized profits of approximately $159,000, and unrealized profits of over $1,000,000. Sovereign itself had realized profits of $35,000 and unrealized profits of $171,000. Other retail customers had realized profits totaling $725,000 and unrealized profits of almost $2,500,000.

44. By virtue of this conduct, Respondents Stephen Carlson, Falcon Trading Group, Inc., John Fiero, Fiero Brothers, Inc., Sovereign Equity Management Corp., and Glen Vittor engaged manipulative conduct in violation of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, and NASD Rules of Conduct 2110 and 2120.

F 002408

SECOND CAUSE OF ACTION

VIOLATIONS OF THE AFFIRMATIVE DETERMINATION REQUIREMENTS

### Violations of Conduct Rules 3370 and 2110 by all Respondents

45. The allegations set forth above in paragraphs 1-13 and 15-43 are realleged for purposes of this cause of action.

46. Conduct Rule 3370 applies specific requirements for short selling in customer and proprietary accounts. For proprietary short sales, Rule 3370(b)(2)(B), requires that the firm make an affirmative determination that the stock can be borrowed. That rule makes an exception for bona fide market making transactions, but that exception is inapplicable here. For customer short sales, Rule 3370(b)(2)(A) requires that firms undertake and document steps to ascertain whether the seller of stock will be able to deliver the shares for settlement, or whether the shares are available to be borrowed.

47. Between January 16, 1995, and February 28, 1995, as alleged more specifically in paragraphs 48-52, Aspen, Brod, Fiero Bros., Falcon, and Sovereign each engaged in proprietary short selling while not registered as market makers without making the requisite affirmative determination that they could borrow the stock. Specifically:

48. Aspen, at the direction of Respondent Carlson and through the actions of Respondent Sherman, made 2 short sales of APROU, 1 of ATOYZ, and 7 of PANXU, for a total of 10 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

49. Brod, at the direction of Respondent Iacono, made 1 short sale of EVRM, 1 of MRJY, and 2 of PLCOU, for a total of 4 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

50. Falcon, at the direction of Respondent Glen Vittor, made 10 short sales of APROU, 14 of ATOY, 4 of ATOYZ, 15 of EVRM, 21 of MRJY, 33 of PANXU, 13 of PLCOU, 9 of PLCO, 10 of PLCOW, and 19 of PMNR, for a total of 148 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

51. Fiero Bros., at the direction of John Fiero, made 3 short sales of APROU, 6 of ATOY, 2 of ATOYZ, 8 of EVRM, 1 of MRJY, 17 of PANXU, 2 of PLCOU, 4 of PLCO, 1 of PLCOW, and 7 of PMNR, for a total of 51 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

52. Sovereign, at the direction of Glen Vittor and through the actions of Greg Vittor, made 1 short sale of APROU, 1 of ATOY, 1 of ATOYZ, 1 of EVRM, 5 of MRJY, 13 of PANXU, 1 of PLCOU, 10 of PLCO, 1 of PLCOW, and 4 of PMNR, for a total of 38 violative trades, in proprietary accounts (while not registered as a market maker) without making the requisite affirmative determination.

53. In addition, as set forth in paragraphs 54-55 below, Aspen and Fiero engaged in numerous short sales in violation of the affirmative determination requirements while registered as market makers, but in transactions that were not bona fide market making transactions. Specifically:

54. Aspen, at the direction of Respondent Carlson and through the actions of Respondent Sherman, made 11 short sales of ATOY, 18 of EVRM, 11 of MRJY, 44 of PANXU, 18 of

PLCOU, 8 of PLCO, 1 of PLCOW, and 7 of PMNR, for a total of 118 violative trades, in proprietary accounts (while registered as a market maker) without making the requisite affirmative determination.

55. Fiero Bros., at the direction of John Fiero, made 26 short sales of APROU, 23 of ATOY, 1 of ATOYZ, 18 of EVRM, 22 of MRJY, 51 of PANXU, 37 of PLCOU, 17 of PLCO, and 26 of PMNR, for a total of 221 violative trades, in proprietary accounts (while registered as a market maker) without making the requisite affirmative determination.

56. Between January 11, 1995, and February 28, 1995, as set forth in paragraphs 57-58 below, two of the firms, Brod and Sovereign, engaged in short sales in customer accounts without ascertaining whether or not the customers would deliver the securities or that the securities could be borrowed for the customers' accounts. Specifically:

57. Brod, acting at the direction of Respondent Iacono, made 4 short sales of APROU, 3 of ATOY, 3 of EVRM, 4 of MRJY, 17 of PANXU, 7 of PLCOU, 2 of PLCO, and 3 of PMNR, for a total of 43 violative trades, in customer accounts without complying with the requirements of Rule 3370(b)(2)(A).

58. Sovereign, acting at the direction of Glen Vittor and through the actions of Greg Vittor, made 1 short sale of MRJY and 3 of PANXU, for a total of 4 violative trades, in customer accounts without complying with the requirements of Rule 3370(b)(2)(A).

59. By virtue of this conduct, Respondents Carlson, Falcon Trading Group, Inc., John Fiero, Fiero Brothers, Inc., Mark Iacono, Robert Sherman, Sovereign Equity Management Corp., Glen Vittor, and Greg Vittor violated NASD Conduct Rules 3370 and 2110.

THIRD CAUSE OF ACTION

FAILURE TO MARK ORDER TICKETS LONG OR SHORT

**Violations of Conduct Rules 3110
and 2110 by Respondent Iacono**

60. The allegations set forth above in paragraphs 1-13, 15-43, and 57 are realleged for purposes of this cause of action.

61. Rule 3110(b)(1) requires that order tickets contain a designation as whether each order is long or short.

62. In making the short sales for a customer described in paragraph 57 above, Iacono failed to comply with this requirement.

63. By virtue of this conduct, Iacono violated Conduct Rules 3110 and 2110.

### PRAYER FOR RELIEF

WHEREFORE, the Complainant respectfully requests:

A. Findings of fact and conclusions of law that the Respondents committed the violations charged and alleged herein;

B. An order imposing fitting sanctions upon the Respondents in accordance with NASD Procedural Rule 8310, as well as an order requiring Respondents to fully disgorge (together with interest) any and all ill-gotten gains and/or make full and complete restitution;

C. An order imposing such costs of any proceeding as are deemed fair and appropriate under the circumstances in accordance with NASD Procedural Rule 8330; and

F 002412

D. An order granting all further relief, legal or equitable, that is warranted under the circumstances.

Dated: February 6, 1998

*[signature]*
Department of Enforcement
NASD Regulation, Inc.
1801 K Street, NW
Washington, DC 20006-1500
(202) 974-2804

by: Roger B. Sherman, Esq.
Vice President and Director

Thomas B. Lawson
Chief Counsel

Jonathan I. Golomb
Senior Attorney

Of Counsel:
Rory C. Flynn, Esq.
Chief Litigation Counsel
Department of Enforcement
NASD Regulation, Inc.
1801 K Street, NW
Washington, DC 20006-1500