# EXHIBIT 19

## BEFORE THE NATIONAL ADJUDICATORY COUNCIL

### NASD

|  |  |  |
|---|---|---|
| In the Matter of | : | |
| | : | |
| Department of Enforcement, | : | <u>DECISION</u> |
| | : | |
| Complainant, | : | Complaint No. CAF980002 |
| | : | |
| vs. | : | |
| | : | |
| John Fiero | : | Dated: October 28, 2002 |
| Jersey City, NJ | : | |
| | : | |
| | : | |
| and | : | |
| | : | |
| | : | |
| Pembroke Pines, FL | : | |
| | : | |
| and | : | |
| | : | |
| Fiero Brothers, Inc. | : | |
| New York, NY, | : | |
| | : | |
| | : | |
| Respondents | : | |
| | : | |

**Firm and its president appeal findings that they, in cooperation with others, manipulated the market for certain securities and engaged in coercive conduct; and that they violated NASD's affirmative determination rule. <u>Held</u>, findings affirmed and sanctions of bar, expulsion, and fine upheld.**

### Appearances

For the Complainant Department of Enforcement: Robert L. Furst, Esq. and Jonathan I. Golomb, NASD Department of Enforcement.

For the Respondents John Fiero and Fiero Brothers, Inc.: Martin H. Kaplan and Brian D. Graifman, Gusrae, Kaplan & Bruno; Martin P. Russo, MPR Law Practice, P.C.; Lewis D. Lowenfels, Tolins & Lowenfels.

2120 and 2110. The Hearing Panel found that the Fiero Respondents committed the violations

charged. As sanctions, the Hearing Panel expelled Fiero Brothers from NASD membership, barred

Fiero from associating with any member firm in any capacity, and fined the Fiero Respondents $1

million and ordered them to pay costs in the amount of $10,809.25, jointly and severally.

## *Appearances*

Robert L. Furst, Esq., and Jonathan I. Golomb, Esq., Washington, DC, (Rory C. Flynn, Esq.,

Of Counsel) for the Department of Enforcement.

Martin P. Russo, Esq., New York, NY, for Fiero Brothers, Inc.; Martin H. Kaplan, Esq., New

York, NY, for John Fiero.

## DECISION

### I. Procedural History

The Department of Enforcement filed the Complaint in this proceeding on February 6, 1998,

naming as respondents Stephen Carlson, Falcon Trading Group, Inc., John Fiero, Fiero Brothers, Inc.,

Mark Iacono, Robert Sherman, Sovereign Equity Management Corp., Glen Vittor and Greg Vittor.

Enforcement subsequently voluntarily dismissed the Complaint as to Carlson, after determining that he

was no longer subject to NASD's jurisdiction, and entered into settlements with Iacono, Sherman and

Greg Vittor that were approved by the National Adjudicatory Council. On December 28, 1998, the

Hearing Officer issued an order holding respondents Sovereign, Falcon and Glen Vittor in default,

pursuant to Rule 9241(f), for failure to participate in a pre-hearing conference on December 16, 1998.

Thereafter, this proceeding continued to hearing as to respondents John Fiero and Fiero Brothers, Inc.

(the "Fiero Respondents").

2

The Complaint alleged that, during January and February 1995, the Fiero Respondents, along

with Carlson, Falcon, Sovereign, Glen Vittor and others not named as respondents, carried out a "bear

raid" in order to manipulate the price of 10 securities underwritten by then-NASD member Hanover

Sterling & Co., Inc., (the "Hanover Stocks"). In carrying out this bear raid, Enforcement alleged, the

Fiero Respondents violated NASD Rule 3370(b)(2)(B) by effecting short sales of the Hanover Stocks

in the firm's proprietary account without making affirmative determinations that the firm could borrow

the securities or otherwise provide for their delivery by the settlement date ("naked" short sales), and, in

cooperation with others, employed threats and coercion to extort large blocks of the Hanover Stocks

from Hanover at below market prices to cover their short positions. Enforcement alleged that the Fiero

Respondents thereby violated Section 10(b) of the Securities Exchange Act, SEC Rule 10b-5, and

NASD Rules 2120 and 2110, as well as Rule 3370.

A hearing on these charges was scheduled to commence on February 1, 1999. On January 25,

1999, however, during the final pre-hearing conference, Enforcement requested an adjournment to

which the Fiero Respondents did not object, and the Hearing Officer granted the request. After

extensive efforts to reschedule the hearing at the reasonable convenience of the parties, witnesses and

Hearing Panel members, the hearing was finally held during the period October 4 through October 14,

1999.

The hearing was before an Extended Hearing Panel that included a Hearing Officer, a former

member of the Market Regulation Committee and the District Committee for District 2, and a former

member of the District Committee for District 5.[1]  Enforcement offered the testimony of six witnesses

---

[1] The Fiero Respondents filed a motion to disqualify one member of the Extended Hearing Panel. The Hearing Officer
denied the motion in an order issued February 8, 1999.

3

and a large number of Complainant's Exhibits (CX) that were admitted in evidence.[2]  Enforcement also

offered several exhibits that were not admitted.[3]  The Fiero Respondents offered the testimony of two

witnesses and 38 Respondents' Exhibits (FB) that were admitted in evidence, as well as several that

were not admitted.[4]

At the conclusion of the hearing, a schedule was established for post-hearing filings.  The parties

(particularly Enforcement), however, requested numerous uncontested extensions of this schedule.  As a

result, the parties' final post-hearing submissions were not filed until June 15, 2000.  The Hearing Panel

subsequently reviewed the parties' submissions and the record, deliberated and made the

determinations set forth below.

## II. Facts

### A.  Introduction

As of January 1995, Hanover was an NASD member firm.  Hanover had underwritten a

number of highly speculative securities, including the 10 involved in this proceeding:  All-Pro Products,

Inc. units (APROU); American Toys, Inc. common stock (ATOY) and warrants (ATOYZ);

Environmetrics, Inc. common stock (EVRM); Mr. Jay's Fashions International, Inc. common stock

(MRJY); Panex Pharmaceutical Co., Ltd. units (PANXU); Play Co. Toys units (PLCOU), common

---

[2] Enforcement's admitted exhibits were CX 1-6; 7 A-D, H, I; 8 A-D, H, I; 9-10; 13-20; 23-26; 28; 29 A; 30; 31A; 34; 34 A; 35-41; 43-44; 46 A, C, E-M; 47 A-E; 48 C, E-H; 49 F-G, J-M; 50 A-B; 51 A, C, F; 52 A, G; 53 A-B, H-I, K, N; 54 A-B; 55 A; 56 A-B; 57 A-B; 59; 61; 65-67; 68 B, E-F, I-M, O-S, U, X, CC, FF-KK, NN, PP; 69-70; 71 A-F, H; 74-77; 78 A-E, G-P, R-T, X, AA, HH-OO, QQ, SS-TT; 79, 84 G; 89; 90 B-C, J-K, M-S; 97-98; 100-103; 108-128; 141-144; 147-188; 191-211; 215-216.  Many of Enforcement's exhibits, such as CX 1, had a number of parts, such as CX 1 A-P.  For exhibits 7-10 the first page of each part that was offered was stricken and the second page was admitted.  (Tr. 569-73.)  Except as indicated, all parts of the listed exhibits were admitted.

[3] CX 29; 31; 46 N; 58; 84 D and 213, as well as the first pages of exhibits 7-10.

[4] FB 1-3; 7-12; 16-17; 21-27; 31; 40-41; 44; 49; 51; 55-56; 107; 111; 113-114; 117; 120-124; and 134-135 were admitted. FB 118; 122 (page 1); 125; 132 and 133 were not admitted.

4

stock (PLCO) and warrants (PLCOW); and Porter McLeod National Retail, Inc. common stock
(PMNR).[5] Collectively, these securities are referred to in this Decision as the Hanover Stocks.

The charges against the Fiero Respondents concern short selling of the Hanover Stocks during
the period January and February 1995. Enforcement contends that the Fiero Respondents and others
engaged in a two stage "bear raid" against the Hanover Stocks, with the first stage ending when the
Fiero Respondents purchased large blocks of Hanover Stocks from Hanover at discounted prices and
the second stage continuing through the failure of Hanover and its clearing firm, Adler Coleman Clearing
Corp. Enforcement contends that during both stages the Fiero Respondents established large short
positions in the Hanover Stocks through naked short sales that violated Rule 3370, and that at the
conclusion of the first stage the Fiero Respondents participated in a scheme to extort Hanover Stocks
from Hanover through threats and coercion in violation of Rule 2110.

The Fiero Respondents deny these charges and also contend that Hanover was, itself, engaged
in a fraudulent scheme to manipulate the market for the Hanover Stocks, with the intention of "pumping"
the price of the Hanover Stocks to unjustifiable heights before "dumping" them on gullible purchasers.
According to the Fiero Respondents, "Hanover was controlled by a gang of outlaws that used Hanover
for their own economic benefit to the detriment of its customers, the public, other broker-dealers and
SIPC." (Fiero Respondents Post-Hearing Submission at 3.) Enforcement does not expressly challenge
these contentions, and the evidence in the record tends to support them. Therefore, for purposes of this
Decision, the Hearing Panel accepts the Fiero Respondents' contention that Hanover was engaged in

---

[5] These were all small issues ranging from 400,000 units for MRJY to slightly more than 1 million for PANXU. CX 35-
41. MRJY and APRO had IPOs in 1993; ATOY, ENVR, PMNR and Play Co. Toys had IPOs in 1994. Id.

5

the fraudulent manipulation of the Hanover Stocks. As explained below, however, the Hearing Panel does not find that to be a defense to the charges in the Complaint.

### B. The Fiero Respondents

During the relevant time, Fiero was president, sole owner and the only registered employee of Fiero Brothers.[6] (Tr. 1534, 1540.) Fiero first became employed in the securities industry in the early 1980's, and worked at a number of member firms before opening his own firm in 1990, which began under the name Fiero Securities and ultimately became Fiero Brothers. (Tr. 1538-39.) Fiero opened the firm in 1991 with $250,000 in capital from his own savings; by 1995, when the events giving rise to this proceeding occurred, the firm's capital had increased to $8-9 million, all of which had come from Fiero himself, rather than any outside investors. The firm had no retail customers. (Tr. 1540, 1562, 1568.)

Fiero explained his approach to the securities business: "I have always made markets in small cap penny stocks. ... These are the type of stocks ... pump/dump schemes, no price/earnings ratios, no reports, sometimes no financials. ... [T]his type of market is the underbelly to the over-the-counter market. ... The only way to operate in this market is through networking and knowing where to step and where not to step. ... In small cap penny stock markets, information is key and intelligence is key." (Tr. 1540-42.)

As of the first quarter of 1995, Fiero Brothers made markets in 50-60 small cap stocks. As a general matter, Fiero thought "the penny stock market [was] very treacherous" and that "the short side has more rewards at the end of the day," because "[n]inety-eight percent of those securities are

---

[6] There are no "brothers" involved in the firm; Fiero simply chose the name because he thought it "had a nice ring." (Tr. 1539.)

6

schemes" in which "the motive is to levitate the securities to unjustifiable prices." He viewed "[b]uy ins [as] an ordinary course of business" that are "pretty much a bookkeeping function" because "a lot of times these issues have artificial demand on artificial supplies where many times ... the clearing firm [and] the sponsoring broker-dealer ... [would] actually be hand in hand and restricting or interfering with the flow of supply in these stocks." (Tr. 1543-46.)

C.  Other Alleged Participants in the Bear Raid

Enforcement contends that a number of other individuals and entities were also involved in the alleged bear raid. Stephen Carlson was originally named as a respondent in this proceeding, but Enforcement dismissed the Complaint as to him when it determined that he was no longer subject to NASD jurisdiction. Carlson owned former NASD member firm Aspen Capital Group, Inc. In 1997, the National Business Conduct Committee (NBCC) barred Carlson from associating with any member firm, in any capacity, for attempting to obtain stock at below-market prices through the use of threats and coercion in June 1994, approximately six months before the events in this proceeding. District Business Conduct Committee for District No. 3 v. Aspen Capital Group, Inc., Complaint No. C3A940064, 1997 NASD Discip. LEXIS 53 (NBCC Sept. 19, 1997), aff'd, Exchange Act Release No. 40672, 1998 SEC LEXIS 2463 (Nov. 12, 1998).

Respondents Falcon Trading Group and Sovereign Equity Management are both former NASD member firms that operated out of adjacent offices in Boca Raton, Florida. Respondent Glen Vittor was the sole registered principal of both firms, and, ostensibly, was sole owner of Sovereign and part owner of Falcon, along with a number of limited partners including Tally Group, Ltd. and Rocena, Ltd., Bahamian entities that shared the same Bahamas post office box address. (CX 74 at 3969-70.) On March 1, 1995, the NBCC issued a decision in which it found that Glen Vittor and Falcon violated

7

NASD Rules by failing to honor trade commitments and by allowing a person whose registration had

been revoked (Philip Gurian, discussed below) to act in an improper capacity at Falcon. The NBCC

censured, suspended and fined Falcon, and it censured and fined Glen Vittor, suspended him in all

capacities for one year, and barred him in all principal capacities. Market Surveillance Committee v.

Falcon Trading Group, Ltd., et al., Complaint No. CMS940010, 1995 NASD Discip. LEXIS 238

(NBCC Mar. 1, 1995), aff'd, Exch. Act Rel. No. 36619, 1995 SEC LEXIS 3454 (Dec. 21, 1995),

aff'd, 102 F.3d 579 (D.C. Cir. 1996).

Philip Gurian, although not a respondent, occupies a central role in this proceeding. Gurian's

registration as a general securities representative was revoked in August 1991 for failure to pay a fine

imposed in a prior disciplinary proceeding. In Falcon Trading Group, however, in which Gurian was a

respondent, the NBCC found that "the record demonstrates that Gurian was acting in an improper

capacity at Falcon during a period when his registration was revoked." The NBCC therefore barred

Gurian from associating with any member firm in any capacity.

The record in this case establishes that Gurian also acted in an improper capacity at both Falcon

and Sovereign during the period relevant to this proceeding, after the 1991 revocation of his registration.

John Moran, Enforcement's witness, testified that he visited Gurian in the offices of Sovereign and

Falcon where Gurian was sitting at the trading desk, talking on the telephone and executing orders.

Moran testified that Glen Vittor was merely a rubber stamp for Gurian; that Gurian told Moran he

controlled Falcon; and that Gurian negotiated an underwriting commitment on behalf of Sovereign and

also negotiated to sell Sovereign in late 1994. (Tr. 816-824.) Fiero, himself, testified that Gurian was

at the offices of Falcon and Sovereign "a lot" during the relevant period and that Gurian would

8

"sometimes" answer the trading phones when Fiero called, although Fiero could not "recall" actually

placing trades though Gurian. (Tr. 1834.)

Enforcement also contends that several securities accounts in the names of entities or individuals

involved with Gurian were employed in the alleged bear raid. These include, most notably, an account

at A.T. Brod & Co. in the name of Roddy DiPrimo, Ltd., a Bahamian entity, which was opened and

serviced by respondent Mark Iacono, a trader at Brod. According to Brod's records, DiPrimo's

address was the same Bahamas post office box used by Falcon limited partners Tally and Rocena.[7]

(CX 46A.)

D. The Bear Raid

1. The First Stage

There is no genuine dispute regarding the actual short sales of the Hanover Stocks, which are

established by trading records. Between January 19, 1995 and January 26, 1995, the first stage of the

alleged bear raid, Fiero Brothers established substantial short positions in seven Hanover Stocks.

During the same period, other participants in the alleged bear raid also established substantial short

positions in the same Hanover Stocks.

On January 19, when it first registered as a market maker in the Hanover Stocks, Fiero

Brothers had a short position in only one Hanover Stock of (7,000) securities[8] valued at approximately

($80,000), but by the end of the day on January 25, it had built an aggregate short position in seven

---

[7] Enforcement also contends that accounts at Sovereign in the names of Tally and Rocena, the Bahamas based
limited partners in Falcon; RA, a Bahamian individual who had the same post office box address as DiPrimo, Tally and
Rocena; and VM and AK, two friends of Gurian, were employed as short selling vehicles in the bear raid. (CX 89, 74
at 3991, 3993, 4004.)

[8] The term "securities" is used to reflect that some of the Hanover Stocks were units or warrants, rather than shares.
Throughout this Decision, short positions are shown in parentheses for clarity.

9

Hanover Stocks totaling approximately (105,000) securities with a value of approximately ($1.2

million). Falcon established a short position of (11,475) securities, valued at approximately ($218,000)

in one Hanover Stock as of January 16, but by January 25 it had established short positions in the same

seven Hanover Stocks shorted by Fiero Brothers totaling approximately (232,000) securities with a

value of approximately ($2.9 million).[9]  As of January 16, the DiPrimo account had short positions in

three Hanover Stocks totaling (15,000) securities worth approximately ($251,000), but by January 25

the DiPrimo account had short positions in the same seven Hanover Stocks totaling (143,000) securities

with a value of approximately ($1.8 million).[10]

There is also no dispute that on January 26 and 27, 1995, Fiero Brothers purchased large

blocks of the seven Hanover Stocks in which it had short positions from Hanover at prices well below

the then-current inside bid. And there is no dispute that Fiero Brothers used the stock to fill its own

short positions and sold the rest, primarily to the alleged participants in the bear raid to fill their short

positions.

The dispute is whether these short sales, block purchases and resales were part of a

coordinated, manipulative bear raid, as Enforcement contends, or represented legitimate market activity,

---

[9] Iacono testified he opened the DiPrimo account on January 11, 1995, based on a call he received from someone who identified himself as "Roddy Simon," but did not explain where he had gotten Iacono's name or why he called Brod. On the new account form, Iacono indicated the account was a "referral," but Iacono testified that was a mistake. (Tr. 1146-47, 1151-55, CX 46A.) Iacono charged DiPrimo just $50 per trade, Brod's minimum commission, of which he received just $25. (Tr. 1170-71.) Between January 11 and February 28, Iacono effected 54 trades in the DiPrimo account representing a total value of approximately $11 million for total commissions of $2,700, or a commission rate of .02%. (CX 46C.) Iacono worked with Fiero (Tr. 1140), worked at Sovereign after Brod (Tr. 1144) and discussed his testimony with Fiero before the hearing (Tr. 1146). The Hearing Panel did not find Iacono to be a credible witness.

[10] The other alleged participants in the bear raid established smaller short positions in the Hanover Stocks during the same period. Tally had a short position of (25,000) in ATOYZ, Rocena had a short position of (30,000) in MRJY and VM had a short position in three Hanover Securities valued at ($844,686). (CX 5, 49J, 48H, 52G, 89 at 99-100, 110-113.)

10

as the Fiero Respondents argue. Resolution of that dispute requires careful examination of the evidence concerning the surrounding circumstances.[11]

a. Moran's Testimony

Enforcement's chief fact witness was John Moran. During the course of his testimony, Moran cheerfully admitted that he has been convicted of securities fraud and that the SEC has barred him from the securities industry. He is now president of Blackmore Group, a firm he describes as a "consultant/investment banker" that does "mergers and acquisitions." (Tr. 810-12.) According to Moran, he became involved in the relevant events in January 1995, after he proposed that Hanover underwrite an initial public offering for one of his clients, Sea Bright Foods. Moran testified that Hanover agreed to take Sea Bright public, but went out of business before that occurred. (Tr. 813-14.)

Moran testified that the Sea Bright IPO was supposed to follow Hanover's initial public offering of Panex Pharmaceutical (PANXU) in January 1995. At the time of the PANXU IPO, however, Hanover asked Moran for help to protect its capital position – capital Hanover would need for the Sea Bright IPO. Hanover's capital relied heavily on the value of the Hanover Stocks, and those stocks were under substantial pressure from short selling. Moran, wanting to protect Hanover's ability to complete the planned Sea Bright IPO, agreed to help. (Tr. 825-27.)

Moran contacted Fiero and asked him to become a market maker in the Hanover Stocks. Moran testified he believed if Fiero, who was a well known short seller, supported the Hanover Stocks, that would discourage other short sellers. Moran called Fiero during the week of January 16, 1995,

---

[11] "Proof of manipulation almost always depends on inferences drawn from a mass of factual detail. Findings must be gleaned from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with free market forces." In re Pagel, Inc., 48 S.E.C. 223, 226 (1985), aff'd, 803 F.2d 942 (5th Cir. 1986).

11

and arranged for Fiero to receive financial statements for the Hanover Stocks. (FB 55.) Fiero Brothers

registered as a market maker for a number of Hanover Stocks on January 19, 1995, and registered as a

market maker for PANXU on January 23.[12]  (Tr. 831-32; CX 34.)

On Friday, January 20, 1995, at approximately 12:30 p.m., CNBC broadcast a report by Dan

Dorfman discussing the Hanover Stocks. In his report, Dorfman talked about PANXU, noting that it

had gone public on January 18 at $5 per unit and immediately shot up to $23 per unit. Dorfman stated

that the company's business was to develop "pharmaceutical products from plants with a history of

medicinal use. It's losing, get this now, it's losing money, has no revenues, its research team was just

put together. The prospectus shows it needs substantial additional financing to develop commercially

feasible products; that's above the recent money raised in the offering." Dorfman continued: "The

company also says, get this now, there is substantial doubt about its ability to continue as a going

concern. The underwriter is Hanover Sterling, a brokerage firm that's under an S.E.C. investigation.

Now Steve Carlson, a money manager who shorted the stock, alleges that he was at one time

threatened by an official of the brokerage firm. That official, by the way, through an attorney, denies it.

Carlson in any case rates this stock a joke, as well as two other Hanover Sterling offerings - Mr. Jay

Fashion [MRJY], and Environmetrics [EVRM]. Panex, by the way, declined comment." (CX 44.)

After Dorfman's report, short selling pressure on the Hanover Stocks increased dramatically

and the price of several, including PANXU, dropped precipitously. Moran testified that in an effort to

help Hanover work out an arrangement to halt the short selling pressure on the Hanover Stocks, he

---

[12] Fiero attempted to register as a market maker in PANXU on January 18, the day it went public, but was not allowed
to do so. (CX 69 at 3677, CX 152 at 5265.)

12

placed a call to Carlson, to whom Dorfman had referred in his report. Moran said he "knew" Carlson must be involved in the short selling. (Tr. 833-36.)

Moran did not speak to Carlson, but left a message. "Within minutes," Moran said, he received a telephone call from Gurian. Moran testified that, when Gurian called him, Gurian said "he had heard about [the short-selling, but] wasn't personally involved. … He said the way to handle this was not … for me to call Carlson [but, instead, Gurian] as a favor to me … would call Carlson." (Tr. 837-38.) According to Moran, this was consistent with a historical pattern in which "stock would get shorted and then there would be a mediator to come in and negotiate … so the shorts would go away." (Tr. 839.) Gurian proposed that Hanover sell blocks of the Hanover Stocks at discounted prices so the short sellers could fill their short positions at a substantial profit. Gurian asked whether Hanover would be prepared to sell 50,000 share blocks of each of the Hanover Stocks at 1/2 point below the bid to halt the short selling. (Tr. 840-41.)

Moran testified that he spoke to Hanover about Gurian's offer, but initially Hanover "had no interest." (Tr. 842.) During the following week, however, Moran continued to talk to Gurian and Hanover separately, and eventually Gurian and Hanover discussed the matter directly with each other. Moran heard from both sides that "the deal was consummated." Moran testified that he knew the deal involved the sale of blocks of Hanover Stocks at specified prices, but did not know the specific amounts or prices. Moran said he did know, however, that "everything was going to flow through Carlson because he was still out there as the stalking horse of the shorts." (Tr. 853-54.)

Moran testified that prior to consummation of the deal, he received a call from Fiero during the evening of January 25, 1995. According to Moran, Fiero proposed "that we broker the trade through he, John Fiero, beat Carlson out of it, leave him short, hanging him out and everybody else will be

13

gone." Fiero told Moran that a particular person, acting through NASD member firm Mitchum, Jones & Templeton, Inc., which was registered as a market maker in the Hanover Stocks, was the largest short seller.[13] Fiero said he had talked to that person, who represented "blue chip guys" who would "go off the box after they were filled." Moran understood from this that, once the deal was completed, the short selling would stop and those market makers in the Hanover Stocks who were involved in the short selling would withdraw as market makers. According to Moran, "I didn't care. I didn't know Carlson. I knew [Fiero]. [Fiero] was helpful to me. I'd rather give it to him than give it [to] Carlson." So, Moran said, he called Robert Catoggio, of Hanover, who "hated Carlson, too," and "the next day the trade was, in fact, run through [Fiero]." (Tr. 857-60.)

### b. Catoggio's Evidence

The record also includes portions of an interview of Catoggio by NASD investigators in May 1995. (CX 98.) Catoggio was not available to testify in person at the hearing because he is in federal prison, for unspecified crimes. (Tr. 959.) Catoggio described himself as just a "trader/account executive" at Hanover during the relevant period, but he also stated that he and Roy Ageloff, of Hanover, were the two people at Hanover who were informed of Hanover's profit and loss on a daily basis. (CX 98 at 5653, 5658.) Moran and Fiero both testified that Catoggio, along with Ageloff, took the lead for Hanover in the relevant events. Moran testified that Lowell Schatzer, who Catoggio testified owned 88 percent of Hanover, "was largely paralyzed." (Tr. 931.) Catoggio testified that

---

[13] The DiPrimo account made three short sales of Hanover Stocks, totaling (15,000) securities, on January 11, the day the account was opened, all of which were effected through Mitchum Jones. (CX 4.) Falcon also shorted to Mitchum Jones. (CX 3.) As described below, the evidence also shows that Fiero engaged in lengthy, late night conversations during the relevant period with Rob Hoffman, a trader at Mitchum Jones who previously worked for Carlson at Aspen. Moran testified that Fiero did not identify Hoffman, but someone else at Mitchum Jones, as behind the short selling.

14

Schatzer gave him full authority to work out an arrangement with the short sellers. (CX 98 at 5659, 5693.)

Catoggio testified that Hanover's capital position had been seriously threatened as a result of the short selling pressure on the Hanover Stocks. He confirmed that Moran brought the Sea Bright deal to Hanover, and that Hanover planned to make Sea Bright its next IPO, but the pressure on Hanover's capital from short selling threatened this plan. Catoggio testified that Moran "did some research," learned Gurian was involved in the short selling, and referred Gurian to Catoggio "to try to solve the problem." (CX 98 at 5671.) Catoggio said Gurian called him, told Catoggio he knew who was shorting the Hanover Stocks, and offered to "play the middle and work out a deal where they would stop shorting" the Hanover Stocks. (CX 98 at 5672.)

Catoggio testified Gurian wanted $12-13 million worth of Hanover Stocks at specific below-market prices that would allow the short-sellers to make a profit of $800,000 to $900,000. Gurian "was supposedly being the middleman for the shorts," but Catoggio "knew damn well it was him." (CX 98 at 5674.) Catoggio testified that he and Gurian did not negotiate precise amounts of the Hanover Stocks that Hanover would sell, because Catoggio understood the amounts would be whatever the short sellers needed to cover their positions, but they did negotiate specific below-market prices for the Hanover Stocks and discussed how the trades would be done. (CX 98 at 5676.) In contrast to Moran's testimony, according to Catoggio, Gurian proposed that the trades be done through Fiero, and there was no discussion between Catoggio and Gurian about effecting the trades through some other broker-dealer. (CX 98 at 5677.)

Catoggio testified Hanover agreed to Gurian's demands in order to halt the short selling. Catoggio understood from Gurian that if he did not agree, the short selling would continue, and "the

15

shorts always win." In contrast, if Hanover agreed, the short selling would stop. In addition, the firms involved in the short selling that were registered as market makers in the Hanover Stocks, which Catoggio understood included Mitchum Jones, would withdraw as market makers. (CX 98 at 5672-74, 5680-81, 5690-91, 5694, 5698, 5701-02, 5705-06, 5734-35.)

Catoggio testified that on January 26 and 27, Fiero placed orders for the Hanover Stocks on the terms that Catoggio and Gurian had agreed upon on January 25, and Hanover filled the orders. Fiero told Catoggio that Fiero Brothers was not short the full amount of the Hanover Stock he was buying, but he "would be selling it to other brokerage houses and would only be making a 16th or an eighth for this off every trade." (CX 98 at 5683-89, 5691, 5722.) Catoggio testified that Hanover agreed to fill Fiero's orders because "we were extorted." (CX 98 at 5712-18.)

### c. Fiero's Testimony

During the course of their investigation, the NASD staff interviewed Fiero on May 30, 1995, approximately four months after the events in question. In response to the staff's questions at that time, Fiero could recall he was a market maker in some of the Hanover Stocks at the time of the Dorfman report, but in response to both general questions and questions about specific Hanover Stocks, Fiero could not recall why he became a market maker. And when asked whether he spoke to anyone outside of Fiero Brothers about becoming a market maker in the Hanover Securities, Fiero could recall only that it was "possible" he did so. At that time, Fiero could not think of any documents that might refresh his recollection on those topics. During his testimony, Fiero first stated he could not recall employing any particular investment strategy when he became a market maker in the Hanover Stocks, and later stated affirmatively, "I did not have a strategy." Fiero recalled the Dorfman report generally, but could

16

not recall what Dorfman said about the Hanover Stocks or whether he mentioned any particular

Hanover Stocks. (CX 69.)

The NASD staff interviewed Fiero again in September 1996, more than three years before the

hearing. During that interview, Fiero testified that he could not recall why his firm went short in APRO

on January 20, 1995, or why Fiero Brothers maintained and increased its short position in APRO

between January 20 and January 26. Similarly, he could not recall why Fiero Brothers went short in

ATOY on January 20, or what his trading strategy had been. He also could not recall why Fiero

Brothers established short positions in EVRM, MRJY, PANXU, or PLCO. He had no recollection of

his investment strategy with regard to these Hanover Stocks, and specifically could not recall any

investment strategies that led him to take short positions in the Hanover Stocks on January 20 or to

increase those short positions through January 25. (CX 70.)

By the time of the hearing, however, Fiero's claimed recollection of the events in question had

improved dramatically. With regard to his decision to become a market maker in the Hanover Stocks,

Fiero recalled at the hearing that Moran called him during the week of January 16 and asked him to

become a market maker supporting the Hanover Stocks. He also recalled that he agreed to become a

market maker based on the strategy that, although the stocks were overpriced, he could make money

by limiting his risk and working in a manner friendly to Hanover. (Tr. 1555-1558.) He became a

market maker in a number of Hanover Stocks on January 19. (Tr. 1564; CX 34.)

At the hearing, "[a]fter refreshing my memory with some of those documents here and reports

and stuff," Fiero remembered hearing the Dorfman report on January 20 and remembered that after the

17

Dorfman report Hanover stopped making markets in the Hanover Stocks, which led to "complete chaos."[14] (Tr. 1564-66.)

In contrast to his investigative testimony, at the hearing Fiero recalled a "strategy" in effecting short sales in the Hanover Stocks after the Dorfman report, claiming they were intended to help create an orderly market in those securities under the circumstances. (Tr. 1564-67, 1572, 1633-34.) Fiero also testified that after January 20 he was "getting my brains kicked in on these stocks" and "facing losses into the six figures" as a result of his market making in the Hanover Stocks. But on January 23, the first trading day after the Dorfman report, Fiero registered as a market maker in yet another Hanover Stock, PANXU. (Tr. 1559, 1573; CX 34.)

Again in contrast to his investigative testimony, at the hearing Fiero recalled that during this period he heard Moran was looking to sell stock at discounted prices on behalf of Hanover and that, at the time, he believed Moran was doing so in order to improve Hanover's liquidity. At the hearing, Fiero recalled that his "intelligence" reported to him that the sale was going to be made through Carlson, so on January 25, he called Moran, who Fiero knew hated Carlson, and said, "[W]hat about me? ... [L]et me broker the trades." (Tr. 1578-81.) At the hearing, Fiero recalled that Moran indicated he would rather Fiero make money on the trades than Carlson; Moran did not care who was long or short in the Hanover Stocks, he just wanted Hanover to have enough liquidity to close the Sea Bright deal. (Tr. 1582-84.)

According to Fiero's testimony at the hearing, it was not until the next morning, January 26, that he began making calls to and receiving calls from people who might be interested in buying the Hanover

---

[14] After the Dorfman report, the NASD received calls indicating that Hanover was not answering its trading phones, and unable to contact Hanover, suspended its market maker status. Once the NASD was able to contact Hanover

Stocks he planned to purchase. Before making the trades with Hanover that afternoon, he identified as prospective purchasers Falcon, which was not registered as a market maker, the DiPrimo account at Brod, which was not registered as a market maker, Midland Walwyn, a Canadian firm that was not a market maker, but at which Gurian's friend AK had an account that was short (22,500) Hanover Stocks, as well as others with substantial short positions in the Hanover Stocks. According to Fiero, Moran gave him the identities of firms that were short Hanover Stocks, including Falcon, Sovereign, and Mitchum Jones. Until Moran told him, he did not know that Falcon was short Hanover Stocks. (Tr. 1844-45.)

Fiero testified he obtained expressions of interest from these potential purchasers and "a general feeling" about how much Hanover Stock he should buy, but had no firm commitments to purchase specific amounts of the Hanover Stocks at specific prices. He also testified that, prior to the purchases, he had no agreement with Hanover as to specific prices that Hanover would charge for the Hanover Stocks, but that Moran had given him "comfort" that he could purchase for 10-15% below the inside bid. (Tr. 1584-86.)[15]

d. The Outcome of the First Stage

In summary, Fiero testified at the hearing that he had little warning of the transactions, no clear agreement as to the price Hanover would charge and no firm commitments from purchasers

---

later on January 20, Hanover was approved to continue as a market maker. (Tr. 585-87.)

[15] Although at the hearing Fiero recalled many more self-serving facts than he had during his investigative testimony, his recollection remained vague concerning his interactions with Gurian during the relevant period. He admitted he spoke to Gurian about Moran, but could not recall what Gurian said. He did not deny, but could not recall, knowing that Gurian was looking for Hanover Stocks, and did not deny, but could not recall, that Gurian indicated specific prices or amounts of stock that Hanover would be willing to sell Fiero. (Tr. 1828-30.)

19

to repurchase the Hanover Stocks from him. Nevertheless, Fiero admits that on January 26 and 27 he

placed orders for, and purchased, a total of 974,000 Hanover Stocks from Hanover for a total of

approximately $12.1 million, representing a total discount of $866,500 below the inside bid (roughly the

amount of stock and discount that Catoggio claimed Gurian demanded). (CX 14.) In making these

purchases, Fiero committed more than Fiero Brothers' entire $8-9 million net worth to Hanover Stocks

that Fiero viewed as overpriced, as a result of manipulation by Hanover, and which he knew had been

under constant pressure from short sellers. (Tr. 1558, 1562, 1564, 1574, 1578.)

Hanover accepted each of Fiero Brothers' below-market offers for the Hanover Securities in

the amounts and for the prices that Fiero offered. Fiero used his purchases to cover nearly all Fiero

Brothers' short positions, which totaled approximately (162,440) securities and successfully resold the

balance of each Hanover Stock, primarily to Falcon and DiPrimo. Fiero Brothers sold 372,200

Hanover Stocks to Falcon at a total price of over $4.8 million, representing a discount of almost

$138,000 from the inside bid, and 245,000 Hanover Stocks to Brod for the Roddy DiPrimo account

for a total of more than $3.2 million, representing a discount from the inside bid of more than

$100,000.[16] He sold all his excess Hanover Stocks almost immediately after, and in some cases even

before, he completed the purchases from Hanover.[17]  (CX 2.)

---

[16] Fiero sold the balance of the Hanover Stocks to other purchasers who held short positions, including 24,300 to Mitchum Jones to cover that firm's short positions; 54,000 to Midland Walwyn, which included 22,500 to cover the short position of Gurian's friend AK; and 25,000 to Sovereign to cover Tally's short position. Apart from the sales to Falcon and Brod (for DiPrimo), Fiero generally charged the current market price for the Hanover Stocks. (CX 2, 5, 18, 49J and 53B.)

[17] According to Fiero: "I would have some type of bid, the shares and price of what those firms are willing to pay. ... That is an indication of interest. I figure what I need. I call Hanover Sterling say, whoever answers the phone, I will pay XYZ and a half, say, for a hundred thousand [shares]. John, I sold you a hundred thousand. Than[k] you [very] much. Very passive, go back to the other side, I call them up, I say sold you XYZ at X price. That would be it. ... I don't recall that being negotiated as far as what are you looking to pay, not pay. The majority, there wasn't squeezing going on." (Tr. 1843-44.)

20

By the end of January 27, Fiero Brothers was flat in the Hanover Stocks, with the exception of long positions of 1,000 PANXU and 75 ATOYZ and a short position of (3,700) PLCOU, after having been short a total of (162,440) Hanover Stocks on January 26 prior to the purchases from Hanover. Falcon's position was flat in all the Hanover Stocks after having been short a total of (272,250) Hanover Stocks on January 26 prior to Fiero's purchases; DiPrimo was flat in all the Hanover Stocks, except for a long position of 3,500 PMNR, after having been short a total of (183,500) Hanover Stocks on January 26. (CX 3, 4.) The Fiero Respondents made more than $550,000 in covering their short positions and reselling the balance; Falcon made nearly $700,000 in covering its short position; the Roddy DiPrimo account made nearly $500,000.

The Fiero Respondents completed the block purchases and the resales of ATOY, EVRM, MRJY, PANXU, PLCOU and PMNR on January 26 and Fiero Brothers withdrew as a market maker in those Hanover Stocks the following morning. The Fiero Respondents completed the purchases and resales of APROU on the morning of January 27 and Fiero Brothers immediately withdrew as a market maker in that Hanover Stock as well. Mitchum Jones also withdrew as a market maker in the Hanover Stocks on January 26 and 27. (CX 34.)

2. The Second Stage

Almost immediately, the Fiero Respondents and other participants in the alleged bear raid began short selling the Hanover Stocks again. These short sellers established large short positions in the Hanover Stocks between January 27 and February 24, when Hanover went out of business. Even after Hanover failed, they continued to build their short positions.

Fiero Brothers increased its aggregate short position value in the Hanover Stocks from ($54,356) on January 27 to ($119,756) as of January 30, ($486,400) as of February 3, ($1,027,041)

21

as of February 8, ($2,002,103) as of February 15, and ($3,233,945) as of February 23. (CX 2.)
During the same period, Falcon built an aggregate short position in the Hanover Stocks that grew to
($7,634,643) as of February 23; the DiPrimo account's short position grew to ($1,603,481) by
February 23; and Sovereign, which had not had any position in the Hanover Stocks until February 16,
had a short position of ($226,438) as of February 23. (CX 3, 4.)

Fiero testified that on February 13 Ageloff, of Hanover, visited him in his office and that, as a
result of the visit, he felt threatened about his short selling activities. (Tr. 1603-12.) But Fiero continued
to sell the Hanover Stocks short. Moran testified that around this time Gurian told him that Hanover
had threatened his friend Fiero, and that Gurian was "declaring himself" in response. Falcon and
Sovereign then began to increase their short selling, and began shorting directly to Hanover. (Tr. 872-
75; CX 3, 5.)

As the short positions in Hanover Stocks grew, Catoggio testified that he tried to make another
deal with Gurian to stop the short selling and save Hanover. After some negotiations, however, Gurian
told him that he could make more money if Hanover went out of business. (CX 98 at 5725-32.)

Hanover did go out of business on Friday, February 24, 1995 and Adler Coleman Clearing
Corp., Hanover's clearing firm, went out of business the following Monday, February 27. (Tr. 597-98,
607-09; CX 43.) On February 24, Fiero Brothers registered again as a market maker in the Hanover
Stocks, and continued its short sales of those securities.

The price of the Hanover Stocks dropped after Hanover failed and they have retained little or
no value since then. (FB 3, 9, 12, 17, 22, 26, 31.) The Security Investors Protection Corporation
(SIPC) appointed a trustee for Adler Coleman, who bought in the various short positions, including
Fiero Brothers' positions. Litigation ensued, and is continuing, between the trustee and various short

22

sellers, including Fiero Brothers, regarding the buy-ins, but that litigation is not directly relevant to the
resolution of this proceeding.

## III. Discussion

There is no dispute that the Fiero Respondents engaged in substantial short selling of the
Hanover Stocks. Short selling – even substantial short selling – is not, however, per se unlawful or a
violation of NASD Rules. On the contrary, as explained by Irving M. Pollack in his NASD-
commissioned study, Short-Sale Regulation of NASDAQ Securities (1986), short selling may
contribute to a number of important market functions. For example, market makers may employ short
sales to provide market liquidity. Similarly, short selling that reflects the seller's belief, based on public
information, that a particular stock is over-priced in the market tends to increase the market's
responsiveness, and to moderate wide swings in market prices.

Short selling also may be employed, however, as an element of a scheme to fraudulently
manipulate the market. This type of manipulation, often referred to as a bear raid, is characterized by
short-selling plus improper tactics by the short-sellers to drive down the price of the securities they have
sold short. See Short-Sale Regulation of NASDAQ Securities at 15.

In this case, Enforcement charges that the Fiero Respondents employed two improper tactics
during their short selling of the Hanover Stocks. First, Enforcement alleges that the Fiero Respondents
failed to comply with the "affirmative determination" requirements in NASD Rule 3370; second,
Enforcement contends that the Fiero Respondents cooperated with others in extorting Hanover Stocks
from Hanover to cover their short positions, in violation of Rule 2110. Because the Fiero Respondents
employed these tactics, Enforcement argues, their short selling amounted to market manipulation and
they violated Section 10(b) of the Exchange Act, SEC Rule 10b-5 and NASD Rules 2120 and 2110.

23

The Hearing Panel will begin its analysis of the manipulation charge by addressing

Enforcement's affirmative determination and extortion arguments.[18]

A. Affirmative Determination Violations

· Rule 3370(b)(2)(B) provides: "No member shall effect a 'short' sale for its own account in any

security unless the member … makes an affirmative determination that the member can borrow the

securities or otherwise provide for delivery of the securities by the settlement date." The affirmative

determination requirement prevents "naked" short selling by those who do not have, and have no

intention of delivering, the stock they are selling. The Fiero Respondents contend that they were exempt

from this requirement during the first stage of the alleged bear raid, from January 20 through January 27,

1995, when Fiero Brothers was a market maker in the Hanover Stocks, and that they complied with it

during the second stage of the alleged bear raid, from January 27 through February 23, 1995, when

Fiero Brothers was not a market maker.

1. The First Stage

Fiero admits that he did not make any affirmative determinations in connection with Fiero

Brothers' short sales of the Hanover Stocks during the period January 19 through January 27. (Tr.

1798-99.) The Fiero Respondents argue, however, that, because Fiero Brothers was registered as a

market maker in the Hanover Stocks during this period, they were exempt from the affirmative

determination requirement, based on the following provision of Rule 3370(b)(2)(B): "This requirement

will not apply to bona fide market making transactions by a member in securities in which it is registered

---

[18] In the Complaint, Enforcement also alleged that the Fiero Respondents participated in the dissemination of adverse
information through the Dorfman report. In its post-hearing memorandum, however, Enforcement does not argue this
point. Enforcement failed to prove that the Fiero Respondents had a role in inducing Dorfman to broadcast his report
on the Hanover Stocks, and, more important, failed to prove that Dorfman said anything about Hanover or the

24

as a Nasdaq market maker" (emphasis added). Enforcement, on the other hand, argues that this

market maker exemption is inapplicable because Fiero Brothers' short sales were not bona fide market

making transactions. The Hearing Panel agrees with Enforcement.

A review of the history of the market maker exemption establishes that it was not intended to

give market makers carte blanche to engage in naked speculative short selling, but rather to give market

makers freedom to effect short sales when required to provide market liquidity. The "Prompt Receipt

and Delivery of Securities" provisions now found in Rule 3370 were originally set forth in an NASD

Board of Governors Interpretation. In 1989, the NASD proposed amending this Interpretation to

impose, for the first time, an "affirmative determination" requirement on member firms in order "to

address unnecessary speculation in connection with the short selling of broker-dealers' proprietary

positions caused by the members' ability to go short without securities to cover the short position."

Exchange Act Release No. 26746, 1989 SEC LEXIS 713 (April 20, 1989). The NASD included the

market maker exemption in the proposed amendment, but when it approved the amendment the SEC

advised that it "expect[ed] the NASD to monitor closely the use of the exemption for bona fide market

making transactions …." Exchange Act Release No. 28186, 1990 SEC LEXIS 2713 (July 5, 1990).

In 1993, the SEC revisited the market maker exemption, and announced: "The Commission believes

that for the qualifier 'bona fide' to have any substance, it must mean more than the fact that the

transactions in the account are effected in a market making account. At a bare minimum, to qualify for

the exception, a market maker's short selling activity must be reasonably related to its market making

---

Hanover Stocks that was false or misleading. See Olympia Brewing Co. Securities Litigation, 613 F. Supp. 1286 , 1294
(N.D. Ill. 1985).

activities." Exchange Act Release No. 32632, 1993 SEC LEXIS 1775 (July 14, 1993) (emphasis added).

In August 1994, the NASD issued Notice to Members 94-68, advising the membership of the adoption of the Short Sale Rule for Nasdaq National Market securities, currently set forth in Rule 3350. In the Notice, the NASD also advised member firms that the Board of Governors had issued three additional Interpretations, one of which, currently set forth as IM-3350, explained that "bona fide market making activity would exclude activity that is related to speculative selling strategies of the member or investment decisions of the firm and is disproportionate to the usual market making patterns or practices of the member in that security. The Association does not anticipate that a firm could properly take advantage of its market maker exemption to effectuate such speculative or investment short selling decisions. Disproportionate short selling in a market making account to effectuate such strategies will be viewed by the Association as inappropriate activity that does not represent bona fide market making" (emphasis added). Although this Interpretation applies expressly to short selling of Nasdaq National Market securities, the Hearing Panel finds that the standards set forth in the Interpretation are equally applicable to the market maker exemption in Rule 3370.

Applying these standards, the Hearing Panel concludes that the Fiero Respondents are not entitled to the market maker exemption for Fiero Brothers' short sales of Hanover Stocks during the period January 20 through January 27, 1995, even though Fiero Brothers was registered as a market maker. Fiero Brothers' short sales during this period did not represent bona fide market making transactions, but rather were designed to carry out Fiero's speculative strategies.

Fiero did not register as a market maker in the Hanover Stocks until January 19, and had not established any "usual market making patterns or practices" as of January 20, when Fiero began

26

substantial short selling of the Hanover Stocks after the Dorfman report was broadcast. By the end of

that day, however, Fiero Brothers had an aggregate short position in the Hanover Stocks of nearly

($577,000). Fiero Brothers' aggregate short position increased to approximately ($660,000) on

January 23, the next trading day; to approximately ($1.2 million) on January 24; and to ($1,213,205)

on January 25. On January 26, before executing the block purchases of discounted stock from

Hanover, Fiero Brothers increased its short position in PANXU from ($133,110) to ($663,188), and

its short position in PLCO from ($396,275) to ($784,550). Fiero Brothers then filled these positions

with the discounted stock it obtained from Hanover.

As explained above, in May 1995, Fiero testified he "did not have a strategy" with respect to

shorting the Hanover Stocks. In contrast, at the hearing more than four years later he claimed his short

selling after January 20 occurred because he was "anticipating a second wave of selling [so he] was

selling short as a market maker into the rise of the price." (Tr. 1634.)

The Hearing Panel rejects this explanation. In light of Fiero's testimony in May 1995 and

subsequently during the course of NASD's investigation, and having had an opportunity to observe

Fiero as he offered this explanation at the hearing, the Panel concludes that Fiero simply concocted this

explanation in order to try to justify his activities.[19] The Hearing Panel concludes that in effecting short

sales in the Hanover Stocks during the period January 20 through January 27, 1995, the Fiero

Respondents were engaged in speculation, not bona fide market making transactions, and were not

entitled to the market maker exemption.

---

[19] The Fiero Respondents rely on In re Richard Hoffman, Initial Decisions Release No. 158, 2000 SEC LEXIS 105 (Jan.
27, 2000), in which an SEC Administrative Law Judge rejected arguments that a respondent's investigative testimony
impeached the credibility of his testimony at the hearing. The circumstances described by the ALJ in that case
differed from those presented here in a number of respects, but most clearly in that the ALJ, having had the

27

2. The Second Stage

Enforcement also contends that the Fiero Respondents violated the affirmative determination

requirements during the second stage of the alleged bear raid, from January 27, after Fiero Brothers

withdrew as a market maker in the Hanover Stocks, through February 24, 1995, when Hanover went

out of business and Fiero Brothers re-registered as a market maker in the Hanover Stocks. During this

period, although it was not registered as a market maker in the Hanover Stocks, Fiero Brothers

engaged in very substantial short selling, leading to a short position in excess of ($3 million) as of

February 23. The Fiero Respondents contend that they made the affirmative determinations required by

Rule 3070 for every short sale they effected during this period. In particular, Fiero testified he relied on

"Hard-to-Borrow" lists issued by Fiero Brothers' clearing firm, Spear, Leeds & Kellogg. (Tr. 1665-

67, 1671-72; CX 142.)

Before turning to the relevant evidence, it is important to understand the applicable standards,

which were evolving. In September 1994, prior to the events giving rise to this proceeding, the SEC

approved an amendment to the NASD's Interpretation Regarding Prompt Receipt and Delivery of

Securities that is currently set forth in Rule 3370(b)(4). The SEC explained that, although the

Interpretation already required NASD member firms to make an affirmative determination that securities

involved in a short sale would be available by settlement date, the Interpretation had not previously

required firms to make and retain any written evidence that they made such a determination. The

amendment, the SEC explained, would cure this by requiring a firm to annotate each short sale, on the

trade ticket or some other record of the firm, with information showing that the firm had made the

---

opportunity to observe the witness' demeanor at the hearing, found the witness credible, while the Panel, having had
the same opportunity in this case, found Fiero's demeanor at the hearing to be evasive and not credible.

required affirmative determination. The SEC also explained that, although the NASD had not specified

a particular manner in which a firm must make the annotation, "the affirmative determination requirement

... applies to each and every transaction [and] a 'blanket' or standing assurance that securities are

available for borrowing is not acceptable to satisfy the requirement, as is evidenced by the duty to

annotate." Exchange Act Release No. 34653, 1994 SEC LEXIS 2859 (Sept. 19, 1994.)

The following month, the NASD distributed Notice to Members 94-80 setting forth the

amended Interpretation. The Notice explained that the NASD had adopted the annotation requirement

in order "to enhance member firm compliance with the affirmative determination requirements ... and to

enable the NASD to more effectively examine for compliance." The Notice advised firms that they

were required "to annotate, on the trade ticket or on some other record maintained for that purpose,

... the identity of the individual and firm contacted who offered assurance that the shares would be

delivered or were available for borrowing by settlement date ...."

As published, the Interpretation stated that "an affirmative determination and annotation of that

affirmative determination must be made for each and every transaction, since a 'blanket' or standing

assurance that securities are available for borrowing is not acceptable to satisfy the affirmative

determination requirement." The Notice explained that, through this provision, "the NASD has made

clear its longstanding policy that firms cannot rely on daily fax sheets of 'borrowable stocks' to satisfy

their affirmative determination requirements ...."

The Notice stated that the annotation requirement would go into effect on November 30, 1994,

but the effective date was later postponed to January 9, 1995. On January 6, 1995, however, the

NASD issued a Special Notice to member firms in which the NASD stepped back, somewhat, from its

earlier rejection of blanket assurances to satisfy the affirmative determination requirement. The Special

Notice allowed firms to "rely on daily fax sheets from their clearing firms as a basis for making their affirmative determinations made in connection with short sales" until August 1, 1995. On January 10, 1995, the SEC published a release confirming the Special Notice. The SEC release stated that one reason for the delay was "the NASD's concern that the prohibition against the use of daily fax sheets and other 'blanket' or standing assurances may have created an unnecessarily burdensome regulatory requirement on NASD members...." 58 S.E.C. Docket 1534, 1995 SEC LEXIS 46 (Jan. 10, 1995). In February 1995, the NASD published a "For Your Information" bulletin for members stating that "members may rely on daily fax sheets and other 'blanket' or standing assurances to satisfy the new annotation requirement until August 1, 1995" (emphasis added).[20]

Applying these standards, the Hearing Panel finds that the Fiero Respondents failed to comply with the affirmative determination requirements in connection with Fiero Brothers' short sales of Hanover Stocks during the period January 27 through February 23, 1995. First, the Hearing Panel rejects Fiero's testimony that he relied on Spear Leeds' Hard-to-Borrow lists. Fiero pointed to no contemporaneous Fiero Brothers records in which he documented his supposed reliance on the lists. His testimony at the hearing that he recalled relying on such lists in connection with every short sale of Hanover Stocks during the relevant period (Tr. 1666-67) was not credible, particularly in light of his investigative testimony in September 1996, more than three years earlier, in which he stated, vaguely: "I

---

[20] The NASD's position regarding a short seller's ability to rely on blanket assurances from its clearing firm to satisfy the affirmative determination requirement continued to evolve after the period at issue in this proceeding. In 1996, the SEC approved a proposal by the NASD that allowed firms to rely on standing assurances that particular securities would be available for borrowing on settlement date – referred to as "Easy to Borrow" lists – to satisfy the member's affirmative determination obligations in certain specifically defined circumstances. More recently, the NASD announced that members may rely on "Hard to Borrow" lists in connection with short sales of Nasdaq National Market or Exchange listed securities in certain specific circumstances, but that for Nasdaq Small Cap and over-the-counter equity securities, members are still prohibited from relying on "Hard to Borrow" lists, although they may continue to rely on "Easy to Borrow" lists that meet certain specific standards. Notice to Members 00-28 (May 2000). The Hearing Panel has not applied these standards because they were not in effect at the relevant time.

believe at that point in time we had Spear Leeds difficult-to-borrow lists. I might have reviewed that. I don't know specifically what I had done." (CX 70 at 3798.)

Fiero's credibility is further undermined by the very lists on which he claims to have relied. The Spear Leeds list for January 23, 1995, for example, included MRJY among securities that were generally unavailable for borrowing, yet Fiero made a short sale of MRJY on January 27, after he had withdrawn as a market maker. (CX 2, Tr. 1852-53.) If, as Fiero testified, he consulted Spear Leeds' list before every short sale, he would have seen MRJY listed. Either he did not consult the list, or he did consult the list, but made the short sale even though MRJY was included. Similarly, Spear Leeds' February 6, 1995 list included APROU among securities that were generally unavailable for borrowing, but Fiero made short sales of APROU on February 7 and 8. (CX 68X.) Spear Leeds also listed "warrants" as generally unavailable for borrowing during the entire relevant period, yet Fiero sold ATOYZ warrants short on February 8 and 13 and sold PLCOW warrants short on February 24. (CX 2.) Again, either Fiero did not consult the lists before making these sales or he did consult the lists, but sold those securities short anyway. In either case, his testimony that he relied on the lists is not credible.

The Hearing Panel concludes that, like much of his self-serving hearing testimony, Fiero concocted his "reliance" on the Hard-to-Borrow lists prior to the hearing in an effort to justify his conduct. Particularly in light of Fiero's testimony that he viewed buy-ins for failing to deliver securities sold short as "an ordinary course of business" and "pretty much a bookkeeping function" (Tr. 1545), the Hearing Panel finds it probable that Fiero simply ignored his affirmative determination obligations while building very large short positions in the Hanover Stocks during the period from January 27 through February 23.

31

Finally, even if Fiero had relied on the Spear Leeds Hard-to-Borrow lists (which the Hearing Panel found he did not do), his reliance would not have been reasonable or in compliance with the affirmative determination requirements. Although those requirements were evolving during the relevant period, based on the then-current advice from the NASD, the Fiero Respondents were entitled to rely, at most, upon "daily fax sheets" or, perhaps in light of the language in the NASD's February bulletin, on other forms of "'blanket' or other standing assurances" from Spear Leeds. But in any event, the Fiero Respondents were only entitled to rely on positive assurances from Spear Leeds that the Hanover Stocks would be available for borrowing by settlement date.

The Spear Leeds "Hard-to-Borrow" lists, however, contained no "assurances" that the Hanover Stocks would be available to borrow. On the contrary, they purported merely to list specific securities or, as in the case of warrants, types of securities that were "generally 'unavailable' for loan." The Fiero Respondents could not reasonably have concluded from this that Spear Leeds was giving an "assurance" that any of the thousands of other Nasdaq, exchange and over-the-counter securities not on the list would be available for borrowing to cover any short sales. In fact, the very first page of each Spear Leeds list stated: "Please check with stock loan department about availability of a security prior to making a commitment." Yet Fiero did not claim he ever checked with Spear Leeds' stock loan department prior to effecting any short sale in the Hanover Stocks.

At the hearing Fiero testified that, in addition to the Spear Leeds lists, for his affirmative determinations he also relied on assurances from the president of member firm Joseph Roberts & Co., Inc., "that a lot of [the Hanover Stocks] were coming over" to Roberts and would be available from Roberts to fill Fiero Brothers' short sales. According to Fiero, Roberts expected these Hanover Stocks would appear as long positions in the accounts of customers of former Hanover representatives who

32

had been hired by Roberts. To support Fiero's testimony, the Fiero Respondents offered FB 49, a letter from Roberts to Fiero dated May 11, 1995, months after the events in question, confirming that "in January and February of this year" Roberts told Fiero it expected to have enough Hanover Stocks to fill Fiero Brothers' short positions once customers of the former Hanover representatives transferred their accounts to Roberts. According to the letter, Roberts was unable to live up to this assurance because Adler Coleman's failure prevented the transfer of the accounts. (Tr. 1667-69; FB 49.)

The Hearing Panel rejects the Fiero Respondents' alleged reliance on assurances from Roberts to satisfy their affirmative determination obligations. First, the Hearing Panel does not believe Fiero's testimony. He admits he never mentioned Roberts' alleged assurances during his investigative testimony (Tr. 1799-1800), and the letter from Roberts confirming the assurances is dated months after the short sales in question.

More important, if they received and wanted to rely on such assurances, the Fiero Respondents were required "to annotate, on the trade ticket or on some other record maintained for that purpose ... the identity of the individual and firm contacted who offered assurance that the shares would be delivered or were available for borrowing by settlement date" at the time of the short sales. Fiero admits he did not make any such annotations. (Tr. 1801-02.) The annotation requirement was adopted precisely in order "to enable the NASD to more effectively examine for compliance" with the short sale rule. If the Hearing Panel were to accept Fiero's claimed reliance on Roberts' assurances in the absence of any contemporaneous annotations, it would directly undermine the purpose of the annotation requirement. Finally, even if the Hearing Panel believed Fiero and was willing to ignore the annotation requirement, Roberts' vague assurance "in January or February" that it expected to receive the accounts of some customers with long positions in the Hanover Stocks would not have satisfied the requirement

33

that, for each short sale, the Fiero Respondents affirmatively determine that Fiero Brothers could "borrow the securities or otherwise provide for delivery of the securities by settlement date."

Therefore, the Hearing Panel finds that the Fiero Respondents violated Rule 3370(b)(2)(B) in connection with the short sales of Hanover Stocks during both the period January 20 through 26, when Fiero Brothers was registered as a market maker, and during the period January 27 through February 23, when it was not registered as a market maker.[21]

B. Extortion

In Aspen Capital Group, which concerned the actions of Carlson, who Enforcement contends was also involved in the alleged bear raid in this case, the NBCC held that it is a violation of Rule 2110 for a member firm or an associated person to attempt to obtain stock at below-market prices through the use of threats and coercion. Enforcement contends that in a similar manner the Fiero Respondents took part in a scheme to extort large blocks of the Hanover Stocks from Hanover, in violation of Rule 2110.

There is no dispute that the Fiero Respondents purchased large blocks of the Hanover Stocks from Hanover on January 25 and 26, 1995, at discount prices, used the blocks to cover Fiero Brothers' short positions, and resold the rest almost immediately to Falcon, Brod (for the Roddy DiPrimo account) and others who held substantial short positions in the Hanover Stocks. Fiero testified that in undertaking these purchases and resales he was acting as a "broker" between Hanover and the

---

[21] Fiero Brothers re-registered as a market maker in the Hanover Stocks on February 24 and continued shorting the Hanover Stocks. Enforcement contends that these short sales also violated the Rule because they were not bona fide market making transactions. Enforcement's arguments appear to have merit. On February 24, Fiero Brothers increased its aggregate short position in Hanover Stocks from (272,500) securities to (443,891) securities, and increased its position on the next trading day, February 27, to (619,621) securities. (CX 2.) This trading appears on its face to be pure speculation, not market making. But these transactions were barely addressed by the parties and,

short-sellers. (Tr. 1580-82.) The Fiero Respondents contend, however, that this "brokerage" was

legitimate market activity, not the culmination of an extortion scheme.

The primary difficulty for the Hearing Panel in evaluating the competing contentions of the

parties was that none of the key witnesses who offered first-hand testimony regarding the relevant

events was inherently credible as a witness. Moran, Enforcement's chief witness, has been convicted of

securities fraud and has been barred from the industry. Having observed Moran at the hearing, the

Hearing Panel concluded that Moran might lie about anything if it furthered his purpose. Enforcement

also relies on the testimony of Catoggio, who is also a convicted, incarcerated felon. The Hearing Panel

did not have an opportunity to observe Catoggio, but having reviewed his testimony and heard much

about Catoggio from the various witnesses, the Hearing Panel concluded that Catoggio would also

probably lie if it suited his purpose.[22]

On the other hand, Fiero's testimony also lacked credibility in light of his prior testimony.

Furthermore, the Hearing Panel found Fiero's testimony at the hearing unconvincing for other reasons.

Most of his self-serving direct testimony appeared carefully rehearsed. His newly refreshed recollection

was strangely selective, and in response to cross-examination and to questions from the Hearing Panel,

he appeared deliberately evasive, particularly with regard to his relationship and communications with

---

in light of its findings regarding Fiero Brothers' short selling during the earlier periods, the Hearing Panel finds it
unnecessary to rest this Decision on the Fiero Respondents' short sales activities after February 23.
[22] The Fiero Respondents argue that the Hearing Panel should disregard all of Catoggio's testimony because they
had no opportunity to cross examine him during his investigative testimony, and he refused to answer their
questions, claiming Fifth Amendment protection, during a subsequent deposition in litigation involving the SIPC
trustee. Although the Hearing Panel could have rejected all of Catoggio's testimony under these circumstances, it
was not required to do so. Instead, the Hearing Panel carefully evaluated his testimony, found that in certain
respects it was consistent with the testimony of other witnesses (including Fiero's), with documentary or other
objective evidence, or is otherwise credible, and therefore credited his testimony in those respects.

35

Gurian and other participants in the alleged bear raid. Finally, his testimony was inconsistent with certain objective evidence, as described below.

Although the witnesses with first-hand knowledge of the critical facts were not individually credible in all respects, that is hardly an unusual circumstance in the hearing process. The Panel did not simply disregard all of Moran's and Catoggio's testimony because they might lie. Instead, the Panel evaluated their testimony, as well as Fiero's, cautiously. The Hearing Panel considered the internal consistency of the testimony of each witness and compared the testimony of the various witnesses; compared the testimony with various documents and other objective evidence; and applied the Panelists' experience and knowledge of the industry to test the credibility of conflicting evidence. As in most cases, this allowed the Hearing Panel to reach conclusions about the relevant facts based on a preponderance of the evidence.[23]

The Hearing Panel finds that a preponderance of the evidence establishes that Gurian engaged in a scheme to extort below-market Hanover Stock from Hanover through threats and coercion. The Hearing Panel finds that Gurian controlled or coordinated the short selling of Falcon, Sovereign, DiPrimo and others, as set forth above, through which they established large short positions in the Hanover Securities during the period leading up to January 26, 1995. Then, while denying his involvement in the short selling, Gurian negotiated an agreement with Hanover for Hanover to provide Hanover Securities to short sellers at a discount in exchange for the short sellers' agreement to stop their activities and, where applicable, to withdraw as market makers in the Hanover Stocks.

---

[23] The Hearing Panel rejects the Fiero Respondents' contention that Enforcement is required to prove its case by "clear and convincing evidence." On the contrary, the Hearing Panel finds that "preponderance of the evidence" is the correct legal standard. Seaton v. SEC, 670 F.2d 309, 311 (D.C. Cir. 1982); District Business Conduct Committee for District No. 10 v. Bruno, Complaint No. C10970007, 1998 NASD Discip. LEXIS 51 (NAC July 8, 1998).

36

The Hearing Panel finds that these facts are supported by reasonably consistent testimony of
Moran and Catoggio and by objective evidence regarding trading in the Hanover Stocks. They are also
supported by evidence showing Gurian's continued improper involvement in the activities of Falcon and
Sovereign, including Fiero's own testimony in that regard, and by evidence tying Gurian to the other
alleged participants in the bear raid. Indeed, there is no credible contrary evidence in the record.

The critical question for this proceeding, however, is not whether Gurian (who is not a
respondent) extorted Hanover Stocks, but whether the Fiero Respondents were participants in his
extortion scheme. There is no evidence that the Fiero Respondents made any threats or applied any
direct coercion to Hanover. Enforcement contends, however, that the Fiero Respondents' short sales,
beginning with the Dorfman report on January 20, were coordinated with those of the other participants
in the alleged bear raid, in anticipation of the extortion that later occurred.

There is no testimony that would establish that the Fiero Respondents joined in an extortion plot
at such an early date. Enforcement asks the Hearing Panel to infer that this occurred based primarily on
parallel short selling activity. The Hearing Panel agrees that those activities are suspicious, but is
unwilling to rest a conclusion that the Fiero Respondents joined in a planned extortion on such limited
evidence.

Enforcement also relies on telephone records of Fiero Brothers, Falcon, Aspen, Carlson and
Gurian, among others, that Enforcement introduced at the hearing. (CX 191-211.) Enforcement
attached a detailed analysis of those records, covering the period December 29, 1994 through April 19,
1995, to its post-hearing submission. That analysis shows very frequent communications among Gurian
or Falcon, Carlson and the Fiero Respondents during the relevant period leading up to Fiero's block

37

purchases from Hanover on January 26 and 27.[24] As the Fiero Respondents point out, the records do

not establish the purpose of the calls or what the participants said, but the Hearing Panel found the

timing and frequency of the calls to be extremely troubling, and found that the Fiero Respondents'

involvement in these calls seriously undermined Fiero's credibility in many respects.[25] Nevertheless, the

Hearing Panel was also unwilling to infer that the Fiero Respondents participated in a planned extortion

as of January 20 based solely on equivocal telephone records.

The Hearing Panel did conclude, however, that the Fiero Respondents joined in the extortion

scheme as of the period January 25 through 27, when Fiero adopted the role of "broker" to effect the

discounted purchases from Hanover and resales to Falcon, DiPrimo and the other short sellers. The

Fiero Respondents do not dispute that they effected these trades, through which, the Hearing Panel

concludes, the extortion was consummated. Instead, they contend that they were unaware of, and

uninvolved in, any extortion scheme. The Hearing Panel rejects this contention. Based on a

preponderance of the evidence, the Hearing Panel finds that the Fiero Respondents, by soliciting Moran

to persuade Hanover to broker the consummation of the extortion through them and by purchasing the

---

[24] For example, Enforcement's analysis shows that communications among Gurian and Falcon, Carlson and the Fiero Respondents increased dramatically beginning on January 20, the day Dorfman broadcast his report on the Hanover Stocks. Calls between Falcon and Carlson began shortly after midnight, and, during the morning hours before the Dorfman report, the records show Carlson calling Dorfman repeatedly, interspersed with calls to and from Falcon. The records also show suspicious communications involving the Fiero Respondents. Carlson called Falcon at 10:06; Falcon called Fiero Brothers at 10:07. Immediately after another series of calls among Carlson, Dorfman and Falcon, Falcon called Fiero Brothers at 11:24, then immediately called Carlson at 11:28, following which Carlson called Fiero Brothers again, at 11:35, then called Falcon again, at 11:43. A series of calls ensued from Falcon to Carlson and Fiero Brothers and from Carlson to Falcon and Fiero Brothers during the period leading up to the actual broadcast at approximately 12:30 p.m. The calls continued for the balance of the day. Overall, the telephone records show 75 calls on January 20 among Falcon (or Gurian), Carlson, Dorfman and Fiero Brothers. Fiero Brothers was involved in 38 of these calls, in each case as the recipient of the call.

[25] For example, the sequence and timing of calls among Fiero, Falcon and Carlson on January 20 shortly before the Dorfman report was broadcast makes Fiero's testimony that he was completely unaware that the report was coming unbelievable.

38

blocks of Hanover Stocks and reselling them to the other short sellers, knowingly took part in Gurian's scheme to extort those securities from Hanover.

First, Moran and Catoggio provided testimony regarding certain critical events that was reasonably consistent and, in light of other evidence in the record, was also reasonably credible. According to Moran, when Fiero called him on January 25, Fiero knew about the planned arrangement with the short sellers and wanted to displace Carlson as the "broker" of the deal. Moran also testified that during the call, Fiero represented that a person involved with Mitchum Jones was at the heart of the short selling, but that Mitchum Jones would withdraw as a market maker if the deal was consummated. According to Catoggio, it was Gurian who suggested Fiero as the "broker," and when Fiero placed orders for the Hanover Stocks on January 26 and 27, Fiero offered the terms Catoggio had agreed on with Gurian. Catoggio's testimony that he capitulated to Gurian's demands and agreed to sell blocks of Hanover Stocks at pre-determined below-market prices in a desperate attempt to save Hanover is also consistent with the objective evidence. Moreover, Catoggio began offering reasonably consistent testimony on these events on February 8, 1995, just days after consummation of the block sales to Fiero Brothers, when he was interviewed by the SEC. (CX 97.)

In contrast, Fiero's testimony at the hearing was plainly inconsistent with his earlier investigative testimony and was not credible in many respects. According to Fiero, he just happened on information that Moran was looking to sell large blocks of Hanover Stocks at discount prices; had no idea that those stocks were being offered in response to threats from others who had been engaged in massive short selling of the Hanover Stocks; had no knowledge who those short sellers were until Moran identified them; had no agreement with Hanover regarding the prices Hanover would charge, but was nevertheless able to purchase nearly a million securities for nearly $900,000 below the inside bid

without any negotiation; had no firm commitments from the other short sellers to purchase the Hanover

Stocks from him, but nevertheless committed more than the entire net worth of his firm to purchase

securities that he thought had been manipulated to unwarranted prices by Hanover and knew were

under enormous short selling pressure; and, in spite of having no commitments from purchasers, was

able to resell the Hanover Stocks he did not need almost immediately, with no negotiation, to the other

short sellers. The Hearing Panel finds this tale, which Fiero was unable or unwilling to articulate in his

investigative testimony, completely unconvincing.

Fiero's story is also seriously undermined by Enforcement's analysis of the telephone records.

As explained above, the Hearing Panel did not find that the calls in themselves proved that the Fiero

Respondents agreed to take part in an extortion scheme, but the call records are inconsistent with

Fiero's story and support Moran's and Catoggio's version of the relevant events, as well as

Enforcement's theory that Fiero's actions were carefully coordinated with Gurian.

Fiero and Moran agreed that Fiero called Moran on the night of January 25 to suggest that

Fiero broker the block sales. Fiero, however, testified he had no preexisting arrangements to resell

those securities and no arrangement with Mitchum Jones to drop out as a market maker when the sales

were completed. The telephone records for January 25, however, show more than 50 calls among

Fiero, Gurian, Falcon and Carlson, with Fiero involved in more than 40 of those calls. Until January 25,

Fiero initiated very few of the calls cited by Enforcement, but this changed abruptly at 9:13 p.m. that

evening. Between 9:13 and 9:51 p.m., Fiero called Glen Vittor, then called Gurian; after a call from

Falcon to Carlson, Fiero called Glen Vittor and then Gurian again.

After these calls, at 11:10 p.m., Fiero called Moran and spoke to him for more than eight

minutes. Fiero immediately called Hoffman, the Mitchum Jones trader, then called Gurian four times

between 11:23 p.m. and 12:02 a.m. on January 26, before calling Hoffman again for 40 minutes. The

calls to Hoffman are particularly significant in light of Moran's testimony, and Fiero's denial, that Fiero

told him an individual (not Hoffman) at Mitchum Jones was behind the short selling of the Hanover

Stocks, and that Mitchum Jones would withdraw as a market maker after Fiero completed the purchase

and resale of the Hanover Stocks. In fact, Mitchum Jones did withdraw as a market maker on January

26.[26]

The telephone records for January 26 and 27, the days on which Fiero completed the

purchases and resales of the Hanover Stock, are also consistent with Moran's testimony that, in effect,

Carlson was excluded from participating in the consummation of the extortion scheme at the last

minute.[27] On January 26, Carlson began the day with a 7:58 a.m. call to Falcon, and made four more

calls to Falcon or Gurian by 9:42 a.m. Carlson made another series of eight calls to Falcon and Fiero

between 10:05 a.m. and 11:00 a.m., and made 24 more calls to Falcon and Fiero between 11:00 a.m.

and the end of the trading day. Carlson's firm, Aspen, was short (44,250) Hanover Stocks, with an

approximate value of ($701,000) as of January 26, but the firm did not participate in any of the Fiero

Respondents' resales of the Hanover Stocks. (CX 6.)

---

[26] During his investigative testimony, Fiero claimed he could barely remember Hoffman's name (CX 69 at 3697), and during his testimony at the hearing Fiero described his relationship with Hoffman as "business." (Tr. 1823.) Enforcement's analysis, however, shows that Fiero had regular, lengthy late-night conversations with Hoffman during the relevant period. For example, Fiero called Hoffman at 10:11 p.m. on January 17 and they talked for 33 minutes; he called Hoffman at 10:40 p.m. on January 18 and they talked for 19 minutes; he called Hoffman three times on January 23 between 9:08 and 9:44 p.m. and they talked for a total of more than 30 minutes (Fiero spoke to Gurian between his calls to Hoffman and called Gurian twice shortly after his last conversation with Hoffman).

[27] Although Moran and Fiero both testified that various people did not like Carlson, another reason for excluding him from the transaction may have been that he and his firm were already the subjects of the NASD charges of attempting to obtain stock at below market prices through threats and coercion that eventually led to the NBCC decision in Aspen Capital Group.

In addition, on January 26, Falcon or Gurian called Fiero 24 times, beginning at 9:58 a.m. and continuing until 8:56 p.m., and Fiero called Gurian at 10:33 p.m. This number of calls is far in excess of what would have been needed if, as Fiero testified, he merely obtained expressions of interest in the morning, and then after he purchased the Hanover Stocks he "call[ed the firms that had expressed interest, and said] sold you XYZ at X price. That would be it."[28]

Based on this evidence, the Hearing Panel finds that, in effecting the purchases and resales of discounted Hanover Stock, the Fiero Respondents knowingly participated in Gurian's extortion scheme, in violation of Rule 2110.

C. Manipulation

Having found that the Fiero Respondents engaged in substantial short selling of the Hanover Stocks without complying with their affirmative determination obligations and that they took part in a scheme to extort below-market stock from Hanover through the use of threats and coercion, the Hearing Panel also concluded that by employing those tactics, the Fiero Respondents manipulated the market for those securities in violation of Section 10(b) of the Exchange Act, SEC Rule 10b-5, and NASD Rules 2120 and 2110.

"Manipulation is the deceptive movement of a security's price, accomplished by an intentional interference with the forces of supply and demand." In re Patten Securities Corp., Exchange Act Release No. 32619, 54 S.E.C. Docket 1126, 1993 SEC LEXIS 1762 (July 12, 1993) (footnotes omitted). The SEC has explained that "investors and prospective investors ... are ... entitled to assume that the prices they pay and receive are determined by the unimpeded interaction of real supply and real

---

[28] On January 27, the pace of the calls slowed dramatically. Falcon called Fiero seven times between 10:35 a.m. and 12:31 p.m., but did not call Fiero again that day. Fiero concluded the last of his purchases from Hanover and resales

demand so that those prices are the collective marketplace judgments that they purport to be." In re Edward J. Mawod & Co., 46 S.E.C. 865, 871-72 (1977), aff'd, 591 F.2d 588 (10th Cir. 1979).

Turning first to the extortion, the Hearing Panel finds that the Fiero Respondents' purchase and resale of discounted Hanover Stock on January 26 and 27 was not based on the unimpaired interaction of real supply and demand for those securities. On the contrary, the Fiero Respondents' purchases were based on pre-determined prices arrived at through coercion, with the promise that the recipients of the discounted securities would refrain from short selling and would withdraw as market makers, rather than through the legitimate operation of supply and demand. The Fiero Respondents effected these purchases and resales through publicly reporting trading systems without disclosing that the transactions were based on coercion, not marketplace judgments. "Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." United States v. Charnay, 537 F.2d 341, 351 (9th Cir.), cert. denied, 429 U.S. 1000 (1976).

The Fiero Respondents were charged with primary liability for these violations, not with aiding and abetting the violations of others. "[A] primary violator is one who 'participated in the fraudulent scheme' or other activity proscribed by the securities laws." Such participation may include "effecting the very buy and sell orders that artificially manipulated" the price of the Hanover Stocks. SEC v. U.S. Environmental, Inc., 155 F.3d 107, 111, 112 (2d Cir. 1998). That was precisely the role assumed by the Fiero Respondents in this case. Therefore, the Hearing Panel finds that the Fiero Respondents were properly charged.

The manipulation through extortion employed by the Fiero Respondents and others in this case does not squarely follow the pattern of any other manipulation cited by the parties, but the Hearing

---

to the short sellers that morning of January 27 by 11:15 a.m. (CX 2.)

Panel does not find that an obstacle to holding the Fiero Respondents liable. "In enacting section 10(b) [of the Exchange Act], 'Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices.'" United States v. Regan, 937 F.2d 823, 829 (2d Cir. 1991), quoting Santa Fe Industries v. Green, 430 U.S. 462, 477 (1977).

The Hearing Panel also finds that the Fiero Respondents' naked short selling in this case was manipulative, even if it was not coordinated with other participants in the alleged bear raid. The Fiero Respondents rely heavily on Sullivan & Long, Inc. v. Scattered Corp., 47 F.3d 857 (7th Cir. 1995), in which the court described the naked short selling of certain securities as "informational" trading. The court explained that the sellers in that case had recognized that the market price for the securities was irrationally high, based on publicly available information, and described the short selling as "not market manipulation, but arbitrage." In so holding, the Court noted that, at the time, the exchange on which the short sales were effected did not have an affirmative determination requirement that prohibited naked short selling.

The circumstances here are different in critical respects. Most notably, the NASD had an affirmative determination requirement at the relevant time, and the Hearing Panel found that the Fiero Respondents did not comply with it. In addition, the preponderance of the evidence establishes that the Fiero Respondents were not engaged in the sort of informational short selling cited with approval in Sullivan & Long. On the contrary, the Hearing Panel finds that the Fiero Respondents, along with the other participants in the bear raid, concluded that the Hanover Stocks were vulnerable because Hanover had fraudulently manipulated their prices to unjustifiable levels, and applied short selling pressure in order to extract, through threats and coercion, a portion of the excessive market value of the

44

Hanover Stocks. And in the second stage, the Fiero Respondents and the other short sellers increased

their naked short selling pressure, leading to Hanover's failure, in an effort to obtain even more of

Hanover's gains from the fraudulent manipulation of the Hanover Stocks. Rather than "arbitrage," these

short selling activities can best be described as "blackmail." And, like other forms of blackmail, they

were unlawful regardless whether Hanover was engaged in a fraudulent market manipulation of its own.

See Regan, 937 F.2d at 829.

Therefore, the Hearing Panel finds that the Fiero Respondents manipulated the market for the

Hanover Stocks in violation of Section 10(b) of the Exchange Act, SEC Rule 10b-5, and NASD Rules

2120 and 2110.[29]

## IV. Sanctions

As sanctions for these violations, Enforcement requests that Fiero Brothers be expelled from

NASD membership, that Fiero be barred from associating with any member firm, and that the Fiero

Respondents be ordered to pay a substantial fine, which should include disgorgement of their profits.

The Sanction Guidelines for Short Sale Violations, which include violations of the affirmative

determination requirements, recommend that adjudicators impose a fine of $1,000 to $2,000 for a first

violation and, in egregious cases, consider expelling the responsible firm and barring the responsible

individual. NASD Sanction Guidelines at 58 (1998 ed.). There are no Guidelines directly applicable to

the extortion charge, but in somewhat similar circumstances in Aspen Capital the NBCC barred Carlson

---

[29] The Hearing Panel finds that all of the elements required to establish violations of these provisions are supported
by a preponderance of the evidence. The transactions were effected through an instrumentality of interstate
commerce, involved manipulative or deceptive devices or contrivances, as described above, and the Fiero
Respondents acted with scienter, because they knowingly participated in the extortion scheme and intended to
employ naked short sales to fraudulently manipulate the market for the Hanover Stocks.

(the firm was no longer in existence) and imposed a substantial fine on him. There are also no Sanction

Guidelines directly applicable to the fraudulent manipulation charge. The most analogous Guidelines

address other types of fraud, involving the intentional or reckless misrepresentations of material facts.

For that type of fraud, the Guidelines recommend, in egregious cases, that adjudicators impose fines of

$10,000 to $100,000, plus the amount of any unjust gains, and consider expelling the member firm and

barring the responsible individual. Sanction Guidelines at 80.

The Hearing Panel concludes that, because the violations in this case are so closely interrelated,

sanctions should be imposed on the violations as a whole, not individually. The Hearing Panel also

concludes that this is an egregious case. The Fiero Respondents employed more than 300 naked short

sales over a period of more than a month, and cooperated with others to extort below-market securities

from Hanover through the use of threats and promises, in order to achieve their goals. Ultimately, their

short sales, along with others, drove Hanover and its clearing firm out of business, leading to

appointment of a SIPC receiver.

The "general considerations" set forth in the Guidelines weigh heavily in favor of sanctions at the

very top of the recommendations. The Fiero Respondents have never acknowledged any responsibility

for their actions; they engaged in their misconduct over a lengthy period; the misconduct was intentional;

and the misconduct resulted in substantial gains for the Fiero Respondents and substantial injury to the

investing public. Sanction Guidelines at 8-9.

Under these circumstances, the Hearing Panel agrees with Enforcement that, in order to

accomplish the NASD's remedial goals, Fiero Brothers must be expelled from membership and Fiero

must be barred. The Hearing Panel also agrees that a substantial fine, which should require the Fiero

46

Respondents to disgorge their gains from their misconduct, is appropriate. The evidence indicates that

the Fiero Respondents' gains from the first stage of the bear raid, ending with their block purchases and

resales of Hanover Stocks, were approximately $550,000. Their gains from the second stage, which

led to Hanover's failure, are not quantifiable based on the evidence in the record, in light of the SIPC

Trustee's buy-in and the subsequent litigation. The Hearing Panel notes, however, that Fiero claimed

that the SIPC trustee's buy-in threatened to cost the Fiero Respondents $3 million in gains they would

otherwise have realized through short selling of the Hanover Stocks. (Tr. 1760-61; CX 68JJ.) In light

of this evidence, the Hearing Panel concludes that a fine of $1 million is required to achieve the NASD's

remedial goals in this case.

## V. Conclusion

Therefore, the Hearing Panel orders that respondent Fiero Brothers, Inc. be expelled from

membership in the NASD; that respondent John Fiero be barred from associating with any member firm

in any capacity; and that the Fiero Respondents, jointly and severally, be fined $1 million and ordered to

pay costs in the amount of $10,809.25, which includes an administrative fee of $750 and hearing

transcript costs of $10,059.25.

These sanctions shall become effective on a date set by the Association, except that the

expulsion and bar shall become effective immediately upon this Decision becoming the final disciplinary

action of the Association. [30]

**HEARING PANEL**

By:    David M. FitzGerald
       Deputy Chief Hearing Officer

Copies to:

H. Thomas Fehn, Esq. (via first class mail)
Martin H. Kaplan, Esq. (via facsimile and first class mail)
Martin P. Russo, Esq.        (via facsimile and first class mail)
Rory C. Flynn, Esq.          (via electronic and first class mail)
Robert L. Furst, Esq.        (via electronic and first class mail)
John Fiero                   (via overnight and first class mail)
Fiero Brothers, Inc.         (via overnight and first class mail)

---

[30] The Hearing Panel considered all of the arguments of the parties. They are rejected or sustained to the extent they are inconsistent or in accord with the views expressed herein.